# 12-2909-cv(L),
## 12-2912-cv(CON), 12-3619-cv(CON), 12-3621-cv(CON)

# United States Court of Appeals
## for the
# Second Circuit

◆◖◗◆

SANDRA C. BARKLEY, aka SANDRA C. BARKLAY,

*Plaintiff-Counter Defendant-Cross Defendant-Appellee,*

– v. –

OLYMPIA MORTGAGE COMPANY,

*Defendant-Counter Claimant-Cross Defendant,*

*(For Continuation of Caption See Reverse Side of Cover)*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

# BRIEF FOR DEFENDANT-CROSS DEFENDANT-CROSS CLAIMANT-APPELLANT YARON HERSHCO

OVED & OVED LLP
*Attorneys for Defendant-Cross
    Defendant-Cross Claimant-Appellant
    Yaron Hershco*
401 Greenwich Street
New York, New York 10013
(212) 226-2376

---

THOMAS MESSINA, DLJ MORTGAGE CAPITAL LLC,

*Defendants-Cross Defendants-Cross Claimants*,

ALLIANCE MORTGAGE CORPORATION, dba Everyhome Mortgage Company, WILSHIRE CREDIT CORPORATION, FEDERAL NATIONAL MORTGAGE ASSOCIATION, XYZ CORPORATION (Said name being fictitious, it being the intention of Plaintiff to designate any corporation having a legal interest in Plaintiff's mortgages), JP MORGAN CHASE BANK, as Trustee for the Home Equity Trust Series 2003-3 substituted as deft for Wilshire Credit Corporation and XYZ Corporation, MICHAEL B. CHEATHAM, CREDIT SUISSE FIRST BOSTON LLC, CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES, INC., BENJAMIN TURNER,

*Defendants-Cross Defendants*,

MICHAEL MASCIALE, CERTILMAN BALIN ADLER & HYMAN, LLP,

*Defendants,*

UNITED PROPERTY GROUP, LLC, UNITED HOMES, LLC, GALIT NETWORK, LLC, YARON HERSHCO,

*Defendants-Cross Defendants-Cross Claimants-Appellants.*

---

# **TABLE OF CONTENTS**

**Page**

JURISDICTIONAL STATEMENT

   A.  Basis for Subject Matter Jurisdiction in the District Court ............... 1

   B.  Basis for this Court's Appellate Jurisdiction .................................... 1

   C.  The Appeal is Timely ........................................................................ 2

STATEMENT OF ISSUES FOR REVIEW ................................................ 3

STATEMENT OF THE CASE .................................................................... 5

STATEMENT OF FACTS

   A.  The Six Home Sales At Issue In The Litigation ................................ 7

       i.    Appellees Rodney and Silvia Gibbons Purchase
            1148 Halsey Street ..................................................................... 7

       ii.   Appellee Mary Lodge Purchases 249 Halsey Street ................. 8

       iii.  Appellee Dewitt Mathis Purchases 21 Marconi Place ............... 10

       iv.  Appellees Lisa and Miles McDale Purchase
            2126 Union Street ...................................................................... 11

       v.    Appellee Charlene Washington Purchases 2422 Dean Street .... 13

       vi.  Appellee Sandra Barkley Purchases 557 Hancock Street .......... 15

   B.  The Lawsuits Filed By Appellees ..................................................... 17

   C.  Pretrial Proceedings .......................................................................... 20

   i.    The District Court Denies The Motions To Dismiss To Provide
       Appellees An Opportunity To Substantiate Their Conclusory
       Allegations Through Discovery .......................................................... 20

   ii.  Discovery Yielded No Evidence To Support Appellees'
       Conclusory Allegations Against Hershco ......................................... 21

iii.  The Trial Further Confirmed That Hershco Had No Involvement In The Transactions And Did Not Operate The United Homes Entities Conduct Personal, Rather Than Corporate, Business........................ 23

    a.  The District Court's Improper Denial of Hershco's Motion for A Directed Verdict ............................................................ 28

    b.  The Jury Verdict ...................................................................... 29

    c.  The District Court's Improper Denial of Hershco's Motion for Judgment as a Matter of Law ........................................... 29

SUMMARY OF ARGUMENT .................................................... 31

ARGUMENT

POINT I

THE JUDGMENT MUST BE REVERSED AND JUDGMENT MUST BE ENTERED IN HERSHCO'S FAVOR .................................. 31

A.  Standard of Review........................................................... 31

B.  No Reasonable Juror Could Have Found Hershco Personally Liable For Fraud ..................................................... 32

    (1)  No Evidence Was Offered At Trial Demonstrating That Hershco Made a Misrepresentation to Any of the Appellees..... 33

    (2)  Because There Was No Evidence of Misrepresentations by Hershco, No Reasonable Juror Could Have Found The Remaining Elements For A Valid Fraud Claim Were Established at Trial .................................................... 38

C.  No Reasonable Juror Could Have Found A Legally Sufficient Evidentiary Basis To Hold Hershco Personally Liable for Violating NY GBL § 349................................................................... 39

D.  No Reasonable Juror Could Have Found A Legally Sufficient Evidentiary Basis To Hold Hershco Personally Liable for Conspiracy to Commit Fraud ........................................... 41

E.  No Reasonable Juror Could Have Found A Legally Sufficient
     Evidentiary Basis To Pierce the Corporate Veil and Hold Hershco
     Liable As The Alter Ego of the United Homes Entities ....................   42

     (1)  Hershco Did Not Utilize the United Homes Entities as a
          "Dummy" to Conduct His Personal Business.......................   43

     (2)  No Reasonable Fact Finder Could Have Found That The
          United Homes Entities Corporate Form Was The
          Proximate Cause of Appellees' Alleged Injury ...................   48

F.  Because Hershco Could Not Be Liable to Appellees as a Matter of
     Law, Hershco Should Not Be Required To Pay Any Damages........   50

POINT II

     HERSHCO JOINS IN THE ARGUMENTS RAISED
     BY THE UNITED HOMES ENTITIES ..................................................   51

CONCLUSION ..........................................................................................   52

CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)(7) .....................   53

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*Bartle v. Home Owners Coop*, 309 N.Y. 103 (N.Y. 1955)........................... 42

*Dist. Council NO. 9 v. APC Painting, Inc.*, 272 F.Supp.2d 229
    (S.D.N.Y. 2003)................................................................... 50

*Electronic Switching Industries, Inc. v. Faradyne Electronics Corp.*,
    833 F.2d 418 (2d Cir. 1987) ....................................... 48

*Enercomp, Inc. v. McCorhill Publishing, Inc.*, 873 F.2d 536
    (2d Cir. 1989) ...................................................... 32

*Freeman v. Complex Computing Co., Inc.,* 119 F.3d 1044
    (2d Cir. 1997) ...................................................... 43

*Freeman v. Complex Computing Company*,
    119 F.3d 1044 (2d Cir. 1997) ................................. 48

*Gartner v. Snyder*, 607 F.2d 582 (2d Cir. 1979).......................................... 44, 46

*Jocks v. Tavernier*, 316 F.3d 128 (2d Cir. 2003) ........................................ 31

*JSC Foreign Econ. Ass'mn Technostroyexport v. International Dev.
    & Trade Servs., Inc.*, 295 F.Supp.2d 366 (S.D.N.Y. 2003) ..................... 49

*Marine Midland Bank v. John E. Russo Produce Co.*, 50 N.Y.2d 31
    (N.Y. 1980)............................................................ 33, 36

*Maurizio v. Goldsmith*, 230 F.3d 518 (2d Cir. 2000) ................................. 39

*McCarthy v. NY City Tech. College of CUNY*, 202 F.3d 161
    (2d Cir. 2000) ...................................................... 31

*Meisel v. Grunberg*, 651 F.Supp.2d 98 (S.D.N.Y. 2009) ........................... 41

*Morris v. New York State Dep't of Taxation and Fin.*,
    82 N.Y.2d 135 (1993)............................................... 48

*New Eng. Ins. Co. v. Healthcare Underwriters Mut. Iins. Co.*,
  295 F.3d 232 (2d Cir. 2002) ........................................................ 31-32

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*,
  85 N.Y.2d 20 (N.Y. 1995) ............................................................ 39

*Port Chester Electrical Construction Corp. v. Atlas*, 40 N.Y.2d 652
  (N.Y. 1976) .................................................................................... 43-44

*Premium Mortgage Corp. v. Equifax, Inc.*, 583 F.3d 103
  (2d Cir. 2009) ............................................................................... 33

*Rolls-Royce Motor Cars, Inc. v. Schudroff*, 929 F. Supp. 117
  (S.D.N.Y. 1996) ............................................................................ 50

*Sir Speedy, Inc. v. L&P Graphics, Inc.*, 957 F.2d 1033
  (2d Cir. 1992) ............................................................................... 31

*Walkovsky v. Carlton*, 18 N.Y.2d 414 (N.Y. 1966) ................................... 44, 45

*William Wrigley Jr. Company v. Waters*, 890 F.2d 594
  (2d Cir. 1989) ............................................................................... 42, 43

*Zellner v. Summerlin*, 494 F.3d 344 (2d Cir. 2007) .................................. 32

**Statutes:**

28 U.S.C. § 1291 ......................................................................... 1

28 U.S.C. § 1331 ......................................................................... 1

28 U.S.C. § 1343 ......................................................................... 1

42 U.S.C. § 1981 ......................................................................... 1, 18

42 U.S.C. § 1982 ......................................................................... 1, 18

42 U.S.C. § 1985 ......................................................................... 1, 18

42 U.S.C. § 3604 ......................................................................... 1, 18

42 U.S.C. § 3605 ......................................................................... 1, 18

NY GBL § 349 ........................................................................... *passim*

28 U.S.C. § 1367 ........................................................................... 1

FRCP 50(b) .................................................................................... 2

FRAP 4(a)(4) .................................................................................. 2

FRAP 4(a)(1)(A) ............................................................................ 2

FRCP 50(a) .................................................................................... 28

# JURISDICTIONAL STATEMENT

## A. Basis for Subject Matter Jurisdiction in the District Court

Subject matter jurisdiction in the district court was premised upon federal question jurisdiction pursuant to 28 U.S.C. § 1331 and upon the District Court's original jurisdiction over civil rights claims brought pursuant to 28 U.S.C. § 1343. Appellees' alleged claims against Appellant Yaron Hershco ("Hershco" or "Appellant") and the other defendants under the Fair Housing Act, 42 U.S.C. §§ 3604, 3605 and for the alleged violation of Appellees' civil rights under 42 U.S.C. §§ 1981, 1982, 1985. Appellees also alleged claims under New York state law against Appellant and the other defendants for fraud, conspiracy to commit fraud, and unfair and deceptive practices under NY Gen. Bus. Law. ("NY GBL") § 349 over which the District Court exercised supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

## B. Basis for this Court's Appellate Jurisdiction

Appellant is appealing from the final judgment entered in the District Court on March 1, 2012 (the "Judgment"), the District Court's order denying Appellant's motion for judgment as a matter of law entered on June 20, 2012 (the "Order"), and the District Court's amended supplemental judgment entered on August 10, 2012 (the "Attorneys' Fee Judgment"). Accordingly, this Court has jurisdiction to hear Appellant's appeal of these final orders pursuant to 28 U.S.C. § 1291.

**C. The Appeal is Timely**

The District Court entered the Judgment on March 1, 2012, and denied Appellant's motion for judgment as a matter of law pursuant to FRCP 50(b) in the Order on June 20, 2012. Appellant filed its notice of appeal on July 18, 2012, 28 days after the Order was entered and is thus timely pursuant to FRAP 4(a)(4).

The Attorneys' Fee Judgment was entered on August 10, 2012, and Appellant filed a Supplemental Notice of Appeal on September 7, 2012 – 27 days after the entry of the Attorneys' Fees Judgment. Accordingly, Appellant's appeal of the Attorneys' Fees Judgment is also timely pursuant to FRAP 4(a)(1)(A).

## STATEMENT OF ISSUES FOR REVIEW

1.     To be held liable for fraud, New York law requires a showing by clear and convincing evidence that, *inter alia*, a party made a material misrepresentation or omission of fact.  After years of discovery and a three week jury trial, it is undisputed that Hershco had no contact, conversation, interaction, or dealings with any of the Appellees prior to or during the purchase of their homes and therefore could not have made a material misrepresentation or omission.  Was it error to hold Hershco liable for fraud based on this undisputed record?

2.     In order to establish liability for deceptive acts or practices pursuant to NY GBL § 349, a plaintiff must show that a defendant made a misrepresentation or omission to a consumer.  It is undisputed that Hershco never made any statements or representations to Appellees prior to or during the purchase of their homes and therefore could not have made a misrepresentation.  Was it error to hold Hershco liable under NY GBL § 349 based on this undisputed record?

3.     To be held liable for conspiracy to commit fraud New York law requires proof of the fraud and proof that the alleged conspirator intentionally participated in the fraudulent conspiracy.  It is undisputed that Hershco did not participate in any way in the transactions upon which Appellees alleged fraudulent scheme is based.  Was it error to hold Hershco liable for conspiracy to commit

fraud in light if the undisputed evidence that he was not involved in the alleged fraudulent scheme?

4.    Under New York law, piercing the corporate veil is an extraordinary remedy granted only in exceptional circumstances.  It is well settled that piercing the corporate veil is appropriate only when a corporation is being utilized as a "dummy" to conduct the personal business of its owner.  It is undisputed that Hershco conducted no personal business through the United Homes Entities, but instead operated the United Homes Entities as a corporate combine – an undisputedly perfectly legitimate means of running a real estate business.  Was it error to pierce the corporate veil and hold Hershco personally liable as the alter ego of the United Homes Entities?

## STATEMENT OF THE CASE

This appeal arises from six separate lawsuits, filed by eight different plaintiffs (collectively the "Appellees") who purchased homes from United Homes, LLC, United Property Group, LLC, and Galit Network, LLC (the "United Homes Entities"), companies owned by Hershco.  The Appellees alleged that Hershco and the United Homes Entities conspired with lenders, appraisers, and attorneys to racially discriminate and defraud them.  The cases were consolidated for a trial by jury before District Judge Matsumoto.  The jury returned a verdict in Hershco's (and the United Homes Entities') favor on the racial discrimination causes of action, but found Hershco liable for fraud, conspiracy to commit fraud, and violation of NY GBL § 349.  The jury further pierced the corporate veil to hold Hershco liable for the alleged fraudulent acts of the Untied Homes Entities.  District Judge Matsumoto denied Hershco's motion for a judgment as a matter of law and this appeal followed.

This Court must grant judgment in Hershco's favor because it is undisputed that Hershco <u>never</u>:

- made any statements or had any interaction with any of the Appellees;

- had any interaction with the other alleged conspirators in this case;

- set the offering price for any of the Appellees' homes;

- oversaw or directed the renovations or repairs to any of the Appellees' homes;

- was consulted or informed of any of the details concerning the transactions whereby Appellees' purchased their homes;

- created, approved, or had any knowledge of the United Homes' Entities advertisements that Appellees' saw,

- attended any of the closings;

- comingled his assets with United Homes Entities' assets or otherwise used United Homes Entities' assets for his personal use; or

Based on this undisputed evidence, no reasonable juror could have found Hershco liable for fraud, conspiracy to commit fraud, or violation of NY GBL § 349 because Hershco never spoke with or interacted with the Appellees in any way prior to their purchase of their homes making it impossible for him to have made a misrepresentation or omission to them – a fundamental element to all three causes of action.

It is equally undisputed that Hershco did not operate the United Homes Entities as a "dummy" to conduct purely personal business – the dispositive factor in determining whether or not to pierce the corporate veil. Indeed, the undisputed evidence unequivocally demonstrates that Hershco operated the Untied Homes Entities as a corporate combine to conduct legitimate business.

Based on the forgoing, it is evident that no reasonable juror could have found Hershco liable to Appellees, and he is entitled to judgment in his favor and reversal of the Judgment, the Order, and the Attorneys' Fee Judgment.

### STATEMENT OF FACTS

**A. The Six Home Sales At Issue In The Litigation**

> **i.  Appellees Rodney and Silvia Gibbons Purchase 1148 Halsey Street**

Appellees Rodney and Silvia Gibbons (the "Gibbons") allege in their complaint that they began looking to purchase a home in 2002 and came to United Homes after seeing a billboard advertisement. A-315 at ¶ 111. The Gibbons met with an unnamed employee of United Homes and then with Barry Braxton. *Id*. at ¶ 112. Braxton showed the Gibbons numerous homes and eventually the Gibbons decided to purchase 1148 Halsey Street in the Bushwick section of Brooklyn. *Id*. at ¶ 115. An unidentified United Homes employee recommended Marios Sfantos, Esq. ("Sfantos") to the Gibbons, and the Gibbons retained Sfantos as their attorney for the purchase. Olympia qualified the Gibbons for a mortgage. *Id*. at ¶ 116. At the initial closing on the property, which Hershco did not attend, the Gibbons expressed their reluctance to purchase the property, and Mr. Gibbons had a heart attack at the closing. A-316 at ¶ 123-124. The closing was obviously postponed. *Id*. at 124. At the second closing, which Hershco also did not attend, the Gibbons reiterated their concern over the cost of the home, and an employee from United Homes agreed to reduce the purchase price by $10,000 and Braxton promised to get them a tenant who would pay rent to offset the cost of the mortgage. A-317 at

¶ 127.  The Gibbons then agreed to go forward with the closing and purchased the home.  Indeed, Ms. Gibbons testified that she did not regret purchasing her home.  A-1905.

There has been no allegation, testimony, or evidence that:

- Hershco ever met with, spoke to, or had any contact with the Gibbons whatsoever;

- Hershco signed the contract of sale on behalf of the United Homes Entities or any other agreement with the Gibbons;

- Hershco created, approved, or even saw the billboard advertisement that made the Gibbons aware that United Homes existed;

- Hershco was involved in setting the price for, or overseeing the renovations to, the Gibbons' home;

- Braxton or any other United Homes employee that interacted with the Gibbons required, or even sought, Hershco's approval before reducing the price of the home by $10,000, or that they informed him of the price reduction after the fact;

- Braxton consulted with or received instructions from Hershco prior to speaking with the Gibbons; and

- Hershco had any contact with, or even knowledge of the existence of, Olympia or Sfantos.

### ii.    Appellee Mary Lodge Purchases 249 Halsey Street

Appellee Mary Lodge ("Lodge") alleges in her complaint that she was interested in buying a home and contacted the United Homes Entities in November 2002 after seeing a United Homes advertisement.  A-243 at ¶ 110.  Chris Webb, a United Homes employee, took Lodge to see three properties and Lodge decided

she wanted to purchase 249 Halsey Street in the Bedford Stuyvesant section of Brooklyn.  A-244 at ¶ 113.  According to Lodge, Webb told her she could rent two units in the three family home to help pay the monthly mortgage.  *Id*. at ¶ 114. Lodge met with Michael Cheatham, Esq. ("Cheatham") who agreed to represent her.  A 245 at ¶ 120-121.  Lodge also received an appraisal from Michael Gilbert ("Gilbert") performed for Olympia (Lodge's mortgage bank) valuing the home at $420,000.  A-249 at ¶ 147.

Lodge closed on the property at 249 Halsey Street on January 16, 2003, and Cheatham allegedly assured her that she could rent two units in the home and that United Homes would help her find tenants.  A-245-6 at ¶ 124, 127-128.  Hershco did not attend the closing.  After the closing, Lodge discovered several problems with the home, notably flooding and drainage problems.  A-248 at ¶ 144.  Lodge alleges that the problems were never properly fixed.

There has been no allegation, testimony, or evidence that:

- Hershco ever met with, spoke to, or had any contact with Lodge whatsoever;

- Hershco signed the contract of sale on behalf of the United Homes Entities or any other agreement with Lodge;

- Hershco created, approved, or even saw the United Homes advertisement that drew Lodge to United Homes;

- Hershco was involved in setting the price for, or overseeing the renovations to, Lodge's home;

- Webb consulted with or received instructions from Hershco prior to speaking with Lodge; or

- Hershco had any contact with, or even knowledge of the existence of, Cheatham, Olympia, or Gilbert.

### iii.    Appellee Dewitt Mathis Purchases 21 Marconi Place

According to his complaint, Appellee Dewitt Mathis ("Mathis") began looking for a home to occupy with his domestic partner Karen Jenkins. A-282 at ¶ 110. Mathis contacted the United Homes Entities after seeing a Daily News advertisement. A-282-3 at ¶ 110-112. A salesman named Oren showed Mathis and his partner two homes and ultimately, after negotiating a $10,000 price reduction, chose 21 Marconi Place in the Brownsville section of Brooklyn. A-283 at ¶ 113, A-3051 at ln. 17-22. According to Mathis, Oren directed Mathis to Alliance Mortgage Banking Corporation ("Alliance") who qualified Mathis for a mortgage. Oren also recommended to Mathis that he use Sfantos as an attorney, and Mathis agreed to retain Sfantos. A-283-284 at ¶ 116-118.

The closing took place on September 17, 2002. A-284 at 116. Hershco did not attend the closing.

There has been no allegation, testimony, or evidence that:

- Hershco ever met with, spoke to, or had any contact with Mathis whatsoever;

- 10 -

- Hershco signed the contract of sale on behalf of the United Homes Entities or any other agreement with Mathis;

- Hershco had any knowledge of or approved the reduction in the sale price;

- Hershco created, approved, or even saw the Daily News advertisement that made Mathis aware that United Homes existed;

- Hershco was involved in setting the price for, or overseeing the renovations to, Mathis' home;

- Oren consulted with or received instructions from Hershco prior to speaking with Mathis; or

- Hershco had any contact with, or even knowledge of the existence of, Alliance or Sfantos.

### iv.    Appellees Lisa and Miles McDale Purchase 2126 Union Street

According to their complaint, Appellees Lisa and Miles McDale (the "McDales"), an African American married couple, began house hunting in 2002. A-352 at ¶ 110-111.  Responding to a United Homes advertisement, the McDales came to a United Homes office and met with Robert Cadoch ("Cadoch").  A-352-3 at ¶ 113.  After several days of looking at many homes, the McDales decided to purchase 2126 Union Street, a former crack house that United Homes was rehabilitating and negotiated a $20,000 reduction in the sale price.  A-353-4 at ¶ 117-118, A-1037; A-1138.  After they decided to purchase this home, Cadoch introduced the McDales to a United Homes employee named Jerry who told them the price of the home and informed them that the property would generate significant rental income.  A-354 at ¶ 119.  The McDales were also introduced to a

representative from Alliance, Mr. Israel who qualified the McDales for a mortgage. A-354-5 at ¶ 120-123. Jerry also told the McDales that they needed an attorney and he informed them they could retain their own or he could recommend one for them. A-355 at ¶ 125. The McDales asked for a recommendation and were introduced to Benjamin Turner, Esq. ("Turner"), whom they ultimately chose to retain. *Id*.

The McDales were also concerned about the ongoing rehabilitation of the home and were introduced to the construction manager for the home who informed them that the home was still being renovated. A-356 at ¶ 127. Based on these conversations, the McDales signed a contract to purchase the home on October 16, 2002. *Id*. at ¶ 128. After providing a list of issues they wanted addressed to their attorney, an associate of Turner named Raj Maddiwar ("Maddiwar"), the McDales closed on the home. A-357 at ¶ 137.

After the closing, which Hershco did not attend, the McDales had some problems with the repairs that were done and contacted the United Homes Entities with their complaints. A-360 at ¶ 154. Jerry allegedly promised to make the repairs. *Id*.

There has been no allegation, testimony, or evidence that:

- Hershco ever met with, spoke to, or had any contact with the McDales whatsoever;

- 12 -

- Hershco signed the contract of sale on behalf of the United Homes Entities or any other agreement with the McDales;

- Hershco knew of or approved of the reduction in the sale price;

- Hershco created, approved, or even saw the advertisement to which the McDales responded;

- Hershco was involved in setting the price for, or overseeing the renovations to, the McDales' home;

- Cadoch, Jerry, or the construction manager consulted with or received instructions from Hershco prior to interacting with the McDales; or

- Hershco had any contact with, or even knowledge of the existence of, Turner, Alliance, Mr. Israel, or Maddiwar.

### v.    Appellee Charlene Washington Purchases 2422 Dean Street

According to her complaint, Appellee Charlene Washington ("Washington") was referred to the United Homes Entities by a member of her church, Robert Wright ("Wright") in 2002.    A-390 at ¶ 110-112.    Based on Wright's recommendation, Washington met with Wright at the offices of United Homes.    A-390-91 at ¶ 114.    Wright showed Washington two homes and Washington selected 2422 Dean Street in the Brownsville section of Brooklyn.    A-391 at ¶ 117.    After selecting the home, Washington met with Cadoch who ran a credit report for her and told her that they could work out a deal for her to purchase the home.    *Id*.    Several days later, Washington met with Wright again, and Wright informed her that she need an attorney.    A-391-92 at ¶ 119.    Wright recommended Cheatham,

but told her she could choose her own attorney. *Id*. Ultimately, Washington decided to retain Cheatham. *Id*.

The closing took place on January 13, 2003. A-392 at ¶ 125. Wright took Washington to the closing, where they met Cheatham who explained the documents Washington would be required to sign. *Id*. Hershco did not attend the closing.

After the closing, Washington had problems with her furnace that caused the heat to not function properly. A-394 at ¶ 137. Washington contacted the United Homes Entities about the problems with the furnace and eventually the furnace was repaired. *Id*.

There has been no allegation, testimony, or evidence that:

- Hershco ever met with, spoke to, or had any contact with Washington whatsoever;

- Hershco signed the contract of sale on behalf of the United Homes Entities or any other agreement with Washington;

- Hershco was involved in setting the price for, or overseeing the renovations and repairs to, the Washington's home;

- Cadoch or Wright consulted with or received instructions from Hershco prior to interacting with Washington; or

- Hershco had any contact with, or even knowledge of the existence of, Cheatham.

### vi.    Appellee Sandra Barkley Purchases 557 Hancock Street

According to her complaint, Appellee Sandra Barkley ("Barkley") began the home buying process in the winter of 2002-2003. A-198 at ¶ 110-111. A friend of hers referred her to the United Homes Entities and she met with a man named Shaun Caesar who showed her a number of homes. A-199 at ¶ 113. Eventually Barkley chose to purchase 557 Hancock Street in the Bedford Stuyvesant section of Brooklyn. *Id*. According to Barkley's complaint, a few days later she met with an attorney named Michael Cheatham who agreed to represent her at the closing. A-199 at ¶ 115-116. Cheatham informed Barkley that she would need a $4,000 down payment on a $359,000 home and asked her to sign some papers related to the closing. *Id*. Barkley was also contacted by a representative of Olympia Mortgage Corporation ("Olympia") who would be providing her with a mortgage who requested some documentation from her to process the loan. A-200 at ¶ 119. Barkley faxed those documents to Olympia on January 9, 2003. *Id*.

Barkley's closing was scheduled for January 14, 2003. *Id*. at ¶ 120. Barkley alleges that she was uncomfortable with Cheatham as her attorney and informed him of her concerns at which point another attorney, Turner, took over her representation. *Id*. at ¶ 121.

Prior to the closing Barkley had a walkthrough at 557 Hancock Street and made a list of repairs she thought still needed to be made. *Id*. at ¶ 122. She gave

the list of repairs to Turner.  A-201 at ¶ 124.  Barkley was also provided with an appraisal of the property performed by Thomas Messina which appraised the property at $359,000.  A-205 at ¶ 149.  Barkley was represented by Turner at the closing.  A-200 at ¶121.  Hershco did not attend the closing.

After she moved in, Barkley discovered that a number of repairs on the list she had given to Turner still had to been made.  A-204 at ¶ 143.  She contacted the United Homes Entities who sent various contractors to her house to make repairs, but she alleges the repairs did not completely fix the problems.  *Id*. at ¶ 144. Several months after her purchase, on July 24, 2003, while the real estate market was rapidly sinking, she had the property re-appraised and was told by her new appraiser that her home was worth $100,000 less than Messina's appraisal.  A-205 at ¶ 147-48.

There has been no allegation, testimony, or evidence that:

- Hershco ever met with, spoke to, or had any contact with Barkley whatsoever except when Barkley met Hershco in 2004, a year after her home purchase, when she asked for a meeting with the president of the United Homes Entities.  Hershco agreed to meet with Barkley and after hearing her complaints about her home, Hershco offered her a full refund and buy her home back from her.  She refused the offer.

- Hershco signed the contract of sale on behalf of the United Homes Entities or any other agreement with Barkley;

- Hershco set the price for Barkley's home or that he oversaw the renovation or repairs made to her home;

- Caesar consulted with or received instructions from Hershco prior to speaking with Barkley;

- any United Homes employee consulted with or was required to obtain authorization from Hershco prior to sending contractors to Barkley's home to make repairs; or

- Hershco had any interaction, or even knowledge of the existence of, Olympia, Cheatham, or Turner.

## B. The Lawsuits Filed By Appellees

Years after purchasing their homes and only after being recruited by South Brooklyn Legal Services, via a flyer circulating around their community, Appellees' filed suit via six separate complaints filled with sweeping conclusory allegations, against the Untied Homes Entities, Hershco, and several lenders, appraisers, and lawyers, alleging that these parties intentionally targeted (and discriminated against) them because of their race and conspired to defraud them by selling them overvalued, defective homes financed with predatory loans.  A-181-410.

In their lawsuits, Appellees claimed, without providing any specific details of Hershco's knowledge or involvement, that Hershco, the United Home Entities, and several appraisers, mortgage lenders and attorneys were part of a fraudulent property flipping scheme whereby the United Homes Entities would purchase damaged properties at foreclosure auctions or estate sales, perform cosmetic repairs and sell the properties at inflated prices working together with the

appraisers, lenders and attorneys to inflate the prices of the homes and dupe Appellees into purchasing homes they could not afford. *See, e.g.,* A-186-190 at ¶ 31, 32, 38-39, 47.[1]

Appellees further alleged in their complaints that the members of this alleged fraudulent conspiracy, including Hershco and the United Homes Entities exploited the racially segregated housing market in New York City by intentionally extending credit to members of minority communities on unfair terms by creating advertisements that featured minority homebuyers and running those advertisements in minority communities. *See, e.g.,* A-187-8, 213 at ¶ 36-37, 221].

Based on these allegations, Appellees' asserted claims against Hershco and the other defendants under the Fair Housing Act, 42 U.S.C. §§ 3604, 3605 and for the alleged violation of Appellees' civil rights under 42 U.S.C. §§ 1981, 1982, 1985.  Appellees also asserted New York state law claims against Appellant and the other defendants for fraud, conspiracy to commit fraud, and unfair and deceptive practices under NY GBL § 349.

As discussed *supra*, the only allegations in any of the complaints that make any reference to alleged wrongdoing by Hershco is the conclusory generic allegation (repeated in each of the Appellees' complaints) that Hershco

---

[1] It is undisputed that each of the homes purchased by the Appellees has appreciated in value and is now worth more than Appellees paid for it despite the woeful downturn in the economy in general and in the housing market specifically. A-1076; A-1893.

"dominate[d] the [United Homes Entities] and caused them and their employees to engage in the property flipping scheme…"  A-190, 236, 278, 307-08, 347-48, 385 at ¶ 46.   Indeed the only specific fact alleged against Hershco is that, in his capacity as President of the United Homes Entities, he signed the deed conveying each property to the Appellees.  *Id*. at ¶ 45.  There are no allegations that any of the Appellees had any contact with Hershco during the time these transactions occurred.[2]  There are no allegations that Hershco set the prices of the homes the Appellees purchased, oversaw or approved the renovations performed to those homes, instructed, directed, or otherwise interacted with the United Homes Entities' employees who allegedly spoke to the Appellees, or had any knowledge of or interaction with the other members of the alleged conspiracy.  Indeed, there are no allegations that discuss with even a modicum of specificity the level of Hershco's knowledge or involvement in the alleged fraud.

---

[2] Indeed, as noted *supra*, the only Appellee that Hershco ever had any contact with was Barkley who Hershco met with more than a year *after* her purchase of 557 Hancock Street when, in response to her complaints about the property, Hershco offered to refund Barkley and repurchase 557 Hancock Street from her.  A-3470: She refused the offer.

## C. Pretrial Proceedings

### i. The District Court Denies The Motions To Dismiss To Provide Appellees An Opportunity To Substantiate Their Conclusory Allegations Through Discovery

Hershco (along with several of the other defendants in the underlying action) filed motions to dismiss the complaints filed against him in the various district court actions on or about February 28, 2006.  A-177-459.  The basis of these motions was that the complaints failed to allege that Hershco interacted with any of the Appellees and thus could not be personally liable for fraud.  Doc. No. 151. Hershco further argued that Appellees' attempts to pierce the corporate veil to hold Hershco personally liable for the alleged wrongdoing of the United Homes Entities were so conclusory that they should be dismissed in their entirety.  *Id*.  Chief Judge Dearie denied Hershco's motion at this nascent stage of the proceeding, not because he found any particular merit to Appellees' arguments, but because he felt discovery was necessary to determine the level of Hershco's knowledge and involvement in the alleged "fraud."  SPA-39-40. ("[G]iven that the complaints are predicated on facts peculiarly within Hershco's knowledge, 'it is difficult to imagine what facts plaintiffs could possibly possess as to [defendants'] knowledge and intent without having conducted discovery.'" [citations omitted]).  Chief Judge Dearie also refused to dismiss the veil piercing claims at "this pre-discovery

juncture" because such an inquiry was fact-specific.  SPA-40 at fn.3.  Accordingly, the parties proceeded to discovery.

### ii. Discovery Yielded No Evidence To Support Appellees' Conclusory Allegations Against Hershco

After the District Court's denial of the motions to dismiss, the parties proceeded to discovery, and exchanged tens of thousands of pages of documents, and conducted numerous depositions of Hershco and various United Homes Entities' employees (as well as the other defendants).  *See generally* A-1-176.[3] Throughout this extensive discovery process, which included the turnover of the United Homes Entities' bank records and the depositions of Hershco and United Homes Entities employees, Appellees had numerous opportunities to establish through admissible evidence and testimony the level of Hershco's knowledge of the alleged fraud, his involvement in the alleged fraudulent scheme, or that he dominated and controlled the United Homes Entities so thoroughly and completely with respect to the six home sales at issue in the litigation that he should be

---

[3] While discovery was ongoing, the parties also attempted to broker a settlement through mediation and numerous settlement conferences with Magistrate Judge Matsumoto, who later would take over the case when she was appointed as District Judge.  *See, e.g.,* A-1023 (Minute Entries for 5/28/2008 and 5/30/2008), A-107-109 (Minute Entries from 6/26/2008 and 7/3/2008); A-110 (Minute Entry for 7/24/2008); A-113-4 (Minute Entry for 8/19/2008); A-126 (Minute Entry for 12/4/2008).  Despite obtaining significant knowledge of the case gleaned from these settlement negotiations, Judge Matsumoto did not recuse herself.

personally liable for the corporate entities' alleged fraudulent conduct. No documents or testimony demonstrated that Hershco:

- had any knowledge of the alleged fraudulent scheme or indeed any knowledge of the transactions at all;

- made any statements or had any interaction with any of the Appellees;

- had any interaction with the other alleged conspirators in this case;

- set the offering price for any of the Appellees' homes;

- oversaw or directed the renovations or repairs to any of the Appellees' homes;

- was consulted or informed of any of the details concerning the transactions whereby Appellees' purchased their homes (such as the decision to reduce the purchase price of the Gibbons' home by $10,000);

- created, approved, or had any knowledge of the United Homes' Entities advertisements that Appellees' saw,

- attended any of the closings;

- comingled his assets with United Homes Entities' assets or otherwise used United Homes Entities' assets for his personal use; or

- had any personal knowledge whatsoever of the events surrounding these transactions.

In fact, after discovery was over, in opposition to the United Homes Entities' motion for summary judgment Appellees admitted that Hershco had no knowledge of the alleged fraudulent scheme and urged the Court to ignore the affidavit submitted by Hershco in support of that motion because he had no personal

knowledge of the events surrounding the Appellees' purchases of their homes. Doc. No. 470 at 16-17.

### iii. The Trial Further Confirmed That Hershco Had No Involvement In The Transactions And Did Not Operate The United Homes Entities Conduct Personal, Rather Than Corporate, Business

After the close of discovery and the Court's denial of the summary judgment motions, the cases proceeded to a consolidated trial by jury.[4]  During the course of the three week trial, which was focused mainly on Appellees' unsuccessful claims of racial discrimination, Appellees called numerous witnesses, including all 8 Appellees and several expert witnesses.  No testimony or evidence was offered supporting Appellees' allegations that Hershco should be liable individually for fraud or that he should be liable for the United Homes Entities' alleged fraudulent acts on a veil piercing theory.  No testimony was elicited from any witness showing the level of Hershco's knowledge or alleged involvement in the alleged fraud.

Each and every Appellee testified that prior to closing on their homes, they had never met with, spoke to, or had any correspondence with Hershco. Specifically, McDale testified that she never met Hershco, believed that Cadoch

---

[4]  As more fully set forth in co-appellant United Homes Entities' brief, the consolidation of the trials significantly prejudiced Hershco, and the United Homes Entities, by permitting (and indeed encouraging) the jury to consider the cumulative evidence presented as proof of liability for each separate transaction.

and Resnick owned the United Homes Entities, and only sued Hershco because she later learned he owned the companies. A-1212, A-1209-10. Lodge testified that she did not know Hershco and had never met him prior to the litigation. A-1392-93. Gibbons could not remember ever speaking with Hershco. A-1880. Washington testified that she never saw or met Hershco during any of her visits to the United Homes offices and that the only reason she sued him was because he owned the companies. A -3859-606; A-3863. Mathis never met Hershco and only sued him because he thought Hershco owned the property he purchased, which Hershco did not. A-3235. Barkley did not have any interaction with Hershco until well after she purchased her home. A-3360-61. Only Appellee Barkley had ever met Hershco prior to the commencement of the litigation, and that was at a meeting that occurred well after Barkley purchased her home where Hershco offered to repurchase her property – an offer Barkley refused because she knew how valuable her property was. A-3470. Thus, it is undisputed that Hershco never made any affirmative representations to any of the Appellees prior to or contemporaneous with their purchase of their respective properties from the United Homes Entities.

Moreover, not a single witness called by Appellees at trial or even a single document offered into evidence demonstrated or even implied that Hershco:

- made any statements or had any interaction with any of the Appellees;

- had any interaction with the other alleged conspirators in this case;

- set the offering price for any of the Appellees' homes;

- oversaw or directed the renovations or repairs to any of the Appellees' homes;

- was consulted or informed of any of the details concerning the transactions whereby Appellees' purchased their homes (such as the decision to reduce the purchase price of the Gibbons' home by $10,000);

- created, approved, or had any knowledge of the United Homes' Entities advertisements that Appellees' saw,

- attended any of the closings;

- comingled his assets with United Homes Entities' assets or otherwise used United Homes Entities' assets for his personal use; or

- had any personal knowledge whatsoever of the events surrounding these transactions.

Appellees offered no testimony from United Homes Entities' employees from which it could be inferred that Hershco had even an infinitesimal amount of knowledge about the sale of Appellees' homes. Indeed, to support their claims against Hershco, Appellees only called (1) Hershco and (2) a forensic accountant, Alan I. Blass ("Blass") as witnesses.

Hershco testified that he has been in the real estate business since 1989, and started his own real estate business in 1995. A-3297; A-3242. Hershco started out in the industry buying a single house in Brooklyn, renovating it and selling that house for a profit. A3298-3299. Hershco took the profits from this first sale to buy additional houses, renovating them, and selling them for a profit. A-3299-

- 25 -

3300.  Through hard work Hershco built a hugely successful real estate business that now employs over 50 people and buys, renovates, and sells homes throughout the New York City metropolitan area, including Brooklyn where the subject properties are located.  A-3294.

Hershco further testified that, as is common in the real estate industry, he formed a number of corporate entities to purchase, renovate, and sell properties on the advice of his independent financial auditors, Goldstein, Golub and Kessler.  A-3292.  Each of these entities had their own tax identification numbers, their own corporate structure, and filed their own taxes.  A-3284.  The entities operated in conjunction with each other as a larger corporate combine with each entity performing a specified role in the larger business.  A-3292.  Every United Homes entity that sold a property would be transferred to the managing LLC which controlled the finances for the corporate combine and the funds would be distributed to whichever United Homes Entity need funds for construction, acquisition, payroll, or other expenses.  *Id*.  The United Homes Entities utilized an accounting software program that would track the monies being distributed between the selling entity and the managing entity, and there would be a reconciliation of the books every three to six months to ensure that all funds were accounted for properly.  A-3293.

It is undisputed that the money generated from the operation of the United Homes Entities was used solely to fund and operate the businesses.  A-3292. Hershco never used United Homes Entities' funds to pay personal expenses.  A-3662-63.  Hershco never arbitrarily withdrew funds from any of the United Homes Entities and "put it in his pocket."  *Id.*  Any money paid to Hershco from the United Homes Entities was in the form of salary or distributions, and Hershco properly accounted for and paid taxes on all such disbursements to himself.  A-3663.  In short, the United Homes Entities were typical successful businesses being properly managed and run by Hershco.

Appellees tried to portray the customary methods by which the United Homes Entities were run as inappropriate and untoward through their expert, Blass. But Blass admitted that common ownership and this type of corporate structure is common for closely held businesses and that there was "nothing wrong" with the operation of the United Homes Entities as a larger corporate combine.  A-3548: Indeed, in reviewing the United Homes Entities' audited financial statement, Appellee's expert testified that the financials "stood the test."  A-3642.  Most importantly, Blass admitted that there was no evidence indicating that Hershco arbitrarily took assets from the United Homes Entities or used company assets for his own personal use.  A-3662-63.  Indeed, although Blass characterized the United Homes Entities as Hershco's "piggy bank," when asked about this characterization

on cross examination he admitted that he was referring to the transfer of funds among the companies as a means of "trying to grow the business" <u>not that Hershco was using the United Homes Entities to conduct personal business or to simply line his own pockets</u>.  A-3664.

### a.    The District Court's Improper Denial of Hershco's Motion for A Directed Verdict

At the close of Appellees' case, Hershco made a motion for a directed verdict on Appellees' veil-piercing claim pursuant to FRCP 50(a) on the ground that no evidence was offered during Appellees' case-in-chief that the United Homes Entities' corporate form was used to perpetrate the fraud that allegedly caused Appellees' damages.  A-4270-76.  The District Court denied the motion on the spot after admittedly not "stud[ying] the cases or some of the other state cases" on piercing the corporate veil and stated that "I believe that the record currently as it stands is sufficient to allow the jury to pass on whether or not the corporation was used to commit a fraud or that there was  -- to decide whether there was wrongful conduct which resulted in injury to the plaintiffs."  A-4278-79.  Without even attempting to ascertain the proper legal standard for veil piercing, the Court improperly denied the motion.

### b.    The Jury Verdict

After closing arguments and the charging of the jury, the case was submitted to the jury.  The jury returned a verdict finding Hershco (and the United Homes Entities) not liable for the alleged racial discrimination claims that made up the bulk of Appellees' collective claims, but finding, despite the lack of evidence, that Hershco was liable for fraud individually and through veil piercing on behalf of the United Homes Entities for all of the lumped claims.  A-4979-5075.

### c.    The District Court's Improper Denial of Hershco's Motion for Judgment as a Matter of Law

After the jury's verdict, Hershco timely moved for judgment as a matter of law on the grounds that (1) no reasonable juror could have found Hershco liable for fraud, conspiracy to commit fraud, and violation of NY GBL § 349 because of the utter lack of evidence of any communications or interaction with Appellees, and (2) no reasonable juror could have found veil piercing appropriate because of the lack of evidence that Hershco abused the corporate form with respect to the six transactions at issue in this case.  A-5706.  The Court denied the first prong of Hershco's motion without even addressing Hershco's lack of communication or interaction with the Appellees in the context of the jury's finding that Hershco was individually liable for fraud.  SPA-251-262.  With respect to veil piercing, the Court also denied Hershco's motion stating without true explanation that Hershco

"abused the corporate form to perpetuate the fraudulent transactions at issue in this action."  SPA-276.

## SUMMARY OF ARGUMENT

Hershco is entitled to judgment as a matter of law.  As set forth in Point I.A *infra*, this Court must review the issue of whether Hershco is entitled to judgment in his favor *de novo* and determine if the evidence presented at trial would have permitted a reasonable juror to have held Hershco liable.

No reasonable juror could have found Hershco liable for fraud because there was no evidence adduced at trial demonstrating that Hershco made any representations to Appellees and without such representations, the first and essential element of a valid fraud claim fails as a matter of law.  *See* Point I.B *infra.*  Similarly, as set forth in Point I.C *infra*, because Hershco made no representations to Appellees, no reasonable juror could have found that Hershco engaged in deceptive acts and practices within the meaning of NY GBL § 349.  In addition, as set forth in Point I.D *infra*, no evidence was presented upon which a reasonable juror could have found that Hershco participated, much less intentionally participated, in the alleged fraudulent scheme and thus the conspiracy to commit fraud cause of action fails as a matter of law.

Finally, the uncontroverted evidence in this case demonstrates that the United Homes Entities were being operated not as a "dummy" for Hershco but as a

corporate combine, a family of companies operating conjunctively. As such, no reasonable juror could have found that the extraordinary remedy of piercing the corporate veil was appropriate in this case. *See* Point I.D *infra*.

## ARGUMENT

## POINT I

### THE JUDGMENT MUST BE REVERSED AND JUDGMENT MUST BE ENTERED IN HERSHCO'S FAVOR

**A. Standard of Review**

This Court must review *de novo* the issue of whether Hershco is entitled to a judgment as a matter of law in his favor by determining whether there was sufficient evidence to permit a reasonable juror to have found in Appellees' favor. *McCarthy v. NY City Tech. College of CUNY*, 202 F.3d 161, 167 (2d Cir. 2000) ("Whether the issue is broached on a motion for summary judgment (before trial), on a motion for a judgment as a matter of law (at trial but prior to submission to the fact finder), on a motion for judgment as a matter of law after a jury verdict, or on appeal after trial, the question is always whether, after 'drawing all reasonable inferences in favor of the nonmoving party and making all credibility assessments in his favor, there is sufficient evidence to permit a rational juror to find in his favor.'") *quoting Sir Speedy, Inc. v. L&P Graphics, Inc.*, 957 F.2d 1033, 1039 (2d Cir. 1992); *see also, Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003)("Appellate review is *de novo*.'") *citing New Eng. Ins. Co. v. Healthcare*

*Underwriters Mut. Iins. Co.*, 295 F.3d 232, 240 (2d Cir. 2002); *Enercomp, Inc. v. McCorhill Publishing, Inc.*, 873 F.2d 536, 541 (2d Cir. 1989).  "A court may grant a judgment against a party as a matter of law if 'the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party…" *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. August 1, 2012) *quoting* FRCP 50(a)(1).  The Court should enter judgment as a matter of law in favor of the moving party if a reasonable jury "'would have been compelled [by the evidence or lack of evidence] to accept the view of the moving party.'" *Jones*, 691 F.3d at 80 *quoting Zellner v. Summerlin*, 494 F.3d 344, 370-71 (2d Cir. 2007).  On this record and under this standard of review, there is only one possible outcome – reversal of the Judgment and entry of judgment as a matter of law in Hershco's favor.

## B.  No Reasonable Juror Could Have Found Hershco Personally Liable For Fraud

No evidence was adduced at trial that would permit a reasonable fact finder to hold Hershco directly and personally liable for fraud.  It is well settled that in order to prevail on a fraud claim under New York law, a plaintiff must establish <u>by clear and convincing evidence</u> at trial that defendant (1) made a material misrepresentation or a material omission of fact which was false and known to be false by defendant, (2) that the misrepresentation or omission was made for the

purpose of inducing the plaintiff to rely upon it, (3) that the plaintiff justifiably relied on the misrepresentation or omission, and (4) the plaintiff was injured from such reliance. *Premium Mortgage Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009). Here there was not an iota of evidence adduced at trial whereby any reasonable fact finder could have found that the first element of a valid fraud claim was satisfied and consequently none of the remaining elements could have been satisfied.

### (1) No Evidence Was Offered At Trial Demonstrating That Hershco Made a Misrepresentation to Any of the Appellees

"It is fundamental that a knowing misrepresentation is an essential element of a cause of action for fraud." *Marine Midland Bank v. John E. Russo Produce Co.*, 50 N.Y.2d 31, 43 (N.Y. 1980). As discussed *supra*, there was not a scintilla of evidence presented at trial upon which a reasonable fact finder could have found that Hershco made a representation to Appellees because Hershco never spoke to or interacted in any way with the Appellees prior to their closing on their respective properties. Indeed, there was no testimony or evidence at trial that Hershco:

- made any statements or had any interaction with any of the Appellees;
- had any interaction with the other alleged conspirators in this case;
- set the offering price for any of the Appellees' homes;
- oversaw or directed the renovations or repairs to any of the Appellees' homes;

- was consulted or informed of any of the details concerning the transactions whereby Appellees' purchased their homes (such as the decision to reduce the purchase price of several Appellees' homes by tens of thousands of dollars);

- created, approved, or had any knowledge of the United Homes' Entities advertisements that Appellees' saw,

- attended any of the closings;

- comingled his assets with United Homes Entities' assets or otherwise used United Homes Entities' assets for his personal use; or

- had any personal knowledge whatsoever of the events surrounding these transactions.

In fact, <u>Appellees admitted that Hershco had no personal knowledge of the events surrounding the Appellees' purchases of their homes</u>.  Doc. No. 470 at 16-17.  Instead, the crux of Appellees' fraud case was that, prior to their purchases, United Homes employees misrepresented: (1) the value of the homes they purchased from the United Homes Entities, (2) the extent of the renovations performed by United Homes, and (3) their creditworthiness.  Even assuming *arguendo* that someone from United Homes made these statements to Appellees and that these statements constitute actionable misrepresentations, <u>there is no evidence, much less clear and convincing evidence</u>, that Hershco made any of the alleged misrepresentations to Appellees.

Indeed, all of the Appellees testified at trial that they never met, spoke to, or even knew who Hershco was when they purchased their respective properties from the United Homes Entities.  Specifically, McDale testified that she never met

Hershco, believed that Cadoch and Resnick owned the United Homes Entities, and only sued Hershco because she later learned he owned the companies. A-1212, A-1209-10. Lodge testified that she did not know Hershco and had never met him prior to the litigation. A-1392-93. Gibbons could not remember ever speaking with Hershco. A-1880. Washington testified that she never saw or met Hershco during any of her visits to the United Homes offices and that the only reason she sued him was because he owned the companies. A -3859-606; A-3863. Mathis never met Hershco and only sued him because he thought Hershco owned the property he purchased, which Hershco did not. A-3235. Barkley did not have any interaction with Hershco until well after she purchased her home. A-3360-61.[5]

If Hershco never met, spoke to, or in any way interacted with Appellees prior to their purchase of properties from the United Homes Entities, then it is undisputed that he never even had an opportunity to make any misrepresentations to them. Accordingly, Appellees failed to carry their burden of proof with respect to the first element of an actionable fraud claim against Hershco personally because they did not (and could not) offer any evidence, much less clear and convincing evidence, establishing that Hershco made any representations to them

---

[5] Indeed, Barkley's only interaction with Hershco was <u>over a year after she purchased her home from the United Homes Entities</u> when Hershco offered to buy her property back from her, which she declined because the value of her property had increased. A-3360-61.

and no reasonable juror could have found to the contrary.  For this reason alone, Hershco is entitled to judgment as a matter of law in his favor.

The only evidence linking Hershco to the transactions sued upon by the Appellees is that he signed the deeds conveying the properties in his role as an officer of the United Homes Entities.  The District Court relied upon this fact in denying Hershco's motion for judgment as a matter of law albeit in the context of addressing issues surrounding the improper piercing of the corporate veil and held that "even though Mr. Hershco did not personally meet any of the plaintiffs except Mrs. Barkley, his signature appeared on each of the deeds through which the homes were conveyed to the plaintiffs."  SPA-276.  As discussed *infra*, this fact is insufficient to establish the propriety of piercing the corporate veil, but it is also insufficient as a matter of law to justify finding Hershco personally liable for fraud because the purely ministerial act of signing a deed cannot, standing alone, create personal liability for a corporate officer for fraud.  Indeed it is well settled that a corporate officer does not become liable for a corporation's obligations simply by signing a contract, such as a deed, without some independent showing of participation in or knowledge of the alleged fraud.  *Marine Midland Bank*, 50 N.Y.2d at 44 (N.Y. 1980) ("[C]orporate officers and directors are not liable for fraud unless they personally participate in the misrepresentation or have actual knowledge of it.") (*citations omitted).*

- 36 -

No evidence was offered at trial that at the time he signed the deeds (or, indeed, at any time) Hershco knew of or orchestrated the alleged scheme to defraud Appellees.  Without such evidence, the mere fact that Hershco signed the deeds cannot support a finding of liability for fraud.  Signing a deed conveying the property specified therein is not a fraudulent act in and of itself, and it is not a representation of anything other than the fact that the property is being transferred to the new owner, which in every case involving the Appellees it was.  Indeed, Hershco probably signed his employees' paychecks but that would not render him liable for his employees' alleged fraud any more than signing a deed could render him liable for the alleged acts of his employees.

Accordingly, Appellees failed to meet their burden in establishing the first element of a valid fraud claim and no reasonable fact finder could have found by clear and convincing evidence, based on the evidence presented at trial, that Hershco made a material misrepresentation or omission to Appellees.  As such, Hershco is entitled to judgment as a matter of law in his favor.

**(2) Because There Was No Evidence of Misrepresentations by Hershco, No Reasonable Juror Could Have Found The Remaining Elements For A Valid Fraud Claim Were Established at Trial**

Without a misrepresentation or omission from Hershco to the Appellees, all of the other elements of a fraud claim could not have been established at trial by clear and convincing evidence because if Hershco did not make a misrepresentation or omission, he could not have intended Appellees to rely upon it, nor could Appellees have justifiably relied upon such a nonexistent misrepresentation. Accordingly, the jury's finding that Hershco was personally liable for fraud stands in direct contradiction to the evidence offered at trial and must be reversed.

The District Court should have granted Hershco's motion for judgment as a matter of law on this claim prior to submitting the case to the jury. It did not; which was erroneous. The District Court simply ignored this argument and circuitously justified its decision on the basis that Hershco was individually liable on a piercing the corporate veil theory. This was another error. While an individual may be held liable for the acts of a corporation under a veil-piercing theory, it does not and cannot give rise to independent individual liability. Accordingly, the District Court erred by denying this aspect of Hershco's motion for a judgment as a matter of law and this Court should correct the error granting

Hershco judgment as a matter of law on the fraud claims levied against him by the Appellees.

### C. No Reasonable Juror Could Have Found A Legally Sufficient Evidentiary Basis To Hold Hershco Personally Liable for Violating NY GBL § 349

As with Appellees' fraud claim, the jury found Hershco personally liable for violating NY GBL § 349 without any evidentiary basis, and the District Court erroneously refused to correct the jury's error in the Order.  To prove a NY GBL § 349 claim, a plaintiff must establish three elements: (1) defendant's deceptive acts or practices were directed at consumers, (2) the acts or practices are misleading in a material way, and (3) the plaintiff was injured as a result.  *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) *citing Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (N.Y. 1995).

Here, there was no evidence at trial upon which a reasonable fact finder could have found that Hershco's conduct satisfied the second element of a valid NY GBL § 349 claim.  The New York Court of Appeals has defined deceptive acts or practices as misrepresentations or omissions likely to mislead a reasonable consumer acting reasonably under the circumstances.  *Oswego Laborers' Local 214 Pension Fund*, 85 N.Y.2d at 26.  As was the case with respect to Appellees' fraud claims against Hershco, there was no evidence adduced at trial upon which a reasonable fact finder could have found that Hershco engaged in deceptive acts or

practices because there was no evidence that Hershco made any misrepresentations or omissions with respect to the Appellees.

In the Order, the District Court addressed this argument in one paragraph holding that the argument that Hershco made no representations to Appellees and therefore could not be personally liable under NY GBL § 349 "has no merit in light of the Court's finding that there was sufficient evidence to pierce the corporate veil." SPA-277. Yet, the District Court's reasoning is flawed. Even assuming *arguendo* that it was appropriate to pierce the corporate veil, which it was not, and that the United Homes Entities engaged in deceptive acts or practices within the meaning of NY GBL § 349, then Hershco would be liable personally for damages attributable to the United Homes Entities. It would not, however, sustain an independent basis of liability for Hershco personally under NY GBL § 349 because in order to establish such liability Appellees were required to show that Hershco, not the United Homes Entities, engaged in deceptive acts or practices, which they did not do. By so holding, the District Court (and the jury) erroneously found Hershco liable twice for the same alleged conduct. Appellees are not entitled to a double recovery from Hershco, and the District Court failed to rectify the jury's error. Accordingly, the District Court's holding should be reversed. In addition, because Appellees' claims against Hershco personally for violation of NY GBL § 349 must be dismissed, the award of punitive damages must also be vacated.

**D. No Reasonable Juror Could Have Found A Legally Sufficient Evidentiary Basis To Hold Hershco Personally Liable for Conspiracy to Commit Fraud**

The jury also found Hershco liable for conspiracy to commit fraud and the District Court upheld this finding. But as noted throughout this brief, there was no evidence to support this finding offered at trial. To prevail on a claim for civil conspiracy against a defendant, a plaintiff must prove the underlying tort (in this case fraud) plus (1) an agreement between two or more parties, (2) an overt act in furtherance of the agreement, (3) the parties' intentional participation in furtherance of the plan or purpose, and (4) resulting damage or injury. *Meisel v. Grunberg*, 651 F.Supp.2d 98, 119 (S.D.N.Y. 2009). Here, as discussed *supra*, Appellees failed to establish Hershco's liability for fraud and the civil conspiracy finding should be overturned for this reason alone.

In addition, as also discussed *supra*, no evidence was presented to the jury upon which a reasonable fact finder could have found that Hershco even participated, let alone intentionally participated, in the alleged fraudulent conspiracy. Indeed, no evidence, circumstantial or otherwise, was presented that could lead anyone to find that Hershco had any knowledge of the alleged fraudulent scheme. Accordingly, the District Court should have granted Hershco's motion for a judgment as a matter of law and this Court should correct the District Court's error.

In denying Hershco's motion for a judgment as a matter of law, the Court obfuscated this glaring error in the jury's verdict by lumping all of the United Homes Entities and Hershco together and summarizing what the allegations of misconduct by the United Homes Entities – an error the Court permitted (and indeed encouraged) the jury to make as well by consolidating the cases for trial. SPA-263-265. Yet, here was no evidence offered at trial upon which a reasonable fact finder could have found that Hershco intentionally participated in the alleged fraudulent conspiracy. Accordingly, the Order (and the jury's verdict) should be vacated.

### E. No Reasonable Juror Could Have Found A Legally Sufficient Evidentiary Basis To Pierce the Corporate Veil and Hold Hershco Liable As The Alter Ego of the United Homes Entities

Based on the evidence adduced at trial, no reasonable fact finder could have found that piercing the corporate veil was appropriate. It is well settled that under New York law, disregarding the corporate form is an extraordinary remedy and will only be done in exceptional circumstances because the corporate form is a perfectly legitimate tool for insulating an owner from liability. *William Wrigley Jr. Company v. Waters*, 890 F.2d 594, 600 (2d Cir. 1989) (collecting cases), *Bartle v. Home Owners Coop*, 309 N.Y. 103, 106 (N.Y. 1955). In order to pierce the corporate veil a plaintiff must establish that (1) the owners exercised complete domination and control of the corporation in respect to the transaction attacked and

(2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury. *Freeman v. Complex Computing Co., Inc.,* 119 F.3d 1044, 1052 (2d Cir. 1997). Here, no reasonable fact finder could have found that Appellees offered sufficient evidence to pierce the corporate veil.

### (1) Hershco Did Not Utilize the United Homes Entities as a "Dummy" to Conduct His Personal Business

In assessing whether the owners of a corporation exercised complete domination and control over a corporation, there is no concrete criterion, especially when dealing with closely held corporations, like the United Homes Entities. Indeed in *Wrigley*, this Court stated that "preoccupation with questions of structure, financial and accounting sophistication or dividend policy or history would inevitably beckon the end of limited liability for small business owners, many, if not most, of whom have chosen the corporate form to shield themselves from unlimited liability and potential financial ruin." 890 F.2d at 600-601. The New York Court of Appeals has held that the <u>determinative factor</u> in deciding whether a shareholder dominated a corporation to such a degree to justify the extraordinary remedy of piercing the corporate veil is "whether 'the corporation is a 'dummy' for its individual stockholders who are in reality carrying on the business in their personal capacities for <u>purely personal rather than corporate ends</u>.'" *Port Chester Electrical Construction Corp. v. Atlas*, 40 N.Y.2d 652, 656

(N.Y. 1976) *quoting Walkovsky v. Carlton*, 18 N.Y.2d 414, 418 (N.Y. 1966) (emphasis added).

Moreover, as is common in the real estate industry, operating multiple corporations as an enterprise, or a corporate combine, is not the type of domination and control necessary to justify piercing the corporate veil. *Gartner v. Snyder*, 607 F.2d 582, 587 (2d Cir. 1979) ("[I]t is apparently not uncommon for real estate developers to conduct business through several different corporations …[and operating as a corporate combine] … "does not prove that Snyder used Enterprises, or the larger combine, to conduct purely personal business."). In the seminal New York case on veil piercing *Walkovszky v. Carlton*, 18 N.Y.2d 414 (N.Y. 1966), the New York Court of Appeals explicitly held that the operation of a corporate combine, in and of itself, does not demonstrate the requisite domination and control necessary to pierce the corporate veil:

> [I]t is one thing to assert that a corporation is a fragment of a larger corporate combine which actually conducts the business. It is quite another to claim that the corporation is a "dummy" for its individual stockholders who are in reality carrying on the business in their personal capacities rather than the corporate ends. Either circumstance would justify treating the corporation as an agent and piercing the corporate veil to reach the principal but a different result would follow in each case. In the first only a larger *corporate* entity would be held financially responsible while in the other, the stockholder would be personally liable. Either the stockholder is conducting business in his individual capacity or he is not. If he is, he will be liable; if he is not, then, it does not matter – insofar as his personal liability is concerned – that the enterprise is actually being carried on by a larger "enterprise entity."

*Id*. at 418-19 (citations omitted)(italics emphasis in original).

The uncontroverted evidence in this case demonstrates that the United Homes Entities were being operated not as a "dummy" for Hershco but as a corporate combine, a family of companies operating conjunctively. There was no evidence or testimony that demonstrated that Hershco comingled his assets with United Homes Entities' assets or otherwise used United Homes Entities' assets for his personal use or that the structure of the United Homes Entities as a corporate combine directly caused any injury to Appellees. In fact, Blass, Appellees' paid consultant and the only witness on the issue of veil piercing, agreed that the United Homes Entities were not a "dummy" for Hershco.[6] Specifically, in response to a question about the determinative factor in veil piercing cases, Blass testified that Hershco never took any money out of the company "arbitrarily" or for his own personal uses. A-3662-63. In fact, there was not a scintilla of evidence offered at the trial upon which any reasonable fact finder could have made a finding that the United Homes Entities were a "dummy" for Hershco conducting purely personal rather than corporate business, and thus no basis to find that Hershco dominated

---

[6] Blass characterized the United Homes Entities as Hershco's "piggy bank," but when asked about this characterization on cross examination admitted that he was referring to the transfer of funds among the companies as a means of "trying to grow the business" <u>not that Hershco was using the United Homes Entities to conduct personal business or to simply line his own pockets</u>. A-3664.

and controlled the United Homes Entities in a way that would justify piercing the corporate veil.

The United Homes Entities' audited financial statements, which Blass admitted "stood the test" of scrutiny and were prepared by an accounting firm that Blass acknowledged was "most reputable," undisputedly showed that the United Homes Entities operated a corporate combine, moving funds among the companies to further the business model of the companies, not to conduct Hershco's personal business.  A-3628; A-3642.  Notwithstanding this undisputed evidence, Blass, Appellees' paid consultant, testified that Hershco dominated and controlled the United Homes Entities because he was the sole owner of the companies and cash was transferred among the companies without being specifically accounted for as intercompany transactions.  A-3663.  Yet, the fact that the United Homes Entities operated as a corporate combine without evidence that Hershco used the United Homes Entities to conduct purely personal business is legally insufficient to justify piercing the corporate veil.  *See Gartner*, 607 F.2d at 587 ("To be sure Snyder does not deny that Enterprises has no books, files, or office distinct from those of the other corporations he controlled, nor that the Hunter Highlands files did not distinguish among the different corporations involved in the project.  [But] Snyder's disregard suggests that Enterprises was simply one arm of a larger

corporate combine; it does not prove that Snyder used Enterprises, or the larger combine, to conduct his purely personal business.").

Thus, it is inconceivable that any reasonable fact finder, including the jury in this case, could have found it appropriate to pierce the corporate veil and hold Hershco liable for the alleged fraudulent activities of the United Homes Entities based upon the evidence submitted in this case. But, of course, this claim never should have gone to the jury, and would not have if the District Court who was admittedly unfamiliar with the proper legal standards under New York law used to assess veil piercing claims had taken the time to review those legal standards instead of summarily denying Hershco's motion for a directed verdict at the close of Appellees' case. The District Court, in an attempt to mask its error, compounded its mistake by denying Hershco's post-verdict motion for a judgment as a matter of law without a thorough explanation of how the extraordinary remedy of veil piercing was appropriate in this case. This Court should not exacerbate the District Court's multiple errors by simply rubber stamping the jury's verdict and the District Court's improper denial Hershco's motion for a judgment as a matter of law.[7]

---

[7] To hold otherwise would spell the end of limited liability for smaller businesses in this circuit. If the verdict is upheld, it will be a precedent for any plaintiff to seek to hold a business owner personally liable simply because he or she owns a business without partners or other shareholders.

### (2) No Reasonable Fact Finder Could Have Found That The United Homes Entities Corporate Form Was The Proximate Cause of Appellees' Alleged Injury

Even assuming *arguendo* that the operation of the United Homes Entities as a corporate combine was sufficient to establish domination and control such domination and control does not end the inquiry.  As previously noted, piercing the corporate veil requires a showing: (1) the owner's complete domination over the corporation <u>concerning the transaction at issue</u> **and** (2) a fraud or other wrong committed <u>through that domination</u> that injures the plaintiff.  *Morris v. New York State Dep't of Taxation and Fin.*, 82 N.Y.2d 135, 141 (1993).  Stated another way, "even if a plaintiff showed that the dominator of a corporation had complete control over the corporation so that the corporation 'had no separate mind, will, or existence of its own,' New York law will not allow the corporate veil to be pierced in the absence of a showing that this control 'was used to commit wrong, fraud, or the breach of a legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights, and that the control and breach of duty proximately caused the injury complained of."  *Freeman v. Complex Computing Company*, 119 F.3d 1044, 1053 (2d Cir. 1997) *quoting Electronic Switching Industries, Inc. v. Faradyne Electronics Corp.*, 833 F.2d 418, 424 (2d Cir. 1987).

Here it is undisputed that Hershco operated his entire business as a corporate combine, which is typical for real estate developers.  This business model has no

relationship to the Appellees alleged injuries. The Appellees contend their alleged injuries stem from misrepresentations made by United Homes Entities' employees and collusion with lenders, appraisers, and employees, not that the United Homes Entities' corporate structure caused their injuries. Indeed, the record is devoid of testimony or evidence upon which a reasonable juror could conclude that the corporate structure of the United Homes Entities was the proximate cause of Appellees' alleged injuries. There is no evidence that the manner in which Hershco structured the United Homes Entities caused Appellees' homes to be overvalued or to be improperly renovated. In fact, Appellees only witness on veil piercing, Blass, testified that he was "here to talk about corporate integrity, not about the fraud." A-3646. Indeed, Blass admitted that the United Homes Entities were structured the way that they were "to grow the business" not that Hershco was using the United Homes Entities to conduct personal business or to simply line his own pockets. A-3664.

Piercing the corporate veil cases typically involve the use of the corporate form to hide assets or to avoid obligations, acts that the use of the corporate structure can be used to achieve. *See, e.g., JSC Foreign Econ. Ass'mn Technostroyexport v. International Dev. & Trade Servs., Inc.*, 295 F.Supp.2d 366, 378 (S.D.N.Y. 2003) (holding that plaintiff had alleged a basis for piercing the corporate veil where complaint alleged that two defendants abused the corporate

- 49 -

form for the purposes of placing assets beyond the reach of creditors); *Dist. Council NO. 9 v. APC Painting, Inc.* 272 F.Supp.2d 229, 241 (S.D.N.Y. 2003) (holding that plaintiff stated a claim for piercing the corporate veil where it alleged that defendant had used his companies to avoid the obligations *Rolls-Royce Motor Cars, Inc. v. Schudroff*, 929 F. Supp. 117, 122 (S.D.N.Y. 1996)imposed by certain arbitration awards); (holding that plaintiff has stated a valid veil piercing claim by alleging that defendants had used their control over various corporate entities to hide assets from creditors).  No such conduct was alleged or proven at trial.  As such, it is precisely the causative element between the alleged domination and the injury to Appellees that is missing and thus entitles Hershco to judgment as a matter of law.

### F.  Because Hershco Could Not Be Liable to Appellees as a Matter of Law, Hershco Should Not Be Required To Pay Any Damages

Based upon the foregoing, Hershco has no liability to Appellees and, as a consequence, the award of damages and the permanent injunction entered in the Judgment and the Attorneys' Fees Judgment must be vacated.

## POINT II

## HERSHCO JOINS IN THE ARGUMENTS RAISED
## BY THE UNITED HOMES ENTITIES

To the extent relevant in light of the arguments raised *supra*, Hershco joins in and adopts the arguments raised in the United Homes Entities' brief as if fully set forth herein. Specifically, the wrongful consolidation of the Appellees' trials irreparably prejudiced Hershco and tainted the record in derogation of well settled rules of evidence causing the jury to reach a result that, but for the improper presentation of unrelated and separately deficient evidence, no reasonable juror could have found to be sufficient to justify holding Hershco liable.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Hershco respectfully requests that this Court reverse the Judgment and Order and enter judgment as a matter of law in Hershco's favor.


Dated:              New York, New York
                  December 26, 2012

                              Respectfully submitted,

                              OVED & OVED LLP
                              *Attorneys for Appellant Yaron*
*Hershco*


                              By: <u>/s/ Darren Oved            </u>
                              Darren Oved, Esq.
                              Brian S. Tretter, Esq.
                              401 Greenwich Street
                              New York, New York 10013
                              (212) 226-2376

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)(7)</u>

Brian S. Tretter, an attorney admitted to practice before this Court, certifies that the foregoing brief contains 11,987 words, exclusive of the Table of Contents, Table of Authorities, and this certification and thus complies with Federal Rule of Appellate Procedure 32(a)(7)(B).  I relied upon the word count feature of Microsoft Word to prepare this certification.


Dated:              New York, New York
                    December 26, 2012

                                    ____/s/ Brian S. Tretter_____
                                        Brian S. Tretter, Esq.