# 12-2909-cv(L),
## 12-2912-cv(CON), 12-3619-cv(CON), 12-3621-cv(CON)

# United States Court of Appeals
## for the
## Second Circuit

SANDRA C. BARKLEY, aka SANDRA C. BARKLAY,

*Plaintiff-Counter Defendant-Cross Defendant-Appellee,*

– v. –

OLYMPIA MORTGAGE COMPANY,

*Defendant-Counter Claimant-Cross Defendant,*

*(For Continuation of Caption See Reverse Side of Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

# BRIEF FOR DEFENDANTS-CROSS DEFENDANTS-CROSS CLAIMANTS-APPELLANTS UNITED PROPERTY GROUP, LLC, UNITED HOMES, LLC and GALIT NETWORK, LLC

LITTLETON JOYCE
 UGHETTA PARK & KELLY LLP
*Attorneys for Defendants-Cross Defendants-*
 *Cross Claimants-Appellants United Property*
 *Group, LLC, United Homes, LLC and*
 *Galit Network, LLC*
The Centre at Purchase
4 Manhattanville Road, Suite 202
Purchase, New York 10577
(914) 417-3400

THOMAS MESSINA, DLJ MORTGAGE CAPITAL LLC,

*Defendants-Cross Defendants-Cross Claimants*,

ALLIANCE MORTGAGE CORPORATION, dba Everyhome Mortgage Company, WILSHIRE CREDIT CORPORATION, FEDERAL NATIONAL MORTGAGE ASSOCIATION, XYZ CORPORATION (Said name being fictitious, it being the intention of Plaintiff to designate any corporation having a legal interest in Plaintiff's mortgages), JP MORGAN CHASE BANK, as Trustee for the Home Equity Trust Series 2003-3 substituted as deft for Wilshire Credit Corporation and XYZ Corporation, MICHAEL B. CHEATHAM, CREDIT SUISSE FIRST BOSTON LLC, CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES, INC., BENJAMIN TURNER,

*Defendants-Cross Defendants*,

MICHAEL MASCIALE, CERTILMAN BALIN ADLER & HYMAN, LLP,

*Defendants*,

UNITED PROPERTY GROUP, LLC, UNITED HOMES, LLC, GALIT NETWORK, LLC, YARON HERSHCO,

*Defendants-Cross Defendants-Cross Claimants-Appellants.*

## Corporate Disclosure Statement

Appellants United Homes LLC, Property Group, LLC, and Galit Network, LLC, are non-governmental limited liability companies.  No publicly-held corporation holds any stock membership or similar equity financial interest in any of said entities.

# Table of Contents

**Corporate Disclosure Statement**................................................................. i

**Table of Contents** ..................................................................................... ii

**Table of Authorities** ............................................................................... iv

**Jurisdictional Statement** ..........................................................................1

**Statement of the Issues Presented for Review**.................................3

**Statement of the Case** ...............................................................................4

**Statement of Relevant Facts**...................................................................6

**Standard of Review and Relevant Law**............................................ 14

**Summary of Argument**............................................................................ 15

**Argument** .................................................................................................... 17

1.  **Consolidating these Six Separate Lawsuits for Trial Unfairly Prejudiced the Defendants**............................................................ 17

2.  **The Specific Merger Clause in each Sale Contract Bars any Fraud Claim based on a Property's Condition** ................................... 24

3.  **A Mere Breach of Contract Cannot Constitute Fraud** ........................... 28

4.  **New York does not Recognize a Separate Claim for Civil Conspiracy to Commit Fraud**....................................................... 30

5.  **The Plaintiffs did not Sufficiently Establish Evidence of Fraud to Allow the Jury's Verdict to Stand**....................................................... 31

    *A. Fraud Requires Clear and Convincing Evidence of Each Element*........ 32

    *B. An Arm's Length Seller's Failure to Disclose Information cannot, as a Matter of Law, Constitute Fraud*.................................................... 32

    *C. There was Insufficient Evidence to Support the Fraud Verdict Based Upon Plaintiffs' Claims Concerning the Houses' Value, Affordability of Mortgages, and State of Renovations*....................................................... 33

    *(1)Value is Necessarily a Matter of Opinion so cannot Constitute Fraud.* 34

    *(2)A Borrower is in the Best Position to Determine whether he can Afford to Repay a Mortgage Loan* ................................................................ 40

*(3) The Plaintiffs had a full Opportunity to Inspect Renovations or Repairs 43*

6. **The Punitive Damage Awards under New York General Business Law § 349 were Excessive as a Matter of Law** ................................................ 47

7. **The Evidences does not Establish Grounds for Punitive Damages** ....... 48

8. **The District Court should have Applied the Full Settlement Values as Set Offs under N.Y. GEN. OBLIG. L. § 15-108** ............................................ 50

9. **The Attorneys' Fee Award was Excessive Given the Plaintiffs' Limited Success at Trial** .................................................................................. 53

    *A. The Jury Rejected both the Heart of Plaintiffs' Claims and the Amount of Damages they Requested, Warranting a Significant Reduction in the District Court's Attorneys' Fee Award* ............................................ 53

    *B. Proportionality Analysis Requires a Substantial Reduction in the District Court's Attorneys' Fee Award* .............................................................. 56

    *C. The Court should Reduce Scarola, Malone & Zubatov's Fee Award to Account for their Termination* ................................................ 58

**Conclusion** ........................................................................................................ 60

**Certification Pursuant To Fed. R. App. P. 32(a)(7)(B) and (C)** ...................... 61

# Table of Authorities

## Cases

*Abrahami v. UPC Constr. Co.*,
224 A.D.2d 231 (1st Dep't 1996).................................................................... 32

*Ackerman v. Price Waterhouse*,
252 A.D.2d 179 (1st Dep't 1998).................................................................... 50

*Alaniz v. Zamora-Quezada*,
591 F.3d 761 (5th 2009). .................................................................................. 23

*Alexander & Alexander, Inc. v. Fritzen*,
68 N.Y.2d 968 (1986)...................................................................................... 30

*Alexander v. Fulton County*,
207 F.3d 1303 (11th Cir. 2000),
*overruled on other grounds*, *Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003). 23

*Amerisource Corp. v. Rx USA Int'l, Inc.*,
02-CV-2514, 2010 U.S. Dist. LEXIS 52424 (E.D.N.Y. May 26, 2010). .......... 56

*Amorgianos v. Amtrak*,
303 F.3d 256 (2d Cir. 2002). ........................................................................... 45

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*,
522 F.3d 182 (2d Cir. 2008). ........................................................................... 59

*Augsbury v. Adams*,
135 A.D.2d 941 (3d Dep't 1987) ...................................................................... 34

*Aylaian v. Town of Huntington*,
459 Fed. Appx. 25 (2d Cir. 2012) .................................................................... 28

*Barfield v. New York City Health & Hospitals Corp.*,
537 F.3d 132 (2d Cir. 2008). ........................................................................... 54

*BD v. DeBuono*,
193 F.R.D. 117 (S.D.NY. 2000)....................................................................... 23

*Bender v. City of New York*,
78 F.3d 787 (2d Cir. 1996). .............................................................................. 31

*Bender v. Underwood*,
93 A.D.2d 747 (1st Dep't 1983)........................................................................ 22

*Bernstein v. Antar (In re Crazy Eddie Sec. Litig.)*,
948 F. Supp. 1154 (E.D.N.Y. 1995)............................................................ 50, 51

*Bradford v. John A. Coleman Catholic High School*,
  110 A.D.2d 965 (3d Dep't 1985). ....................................................... 22

*Bridgestone/Firestone Inc. v. Recovery Credit Services, Inc.*,
  98 F.3d 13 (2d Cir. 1996) ................................................................ 29

*Busch v. Mastropierro*,
  258 A.D.2d. 492 (2d Dep't 1999) ....................................................... 27

*Callisto Pharm., Inc. v. Picker*,
  74 A.D.3d 545 (1st Dep't 2010) ........................................................ 32

*Chubb & Son Inc. v. Kelleher*,
  92-CV-4484, 2010 U.S. Dist. LEXIS 141842 (E.D.N.Y. Oct. 22, 2010).......... 50

*Columbus Trust Co. v. Campolo*,
  110 A.D. 2d 616 (2d Dep't)
  *aff'd*, 66 N.Y.2d 701 (1985) ............................................................ 28

*Consorti v. Armstrong World Indus.*,
  72 F.3d 1003 (2d Cir. 1995),
  *vacated and remanded on other grounds*, 518 U.S. 1031 (1996). .............. 19, 21

*Corona v. Hustedt Chevrolet, Inc.*,
  05-3526, 2009 U.S. Dist. LEXIS 120971 (E.D.N.Y. Dec. 29, 2009). .............. 23

*Costigan v. CitiMortgage, Inc.*,
  10 Civ. 8776, 2011 U.S. Dist. LEXIS 84860 (S.D.N.Y. Aug. 1, 2011) ........... 35

*Cowan v. Prudential Ins. Co.*,
  935 F.2d 522 (2d Cir. 1991). ........................................................... 56

*Crigger v. Fahnestock & Co.*,
  443 F.3d 230 (2d Cir. 2006) ............................................................. 38

*Daly v. Kochanowicz*,
  67 A.D.3d 78 (2d Dep't 2009) .......................................................... 37

*Danann Realty Corp. v. Harris*,
  5 N.Y.2d 317 (1959).............................................................. passim

*Debruyne v. National Semiconductor Corp. (In re Repetitive Stress Injury Litig.)*,
  11 F.3d 368 (2d Cir. 1993). ............................................................. 14

*Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*,
  68 N.Y.2d 954 (1986).................................................................... 29

*DiBella v. Hopkins*,
    403 F.3d 102 (2d Cir.),
    *cert. den.*, 546 U.S. 939 (2005). ....................................................................... 14

*EEOC v. HBE Corp.*,
    135 F.3d 543 (8th Cir. 1998). ........................................................................... 23

*F.H. Krear & Co. v. Nineteen Named Trustees*,
    810 F.2d 1250 (2d Cir. 1987). ..................................................................... 56, 57

*Farrar v. Hobby*,
    506 U.S. 103 (1992). ......................................................................................... 55

*Fishkill Health Related Facility v. Whalen*,
    95 A.D.2d 974 (3d Dep't 1983). ....................................................................... 33

*FTC v. Capital City Mortgage Corp.*,
    98-CV-237, Doc # 536 (D.D.C. Feb. 11, 2002). ............................................... 23

*Gaidon v. Guardian Life Ins. Co. of Am.*,
    94 N.Y.2d 330 (1999) ....................................................................................... 32

*GE v. Joiner*,
    522 U.S. 136 (1997) ......................................................................................... 45

*George Backer Mgmt. Corp. v. Acme Quilting Co.*,
    46 N.Y.2d 211, 220 (1978) ............................................................................... 32

*Getty Petroleum Corp. v. Island Transp. Corp.*,
    862 F.2d 10 (2d Cir. 1988),
    *cert. den.*, 490 U.S. 1006 (1989). ................................................................... 50

*Glussi v. Fortune Brands, Inc.*,
    276 A.D.2d 586 (2d Dep't), *app. dism'd*, 96 N.Y.2d 730 (2000). ..................... 22

*Gordon & Co. v. Ross*,
    84 F.3d 542 (2d Cir. 1996) ............................................................................... 38

*Greenberg v. Chrust*,
    282 F. Supp. 2d 112 (S.D.N.Y. 2003) ............................................................... 35

*Gronowski v. Spencer*,
    424 F.3d 285 (2d Cir. 2005). ........................................................................... 15

*Hargraves v. Capital City Mortgage Corp.*,
    140 F. Supp. 2d 7 (D.D.C. 2000). ............................................................... 22, 23

*Hart v. Moore*,
    155 Misc. 2d 203 (Sup. Ct. 1992). ................................................................... 48

*Hayrioglu v. Granite Capital Funding, LLC*,
  794 F. Supp. 2d 405 (E.D.N.Y. 2011)................................................. 42

*Honorable v. Easy Life Real Estate Sys.*,
  182 F.R.D. 553 (N.D. Ill. 1998). ....................................................... 46

*In re New York City Asbestos Litig.*,
  82 N.Y.2d 342 (1993)....................................................................... 50

*In re Repetitive Stress Injury Litig.*,
  11 F.3d 368 (2d Cir. 1993). .............................................................. 21

*Jocks v. Tavernier*,
  316 F.3d 128 (2d Cir. 2003). ............................................................ 15

*Johnson v. Celotex Corp.*,
  899 F.2d 1281, 1285 (2d Cir.),
  *cert. denied*, 498 U.S. 920 (1990). ...................................... 18, 19, 21

*Johnson v. Georgia Highway Express, Inc.*,
  488 F.2d 714 (5th Cir. 1974),
  *abrogated on other grounds by Blanchard v. Bergeron*,
  489 U.S. 87 (1989). .......................................................................... 59

*Korren v. Eli Lilly & Co.*,
  150 Misc. 2d 429 (1990). .................................................................. 22

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999). ........................................................................ 45

*Latiuk v. Faber Constr. Co.*,
  269 A.D.2d 820 (4th Dep't 2000). .................................................... 48

*LeGrand v. New York City Transit Auth.*,
  83 Fair Empl. Prac. Cas. (BNA) 1817 (E.D.N.Y. 1999).................... 22

*Light v. W2001 Metro. Hotel Realty LLC*,
  10 Civ. 4449, 2011 U.S. Dist. LEXIS 59189 (S.D.N.Y. June 2, 2011). ............ 49

*London v. Courduff*,
  141 A.D.2d 803 (2d Dep't),
  *app. dism'd without op.*, 73 N.Y.2d 809 (1988).................................. 39

*Lukaszuk v. Sudeen*,
  CV 02-5143, 2007 U.S. Dist. LEXIS 95919 (E.D.N.Y. Nov. 27, 2007). .......... 50

*Malcolm v. Nat'l Gypsum Co.*,
  995 F.2d 346 (2d Cir. 1993). ...................................................... 19, 21

*Mandarin Trading Ltd. v. Wildenstein*,
  16 N.Y.3d 173 (2011) ....................................................................... 40

*Martinez Tapia v. Banque Indosuez*,
  99-7170, 1999 U.S. App. LEXIS 29260, 5-6 (2d Cir. Nov. 3, 1999) ............... 28

*MBIA Ins. Corp. v Royal Bank of Can*.,
  28 Misc. 3d 1225A (Sup. Ct. 2010). ................................................. 33

*McCarthy v. New York City Tech. College*,
  202 F.3d 161 (2d Cir. 2000). ............................................................ 15

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005). ............................................................ 45

*Oquendo v. Federal Reserve Bank*,
  98 F.2d 708 (2d Cir.),
  *cert. den*., 305 U.S. 656 (1938) ....................................................... 28

*Pettis v. Haag*,
  84 A.D.3d 1553 (3d Dep't 2011). ...................................................... 32

*Pimpinello v. Swift & Co*.,
  253 N.Y. 159 (1930) ................................................................. 28, 43

*Ponzini v. Gatz*,
  155 A.D.2d 590 (2d Dep't 1989) ....................................................... 37

*Psenicska v. Twentieth Century Fox Film Corp.*,
  409 Fed. Appx. 368 (2d Cir. 2009) .................................................... 38

*Ramey v. Dist. 141*,
  362 Fed. Appx. 212 (2d Cir. 2010). ................................................... 15

*Randi A. J. v. Long Is. Surgi-Center*,
  46 A.D.3d 74 (2d Dep't 2007). ........................................................ 49

*Reich v. Mitrani Plasterers Co*.,
  268 A.D.2d 256 (1st Dep't 2000) ...................................................... 35

*Riordan v. Nationwide Mut. Fire Ins. Co.*,
  977 F.2d 47 (2d Cir. 1992). ................................................... 54, 55, 57

*Rocanova v. Equitable Life Assur. Soc'y*.,
  83 N.Y.2d 603 (1994) ..................................................................... 48

*Rosano v. United States*,
  67 F. Supp. 2d 113 (E.D.N.Y. 1999) .................................................. 46

*Royal American Managers, Inc. v. IRC Holding Corp.*,
    885 F.2d 1011 (2d Cir. 1989) ............................................................. 38

*Rutkin v. Reinfeld*,
    229 F.2d 249 (2d Cir.),
    *cert. den.*, 352 U.S. 844 (1956) ........................................................ 30

*SCS Communs., Inc. v. Herrick Co*.,
    360 F.3d 329 (2d Cir. 2004). ............................................................ 52

*Seis v. Plaisantin*,
    52 A.D. 206 (2d Dep't 1900) .................................................... 34, 39

*Simms v. Biondo*,
    816 F. Supp. 814 (E.D.N.Y. 1993).................................................... 34

*Sir Speedy, Inc. v. L&P Graphics, Inc.*,
    957 F.2d 1033 (2d Cir. 1992). .......................................................... 15

*Small v. Lorillard Tobacco Co.*,
    94 N.Y.2d 43 (1999)......................................................................... 39

*Smith v. Wade*,
    461 U.S. 30 (1983). .......................................................................... 49

*SRW Assocs. v. Bellport Beach Prop. Owners*,
    129 A.D.2d 328 (2d Dep't 1987). ..................................................... 30

*Stambovsky v. Ackley*,
    169 A.D.2d 254 (1st Dep't 1991)...................................................... 38

*State Farm Mut. Auto. Ins. Co. v. Accident Victims Home Health Care Servs*.,
    467 Fed. Appx. 368 (6th Cir. 2012). .......................................... 19, 20

*Van Neil v. Berger*,
    219 A.D.2d 811 (4th Dep't 1995) ..................................................... 29

*Walker v. Sheldon*,
    10 N.Y.2d 401 (1961)................................................................. 48, 49

*Washington v. Kellwood Co.*,
    05 Civ. 10034, 2009 U.S. Dist. LEXIS 32565 (S.D.N.Y. Mar. 24, 2009)......... 49

*Western World Ins. v. Stack Oil, Inc.*,
    922 F.2d 118 (2d Cir. 1990) ............................................................. 46

*Wilson v. Car Land Diagnostics Ctr., Inc.*,
    99-cv-9570, 2001 U.S. Dist. LEXIS 19760, (S.D.N.Y. Nov. 15, 2001)............ 54

*Zanett Lombardier, Ltd. v. Maslow*,
    29 A.D.3d 495 (1st Dep't 2006) ............................................................ 38

**Statutes**

28 U.S.C. § 1291 ................................................................................................ 1

28 U.S.C. § 1331 ................................................................................................ 1

28 U.S.C. § 1343 ................................................................................................ 1

28 U.S.C. § 1367 ................................................................................................ 1

42 U.S.C. § 1981 ................................................................................................ 1

42 U.S.C. § 1982 ................................................................................................ 1

42 U.S.C. § 1985 ................................................................................................ 1

42 U.S.C. § 3604 ................................................................................................ 1

42 U.S.C. § 3605 ................................................................................................ 1

N.Y. Gen. Bus. L. § 349 .......................................................................... passim

N.Y. Gen. Oblig. L. § 15-108 .................................................................. passim

**Rules**

Fed. R. Civ. P. 50 ............................................................... 1, 25, 28, 43

Fed. R. Civ. P. 59 ................................................................................ 1

Fed. R. Civ. P. 60 ................................................................................ 1

Fed. R. Evid. 404 ......................................................................... passim

Fed. R. Evid. 405 ......................................................................... 20, 22

Fed. R. Evid. 607 .............................................................................. 21

Fed. R. Evid. 608 .............................................................................. 21

Fed. R. Evid. 702 .............................................................................. 45

## Jurisdictional Statement

(A) The District Court exercised federal-question subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367 based on the plaintiffs' claims under the Fair Housing Act (42 U.S.C. §§ 3604, 3605) and civil rights claims under 42 U.S.C. §§ 1981, 1982, and 1985. The District Court also exercised supplemental jurisdiction over the plaintiffs' state law claims under 28 U.S.C. § 1367.

(B) Jurisdiction in this Court is based upon 28 U.S.C. § 1291, in that this is an appeal from a final judgment of the District Court disposing of all claims by all parties.

(C) Following a jury trial, the District Court entered a money judgment for plaintiffs on March 1, 2012 (Docket No. 613) (SPA-220).

Defendants moved for post-judgment relief under FED. R. CIV. P. 50(b), 59, and 60. On June 20, 2012, the District Court entered a final order denying the motions (docket no. 655) (SPA-226). Defendants filed a timely notice of appeal on July 18, 2012 (A-5918).

By further order dated July 30, 2012, the District Court granted plaintiffs' motion to award attorneys' fees (docket no. 658) (SPA-285). On August 10, 2012, the clerk entered the final judgment in this matter (docket no. 660) (SPA-318). Defendants filed a supplemental notice of appeal on September 7, 2012 (A-5923).

- 1 -

(D) This appeal is from a final judgment that disposes of all parties' claims.

## Statement of the Issues Presented for Review

1.   Did the District Court err in consolidating six separate trials, arising from separate transactions, concerning separate properties (each with its own unique condition issues), and involving different buyers, different financing issues, different lawyers, and different mortgage lenders?

2.   Did the District Court apply an inapplicable balancing standard in evaluating the prejudice that consolidation would cause these defendants?

3.   Did the District Court, in consolidating these cases for trial, ignore and contravene bedrock protections afforded in the Rules of Evidence?

4.   Did the District Court err in not only failing to ameliorate consolidation's prejudicial effects with cautionary instructions — which it said were necessary and appropriate when it ordered consolidation — but in giving improper and misleading instructions that aggravated that prejudice?

5.   Did the District Court err in allowing the plaintiffs to claim fraud based on the properties' conditions despite the specific merger clause in each plaintiff's contract?

6.   Did the District Court err in allowing the plaintiffs to claim fraud based on conduct that constituted, at most, a breach of contract?

7.  Did the plaintiffs adduce sufficient clear and convincing evidence to allow a reasonable jury to find fraud?

8.  Did the District Court err in allowing an award of punitive damages under N.Y. GEN. BUS. L. § 349 in addition to the jury's compensatory damage award under that same statute that exceeded $1,000?

9.  Did the plaintiffs adduce sufficient clear and convincing evidence to allow a reasonable jury to award punitive damages?

10. Did the District Court err in allowing a separate charge for civil conspiracy which resulted in duplicative damages totaling approximately $320,000?

11. Did the District Court err in refusing to apply the full consideration the plaintiffs received from the settling defendants as a set off under N.Y. GEN. OBLIG. L. § 15-108?

12. Was the District Court's award of attorneys' fees excessive?

## Statement of the Case

This appeal is from a final judgment entered in six separate lawsuits, each with different plaintiffs, arising from separate real property transactions, which the District Court (the United States District Court for the Eastern District of New York, per Hon. Kiyo A. Matsumoto, U.S.D.J.) improperly consolidated for trial.

- 4 -

In this case, eight different plaintiffs (four individuals and two couples) alleged that they had purchased real property from one of the three appellants on this brief, United Homes, LLC, United Property Group, LLC, and Galit Network, LLC ("United Homes").  United Homes bought, renovated, and resold residential real estate, primarily in urban areas, typically selling at moderate prices to people of moderate income.

The plaintiffs alleged discrimination claims based upon the defendants' race, and violations of federal, state, and municipal housing discrimination laws.  The plaintiffs also raised civil rights claims, violation of consumer protection statutes, fraud and conspiracy to defraud.

The Court, by order dated September 13, 2010 (SPA-48), denied the defendants' summary-judgment motions and granted the plaintiffs' motion to consolidate the six actions for trial.

Judge Matsumoto  conducted a jury trial in the District Court from May 9, to May 31, 2011, resulting in a verdict that: (a) rejected all of the plaintiffs' discrimination and civil rights claims; and (b) awarded monetary judgment against United Homes in each action on the plaintiffs' fraud, conspiracy to commit fraud, and state consumer protection statute (N.Y. GEN. BUS. L. § 349) claims.  SPA-220-225.  The District Court also granted the plaintiffs' request for injunctive relief. SPA-224-225.

United Homes appeals the jury verdict (A-4979) and the judgment granting injunctive relief to plaintiffs, (SPA-220), and all orders subsumed in that judgment, including the summary judgment/consolidation order described above, the District Court's order that denied United Homes post-trial motion to treat the jury's duplicate damage award as such, that partially granted and partially denied United Homes' entitlement to a full set off under N.Y. GEN. OBLIG. L. § 15-108, and awarding attorneys' fees to plaintiffs.

## Statement of Relevant Facts

United Homes was a real estate developer in the New York City area. United Homes bought older properties and, depending on the property, renovated and resold at a profit.

The plaintiffs are six buyers (two of the buyers were couples who bought together) who bought separate properties in separate transactions. Each property had its own issues and idiosyncrasies. Each transaction involved its own financing questions. Each buyer (or buyer couple) had different levels of education, home ownership experience, and financial conditions. The buyers used different lawyers and borrowed from different mortgage lenders.

The United Homes defendants purchased, renovated, and sold hundreds of residential properties in Brooklyn, turning rundown buildings into livable residential properties. Plaintiffs' counsel called this "flipping," despite knowing

that there is nothing wrong with this business, as though United Homes was not worthy enough to make these properties a little more habitable, and as though Brooklyn would have been better off allowing these buildings to go to seed.

The plaintiffs never established that this business was illegal or wrong in any way. Indeed, the plaintiffs' own experts, Dominick Pompeo and James L. Brown, confirmed as much. Trial Tr., Vol. VII, 129:23-130:2 (A-2416-2417); Trial Tr., Vol. VIII, 228:5-10 (A-2815).

United Homes dealt in existing properties but nevertheless offered its customers one-year warranties, agreeing to provide repairs post-closing. United Homes made every effort to honor its warranties. Trial Tr., Vol. II, 90:4-7 (A-1052); Trial Tr., Vol. III, 157:25-158:4 (A-1410-1411); Trial Tr., Vol. IV, 54:15-55:15 (A-1589-1590); Trial Tr., Vol. IX, 183:11-18 (A-3061), 190:7-8 (A-3068), 199:6-10 (A-3077); Trial Tr., Vol. X, 62:23-24 (A-3277), 167:3-169:3 (A-3332-3334); Trial Tr., Vol. XII, 118:15-17 (A-3829). Even Sirivishnu Khalsa, the plaintiffs' construction expert, testified that United Homes made satisfactory and up to code renovations. Trial Tr., Vol. VI, 4:16-19 (A-2046).

Plaintiffs' lead counsel, South Brooklyn Legal Services, canvassed United Homes' hundreds of customers, and convinced six buyers — without any foundation — that United Homes had discriminated against them because they were African-Americans. An unfortunate theme in these cases demonstrated that it

- 7 -

was all about the lawyers, from the time they solicited the plaintiffs to sue through

their aggressive pursuit of attorneys' fees, where they sought more than four times

the jury verdict.

United Homes had access to a network of banks, lenders, and lawyers that it

referred their customers to, trying to help them navigate the real estate process.

These individuals were not United Homes' employees, although they met with

plaintiffs at United Homes' office in Brooklyn.  Trial Tr., Vol. II, 14:13-15

(A-976); Trial Tr., Vol. III, 34:17-20 (A-1287); Trial Tr., Vol. IX, 163:16-21

(A-3041), 168:17-169:9 (A-3046); Trial Tr., Vol. V, 12:2-8 (A-1800).  United

Homes' customers, including the plaintiffs, were free to reject or use these

resources as they saw fit.  Trial Tr., Vol. I, 78:19-25 (A-912); Trial Tr. Vol. IV,

184:13-16 (A-1719); Trial Tr., Vol. X, 19:2-14 (A-3184), 25:12-26:8 (A-3190-

3191); Trial Tr., Vol. X, 162:18-20 (A-3327); Trial Tr., Vol. XII, 38:19-39:3

(A-3749).  The plaintiffs never established that this practice was wrong or illegal.

Significantly, as the plaintiffs argued in their closing statement, these

referrals formed the crux of the plaintiffs' fraud claim.  The plaintiffs contended

that United Homes conspired with banks, lawyers, and appraisers, to misstate

property values and to provide unaffordable mortgages.  Despite this network's

importance to the plaintiffs' fraud allegations, they did not call any of these

individuals or anyone from any of these companies to testify at trial.  And the scant

testimony that plaintiffs elicited at trial, from a bank to which United Homes referred plaintiffs, demonstrated no wrongdoing.  Trial Tr., Vol. III, 227:25-228:1 (A-1480-1481).

In their buying efforts, each plaintiff came to United Homes.  Some of the plaintiffs first heard about United Homes through advertising, and others were referred by friends, family, and co-workers.  Trial Tr., Vol. II, 47:2-10 (A-1009); Trial Tr., Vol. III, 28:2-7 (A-1281); Trial Tr., Vol. IV, 95:2-5 (A-1630); Trial Tr., Vol. IX, 155:5-10 (A-3033); Trial Tr., Vol. X, 147:8-11 (A-3312), 149:11-23 (A-2314); Trial Tr., Vol. XII, 20:14-18 (A-3731).  Regardless, each plaintiff (or buyer pair) looked at several properties before choosing one.  Trial Tr., Vol. I, 68:14-16 (A-902), 71:16-18 (A-905); Trial Tr., Vol. III, 31:24-32:11 (A-1284-1285); Trial Tr., Vol. IV, 99:8-9 (A-1634); Trial Tr., Vol. IX, 159:19-162:14 (A-30347-3040); Trial Tr., Vol. X, 151:10-152:22 (A-3516-3517); Trial Tr., Vol. XII, 31:13 (A-3742).  Indeed, United Homes offered to show Mr. Mathis more homes in Queens, but he declined.  Furthermore, all prices were subject to negotiation.

Each transaction at bar constituted a separate arms-length transaction, as no party was a related fiduciary, and no buyer was compelled to complete the sale. United Homes had no prior relationship with and undertook no fiduciary duty as to any plaintiff, and no plaintiff was otherwise compelled to sign a contract or

complete a purchase.  For example, when plaintiff Mary Lodge (case no. 05-CV-187) received two mortgages to sign at her closing, she admitted she could have walked away, but she chose to close the sale.  Trial Tr., Vol. III. 53:1 (A-1306). Ms. Lodge also testified that she took full responsibility for buying the property, and she did not blame United Homes for her decision to buy.  Trial Tr., Vol. III, 120, 139 (A-1373).  She also testified that no one forced her to buy the property (Trial Tr., Vol. IV, 44 (A-1579)), and she understood that she should have read her contract before signing it.  Trial Tr., Vol. IV, 67 (A-1602).  Plaintiff Miles McDale (case no.: 05-CV-5361) testified similarly that United Homes employees did not pressure him to buy, and he even walked out when he thought the price was too high.  Trial Tr., Vol. II, 64 (A-1026).  Indeed, plaintiffs' own expert, Dominick Pompeo, could not conclude any of these sales were anything but arms length. Trial Tr. Vol. VII, 129:14-17 (A-2416).

Moreover, contrary to plaintiffs' counsel's misleading and false statement to the jury that "plaintiffs were people with no experience in purchasing a property," (Trial Tr., Vol. I, 16:24-17:1 (A-852-851)), all of the plaintiffs were experienced real property buyers who understood their available options.  For example, Miles and Lisa McDale (case no. 05-CV-5362) had prior experience buying real estate and had entered a contract to buy a home in Pennsylvania.  Trial Tr., Vol. II 42:1-6, 43:12-14 (A-1002-1003).  Plaintiffs Rodney and Sylvia Gibbons (case no. 05-

CV-5302) had shopped around for a house since July 2002 with three other real estate companies.  Trial Tr. Vol. IV, 173:2-174:8 (A-1004-1005).  They signed a contract in July 2002 to buy a different property from United Homes, but they did not complete that purchase.  Trial Tr., Vol. V, 8:8-10:19 (A-1796-1798).  Mrs. Gibbons also testified that she knew she had a choice to buy.  Trial Tr., Vol. V, 112:16-17 (A-1900).

Plaintiff Mary Lodge (case no. 05-CV-187) was also an experienced property owner and buyer.  Ms. Lodge had been added as an owner of another property in Brooklyn where she lived with her two dependent sisters for 17 years. Trial Tr., Vol. III, 24:1-25:6 (A-1277-1278).  Ms. Lodge was involved in mortgaging that property to finance repairs and also in later selling the property for $520,000, for a $290,000 profit.  Trial Tr., Vol. III, 25:9-27:13 (A-1278-1280), 27:19-28:7 (A-1280-1281).  Ms. Lodge also testified that her lawyer and realtor from that prior sale were available to her, but instead she chose otherwise of her own volition.  Trial Tr., Vol. III, 138:21-139:2 (A-1391-1392).

Likewise, plaintiff DeWitt Mathis (case no. 05-CV-4386), a computer operator with an Associates Degree in Occupational Studies and Business Management (Trial Tr., Vol. IX, 151:15-16 (A-3029)), had previously shopped for real estate with another company called City Developers before he ever went to United Homes.  Trial Tr., Vol. IX, 212:10-19 (A-3090); 213:20-22 (A-3091).  Mr.

Mathis saw approximately four properties through City Developers and even

obtained financing for a different property located on Wyona Place in Brooklyn

with the same bank he claimed conspired with United Homes in this case. Trial Tr.,

Vol. IX, 215:10-216:22 (A-3093-3094); 230:14-16 (A-3108). Mr. Mathis also

appreciated the importance of inspecting a building for defects, as he had procured

an inspection report for the Wyona Place property but decided not to buy it

because City Developers would not fix the reported defects. Trial Tr., Vol. IX,

217:3-25 (A-3095).

Plaintiff Sandra Barkley (case no. 04-CV-875) is a staff analyst for the New

York City Housing Authority. Trial Tr., Vol. X, 146:3-4 (A-3311). Ms. Barkley

was not naïve, but rather was a sophisticated buyer. She pursued outside legal

consultation and made an appointment with a different lawyer. Trial Tr., Vol. X,

164:18-24 (A-3329). Plaintiff Charlene Washington also admitted she knew she

could choose any lawyer and could shop around for a mortgage. Trial Tr., Vol.

XII, 97:13-98:5 (A-3808-3809).

The plaintiffs also testified that United Homes promised to make certain

repairs, either before or after closing. The plaintiffs testified that United Homes

never made some of these repairs. Although the evidence showed they did, even if

all of the plaintiffs were not always satisfied. Trial Tr., Vol. II, 109:2-24 (A-1091);

Trial Tr., Vol. III, 157:24-158:4 (A-1410-1411); Trial Tr., Vol. IV, 54:15-55:15

(A-1589-1590); Trial Tr., Vol. IX, 183:11-18 (A-3061), 190:7-8 (A-3068, 199:6-20 (A-3077); Trial Tr., Vol. X, 62:21-24 (A-3227); Trial Tr., Vol. X, 183:15-186:6 (A-3349-3351); Trial Tr., Vol. XII, 127:8-128:7 (A-3838-3839), 139:4-8 (A-3800). Also, most of the properties were in average condition.  Trial Tr., Vol. VII, 43:1-2 (A-2330).  Each buyer inspected in advance.  Trial Tr., Vol. II, 90:4-7 (A-1052); Trial Tr., Vol. III, 46:24-49 (A-1299), 48:22-49:3 (A-1301); Trial Tr., Vol. X, 167:3-169:3 (A-3332-3334); Trial Tr., Vol. XII, 127-128 (A-3838-3839).  Thus, the plaintiffs had an opportunity to discover any defects.  Except for plaintiff Charlene Washington, all of the plaintiffs were living in the properties at the time of trial.

As time passed, many of the properties increased in value, exceeding the purchase prices.  Trial Tr., Vol. II, 114:2-15 (A-1076); Trial Tr., Vol. V, 105:25-106:3 (A-1893-1894).  The plaintiffs lived in the properties for many years without making mortgage payments even though many received rents from tenants.  Trial Tr., Vol. II, 37:4-11 (A-999); Vol. III, 55:1-16 (A-1308); Vol. V, 101:24-102:24 (A-1889-1890); Vol. XII, 53-54 (A-3764-3765); Vol. X, 177 (A-3342).

The plaintiffs never thought about suing United Homes until entities affiliated with South Brooklyn Legal Services solicited them.  Trial Tr., Vol. V, 50:21-51:3 (A-1838-1839).

By order dated September 13, 2010 (SPA-49-127), the District Court granted the plaintiffs' motion to consolidate these six actions for trial. Trial commenced on May 9, 2011, and continued until May 31, 2011. After several weeks of testimony from each plaintiff and several experts concerning the discrimination claims, value, and construction quality, the jury deliberated and awarded both compensatory and punitive damages to each plaintiff. The jury rejected the plaintiffs' discrimination claims, which were at the heart of their lawsuits. *See*, Order dated July 30, 2012 (SPA-309). After a series of post-trial motions, Judge Matsumoto also awarded attorneys' fees of $2,363,467.90, which was more than 2½ times the amount of the verdict. SPA-317.

### Standard of Review and Relevant Law

This Court reviews a consolidation order for an abuse of discretion. *Debruyne v. National Semiconductor Corp. (In re Repetitive Stress Injury Litig.)*, 11 F.3d 368 (2d Cir. 1993).

There is no dispute that the plaintiffs' state-law claims were subject to New York law. *DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir.), *cert. den*., 546 U.S. 939 (2005).

This Court must review *de novo* whether the United Homes entities are entitled to judgment as a matter of law based on insufficient evidence allowing a reasonable jury to find in Appellees' favor. *McCarthy v. New York City Tech.*

*College*, 202 F.3d 161, 167 (2d Cir. 2000).  "Whether the issue is broached on a motion for summary judgment (before trial), on a motion for a judgment as a matter of law (at trial but prior to submission to the fact finder), on a motion for judgment as a matter of law after a jury verdict, or on appeal after trial, the question is always whether, after 'drawing all reasonable inferences in favor of the nonmoving party and making all credibility assessments in his favor, there is sufficient evidence to permit a rational juror to find in his favor.' "  *Id*. at 167, *quoting Sir Speedy, Inc. v. L&P Graphics, Inc.*, 957 F.2d 1033, 1039 (2d Cir. 1992); *see also Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003).

The appellants are seeking to overturn a jury verdict, so this Court examines factual evidence "in the light most favorable to the party in whose favor the jury decided, drawing all reasonable inferences in the winning party's favor." *Gronowski v. Spencer*, 424 F.3d 285 (2d Cir. 2005).

To the extent that appellants seek to overturn the excessive award of attorneys' fees, this Court reviews the decision for an abuse of discretion**.**  *Ramey v. Dist. 141*, 362 Fed. Appx. 212, 215 (2d Cir. 2010).

## Summary of Argument

The District Court erred in consolidating these six cases for trial, as the plaintiffs' claimed injuries did not arise from a single event.  Specifically, the District Court applied the wrong standard in considering the prejudice

consolidation would cause by applying a simple balancing test instead of requiring any benefits from consolidation to yield to that prejudice.  The error allowed the plaintiffs to present the type of similar-act evidence that is disfavored under FED. R. EVID. § 404, and the District Court not only failed to ameliorate the prejudice with a cautionary instruction, but instead gave confusing instructions that only aggravated that prejudice.

Further, the District Court erred in allowing the plaintiffs to point to the properties' conditions to establish their fraud claims in light of the specific merger clause contained in each contract of sale.  Every plaintiff expressed knowledge of the property's condition, acknowledged an opportunity to inspect the property, agreed to buy "as is," and expressly waived reliance on any representation concerning the property's condition.  The District Court also erred in allowing the plaintiffs to point, in pursing fraud, to any dissatisfaction with the sellers' post-sale efforts to honor their warranties and conduct repairs.  Any failure to repair could at most constitute a breach of contract, which cannot, as a matter of law, constitute fraud.

The plaintiffs did not adduce sufficient clear and convincing evidence to allow a reasonable jury to find fraud.  No transaction implicated any fiduciary obligation; they were all at arms-length.  Value questions can never constitute anything other than an opinion and thus can never be the subject of a fraud

allegation.  Determining a mortgage loan's affordability is something only a borrower can determine, and in any event the undisputed evidence showed that these defendants were not involved in the mortgage loan process.  The state of repairs and quality of renovations, like value, constituted mere opinion.  As noted, the plaintiffs all effectively waived any claim based on property condition, and post-sale conduct at most could have constituted a breach of contract and could not have fraudulently induced any plaintiff to buy.

The punitive damages, particularly those awarded under N.Y. GEN. BUS. L. § 349, were excessive and not supported by sufficient evidence.  Moreover, the District Court should have allowed the full consideration from the settling defendants as a set off under N.Y. GEN. OBLIG. L. § 15-108, and it improperly allocated fault based on the recovery theory rather than injury.  The attorneys' fee award was similarly excessive and did not account for the jury's rejection of the plaintiffs' central discrimination claims.

## Argument

### 1.   Consolidating these Six Separate Lawsuits for Trial Unfairly Prejudiced the Defendants

The District Court erred when it granted the plaintiffs' motion to consolidate these six lawsuits for trial.  On a consolidation motion, "[c]onsiderations of convenience and economy must yield to a paramount concern for a fair and

impartial trial." *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1285 (2d Cir.), *cert. denied*, 498 U.S. 920 (1990). But while the District Court thoroughly analyzed the plaintiffs' convenience, it's analysis was flawed because it did not properly address the prejudice to defendants.

The prejudice to United Homes here, which the District Court discounted, flows from exposing the defendants to allegations of other bad acts that they should not and would not have faced trying each case separately. The consolidation and the prejudice it allowed thus subjected the defendants to an unfair trial, allowing and even encouraging one plaintiff to use another's story to make its case. It allowed the plaintiffs to paint a broad picture of the defendants and then place that picture behind each case, allowing each plaintiff's story to buttress another's claim.

Specifically, the District Court applied the wrong analytical standard to the prejudice question. The District Court improperly *balanced* prejudice against convenience, finding, "The UH Defendants' concerns regarding prejudice or confusion do not outweigh the significant benefits of consolidation." Memorandum and Order dated September 13, 2010 (docket no. 485), p. 76, SPA-123. But under the standard this Court articulated in *Johnson*, a simple balancing test to determine whether that prejudice "outweighs" convenience is not enough. Prejudice has the "right of way" at this judicial intersection, because

- 18 -

*Johnson* requires convenience to overbear and not merely "outweigh" the prejudice to defendants.

As this Court noted in *Malcolm v. Nat'l Gypsum Co*., 995 F.2d 346 (2d Cir. 1993), the *Johnson* standard only allows consolidation if prejudice and the potential for jury confusion "are overborne by" possible inconsistent adjudication; and the burdens imposed on the parties, the witnesses, and the judicial system. *Id*. at 350 (brackets omitted), quoting *Johnson*, 899 F.2d at 1285.

When considering whether to consolidate cases for trial, it is a basic premise that any benefits from consolidation must give way to any resulting potential prejudice. "Efficiency cannot be permitted to prevail at the expense of justice. … The obligation of the courts to deliver justice is paramount, and it may not be scrapped for the benefit of cheaper and more rapid dispositions." *Consorti v. Armstrong World Indus*., 72 F.3d 1003, 1006 (2d Cir. 1995) (internal citation omitted), *vacated and remanded on other grounds*, 518 U.S. 1031 (1996).

Although these cases addressed prejudice in the context of asbestos litigation, the same standards apply here. In *State Farm Mut. Auto. Ins. Co. v. Accident Victims Home Health Care Servs*., 467 Fed. Appx. 368 (6th Cir. 2012), involving alleged fraudulent medical insurance reimbursement, evidence of the defendant's similar conduct in another case involving a different, unrelated client was inadmissible because FED. R. EVID. 404(a) bars evidence of "other … wrongs

or acts … to prove the character of a person in order to show actions in conformity therewith."  *Id*. at 372.  The court also rejected admissibility under FED. R. EVID. 405(b), saying that character evidence "may not be proved by specific incidents of conduct unless the character trait is an essential element of the claim or defense." *Id*. at 373.  The court also noted the lack of cautionary jury instructions (*Id*. at 372), an error repeated at bar.

A bedrock foundation of evidence law bars other conduct outside the complaint's allegations "to show that on a particular occasion the person acted in accordance with the character."  FED R. EVID. 404(b)(2).  But piling on fraud allegations was the explicit reason the District Court gave in favor of consolidation, explaining, "The complaints in each action contain virtually identical factual allegations, claiming that the UH Defendants, among others, targeted persons of limited financial means who had never before purchased homes."  Memorandum and Order dated September 13, 2010 (docket no. 485), p. 70, SPA-117.  This finding might find firmer footing if the plaintiffs had all been parties to the same transaction, but they were not.  Each of the six actions involved separate transactions, separate meetings, separate communications, separate contracts, separate closings, and separate properties (each with its own conditions and value).  Thus, although each plaintiff sued one of the United Homes defendants, each suit involved a separate and independent transaction.  This case is

- 20 -

thus different from the asbestos exposure cases in *Johnson*, *Malcolm*, and

*Consorti*, where all the plaintiffs experienced a shared or common exposure.

Rather, proof at bar of one plaintiff's experience would not also show what another

plaintiff experienced but rather would only lead a fact finder to hear similar stories

and thereby be swayed to consider them accurate, the exact evil Rule 404(b) is

designed to thwart. Furthermore, as the District Court's words bear out, its ruling

was not designed to impeach a defense witnesses' credibility, and so Rules 607 and

608 are not relevant. Rather, this ruling was designed to help the plaintiffs

establish their case in chief, so they could use each other's stories to prove their

own.

Accordingly, this Court in *Debruyne v. National Semiconductor Corp. (In re*

*Repetitive Stress Injury Litig.)*, 11 F.3d 368 2d Cir. 1993), rejected consolidation in

a mass injury suit.

> Although consolidation may enhance judicial efficiency,
> "considerations of ***convenience and economy must yield***
> to a paramount concern for a fair and impartial trial." …
> As we have recently cautioned, 'The systemic urge to
> aggregate litigation ***must not be allowed to trump our***
> ***dedication to individual justice***, and we must take care
> that ***each individual*** plaintiff's — and ***defendant's*** —
> cause not be lost in the shadow of a towering mass
> litigation."

*Id*. at 373 (emphasis added). But unlike these courts, the District Court at bar did

not consider the issues concerning prejudice and the impact it would have on the

jury's verdict.  Other New York state cases, which follows the same standard on

consolidation, agree.  See, e.g., *Glussi v. Fortune Brands, Inc*., 276 A.D.2d 586 (2d

Dep't), *app. dism'd*, 96 N.Y.2d 739 (2000); *Bradford v. John A. Coleman Catholic*

*High School*, 110 A.D.2d 965 (3d Dep't 1985); *Bender v. Underwood*, 93 A.D.2d

747 (1st Dep't 1983); *Korren v. Eli Lilly & Co.*, 150 Misc. 2d 429, 431-32 (1990).

Moreover, the District Court misplaced reliance on *LeGrand v. New York*

*City Transit Auth.*, 83 Fair Empl. Prac. Cas. (BNA) 1817 (E.D.N.Y. 1999), which

involved an employer's policy concerning pregnant workers.  The various

plaintiffs in *LeGrand* sued on one policy, and so they pointed to a single common

fact — the one policy that affected them all — to justify consolidation.

Conversely, the plaintiffs at bar did not point to a single, common fact, but rather

to a pattern of behavior, and the District Court thus improperly allowed the

plaintiffs to use one set of allegations as evidence of similar conduct in other

transactions.  This wrongfully prejudiced the defendants, as it blatantly subjected

them to the type of evidence Rules 404 and 405 are intended to exclude.

The District Court rejected the prejudice argument and improperly

consolidated the actions primarily based on *Hargraves v. Capital City Mortgage*

*Corp*., 140 F. Supp. 2d 7 (D.D.C. 2000), but that reliance has a dubious foundation.

First, *Hargraves* included RICO claims, not present at bar, which materially invite

the type of pattern and practice evidence not relevant to any of the counts at bar.

- 22 -

Second, even the *Hargraves* court apparently tempered its decision denying

severance when it later granted severance to another defendant in the same case.

*FTC v. Capital City Mortgage Corp.*, 98-CV-237, Doc # 536 (D.D.C. Feb. 11,

2002).

The District Court also misplaced reliance in consolidating the actions on

*EEOC v. HBE Corp.*, 135 F.3d 543 (8th Cir. 1998); *Corona v. Hustedt Chevrolet,*

*Inc.*, 05-3526, 2009 U.S. Dist. LEXIS 120971 (E.D.N.Y. Dec. 29, 2009); *Alaniz v.*

*Zamora-Quezada*, 591 F.3d 761 (5th 2009); and *Alexander v. Fulton County*, 207

F.3d 1303 (11th Cir. 2000), *overruled on other grounds*, *Manders v. Lee*, 338 F.3d

1304 (11th Cir. 2003), because those employment discrimination cases also

included hostile workplace allegations, thus implicating a common (and not just

similar) experience, more like the asbestos cases and unlike the case at bar.

The District Court similarly misplaced reliance on *BD v. DeBuono*, 193

F.R.D. 117 (S.D.NY. 2000), because that case involved a motion to sever rather

than to consolidate, centered on the state's common legal obligation to various

local agencies unlike the transactions at bar, which were all factually separate and

distinct (even if allegedly similar).

Furthermore, the District Court failed to provide the type of cautionary jury

instructions that generally must accompany consolidation, instructions that the

District Court even noted, in its consolidation decision, would be appropriate here.

The District Court omitted cautionary instructions, and instead affirmatively gave

contrary instructions, directly allowing and encouraging the jury to consider this

cross-pollinated evidence for improper purposes.  In instructing on the elements of

fraud, the District Court suggested that a false statement to one plaintiff was

enough to support every plaintiff's fraud claim: "In order for ***plaintiffs*** to prevail

on ***their claims*** of fraud, the defendants must have made ***a misrepresentation*** or ***a***

***material omission*** of fact."  Trial Tr., Vol. XVI, 15:10-12 (A-4796) (emphasis

added).  The District Court also suggested that the plaintiffs could establish all of

their claims by showing that the defendants induced only one of them to buy:

> If you decide that the defendants did in fact make false
> representations to the plaintiffs, you must then decide if
> ***any misrepresentations*** made by the defendants were
> made for the purpose of inducing the plaintiffs to
> purchase and finance the subject properties.  It is not
> necessary for the representations to have been the only
> cause of plaintiffs' action or non-action; ***it is sufficient***
> that the representations were a substantial factor in
> inducing ***a plaintiff*** to purchase and finance the subject
> properties."

Trial Tr., Vol. XVI, 17:7-15 (A-4798) (emphasis added).

## 2.    The Specific Merger Clause in each Sale Contract Bars any Fraud Claim based on a Property's Condition

The plaintiffs should not have recovered in fraud based on their allegations

concerning the properties' conditions because the contract of sale in each

transaction included a specific merger clause addressing condition, in which each

buyer agreed that he or she was not relying on anything outside the contract's four corners. The District Court thus erred in denying United Homes' Rule 50(b) motion on that point. New York law enforces a specific merger clause to prevent a plaintiff from complaining that he signed a written contract relying on contrary parol representations concerning the clause's subject matter. *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320-21 (1959).

The situation in *Danann Realty* is indistinguishable from the six transactions at bar. In *Danann Realty,* the plaintiff claimed fraud in a real estate transaction based on alleged misrepresentations concerning the property's operating expenses and "profits to be derived from the investment." *Danann Realty*, 5 N.Y.2d at 319. Here, each plaintiff claimed to have been misled concerning property condition, value, and potential rental income. Trial Tr. Vol. I, 21:4-22:15 (A-855-856); 15:3-13 (A-849), 20:17-22 (A-854). The sale contract in *Danann Realty* included a specific merger clause in which the buyer represented that he had "examined the premises" and was "familiar with the physical condition thereof," and that the seller had not made any representations concerning the property's "physical condition, rents, leases, expenses, operation or any other matter or thing affecting or related to the aforesaid premises." *Id*. at 320. The buyer also "expressly acknowledge[d] that no such representations have been made," and that it had "inspected the premises and agree[d] to take the premises 'as is,' " and represented

that he had conducted a "full investigation" and had "inspected the buildings" and was "thoroughly acquainted with their condition." *Id.*

Like the plaintiffs in *Danann Realty*, each plaintiff at bar acknowledged and represented that he or she was "fully aware of the physical condition and state of repair" of the property "based on Purchaser's own inspection and investigation." A-5720. Each plaintiff also represented that he or she was entering into the contract "based solely" on the buyer's own inspection and investigation "and not upon any information, data, statements, representations, written or oral" concerning the property's "physical condition, state of repair, … or any other matter related to the premises." In this case, each plaintiff bought the property "'as is' in their present condition and state of repair." A-5720 (emphasis added).

> 12.    Condition of Property.  Purchaser acknowledges and represents that Purchaser is ***fully aware of the physical condition and state of repair*** of the Premises and of all other property included in this sale, ***based on Purchaser's own inspection and investigation*** thereof, and Purchaser is entering into this contract ***based solely upon such inspection and investigation*** and ***not upon*** any information, data, statements, representations, written or oral, as to the physical condition, state of repair, use, cost of operation or any other matter related to the premises, the other property included in the sale, given or made by Seller or its representatives, and shall accept the same ***"as is"*** in their present condition and state of repair subject to reasonable use, wear, tear and natural deterioration between the date hereof and the date of Closing (except as otherwise set forth in paragraph 16(f), without any reduction in the purchase price or

> claim of any kind for any change in such condition by
> reason thereof subsequent to the date of this contract.
> Purchase[r] and its authorized representatives shall have
> the right, at reasonable times upon reasonable notice (by
> telephone or otherwise) to Seller, to inspect the Premises
> within forty eight (48) hours before Closing.

A-5720, plaintiffs' Sales Contracts, Miscellaneous, § 12 entitled "Condition of the

Property."

The *Danann Realty* court distinguished between a boilerplate "general and

vague merger clause" and the specific type of clause at issue both here and there,

and each type of clause's relative susceptibility to a fraud claim.  With a specific

merger clause like the ones here — where the "plaintiff has in the plainest

language announced and stipulated that it is not relying on any representations as

to the very matter as to which it now claims it was defrauded" — the "specific

disclaimer destroys the allegations" that the plaintiff executed agreement "in

reliance upon these contrary oral representations."  *Id*. at 320-21.  The *Danann*

*Realty* court thus explicitly created a safe harbor from a fraud claim concerning a

property's condition when a contract employs the type of language found both at

bar and in *Danann Realty*: "If the language here used is not sufficient to estop a

party from claiming that he entered the contract because of fraudulent

representations, then no language can accomplish that purpose."  *Id*. at 323.  See

also, *Busch v. Mastropierro*, 258 A.D.2d. 492, 493 (2d Dep't 1999).

- 27 -

Each plaintiff signed his or her contract of sale and thus is conclusively bound by its terms, including those specific merger clauses. The conclusive enforceability of a written contract's terms is a fundamental foundation of New York contract law. *Pimpinello v. Swift & Co*., 253 N.Y. 159 (1930) ; *see also Columbus Trust Co. v. Campolo,* 110 A.D. 2d 616, 617 (2d Dep't), *aff'd*, 66 N.Y.2d 701 (1985). This Court strictly follows *Pimpinello*, even under extreme harsh situations. *Aylaian v. Town of Huntington*, 459 Fed. Appx. 25 (2d Cir. 2012); *Martinez Tapia v. Banque Indosuez*, 99-7170, 1999 U.S. App. LEXIS 29260, 5-6 (2d Cir. Nov. 3, 1999); *Oquendo v. Federal Reserve Bank*, 98 F.2d 708, 710 (2d Cir.), *cert. den*., 305 U.S. 656 (1938). Here, all the plaintiffs were literate and could read the sale contracts. No emergency required any plaintiff to sign without reading. And the plaintiff's testimony confirmed that United Homes did not hide any contract terms or otherwise prevent any plaintiff from reading the contracts before signing. Trial Tr., Vol. II 84:1-5 (A-1046).

**3.    A Mere Breach of Contract Cannot Constitute Fraud**

Even if United Homes broke a promise or breached a contract in responding to the plaintiffs' repair demands, that could not translate into a fraud claim. The District Court thus erred in denying United Homes' summary judgment and Rule 50(b) on that point. Alleged wrongdoing that merely constitutes a breach of contract cannot constitute fraud. *Van Neil v. Berger*, 219 A.D.2d 811 (4th Dep't

1995).  A fraud claim based on representations concerning repairs or renovations thus required the plaintiffs to prove that United Homes made promises with the preconceived and undisclosed intention not to perform.  *Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986).  In addition, any alleged representations or statements regarding future repairs could not have supported a fraud claim under New York law because no claim exists to recover damages for fraud where the only "fraud" is that one party never intended to comply with the terms of the contract.  *Bridgestone/Firestone Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996).  Any evidence of a contract breach or broken promise thus cannot constitute fraud.

The plaintiffs adduced no evidence that United Homes never intended to complete the repairs identified during "walk-through" or in inspection punch lists. To the contrary, the evidence at trial amply demonstrated that United Homes returned to the plaintiffs' homes and performed the promised repairs after closing. Trial Tr., Vol. II, 109:2-24 (A-1071); Trial Tr., Vol. III, 157:24-158:4 (A-1410-1411); Trial Tr., Vol. IV, 54:15-55:15 (A-1589-1590); Trial Tr., Vol. IX, 183:11-18 (A-3061), 190:7-8 (A-3068), 199:6-20 (A-3077); Trial Tr., Vol. X, 62:21-24 (A-3227); Trial Tr., Vol. X, 183:15-187:5 (A-3348-3352); Trial Tr., Vol. XII, 138:16-139:10 (A-3838-3839).  Thus, any dissatisfaction with United Homes'

remediation efforts could not translate into fraudulent conduct or establish that United Homes intended to ignore its warranty obligations.

### 4.    New York does not Recognize a Separate Claim for Civil Conspiracy to Commit Fraud

The District Court improperly allowed the plaintiffs' state law conspiracy claims to proceed to trial, and wrongfully refused to dismiss that count notwithstanding the jury verdict, even though New York law recognizes no such cause of action.  "There is no substantive tort of conspiracy" under New York law. *SRW Assocs. v. Bellport Beach Prop. Owners*, 129 A.D.2d 328, 332–33 (2d Dep't 1987).  "Allegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort."  *Alexander & Alexander, Inc. v. Fritzen,* 68 N.Y.2d 968, 969 (1986).  Thus, while conspiracy might constitute an element of fraud in a particular case, it is not an independent cause of action.  Consequently, "[t]he charge of conspiracy in a civil action is merely the string whereby the plaintiff seeks to tie together those who, acting in concert, may be held responsible in damages for any overt act or acts."  *Rutkin v. Reinfeld*, 229 F.2d 249, 252 (2d Cir.), *cert. den*., 352 U.S. 844 (1956).  Therefore, conspiracy cannot stand as a separate cause of action under New York law even if it constitutes a mere element of a fraud claim.  The District Court improperly allowed this confusing and legally baseless and duplicative cause of action to

proceed, ultimately leading to duplicative damages totaling approximately

$320,000 for all of the plaintiffs combined.  The Second Circuit has agreed that a

plaintiff seeking compensation for the same injury under different legal theories is

of course only entitled to one recovery.  *Bender v. City of New York*, 78 F.3d 787

(2d Cir. 1996).  Here, the District Court's instructions were affirmatively confusing

(the court's statement that "[t]he plaintiffs also claim that they were injured by a

larger conspiracy entered into by the defendants to defraud them," *see* Instructions

at 36-37), suggesting that there was a separate injury attributable to the conspiracy.

Based on the foregoing, this Court should reverse the jury verdict and remand this

case for a new trial.

**5.      The Plaintiffs did not Sufficiently Establish Evidence of Fraud to Allow
the Jury's Verdict to Stand**

Plaintiffs' also failed to adduce "clear and convincing" evidence allowing a

reasonable jury to conclude that United Homes had defrauded any plaintiff.  The

real property sales at issue were arms-length transactions, and any statements

concerning value, the affordability of a mortgage, or the quality of repairs or

renovations, could not, as a matter of law, provide the foundation for a fraud

verdict.

## A.      *Fraud Requires Clear and Convincing Evidence of Each Element*

Fraud requires proof by ***clear and convincing evidence***.  *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 349-50 (1999).  New York has long required a high order of quantitative and qualitative proof for a fraud claim. *George Backer Mgmt. Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 220 (1978). Loose, equivocal, or contradictory evidence will not suffice.  *Callisto Pharm., Inc. v. Picker*, 74 A.D.3d 545, 546 (1st Dep't 2010).  Likewise, proof constituting a mere preponderance of the evidence is not enough.  *Abrahami v. UPC Constr. Co.*, 224 A.D.2d 231, 233 (1st Dep't 1996).  A plaintiff cannot prevail on a fraud claim without proving ***each and every element of fraud*** through ***clear and convincing evidence.***  *Gaidon v. Guardian Life*.

## B.      *An Arm's Length Seller's Failure to Disclose Information cannot, as a Matter of Law, Constitute Fraud*

No reasonable jury could have concluded that United Homes had engaged in fraud, because the transactions occurred at arm's length and were between parties of ordinary intelligence and experience.  In an arms-length real property sale like the ones at bar, New York law imposes a duty on the buyer to ascertain relevant information independently, as long as the seller does not prevent the buyer from doing so.  *Pettis v. Haag*, 84 A.D.3d 1553 (3d Dep't 2011).

Each transaction at bar constituted an arms-length transaction because no party was a related fiduciary, and no buyer was compelled to complete the sale. New York courts determining "what constitutes an 'arm's-length' transaction look for interrelated business structures and associations." *Fishkill Health Related Facility v. Whalen*, 95 A.D.2d 974, 976 (3d Dep't 1983). Thus, "an arms-length relationship … by definition ***is not fiduciary in nature***." *MBIA Ins. Corp. v. Royal Bank of Can*., 28 Misc. 3d 1225A (Sup. Ct. 2010) (emphasis added). As noted above, United Homes had no prior relationship with and undertook no fiduciary duty as to any plaintiff, and no plaintiff was otherwise compelled to sign a contract or complete a purchase. Each plaintiff was free to buy or walk away, as they testified. Each plaintiff had some experience buying real property and understood the available options. None of the plaintiffs were unsophisticated or vulnerable purchasers.

## C.    *There was Insufficient Evidence to Support the Fraud Verdict Based Upon Plaintiffs' Claims Concerning the Houses' Value, Affordability of Mortgages, and State of Renovations*

The plaintiffs could not have met their burden of proof as to fraud based on their contentions that: (1) they paid more than what their properties were worth; (2) they undertook unaffordable mortgage obligations; or (3) they were deceived as to the state of renovations and repairs. Trial Tr., Vol. XV, 26:8-17 (A-4517). But applying the elements of fraud to plaintiffs' assertions establishes they failed to

submit sufficient evidence to support their claims, and the case should not have been submitted to the jury.

### *(1)  Value is Necessarily a Matter of Opinion so cannot Constitute Fraud.*

The plaintiffs' argument, that they paid more than what the properties were worth cannot serve as the basis for fraud under New York law, because the value of real property is by definition a matter of opinion.  Value is not a fact, which is necessary to establish fraud.  New York has long held that a statement concerning the value of real property is mere opinion.  *Simms v. Biondo*, 816 F. Supp. 814 (E.D.N.Y. 1993).  Sellers and buyers' opinions often differ regarding a property's value.  And a post-sale difference of opinion does not mean a pre-sale misrepresentation occurred:

> It is well settled that a false statement as to the value of property, made by a vendor for the purpose of obtaining a higher price ***than he knows the property is worth***, will ***not sustain an action for fraud*** by a purchaser who contracted for the purchase in reliance upon such statement; that the ***purchaser must rely upon his own judgment*** as to value, and that it is ***folly to rely*** upon the representation of the vendor in that respect.

*Seis v. Plaisantin*, 52 A.D. 206 (2d Dep't 1900) (emphasis added); *see also, Augsbury v. Adams*, 135 A.D.2d 941 (3d Dep't 1987).  An alleged misrepresentation of a property's value is thus neither material nor actionable.

- 34 -

Similarly, exaggerations of value made during the sales process or opinions as to future events cannot constitute fraud. *Costigan v. CitiMortgage, Inc*., 10 Civ. 8776, 2011 U.S. Dist. LEXIS 84860 (S.D.N.Y. Aug. 1, 2011). By definition, expressions of mere opinion or puffery do not constitute the "representations of fact" that are necessary to state a fraud claim. *Greenberg v. Chrust*, 282 F. Supp. 2d 112, 120-21 (S.D.N.Y. 2003), *quoting Reich v. Mitrani Plasterers Co*., 268 A.D.2d 256 (1st Dep't 2000).

In the case at bar, no plaintiff established that United Homes made a statement regarding value that constituted a factual representation. To the contrary, the plaintiffs introduced no testimony from the appraisers who originally appraised their homes. The plaintiffs did not elicit or introduce even a scintilla of evidence (much less what might qualify as clear and convincing evidence) demonstrating how United Homes set prices. Without evidence as to how United Homes set prices, no reasonable jury could have concluded that it artificially or fraudulently inflated its prices. Assuming *arguendo* that the prices constituted factual representations, the plaintiffs did not introduce any documents or testimony establishing that a material misrepresentation had been made.

The evidence concerning value came through their experts' ***opinion*** testimony, which underscored the point that ***statements of value are statements of opinion, not fact***. Even the plaintiff's expert, Dominic Pompeo, conceded that he

- 35 -

has seen individuals pay above "market value" for property, and that a buyer's opinion regarding value can differ and even exceed the seller's opinion.  Trial Tr., Vol. VII, 123:1-4 (A-2410).

But Mr. Pompeo's opinions of value were fatally flawed because he did not explain *why* his appraised values differed from the appraisals performed at the time of sale.  Trial Tr., Vol. VII, 43:23-60:8 (A-2330).  The plaintiffs did not explain why Mr. Pompeo's opinion, expressed solely as their hired gun, differed so drastically from the other appraisers.  Rather, the plaintiffs simply presented his opinion and improperly asked the jury to fill in the missing pieces of the "clear and convincing" puzzle.

Further, plaintiffs' expert, James Brown, did not know whether the appraisals were right or wrong.  Trial Tr., Vol. VII, 242:10-11 (A-2529).  He did not suggest that United Homes exerted any pressure, either directly or indirectly, on the appraisers to inflate values.  Trial Tr., Vol. VIII, 80:14-16 (A-2667).  He saw no evidence of an improper appraisal, and he did not infer that the appraisers acted improperly.  Trial Tr., Vol. VIII, 143:20-144:1 (A-2730-2731); 215:10-18 (A-2802).  Finally, he underscored that an appraisal is an opinion when he testified that if someone wants to pay more for a property, he or she can.  Trial Tr., Vol. VIII: 227:17-228:10 (A-2814-2815). Mr. Brown's testimony thus established not

only that United Homes made no material misrepresentations, but that it conducted itself properly in all respects in these arms-length transactions.

The evidence adduced at trial demonstrated that each plaintiff negotiated the price and knew he or she could have investigated a property's value. For example, Mr. McDale convinced the defendants to reduce his price by $20,000. Trial Tr., Vol. II, 75:12-14 (A-1037); 176:1-8 (A-1038). Mr. Mathis similarly negotiated a $10,000 price reduction. Trial Tr., Vol. IX, 173:10-174:1 (A-3051-3052); Vol. X, 66:8-19 (A-3231). The Gibbonses bargained for a $10,000 price reduction, and Ms. Gibbons did not even regret buying the property, as she only decided to sue because she received a flyer from her eventual attorney. Trial Tr., Vol. IV 122 (A-1657); Trial Tr., Vol. V, 117 (A-1905). In addition, Mr. McDale testified he knew about websites that provided comparable home prices. Trial Tr., Vol. II, 113:16-19 (A-1075). Thus, there can be no fraud claim as to matters a plaintiff can discover by using or deny intelligence. *See, Danann Realty Corp. v Harris*, 5 N.Y.2d at 322 (internal quotation marks omitted); *see also Daly v. Kochanowicz*, 67 A.D.3d 78, 91 (2d Dep't 2009); *Ponzini v. Gatz*, 155 A.D.2d 590, 590-91 (2d Dep't 1989). Here, in these arms-length transactions, the plaintiffs had all the means and knowledge available to assess a property's value.

The plaintiffs also cannot establish the justifiable reliance element based on any statements concerning property value. The proper test of reliance in a fraud

case is "justifiable" reliance. *Gordon & Co. v. Ross*, 84 F.3d 542, 546 (2d Cir. 1996). A party cannot justifiably rely on an alleged misrepresentation if he or she could have discovered the true facts or conditions by ordinary intelligence or with reasonable investigation. *Zanett Lombardier, Ltd. v. Maslow*, 29 A.D.3d 495 (1st Dep't 2006). Further, a party cannot rely on an alleged false representation if the allegedly misrepresented facts were not peculiarly within the other party's knowledge and if both parties had the means to ascertain the truth. *Crigger v. Fahnestock & Co*., 443 F.3d 230, 234 (2d Cir. 2006). If a plaintiff "should have discovered the facts … [then] any reliance under such circumstances therefore would be unjustifiable." *Royal American Managers v. IRC Holding Corp.*, 885 F.2d 1011, 1016 (2d Cir. 1989). In New York, where a plaintiff "has in the plainest language announced and stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded," the disclaimer "destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon these contrary oral representations." *Psenicska v. Twentieth Century Fox Film Corp.,* 409 Fed. Appx. 368, 371 (2d Cir. 2009), *quoting Danann Realty Corp. v. Harris*, 5 N.Y.2d at 320-21.

New York law requires a purchaser to rely solely on her own judgment to determine value. *Stambovsky v. Ackley*, 169 A.D.2d 254 (1st Dep't 1991); *London v. Courduff*, 141 A.D.2d 803 (2d Dep't), *app. dism'd without op*., 73 N.Y.2d 809

(1988).  Reliance on a seller's representation of value has been called "folly" that cannot support a claim.  *Seis v. Plaisantin*, *supra*.  Here, the plaintiffs were all experienced buyers of ordinary intelligence with the means to ascertain the truth of any representations concerning value.  Trial Tr., Vol. II 42:1-6 (A-1004), 43:12-14 (A-1005); Trial Tr., Vol. III, 24:1-28:7 (A-1277-1281); Trial Tr., Vol. V, 8:8-10:19 (A-1796-1798); Trial Tr., Vol. IX, 212:10-19 (A-3090); 213:20-22 (A-3091), 215:10-216:22 (A-3093-3094), 230:14-16 (A-3108).  Facts were not peculiar to one party as opposed to the other.  Nothing prevented any plaintiff from conducting independent research concerning any property.  Each plaintiff could have obtained a property appraisal and an independent property inspection.  Trial Tr., Vol. III, 46:24-49:3 (A-1299-1302); Trial Tr., Vol. III, 48:22-49:3 (A-1301-1302); Trial Tr., Vol. II, 85:1-3 (A-1047); Trial Tr., Vol. IX, 170:24-25 (A-3048); Trial Tr., Vol. XII, 138:16-139:10 (A-3849-3850).  And any plaintiff could have simply used Internet resources to investigate property values.  Trial Tr., Vol. II, 113:16-19 (A-1075).

Injury is another essential element of fraud.  *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43 (1999).  There was also insufficient evidence adduced at trial that plaintiffs suffered injury or damages as a result of any purported misrepresentations regarding any opinion of value, because the properties all

increased in value since purchase.  Trial Tr., Vol. II, 114:2-15 (A-1076); Trial Tr.,

Vol. V, 105:25-106:3 (A-1893-1894).

### (2)    *A Borrower is in the Best Position to Determine whether he can Afford to Repay a Mortgage Loan*

The plaintiffs' evidence regarding the mortgages' affordability (or lack

thereof) was also insufficient as a matter of law for the same reasons mentioned

concerning value.  Nothing in the record shows that United Homes was involved in

the mortgage underwriting process.  Furthermore, the record does not support the

plaintiffs' allegations that United Homes did not help secure tenants as promised to

help offset mortgage payments.  In any event, any alleged misrepresentation that

ultimately amounted to an unfulfilled promise cannot constitute actionable fraud.

*Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 179 (2011).

The trial record demonstrates that every plaintiff who wanted a tenant

secured one.  The McDales and the Gibbonses both secured tenants within six

months after they moved in.  Trial Tr., Vol. II, 37:4-11 (A-999); Trial Tr., Vol. IV,

138:13 (A-1073).  United Homes helped Ms. Washington obtain a tenant who paid

$1,450 per month in rent.  Trial Tr., Vol. XII, 53-54 (A-3764-3765).

Furthermore, referrals to Olympia and Alliance were the only evidence that

plaintiffs presented linking United Homes to the lenders.  In their closing statement

the plaintiffs pointed only to Olympia's underwriting practices to identify evidence

- 40 -

they considered relevant to the affordability issue.  They introduced absolutely no evidence suggesting that United Homes had any involvement in, knowledge of, or control of Olympia's or Alliance's underwriting practices other than the mere referral.  And each plaintiff was free to select a lender independently — United Homes did not require that any plaintiff obtain a mortgage from Olympia or Alliance.  Even the plaintiffs' expert James Brown acknowledged that United Homes did not provide the mortgage loans.  Trial Tr., Vol. VIII, 103:3-7 (A-2690).  To this point, the Gibbonses knew they were not obligated to use the mortgage brokers or banks that United Homes suggested.  Trial Tr., Vol. IV, 184:13-19 (A-1219).  In addition, United Homes did not tell Mr. Mathis that he had to use Alliance or Gateway to obtain a mortgage.  Trial Tr., Vol. X, 19:2-4 (A-3184).  Before the closing, Mr. Mathis met with Mr. Israel, a bank representative, who told him that he was not affiliated with United Homes.  Trial Tr., Vol. IX, 168:17-169:9 (A-3046-3047).  Ms. Washington also testified that she knew she could shop around for other mortgages.  Trial Tr., Vol. XII, 97:22-24 (A-3808).  And no one from United Homes spoke with Ms. Washington about her ability to obtain a mortgage.  Trial Tr., Vol. XII, 39:11-13 (A-3750).  As plaintiffs' counsel stressed in her summation, plaintiffs linked their unaffordable mortgage claims directly to Olympia's underwriting processes (Trial Tr., Vol. XV, 40:19-20 (A-4531); 42:7-

15, 18-19 (A-4533); 43:4-6, 16-18 (A-4534)), to which United Homes was not connected.

Further, the plaintiffs had all the information they needed to easily ascertain affordability.  Each plaintiff testified to understanding the mortgages' terms and conditions.  For example, Mrs. Gibbons acknowledged that the documents she signed indicated both the mortgage's amount and rates.  Trial Tr., Vol. V, 27:19-30:7 (A-1815-1818).  Similarly, Ms. Lodge, a previous homeowner with experience obtaining mortgages, testified that she knew her mortgage's terms.  Trial Tr., Vol. III, 78:19-79:16 (A-1331-1332).  Mr. Mathis said he was told about his mortgage, including its terms and interest rate.  Trial Tr., Vol. IX, 168:17-169:9 (A-3046-3047).

Accordingly, no reliance on any statement regarding affordability could have been justifiable.  Reliance on a statement about affordability cannot be justifiable unless the lender lied about the mortgage documents' contents if a few relatively simple mathematical calculations would have revealed the payment obligation.  *Hayrioglu v. Granite Capital Funding, LLC*, 794 F. Supp. 2d 405, 414 (E.D.N.Y. 2011).  Nevertheless, Mrs. Gibbons said she never "ran the numbers" to see what she could afford precludes any finding of reasonable reliance.  Trial Tr., Vol. IV, 182-183 (A-1717-1718).  Therefore, plaintiffs failed to establish justifiable reliance in this regard.

- 42 -

In sum, any plaintiff who wanted tenants procured tenants at some point after moving in, and the plaintiffs knew about the mortgages' terms.  In addition, as a matter of law, the plaintiffs failed to present evidence attributing statements or representations regarding mortgage affordability to United Homes, who did not participate in the loan process.  Regardless, as a matter of law, the written mortgage contracts conclusively bind the plaintiffs.  *Pimpinello v. Swift & Co.* 253 N.Y. at 162-63.

The District Court thus erred in denying United Homes' motion for summary judgment and Rule 50 motions because the plaintiffs could not, as a matter of law, state a fraud claim.  For that reason, this Court should reverse and remand for a new trial.

### (3)    *The Plaintiffs had a full Opportunity to Inspect Renovations or Repairs*

The record included no material representations or omissions regarding repairs.  To this point, Mr. McDale said that he relied on his own observations instead of an independent inspection or appraisal to determine the property's quality.  Trial Tr., Vol. II, 85:1-3 (A-1047).  Mr. McDale proposed a punch list of items that he wanted repaired, based on his own inspection and walk-through before the closing, and United Homes fixed all but one of those punch list items.  Trial Tr., Vol. II, 90:4-7 (A-1052).  Similarly, Ms. Lodge obtained an independent

property inspection, and United Homes completed the resulting requested repairs.
Trial Tr., Vol. III, 46:24-49:3 (A-1299-1302); Vol. III, 48:22-49:3 (A-1301-1302).
And Ms. Lodge also testified about additional repairs that United Homes
performed after she moved in.  To this point, United Homes returned and repaired
her property six or seven times during the first two years she lived there (Trial Tr.,
Vol. III, 157:24-158:4 (A-1410-1411); Vol. IV, 54:15-55:15 (A-1589-1590)), even
after the one-year warranty period expired.  United Homes sent someone to
complete a repair every time Mr. Mathis called.  Trial Tr., Vol. IX, 183:11-18;
190:7-8; 199:6-20 (A-3060, 3068, 3077); Trial Tr., Vol. X, 62:23-24 (A-3227).
Before her closing, Ms. Barkley inspected and walked through the property and
prepared a punch list (Trial Tr., Vol. X, 167:3-169:3 (A-3332-3334), and United
Homes performed all of those repairs after she moved in.  Specifically, United
Homes fixed the door, the downstairs radiator, and the basement floor.  Trial Tr.,
Vol. X, 183:15-186:6 (A-3348-3351).  Ms. Washington also testified that United
Homes sent someone out every time she called with a problem.  Trial Tr., Vol. XII,
118:15-17 (A-3829).

Similarly, the evidence reflected no material misrepresentations regarding
renovations.  Again, plaintiffs' evidence on this point primarily came through an
expert's *opinion*, but the *opinions* of that expert, Sirivishnu Khalsa, cannot turn an

alleged promise into a *factual* statement or turn puffery or permissible exaggeration into material factual statements.

Mr. Khalsa based all of his opinions on unestablished assumptions (Trial Tr., Vol. VI, 157, 162 (A-2199, 2204)), and thus they were not properly submitted to the jury in accordance with FED. R. EVID. § 702. Khalsa also improperly based his testimony in part on photographs taken in 2009, six years after the sales. These photos could not have accurately depicted the properties when they were purchased and thus could not have served as a reliable foundation for an opinion about the quality of renovations. This evidence was therefore insufficient to support damage claims and should not have been admitted in evidence. Allowing Mr. Khalsa's testimony over United Homes' objections was prejudicial given that it was only based on his own experience and nothing else. Courts routinely reject such *ipse dixit* testimony to support an expert opinion. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999); *GE v. Joiner*, 522 U.S. 136, 146 (1997); *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005); *Amorgianos v. AMTRAK*, 303 F.3d 256, 266 (2d Cir. 2002). Neither *Daubert* nor the Rules of Evidence requires a district court to admit opinion evidence that is only connected to existing data by the testifying expert's *ipse dixit (GE v. Joiner*, 522 U.S. at 146), which is not even enough to defeat summary judgment. *Rosano v. United States*, 67 F. Supp. 2d 113,

118 (E.D.N.Y. 1999), *citing Western World Ins. Co. v. Stack Oil, Inc*., 922 F.2d

118, 121 (2d Cir. 1990).

Mr. Khalsa acknowledged that no law, code, statute, or regulation provides a

factual definition of the terms "newly renovated," "gut renovated," or "fully

renovated" (Trial Tr., Vol. VI, 163:17-164:2 (A-2205-2206)), which formed the

center of the plaintiffs' contention that United Homes had fraudulently represented

any property by those terms. He also conceded that he had not seen any

documentation implying that the plaintiffs were getting completely gut- renovated

properties. Trial Tr., Vol. VI, 162:16-24 (A-2204). If anything, any statements

describing the quality or extent of renovations constituted, as a matter of law,

inactionable opinion or puffery. For example, calling a property "newly

renovated" cannot be actionable in fraud without evidence defining "newly

renovated," which is mere puffery that provides no concrete factual representation

and is thus not actionable. Terms like "newly rehabbed" or "renovated" "are

subjective and incapable of proof" and thus cannot be the foundation for a fraud

claim. *Honorable v. Easy Life Real Estate Sys*., 182 F.R.D. 553, 564-65 (N.D. Ill.

1998). Stated differently, mere dissatisfaction with a repair does not amount to

fraud. Mr. Khalsa even admitted that many of the renovations were satisfactory

and up to code, and that he might have erred in some of his conclusions about the

extent of renovations (thereby necessarily missing the applicable clear and

convincing standard).  Trial Tr. Vol. VI, 4:16-19 (A-2046), 139:22-141:16

(A-2181-2183).  Furthermore, the plaintiffs' expert appraiser testified that most of

the properties he inspected were in average condition.  Trial Tr., Vol. VII, 43:1-2

(A-2330).

**6.    The Punitive Damage Awards under New York General Business Law § 349 were Excessive as a Matter of Law**

The punitive damages awarded under New York General Business Law

§ 349 were excessive as a matter of law and should have been stricken.  The jury

allowed two separate awards to each plaintiff (or plaintiff pair) under section 349:

a compensatory award of $1,000, and a punitive damage award of $5,000.  Trial

Tr. Vol. XVII, 9:3-13, 11:20 (A-5019, 5021).  These punitive damage awards are

thus excessive as a matter of law, because the statute does not allow any punitive

damage award if the compensatory damages equal or exceed $1,000.

> [A]ny person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions.  The court may, in its discretion, ***increase the award of damages*** to an amount not to exceed three times the actual damages ***up to one thousand dollars.***

N.Y. GEN. BUS. L. § 349(h) (emphasis added).  Thus, "once actual damages exceed

$1,000, ***there can be no increase for punitive damages***.  It appears that punitive

damages may ***only*** be awarded where the ***total award, together with the punitive***

- 47 -

**damages, does not exceed $1,000**." *Hart v. Moore*, 155 Misc. 2d 203, 207 (Sup. Ct. 1992).

The decision in *Latiuk v. Faber Constr. Co*., 269 A.D.2d 820 (4th Dep't 2000), does not lead to a different result because *Latiuk* did not sustain punitive damages available under section 349 but rather dismissed a claim for punitive damages (also based on alleged defective construction) did not rise to the level of "moral turpitude" that *Walker v. Sheldon*, 10 N.Y.2d 401, 405 (1961), requires for punitive damages. Furthermore, the *Latiuk* court explicitly acknowledged the $1,000 recovery cap, stating, "If plaintiffs establish defendant's intent to defraud or mislead, however, they may be entitled to an award of treble damages **up to $1,000** under General Business Law § 349." *Latiuk*, 269 A.D.2d at 821 (emphasis added).

**7.    The Evidences does not Establish Grounds for Punitive Damages**

Since the evidence did not meet the standard necessary to establish the plaintiffs' fraud claims, the punitive damage awards must fail. New York does not recognize an independent cause of action for punitive damages: "[a] demand or request for punitive damages is parasitic and possesses no viability absent its attachment to a substantive cause of action." *Rocanova v. Equitable Life Assur. Soc'y.*, 83 N.Y.2d 603, 616 (1994).

"[T]he standard for awarding punitive damages is extraordinarily stringent."

*Washington v. Kellwood Co.*, 05 Civ. 10034, 2009 U.S. Dist. LEXIS 32565, *34

(S.D.N.Y. Mar. 24, 2009).

> In order to recover punitive damages, it must be shown
> that the defendant "acted with ***actual malice*** involving an
> intentional wrongdoing, or that such conduct amounted
> to a wanton, willful or reckless disregard of plaintiffs'
> rights." To support a finding of actual malice, there must
> be an "evil motive on the part of the defendant," such
> that the defendant's actions were done out of "***hatred, ill***
> ***will, [or] spite***" for the plaintiff.

*Light v. W2001 Metro. Hotel Realty LLC*, 10 Civ. 4449, 2011 U.S. Dist. LEXIS

59189 (S.D.N.Y. June 2, 2011). And, as noted above, under New York law

punitive damages in a fraud case are only available "where the defendant's conduct

evinced a high degree of moral turpitude and demonstrated such wanton dishonesty

as to imply a criminal indifference to civil obligations." *Walker v. Sheldon*, 10

N.Y.2d at 405. Establishing this type of "criminal indifference" requires proof "of

actual malicious intent." *Smith v. Wade*, 461 U.S. 30, 43 n.9 (1983). The evidence

did not establish these elements, particularly to the applicable clear and convincing

evidence for each element. *Randi A. J. v. Long Is. Surgi-Center*, 46 A.D.3d 74, 86

(2d Dep't 2007). The plaintiffs at bar offered no evidence establishing these

elements sufficient to warrant punitive damages.

**8.    The District Court should have Applied the Full Settlement Values as Set Offs under N.Y. Gen. Oblig. L. § 15-108**

Section 15-108 of New York's General Obligations Law reduces a non-settling tortfeasor's liability by the greater of (1) the amount of the settling tortfeasor's settlement; or (2) the settling tortfeasor's equitable share of fault. Where several tortfeasors settle, the court aggregates settlements and applied, under the same formula. *In re New York City Asbestos Litig.*, 82 N.Y.2d 342 (1993). The statute applies to any state law tort claim, including a claim sounding in common law tort. *Chubb & Son Inc. v. Kelleher*, 92-CV-4484, 2010 U.S. Dist. LEXIS 141842, n.12 (E.D.N.Y. Oct. 22, 2010); *Lukaszuk v. Sudeen*, CV 02-5143, 2007 U.S. Dist. LEXIS 95919 (E.D.N.Y. Nov. 27, 2007). As long as the judgment compensated the same injuries that were the subject of the settled claims, the non-settling defendant is entitled to an offset under section 15-108 ***without regard to the theory*** supporting the claims or to whom the claim is directed, because section 15-108 applies if the settlement payment represented compensation for the same injuries as the verdict's compensatory award. *Getty Petroleum Corp. v. Island Transp. Corp.*, 862 F.2d 10, 15-16 (2d Cir. 1988), *cert. den.*, 490 U.S. 1006 (1989). In other words, the statute applies if the settling and not-settling defendants caused the same injury. *Bankr. Servs. v. Ernst & Young (In re CBI Holding Co), supra, citing Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 196 (1st Dep't 1998). As the court said in the *Crazy Eddie Securities Litigation* case, even though

- 50 -

the settlement encompassed negligence claims never
asserted against Antar, ***the critical inquiry is the harm
caused*** by the settling defendants ***rather that the
difference in theories*** of liability giving rise to the claims
against them.  The claims in negligence, fraud or
misrepresentation all led to the same result — inflating
the value of Crazy Eddie securities and defrauding
innocent purchasers.  Since the settled claims involve the
***same injuries*** and damages as those caused by Antar,
some sort of ***set-off*** of the settlement payment is
***required***.

*Bernstein v. Antar (In re Crazy Eddie Sec. Litig*.), 948 F. Supp. 1154, 1168

(E.D.N.Y. 1995) (emphasis added).  The case at bar is strikingly similar to the

*Crazy Eddie* case because the plaintiffs here claimed that all of the defendants,

whether settling or non-settling, contributed to the same injuries, *to wit*, the

"inflated" values and financing costs.  Each plaintiff identified these common

injuries that both the settling and non-settling defendants caused.  Although the

counts against the banks raised different theories and alleged different conduct than

the counts against United Homes, the plaintiffs alleged identical injuries.  The

plaintiffs alleged that the settling defendants "aided and abetted the fraudulent

property flipping scheme" and that "without the secondary market funding

provided by the CSFB entities, Olympia would not have been able to originate the

related victims' loans because it would have had nowhere to sell them, and

plaintiff and others would not have been victimized by the fraudulent property

flipping scheme."  Lodge Third Amended Complaint, ¶¶ 90 & 92 (A-240-241).

- 51 -

This unitary injury was at the crux of the plaintiffs' conspiracy theories, through which they alleged the various defendants caused the same loss.

As long as the defendant raised § 15-108 as a defense before adjudication of liability it is entitled to the statute's offset protections. *Schipani v. McLeod*, 541 F.3d 158 (2d Cir. 2008). Here, United Homes raised § 15-108 as an affirmative defense in all of its answers. A-702. Pleading the statute in this manner thus put the plaintiffs on notice that the defendants would seek a reduction, thereby allowing the plaintiffs to order their trial strategy accordingly as to categories or bases of damages. *SCS Communs., Inc. v. Herrick Co.*, 360 F.3d 329, 345-46 (2d Cir. 2004).

Here, the District Court omitted a number of items of damage from the setoff that it should have included. First, it allowed no credit for settlements from Rule 19 defendants, reasoning they were not tortfeasors. But the District Court did not identify any other injuries these settlement payments might have compensated, thus knowingly approving a double recovery that even it acknowledged state law disfavored. Second, the court only allowed a portion of other co-defendants' settlement payments, attributing those unapplied portions to noneconomic injury under the discrimination counts that the jury rejected. But even attributing some of those settlement payments to the discrimination claim does not identify a separate injury in this case. The plaintiffs pursued those same claims at trial against United

Homes, but they neither pled such losses nor offered any evidence — such as psychiatric testimony — supporting any such noneconomic injury. Since the verdict form (A-4979), which the plaintiffs have so vehemently defended, did not offer any option for the jury to distinguish between economic and injuries even under the discrimination counts, there can be no basis for such an allocation on setoff. Finally, the District Court gave no credit for the nonmonetary settlements involving mortgage forgiveness. Those forgiven mortgage loans represented the very same purchase prices the plaintiffs screamed were inflated, yet the District Court refused to order the plaintiffs to disclose the forgiven loan amounts. Even after applying the allowed monetary setoffs, those forgiven loan amounts would have eclipsed any remaining damages.

## 9.    The Attorneys' Fee Award was Excessive Given the Plaintiffs' Limited Success at Trial

### A.    *The Jury Rejected both the Heart of Plaintiffs' Claims and the Amount of Damages they Requested, Warranting a Significant Reduction in the District Court's Attorneys' Fee Award*

Though each plaintiff or pair of plaintiffs sought approximately $6 million in damages, together they only recovered approximately $1.1 million combined. Trial Tr., Vol. XV, 75, 78, 80 (A-4566, 4569, 4571). The District Court therefore erred in awarding grossly excessive attorneys' fees, particularly when considering the jury's rejection of the plaintiffs' central discrimination claims. ''

- 53 -

"The most critical factor in a district court's determination of what constitutes reasonable attorney's fees in a given case is the degree of success obtained by the plaintiff." *Barfield v. New York City Health & Hospitals Corp.*, 537 F.3d 132, 152 (2d Cir. 2008). The Second Circuit requires a thorough review of the case to compare the results with the relief Plaintiffs sought:

> A district court's assessment of the "degree of success" achieved in a case is not limited to inquiring whether a plaintiff prevailed on individual claims. Both "the quantity and quality of relief obtained," ***as compared to what the plaintiff sought*** to achieve as evidenced in her complaint, are key factors in determining the degree of success achieved. Indeed, this comparison "promotes the court's 'central' responsibility to 'make the assessment of what is a reasonable fee under the circumstances of the case.'"

*Id.* (emphasis added, internal citations omitted). The same analysis applies under New York law, and specifically in cases under N.Y. GEN. BUS. L. § 349. *See, e.g.*, *Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 54 (2d Cir. 1992); *Wilson v. Car Land Diagnostics Ctr., Inc.*, 99-cv-9570, 2001 U.S. Dist. LEXIS 19760, *2-3 (S.D.N.Y. Nov. 15, 2001).

Plaintiff enjoyed only a limited success at trial. The jury rejected the discrimination claims at the heart of this action. While the District Court recognized that the unsuccessful "discrimination claims were central to the plaintiffs' actions, as evidenced by the substantial discovery work, research, and

- 54 -

briefing devoted to those claims," the attorneys' fee award in the amount of

$2,480,286.25 did not so reflect.  *See*, Judge Matsumoto Memorandum and Order

at 33.  The jury also awarded significantly less in total damages than plaintiffs

requested.  Any fees incurred for trial thus represented wasted effort that the Court

should not reward, as the plaintiffs could have already received the same amount in

mediation at far less cost.  For that reason, the defendants should not be held

responsible for the cost of litigation.  Accordingly, this Court should significantly

reduce the amount awarded to Plaintiffs in attorney fees.

Both the Supreme Court and this Court have recognized that the district

court "is obligated to give primary consideration to the amount of damages

awarded as compared to the amount sought."  *Kassim v. City of Schenectady,* 415

F.3d at 254, quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992).  Case results are a

key factor in evaluating a fee award under N.Y. GEN. BUS L. § 349.  *Riordam v.*

*Nationwide Mut. Fire Ins. Co*., 979 F.2d at 53.  Because all plaintiffs recovered far

less damages than requested, the fee awarded should be significantly reduced.

The jury awarded far lower amounts than the plaintiff sought in damages.

Each plaintiff sought $200,000 in "emotional damages," and the jury awarded

nothing.  Trial Tr., Vol. XV, 78 (A-4510); Trial Tr., Vol. XVII, 11-13, 18-20, 25-

27, 32-34, 39-42, 47-49 (A-5021-5023, 5028, 5035-5037, 5042-5044).  Each

plaintiff sought $800,000 in punitive damages for fraud, but the jury awarded

$60,000.  Trial Tr., Vol. XV, 80 (A-4571); Trial Tr., Vol. XVII, 11, 18, 25, 32, 39,

47 (A-5022, 5028, 5035, 5042, 5049, 5057).  Because the District Court's award of

attorneys' fees did not reflect the plaintiffs' limited success at trial, this Court

should strike the award in its entirety or, alternatively, remand and reduce the

award to $350,000 in accordance with the proportionality analysis.

**B.**     ***Proportionality Analysis Requires a Substantial Reduction in the District Court's Attorneys' Fee Award***

Although New York and federal fee law for the most part employ the same

analysis, they differ in certain limited respects, including proportionality analysis.

In civil rights cases, the Second Circuit forbids a proportionality analysis in

determining attorneys' fees.  *Cowan v. Prudential Ins. Co.*, 935 F.2d 522, 526-27

(2d Cir. 1991).  But under New York law, proportionality is the general rule: "New

York courts have stated that, as a general rule, they will rarely find reasonable an

award to a plaintiff that exceeds the amount involved in the litigation."  *F.H. Krear*

*& Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1264 (2d Cir. 1987);

*Amerisource Corp. v. Rx USA Int'l, Inc*., 02-CV-2514, 2010 U.S. Dist. LEXIS

52424 (E.D.N.Y. May 26, 2010).  Accordingly, in a case under N.Y. GEN. BUS. L.

§ 349 case, the Second Circuit affirmed a trial court's limitation of fees to 50% of

the recovery, expressly based on proportionality analysis:

> In calculating the award, the district court limited the
> amount to one half of the total amount of damages

> awarded . . . The district court expressly noted that it was
> limiting the final award to fifty percent of the recovery,
> rather than using the fifty percent figure as the
> determinant of the appropriate fee. In setting this
> relationship between the amount recovered and the
> amount of the fee award, the district court merely
> exercised its discretion with respect to one factor
> considered in arriving at an appropriate fee award: the
> result obtained. In a case such as this, where the issues
> and claims intertwine to such a great extent, a limitation
> based on the total recovery does not seem unreasonable
> to us.

*Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d at 54.

The New York proportionality rule should apply here.  A departure from the rule requires the District Court to articulate a basis for an exception.  *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d at 1264.  "Exceptions to this general rule may be made where the court finds that the benefits of the litigation reached far beyond the amount sought in the immediate suit …"  *Id.*   The mere fact that other plaintiffs may have similar claims is not a basis for an exception to the proportionality rule — the *Krear* court expressly noted that other plaintiffs had similar claims against the same defendants but nevertheless applied the proportionality rule.  *Id.*  The *Krear* court limited the fee for plaintiffs' recovery to one-third of the amount recovered (before considering plaintiffs' success on the defendants' counterclaims).  *Id.*

United Homes acknowledges that Plaintiffs did obtain some relief beyond individual damages, as the Court awarded injunctive relief. But given the limited success in this matter, combined with the extreme examples of excessive and block billing, Defendants request that Plaintiffs' attorneys' fees be limited to no more than 35% of the total monetary recovery rendered at the time of verdict. This would grant Plaintiffs a substantial fee commensurate with the results in this case that is also reasonable in light of all the factors warranting a reduction in the rates and hours submitted by plaintiffs' counsel as well as the applicable law.

Due to the Second Circuit's emphasis on incorporating all case-specific factors as part of the initial determination of reasonable hours and rates, plaintiffs believe the Court should achieve this proportionality in setting the amount of hours allowed as reasonable, and the reasonable hourly rates, rather than an adjustment to the presumptively reasonable fee.

## C.    *The Court should Reduce Scarola, Malone & Zubatov's Fee Award to Account for their Termination*

In 2009, the plaintiffs terminated Scarola, Malone & Zubatov ("SMZ," then known as Scarola Ellis) as their attorneys. The record does not reflect the plaintiffs reason, and the District Court denied defendants' request for discovery to determine the reasons for the firm's termination. *See*, docket entry order entered

May 2, 2012. Defendants urge that SMZ's termination warrants a reduction in its requested fees.

The factors for evaluating a fee award include: "the nature and length of the professional relationship with the client." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 186 n.3 (2d Cir. 2008), *citing Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron,* 489 U.S. 87, 92-93, 96 (1989). Although Defendants do not know why the plaintiffs terminated SMZ, the materials of record show that the firm wished to continue the representation but withdrew after current counsel told them that the plaintiffs wanted to end the representation. *See* correspondence directed to the Court from Richard Scarola dated February 2, 2009. It seems obvious that Plaintiffs fired SMZ because they were unsatisfied with the firm, or else they would have continued the representation. Plaintiff's unsatisfactory relationship with SMZ indicates that the Court should further reduce its fees to account for the discord in the attorney-client relationship and the plaintiffs' dissatisfaction with the firm.

Given that the District Court refused to allow additional discovery pertaining to the reasons for SMZ's termination, the defendants could not argue this point further during the post trial proceedings below. Thus, United Homes asks this

Court remand this issue back to the District Court so it can take additional

discovery regarding the circumstances that led to SMZ's termination.

### Conclusion

For the reasons stated above, the undersigned appellants ask this Court to

reverse the judgment and dismiss the complaint, or, in the alternative, to reverse

the judgment and remand for new and separate trials, together with the costs of this

appeal.


Dated:         Purchase, New York
               December 26 2012

                              Respectfully submitted

                              LITTLETON JOYCE
                              UGHETTA PARK & KELLY LLP
                              Attorneys for Defendants-Appellants
                              UNITED HOMES, LLC, UNITED
                              PROPERTY GROUP, LLC, GALIT
                              NETWORK, LLC,


                              By:   /s/Bryon L. Friedman
                                    Bryon L. Friedman, Esq.
                                    Jason P. Sultzer, Esq.
                              The Centre at Purchase
                              4 Manhattanville Road, Suite 202
                              Purchase, New York  10577
                              (914) 417-3400
                              File no. 00147.00001

**Certification Pursuant To**
**Fed. R. App. P. 32(a)(7)(B) and (C)**

The undersigned hereby certifies that the foregoing brief complies with the

type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and (C) because the brief

contains 13,452 words of text.

The brief complies with the typeface requirements of Fed. R. App.

P.32(a)(5) and the type style requirements of Fed.R.App.P.32(a)(6) because this

brief was prepared in a proportionally spaced typeface using Microsoft Word 2003,

Times New Roman, Size 14.

Dated: December 26, 2012

  /s/Bryon L. Friedman
Bryon L. Friedman, Esq.

**UNPUBLISHED OPINIONS**



DESIREE LeGRAND et al., Plaintiffs, -against- NEW YORK CITY TRANSIT AU-
THORITY et al., Defendants.

95-CV-0333 (JG)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW
YORK

*1999 U.S. Dist. LEXIS 8020*; 83 Fair Empl. Prac. Cas. (BNA) 1817

May 26, 1999, Decided

**NOTICE:**       [*1]  FOR ELECTRONIC PUBLICA-
TION ONLY

**DISPOSITION:**    Plaintiffs' motion for class certifica-
tion denied. Their motion for consolidation with Adrian
v. New York City Transit Auth., 96-CV-6204, granted.

**COUNSEL:** KATHLEEN PERATIS, Esq., New York,
N.Y., for Plaintiffs.

RICHARD SCHOOLMAN, Esq., Office of the General
Counsel, New York City Transit Authority, Brooklyn,
N.Y., for Defendants.

**JUDGES:** JOHN GLEESON, United States District
Judge.

**OPINION BY:** JOHN GLEESON

**OPINION**

*MEMORANDUM AND ORDER*

JOHN GLEESON, United States District Judge:

Plaintiffs, current and former employees of the New
York City Transit Authority ("TA"), brought this action
under *42 U.S.C. § 1983* and Title VII of the Civil Rights
Act of 1964, *42 U.S.C. § 2000e et seq.*, alleging that the
TA maintains a practice or policy of discriminating
against pregnant employees in its Subway Operations
Division. On April 11, 1997, defendants made a motion
for summary judgment, which I referred to the Honora-
ble Joan M. Azrack, United States Magistrate Judge.
Judge Azrack issued a Report and Recommendation on

March 25, 1998, recommending denial of defendants'
summary judgment motion, which I adopted in its entire-
ty in an order dated August 13, 1998.

[*2]  On August 14, 1998, plaintiffs moved for class
certification, pursuant to *Federal Rules of Civil Proce-
dure 23(a)* and *23(b)(2)*, and for an order consolidating
this matter with *Adrian v. New York City Transit Auth.,
1997 U.S. Dist. LEXIS 23236, 96*-CV-6204, pursuant to
*Federal Rule of Civil Procedure 42(a)*. These motions
were also referred to Judge Azrack. On February 18,
1999, she issued a report recommending that I grant
plaintiffs' motions for class certification and for consoli-
dation. Defendants have objected to Judge Azrack's Re-
port and Recommendation and plaintiffs have responded
to those objections. Pursuant to *Federal Rule of Civil
Procedure 72(b)*, I have conducted a *de novo* review of
Judge Azrack's Report. In addition, I have considered the
parties' submissions to Judge Azrack. Having reviewed
this material, I respectfully decline to adopt Judge Az-
rack's recommendation with respect to class certification,
but I adopt her recommendation with respect to consoli-
dation. Accordingly, plaintiffs' motion for class certifica-
tion is denied, and their motion for consolidation is
granted.

*BACKGROUND*

Judge Azrack's Report and Recommendation of
March 25, 1998 fully describes the facts underlying this
action.  [*3]  I will restate them here only as necessary.

Plaintiffs, eleven women currently or formerly em-
ployed by the TA as road conductors and road train op-
erators, were pregnant at some point during their tenure
at the TA. They allege that the TA treated them less fa-

Case: 12-2909    Document: 111    Page: 76    12/26/2012    802358    153

Page 2

1999 U.S. Dist. LEXIS 8020, *; 83 Fair Empl. Prac. Cas. (BNA) 1817

vorably than non-pregnant employees with respect to restricted duty assignments.

Conductors and train operators at the TA must undergo an examination by a TA doctor at the TA's Medical Assessment Center ("MAC") if one of the following circumstances applies to them: (a) if they seek a restricted duty assignment; (b) if they get injured while on duty; (c) after an absence from work of over twenty-one days; (d) for scheduled visits; (e) if they report certain medical conditions; or (f) if sent there by a supervisor. At the MAC, the TA doctor assesses employees' physical condition to determine whether they can perform their regular assignment, an assignment with certain restrictions, or no work at all. On the employees' medical evaluation forms, the doctor indicates either "full work," "restricted work assessment," or "no work," according to his or her determination. Employees who receive restricted work designations then go to Employee [*4] Availability, which assigns them to jobs depending on the doctor's appraisal of their limitations.

For road conductors with restricted work assessments, Employee Availability designates them for work assignments as follows: (1) "work own job," meaning the employee returns to her regular position indefinitely; (2) "platform work," an unbudgeted position, meaning the TA pays the employee out of accrued sick, vacation, and other leaves to perform work on the platform; (3) "no work available" ("NWA"), which puts the employee on an unpaid leave status; or (4) "administrative assignment," also an unbudgeted position. With respect to road train operators with restricted work assessments, Employee Availability assigns them as follows: (1) "work own job"; (2) "no passenger trains," meaning the employee works as a yard train operator indefinitely; (3) "no work available"; or (4) "administrative assignment."

Plaintiffs allege that TA doctors routinely give pregnant employees restricted work assessments even though these employees remain able to work without limitations. Moreover, plaintiffs claim that those pregnant employees who receive restricted work assessments, appropriately or not, are [*5] assigned to unbudgeted positions or NWA status more often than their peers with similar work restrictions. They maintain that such discrimination against pregnant employees exists systemically throughout the TA Subway Operations Division. For this reason, plaintiffs have proposed to consolidate their case with a similar one, *Adrian v. New York City Transit Auth.*, and style the matter as a class action. According to plaintiffs, twenty-four conductors and operators went on maternity leave in 1994. Taking this number as an estimate of potential class members for each year from 1993 to the present, plaintiffs arrive at 100 as the number of individuals comprising their putative class, which consists of "all train operators and conductors employed by the TA

who were adversely affected by defendants' illegal pregnancy discriminatory policies" since the fall of 1993. Plaintiffs' Mem. of July 1, 1997, at 37.

*DISCUSSION*

A. *The Motion for Class Certification*

*Rule 23 of the Federal Rules of Civil Procedure* establishes a two-step analysis for determining whether a class action is appropriate. First, a potential class representative must show that the proposed class satisfies [*6] *Rule 23(a)*'s requirements that:

> (1) the class is so numerous that joinder of all members is impracticable,
>
> (2) there are questions of law or fact common to the class,
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

*Fed. R. Civ. P. 23(a)*. Second, the potential class representative must demonstrate that the proposed class falls within one of the three subsections of *Rule 23(b)*. In this case, plaintiffs rely on the second subsection, which authorizes a class action if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." *Fed. R. Civ. P. 23(b)(2)*.

The burden of proving each of the requisite elements of *Rule 23* rests with the party seeking certification. *See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 117 S. Ct. 2231, 2245, 138 L. Ed. 2d 689 (1997)*. Failure to prove any element precludes certification. *See id.; Ansari v. New York* [*7] *Univ., 179 F.R.D. 112, 114 (S.D.N.Y. 1998)*. While courts should apply a "liberal rather than restrictive construction" to *Rule 23, Marisol A. v. Giuliani, 126 F.3d 372, 377 (2d Cir. 1997)*, the Supreme Court has stated that courts must undertake a "rigorous analysis" to determine whether the movant has met her burden of proving she has satisfied the rule. *General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 161, 72 L. Ed. 2d 740, 102 S. Ct. 2364 (1982)*.

In this case, defendants assert that plaintiffs' motion for class certification should be denied because they have failed to satisfy the requirements of both *Rule 23(a)* and *Rule 23(b)(2)*. Defendants also contend that the motion

should be denied on the ground that plaintiffs made it in an untimely manner.

1. *The Requirements Under Rule 23(a)*

   a. *Numerosity*

   For a court to certify a class, *Rule 23(a)* requires a finding that the numerosity of injured persons makes joinder of all class members "impracticable." *Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993)*. Impracticable does not mean impossible, but simply difficult or inconvenient. *See id.; Primavera Familienstiftung v. Askin, 178 F.R.D. 405, 409 (S.D.N.Y. [*8] 1998)*; 7A Charles Alan Wright *et al., Federal Practice and Procedure § 1762 (2d ed. 1997)*. Moreover, plaintiffs need not provide a precise quantification of their class, since a court may make "common sense assumptions" to support a finding of numerosity. *DeFlumer v. Overton, 176 F.R.D. 55, 58 (N.D.N.Y. 1997)*; *see also German v. Federal Home Loan Mortgage Corp., 885 F. Supp. 537, 551 (S.D.N.Y. 1995)*. Nevertheless, "as the bearers of the burden to show joinder is impracticable, 'plaintiffs must show some evidence of or reasonably estimate the number of class members.'" *German, 885 F. Supp. at 551* (quoting *Barlow v. Marion County Hosp. Dist., 88 F.R.D. 619, 625 (M.D. Fla. 1980)*); *see also Narwick v. Wexler, 901 F. Supp. 1275, 1278 (N.D. Ill. 1995)* (stating that "a putative class representative must provide some evidence as to the size of the class; 'he or she cannot rely on conclusory allegations that joinder is impractical [sic] or on speculation as to the size of the class in order to prove numerosity'" (quoting *Marcial v. Coronet Ins. Co., 880 F.2d 954, 957 (7th Cir. 1989)*)).

   Plaintiffs define the class as approximately 100 pregnant women who have worked [*9] for the TA as train operators and conductors since the fall of 1993. According to plaintiffs, they satisfy the numerosity requirement because "joinder of this many women is impracticable." Plaintiffs' Mem. of July 1, 1997, at 39. Defendants, on the other hand, respond that plaintiffs have failed to satisfy the numerosity requirement because, among other things, they have not provided evidence that anyone other than the named plaintiffs falls within the proposed class. According to defendants, plaintiffs' method of estimating the number of class members has not produced a realistic result.

   I agree that plaintiffs have failed to proffer sufficient evidence to permit a reasonable estimate of the number of persons who fit within the proposed class. In determining that number, plaintiffs use twenty-four -- the number of TA conductors and operators who went on maternity leave in 1994 -- as the number of conductors and operators who take maternity leave in a typical year, and they multiply that number by four years to arrive at

approximately 100 as the number of individuals comprising their putative class. This class consists of "all train operators and conductors employed by the TA who [*10] were adversely affected by defendants' illegal pregnancy discriminatory policies" since the fall of 1993. Plaintiffs' Mem. of July 1, 1997, at 37. Other than some of the named plaintiffs, however, plaintiffs have provided no evidence that any other members of the purported class had any contact with TA doctors or Employee Availability that resulted in inappropriate work assignments or leave. Moreover, going on maternity leave is not the equivalent of being pregnant. At the TA, women and men can take maternity leave in the event of adoption or for some other child care purpose, *i.e.*, not only because of pregnancy.

   To state that all TA operators or conductors who took maternity leave since 1993 faced discrimination because of pregnancy, therefore, amounts to pure speculation. That argument does not provide a basis for a reasonable estimate of the number of individuals contained in the proposed class. Nor does it allow the Court to infer that the class is necessarily so large as to make joinder impracticable. Rather, it represents a naked assertion with no factual support, such as the number of conductors and operators who were actually pregnant, how many months before giving birth [*11] pregnant employees were placed on NWA status, or how long maternity leave for these individuals lasted. *See Green v. Borg-Warner Protective Servs. Corp., 1998 U.S. Dist. LEXIS 292, No. 95 Civ. 10419, 1998 WL 17719, at *4 (S.D.N.Y. Jan. 15, 1998)* (rejecting argument that plaintiffs satisfied numerosity requirement by simply alleging that all homeless people in New York City shelters faced discrimination, absent evidence pertaining to those other than named plaintiffs); *DeFlumer v. Overton, 176 F.R.D. 55, 59 (N.D.N.Y. 1997)* (finding that plaintiffs failed to meet numerosity requirement in action against debt collector without evidence of number of consumers who had actually received threatening letters); *Ross v. Nikko Sec. Co. Int'l, Inc., 133 F.R.D. 96, 97 (S.D.N.Y. 1990)* (holding that plaintiffs' statistical evidence, offered in support of their race and national origin discrimination claims, did not demonstrate existence of class of individuals with similar grievances).

   Even if 100 were a realistic number, I would still find that plaintiffs have failed to meet the numerosity requirement. Numerosity and the issue of whether joinder is practicable do not depend upon hard numbers. *See Elliott Assocs. [*12] v. J. Henry Schroder Bank & Trust Co., 655 F. Supp. 1281, 1285 (S.D.N.Y. 1987)* ("In dealing with the issue of numerosity, we deal with it not in absolute numbers, but in the relationship of the numbers of the putative class members involved to their economic interests and all of the other circumstances peculi-

Case: 12-2909    Document: 111    Page: 78    12/26/2012    802358    153

Page 4
1999 U.S. Dist. LEXIS 8020, *; 83 Fair Empl. Prac. Cas. (BNA) 1817

ar to this case."), *aff'd*, 838 F.2d 66 (2d Cir. 1988). In determining whether a proposed class "is so numerous that joinder of all members is impracticable," courts examine several factors, including the following: (1) judicial economy; (2) the geographic dispersion of class members; (3) class members' financial resources; (4) the ability of claimants to institute individual lawsuits; (5) knowledge of the names and existence of the potential class members; and (7) requests for injunctive relief that would involve future class members. *See Robidoux, 987 F.2d at 936; Familienstiftung, 178 F.R.D. at 410.*

Plaintiffs have barely addressed these factors relevant to the issue of impracticability of joinder. In any event, I agree with defendants that the application of these factors to the instant action does not support a grant of class certification. First, [*13] the prospective class members are not geographically dispersed. All work or have worked for the TA and apparently live within New York City. *See Universal Calvary Church v. City of New York, 177 F.R.D. 181, 183 (S.D.N.Y. 1998)* (concluding that joinder would not be impracticable because putative class members all lived in Queens, Brooklyn, or Nassau County). Second, the evidence indicates that these class members do not lack the financial resources necessary to render joinder impracticable. During the period specified by plaintiffs, conductors and operators at the TA earned an average of $ 47,318 a year, enough for the Court to reasonably infer that each has the ability to retain an attorney either to join in the pending action or to file a separate suit, should she wish to do so. *See Ansari v. New York Univ., 179 F.R.D. 112, 115 (S.D.N.Y. 1998).*

Third, a class action would not better serve judicial economy than would joinder. In either case, subclasses of the various plaintiffs would exist since the facts surrounding the claims of the named plaintiffs alone differ significantly. In order to subdivide in this manner, the exact nature of the individual claims will have to be [*14] analyzed and categorized. Class certification will thus produce no saving of judicial effort, while joinder, on the other hand, would fortify control over the proceeding.

Finally, while plaintiffs state that they seek injunctive relief, the only specific relief they have requested is monetary. Considering the nature of the violation alleged -- discrimination based on pregnancy -- and plaintiffs' focus on significant compensatory and punitive damages, there exists little possibility that separate trials could lead to inconsistent injunctive relief. Moreover, the potential plaintiffs see for a large recovery in damages for each plaintiff runs counter to one of the basic tenets underlying the promulgation of *Rule 23. See Stoudt v. E.F. Hutton & Co., Inc., 121 F.R.D. 36, 38 (S.D.N.Y. 1988)* ("When the size of each claim is significant, and each

proposed class member therefore possesses the ability to assert an individual claim, the goal of obtaining redress can be accomplished without the use of the class action device.").

I find that plaintiffs have failed to establish that their putative class is so numerous that joinder of all members would be impracticable.

b. *Commonality and* [*15] *Typicality*

Plaintiffs also fail to satisfy *Rule 23(a)*'s commonality and typicality requirements. With respect to these requirements in the context of a Title VII claim, the Supreme Court has explained:

> Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class of claims. For respondent to bridge that gap, he must prove much more than the validity of his own claim.

*General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 157-58, 72 L. Ed. 2d 740, 102 S. Ct. 2364 (1982)* (holding that district court erroneously presumed that individual plaintiff's claim was typical of other claims against plaintiff's employer).

To "bridge" this conceptual gap, courts in Title VII actions subsequent to *Falcon* have required individual plaintiffs to establish that there [*16] are aggrieved persons in the purported class, primarily through affidavits from employees alleging discriminatory treatment or other evidence confirming the existence of an aggrieved class. *See, e.g., Ross v. Nikko Sec. Co. Int'l, Inc., 133 F.R.D. 96, 97 (S.D.N.Y. 1990); Sheehan v. Purolator, Inc., 103 F.R.D. 641, 649 (E.D.N.Y. 1984), aff'd, 839 F.2d 99 (2d Cir.), cert. denied, 488 U.S. 891, 102 L. Ed. 2d 216, 109 S. Ct. 226 (1988); Grant v. Morgan Guar. Trust Co. of N.Y., 548 F. Supp. 1189, 1193 (S.D.N.Y. 1982).* The number of aggrieved employees so identified must bear some statistically significant relationship to the relevant portion of the employer's workforce. *See Sheehan, 103 F.R.D. at 648-49.* Even prior to the *Falcon* decision, some courts refused to certify Title VII class actions where the plaintiff had failed to produce affida-

Case: 12-2909    Document: 111    Page: 79    12/26/2012    802358    153

Page 5

1999 U.S. Dist. LEXIS 8020, *; 83 Fair Empl. Prac. Cas. (BNA) 1817

vits or other evidence establishing the existence of an aggrieved class. *See, e.g., Wright v. Stone Container Corp., 524 F.2d 1058, 1062 (8th Cir. 1975); Richardson v. Restaurant Mktg. Assocs., Inc., 83 F.R.D. 268, 270 (N.D. Cal. 1978); Steffin v. First Charter Fin. Corp., 77 F.R.D. 498, 500 (C.D. Cal. 1978)*. [*17]

In this case, plaintiffs have submitted no affidavits from, or any other evidence related to, any aggrieved persons not already named in the suit. To establish typicality and commonality, they rely upon statistics from which they estimate the number of employees who went on maternity leave since 1993. As discussed above in Part 1.a. above, however, these raw numbers do not, by themselves, establish the existence of an aggrieved class of pregnant employees. *See Sheehan, 103 F.R.D. at 649*. The statistics do not offer the relevant comparisons of similarly-situated pregnant and non-pregnant employees who had work restrictions or who took leave, nor do the statistics alone indicate that other pregnant employees felt aggrieved. *See id.; Steffin, 77 F.R.D. at 500*.

Furthermore, the details underlying each named plaintiff's circumstances are sufficiently varied that it appears doubtful their claims present common questions of fact or that they represent allegations typical of other pregnant employees. While most of the named plaintiffs sought restricted duty, for instance, a few claim they did not. The TA sent most of the plaintiffs home on NWA status involuntarily, after restricted [*18] duty assignments of varying lengths, but three (Palmer, Thomas, and Mehrtens) did not go home involuntarily and worked until they no longer wanted to work. Of those sent home involuntarily, some claim they were fit enough to continue performing their restricted duty assignments, but at least one (Pryce) submitted a certificate from her private physician stating that she could not perform her duties and recommending bed rest. Some plaintiffs have indicated they had pleasant or helpful interaction with the named defendants, others have indicated they had no interaction with the named defendants, and some claim they encountered difficulties with the named defendants. Plaintiff Palmer alleges only that she was afraid the TA would send her home if it discovered she was pregnant, although the TA never sent her home, and she worked as long as she wanted.

The differing circumstances underlying each plaintiff's claims, combined with plaintiffs' failure to establish the existence of an aggrieved class, lead me to conclude that plaintiffs have not met *Rule 23(a)*'s commonality and typicality requirements.

### c. *Adequacy of Representation*

Plaintiffs without claims typical of those of the putative [*19] class cannot adequately represent that class. *See Cullen v. New York State Civil Serv. Comm'n, 435 F.*

*Supp. 546, 560 (E.D.N.Y. 1977)*. I need not determine the adequacy of representation in this case, however, since I have already concluded that plaintiffs have failed to satisfy the other three requirements of *Rule 23(a)*.

### 2. *The Requirements Under Rule 23(b)(2)*

Even if plaintiffs had met the requirements of *Rule 23(a)*, their motion for class certification would still fail because they have not demonstrated that their action falls within one of the subsections of *Rule 23(b)*. As mentioned above, plaintiffs rely on the second subsection of that rule, which authorizes a class action if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." *Fed. R. Civ. P. 23(b)(2)*. Certification under *Rule 23(b)(2)*, however, "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." *Fed. R. Civ. P. 23(b)(2)* advisory committee's note. Rather, certification under [*20] this rule pertains to cases in which the plaintiffs seek broad declaratory relief.

The instant action is not that type of case. Each of the plaintiffs in this action seeks $ 1,000,000 in compensatory damages for emotional distress as well as an additional $ 1,000,000 in punitive damages. This significant sum of money that each hopes to gain, combined with the plaintiffs' failure to spell out in any meaningful way the injunctive relief they seek, makes clear that final relief here relates predominantly to money damages. The well-established doctrine in this circuit is that *Rule 23(b)(2)* "was never intended to cover cases. . . where the primary claim is for damages, but is only applicable when the relief sought is exclusively or predominantly injunctive or declaratory." *Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 564 (2d Cir. 1968), vacated on other grounds*, 417 U.S. 156 (1974); *see also Goldberg v. Winston & Morrone, P.C., 1997 U.S. Dist. LEXIS 3521*, No. 95 Civ. 9282, 1997 WL 139526, at *4 (S.D.N.Y. Mar. 26, 1997). While showing typicality and commonality under *Rule 23(a)*, which plaintiffs have failed to show, goes a long way toward satisfying *Rule 23(b)(2)*'s requirement of commonality, in *Rule* [*21] *23(b)(2)* "the predominance criterion is far more demanding." *Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 117 S. Ct. 2231, 2250, 138 L. Ed. 2d 689 (1997)*. Plaintiffs' argument that they primarily seek declaratory relief, and are pursuing damages only incidentally, is untenable. *See Langley v. Coughlin, 715 F. Supp. 522, 551 n.27 (S.D.N.Y. 1989)* ("In fact it is obvious that the predominant relief sought is damages and the purported declaratory relief is tantamount simply to a declaration of liability, for which

Case: 12-2909    Document: 111    Page: 80    12/26/2012    802358    153

Page 6

1999 U.S. Dist. LEXIS 8020, *; 83 Fair Empl. Prac. Cas. (BNA) 1817

plaintiffs seek a damage award."). Certification pursuant to *Rule 23(b)(2)* is therefore inappropriate.

### 3. *Timeliness*

Defendants claim that, because plaintiffs moved for class certification on July 1, 1997, almost three years after initiating this action in October 1994, their motion should be denied based on untimeliness. While I do not doubt that defendants raised this issue in good faith, I defer to Judge Azrack's rejection of it.

### B. *The Motion for Consolidation*

Plaintiffs seek to have this action consolidated under *Federal Rule of Civil Procedure 42(a)* with *Adrian v. New York City Transit Auth., 1997 U.S. Dist. LEXIS 23236, 96*-CV-6204. *Rule 42(a)* provides that "when actions [*22] involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all matters in issue in the actions." *Fed. R. Civ. P. 42(a).* Trial courts retain "broad discretion to determine whether consolidation is appropriate." *Johnson v. Celotex Corp., 899 F.2d 1281, 1285* (2d Cir.), *cert. denied*, *498 U.S. 920, 112 L. Ed. 2d 250, 111 S. Ct. 297(1990).* That discretion, however, "is not unfettered." *Id.* In deciding whether to grant a motion to consolidate, courts must consider

"whether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on the parties, witnesses, and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives."

*Id.* (alteration in original) (quoting *Hendrix v. Raybestos-Manhattan, Inc., 776 F.2d 1492, 1495 (11th Cir. 1985)* (citation omitted)). Consequently, considerations of "convenience and economy" must yield to "a [*23] par-

amount concern for a fair and impartial trial." *Malcolm v. National Gypsum Co., 995 F.2d 346, 350 (2d Cir. 1993)* (quoting *Johnson, 899 F.2d at 1285*). Despite common questions of law or fact, "where confusion and prejudice will result, it is inappropriate for a court to order consolidation." *Tucker v. Arthur Andersen & Co., 73 F.R.D. 316, 317 (S.D.N.Y. 1976)*.

The party moving for consolidation bears the burden of showing the commonality of factual and legal issues in the actions it seeks to consolidate. *See In re Repetitive Stress Injury Litig., 11 F.3d 368, 373 (2d Cir. 1993).* Although plaintiffs have done little to meet that burden, I find that the two actions at issue involve common questions of both law and fact such that they warrant consolidation under *Rule 42(a).* In both *LeGrand* and *Adrian*, the central legal question is the same -- whether the TA's Subway Operations Division engages in a practice or policy of discriminating against employees based on pregnancy. The facts underlying both cases are relevant to determining that question. While, as defendants stress, *LeGrand* focuses on the actions of the TA's Employee Availability Office and *Adrian* [*24] focuses on the actions of the TA's doctors, the two cases are essentially identical, brought by the same group of plaintiffs with regard to the same issue. For this reason, consolidating these two actions will not result in confusion or prejudice.

Accordingly, plaintiffs' motion for consolidation is granted.

### *CONCLUSION*

For the reasons stated above, plaintiffs' motion for class certification is denied. Their motion for consolidation with *Adrian v. New York City Transit Auth., 1997 U.S. Dist. LEXIS 23236, 96*-CV-6204, is granted.

So Ordered.

JOHN GLEESON, U.S.D.J.

Dated: May 26, 1999

Brooklyn, New York

LEXSEE

**AMERISOURCE CORPORATION, Plaintiff, -against- RX USA INTERNA-
TIONAL INC., PARSONS MEDICAL CENTER PHARMACY INC., and
PARSONS MEDICAL CENTER PHARMACY INC. (II), Defendants.**

**02-CV-2514 (JMA)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
NEW YORK**

**2010 U.S. Dist. LEXIS 52424**

**May 26, 2010, Decided
May 26, 2010, Filed**

**SUBSEQUENT HISTORY:** Sanctions allowed by
Amerisource Corp. v. Rx USA Int'l Inc., 2010 U.S.
Dist. LEXIS 67108 (E.D.N.Y., July 6, 2010)

**PRIOR HISTORY:** Amerisource Corp. v. RxUSA
Int'l, Inc., 2009 U.S. Dist. LEXIS 6864 (E.D.N.Y.,
Jan. 29, 2009)

**COUNSEL:** [*1] For Plaintiff: Craig D. Mills, Bu-
chanan Ingersoll, & Rooney PC, Philadelphia, PA;
Paul G. Nofer, Klehr, Harrison, Harvey, Branzburg,
& Ellers, Philadelphia, PA.

For Defendants: Michael L. Levine, The Law Firm of
Michael Levine, Scarsdale, NY.

**JUDGES:** JOAN M. AZRACK, UNITED STATES
MAGISTRATE JUDGE.

**OPINION BY:** JOAN M. AZRACK

**OPINION**

***MEMORANDUM OF DECISION***

**AZRACK, J., United States Magistrate Judge**:

In this action for breach of contract, plaintiff
Amerisource Corporation ("plaintiff" or "Amer-
isource") alleges that defendants Rx USA Internation-
al Inc., Parsons Medical Center Pharmacy Inc., and
Parsons Medical Center Pharmacy Inc. (II) (collec-
tively "defendants" or "RxUSA") failed to pay Amer-
isource for goods delivered to and accepted by
RxUSA pursuant to the parties' 1999 agreement for
the sale and purchase of pharmaceutical products.
RxUSA counterclaimed for breach of contract alleg-
ing that Amerisource overcharged RxUSA and failed

to honor various price discounts that an Amerisource
sales representative verbally promised to RxUSA. [1]
On March 25, 2008, the parties consented to my ju-
risdiction over all matters. The Court held a bench
trial with an advisory jury between January 26 and
February 4, 2009. After approximately [*2] ninety
minutes of deliberation, the jury rendered an advisory
verdict in favor of Amerisource in the amount of $
275,427.27. Amerisource then moved for contractual
interest and attorneys' fees.

> 1    RxUSA also counterclaimed for defama-
> tion, violations of state and federal antitrust
> laws, and tortious interference with business
> relations. It voluntarily withdrew the defama-
> tion claims and the Hon. Dora L. Irizarry, U.S.
> District Judge, dismissed the antitrust claims
> on summary judgment. The parties tried the
> tortious interference claim to a jury, which re-
> turned a verdict of no liability in favor of Am-
> erisource.

Having considered the relevant evidence and tes-
timony, the Court adopts the jury's advisory verdict
and orders judgment in favor of Amerisource on the
reciprocal contract claims. In accordance with Federal
Rule of Civil Procedure 52(a)(1), the Court issues the
following findings of fact and conclusions of law. [2]

> 2    To the extent that any finding of fact re-
> flects a legal conclusion, it shall be deemed a
> conclusion of law, and vice versa. *See Miller
> v. Fenton, 474 U.S. 104, 113-14, 106 S. Ct.
> 445, 88 L. Ed. 2d 405 (1985)* (noting the diffi-
> culty, at times, of distinguishing findings of
> fact from conclusions of law).

**I. *FINDINGS*** [*3] ***OF FACT***

The material facts are largely undisputed. Plaintiff Amerisource is a Fortune 500 pharmaceutical distributor that sells prescription and over-the-counter drugs to wholesale and retail pharmacies. Amerisource buys product from manufacturers at the wholesale acquisition cost ("WAC") and generally sells the product at some percentage above or below WAC. The sale price varies from buyer to buyer and depends on a variety of factors including volume, payment terms, credit assessments, and the nature of the buyer's pharmacy business. Amerisource also offers some buyers a "Hot List" discount for products purchased from a predetermined list of eligible products. Price is further affected by manufacturer discount and rebate programs that are implemented through Amerisource. The manufacturers establish the eligibility criteria and approve the discounts.

Defendants were licensed New York pharmacies owned and operated by Robert Drucker ("Drucker"), their sole executive and majority shareholder during the relevant period. Rx USA International, Inc. engaged in both wholesale and retail sales and included an online pharmacy. Parsons Medical Center Pharmacy Inc. and Parsons Medical Center Pharmacy [*4] Inc. (II) operated as a single retail pharmacy under the name Parsons Medical Center. Drucker operated the RxUSA pharmacies out of his dry cleaning business in Queens, New York with the assistance of a handful of employees.

In March 1999, Amerisource sales representative Wilfredo LaFontaine ("LaFontaine") made an unsolicited sales call to RxUSA's Queens headquarters. Thereafter, RxUSA agreed to purchase pharmaceuticals from Amerisource at WAC-0% under three separate accounts. RxUSA also signed up for manufacturer discounts that were to be applied at the time of invoicing if approved by the manufacturer. Amerisource later granted one of the RxUSA accounts a WAC-.5% Top 40 Hot List discount, which was to be applied to a predetermined list of forty eligible products. However, RxUSA failed to submit a valid Top 40 list to Amerisource and this discount was never triggered.

The negotiated price terms were memorialized on Amerisource "customer load sheets," which were used to open each of the three RxUSA accounts. Upon opening the accounts, Drucker also signed a "Terms of Sale" agreement, which includes provisions governing Amerisource's rights to prejudgment interest, attorneys' fees, and [*5] costs in the event that RxUSA's accounts became overdue. [3] No other price adjustments were negotiated at any point. [4]

3   The Court's findings and conclusions regarding interest, attorneys' fees, and costs are discussed below.
4   RxUSA's key evidence in support of additional discounts was Drucker's trial testimony and LaFontaine's deposition testimony. Neither witness was credible and their assertions regarding the discounts cannot be corroborated with any evidence that originates from someone other than themselves. Indeed, letters written prior to litigation by both Drucker and LaFontaine conflict with the alleged discounts that RxUSA now claims. For example, on several occasions Drucker made written demand for a Top 20 Hot List discount, whereas at trial he asserted a Top 40 Hot List discount. Trial Exs. 62, 67. In a May 2000 letter to Amerisource that LaFontaine and Drucker wrote together after LaFontaine had been fired, LaFontaine claimed that AmeriSouce had promised RxUSA a WAC-10% insulin discount while RxUSA now claims that it was entitled to a WAC-15% discount. Trial Ex. 85.

RxUSA began purchasing pharmaceuticals from Amerisource immediately after opening its three accounts and ordered [*6] several hundred thousand dollars worth of product each month over the course of the next year. To facilitate ordering and shipping, Amerisource supplied RxUSA with a computer and ordering software that was programmed to reflect the prices specific to the terms negotiated for each of the three RxUSA accounts. At one point, Amerisource uploaded the wrong prices to the software. Drucker saw the incorrect, lower prices for a brief period before Amerisource discovered and rectified the error. RxUSA subsequently continued to order product from Amerisource and Amerisource regularly delivered and invoiced the orders at WAC-0%. Upon delivery of each shipment, an RxUSA employee signed an invoice reflecting WAC-0% prices and RxUSA paid the majority of the invoices accordingly each time it exceeded its credit limit.

RxUSA continued to order product from Amerisource until April 2000. Throughout this period, Drucker complained to Amerisource managers and executives about shipment shortages, billing errors, and Amerisource's failure to issue credits and rebates in accordance with RxUSA's manufacturer discount elections. He also complained vigorously to LaFontaine, with whom he maintained a close secret [*7] relationship, about Amerisource's failure to offer RxUSA the lower prices that he believed were available to other buyers. Drucker repeatedly pressed LaFontaine for help in getting lower prices. Though LaFontaine claimed to Drucker that he was trying, he

mainly stalled. Aside from a single letter to his supervisor requesting a WAC-1% volume discount on future orders, there is no evidence that LaFontaine lobbied or received approval for the discounts off the existing RxUSA contract. However, after informing Amerisource executives that RxUSA had the potential to grow its business to millions in sales per month, Amerisource told LaFontaine to draft a formal sales agreement for future high-volume business with RxUSA. Though Amerisource instructed LaFontaine not to show any drafts to Drucker, LaFontaine sent the entire agreement to Drucker via email and modified it according to Drucker's instructions. Drucker and LaFontaine exchanged several drafts but never executed final agreement.

Meanwhile, beginning in January 2000, Drucker began asserting to Amerisource executives that RxUSA was entitled to unspecified insulin credits, a WAC-1.5% volume discount, and a WAC-1% Top 20 Hot List discount.    [*8] Amerisource permitted RxUSA to return some products and issued some refunds based on Drucker's complaints, but disputed most of his claims. In several instances, Amerisource discovered that RxUSA was not eligible for the manufacturer discounts it claimed and billed RxUSA for the difference.

In April of 2000, RxUSA stopped paying Amerisource, but continued to order and accept products, which Amerisource invoiced in full compliance with the terms of the agreement. By May 2000, RxUSA owed Amerisource $ 275,427.27 for products from Amerisource. When Amerisource demanded payment, Drucker refused, claiming that Amerisource owed RxUSA over $ 400,000 in discounts, credits, and rebates that were verbally promised to him by LaFontaine, but not honored by Amerisource. He further asserted that Amerisource failed to invoice the products at the true WAC price.

## II. *CONCLUSIONS OF LAW*

To prevail on a breach of contract claim under New York law, which the parties agree govern this contract, a plaintiff must prove by a preponderance of evidence: (1) that a contract existed between the parties; (2) that the plaintiff performed on the contract; (3) that the defendant breached the contract; and (4) that the    [*9] plaintiff suffered damages as a result of the defendant's breach. *See Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994).*

Based on the above facts proven at trial, and in accordance with the jury's advisory verdict, the Court concludes that a contract for the sale and purchase of pharmaceuticals at WAC-0% existed between the parties; that Amerisource adequately performed its material obligations under the contract by delivering goods to and billing RxUSA at the agreed price; that RxUSA breached the contract by failing to pay for accepted goods; and that Amerisource suffered a financial loss as a result of RxUSA's breach. Conversely, the Court concludes that RxUSA failed to prove its breach of contract counterclaim because it established neither its own adequate performance nor breach by Amerisource. Specifically, RxUSA failed to prove that the contract included the discounts it now claims or that Amerisource did not charge true WAC.

## III. *REMEDIES*

For RxUSA's breach, Amerisource seeks $ 275,427.27 in past due invoices, $ 748,635.05 in prejudgment interest, and $ 2,618,657.51 in contractual attorneys' fees, costs, and expert fees. RxUSA challenges the amount of prejudgment    [*10] interest available under the contract, but does not object to Amerisource's methodology or calculations regarding interest. RxUSA objects to the fees application on the ground that under the contract Amerisource is only entitled to fees incurred in connection with its contract claim and therefore should not be awarded fees expended on defense of the counterclaims. However, RxUSA raised no objections to the Amerisource's hourly rates, number of hours expended, specific cost expenditures, or associated records.

### A. *Contract Price*.

Under New York law, a seller who prevails on a breach of contract claim may recover the contract price of accepted goods. N.Y. U.C.C. § 2-709(1)(b); *see also Hyosung America, Inc. v. Sumagh Textile Co., Ltd., 137 F.3d 75, 80-81 (2d Cir. 1998).* Here, unpaid invoices signed by RxUSA employees show that RxUSA accepted, but failed to pay for, goods totaling $ 275,274.27 across its three accounts. Accordingly, and consistent with the jury's advisory verdict, the Court directs entry of judgment against Rx USA International, Inc. in the principal sum of $ 175,718.26 and against Parsons Medical Center Pharmacy Inc., and Parsons Medical Center Pharmacy Inc. (II) in the    [*11] principal sum of $ 99,709.01.

### B. *Prejudgment Interest*.

In a diversity action such as this, state law governs the availability of prejudgment interest. *See Baker v. Dorfman, 239 F.3d 415, 425 (2d Cir. 2000).* New York law entitles the prevailing party in a breach of contract claim to prejudgment interest as a matter of statutory right. *Paddington Partners v. Bouchard, 34 F.3d 1132, 1139 (2d Cir. 1994) (citing N.Y. C.P.L.R. § 5001(c)).* Interest accrues at the rate of 9% per annum unless otherwise provided in the contract and is computed from the date the principal became

past due through the date of judgment. *See id*. at § 5001(b)-(c); *E\*Trade Financial Corp. v. Deutsche Bank AG, 374 Fed. Appx. 119, 2010 WL 1196814, at \*3 (2d Cir. 2010)* (*citing NYCTL 1998-2 Trust v. Wagner, 61 A.D.3d 728, 729, 876 N.Y.S.2d 522 (2d Dep't 2009)).*

Here, it is undisputed that the prejudgment interest rate is governed by the Terms of Sale (the "Terms"), which Drucker signed on behalf of each of the defendants upon opening their respective Amerisource accounts. The Terms include two provisions relevant to prejudgment interest. The first states: "All past due balances are subject to a Service Charge of 1.50% per month." After [*12] reciting a number of other provisions regarding access to credit history and other payment logistics, the Terms go on to state: "Should Amerisource find it necessary to obtain assistance in collecting any past due balances, I/We agree to pay interest at the rate of 1.50% (or such other rate allowable by State Law) . . . ." Amerisource asserts that the two provisions combined establish a single prejudgment interest rate of 1.5% per month. RxUSA asserts that the two provisions create two distinct obligations and that prejudgment interest is governed solely by the latter. Since that provision does not explicitly identify the frequency with which interest is to be assessed, RxUSA argues that it sets a one-time lump sum prejudgment interest charge equivalent to 1.5% of the unpaid balance, regardless of the delay in payment.

To determine RxUSA's contractual prejudgment interest obligations, the Court must read the Terms of Sale as a whole. *See Adams v. Suozzi, 433 F.3d 220, 228 (2d Cir. 2005)*. Every part must be interpreted with reference to the whole and, if possible, must be interpreted so as to give effect to its general purpose. *Id.* "[T]he intent of the parties governs" and the "contract [*13] should be construed so as to give full meaning and effect to all of its provisions." *Am. Express Bank Ltd. v. Uniroyal, Inc., 164 A.D.2d 275, 562 N.Y.S.2d 613 (1st Dep't 1990)* (citations omitted). If the contract "is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument." *British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A., 342 F.3d 78, 82 (2d Cir. 2003)* (*quoting Rainbow v. Swisher, 72 N.Y.2d 106, 109, 527 N.E.2d 258, 531 N.Y.S.2d 775 (1988)*). Additionally, words must be given the plain meanings ordinarily ascribed to them and absurd results should be avoided. *Mastrovincenzo v. City of N. Y., 435 F.3d 78, 104 (2d Cir. 2006)*.

In light of these principles, the only reasonable interpretation of the Terms is that they require prejudgment interest to be assessed at a rate of 1.5% *per*

*month* rather than as a one-time flat fee. Consistent with the overall thrust of the Terms, the explicit 1.5% per month service charge was clearly designed not only to encourage timely payment, but also to mitigate the past due balance's inevitable loss in value over time. Thus, the service charge serves the same purpose as prejudgment interest. *See, e.g., Kassis v. Teachers' Ins. & Annuity Ass'n, 13 A.D.3d 165, 165, 786 N.Y.S.2d 473 (1st Dep't 2004)* [*14] ("The purpose of prejudgment interest is to compensate parties for the loss of the use of money they were entitled to receive, taking into account the 'time value' of money."). Courts routinely interpret such "service charge" language as establishing a contractual rate of prejudgment interest that supersedes the statutory rate. *See, e.g., Warren Electrical Supply Inc. v. Davidson, 284 A.D.2d 869, 870-71, 727 N.Y.S.2d 502 (3d Dep't 2001)* (awarding prejudgment interest at the contract's service charge rate of 2% per month); *see also Consolidated Container Co. LP v. Package Supply & Equip. Co., No. 09-CV-1478, 2009 U.S. Dist. LEXIS 96819, 2009 WL 3365949 (N.D.G.A. Oct. 19, 2009)* (awarding prejudgment interest based on the contract's 18% "monthly service charge rate" rather than the statutory rate); *Power Tools & Supply, Inc. v. Cooper Power Tools, Inc., 543 F. Supp. 2d 749, 767 (E.D.M.I. 2008)* (same); *Vulcan Auto. Equip., Ltd. v. Global Marine Engine & Parts, Inc., 240 F. Supp. 2d 156, 160, 163 (D.R.I. 2003)* (same); *The Scotts Co. v. Central Garden & Pet Co., 256 F. Supp. 2d 734, 746 (S.D.O.H. 2003)* (same); *Hillside Enterprises v. Carlisle Corp., 69 F.3d 1410, 1416 (8th Cir. 1995)* ("Although the contract uses the term 'service charge,' [*15] a sensible reading of the provision indicates it is an interest rate.").

The one-time assessment advocated by RxUSA is not only inconsistent with the ordinary and plain meaning of "interest," but would also require the Court to ignore all of the other provisions of the Terms, which are designed to encourage timely payment, mitigate the buyer's delinquency, and protect the contract's value to Amerisource in the event of breach. RxUSA's interpretation would render the parties' interest agreement essentially meaningless and would lead to an unreasonable result. At a single assessment of 1.5%, RxUSA would pay barely more than $ 4,000 in interest for a $ 275,000 debt that is over nine years overdue. Given that this was an arm's length deal between sophisticated parties, the Court is unpersuaded that Amerisource intended such a substantial downward departure from its statutory rights or that RxUSA expected that it would be granted such a favorable rate without having to make a comparable concession of its own. Moreover, though the latter provision referring explicitly to interest does not spec-

ify a monthly rate, its reference to a "rate" of interest rather than a mere percentage reveals an [*16] intention to assess interest periodically rather than once.

The Court also rejects RxUSA's argument that Amerisource is not entitled to relief under the service charge provision because it did not state a claim for such relief in its complaint. First, the complaint does pray for 1.5% per month interest and quotes the service charge provision in support of this request. *See* Compl. PP 21, 25, 29, 36(B), 40. Second, in awarding damages, the Court is not limited to the relief requested in the complaint, but rather may award any relief that it deems just and proper. *See* N.Y. C.P.L.R. § 3017(a) ("Except as provided in section 3215 [concerning default judgments], the court may grant any type of relief within its jurisdiction appropriate to the proof whether or not demanded, imposing such terms as may be just."); *see also* Fed. R. Civ. P. 54(c) (directing that aside from default judgments, "[e]very other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings"). Finally, even if the service charge were an additional contract remedy independent of prejudgment interest, the judgment would be unaffected. Since both [*17] forms of relief compensate for the same loss, equitable rules against double recovery and unjust enrichment would prevent Amerisource from collecting damages under both provisions. *See* Phelan v. Local 305 of United Ass'n of Journeymen, 973 F.2d 1050, 1063 (2d Cir. 1992) (*citing* Ostano Commerzanstalt v. Telewide Systems, 880 F.2d 642, 649 (2d Cir. 1989)).

Accordingly, Amerisource is entitled to prejudgment interest at the contractual rate of 1.5% per month. The Court has reviewed Amerisource's interest calculations and the supporting affidavit of Amerisource Regional Director of Credit Deborah Wertz. They appear accurate and contain no apparent errors, nor has RxUSA challenged the methodology or results. *See* Swartz Aff. Supp Prejudgment Interest Ex. 1-3. Therefore, the Court awards Amerisource prejudgment interest against RxUSA at a rate of 1.5% per month from the various due dates, as specified in Amerisource's calculations, through the date of payment. *See id.*

### C. Litigation Expenses.

Consistent with the American Rule regarding attorneys' fees, New York law generally requires parties to pay their own litigation expenses unless otherwise authorized by statute or contract. *See* Equitable Lumber Corp. v. IPA Land Dev. Corp., 38 N.Y.2d 516, 519-20, 344 N.E.2d 391, 381 N.Y.S.2d 459 (1976). [*18] Here, the Terms of Sale state that "[s]hould Amerisource find it necessary to obtain assistance in collecting any past due balances, I/We agree to pay . . . . reasonable attorney fees, collection fees, and/or court costs allowable by law." Citing this fee-shifting provision, Amerisource seeks an additional judgment of $ 2,618,657.51 against RxUSA. This sum represents attorneys' fees, expert fees, and costs expended on all claims raised in this action, including RxUSA's five counterclaims for breach of contract, defamation, antitrust conspiracies, and tortious interference with business relations.

### 1. *Scope of the Fee-shifting Provision.*

"[W]hile parties may agree that attorneys' fees should be included as another form of damages, such contracts must be strictly construed to avoid inferring duties that the parties did not intend to create." Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 199 (2d Cir. 2003) (*citing* Hooper Assocs., Ltd. v. AGS Computers, Inc., 74 N.Y.2d 487, 491, 548 N.E.2d 903, 549 N.Y.S.2d 365 (1989)). "[T]he court should not infer a party's intention to waive the benefit of the [American Rule] unless the intention to do so is unmistakably clear from the language of the promise." Hooper Assocs., 549 N.Y.S.2d at 492; [*19] *accord* Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 177 (2d Cir. 2005); U.S. Fidelity and Guar. Co. v. Braspetro Oil Serv. Co., 369 F.3d 34, 75 (2d Cir. 2004).

The fees provision in this case is narrowly tailored and unambiguously limits fee-shifting to attorneys' fees and costs expended on "collecting any past due balances" only. In order to collect that balance, Amerisource had to prevail on the price issue. Thus, Amerisource is entitled to fees expended on any claims in which price was a material fact. These include fees expended on both Amerisource's contract claim as well as RxUSA's contract counterclaim. Since RxUSA alleged that it was owed money under its version of the price terms, Amerisource could not have collected the past due balance without prevailing on both contract claims. *See* Diamond D Enterprises USA, Inc. v. Steinsvaag, 979 F.2d 14, 18 (2d Cir. 1992) ("[W]here a fee applicant recovers on a claim subject to a contractual attorney's fee provision and in the process litigates a counterclaim on which he must prevail in order to recover on his claim, then the fee applicant is entitled to his attorney's fees for both the claim and [*20] the counterclaim.") (internal citations and quotation marks omitted).

Amerisource is also entitled to fees and costs incurred in defending against RxUSA's two tort counterclaims (defamation and tortious interference with business relations). To prevail on those claims, RxUSA had to prove that Amerisource's statements regarding RxUSA's creditworthiness were false. *See*

Page 5

*Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d Cir. 1986) (noting that it is well-settled that truth is an absolute defense to defamation and the plaintiff bears the burden of proving the falsity of the allegedly defamatory statement); *Don Buchwald & Associates, Inc. v. Rich*, 281 A.D.2d 329, 330, 723 N.Y.S.2d 8 (1st Dep't 2001) ("A necessary element to the claim of tortious interference with economic relations is the use of 'wrongful means' to achieve the end, such as by fraud or misrepresentation."). According to RxUSA, the statements were false because, under RxUSA's version of the contract prices, RxUSA was not in arrears and therefore did not have bad credit. Given RxUSA's theory of the case, there is no scenario under which the fact-finder could find that Amerisource proved its case regarding price, but was nevertheless [*21] liable for defamation and tortious interference. Thus, the tort claims were inextricably intertwined with the collection action and are compensable under the contract.

Price was not material to the Sherman and Donnelly Act antitrust counterclaims and Amerisource is not otherwise entitled to fees and costs expended on those claims. RxUSA's antitrust claim alleged that Amerisource and its competitors unlawfully conspired to "carve up the market of large customers" and that vendors agreed not to sell products to buyers not assigned to them. Price was only a factor in these claims to the extent that RxUSA alleged that the conspirators concocted a false explanation regarding RxUSA's lack of creditworthiness as a means to conceal the conspiracy behind their true motive for declining RxUSA's business. This connection is too attenuated to trigger the narrow fee-shifting at issue here. Moreover, how the conspirators concealed the alleged conspiracy was neither a prima facie element nor probative of any defenses. [5] Thus, it is not "unmistakably clear" that the parties intended RxUSA's liability for litigation expenses to extend to disputes so far removed from a basic collection situation as defendants' [*22] Sherman and Donnelly Act claims. *See, e.g.*, *Jackson v. Oppenheim*, 533 F.2d 826, 831 (2d Cir. 1976) (holding that "language more express than 'costs of collection' should have been employed" to create liability for costs incurred in defending a separate securities law claim regarding validity of the underlying sale transaction).

> [5]   To establish a violation of § 1 of the Sherman Act, a plaintiff must prove some form of concerted action between at least two legally distinct economic entities and that such conduct constituted an unreasonable restraint of trade. *See, e.g.*, *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 95-96 (2d Cir.

1998). To establish a Donnelly Act violation, a plaintiff must: (1) identify the relevant product market; (2) describe the nature and effects of the purported conspiracy; (3) prove how the economic impact of that conspiracy is to restrain trade in the market in question; and (4) show a conspiracy or reciprocal relationship between two or more entities. *Great Atlantic & Pacific Tea Co., Inc. v. Town of East Hampton*, 997 F. Supp. 340, 352 (E.D.N.Y. 1998).

The cases relied upon by Amerisource are not to the contrary. Both *Diamond D*, 979 F.2d 14, and *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516 (2d Cir. 1990), [*23] are distinguishable because the contractual fee-shifting language in those cases was substantially broader than the narrowly tailored language at issue here. *See Diamond D*, 979 F.2d at 18 (awarding fees on various contract and non-contract claims and counterclaims where the fee-shifting provision entitled the franchisor to attorneys' fees and costs incurred to enforce any obligation or defend against any claim, regardless of which party filed the action); *Towers Marine*, 894 F.2d at 524-25 (awarding lender fees incurred in connection with borrower's direct action for anticipatory breach and with third-party's interpleader action regarding escrowed loan funds where the contractual fee-shifting provision in the loan documents stated that borrower would be responsible for lender's expenses incurred "in connection with the [l]oan"). Moreover, unlike in *Towers Marine*, RxUSA did not inject its Sherman and Donnelly Act counterclaims into the contract claims such that Amerisource was required to defend against those claims in order to collect the past due balance. *Towers Marine*, 894 F.2d at 525.

For the foregoing reasons, the Court finds that the contract entitles Amerisource to fees and costs [*24] expended on the its contract claim, as well as on RxUSA's counterclaims for breach of contract, defamation, and tortuous interference with prospective business relations. Amerisource is not entitled to fees and costs expended on RxUSA's Sherman and Donnelly Act counterclaims.

## 2. *The Attorneys' Fees Award*.

Having determined that the contract authorizes an award of reasonable attorneys' fees for Amerisource's collection expenses, the Court must calculate an appropriate fee award. *See McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1313 (2d Cir. 1993) (holding that in a fee application based on contract, "the judge determines the amount of attorneys' fees owed . . . after the liability for such fees is decided at a trial, whether bench or jury"); *see also GMC v. Villa Marin Chevro-*

*let, Inc.*, 240 F. Supp. 2d. 182, 185 (E.D.N.Y. 2002) ("Regardless of whether fees are awarded pursuant to statute or pursuant to contract, the determination of what is a reasonable award is within the sound discretion of the trial court."); *Orix Credit Alliance, Inc. v. Grace Indus., Inc.*, 261 A.D.2d 521, 521-22, 690 N.Y.S.2d 651 (2d Dep't. 1999) (the court has "the inherent authority to determine reasonable attorneys' fees").

Under [*25] both New York and federal law, attorneys' fees are determined by multiplying a reasonable hourly rate by the number of hours reasonably expended to arrive at a presumptively reasonable fee, which may then be adjusted to account for the circumstances of the case. *See F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1263 (2d Cir. 1987) (describing the "lodestar" method used in New York law); *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 493 F.3d 110, 117-18 (2d Cir. 2007) *amended on other grounds by* 522 F.3d 182 (2d Cir. 2008) (describing the "presumptively reasonable fee" approach endorsed by the Second Circuit); *see also Bldg. Serv. 32BJ Health Fund v. Renaissance Equity Holdings*, No. 08-CV-9264, 2010 U.S. Dist. LEXIS 36046, 2010 WL 1438117, at *2 (S.D.N.Y. Apr. 9, 2010) (Chin, J.)(*quoting Robinson v. City of N.Y.*, No. 05-CV-9545, 2009 U.S. Dist. LEXIS 89981, 2009 WL 3109846, at *3 (S.D.N.Y. Sept. 29, 2009) (Lynch, J)). The presumptively reasonable fee is defined as "what a reasonable, paying client would be willing to pay," in order to "spend the minimum necessary to litigate the case effectively." *Arbor Hill*, 493 F. 3d at 112, 118.

### a. *Reasonable Hourly Billing Rate*.

The hourly rate generally must be consistent [*26] with rates charged within the district in which the reviewing court sits. *See Arbor Hill*, 493 F.3d at 119 (*quoting In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 226, 232 (2d Cir. 1987)). To obtain higher out-of-district rates, a fee applicant must persuade the Court "that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result." *Simmons*, 575 F.3d at 175. Courts should apply current, rather than historic, rates in order to account for the delay in payment. *Konits v. Valley Stream Cent. High School Dist.*, 350 Fed. Appx. 501, 505 n.2 (2d Cir. 2009) (*citing LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998)). In setting the hourly rate, courts must "bear in mind all of the case-specific variables that [the Second Circuit] and other courts have identified as relevant to the reasonableness of attorney's fees." *Arbor Hill*, 493 F.3d at 117. The court should consider:

(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance [*27] of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* at 114 n.3 (*quoting Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)); *see also Bankers Federal Sav. Bank FSB v. Off West Broadway Developers*, 224 A.D.2d 376, 377, 638 N.Y.S.2d 72 (identifying the same factors).

Amerisource seeks $ 2,396,881.76 in attorneys' fees [6] for a team of thirty-seven individuals spread across three law firms. [7] The team consisted of ten partners, one counsel, thirteen associates, twelve paralegals, [8] and one librarian. [9] Amerisource requests fees that it actually paid over the nine-year course of this litigation, which were based on varying individual hourly rates and the hours expended by each team member. Certain individuals billed at multiple rates as their rates changed over time. In support of the fee application, [*28] Amerisource submitted nine years of contemporaneous billing records for all thirty-seven individuals as well as the professional biographies of several partners and associates. According to these records, Amerisource paid hourly rates ranging from $ 93.75 to $ 556 for partners, $ 88.37 to $ 285 for associates, $ 85 to $ 195 for paralegals, and $ 75 to $ 125 for the librarian.

6  This sum represents $ 1,792,374.86 paid to Klehr, Harrison, Harvey, Branzburg, & Ellers LLP ("Klehr"), *see* Pl. Mot. for Attorneys' Fees and Costs, Dkt. No. 246 Ex. H-1-1; $ 380,911.40 paid to Buchanan Ingersoll & Rooney PC ("Buchanan"), *see id.* Ex. I-4; and $ 223,595.50 paid to Drinker Biddle & Reath LLP ("Drinker"), *see id.* Ex. I-4.

7  Drinker identified two additional individuals, paralegal Harley Miller and legal assistant

Jennifer Jascoll, as having worked on this matter, but they are absent from Drinker's billing summary. The Court therefore assumes that Amerisource is not requesting fees for work completed by Harley and Jascoll and excludes them from the fee calculation. Amerisource also requested fees paid to two computer forensics experts and a jury consulting firm. These non-attorney fees are discussed separately [*29] below.

8  Included among these twelve paralegals are individuals variously identified by Buchanan and Drinker as having provided litigation technology support, legal assistance, or litigation analysis.

9  Like computer research fees, librarian services are compensable as attorneys' fees because such services save money by making legal research more efficient for attorneys and because paying clients reimburse research expenses, just as they reimburse paralegal expenses. *See* *Arbor Hill*, 493 F.3d at 117 (permitting recovery of computer research fees as attorneys' fees).

RxUSA has not challenged the requested hourly rates. However, many of the historic rates actually charged to Amerisource exceed the current prevailing rates for legal services in the Eastern District, which range from $ 300 to $ 400 for partners, $ 200 to $ 300 for senior associates, $ 100 to $ 200 for junior associates, and $ 75 to $ 90 for paralegals. *See, e.g., Luca v. County of Nassau*, No. 04-CV-4898, 698 F. Supp. 2d 296, 2010 U.S. Dist. LEXIS 5867, 2010 WL 307027, at *3-4 (E.D.N.Y. Jan. 25, 2010) (finding $ 400 for experienced attorney's services reasonable in the Eastern District); *Gutman v. Klein*, No. 03-CV-1570, 2009 U.S. Dist. LEXIS 123057, 2009 WL 3296072, at *2 (E.D.N.Y. Oct. 13, 2009) (awarding [*30] $ 300-400 for partners, $ 200-300 for senior associates, and $ 100-200 for junior associates reasonable in the Eastern District); *Century 21 Real Estate LLC v. Bercosa Corp.*, 666 F. Supp. 2d 274, 299 (E.D.N.Y. 2009) (Gleeson, J.) (Orenstein, M.J.) (awarding rates of $ 320 to partners, $ 230 to associates, $ 100 to law clerks, and $ 75 to paralegals in an uncontested breach of contract and Lanham Act case). Amerisource, which cites mostly Southern District cases for a legal team based entirely in Philadelphia, did not argue and does not establish on the face of the fee application that it meets this Circuit's standard for higher out-of-district fees. *See* *Simmons*, 575 F.3d at 175. Accordingly, some of the requested rates must be reduced. [10]

10  All but one of the cases that Amerisource cited in support of its rates are from the Southern District of New York and are therefore inapplicable here under the *Simmons* standard. The one Eastern District case cited, *In re Gilat Satellite Networks, Ltd.*, No. 02-CV-1510, 2007 U.S. Dist. LEXIS 68964, 2007 WL 2743675 (E.D.N.Y. Sept. 18, 2007) (Sifton, J.), noted that rates of up to $ 725 per hour for partners and $ 325 per hour for associates were appropriate. However, in that [*31] case, which involved a high-risk securities class action taken on contingency, the court awarded attorneys' fees based on a percentage-of-recovery method permissible in class actions and conducted a limited lodestar analysis simply to "cross check" the results of the percentage analysis. Accordingly, it is distinguishable from this case.

An assessment of the *Johnson* factors compels the Court to set the billing rates for the lead attorneys at the highest rates available in the Eastern District. This action involved a complex factual backdrop, which counsel was required to master in order to effectively depose industry insiders and craft a cohesive case. Due to extensive discovery, deposition, and motion practice, counsel were also required to expend significant time and labor. At least one attorney, Paul Nofer, worked on the matter for nearly its entire nine-year lifespan. Additionally, all of the lead attorneys were experienced litigators from respected firms who provided excellent services and obtained a complete victory for their client. Based on these considerations, the Court makes the following adjustments to the requested billing rates.

The highest rates for partners Paul Nofer [*32] and Craig Mills, who were the lead attorneys through pre-trial and trial respectively and had the most contact with the Court, are reduced to $ 400. The highest rates for partners Morton Branzburg, William Hinchman, and David Kessler, who played active supporting roles, are reduced to $ 375. The highest rate for partner R. Roisman, whom the Court had no opportunity to observe and for whom no professional biography was submitted, is reduced to $ 350. The highest rate for associates Rachel Bernstein, Brian Crowley, A. Kristina Littman, and Michael Burg are reduced to $ 250. The highest rate for paralegal Reeny Kelly, who played an integral role at trial, is pegged to the high end of this district's range and is reduced to $ 90. The highest rate for all other paralegals and support staff is reduced to $ 80. The requested rates for the remaining partners and associates are reasonable and RxUSA has not objected to them. Therefore, they will not be adjusted.

### b. *Reasonable Hours Expended*.

In calculating the number of reasonable hours, district courts look to the facts and complexity of the case and take into account their own experience with the case. *Clarke v. Frank*, 960 F.2d 1146, 1153 (2d Cir. 1992) [*33] (citations omitted). Hours should be examined "with a view to the value of the work product of the specific expenditures to the client's case." *Tr. of the Road Carriers Local 707 Welfare Fund v. Goldberg*, No. 08-CV-0884, 2009 U.S. Dist. LEXIS 101772, 2009 WL 3497493, at *9 (E.D.N.Y. Oct. 28, 2009) (citations omitted). The fee applicant bears that burden of proving that the hours are reasonable and must produce contemporaneous time records showing the dates, hours expended, and nature of work performed by each attorney. *N.Y. State Ass'n for Retarded Children v. Carey*, 711 F.2d 1136, 1148 (1983); *Morin v. Nu-Way Plastering Inc.*, No. CV-03-CV-405, 2005 U.S. Dist. LEXIS 37867, 2005 WL 3470371, at *2-3 (E.D.N.Y. Dec. 19, 2005). Courts should reduce hours where the fee applicant submits deficient or incomplete billing records. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 n. 12, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983) (attorneys seeking fee awards must "identify the general subject matter of [their] time expenditures"). Courts may exclude "excessive, redundant or otherwise unnecessary hours" from the calculation, *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999), or make an across-the-board reduction in the number of hours. *See Luciano v. Olsten Corp.*, 109 F.3d 111, 117 (2d Cir. 1997). [*34] However, hours should be based not on what appears necessary in hindsight, but on whether "at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992).

According to the billing records, the Amerisource team expended a total of 7,644.65 hours on this matter. [11] RxUSA has not objected to the hours. Nevertheless, the Court must ensure their reasonableness. At first blush, the figure may seem excessive due to overstaffing. A total of thirty-seven people, including eight partners from the Klehr firm alone, billed on this matter. However, a close review of the billing records indicates that several of the thirty-seven individuals billed relatively modestly and that the majority of the work was done by a reasonably-sized group of core attorneys and paralegals. Nearly half the team billed fifteen hours or less over nine-years and over one-third of the total hours were billed by a single attorney, Klehr partner Paul Nofer. Accordingly, no reduction for overstaffing is necessary. There are some instances in which attorneys fail to adequately describe their work, which makes it difficult for the Court [*35] to determine the necessity and value of the particular time expenditure. [12] However, the substantial majority of the billing entries are adequately detailed and do not appear duplicative or inconsistent with the particular task performed. Accordingly, the hours shall not be reduced for vagueness, excess, or inefficiency.

> 11    This total represents 5,676.55 hours expended by Klehr, *see* Dkt. No. 246 Ex. H-11; 1,246 hours expended by Buchanan, *see* Dkt. No. 246 Ex. I-4; and 722.1 expended by Drinker, *see* Dkt. No. 246 Ex. J-5.
>
> 12    For example, several entries for Klehr partners Morton Branzburg and Jonathon Bennett fail to identify the subject matter of their meetings and telephone calls. *See, e.g.*, Dkt. No. 246 Ex. H-11: Klehr Invoice dated May 24, 2001, Klehr Invoice dated May 31, 2003. There are several entries by Librarian Margaret Fallon that simply state "obtain address information." *See, e.g., id.*: Klehr Invoice dated Mar. 31, 2009.

The total requested hours represent a reasonable expenditure of time given the near decade over which this case has been pending, the need to defend multiple claims in pursuit of the overdue balance, the factually complexity, the extensive motion practice, the [*36] voluminous and convoluted discovery, and the lengthy trial. Moreover, in light of RxUSA's sizable counterclaims, it was not unreasonable for Amerisource to pursue its claims and pay legal fees for nine years to collect a relatively paltry principal sum. It is likely that under such circumstances, other sellers would also hold their ground in order to demonstrate to their customers that debts cannot be escaped simply by raising expensive counterclaims and dragging out collection efforts.

Amerisource seeks reimbursement for attorney time expended on non-compensable activity. However, the voluminous billing records do not delineate between the claims and issues to which the expended time should be assessed and it would be too onerous for the Court to cull the non-compensable hours from nine years of records maintained by thirty-seven different people. Therefore, an overall fee reduction, which I discuss below, is a more efficient method of accounting for non-compensable time. *See, e.g., U.S. Football League v. National Football League*, 887 F.2d 408 (2d Cir. 1989).

### c. *Presumptively Reasonable Fee*.

Multiplying the reasonable hourly billing rates by the numbers of hours reasonably expended, [*37] as established above, yields a total presumptively reasonable fee of $ 2,280,643.62. The Court's calcula-

tions are illustrated on the fee schedule attached as Exhibit A to this Opinion. Though there is a strong presumption in favor of this figure, courts may adjust it to account for any relevant factors that it does not reflect. *See Building Service 32BJ Health Fund*, 2010 U.S. Dist. LEXIS 36046, 2010 WL 1438117, at *2.

**d.** *Adjustments*.

Because the contract only permits fee-shifting for collection expenditures, the presumptively reasonable fee must be reduced to account for non-compensable activity. RxUSA asserts that the majority of Amerisource's fees were expended on the antitrust claims. However, it provides scant support for this assertion, relying merely on counsel's conclusory unsworn statement and a one-sentence discovery order from 2002. Moreover, neither party made an effort to quantify the value of the time expended on those claims or identify any facts that would aid the Court in calculating an appropriate reduction. The Court therefore must employ a percentage reduction based on its familiarity with the case.

Though the antitrust claims were dismissed on summary judgment motion years ago, the effort and [*38] time expended on those claims was not insubstantial. The parties completed full discovery involving numerous depositions and third-party paper discovery in addition to the motion practice itself. The presumptively reasonable fee is reduced by fifteen percent to account for this non-compensable activity. Additionally, a review of the billing records indicates that the fee request includes attorney time spent on sanctions motions and the fee application. [13] Since these motions were not required to collect the past due balances, the presumptively reasonable fee is reduced by an additional ten percent. [14] These adjustments result in a twenty-five percent reduction of the presumptively reasonable fee to $ 1,710,482.72.

[13] For example, Drinker billing entries dated January 9-12, 2009 bill for time spent "[r]esearching law re: fraud upon the court occasion by proffer of falsified documents," "[d]rafting failure to preserve and spoliation of evidence analysis," and "[p]roof reading brief for motion for sanctions." Dkt. No. 246 Ex. J-5. An entry by Buchanan dated April 10, 2009 bills for time spent researching billable rates in the Eastern and Southern Districts [*39] and another dated July 31, 2009 bills for work on the memorandum of law in support of attorneys' fees. *Id*. at Ex. I-4.

[14] Fees expended on the attorney fee application must also be excluded under the rule

that "a general contract provision for the shifting of attorneys' fees does not authorize an award of fees for time spent in seeking the fees themselves." *Krear*, 810 F.2d at 1266.

RxUSA argues that the fee should be additionally reduced because it is disproportionate to the $ 275,000 recovered in Amerisource's underlying contract claim. RxUSA correctly cites *Krear* for the "the general rule in New York" that "it is rarely proper to award fees in an amount that exceeds the amount involved in the litigation." *Krear*, 810 F.2d at 1250. However, RxUSA's argument is flawed for two reasons. First, a proper calculation of the true amount in controversy relevant to the fee application requires consideration of all claims that Amerisource was required to prevail on in order to collect the past due balance. To hold otherwise would permit RxUSA to use its expensive counterclaims to first frustrate legitimate collection efforts, and then, when that fails, to thwart its contractual obligations. Prejudgment [*40] interest must also be included to account for the true value of the collection aspect of this case. Accordingly, the relevant amount in controversy is over $ 55 million, [15] not $ 275,000 as asserted by RxUSA.

[15] RxUSA claimed over $ 400,000 in contract damages and over $ 54 million under the defamation and tortious interference claims. *See generally* Second Amended Counterclaims.

Additionally, the proportionality standard articulated in *Krear* is not a per se rule but rather one guidepost of many in determining the reasonableness of a fee award. Accordingly, the Court has the discretion to permit a fee award that exceeds the basic damages value of the case if it is reasonable to do so under the circumstances. *See Krear; see also Kassim v. City of Schenectady*, 415 F.3d 246, 252 (2d Cir. 2005) (noting that "[i]t is . . . difficult to generalize about the appropriate size of the fee in relation to the amount in controversy" because "an attorney is in part reacting to forces beyond the attorney's control, particularly the conduct of opposing counsel and of the court" and "the hours required to litigate even a simple matter can expand enormously"); *Kahlil v. Original Old Homestead Restaurant, Inc*., 657 F. Supp. 2d 470, 478 (S.D.N.Y. 2009) [*41] ("[T]he simple disproportion between a plaintiff's recovery and the fee applied for is not a proper basis for a reduction in an otherwise reasonable fee."); *Krumme v. Westpoint Stevens Inc.*, 79 F. Supp. 2d 297 (S.D.N.Y. 1999) (noting that "there is no bright-line rule-even with regard to the amount in controversy-for the calculation of reasonable attorneys' fees" and that New York case law "explicitly states that there are circumstances where rea-

sonable attorneys' fees can exceed the amount in controversy.").

In this case, the sheer length of the litigation, nine years, is a sufficiently unusual circumstance to warrant a departure from the proportionality rule. Moreover, the seemingly straightforward, single-issue nature of the contract claims belies the voluminous discovery and complex factual backdrop of pricing in the pharmaceutical industry. Finally, the adjusted presumptively reasonable fee is also proper because it is based on attorney time actually and reasonably expended and paid for by Amerisource. It is unlikely that Amerisource would have agreed to a different fee arrangement, such as a contingency fee, even if there had been no fee-shifting agreement. Thus, the award is [*42] consistent with the "principle that a contractual fee award should approximate the fee arrangement that would have been made absent the fee-shifting provision." *In Time Products, Ltd. v. Toy Biz, Inc.*, 38 F.3d 660, 668 (2d Cir. 1994). There is no evidence that Amerisource intentionally manipulated its litigation expenses to take advantage of the fee-shifting agreement. Accordingly, the fee will not be adjusted to the past due balance.

**3.** *Costs*.

In addition to attorneys' fees, Amerisource seeks $ 127,750.67 [16] in costs for a variety of routine items such as filing, photocopying, postage, telephone, travel, and meals. These costs, to which RxUSA has not specifically objected, are reasonable and generally compensable under the Terms of Sale, which explicitly entitle Amerisource to "court costs" incurred in collecting the past due balance. [17] *See, e.g., ATC Healthcare Servs., Inc. v. Personnel Solutions, Inc.*, No. 01-CV-762, 2007 U.S. Dist. LEXIS 47441, 2007 WL 1893205 at *4 (S.D.N.Y. June 29, 2007)* (awarding such costs under contractual attorneys' fee provision); *Brigiotta's Farmland Produce & Garden Ctr., Inc. v. Przykuta, Inc.*, No. 05-CV-273, 2006 U.S. Dist. LEXIS 48004, 2006 WL 3240729 at *5 (W.D.N.Y. July 13, 2006)* (same); *Ursa Minor Ltd. v. Aon Fin. Prods., Inc.*, No. 00-CV-2474, 2001 U.S. Dist. LEXIS 7455, 2001 WL 1842042 at *9 (S.D.N.Y. May 30, 2001)* [*43] (same). However, to discount for costs associated with non-collection activity, which, as discussed above, is not compensable under the parties' agreement, the Court reduces the cost request by twenty-five percent for a total contractual cost award of $ 95,813.00.

16    This includes $ 81,754.15 in costs incurred by Klehr, $ 19,561.72 in costs incurred by Buchanan, and $ 26,434.80 in costs incurred by Drinker. *See* Dkt. No. 246 Ex. K.

17    These items are largely consistent with the taxable costs enumerated in Local Civil Rule 54.1(c) and 18 U.S.C. 1920. While those statutory rules do not govern the costs award here because the costs are sought as damages pursuant to a controlling contractual provision, *see, e.g., Austrian Airlines Oesterreichische Luftverkehrs AG v. UT Finance Corp.*, No. 04-CV-3854, 2008 U.S. Dist. LEXIS 90985, 2008 WL 4833025, at *9 (S.D.N.Y. Nov. 3, 2008)*, they are relevant to the extent that they reveal the ordinary and plain meaning of the term "court costs," which this Court must interpret in order to enforce the parties' agreement.

**4.** *Expert Fees*.

Amerisource also requests $ 146,787.83 in expert fees. [18] However, there is no basis for an award for expert fees. Expert fees are not specifically compensable [*44] under the Collection Provision, which limits liability for litigation expenses to attorneys' fees, court costs, and collection fees only. Additionally, none of these three enumerated categories can be reasonably interpreted to encompass expert fees. *See Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 303, 126 S. Ct. 2455, 165 L. Ed. 2d 526 (2006)* (noting that the term "attorneys' fees," standing alone, is generally not understood as encompassing expert fees). Thus, it is not "unmistakably clear" that the parties contemplated liability for expert fees.

18    This includes $ 45,291.12 in fees and costs paid to LECG, $ 91,209.52 in fees and costs paid to DOAR, and $ 10,287.19 in fees and costs paid to NERA. Dkt. No. 246 Ex. K.

Additionally, even if expert fees were generally available under the contract, they could not be awarded here because they were not necessary to collecting the past due balance and were not reasonable expenses given the circumstances of this case. The NERA team billed a total of $ 10,287.19 in fees and costs. It consisted of two individuals, Alexander Stein and Jesse David, who provided services between September 2005 and June 2006. Stein charged $ 145 per hour and David charge $ 425 [*45] and $ 450 per hour. Amerisource did not provide a description of their services and their billing records are very vague, but it appears that they had some involvement with electronic discovery. Among other things, David billed $ 3,600 for attending a deposition, but failed to identify the deponent or the subject matter. No one from NERA testified at trial and it is not apparent from the fee application exactly how, if it at all, NERA furthered Amerisource's collection efforts.

Amerisource seeks $ 45,291.12 in fees and costs for James Vaughn, an electronic discovery expert who was "hired to conduct forensic analysis and provide expert opinion with respect to" electronic discovery regarding Exhibit OO. However, Vaughn's forensic investigation, which took place after the original trial date was abruptly adjourned just days before it was scheduled to commence, yielded little regarding Exhibit OO and Amerisource largely abandoned its attack on the authenticity of Exhibit OO by the time of trial. Indeed, Exhibit OO ultimately played only a minor role in the overall case. The Exhibit OO investigation happened to uncover substantial damning evidence regarding the authenticity of the WAC-15 [*46] emails, which were integral to RxUSA's case and which enabled RxUSA to survive summary judgment. This new evidence was extremely helpful to Amerisource to the extent that it caused RxUSA to admit that the emails were fabrications and withdraw them from its case. However, Amerisource had asserted that the WAC-15 emails were suspect several years prior to the Exhibit OO investigation and had evidence to successfully attack their authenticity at trial even without the benefit of the supplemental discovery.

Amerisource's expenditures on litigation and jury experts were even more unnecessary and are additionally non-compensable because they exceed the minimum that a reasonable paying client would pay absent a fee-shifting arrangement. *See Arbor Hill, at 112, 118.* The eight DOAR experts billed a total of $ 96,209.52 in fees and costs and charged between $ 225 and $ 295 per hour. Amerisource's fee application provides no description of the services DOAR provided but the contemporaneous time records suggest that DOAR facilitated the impressive evidence presentation system that Amerisource used during trial and also conducted jury research prior to the trial. The DOAR billing records include [*47] several entries for the creation of "graphics concepts," "animations," and "database preparation." Their list of itemized costs includes $ 35,000 for a jury focus group and $ 13,500 for juror "incentives" and "recruitment." It would be unreasonable to hold RxUSA accountable for such premium services, which far exceed the standard litigation expenses of the average reasonable litigant.

### IV. *CONCLUSION*

The Court finds that a contract existed between the parties, that the defendants breached the contract, and that defendants' breach entitles plaintiff to the past due balances, prejudgment interest, and certain contractual attorneys' fees and costs. Therefore, it is hereby ORDERED that the Clerk of the Court enter judgment against the defendants in accordance with the following:

judgment against defendant Rx USA International, Inc. in the principal sum of $ 175,718.26, prejudgment interest of $ 480,738.65 through September 9, 2009, and additional prejudgment accruing at a rate of 1.5% per month from September 10 through the date of judgment;

judgment against defendants Parsons Medical Center Pharmacy Inc., and Parsons Medical Center Pharmacy Inc. (II), jointly and severally, in the principal [*48] sum of $ 99,709.01, prejudgment interest of $ 267,896.40 through September 9, 2009, and additional prejudgment interest accruing at a rate of 1.5% per month from September 10, 2009 through the date of judgment; and

judgment against each defendant, jointly and severally, in the sum of $ 1,806,295.72 in attorneys' fees and costs.

It is further ORDERED that defendants' counterclaim for breach of contract be dismissed in their entirety and that defendants take nothing of plaintiff.

SO ORDERED.

Dated: May 26, 2010

Brooklyn, New York

/s/

JOAN M. AZRACK

UNITED STATES MAGISTRATE JUDGE

**Exhibit A**

LEXSEE

**CHUBB & SON INC., et al., Plaintiffs, -against- MICHAEL J. KELLEHER, et al., Defendants. CHUBB & SON INC., et al., Plaintiffs, -against- JAMES KELLEHER, et al., Defendants.**

**92 CV 4484 (TLM) (RML),95 CV 0951 (CBA) (RML)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

**2010 U.S. Dist. LEXIS 141842**

**October 22, 2010, Decided**
**October 22, 2010, Filed**

**SUBSEQUENT HISTORY:** Adopted by, Partial summary judgment granted by Chubb & Son Inc. v. Kelleher, 2011 U.S. Dist. LEXIS 22834 (E.D.N.Y., Mar. 7, 2011)

**PRIOR HISTORY:** Chubb & Son Inc. v. Kelleher, 2009 U.S. Dist. LEXIS 37765 (E.D.N.Y., May 1, 2009)

**COUNSEL:** [*1] For Chubb & Son Inc. (0:92-cv-04484-TLM -RML), Plaintiff: Marvin Wexler, LEAD ATTORNEY, Kornstein, Veisz & Wexler, LLP, New York, NY; Amy Christine Gross, Daniel A. Cohen, Kornstein Veisz Wexler & Pollard, LLP, New York, NY.

For Federal Insurance Company, Vigilant Ins. Co., Sea Insurance Company of America. (0:92-cv-04484-TLM -RML), Plaintiffs: Marvin Wexler, LEAD AT-TORNEY, Kornstein, Veisz & Wexler, LLP, New York, NY; Daniel A. Cohen, Kornstein Veisz Wexler & Pollard LLP, New York, NY.

For Harold Casey (0:92-cv-04484-TLM -RML), Defendant: Richard P. Broder, LEAD ATTORNEY, Richard P. Broder, Garden City, NY; Richard P. Broder, LEAD ATTORNEY, Stephen C. Scaring, Garden City, NY.

For Jack Duboff Associates, Inc. (0:92-cv-04484-TLM -RML), Defendant: James I. Wasserman, LEAD ATTORNEY, Doar Rieck Kaley & Mack, New York, NY.

For Seymour B Berson (0:92-cv-04484-TLM -RML), Defendant: Seymour Glanzer, LEAD ATTORNEY,

Dickstein Shapiro Morin & Oshinsky LLP, Washington, DC.

Gary Beckerman (0:92-cv-04484-TLM -RML), Defendant, Pro se, Long Beach, NY.

Stuart Benson (0:92-cv-04484-TLM -RML), Defendant, Pro se, New York, NY.

Marilyn Forem, Milton Plotsker, Rosalie Plotsker (0:92-cv-04484-TLM -RML), Defendants, [*2] Pro se, Boca Raton, FL.

Barry Gold (0:92-cv-04484-TLM -RML), Defendant, Pro se, Roslyn Heights, NY.

For Kim Luttinger (0:92-cv-04484-TLM -RML), Defendant: John W. Mitchell, LEAD ATTORNEY, John W. Mitchell, Esq., New York, NY.

Glen Plotsker (0:92-cv-04484-TLM -RML), Defendant, Pro se, Boca Raton, FL.

For Lester Weiss (0:92-cv-04484-TLM -RML), Defendant: Alan B Leibowitz, LEAD ATTORNEY, Simonson Hess & Leibowitz, P.C, New York, NY.

For Interstate Adjusters, Inc. (0:92-cv-04484-TLM -RML), Defendant, Cross Defendant: Mark D. Mermel, LEAD ATTORNEY, Lake Success, NY.

Alegra Rishty-Shweky (0:92-cv-04484-TLM -RML), Claimant, Pro se, Brooklyn, NY.

For Michelle K. Williamson, Christina K. Taylor, Virginia K. Beigel (0:92-cv-04484-TLM -RML), Interested Parties: Isaac Nutovic, LEAD ATTORNEY,

2010 U.S. Dist. LEXIS 141842, *

Nutovic & Lichtenberg, New York, NY; Leslie S. Osborne, LEAD ATTORNEY, Furr and Cohen, P.A., Boca Raton, FL.

For Patricia Dzikowski (0:92-cv-04484-TLM -RML), Trustee: Leonard W. Wagman, Snow, Becker, Krauss, P.C., New York, NY.

For Richard Davis (0:92-cv-04484-TLM -RML), Defendant, Cross Defendant: Stephen N. Shapiro, LEAD ATTORNEY, Gutstein & Shapiro, New York, NY.

For United International Adjusters, Inc. (0:92-cv-04484-TLM [*3] -RML), Defendant: James R. DeVita, LEAD ATTORNEY, Schoeman, Updike & Kaufman, LLP, New York, NY.

For M.F Bank & Co., Inc. (0:92-cv-04484-TLM -RML), Defendant: Kevin H. Marino, LEAD ATTORNEY, Kevin H. Marino, Attorney at Law, Newark, NJ; Peter J. Gleekel, LEAD ATTORNEY, Winthrop & Weinstine, P.A., Minneapolis, MN.

Joseph Rigney (0:92-cv-04484-TLM -RML), Defendant, Pro se, Wantagh, NY.

For Joseph Rigney (0:92-cv-04484-TLM -RML), Defendant: Robert Silverstein, LEAD ATTORNEY, Shreck Wardi Coiro & Madow, New York, NY.

Neil Saada, Defendant (0:92-cv-04484-TLM -RML), Pro se, Long Branch, NJ.

For Techknits, Inc., Simon Taub (0:92-cv-04484-TLM -RML), Defendants, Counter Claimants, Cross Claimants: George Samuel Meissner, LEAD ATTORNEY, Meissner, Kleinberg & Finkel, New York, NY; Richard Avery Finkel, LEAD ATTORNEY, Meissner, Kleinberg & Finkel, LLP, New York, NY.For M.F Bank & Co., Inc. (0:92-cv-04484-TLM -RML), Counter Claimant: Claire C. Cecchi, LEAD ATTORNEY, Robinson, St. John & Wayne, Esqs., Newark, NJ; Kevin H. Marino, LEAD ATTORNEY, Kevin H. Marino, Attorney at Law, Newark, NJ.

For Chubb & Son Inc. (0:92-cv-04484-TLM -RML), Counter Defendant: Marvin Wexler, LEAD ATTORNEY, Kornstein, Veisz & [*4] Wexler, LLP, New York, NY.

For M.F Bank & Co., Inc. (0:92-cv-04484-TLM -RML), Cross Claimant: Kevin H. Marino, LEAD ATTORNEY, Kevin H. Marino, Attorney at Law, Newark, NJ.

For Criterion Bead and Novelty Corp. (0:92-cv-04484-TLM -RML), Cross Defendant: Christopher E. Martin, Japhet Boutin, LEAD ATTORNEYS, Ohrenstein & Brown, LLP, New York, NY; Peter J. Biging, LEAD ATTORNEY, Ohrenstein & Brown, LLP, Garden City, NY.

For Alan Feingold (0:92-cv-04484-TLM -RML), Cross Defendant: Peter J. Biging, LEAD ATTORNEY, Ohrenstein & Brown, LLP, Garden City, NY.

For Great Northern Insurance Company (0:92-cv-04484-TLM -RML), Plaintiff: Kornstein, Veisz & Wexler, LEAD ATTORNEY, Kornstein, Veisz & Wexler, LLP, NYC, NY; Daniel A. Cohen, Kornstein Veisz Wexler & Pollard LLP, New York, NY.

Elliot Zerring (0:92-cv-04484-TLM -RML), Defendant, Pro se, Woodmere, NY.

For Elliot Zerring (0:92-cv-04484-TLM -RML), Defendant: Mark D. Mermel, LEAD ATTORNEY, Lake Success, NY.

Robyn Gold (0:92-cv-04484-TLM -RML), Defendant, Pro se, East Hills, NY.

For Isaac Saada (0:92-cv-04484-TLM -RML), Defendant: Matthew C. Rueter, LEAD ATTORNEY, New York, NY; Roger J. Bernstein, LEAD ATTORNEY, Law Offices of Roger Bernstein, Esq., New [*5] York, NY.

For Federal Insurance Company (0:92-cv-04484-TLM -RML), Counter Defendant, Cross Defendant: Marvin Wexler, LEAD ATTORNEY, Kornstein, Veisz & Wexler, LLP, New York, NY.

For Chubb & Son Inc. (0:92-cv-04484-TLM -RML), Cross Defendant: Marvin Wexler, LEAD ATTORNEY, Kornstein, Veisz & Wexler, LLP, New York, NY; William B. Pollard, III, LEAD ATTORNEY, Kornstein, Veisz, Wexler & Pollard LLP, New York, NY.

For Stephen Horowitz (0:92-cv-04484-TLM -RML), Cross Defendant: Robert A. Scher, LEAD ATTORNEY, Scher & Scher P.C., Great Neck, NY.

For Itzhak Weinstock (0:92-cv-04484-TLM -RML), Cross Defendant: Paul D. Montclare, LEAD ATTORNEY, Mitchell Silberg & Knupp LLP, New York, NY.

For Chubb & Son, Inc. (0:95-cv-00951-CBA-RML), Plaintiff: Howard S. Veisz, LEAD ATTORNEY,

Kornstein, Veisz & Wexler, LLP, New York, NY; William B. Pollard, III, LEAD ATTORNEY, Amy Christine Gross, Daniel A. Cohen, Kornstein, Veisz, Wexler & Pollard, LLP, New York, NY.

For Federal Insurance Company, Vigilant Insurance Company, Sea Insurance Company of America, Great Northern Insurance Company (0:95-cv-00951-CBA-RML), Plaintiffs: Howard S. Veisz, LEAD ATTORNEY, Kornstein, Veisz & Wexler, LLP, New York, NY; Daniel A. [*6] Cohen, Kornstein Veisz Wexler & Pollard LLP, New York, NY.

For James Kelleher (0:95-cv-00951-CBA-RML), Defendant, Cross Defendant: James J. O'Rourke, LEAD ATTORNEY, James J. O'Rourke & Associates, PLLC, Hauppauge, NY.

Robert Simon (0:95-cv-00951-CBA-RML), Defendant, ThirdParty Plaintiff, Pro se, Boca Raton, FL.

For Rich & Simon (0:95-cv-00951-CBA-RML), Defendant, Cross Claimant: Evan Glassman, LEAD ATTORNEY, LaRossa, Mitchell & Ross, New York, NY.

For Alan Rosenkranz (0:95-cv-00951-CBA-RML), Defendant, Cross Defendant: Lawrence K. Katz, LEAD ATTORNEY, Katz & Kreinces LLP, Mineola, NY.

For Venus Trimming and Binding, Inc., Stanley Sloan, Jerry Clair (0:95-cv-00951-CBA-RML), Cross Defendants: S. Reid Kahn, LEAD ATTORNEY, Kane Kessler, P.C., New York, NY.

For Louis Rosenkranz (0:95-cv-00951-CBA-RML), Cross Defendant: David B. Newman, LEAD ATTORNEY, Day Pitney LLP, New York, NY.

For Edward A. Rich (0:95-cv-00951-CBA-RML), ThirdParty Defendant, Counter Claimant: Peter G. Goodman, LEAD ATTORNEY, Hartman & Craven LLP, New York, NY.

For Great Northern Insurance Company, Sea Insurance Company of America, Counter Vigilant Insurance Company, Federal Insurance Company, Chubb & Son, Inc. (0:95-cv-00951-CBA-RML), [*7] Defendants: Howard S. Veisz, LEAD ATTORNEY, Kornstein, Veisz & Wexler, LLP, New York, NY.

**JUDGES:** ROBERT M. LEVY, United States Magistrate Judge.

**OPINION BY:** ROBERT M. LEVY

**OPINION**

REPORT AND RECOMMENDATION

LEVY, United States Magistrate Judge:

Plaintiffs Chubb & Son Inc., Federal Insurance Company, Vigilant Insurance Company, Sea Insurance Company of America, and Great Northern Insurance Company ("plaintiffs" or "Chubb") move for partial summary judgment against defendant Elliot Zerring ("defendant" or "Zerring"). By order dated March 26, 2010, the Honorable Carol Bagley Amon, United States District Judge, referred plaintiffs' motion to me for a report and recommendation. For the reasons stated below, I respectfully recommend that the motion be granted.

**Background and Facts**[1]

1 The following facts, upon which plaintiffs' complaint is based, are undisputed or deemed admitted, unless otherwise noted. Plaintiffs served and filed a Statement of Material Facts Not in Genuine Dispute, in compliance with Local Civil Rule 56.1(a). The rule states that upon any motion for summary judgment, "there shall be annexed to the notice of motion a separate, short and concise statement . . . of the material facts as to which the moving [*8] party contends there is no genuine issue to be tried." Rule 56.1(b) then requires the party opposing summary judgment to include "a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." Under Rule 56.1(c), all "material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless specifically controverted by . . . the statement required to be served by the opposing party." See AAI Recoveries, Inc. v. Pijuan, 13 F. Supp. 2d 448, 449-50 (S.D.N.Y. 1998); Montalvo v. Sun Roc Corp., 179 F.R.D. 420, 421-23 (S.D.N.Y. 1998); see also T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009). Plaintiffs have also submitted a "Notice To Pro Se Litigant Who Opposes a Motion For Summary Judgment" pursuant to Local Rule 56.2. As explained infra, Zerring has not submitted a Rule 56.1 statement or otherwise contested his liability in this case.

Chubb brought these actions against numerous defendants, including Zerring, alleging that they participated in the submission of fraudulent property and

2010 U.S. Dist. LEXIS 141842, *

casualty insurance claims to Chubb in violation of the Racketeer [*9] and Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, et seq., and state law. (See Third Amended Complaint in 92 CV 4484, dated Aug. 7, 1998 ("Third Am. Compl.").) Chubb commenced the first civil action, 92 CV 4484 (the "'92 Action"), in September 1992 and the related action, 95 CV 951 (the "'95 Action"), in March 1995. Initially, there were more than 150 parties to these and thirty-three related federal, state, and bankruptcy actions. At this point, Zerring is one of two remaining defendants in these cases.[2]

> 2   Chubb has settled with or reduced to judgment its claims against all of the defendants, with the exception of Zerring, Marilyn Forem, Mitchell Jacoby, and Interstate Adjusters, Inc. ("Interstate"). The case against Marilyn Forem is due to go to trial shortly; Mitchell Jacoby cannot be located; and Interstate has been dissolved by proclamation.

In this motion, Chubb seeks damages based on fifteen purportedly fraudulent insurance claims, totaling $7,381,935.75. (See Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment Against Defendant Elliot Zerring, dated Jan. 15, 2010 ("Pls.' Mem."), at 1-2.) All of the claims at issue in the instant [*10] motion were handled by Interstate Adjusters, Inc. ("Interstate"), which Zerring owned and controlled with his business partner, Robert Greenberg ("Greenberg").[3] Interstate was a licensed public adjuster based in Great Neck, New York, which represented policyholders in the preparation, adjustment, and settlement of their insurance claims. (See Plaintiffs' Rule 56.1 Statement of Undisputed Facts, dated Jan. 15, 2010 ("Pls.' Rule 56.1 Statement"), ¶ 20; see also N.Y. Ins. Law § 2101(g)(2) (defining "public adjuster").)

> 3   Zerring was Interstate's Chief Executive Officer (see Grand Jury Transcript in United States v. John Doe, 46 CR 1016, annexed as Ex. 2 to the Affidavit of William B. Pollard, III, Esq., sworn to Jan. 15, 2010 ("Pollard Aff.")), and Greenberg was the company's president. (See Deposition of Robert Greenberg. dated Aug. 26, 1998, annexed as Ex. 3 to the Pollard Aff.).

Federal authorities arrested Zerring and Greenberg in 1992 for participating in a criminal conspiracy to defraud Chubb and other insurance carriers by misrepresenting the nature and extent of their clients' losses and bribing insurance company adjusters and consultants to obtain approval and payment of fraudulent [*11] claims. In August 1993, Zerring pleaded

guilty in this court to two counts of mail fraud, one of which involved an insurance claim submitted to Chubb.[4] (Transcript of Guilty Plea, dated Aug. 26, 1993, annexed as Ex. 8 to the Affidavit of William B. Pollard, III, Esq., sworn to Jan. 15, 2010 ("Pollard Aff.").) In 1998, in an unrelated criminal trial, Zerring testified that he and others at Interstate were involved in submitting "probably hundreds" of fraudulent insurance claims and regularly bribing insurance company employees and experts. (See Transcript of Trial in United States v. Bruce Gordon, 96 CR 1016, annexed as Ex. 16 to the Pollard Aff., at 6909--11.) His partner, Robert Greenberg, has stated that approximately one-third of the insurance claims handled by Interstate were fraudulent. (Affidavit of Robert Greenberg, sworn to Sept. 9, 2009, ¶ 6.)

> 4   One of the fraudulent claims was submitted to Chubb in 1991 on behalf of Criterion Bead & Novelty Corp. The other fraudulent claim was submitted to American International Group, Inc. in 1990 on behalf of Rafaella Sportswear Inc. (See Criminal Information, annexed as Ex. 4 to the Pollard Aff.; Transcript of Guilty Plea, dated Aug. 26, [*12] 1993, annexed as Ex. 8 to the Pollard Aff.) Zerring also pleaded guilty to one count of tax evasion. (Pollard Aff., Ex. 8 at 24.) The court sentenced him to five years of probation on the three counts, to run concurrently. (Pollard Aff., Ex. 9.)

## Discussion

### A. Standard for Summary Judgment

A court shall grant summary judgment if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). When deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and decide only whether there is any genuine issue to be tried. Eastman Mach. Co. v. United States, 841 F.2d 469, 473 (2d Cir. 1988). "[T]he court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact . . . . Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment." United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994) (internal citations omitted). A genuine factual issue exists if, taking into account [*13] the burdens of production and proof that would be required at trial, sufficient evidence favors the non-

movant such that a reasonable jury could return a verdict in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In other words, there must be more than "a scintilla of evidence" to support the non-moving party's claims, id. at 251; "assertions that are conclusory" will not suffice, Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).

In this motion, Chubb seeks summary judgment on its claims for violations of RICO and conspiracy to violate RICO (the First, Fourth, Fifth, Eighth and Twelfth Claims for Relief in the Third Amended Complaint in 92 CV 4484) and common law fraud and conspiracy to commit common law fraud (the Thirteenth Claim for Relief). I will address each claim in turn.

B. RICO § 1962(c)

Chubb's First, Fourth, and Fifth Claims for Relief against Zerring assert claims based on RICO, 18 U.S.C. § 1962(c). (See Third Am. Compl. ¶¶ 390-- 400, 411--415, 416--420.) Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct [*14] or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To establish a claim for a civil violation of section 1962(c), a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Azrielli v. Cohen Law Offices, 21 F.3d 512, 520 (2d Cir. 1994) (internal quotations omitted), abrogated on other grounds by Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994). See also Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985); S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp., 84 F.3d 629, 633 (2d Cir. 1996).

A RICO enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). To meet the "conduct" requirement, a plaintiff must establish that the defendant "played some part in directing the affairs" of the RICO enterprise or had "discretionary authority in carrying out the instructions of the [conspiracy's] principals." Baisch v. Gallina, 346 F.3d 366, 376 (2d Cir. 2003) [*15] (citing United States v. Diaz, 176 F.3d 52, 93 (2d Cir. 1999); De Falco v. Bernas, 244 F.3d 286, 311 (2d Cir. 2001); United States v. Miller, 116 F.3d 641, 673 (2d Cir. 1997); Napoli v. United States, 45 F.3d 680, 681-

-83 (2d Cir. 1995)). The enterprise must be separate from the pattern of racketeering activity, United States v. Turkette, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981), and distinct from the person conducting the affairs of the enterprise, see Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161-62, 121 S. Ct. 2087, 150 L. Ed. 2d 198 (2001); accord Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 89 (2d Cir. 1999).

Moreover, "[u]nder RICO, a pattern of racketeering activity consists of at least two acts of racketeering activity (often referred to as the 'predicate acts') within a ten year period." Lugosch v. Congel, 443 F. Supp. 2d 254, 264 (N.D.N.Y. 2006) (citing 18 U.S.C. §§ 1961(1), (5)). RICO defines "racketeering activity" to include a host of criminal offenses, which are in turn defined by federal and state law. See 18 U.S.C. § 1961(1). Mere common law fraud does not constitute racketeering activity for RICO purposes. See id. Here, however, Chubb also accuses Zerring of engaging in mail fraud in violation of [*16] 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and violations of the Travel Act, 18 U.S.C. §§ 1341, 1343, 1346, 1952, all of which constitute racketeering activity under 18 U.S.C. § 1961(1)(B).

In addition, in order to constitute a pattern, these acts of racketeering activity must be "related, and either amount to or pose a threat of continuing criminal activity." Spool v. World Child Int'l Adoption Agency, 520 F. 3d 178, 183 (2d Cir. 2008). See also H. J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239, 250, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989) (explaining that a pattern of racketeering activity is established by satisfying its two requisite components: relatedness and continuity). Relatedness is established by "proof of 'criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" Azrielli, 21 F.3d at 520 (quoting H.J. Inc., 492 U.S. at 240). This proof may be adduced in numerous ways, including "temporal proximity, or common goals, or similarity of methods, or repetitions. The degree to which these factors establish a pattern may depend on the [*17] degree of proximity, or any similarities in goals or methodology or the number of repetitions." United States v. Indelicato, 865 F.2d 1370, 1382 (2d Cir. 1989). The continuity element may be satisfied in either of two ways, referred to as "closed-ended" and "open-ended" continuity. Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999). Closed-ended continuity requires proof of "continued criminal activity, by a particular defendant . . . extending over a substantial period of time," usually more than two

years. Id. Open-ended continuity may be established by a showing of a shorter period of criminal conduct coupled with a threat of future criminal activity. See id.; GICC Capital Corp. v. Technology Fin. Group, Inc., 67 F.3d 463, 466 (2d Cir. 1995).

With respect to plaintiffs' allegations of mail and wire fraud, plaintiffs must allege "(1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." S.Q.K.F.C., Inc., 84 F. 3d at 633. Furthermore, where a plaintiff alleges predicate acts that sound in fraud, those allegations [*18] must be pleaded with particularity under Federal Rule of Civil Procedure 9(b) and must contain facts "that give rise to a *strong* inference of fraudulent intent."[5] First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 178--79 (2d Cir. 2004) (emphasis in original) (quoting Moore v. PaineWebber, Inc., 189 F.3d 165, 173 (2d Cir. 1999)).

[5] Rule 9 of the Federal Rules of Civil Procedure requires that "in all averments constituting fraud and mistake, the circumstances constituting fraud and mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Therefore, in order to sustain a RICO cause of action with predicate acts of mail and wire fraud, plaintiffs must plead the fraud aspects of their allegations with particularity. Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989); see also Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 1993) ("[A]llegations of predicate mail and wire fraud acts should state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent.") (citation omitted).

Plaintiffs easily satisfy each of these elements. As an initial matter, Zerring does not deny his liability in this case. [*19] In opposition to Chubb's motion for summary judgment, Zerring has submitted a one-page handwritten statement,[6] in which he argues only that "Chubb has incorrectly calculated the amount of possible damages," as "the calculation does not take into consideration any sums received by or recovered by plaintiff Chubb from any other defendants in the above captioned matter." He asks that the court conduct a hearing "to determine the exact damages" Chubb is entitled to recover. (See Letter of Elliott Zerring, filed Mar. 23, 2010.) However, Zerring does not contest any of the factual evidence submitted by Chubb or dispute any of the legal grounds Chubb advances in support of its motion.[7] Even giving the most generous deference to Zerring's pro se status,[8] this

court would be hard-pressed to interpret his submission as denying liability for Chubb's claims.

[6] The statement purports to be an affidavit but is not made under oath.

[7] In fact, Zerring has never denied Chubb's allegations. In his Answer to the Third Amended Complaint, Zerring declined to respond to any of Chubb's allegations, instead invoking his Fifth Amendment privilege against self-incrimination. (See Pollard Aff., Ex. 1, ¶ 1.) It is [*20] well-settled that, in a civil action, a trier of fact may draw an adverse inference against a party who invokes the Fifth Amendment privilege. See Baxter v. Palmigiano, 425 U.S. 308, 318-20, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976); S.E.C. v. Suman, 684 F. Supp. 2d 378, 387 (S.D.N.Y. 2010).

[8] Zerring was initially represented by counsel, but the court granted his attorney's request for leave to withdraw on December 21, 1998. Since that time, Zerring has appeared pro se at a number of court conferences. It bears observing that Zerring has consistently displayed a firm grasp of the proceedings and the potential consequences of his actions.

Moreover, Zerring has pleaded guilty to two predicate acts of mail fraud,[9] and both he and Robert Greenberg have testified at length about Interstate's long-running scheme to defraud Chubb and other insurance companies by submitting false or inflated claims, as well as their cultivation of corrupt relationships with various Chubb claims representatives. (See Pollard Aff., Exs. 8, 16, 28, 70, 83.) Numerous former Interstate employees and other witnesses have corroborated those accounts. (See, e.g., Pollard Aff., Exs. 8, 17, 29, 36, 40, 82, 84.)

[9] As Judge Amon has ruled previously in this [*21] case, a predicate act injuring a non-plaintiff may be used to show the existence of a RICO pattern. (See Memorandum and Order, dated Feb. 26, 2008, at 97.)

Chubb has submitted competent evidence to prove that Interstate submitted at least fifteen separate fraudulent insurance claims to Chubb (see Pls.' Rule 56.1 Statement ¶¶ 33-56, 57-75, 76-85, 86-88, 89-97, 98-115, 116-126, 127-134, 135-147, 148-155, 156-164, 165-171, 172-180, 181-192, 193-202), and that Zerring participated in the management of Interstate's affairs and its submission of fraudulent claims, personally committing dozens of acts of mail and wire fraud (see Pollard Aff., Exs. 136, 137) pertaining to five separate fraudulent insurance claims.[10] In addi-

tion, there can be no question that the predicate acts of fraud are related, since they are alleged to have had the same victim, Chubb, and the same or similar purpose, *i.e.*, defrauding Chubb and other insurance companies. In other words, these were not isolated events; they were part of Interstate's regular way of conducting business. See H.J. Inc., 492 U.S. at 243. I therefore respectfully recommend that plaintiffs' motion for summary judgment be granted with respect to [*22] their claims under 18 U.S.C. § 1962(c).

> 10    The five fraudulent claims in which Zerring participated personally were (1) the Criterion Bead & Novelty Corp. claim for $525,384.84, relating to fire damage purportedly caused on April 26, 1991 (Pls.' Rule 56.1 Statement ¶¶ 33-52), (2) two claims submitted by Arthur and Nina Damast for losses allegedly suffered on June 12, 1989 and June 23, 1989, on which Chubb paid $25,964.85 and $343,794.81, respectively (Pls.' Rule 56.1 Statement ¶¶ 82--86), (3) the Carnival Creations claim for $430,888 for alleged hurricane damage on September 18, 1989 (Pls.' Rule 56.1 Statement ¶¶ 57, 60, 64, 69), and (4) the International Foam Products claim for $1,030,425.07 for fire and water damage that allegedly occurred on September 20, 1988 (Pls.' Rule 56.1 Statement ¶¶ 89-94).

### C. RICO § 1962(d)

Chubb's Eighth and Twelfth Claims for Relief against Zerring assert claims based on the RICO conspiracy statute, 18 U.S.C. § 1962(d). (See Third Am. Compl. ¶¶ 439--444, 466--469.) For violations of section 1962(d), a plaintiff must establish that the defendant and others "agreed to form and associate themselves with a RICO enterprise and that they agreed to commit two predicate [*23] acts in furtherance of a pattern of racketeering activity in connection with the enterprise." Cofacredit, S.A., 187 F.3d at 244. It is not necessary to find that each defendant knew all the details or the full extent of the conspiracy, including the identity and role of every other conspirator. United States v. Boylan, 898 F.2d 230, 242 (1st Cir. 1990) ("A RICO conspiracy does not demand . . . that all defendants participate in all racketeering acts, know of the entire conspiratorial sweep, or be acquainted with all other defendants.") All that is necessary to prove this element of the RICO conspiracy, against a particular defendant, is to prove that he or she agreed with one or more co-conspirators to participate in the conspiracy. Moreover, it is not necessary for the conspiratorial agreement to be express, so long as its existence can plausibly be inferred from

words, actions, and the interdependence of activities and persons involved. United States v. Concemi, 957 F.2d 942, 950 (1st Cir. 1992).

Again, Chubb easily satisfies these requirements. Zerring has admitted, under oath, that he agreed to associate himself with and to conduct the affairs of Interstate through a pattern of [*24] racketeering activity, and there is ample evidence in the record to support that admission. I therefore respectfully recommend that plaintiffs' motion for summary judgment be granted with respect to their claims under 18 U.S.C. § 1962(d).

### D. Common Law Fraud

Plaintiffs' Thirteenth Claim for Relief against Zerring asserts a claim for common law fraud and conspiracy to commit fraud. (See Third Am. Compl. ¶¶ 470-475.) To prevail on a fraud claim under New York law, a plaintiff must establish by clear and convincing evidence that (1) the defendant made a material misrepresentation; (2) the defendant knew of its falsity; (3) the defendant possessed an intent to defraud; (4) the plaintiff reasonably relied on the misrepresentation; and (5) the plaintiff suffered damage as a result of the misrepresentation. Kaye v. Grossman, 202 F.3d 611, 614 (2d Cir. 2000); New York Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 662 N.E.2d 763, 769, 639 N.Y.S.2d 283 (N.Y. 1995) (citing Channel Master Corp. v. Aluminum Ltd. Sales, Inc., 4 N.Y.2d 403, 151 N.E.2d 833, 835, 176 N.Y.S.2d 259 (N.Y. 1958)). To sustain a claim for conspiracy to commit fraud, a plaintiff must prove that the defendant entered into an agreement or understanding with other defendants to cooperate in [*25] a fraudulent scheme. Richards v. Cesare, 25 Misc. 3d 1217[A], 901 N.Y.S. 2d 910, , 2009 NY Slip Op 52164[U], 2009 WL 3415279, at *5 [Sup. Ct., N.Y. County 2009] (citing Abrahami v. UPC Constr. Co., 176 A.D.2d 180, 574 N.Y.S.2d 52 (1st Dep't 1991)).

Plaintiffs have provided more than sufficient evidence to prove that Zerring participated directly in defrauding Chubb. At his guilty plea allocution, Zerring admitted to making false statements with the intent of inducing Chubb to pay an inflated claim for fire and water loss. (See Pollard Aff., Ex. 8, at 34-35.) It is beyond dispute that Chubb justifiably relied on those deliberate misrepresentations, to its detriment, when it paid the claim at issue. See Twenty First Century L.P.I. v. LaBianca, 19 F. Supp. 2d 35, 38--39 (E.D.N.Y. 1998) (granting summary judgment to plaintiff on fraud claim where defendants had entered guilty pleas for mail and wire fraud, and explaining that although justifiable reliance is not an element of those crimes, plaintiff's payment of inflated invoices

based on its own employees' approval established its reasonable reliance on the fraudulent representations); see also Memorandum and Order, dated Sept. 28, 2001, at 39 (granting summary judgment against other insureds [*26] and public adjuster Gary Beckerman, and explaining that "the fact that plaintiffs acted reasonably in relying on the approvals of its claims representatives in paying the inflated claims cannot seriously be disputed.")

Plaintiffs have also demonstrated that Zerring participated in a conspiracy to defraud Chubb. In testimony he gave as a government witness, Zerring admitted his agreement to take part in a wide-ranging scheme to inflate and falsify insurance claims and bribe insurance company representatives. (See Pollard Aff., Ex. 16.) As there is no genuine issue to be tried and no conflicting version of the facts, I respectfully recommend that plaintiffs' motion for summary judgment be granted on the state-law claim for fraud and conspiracy to commit fraud.

E. Damages

1. Damages for Civil RICO and Common Law Fraud

RICO damages should be "'sufficient to place the plaintiff in the same financial position [it] would have occupied absent the illegal conduct.'" Lukaszuk v. Sudeen, No. 02-CV-5143, 2007 U.S. Dist. LEXIS 95919, 2007 WL 4699018, at *6 (E.D.N.Y. Nov. 27, 2007) (quoting Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1106 (2d Cir. 1988)); see also First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 768-69 (2d Cir. 1994) [*27] (the "general rule of fraud damages is that the defrauded plaintiff may recover out-of-pocket losses caused by the fraud."). As Judge Amon has previously held in this case, the appropriate measure of damages under plaintiffs' RICO and common law fraud claims "is a sum equal to the settlements paid on the fraudulent claims submitted by the defendants." (Mem. and Order, dated Sept. 28, 2001, at 23 (citing Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1568-69 (1st Cir. 1994) ("as a matter of law, Aetna is entitled to damages equal to the entire amount of its payments on fraudulent claims, regardless of any portion of the claims that might have been shown to be supportable if no fraudulent enlargement of the claims had occurred.")). Since plaintiffs are only entitled to collect once on each fraudulent claim, each defendant who participated in the submission of a fraudulent claim is jointly and severally liable for the amount of that claim with the other defendants who participated in submitting it. (Id. at 24 (citing Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Arcturus Builders, Inc., 159 A.D.2d 283, 552 N.Y.S.2d 287, 288 (1st Dep't 1990)).)

Chubb seeks to hold Zerring liable for all fifteen fraudulent [*28] claims submitted by Interstate, including those in which Zerring was not personally involved. It argues that "Zerring's membership in the ongoing conspiracy to defraud Chubb and others through a pattern of racketeering activity renders him personally liable for all of Chubb's damages . . . regardless of his knowledge of the full scope of the conspiracy." (Pls.' Mem. at 37.) Plaintiffs cite no Second Circuit authority for that proposition, although they do reference one First Circuit opinion. See Aetna Cas. Sur. Co., 43 F.3d at 1562 ("A defendant who does not know the 'entire conspiratorial sweep' is nevertheless jointly and severally liable, in the civil context, for all acts in furtherance of the conspiracy."); see also United States v. Hurley, 63 F.3d 1, 22 (1st Cir. 1995) (concluding in forfeiture action that, under RICO, "a member of a conspiracy is responsible for the foreseeable acts of other members of the conspiracy taken in furtherance of the conspiracy.").[11] Other courts have held likewise. See Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n, 298 F.3d 768, 775 (9th Cir. 2002) ("If a RICO conspiracy is demonstrated, '[a]ll conspirators are liable for the acts of their [*29] co-conspirators.'" (quoting Sec. Investor Prot. Corp. v. Vigman, 908 F.2d 1461, 1468 (9th Cir. 1990), rev'd on other grounds sub nom., Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992) (internal quotations and citations omitted))); State Farm Mut. Auto. Ins. Co. v. Kalika, No. 04-CV-4631, 2007 U.S. Dist. LEXIS 90322, 2007 WL 4326920, at *9 (E.D.N.Y., Dec. 7, 2007) (finding "ample authority" to hold one defendant jointly and severally liable "for the total cost of the medically unnecessary procedures submitted to State Farm by all of the defendants involved in the conspiracy."); Ducote Jax Holdings, L.L.C. v. Bradley, No. 04-CV-1943, 2007 U.S. Dist. LEXIS 49088, 2007 WL 2008505, at *7 (E.D. La. July 5, 2007) ("All conspirators are liable for the acts of their co-conspirators" under § 1962(d)). Indeed, "[e]very circuit in the country that has addressed the issue has concluded that the nature of . . . civil . . . RICO offenses requires imposition of joint and several liability because all defendants participate in the enterprise responsible for the RICO violations." United States v. Phillip Morris USA, Inc., 316 F. Supp. 2d 19, 27 (D.D.C. 2004) (collecting cases from various circuits); see also 16 Am. Jur. 2d Conspiracy § 70 ("If a conspiracy [*30] is found, "[w]ithout qualification, each conspirator is liable for all damages flowing from the conspiracy."). Under New York law, as well, a defendant who is found to have conspired to commit fraud is liable for the independent actions of his or her co-conspirators done in furtherance of the conspiracy. See CPC Int'l Inc. v. McKesson Corp., 70 N.Y.2d 268, 514 N.E.2d

2010 U.S. Dist. LEXIS 141842, *

116, 125, 519 N.Y.S.2d 804 (N.Y. 1987); see also Hoag v. Chancellor, Inc., 246 A.D.2d 224, 677 N.Y.S.2d 531, 535 (1st Dep't 1998) (explaining that an allegation of conspiracy "serve[s] to enable a plaintiff to connect a defendant with the acts of his co-conspirators where without it he could not be implicated.") (citation and internal quotation marks omitted); NY JUR CONSPIRACY § 10 ("Once a conspiracy is established, every act and declaration of each member of the confederacy in pursuance of the original concerted plan is, in law, the act and declaration of them all, so that all the conspirators are equally liable, jointly and severally, as tortfeasors.") (citations omitted).

11   Plaintiffs also cite United States Reiner, 500 F.3d 10, 18 (1st Cir. 2007), a criminal forfeiture action in which the court followed Hurley in holding that "members of a conspiracy [are] substantively [*31] liable for the foreseeable conduct of other members of the conspiracy."

I therefore respectfully recommend that Zerring be held jointly and severally liable for all of the fraudulent claims Interstate submitted to Chubb, totaling $7,381,935.55. Specifically, those claims are:

_____

_____

| Insured | Date of Loss | Amount Paid |
|---|---|---|
| H. Fox & Company | 4/26/87 | $866,741.47 |
| | | |
| | | |
| | | |
| Better Belts | 7/22/88 | $85,561.77 |
| | | |
| | | |
| | | |
| International Foam Products | 9/13/88 | $1,030,452.07 |
| | | |
| | | |
| | | |
| Irving Tanning | 03/01/89 | $610,035.00 |
| | | |
| | | |
| | | |
| | | |
| Arthur and Nina Damast | 06/12/89 | $25,964.85 |
| | | |
| | | |
| Foxx & DeLorezzo | 06/21/89 | $249,412.71 |
| | | |
| | | |
| | | |
| | | |
| Arthur and Nina Damast | 06/23/89 | $343,793.81 |
| | | |
| | | |
| | | |
| Eastbank Corp. | 08/05/89 | $160,350.32 |
| | | |
| | | |
| | | |
| Carnival Creations | 09/18/89 | $430,888.00 |
| | | |

2010 U.S. Dist. LEXIS 141842, *

| Insured | Date of Loss | Amount Paid |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| Variety Knit Company | 11/20/89 | $1,151,806.56 |
| | | |
| | | |
| S&J Realty | 11/21/89 | $272,299.85 |
| | | |
| | | |
| Nicon Plastics | 06/09/90 | $262,348.00 |
| | | |
| | | |
| | | |
| Techknits | 03/04/91 | $1,278,150.00 |
| | | |
| | | |
| | | |
| | | |
| Criterion Bead | 04/26/91 | $525,384.84 |
| | | |
| | | |
| | | |
| | | |
| | | |
| Sam Gindi | 06/12/91 | $88,746.30 |
| | | |

_____

| Insured | Sources |
|---|---|
| H. Fox & Company | Pls.' Rule 56.1 Statement ¶¶ 193-202; |
| | Pollard Aff., Exs. 128-134; Greenberg |
| | Aff. ¶¶ 59-61. |
| | |
| Better Belts | Pls.' Rule 56.1 Statement ¶¶ 127-134; |
| | Pollard Aff., Exs. 87-91, Ex. 17 at |
| | 133-35, Ex. 92 at 53-54. |
| | |
| International Foam Products | Pls.' Rule 56.1 Statement ¶¶ 89-97; |
| | Pollard Aff., Exs. 52-58, Ex. 61 at |

| Insured | Sources |
|---|---|
|  | 138-40; Greenberg Aff. ¶ 62 |
|  |  |
| Irving Tanning | Pls.' Rule 56.1 Statement ¶¶ 116-126; |
|  | Pollard Aff., Exs. 13-15, 76-80, Ex. 82 |
|  | at 31-34, 50, Ex. 83 at 15, Exs. 85- 86; |
|  | Greenberg Aff. ¶¶ 70-73, 75-77. |
|  |  |
| Arthur and Nina Damast | Pls.' Rule 56.1 Statement ¶¶ 86-88; |
|  | Pollard Aff. Ex. 29 at 493-97. |
|  |  |
| Foxx & DeLorezzo | Pls.' Rule 56.1 Statement ¶¶ 181-192; |
|  | Pollard Aff., Ex. 29 at 227, 229-32, |
|  | 236-39, Exs. 122-126; Greenberg Aff. |
|  | ¶¶ 51, 53, 54. |
|  |  |
| Arthur and Nina Damast | Pls.' Rule 56.1 Statement ¶¶ 76-85; |
|  | Pollard Aff., Ex. 29 at 476-81, 493-97, |
|  | Exs. 42-50; Greenberg Aff. ¶ 41. |
|  |  |
| Eastbank Corp. | Pls.' Rule 56.1 Statement ¶¶ 165-171; |
|  | Pollard Aff., Ex. 29 at 217-21, Exs. |
|  | 110-114. |
|  |  |
| Carnival Creations | Pls.' Rule 56.1 Statement ¶¶ 57-75; |
|  | Pollard Aff., Ex. 17 at 212-13, 218, |
|  | 221-22, 225-26, 231, 241-43, Ex. 36 |
|  | at 93-95, 98, 112, Exs. 31-35, Exs. 37-39, |
|  | Ex. 40 at 141-44; Greenberg Aff. |
|  | ¶¶ 42, 44, 48-50. |
|  |  |
| Variety Knit Company | Pls.' Rule 56.1 Statement ¶¶ 135-147; |
|  | Pollard Aff., Ex. 92 at 68, Exs. 93-98; |
|  | Greenberg Aff. ¶¶ 20-21, 23, 25, 27. |
|  |  |
| S&J Realty | Pls.' Rule 56.1 Statement ¶¶ 156-164; |
|  | Pollard Aff., Ex. 17 at 158, 161-62, |
|  | 174, 177, Exs. 105-108. |
|  |  |
| Nicon Plastics | Pls.' Rule 56.1 Statement ¶¶ 172-180; |
|  | Pollard Aff., Ex. 29 at 271, 275-79, |
|  | 282, Exs. 115-119; Greenberg Aff. ¶¶ |
|  | 65-69. |
|  |  |
| Techknits | Pls.' Rule 56.1 Statement ¶¶ 98-115; |
|  | Pollard Aff., Exs. 6, 8, 11, Ex. 29 at |
|  | 287-88, Exs. 62-69, Ex. 70 at 77-78, |
|  | 86-89, 91-92, 94, 98-100, 103, 110-11, |
|  | Exs. 71-74. |
|  |  |
| Criterion Bead | Pls.' Rule 56.1 Statement ¶¶ 33-56; |
|  | Pollard Aff., Exs. 8, 18-28, Ex. 29 at |

| Insured | Sources |
|---------|---------|
|  | 378-80, 391, 397-98, 407, 410-11, |
|  | 413, 415, 418-19, 428-29, 440, 448-49, |
|  | Exs. 138-40; Greenberg Aff. ¶¶ |
|  | 29-40. |
|  |  |
| Sam Gindi | Pls.' Rule 56.1 Statement ¶¶ 148-155; |
|  | Pollard Aff., Ex. 17 at 137, 139-41, |
|  | Ex. 92 at 52-58, Exs. 100-103. |

_____

I [*32] have reviewed plaintiffs' evidence in detail, and I find no genuine issues of material fact with respect to any of these claims.

2. Set-Offs

In RICO cases, when a plaintiff settles with one defendant, the non-settling defendants are "entitled to a credit of the settlement amount against any judgment obtained by the plaintiff against the non-settling defendant as long as both the settlement and judgment represent common damages." Singer v. Olympia Brewing Co., 878 F.2d 596, 600 (2d Cir. 1989); see also In re Masters Mates & Pilots Pension Plan, 957 F.2d 1020, 1031 (2d Cir. 1992). The Second Circuit has applied a "one satisfaction rule" rather than a "proportionate responsibility rule" in such cases, affording a non-settling defendant a reduction equal to the amount of a prior settlement. Singer, 878 F.2d at 600; see also Gerber v. MTC elec. Techs. Co., 329 F.3d 297, 303 (2d Cir. 2003); Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., Nos. 93 CV 6878, 94 CV 2713, 2000 U.S. Dist. LEXIS 13466, 2000 WL 1364272, at *2--3 (S.D.N.Y. Sept. 20, 2000).[12]

12    The common law fraud claim against Zerring is subject to N.Y. Gen. Oblig. Law § 15-108(a). See SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329, 346 (2d Cir. 2004); [*33] Bank Brussels, 2000 U.S. Dist. LEXIS 13466, 2000 WL 1364272, at *1-2 (applying section 15-108(a) to state law fraud claim and Singer's one satisfaction rule to RICO claim). Under section 15-108(a), a non-settling defendant is entitled to a reduction that is the greater of (1) the settling defendant's equitable share of the damages, (2) the stipulated amount of the settlement, or (3) the amount actually paid by the settling defendant. See Chubb & Son Inc. v. Kelleher, No. 92 CV 4484, 2006 U.S. Dist. LEXIS 97260, 2006 WL 2728636, at *5 (E.D.N.Y. Mar. 29, 2006); Whalen v. Kawasaki Motors Corp., 92 N.Y.2d 288, 703 N.E.2d 246, 248-49, 680 N.Y.S.2d 435 (N.Y. 1998). However, "the protection of section 15-108(a) is an affirmative defense and is waived if not pled in the defendant's answer." Chubb & Son Inc. v. Kelleher, No. 92 CV 4484, 2006 U.S. Dist. LEXIS 67879, 2006 WL 2711543, at *3 (E.D.N.Y. Sept. 21, 2006); see also Whalen, 92 N.Y.2d 288, 703 N.E.2d 246, 680 N.Y.S.2d 435. Zerring did not assert this affirmative defense in his answer to the Third Amended Complaint, and I therefore recommend that it be deemed waived.

Plaintiffs state that, if this court finds Zerring liable, they will prepare and submit calculations of the amount of the judgment to be entered against Zerring after crediting offsets for prior recoveries for the same claims. [*34] (See Pls.' Mem. at 39.) I respectfully recommend that their request to do so be granted, and that the court conduct a damages inquest prior to the entry of judgment.

3. Treble Damages

Plaintiffs are also entitled to treble damages against Zerring under RICO. See 18 U.S.C. § 1964(c). Where plaintiffs are entitled to treble damages under federal law, courts have upheld the trebling of damages before crediting settlement payments. See Singer, 878 F.2d at 601 (where plaintiff sues multiple defendants for treble damages, settles with one or more of them, and then prevails against the remaining defendants, "it is proper to treble the damage award before crediting settlement payments"); see also Auwood v. Harry Brandt Booking Office, Inc., 850 F.2d 884, 894 (2d Cir. 1988); New York v. Hendrickson Brothers, Inc., 840 F.2d 1065, 1086 (2d Cir. 1988); City of New York v. Venkataram, No. 06 CV 6578, 2009 U.S. Dist. LEXIS 57273, 2009 WL 1938984, at *7 (S.D.N.Y. July 7, 2009). Thus, I recommend awarding Chubb treble damages against Zerring in the amount of $22,145,806.65, subject to the set-offs discussed above.

4. Pre-Judgment Interest

Although the RICO statute does not specifically provide for the award of pre-judgment interest, [*35] a district court has discretion to make such an award. See Abou-Khadra v. Mahshie, 4 F.3d 1071, 1084 (2d Cir. 1993); Wickham Contracting Co. v. Local Union No. 3, 955 F.2d 831, 835 (2d Cir. 1992); Panix Prods., Ltd. v. Lewis, No. 01 CV 2709, 2003 U.S. Dist. LEXIS 11952, 2003 WL 21659370, at *3 (S.D.N.Y. July 15, 2003). Where, as here, treble damages are adequate to compensate plaintiffs, an award of pre-judgment interest would generally be inappropriate. TWA v. Hughes, 449 F.2d 51, 80 (2d Cir. 1971), rev'd on other grounds, 409 U.S. 363, 93 S. Ct. 647, 34 L. Ed. 2d 577 (1973); Panix Prods., 2003 U.S. Dist. LEXIS 11952, 2003 WL 21659370, at *3; Group III Capital, Inc. v. Parasol Group, Ltd., No. 00 CV 6860, 2003 U.S. Dist. LEXIS 6865, 2003 WL 1948801, at *3 (S.D.N.Y. Apr. 23, 2003); Securitron Magnalock Corp. v. Schnabolk, No. 89 CV 6731, 1994 U.S. Dist. LEXIS 14894, 1994 WL 576897, at *1 (S.D.N.Y. Oct.19, 1994), aff'd, 65 F.3d 256 (2d Cir. 1995). Nevertheless, since plaintiffs have asserted a pendent state claim for fraud, they are entitled to pre-judgment interest on damages arising under that claim under New York law. See Lukaszuk, 2007 U.S. Dist. LEXIS 95919, 2007 WL 4699018, at *7; Tosto v. Zelaya, No. 99 CV 11864, 2003 U.S. Dist. LEXIS 8085, at *23-24 (S.D.N.Y. May 12, 2003). Under New York law, awarding pre-judgment interest on damages awarded for fraud [*36] is mandatory. See Mfrs. Hanover Trust Co. v. Drysdale Sec. Corp., 801 F.2d 13, 28 (2d Cir. 1986); Mallis v. Bankers Trust Co., 717 F.2d 683, 693-95 (2d Cir. 1983); Tosto, 2003 U.S. Dist. LEXIS 8085, at * 23--24.

Whether pre-judgment interest is awarded under federal or state law, federal courts have ordinarily looked to state law in determining the appropriate interest rate. See S.E.C. v. Musella, 748 F. Supp. 1028, 1032 (S.D.N.Y. 1989), aff'd, 898 F.2d 138 (2d Cir. 1990). New York C.P.L.R. § 5001(b), which governs awards of pre-judgment interest, provides that:

Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each time from the date it

was incurred or upon all of the damages from a single reasonable intermediate date.

In the absence of a written contract which clearly specifies a different rate, pre-judgment interest should be awarded at the statutory rate of nine percent authorized by C.P.L.R. § 5004. Marine Mgmt., Inc. v. Seco Mgmt., Inc., 176 A.D.2d 252, 574 N.Y.S.2d 207 (2d Dep't 1991), [*37] aff'd, 80 N.Y.2d 886, 600 N.E.2d 627, 587 N.Y.S.2d 900 (N.Y. 1992). Any pre-judgment interest awarded should be calculated on a simple interest basis. See Marfia v. T.C. Ziraat Bankasi, 147 F.3d 83, 90 (2d Cir. 1998); Novomoskovsk Joint Stock Co. v. Revson, No. 95 CV 5399, 1999 WL 767325, at *3 (S.D.N.Y. Apr. 29, 1999). Thus, I recommend that plaintiffs be awarded pre-judgment interest at the rate of nine percent on the common law fraud damages.

Conclusion

For the reasons stated above, I respectfully recommend that plaintiffs' motion for partial summary judgment with respect to defendant Elliot Zerring be granted and that plaintiffs be awarded treble damages of $22,145,806.65, minus set-offs for prior recoveries on the same claims. I further recommend that plaintiffs be awarded pre-judgment interest at the rate of nine percent per annum on the common law fraud damages, and that plaintiffs be directed to prepare and submit their calculations regarding the amount of the judgment to be entered against Zerring, taking into account set-offs for prior recoveries and prejudgment interest.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with courtesy copies to Judge Amon and to my [*38] chambers, within fourteen (14) days. Failure to file objections within the specified time waives the right to review. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Respectfully submitted,

/s/

ROBERT M. LEVY

United States Magistrate Judge

Dated: Brooklyn, New York

October 22, 2010

LEXSEE

**JOSEPHINE CARONIA, Plaintiff, -against- HUSTEDT CHEVROLET, HUSTEDT CHEVROLET, INC., HUSTEDT CHEVROLET WEST, HUSTEDT CHEVROLET WEST INC., HUSTEDT HYUNDAI, HUSTEDT HYUNDAI, INC., and CHARLES CHALOM, individually and in his capacities as owner and/or agent of Hustedt Chevrolet, Hustedt Chevrolet, Inc., Hustedt Chevrolet West, Hustedt Chevrolet West, Inc., Hustedt Hyundai, and Hustedt Hyundai, Inc., THOMAS JONES, JONES & LITTLE, CPA'S, P.C. and JOHN DOES 1-20, Defendants. KEVIN PRATT, Plaintiff, -against- HUSTEDT CHEVROLET, HUSTEDT CHEVROLET, INC., HUSTEDT HYUNDAI, HUSTEDT HYUNDAI, INC., and CHARLES CHALOM, individually and in his capacities as owner and/or agent of Hustedt Chevrolet, Hustedt Chevrolet, Inc., Hustedt Hyundai, and Hustedt Hyundai, Inc., and JOHN DOES 1-20, Defendants. FRANK VENTIMIGLIA, Plaintiff, -against- HUSTEDT CHEVROLET, HUSTEDT CHEVROLET, INC., HUSTEDT HYUNDAI, HUSTEDT HYUNDAI, INC., and CHARLES CHALOM, individually and in his capacities as owner and/or agent of Hustedt Chevrolet, Hustedt Chevrolet, Inc., Hustedt Hyundai, and Hustedt Hyundai, Inc., and JOHN DOES 1-20, Defendants. PAUL WEISS, Plaintiff, -against- HUSTEDT CHEVROLET, HUSTEDT CHEVROLET, INC., HUSTEDT HYUNDAI, HUSTEDT HYUNDAI, INC., and CHARLES CHALOM, individually and in his capacities as owner and/or agent of Hustedt Chevrolet, Hustedt Chevrolet, Inc., Hustedt Hyundai, and Hustedt Hyundai, Inc., and JOHN DOES 1-20, Defendants.**

**Civil Action No. 05-3526 (DRH) (MLO),Civil Action No. 05-4148 (DRH) (MLO),Civil Action No. 05-4149 (DRH) (MLO),Civil Action No. 05-4230 (DRH) (MLO)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

**2009 U.S. Dist. LEXIS 120971**

**December 29, 2009, Decided**
**December 29, 2009, Filed**

**PRIOR HISTORY:** Caronia v. Hustedt Chevrolet, Inc., 2009 U.S. Dist. LEXIS 101626 (E.D.N.Y., Oct. 30, 2009)

**COUNSEL:** [*1] For Plaintiffs: Sharon D. Simon, Esq., Steinberg, Fineo, Berger & Fischoff, P.C., Melville, New York.

For Defendants: Perry S. Heidecker, Esq., Michael J. Mauro, Esq., Milman Labuda Law Group, PLLC, Lake Success, New York.

**JUDGES:** Denis R. Hurley, Senior District Judge.

**OPINION BY:** Denis R. Hurley

**OPINION**

**MEMORANDUM & ORDER**

**HURLEY, Senior District Judge**:

In each of the above-captioned actions, a former employee of Defendants Hustedt Chevrolet, Hustedt Chevrolet Inc. ("Chevrolet Inc."), Hustedt Chevrolet West Inc. ("West Inc.") and/or Hustedt Hyundai, Inc. ("Hyundai Inc.") (collectively "Dealership Defendants") is seeking redress for the alleged discriminatory and retaliatory practices of Defendant Charles Chalom ("Chalom"), [1] owner of Dealership Defendants, and hostile work environment created by him. Pres-

2009 U.S. Dist. LEXIS 120971, *

ently before the Court are motions by each of the plaintiffs, Josephine Caronia ("Caronia"), Kevin Pratt ("Pratt"), Frank Ventimiglia ("Ventimiglia") and Paul Weiss ("Weiss") (collectively "Plaintiffs"), to consolidate these actions for purposes of trial. For the reasons set forth below, the motions are granted.

> 1   Dealership Defendants and Chalom shall be collectively referred to as Defendants.

**Background**

In order to  [*2] place the current motion to consolidate in context, a brief description of the four actions and their factual underpinnings is in order. These descriptions are taken from the Court's Memoranda and Orders on the motions for summary judgment made in each of the respective actions. [2]

> 2   *See Caronia v. Hustedt Chevrolet*, Memorandum and Order, dated March 31, 2009; *Ventimiglia v. Hustedt Chevrolet*, Memorandum and Order, dated March 25, 2009; *Pratt v. Hustedt Chevrolet*, Memorandum and Order, dated March 27, 2009; *Weiss v. Hustedt Chevrolet*, Memorandum and Order, dated July 13, 2009.

Dealership Defendants are engaged in the sale and lease of cars and trucks. Chalom owns 100% of the stock of Chevrolet Inc. and Hyundai Inc. He has the final decision-making authority for the Dealership Defendants and supervised their employees, including Caronia, Pratt, Ventimiglia, and Weiss.

**I. Caronia**

Caronia worked at Dealership Defendants at least since 1995 and remained employed until February 8, 2005. She held the position of office manager/controller.

Caronia and Chalom had a personal relationship that ended in or about the year 2000. Chalom paid her home mortgage and apartment rental fee from 1995 through  [*3] January 2005. According to Caronia, from the day she told Chalom that their relationship was over until the day she left her job, Chalom sexually harassed her. She claims that the course of conduct includes the following: "Chalom would call [Caronia] into his office and would say that she was ruining his sex life. Chalom would say she was holding his dick hostage. Chalom would call Caronia cold and a bitch. If Caronia walked out of the office he would say get out and stay out to her. If she was standing at one of the desks, he would rub up against her. Chalom would say to Caronia in front of the office staff that she was provoking him with her tits and her ass and

that his anger was her fault. This continued almost every day for five years." (Caronia's Resp. to Def.s' 56.1 Statement at P 61 (citing Caronia Dep. at 70-71.) Caronia also asserts that there were constant incidents of Chalom rubbing her and touching her, and the more she objected the more he kept doing these things.

In her complaint, Caronia asserted claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the New York Executive Law § 296 for sexual harassment, hostile work environment,  [*4] disability discrimination, age discrimination, and retaliation. She also asserted common law causes of action. As a result of Defendants' motion for summary judgment, what remains for trial are her federal and state law claims for sexual harassment and hostile work environment and her claims for assault and battery occurring on or after July 27, 2004.

**II. Ventimiglia**

Ventimiglia was employed by Chevrolet Inc. as the general sales manager from approximately May 2004 to October 4, 2004. In his complaint, Ventimiglia asserted the following claims under Title VII and the New York Executive Law § 296: (1) hostile work environment based on his national origin, Italian; (2) hostile work environment based on sex; (3) hostile work environment based on race; and (4) retaliation for opposing Chalom's sexual harassment of Caronia. In addition, Ventimiglia asserts common law tort claims, including one for defamation. As a result of Defendants' motion for summary judgment, the claims for defamation claim and hostile work environment claim based on race were dismissed. What remain are the claims for hostile work environment based on national origin and sex and the retaliation claim.

Ventimiglia's claim  [*5] for hostile work environment based on sex may be summarized as follows. Chalom was obsessed with Caronia and continually demanded she engage in a relationship with him. Caronia refused these requests and when she did so, Chalom did not react well. For example, he accused her of having sex with other men at the dealership including Ventimiglia. He would accuse and interrogate Ventimiglia about having a sexual relationship with Caronia. Despite Ventimiglia's denials, Chalom's accusations did not stop. Rather, Ventimiglia was placed in the middle of Chalom's harassment of Caronia by Chalom's constantly accusing Ventimiglia of having an affair with her and forcing him to defend himself against these accusations. Ventimiglia also witnessed Chalom calling Caronia offensive names like whore, making lecherous remarks about her

body, and actually grabbing her and touching various areas of her body while she struggled to get free. According to Ventimiglia, Chalom's remarks were not limited to Caronia; he made lecherous and inappropriate remarks about other female employees, as well as Plaintiff's wife and women who came into the dealership.

In support of his retaliation claim, Ventimiglia avers [*6] that he told Chalom that his remarks, accusations and behaviors were offensive. He maintains that in 2004 he spoke to Chalom about his treatment of Caronia more than a dozen times and that his position was taken away as a result of his constantly imploring Chalom to stop harassing Caronia.

### III. Pratt

Pratt, an African American male, was employed by Chevrolet Inc. and Hyundai Inc. as a car salesperson from approximately June 2004 to May 2005 when he was terminated. In his complaint he asserted the following claims under Title VII, as well as 42 U.S.C. § 1981 and the New York Executive Law § 296: (1) termination of his employment as a result of race discrimination; (2) a hostile work environment based on his race; (2) hostile work environment based sex; and (3) retaliation for opposing Chalom's discriminatory practices and harassment against himself and his co-worker Josephine Caronia.. As a result of Defendants' motion for summary judgment, his claim for hostile work environment based on sex was dismissed.

Pratt's surviving hostile work environment is based upon racial comments and racial slurs, including the term nigger, directed at him by Chalom, as well as Chalom's failure to address [*7] Pratt's complaints of racial slurs and comments made by other employee. Pratt also asserts that he was witness to Chalom's alleged sexual harassment of Caronia. Pratt maintains that his firing was in retaliation for his protests against Chalom's treatment of Caronia and Ventimiglia, and the racial slurs directed at him..

### IV. Weiss

Weiss was employed by Chevrolet Inc. as finance manager from 1992 to 1994 and as finance director for the period 1997 until October 2004, at which time he claims he was constructively discharged. Although he asserted numerous claims in his complaint, what remains after summary judgment are his claims under Title VII and the New York Executive Law for hostile work environment based on gender and for retaliation.

Weiss's claim for hostile work environment based on sex, like that of Ventimiglia is based on, among other things, Chalom's interrogation and harassment

of him regarding his, Weiss's, relationship with Caronia. Weiss's retaliation claim is based on his alleged complaints to Chalom regarding Chalom's harassment of Caronia. More particularly, in the last year of his employment Weiss complained to Chalom about his sexual harassment of Caronia at least ten [*8] to fifteen times. Weiss maintains that Chalom retaliated against him by cheating him out of his commissions. Weiss also claims that Chalom retaliated against him when Chalom decided to transfer Weiss to Hyundai because Chalom felt Weiss was getting too close to Caronia. The transfer would have resulted in a reduction in Weiss's income because Hyundai was not as busy and Weiss would have seen fewer customers. Weiss left Chevrolet Inc.'s employ before the transfer occurred.

### Discussion

### I. Standard for Consolidation

Rule 42 empowers a trial judge to consolidate actions for trial when there are common issues of law or fact to avoid unnecessary costs or delay. Specifically, the Rule provides:

> If actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay.

Fed. R. Civ. P. 42(a). District courts have "broad discretion to determine whether consolidation is appropriate," and they "have taken the view that considerations of judicial economy favor consolidation." Johnson v. Celotex Corp., 899 F.2d 1281, 1284-85 (2d Cir. 1990). [*9] "However, the discretion to consolidate is not unfettered." Id. at 1285. "Considerations of convenience and economy must yield to a paramount concern for a fair and impartial trial." Id. "So long as any confusion or prejudice does not outweigh efficiency concerns, consolidation will generally be appropriate." Toussie v. County of Suffolk, 2007 U.S. Dist. LEXIS 36886, 2007 WL 1490463, at *1 (E.D.N.Y. May 21, 2007) (internal quotations omitted). "In that regard, the Second Circuit has noted that 'the risks of prejudice and confusion may be reduced by the use of cautionary instructions to the jury and verdict sheets outlining the claims of each plaintiff.'" Franco v. Ideal Mortgage Bankers, Ltd., 2009 U.S. Dist. LEXIS 91570, 2009 WL 3150320 (E.D.N.Y. Sept. 28, 2009) (quoting Johnson, 899 F.2d at 1285.)

2009 U.S. Dist. LEXIS 120971, *

In deciding whether to exercise its discretion to consolidate, a district court must consider "whether the specific risks of prejudice and possible confusion are overborne by risk of inconsistent adjudications of common factual and legal issues, the burden on the parties, witnesses, and available judicial resources posed by multiple lawsuits, the length of time required to consolidate multiple suits as against a single one, and the relative expense  [*10] to all concerned of the single-trial, multiple-trial alternatives." *Johnson*, 899 F.2d at 1285.

**II. Consolidation of these Actions is Warranted**

Preliminarily, the Court makes the following observations. First, the discrimination and retaliation claims asserted in each of these four actions are all premised upon allegations against a single individual, Defendant Chalom, the owner of the Corporate Defendants and the supervisor of each of the Plaintiffs. Moreover, the alleged actions and statements of Chalom which form the bases of each plaintiff's claims all occurred in the same general time frame.

In discrimination actions based on a hostile work environment, "[b]ecause the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who [him]self experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support [his] claim." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000). "Nor must offensive remarks or behavior be directed at individuals who are members of the plaintiff's own protected class. Remarks targeting members of other minorities, for example, may contribute to the overall  [*11] hostility of the working environment for a minority employee." *Id.* Given the identity of time and actor between the discrimination claims of each plaintiff, it would appear that testimony concerning the nature of the workplace environment as a whole will necessarily involve the same witnesses and many of the same incidents in each of these four cases.

Against this backdrop, the Court finds that Plaintiffs have sustained their burden of demonstrating common issues of law and fact. For example, Ventimiglia and Weiss both have claims of sexual discrimination. It is alleged that Chalom was obsessed with Caronia and continually demanded she engage in a relationship with him; when she refused, Chalom accused her of having sex with other men at the dealership including Ventimiglia and Weiss and would interrogate Weiss and Ventimiglia about having a sexual relationship with Caronia placing them in the middle of Chalom's harassment of Caronia. Moreover,

Pratt's retaliation claim is interrelated in that he maintains he was fired because, inter alia, Chalom did not like the idea that Pratt had protested his accusations against Caronia and Ventimiglia by his refusal to sign an affidavit stating  [*12] the two were having an affair. In addition, Ventimiglia, Weiss and Pratt all have retaliation claims based upon their claimed opposition to Chalom's alleged sexual harassment of Caronia. Finally, there is substantial overlap in the legal issues presented in these actions, for example, the retaliation claims made by each of the Plaintiffs, and the hostile work environment claims based on sex asserted by Ventimiglia and Weiss.

Consideration of the burden on the parties, witnesses and available resources in the event these cases were to be tried separately favors consolidation. Based upon the records submitted in each of these actions in connection with the motions for summary judgment and as noted above, it is apparent to the Court that there will be substantial overlap in testimony and consolidation is the most efficient course. Allowing these actions to proceed separately will result in duplicative efforts, wasting both the Court's time and the parties' time and money. Concededly, there are differences in the causes of action. But such differences "do not render consolidation inappropriate if the cases present sufficiently common questions of fact and law and the differences do not outweigh  [*13] the interests of judicial economy served by consolidation." *In re Bank of America Corp. Securities, Derivative and ERISA Litig.*, 258 F.R.D. 260, 268 (S.D.N.Y. 2009) (quoting *Kaplan v. Gelfond*, 240 F.R.D. 88, 91 (S.D.N.Y. 2007)). Here, the differences do not outweigh the interest of judicial economy served by consolidation.

Finally, the Court finds that Defendants' concerns regarding prejudice and juror confusion can be adequately addressed through the use of cautionary instructions to the jury and carefully crafted verdict sheets.

**Conclusion**

The motion of the Plaintiffs to consolidate these four actions for trial is granted.

**SO ORDERED**.

Dated: Central Islip, New York

December 29, 2009

/s/

Denis R. Hurley

Senior District Judge

LEXSEE

**BRIAN COSTIGAN, individually and on behalf of a class of all others similar-
ly situated, Plaintiff, - against - CITIMORTGAGE, INC., Defendant.**

**10 Civ. 8776 (SAS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT
OF NEW YORK**

**2011 U.S. Dist. LEXIS 84860**

**August 1, 2011, Decided
August 2, 2011, Filed**

**COUNSEL:** [*1] For Plaintiff: Preetpal Grewal, Esq., Brendan S. Thompson, Esq., Charles Joseph LaDuca, Esq., Matthew L. Wiener, Esq., Cuneo Gilbert & LaDuca, LLP, Washington, DC; Alexandra Coler Warren, Esq., Cuneo Gilbert & LaDuca, LLP, Alexandria, VA; Charles E. Schaffer, Esq., Levin, Fishbein, Sedran & Berman, Phila, PA; David Ian Greenberger, Esq., Matthew James McDonald, Esq., Liddle & Robinson, LLP, New York, NY; Gerald W. Crawford, Esq., Nicholas J. Mauro, Esq., Crawford Quilty & Mauro Law Firm, Des Moines, IA; Jonathan Minkove, Esq., Friscia & Associates, LLC, Newark, NJ; Robert K. Shelquist, Esq., Lockridge, Grindal, Nauen, P.L.L.P., Minneapolis, MN.

For Defendant: Matthew D. Ingber, Esq., Mauricio Alejandro Espana, Esq., Mayer Brown LLP, New York, NY; Lucia Nale, Esq., Debra Bogo-Ernst, Esq., Michele Odorizzi, Esq., Stephen Kane, Esq., Mayer Brown LLP (Chicago), Chicago, IL.

**JUDGES:** Shira A. Scheindlin, United States District Judge.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

**OPINION AND ORDER**

   **SHIRA A. SCHEINDLIN, U.S.D.J.:**

**I. INTRODUCTION**

   Brian Costigan brings this putative class action against CitiMortgage, Inc., ("Citi"), seeking declaratory relief, injunctive relief, damages, and attorneys' fees, alleging (1) breach of contract; [*2] (2) promissory estoppel; (3) breach of the covenant of good faith and fair dealing; (4) fraud; (5) constructive fraud; (6) negligence; (7) violation of the New York Deceptive Practices Act; (8) violation of the New Jersey Consumer Fraud Act; and (9) violation of the Fair Debt Collection Practices Act. Defendant now moves to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. [1] For the reasons discussed herein, defendant's motion is granted.

   1   *See* Memorandum of Law in Support of Citimortgage Inc.'s Motion to Dismiss Amended Complaint ("Def. Mem.").

**II. BACKGROUND**[2]

   2   All alleged facts are drawn from the relevant portions of the complaint, and are taken to be true for the purposes of this motion to dismiss. *See Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1943, 173 L. Ed. 2d 868 (2009).*

**A. Home Affordable Mortgage Program**

   In response to the financial crisis, Congress in 2008 enacted the Emergency Economic Stabilization Act of 2008, which in turn authorized the Secretary of the Treasury to establish the Troubled Asset Relief Program ("TARP"). [3] TARP directed the Secretary of the Treasury to "implement a plan that seeks to maximize assistance for homeowners" [*3] and allowed the Secretary to "use loan guarantees and credit enhancements to facilitate loan modifications to prevent avoidable foreclosures." [4] Under this authority, the Department of the Treasury announced the "Making Home Affordable Program" in February 2009, which included the "Home Affordable Mortgage Program"

("HAMP"). HAMP was aimed at helping homeowners who were in or were at immediate risk of being in default on their home loans by reducing monthly payments to sustainable levels.

3  Pub. L. No. 110-343, 122 Stat. 3765 (codified as amended at 12 U.S.C. §§ 5201-5261).
4  12 U.S.C. § 5219(a)(1).

Under HAMP, Citi entered into a Service Participation Agreement ("SPA") with Fannie Mae in July 2009, acting as an agent of the U.S. Department of the Treasury. [5] The SPA states that it "shall inure to the benefit of and be binding upon the parties to the Agreement and their permitted successors in interest." [6] In entering into the SPA, Citi agreed to "perform the loan modification and other foreclosure prevention services" [7] for "all mortgage loans it services, whether it services such mortgage loans for its own account or for the account of another party." [8]

5  *See* Commitment to Purchase Financial [*4] Instrument and Service Participation Agreement for the Home Affordable Mortgage Program under the Emergency Economic Stabilization Act of 2009 ("SPA"), Ex. D to Notice of Motion at 11. Although the SPA, the Trial Period Plan, and plaintiff's original mortgage documents were not attached to the Complaint, the Court may consider these documents because the Complaint "relies heavily on [their] terms and effects," rendering these documents "integral" to the Complaint. *Chambers v Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).
6  SPA § 10.F.
7  *Id.* § 1.A.
8  *Id.* § 2.A.

**B. Loan Modification**

To obtain a home loan modification under HAMP, the borrower applying for modification initially provides the lender with required documentation. The lender reduces the monthly mortgage payment to thirty-one percent of the homeowner's gross monthly income. The homeowner participates in a three-month Trial Period Plan ("TPP"), based on the new mortgage payment. In executing the TPP agreement, which is labeled "Step One of a Two-Step Documentation Process," the borrower represents that

I am unable to afford my mortgage payments for the reasons indicated in my Hardship Affidavit [9] and as a result (i) I am either  [*5] in default or believe that I will be in default under the

Loan Documents in the near future, and (ii) I do not have the sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future. [10]

If the borrower does not provide all the required documentation required by the lender, or if the lender does not provide the borrower with an executed copy of a modification agreement, "the Loan Documents will not be modified . . . and the lender will have all of the rights and remedies provided in the Loan Documents," including instituting foreclosure proceedings. [11] The lender "will not be obligated or bound to make any modification of the Loan Documents if the lender determines that [the borrower does] not qualify." [12] Payments made under the TPP do "not constitute a cure of [the borrower's] default under the Loan Documents unless such payments are sufficient to completely cure [the borrower's] entire default." [13] Borrower agreed that "all terms and provisions of the Loan Documents remain in full force and effect; nothing in [the TPP] shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained  [*6] in the Loan Documents." [14] Following successful completion of the TPP, including final approval by the lender, the lender will permanently modify eligible mortgages.

9  The Hardship Affidavit is used to verify the borrower's financial hardship in connection with an application for a loan modification.
10  Home Affordable Modification Trial Period Plan ("TPP"), Ex. C to Notice of Motion, § 1.A.
11  *Id.* § 2.F.
12  *Id.* § 2.G.
13  *Id.* § 2.E.
14  *Id.* § 4.D.

**C. Costigan**

In October 2005, Costigan received a loan from ABN Amro Mortgage Group, Inc., secured by a mortgage on his home, which is located at 453 Boesel Avenue, Manville, New Jersey. [15] In April 2009, Costigan contacted Citi, the servicer of the loan, seeking to obtain a loan modification. At that time, Costigan was suffering economic difficulties, but had never missed a mortgage payment. [16]

15  *See* Mortgage, Ex. A to Notice of Motion, at 1-2.
16  *See* Amended Complaint ("FAC") ¶ 172.

Costigan entered into a TPP with Citi effective November 1, 2009. [17] Under the TPP, Costigan was to make three monthly payments of $1,409.75 each, due on November 1, 2009, December 2, 2009, and January 1, 2010. [18] Costigan made all three payments on time. [19] Costigan also regularly [*7] contacted Citi, who assured him that "everything was progressing smoothly and that Mr. Costigan would obtain a permanent modification at the end of the trial period." [20]

17 *See* TPP.
18 *See* FAC ¶ 175.
19 *See id.* ¶ 177.
20 *See id.*

When Costigan contacted Citi in January 2010, after submitting his third payment under the TPP, Citi told Costigan that his modification was still being reviewed and that he should make another trial payment. [21] Upon contacting Citi again in February 2010, Costigan was told that his HAMP modification application had been rejected in December 2009. [22] Citi also informed Costigan that "there was a large amount of unapplied funds in his account equaling [the TPP payments]." [23]

21 *See id.* ¶ 178.
22 *See id.* ¶ 180.
23 *Id.* ¶ 181.

Citi subsequently informed Costigan that he should apply for Citi's internal loan modification program, and that Costigan should resume making full payments in accordance with the terms of the original loan documents. By March 2010, Costigan resumed making full payments. [24] Costigan also applied for Citi's internal loan modification program. Although Costigan contacted Citi regularly to inquire about the status of the application, Citi did not respond to [*8] his request for information. [25]

24 *See id.* ¶ 182.
25 *See id.* ¶ 183.

Ultimately, Costigan was unable to afford his full monthly payments and filed for Chapter 7 bankruptcy. On August 4, 2010, after discharge of the bankruptcy, Citi filed a foreclosure complaint against Costigan. [26]

26 *See id.* ¶ 184.

## III. LEGAL STANDARD

### A. Rule 12(b)(6) Motion to Dismiss

In deciding a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, the court evaluates the sufficiency of the complaint under the "two-pronged approach" promulgated by the Supreme Court in *Ashcroft v. Iqbal.* [27] *First*, a court "'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" [28] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to withstand a motion to dismiss. [29] *Second*, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." [30] To survive a *Rule 12(b)(6)* motion to dismiss, the allegations in the complaint must meet a standard of "plausibility." [31] A claim [*9] is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [32] Plausibility "is not akin to a probability requirement;" rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." [33]

27 *129 S.Ct. at 1950*.
28 *Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010)* (quoting *Iqbal, 129 S. Ct. at 1950*). *Accord Ruston v. Town Bd. for Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010)*.
29 *Iqbal, 129 S.Ct. at 1949* (citing *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*).
30 *Id.* at 1950. *Accord Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111, 124 (2d Cir. 2010)*.
31 *Twombly, 550 U.S. at 564*.
32 *Iqbal, 129 S. Ct. at 1949* (quotation marks omitted).
33 *Id.* (quotation marks omitted).

### B. Federal Rule of Civil Procedure 9(b)

*Rule 9(b)* provides that "the circumstances constituting fraud . . . shall be stated with particularity." To satisfy the particularity requirement, "the complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain [*10] why the statements were fraudulent." [34] "While traditionally associated with claims of securities fraud, *Rule 9(b)* has been applied to claims of consumer fraud as well as claims relating to consumer protection statutes." [35]

34 *Lerner v. Fleet Bank N.A., 459 F.3d 273, 290 (2d Cir. 2006)* (quotation marks omitted).
35 *Meserole v. Sony Corp. of America,* No. 08 Civ. 8987, 2009 U.S. Dist. LEXIS 42772,

2009 WL 1403933, at *3 (S.D.N.Y. May 19, 2009).

Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," [36] this rule should not be "mistaken for license to base claims of fraud on speculation and conclusory allegations." [37]

[P]laintiffs must plead facts that give rise to a strong inference of intent. The requisite "strong inference" of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. [38]

36  Fed. R. Civ. P. 9(b).
37  Shields v. Citytrust Bancorp., 25 F.3d 1124, 1128 (2d Cir. 1994).
38  Lerner, 459 F.3d at 290-91 (quotation marks and citations omitted).

### C. Leave to Amend

Rule 15(a)(2) of the Federal Rules of Civil Procedure [*11] provides that other than amendments as a matter of course, "a party may amend its pleading only with the opposing party's written consent or with the court's leave." [39] Although "[t]he Court should freely give leave when justice so requires," [40] it is "within the sound discretion of the district court to grant or deny leave to amend." [41] "When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." [42] However, "it is well established that leave to amend a complaint need not be granted when amendment would be futile." [43]

39  Slayton v. American Express Co., 460 F.3d 215, 226 n.10 (2d Cir. 2006) (quotation marks omitted).
40  Fed. R. Civ. P. 15(a)(2).
41  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007).
42  Hayden v. County of Nassau, 180 F.3d 42, 53 (2d Cir. 1999).
43  Ellis v. Chao, 336 F.3d 114, 127 (2d Cir. 2003).

## IV. APPLICABLE LAW[44]

44  With the exception of plaintiff's claim under the New York Deceptive Practices Act, New Jersey law applies to all of the claims at issue in this motion.

### A. Breach of Contract

To survive a motion to dismiss a breach of contract claim, the complaint must allege "(1) a contract between the parties; (2) a breach  [*12] of that contract; (3) damages flowing therefrom, and (4) that the party stating the claim performed its own contractual obligation." [45] "Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested." [46]

45  Frederico v. Home Depot, 507 F.3d 188, 203 (3d Cir. 2007) (citing Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 210 F. Supp. 2d 552, 561 (D.N.J. 2002)).
46  Restatement (Second) of Contracts § 313(1) cmt. a (1981).

### B. Promissory Estoppel

A claim for "[p]romissory estoppel is made up of four elements: (1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." [47]

47  Toll Bros. v. Brotherhood of Chosen Freeholders of Burlington, 194 N.J. 223, 253, 944 A.2d 1 (2008).

### C. Breach of Covenant of Good Faith and Fair Dealing

"Every party to a contract . . . is bound by a duty of good faith and fair dealing in both the performance and enforcement of the contract." [48] New Jersey has adopted the Uniform Commercial Code definition of "good faith," defining it as "honesty in fact and the observance  [*13] of reasonable commercial standards of fair dealing in the trade." [49] The covenant of good faith and fair dealing therefore "'requires that neither party do anything which will interfere with or destroy each party's reasonable expectations under the contract.'" [50]

48  Elliott & Frantz, Inc. v. Ingersoll-Rand Co., 457 F.3d 312, 328 (3d Cir. 2007) (quoting Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 224, 864 A.2d 387 (2005)).

49   N.J. Stat. Ann. § 12A:2-103(1)(b) (West 2004). *See also* U.C.C. § 2-103(1)(c) (2005).
50   *Lekki Capital Corp. v. Automatic Data Processing, Inc.*, No. 01 Civ. 7421, 2002 U.S. Dist. LEXIS 8538, 2002 WL 987147, at *4 (S.D.N.Y. May 14, 2002) (quoting *Atlantic City Racing Assoc. v. Sonic Fin. Corp.*, 90 F. Supp. 2d 497, 510 (D.N.J. 2000).

### D. Fraud

"To establish common-law fraud, a plaintiff must prove: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." [51] "Under New Jersey law, a tort remedy does not arise from a contractual relationship unless the breaching party owes an independent [*14] duty imposed by law." [52]

51   *Banco Popular North Am. v. Gandi*, 184 N.J. 161, 172-73, 876 A.2d 253 (2005) (quotation marks omitted).
52   *Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297, 316, 788 A.2d 268, 280 (2002).

"[S]tatements will not form the basis of a fraud claim when they are mere 'puffery' or are opinions as to future events." [53] Although an opinion can constitute a misrepresentation, there is "a marked difference between what constitutes justifiable reliance upon statements of the maker's opinion and what constitutes justifiable reliance upon other representations." [54]

53   *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) (applying New York law).
54   Restatement (Second) of Torts § 525 cmt. d.

### E. Negligent Misrepresentation

"To establish a claim of negligent misrepresentation, a plaintiff must prove that an incorrect statement was negligently made and justifiably relied upon to recover damages for economic loss or injury sustained as a consequence of that reliance." [55] "[N]egligence might be inferred from the falsity of the representation." [56] "Because negligent misrepresentation does not require scienter as an element, it is easier to prove than fraud." [57]

55   *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, No. 06-cv-5774, 2009 U.S. Dist. LEXIS 58900, 2009 WL 2043604, at *32 (D.N.J. July 10,

2009) [*15] (citing *H. Rosenblum, Inc. v. Adler*, 93 N.J. 324, 334, 461 A.2d 138 (1983)).
56   *Rosenblum*, 93 N.J. at 334.
57   *Kaufman v. i-Stat Corp.*, 165 N.J. 94, 110, 754 A.2d 1188 (2000).

### F. Negligent Processing of Loan Modifications and Foreclosures

A common law cause of action for negligence has four elements: "(1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages." [58]

58   *Polzo v. County of Essex*, 196 N.J. 569, 584, 960 A.2d 375 (2008).

### G. Violation of the New York Deceptive Practices Act

The New York Deceptive Practices Act (the "DPA") [59] makes "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing or any service in this state" unlawful. [60] The DPA allows "any person who has been injured by reason of any violation of [the DPA]" to bring an action for damages. Under the statute, "[t]he court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated [the DPA]." [61] The court may also "award reasonable [*16] attorney's fees to a prevailing plaintiff." [62]

59   N.Y. Gen. Bus. Law § 349 (McKinney 2004).
60   *Id.* § 349(a).
61   *Id.* § 349(h).
62   *Id.*

To state a cause of action under the DPA a plaintiff must allege that "(1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result." [63] A violation of the DPA does not require proof of the elements of common-law fraud and thus "an action under [section] 349 is not subject to the pleading-with-particularity requirements of Rule 9(b)." [64]

63   *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) (citation omitted).
64   *Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005).

### H. Violation of the New Jersey Consumer Fraud Act

The New Jersey Consumer Fraud Act (the "CFA") outlaws

> The act, use or employment . . . of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate . . . . [65]

"To state a [*17] claim under the [CFA], a plaintiff must allege (1) a violation of the Act, (2) that he or she suffered an ascertainable loss as a result of the unlawful conduct, and (3) a causal relationship between the unlawful practice and the loss sustained by plaintiff." [66] New Jersey courts have repeatedly held that a "mortgage loan [is] covered by the CFA's definitions of merchandise and advertisement . . . and that [a] claim that the lender had engaged in an unconscionable commercial practice in violation of N.J.S.A. 56:8-2 was for a jury to decide." [67] "Claims under the CFA are required to meet the particularity requirement of [Rule] 9(b)." [68]

[65] N.J. Stat. Ann. §§ 56:8-1 to -109 (West 2004).

[66] Meadowlands Invs., LLC v. CIBC World Mkts Corp., No. 04 Civ. 7328, 2005 U.S. Dist. LEXIS 21102, 2005 WL 2347856, at *6 (S.D.N.Y. Sept. 22, 2005).

[67] Gonzalez v. Wilshire Credit Corp., 411 N.J. Super. 582, 988 A.2d 567, 573 (N.J. Super. Ct. App. Div. 2010) (citing Associates Home Equity Servs. v. Troup, 343 N.J. Super. 254, 778 A.2d 529 (N.J. Super. Ct. App. Div. 2001)).

[68] Daloisio v. Liberty Mut. Fire Ins. Co., 754 F. Supp. 2d 707, 709 (D.N.J. 2010). Accord Meadowlands, 2005 U.S. Dist. LEXIS 21102, 2005 WL 2347856, at *3.

## I. Violation of the Fair Debt Collection Practices Act

Congress passed the Fair Debt [*18] Collection Practices Act (the "FDCPA") [69] to "eliminate abusive debt collection practices by debt collectors . . . ." [70] The FDCPA prohibits the "use of any false representation or deceptive means to collect or attempt to collect any debt . . . ," [71] and of any "unfair or unconscionable means to collect or attempt to collect any debt." [72] A debt collector, under the definition of the statute, is a person who collects or attempts to collect "debts owed or due or asserted to be owed or due another." [73] The FDCPA, however, provides a number of exceptions to this definition. One such exception is "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity. . . (iii) concerns a debt which was not in default at the time it was obtained by such person." [74] "Thus, under [section] 1692a(6)(F)(iii), the classification of debt collector depends upon the status of a debt, rather than the type of collection activities used." [75]

[69] 15 U.S.C. §§ 1692-1692p (2009).

[70] Id. § 1692(e).

[71] Id. § 1692e(10).

[72] Id. § 1692f.

[73] Id. § 1692a(6).

[74] Id. § 1692a(6)(F). See also Kesselman v. The Rawlings Co., LLC, 668 F. Supp. 2d 604, 611-12 (S.D.N.Y. 2009).

[75] Alibrandi v. Financial Outsourcing Servs., 333 F.3d 82, 86 (3d Cir. 2003).

## V. [*19] DISCUSSION

### A. Breach of Contract

#### 1. Mortgage Agreement

Costigan alleges that Citi breached the terms of the residential mortgage agreement by "foreclosing on loans that were not in default." [76] This claim has no merit. The mortgage agreement states that if Costigan were to default, Citi could, after giving notice, "foreclose [the Mortgage] by judicial proceeding." [77] Costigan does not allege that Citi failed to give notice before instituting foreclosure proceedings. Costigan admits that he could not pay his full mortgage payments after his application for modification had been denied, and that he declared bankruptcy. Costigan therefore breached the mortgage agreement, and Citi, by initiating foreclosure proceedings, merely exercised its rights under the mortgage agreement. Costigan's claim for breach of the original mortgage agreement is therefore dismissed.

[76] Compl. ¶ 239.

[77] Mortgage, Ex. A to Compl. ¶ 22.

#### 2. Service Provider Agreement

Costigan cannot enforce the provisions of the SPA between Citi and Fannie Mae. Several district courts have held that borrowers have no third-party

right to enforce the SPA. [78] Contrary to Costigan's assertion that "the SPA and the incorporated Program Documentation [*20] constitute a contract for which [p]laintiff's and the Class are intended beneficiaries," [79] the SPA specifically states that it "shall inure to the benefit of and be binding upon the parties to the Agreement," [80] Citi and Fannie Mae. Allowing Costigan to enforce the SPA would contradict the express terms of the agreement and would "open the door to potentially 3-4 million homeowners filing individual claims." [81] Costigan's claim for breach of the SPA is therefore dismissed.

> 78    *Edwards v. Aurora Loan Servs., LLC*, No. 09 Civ. 2100, 791 F. Supp. 2d 144, 2011 U.S. Dist. LEXIS 62462, 2011 WL 2340939, at *4-*6 (D.D.C. June 14, 2011). *Accord Grill v. BAC Home Loans Servicing*, No. 10-CV-03057, 2011 U.S. Dist. LEXIS 3771, 2011 WL 127891, at *5-*7 (E.D. Cal. Jan. 14, 2011) (collecting cases).
> 79    FAC ¶ 241.
> 80    SPA § 10.F.
> 81    *Marks v. Bank of Am., N.A.*, No. 10-cv-08039, 2010 U.S. Dist. LEXIS 61489, 2010 WL 2572988, at *4 (D. Ariz. June 22, 2010).

### 3. Trial Period Plan

Costigan argues that the TPP agreement constitutes a valid contract for the permanent modification of his home loan, and that Citi breached this contract by not offering him a permanent loan modification. As discussed by this Court in *Thomas v. JPMorgan Chase*, Costigan's claim "is contradicted by the express terms of the TPP [*21] agreement, which states that any permanent modification is subject to the subsequent approval of Chase, and the receipt of a signed modification agreement." [82]

> 82    *Thoma v. JPMorgan Chase*, No. 10 Civ. 8993, 2011 U.S. Dist. LEXIS 83504, 2011 WL __, at *26 (S.D.N.Y. July 29, 2011).

Although the TPP states that Citi "will provide [the borrower] with a Home Affordable Modification Agreement" [83] if the borrower is in compliance with the TPP, it also unequivocally states that the TPP does not constitute a permanent modification of the original loan; by signing the TPP, Costigan attested that he

> understand[s] that this Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) [he] meets all of the conditions required for modification, (ii) [he] receive[s] a fully

executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed. [84]

The TPP ponders that "[i]f prior to the Modification Effective Date . . . the Lender does not provide [the borrower] with a fully executed copy of . . . the Modification Agreement . . . the Loan documents will not be modified . . . ." [85] By signing the TPP, Costigan "agree[d] that [Citi] will not be obligated [*22] or bound to make any modification of the Loan Documents if [Citi] determines that [Costigan does] not qualify." [86] The Complaint fails to plead that Costigan met "all of the conditions required for modification" and Citi clearly never received a "fully executed copy of the Modification Agreement."

> 83    TPP, preamble.
> 84    *Id.* § 2.G.
> 85    *Id.* § 2.F.
> 86    *Id.*

Several courts have already held that the TPP does not constitute a binding contract for permanent modification. [87] The cases Costigan cites in opposition are not only limited to one district, but are easily distinguishable. In *Bosque v. Wells Fargo*, plaintiffs' theory was "that the TPP is a contract governing the three-month trial period, and that compliance with its obligations entitles plaintiffs to either (1) a new contract with a permanent loan modification or (2) a decision on whether plaintiffs are entitled to the permanent modification by the modification effective date stated in the TPP." [88] The *Bosque* court held that "modified mortgage payments standing alone would likely not constitute cognizable consideration under the TPP." [89] However, the *Bosque* court held that because plaintiffs "were required to provide documentation of their current [*23] income, make legal representations about their personal circumstances, and agree to undergo credit counseling if requested to do so" they had suffered a "new legal detriment," and that plaintiffs therefore had sufficiently alleged consideration. [90] Costigan does not allege that any such matters constituted consideration.

> 87    *See, e.g., Lund v. CitiMortgage, Inc.*, No. 10-CV-1167, 2011 U.S. Dist. LEXIS 52890, 2011 WL 1873690, at *2 (D. Utah May 17, 2011); *Grill*, 2011 U.S. Dist. LEXIS 3771, 2011 WL 127891, at *4; *Brown v. Bank of New York Mellon*, No. 10-CV-550, 2011 U.S. Dist. LEXIS 6006, 2011 WL 206124, at *3 (W.D. Mich. Jan. 21, 2011); *Vida v. OneWest Bank*, No. 10-987, 2010 U.S. Dist. LEXIS

132000, 2010 WL 5148473, at *15 (D. Or. Dec. 13, 2010).

88    762 F. Supp. 2d 342, 352 (D. Mass. 2011).

89    Id.

90    Id.

Under the TPP agreement Citi would "suspend any scheduled foreclosure sale" while Costigan was making TPP payments. [91] But Costigan does not allege that Citi foreclosed on his home while the TPP was in effect, nor that Citi did so before it notified him that his application for permanent modification had been denied. Thus Citi fulfilled all of its obligations under the TPP. Accordingly, Costigan's claim for breach of the TPP agreement is dismissed.

91    TPP § 2.B.

## B. Promissory Estoppel

In the alternative, Costigan [*24] seeks to recover damages based on promissory estoppel, alleging that he "forewent other remedies" such as bankruptcy or selling his home, because Citi "by way of the TPP agreement, made a representation to [Costigan] and Class Members . . . that if they returned the TPP agreements executed and with supporting documentation, and made their TPP payments, they would receive a permanent HAMP modification." [92] As discussed earlier, the TPP agreement unequivocally states that it does not constitute a permanent modification of Costigan's loan. [93] Accordingly, Costigan's promissory estoppel claim is dismissed.

92    FAC ¶ 218.

93    None of the cases relied on by Costigan discusses the relevant language quoted from the TPP in part V.A.3, supra. See, e.g., Jackson v. Ocwen Loan Servicing, LLC, No. 10-cv-00711, 2011 U.S. Dist. LEXIS 12816, 2011 WL 587587, at *3 (E.D. Cal. Feb. 9, 2011); Bosque, 762 F. Supp. 2d at 351-53; Durmic v. J.P. Morgan Chase Bank, NA, No. 10-CV-10380, 2010 U.S. Dist. LEXIS 124603, 2010 WL 4825632, at *5 (D. Mass. Nov. 24, 2010); Hanson v. Wells Fargo Home Mortg., No. 10CV00318, 2010 U.S. Dist. LEXIS 85629, 2010 WL 3310615, at *2-3 (E.D. Ark. Aug. 18, 2010).

## C. Breach of Covenant of Good Faith and Fair Dealing

Costigan claims that Citi, by entering into the SPA and receiving [*25] funds under TARP from the Department of the Treasury, "covenanted, on behalf of itself and its subsidiaries to administer its contractual obligations with principles of good faith and fair dealing." [94] Costigan further claims that Citi therefore has an "implied duty to insure that its loan modification and foreclosure procedures were not fraudulent or unconscionable with respect to borrowers." [95] Costigan claims that these covenants were breached by defendants in several ways. [96]

94    FAC ¶ 226.

95    Id. ¶ 225.

96    See id. ¶ 229

As discussed above, Costigan was neither a party to the SPA nor an intended third-party beneficiary of that agreement. As such, he cannot enforce any covenant of that agreement, explicit or implied. The only agreement to which Costigan was a party is the original loan and mortgage. But Costigan's allegations of breach of the covenant of good faith and fair dealing concerns Citi's obligations under the SPA, not under the original loan documents.

The only alleged breach of the covenant of good faith and fair dealing that concerns the original loan documents are that Citi failed to take reasonable measures to collect the proper sums from Costigan and initiated foreclosure [*26] proceedings without cause. But the sums Citi collected or attempted to collect from Costigan were either due under his original mortgage or lower sums paid in accordance with the TPP agreements. Further, as discussed earlier, Costigan breached the express terms of the original loan documents by failing to pay his mortgage, and defendants therefore had reason to initiate foreclosure proceedings. Accordingly, Costigan's claim for breach of the covenant of good faith and fair dealing is dismissed.

## D. Fraud and Negligent Misrepresentation

Costigan asserts a claim for fraud and for negligent misrepresentation, alleging that defendant knowingly, recklessly, or negligently "misrepresented and/or failed to disclose material facts relating to Citi's loan modification and foreclosure processes," [97] and that he as a result "suffered damages and economic loss in an amount to be proven at trial." [98] Specifically, Costigan alleges that Citi misrepresented that

(1) Citi had properly processed modification documents; (2) Citi would make prompt decisions on modifications, although the bank kept many consumers waiting months longer than promised; (3) Citi would not foreclose upon consumers' homes while [*27]

modification requests were pending or while homeowners were making trial modification payments; (4) Citi had approved a loan modification, when it had not; and/or that (5) Citi would convert consumers to permanent modifications if and when they made the payments required by trial modification agreements, although many consumers who successfully completed their trial periods have not received permanent modifications. [99]

97  *Id.* ¶¶ 234, 244.
98  *Id.* ¶¶ 241.
99  *Id.* ¶ 234.

Costigan's allegations fail to satisfy the strict pleading requirement of Rule 9(b) of the Federal Rules of Civil Procedure. [100] The Amended Complaint alleges only that Citi represented to Costigan that "everything was processing smoothly and that Mr. Costigan would obtain a permanent modification at the end of the period." [101] Costigan therefore fails to "identify the speaker, [] state where and when the statements were made, [or] explain why the statements were fraudulent." [102] Accordingly, Costigan's fraud and negligent misrepresentation claims are dismissed.

100  Rule 9(b) applies to both fraud claims and negligent misrepresentation. *See In re Schering-Plough Corp. Intron/Temodar Consumer Class Action, 2009 U.S. Dist. LEXIS 58900, 2009 WL 2043604, at *32 (D.N.J. July 10, 2009)* [*28] .
101  FAC ¶ 177.
102  *Lerner, 459 F.3d at 290.*

## E. Negligent Processing of Loan Modifications and Foreclosures

Costigan claims that Citi owes its borrowers "a duty of reasonable care in the processing and determination of the loan modification applications and the processing of their foreclosures" [103] and that Citi breached this duty by "failing to properly evaluate [p]laintiff and Class Members' loan modification applications and foreclosures." [104] *First*, as discussed above, the SPA and the other terms of HAMP do not impose a duty on Citi with respect to borrowers. *Second*, it is well-established that "a bank does not owe a duty of care to a borrower, even if the borrower is a

consumer." [105] Costigan's negligence claim is therefore dismissed.

103  *Id.* ¶ 249.
104  *Id.* ¶ 250.
105  *Shinn v. Champion Mortgage Co.*, No. 09-cv-00013, 2010 U.S. Dist. LEXIS 9944, 2010 WL 500410, at *4 (D.N.J. Feb. 5, 2010) (citing *United Jersey Bank v. Kensey*, 306 N.J.Super. 540, 553, 704 A.2d 38 (N.J. Super. Ct. App. Div. 1997)).

## F. Violation of the New York Deceptive Practices Act

Costigan's claims that Citi violated section 349 of New York's General Business Law must be dismissed because the Complaint fails to allege that any consumer-oriented [*29] conduct took place in New York. Section 349(a) outlaws "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing or any service *in this state.*" [106] Costigan is a resident of New Jersey, and his loan and mortgage were obtained through branches located in New Jersey. Costigan in fact does not allege that Citi committed any acts that caused injury to him in New York.

106  N.Y. Gen. Bus. Law § 349(a) (emphasis added).

To the extent that Costigan alleges that he was injured in New Jersey by allegedly deceptive practices devised or originating in New York, his claim under section 349 also fails. "The phrase 'deceptive acts or practices' under the statute is not the mere invention of a scheme or marketing strategy, but the actual misrepresentation or omission to a consumer." [107] The statute "was not intended to police the out-of-state transactions of New York companies." [108] Instead, the legislative history of the statute makes clear that it was intended to protect consumers in the state of New York. [109] To expand this protection to consumers in other states would subject New York businesses to almost unlimited liability. Not only is this a burden on [*30] the courts, but would undermine other states' initiatives to protect their consumers in a way they think most appropriate. Costigan's claim for violation of the DPA is therefore dismissed.

107  *Goshen v. Mutual Life Ins. Co. of New York*, 98 N.Y.2d 314, 325, 774 N.E.2d 1190, 746 N.Y.S.2d 858 (2002) (dismissing Florida plaintiff from an action against New York insurer where policy was purchased and paid for in Florida). *Accord Wiener v. Unumprovident Corp.*, 202 F. Supp. 2d 116, 120 (S.D.N.Y.

2002) (dismissing claim because "[w]hile it appears that plaintiff's application for the insurance policies was submitted in New York, she is a New Jersey resident and received her benefits in New Jersey").

108  *Goshen*, 98 N.Y.2d at 325.

109  *See id.* (discussing legislative history and underlying public policy rationale of section 349).

## G. Violation of the New Jersey Consumer Fraud Act

Plaintiff alleges that "the acts and practices of Defendant" as set forth elsewhere in the Amended Complaint, violate the CFA. [110] As discussed earlier, Costigan's allegations regarding Citi's purportedly fraudulent or deceptive conduct fails to satisfy the strict pleading requirement of Rules 9(b) of the Federal Rules of Civil Procedure. [111] Costigan simply fails [*31] to "plead the who, what, when, where, and how: the first paragraph of any newspaper story." [112] Accordingly, Costigan's claim under the CFA is dismissed.

110  FAC ¶¶ 258-259. Defendant seeks to dismiss this claim on the ground that "where, as here 'the factual allegations of the cause of action are . . . scattered throughout the complaint . . .' dismissal for failure to satisfy Rule 8(a)(2) is proper." Def. Mem. at 22 (quoting *San Diego Home Solutions v. Recontrust Co.*, No. 08 cv 1970, 2008 U.S. Dist. LEXIS 99684, 2008 WL 5209972, at *2 (S.D. Cal. Dec. 10, 2008)). "A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion." Fed. R. Civ. P. 10(c). This rule is not made void by the *Twombly-Iqbal* "plausibility" requirement, nor by Rule 9(b)'s particularity requirement. A complaint does not need to restate the same facts outlined in the section for common-law fraud for each subsequent claim, and the court will not dismiss Costigan's claim simply because he incorporates by reference facts stated elsewhere in the Amended Complaint. The particularity requirement of Rule 9(b) has three purposes: (1) to put the defendant on notice of the details of the claims [*32] against him, (2) to protect a defendant's reputation and goodwill from unfounded allegations, and (3) to prevent strike suits. *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). The Amended Complaint states facts with sufficient particularity to accomplish these goals.

111  *See Daloisio*, 754 F. Supp. 2d at 709 (holding that "[c]laims under the CFA are required to meet the particularity requirement of [Rule] 9(b)").

112  *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999)

## H. Violation of the Federal Debt Collection Practices Act

Costigan alleges that Citi violated the FDCPA by engaging "in a pattern and practice of filing false, deceptive, misleading, and perjured affidavits in connection with foreclosure proceedings." [113] But the FDCPA does not extend to the facts of this case. A "debt collector" under means anyone who collects "debts owed . . . another" and excludes collecting a debt to the extent the collection "concerns a debt which *was not in default* at the time it was obtained by such person." [114] The Amended Complaint does not allege that Costigan's loan was in default at the time Citi "obtained" that loan. [115] As a result, Citi is excluded from the definition of "debt [*33] collector" under the statute. Costigan's claim under the FDCPA is therefore dismissed.

113  FAC ¶ 305.

114  15 U.S.C. § 1692a(6)(F) (emphasis added).

115  *Id.* § 1692a(6)(F)(iii).

## I. Leave to Replead

Leave to replead is generally granted unless it would be futile to permit plaintiff to amend. Here, Costigan may, with regard to his fraud, negligent misrepresentation, and CFA claims, be able to allege additional facts that would satisfy the particularity requirement of Rule 9(b). Likewise, Costigan could allege additional facts that would allow him to state a claim for breach of the original loan agreements.

However, repleading the other claims would be futile. Costigan has no standing to enforce the SPA, rendering futile any attempt to replead their claims for breach of the SPA or for breach of the covenant of good faith and fair dealing. Given that the TPPs did not grant Costigan a permanent modification, repleading his claim for breach of the TPP and for promissory estoppel likewise would be futile. New Jersey law holds that Citi does not owe a duty of care to borrowers beyond the terms of their contract, defeating any negligence claim. And because Costigan is a New Jersey resident who conducted all [*34] of his transactions with Citi in New Jersey repleading the DPA claim would also be futile. Additionally, Citi is explicitly excluded from the statutory language of the

FDCPA. Accordingly, these claims are dismissed with prejudice. Costigan may within thirty (30) days of the date of this Order file a second amended complaint with respect to his claims for (i) breach of the original mortgage agreements, (ii) fraud, (iii) negligent misrepresentation, and (iv) violation of the CFA. If Costigan fails to do so, all claims dismissed herein will be dismissed with prejudice.

**VI. CONCLUSION**

For the foregoing reasons, Citi's motion to dismiss is granted without prejudice as to Costigan's claims for (i) breach of contract of the original mortgage agreements, (ii) fraud, (iii) negligent misrepresentation, and (iv) violation of the CFA. Citi's motion to dismiss is granted with prejudice as to Costigan's claims for (i) breach of the SPA and the TPP agree-ments, (ii) promissory estoppel, (iii) breach of the covenant of good faith and fair dealing, (iv) negligence, (v) violation of the DPA, and (vi) violation of the FDCPA. The Clerk of the Court is directed to close this motion [docket #25], and, if Costigan [*35] does not file an amended complaint within thirty (30) days, to close this case.

SO ORDERED:

/s/ Shira A. Scheindlin

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

August 1, 2011

LEXSEE

**WENDY LIGHT and IVAN LIGHT, Plaintiffs, - against - W2001 METRO-POLITAN HOTEL REALTY LLC and W2001 METROPOLITAN HOTEL OPERATING LESSEE LLC d/b/a DOUBLETREE HOTEL METROPOLITAN, Defendants.**

**10 Civ. 4449 (SAS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2011 U.S. Dist. LEXIS 59189**

**June 2, 2011, Decided**
**June 2, 2011, Filed**

**COUNSEL:** [*1] For Plaintiffs: Norman Perlberger, Esq., Pomerantz Perlberger & Lewis LLP, Bala Cynwyd, Pennsylvania.

For Defendants: Mayya S. Gotlib, Esq., Mintzer, Serowitz, Zeris, Ledva & Meyers LLP, New York, New York.

**JUDGES:** Shira A. Scheindlin, United States District Judge.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

**OPINION AND ORDER**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**I. INTRODUCTION**

Wendy and Ivan Light bring suit for damages arising from personal injuries sustained by Wendy Light as a result of bed bug bites that occurred while she was a guest in a hotel located in midtown Manhattan. [1] Plaintiffs allege that the defendant hotel operator ("the Metropolitan") breached its duty of care to Light by negligently failing to provide a reasonably safe environment. Jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332. [2] Defendants now move for partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure on the negligent infliction of emotional distress ("NIED") cause of action, the availability of punitive damages, and any cause of action arising from alleged false or misleading advertisement. For the reasons discussed below, defendants' motion is granted.

1  Ivan Light asserts a derivative claim for loss [*2] of consortium, which is not directly at issue in the present motion. Therefore, for the sake of simplicity, any reference to "Light" is a reference to Wendy Light.
2  Plaintiffs are citizens of California, while defendants are New York corporations with their principal place of business in New York.

**II. BACKGROUND**

Plaintiffs' Amended Complaint lists three causes of action: (1) negligence, (2) intentional infliction of emotional distress, and (3) loss of consortium. [3] Since filing the Complaint, plaintiffs have withdrawn their claim for intentional infliction of emotional distress ("IIED"). [4] Plaintiffs have also confirmed that they "[would] not be proceeding . . . on a state-based claim of false advertising," but intend to incorporate the false advertisement allegation into the negligence claim. [5] Plaintiffs have indicated that they "believe that our negligence claims do properly plead and may go forward to show the severe emotional harm [] Light suffered as a result of defendants' negligence." [6] Additionally, plaintiffs intend to seek punitive damages, notwithstanding the withdrawal of the IIED claim - which was the only claim in the Complaint under which punitive damages were sought. [7]

3  *See* [*3] Plaintiffs' First Amended Complaint ("Compl.") at 5-7.
4  *See* 2/17/11 Letter from Norman Perlberger, Counsel for Plaintiffs, Ex. N to Declaration of Mayya Gotlib, Counsel for Defend-

ants, in Support of Defendants' Motion for Summary Judgment ("Gotlib Decl."), at 1.
5  *Id.*
6  *Id.*
7  *See id.*

## A. Facts

Plaintiff Wendy Light was a guest at the Doubletree Metropolitan Hotel in room 740. [8] Light checked in on June 22, 2009, while on a business trip to New York. [9] On June 23, 2009, at approximately 5:45 a.m., Light awoke, showered and dressed in the bathroom. [10] Upon returning to the bedroom to retrieve a pair of earrings from the night stand, Light noticed that the bed sheet was dappled with hundreds of brown and red blood spots. [11] When Light turned on the bedside light, thousands of small brownish bugs retreated from the bed in every direction, fleeing up the wall, headboard, and onto the carpet. [12] Light immediately gathered her belongings and went to the front desk to notify the hotel of the situation. [13]

8  *See* Defendants' Local Rule 56.1 Statement of Undisputed Facts in Support of its Motion for Partial Summary Judgment ("Def. 56.1") ¶ 8; Plaintiffs' Local Rule 56.1 Counter-Statement of Undisputed Facts [*4] ("Pl. 56.1") ¶ 8.
9  *See id.*
10  *See* Narrative of Wendy Light ("Light Narr."), Ex. F to Gotlib Decl., at 1.
11  *See id.*
12  *See id.*
13  *See* Def. 56.1 ¶ 11; Pl. 56.1 ¶ 11.

A member of the hotel security staff listened to Light's account, and informed her that she would be moved to a different room, that her suitcase would be held in isolation, and that the hotel would pay her costs if she required a hospital visit. [14] Light proceeded to the emergency room at nearby Lenox Hill Hospital, but left after being informed that there was a seven-hour wait. [15] Around 11:00 a.m., itchy welts began to appear on Light's body. [16] Subsequently, Light arranged to receive treatment from an internist in New York, Dr. Julian Klapowitz, who prescribed three medications including topical creams and antibiotics. [17] After returning home, Light was treated by Dr. Stanley Bierman, a dermatologist. [18] Dr. Bierman tested Light for HIV, due to Light's concern that the insects may have transmitted that disease. [19] Those tests were negative. [20]

14  *See* Light Narr. at 1.
15  *See* Def. 56.1 ¶ 12; Pl. 56.1 ¶ 12.
16  *See* Light Narr. at 2.

17  *See id.*
18  *See id.* at 3.
19  *See id.* at 4.
20  *See id.* at 5.

There had been previous incidents of bed bug infestation [*5] throughout the hotel prior to Light's stay, including in Room 740. [21] The hotel had utilized the services of two exterminators before June 22, 2009 to inspect for bed bugs and to conduct remedial treatment in rooms where bed bugs were found. [22] Room 740 was treated for bed bug infestation by Precision Pest Control Services on March 2-4, 2009, and a follow-up visit was conducted in April 2009. [23] There was no evidence of further infestation in Room 740 preceding Light's stay. [24]

21  *See* Def. 56.1 ¶¶ 15, 18; Pl. 56.1 ¶¶ 15, 18.
22  *See* Def. 56.1 ¶ 16; Pl. 56.1 ¶ 16.
23  *See* Def. 56.1 ¶ 19; Pl.56.1 ¶ 19.
24  *See* Def. 56.1 ¶ 18; Pl.56.1 ¶ 18.

## III. APPLICABLE LAW

### A. Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." [25] "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law.'" [26] "[T]he burden of demonstrating that no material fact exists lies [*6] with the moving party . . . ." [27] "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim." [28]

25  Fed. R. Civ. P. 56(c).
26  *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury,* 542 F.3d 31, 34 (2d Cir. 2008)).
27  *Miner v. Clinton County, N.Y.,* 541 F.3d 464, 471 (2d Cir. 2008) (citing *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir. 2007)).
28  *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir. 2008).

To defeat a motion for summary judgment, the non-moving party must raise a genuine issue of mate-

rial fact. [29] The non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'" [30] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'" [31] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" [32]

29   *See id.*

30   *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007)  [*7] (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

31   *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

32   *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving party and draw all reasonable inferences" in that party's favor. [33] However, "'only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.'" [34] "'Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" [35] Summary judgment is therefore "appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." [36] Summary judgment is not an all-or-nothing proposition. Federal Rule of Civil Procedure 56(a) permits a party to move for  [*8] summary judgment as to a claim, defense, or part of a claim or defense.

33   *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*, 477 U.S. at 247-50, 255).

34   *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1997)).

35   *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).

36   *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009).

**B. NIED**

It has long been established that an individual who sustains physical injuries as a result of a tortfeasor's negligence may recover for pain and suffering -- physical or mental -- that is the natural and proximate result of the physical injuries. [37] A cause of action for NIED "has its roots in the acknowledgment by the courts of the need to provide relief in those circumstances where traditional theories of recovery do not." [38] As a narrow, interstitial cause of action, NIED allows for recovery for emotional harm in the *absence* of a contemporaneous physical injury. [39]

37   *See McDougald v. Garber*, 73 N.Y.2d 246, 251, 536 N.E.2d 372, 538 N.Y.S.2d 937 (1989).

38   *Abbatiello v. Monsanto Co.*, 522 F. Supp. 2d 524, 534 (S.D.N.Y. 2007) (citing *Lee v. McCue*, 410 F. Supp. 2d 221, 226-27 (S.D.N.Y. 2006)).

39   *See* [*9]In re Air Crash Disaster at Cove Neck, Long Island, N.Y. on Jan. 25, 1990, 885 F. Supp. 434, 438 (E.D.N.Y. 1995).

**C. Punitive Damages**

New York does not recognize an independent cause of action for punitive damages. Rather, a demand or request for punitive damages must be attached to a substantive cause of action. The controlling standard for punitive damages in New York "has been variously described but, essentially, it is conduct having a high degree of moral culpability which manifests a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard." [40] In order to recover punitive damages, it must be shown that the defendant "acted with actual malice involving an intentional wrongdoing, or that such conduct amounted to a wanton, willful or reckless disregard of plaintiffs' rights." [41] To support a finding of actual malice, there must be an "evil motive on the part of the defendant," such that the defendant's actions were done out of "hatred, ill will, [or] spite" for the plaintiff. [42] The New York Pattern Jury Instructions ("PJI") provides that malice requires "the *intent* to interfere with the rights of others." [43] There cannot be a finding of malice  [*10] under New York law unless, at a minimum, the defendant intended to harm the plaintiff. [44]

40   *Home Ins. Co. v. American Home Prods. Corp.*, 75 N.Y.2d 196, 203, 550 N.E.2d 930, 551 N.Y.S.2d 481 (1990).

41   *Ligo v. Gerould*, 244 A.D.2d 852, 665 N.Y.S.2d 223, 224 (4th Dep't 1997). *Accord Home Ins. Co.*, 75 N.Y.2d at 203 ("Such conduct need not be intentionally harmful but may consist of actions which constitute willful or wanton negligence or recklessness.").

42   *Prozeralik v. Capital Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479, 626 N.E.2d 34, 605 N.Y.S.2d 218 (1993).

43   NY PJI 2:278 Damages - Punitive (emphasis added).

44   *Cf. Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832, 838 (2d Cir. 1967) (noting that plaintiff "does not claim that defendant intended to harm him" and then considering whether defendant's conduct was reckless and morally culpable under New York law).

To justify punitive damages based on wanton and reckless conduct, the defendant must have acted with a "conscious indifference and utter disregard of its effect upon the health, safety [or] rights of others." [45] As explained by the Second Circuit, "the recklessness that will give rise to punitive damages [in New York law] must be close to criminality." [46] Under this standard, "[a] person acts recklessly with respect [*11] to a result . . . when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists." [47] "The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." [48]

45   NY PJI 2:278 Damages - Punitive.

46   *Roginsky*, 378 F.2d at 843. *Accord Home Ins. Co.*, 75 N.Y.2d at 203 (referring to punitive damages as "a sort of hybrid between a display of ethical indignation and the imposition of a criminal fine").

47   *Roginsky*, 378 F.2d at 843 (quotation marks omitted).

48   *Id.* (quotation marks omitted).

Punitive damages are never warranted unless "the very high threshold of moral culpability is met." [49] This is because punitive damages are "a socially exemplary remedy, not a private compensatory remedy." [50] Accordingly, to warrant the imposition of punitive damages, the reckless conduct at issue must be "sufficiently blameworthy" such that punishing it "advance[s] a strong public policy of the State." [51]

49   *Giblin v. Murphy*, 73 N.Y.2d 769, 772, 532 N.E.2d 1282, 536 N.Y.S.2d 54 (1988).

50   *Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 358, 353 N.E.2d 793, 386 N.Y.S.2d 831

(1976). *Accord Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 489, 868 N.E.2d 189, 836 N.Y.S.2d 509 (2007) [*12] ("Punitive damages are not to compensate the injured party but rather to punish the tortfeasor and to deter this wrongdoer and others similarly situated from indulging in the same conduct in the future.").

51   *Randi A.J. v. Long Island Surgi-Center*, 46 A.D.3d 74, 842 N.Y.S.2d 558, 564 (2d Dep't 2007) (emphasis added).

Two factors are particularly important in assessing the availability of punitive damages. *First*, as the Second Department explained in 2007, to analyze "the egregiousness of a tortfeasor's conduct, and the corresponding need for deterrence," courts must "take into account the importance of the underlying right or public policy jeopardized by the tortfeasor's conduct. . . . [T]he more important the right at issue, the greater the need to deter its violation." [52] *Second*, the plaintiff must introduce evidence that the defendant's conduct in the case, viewed at the time that conduct occurred, manifested a conscious disregard of an unacceptably high risk of harm. [53]

52   *Id.*

53   *See In re Matter of New York City Asbestos Litig.*, 89 N.Y.2d 955, 956, 678 N.E.2d 467, 655 N.Y.S.2d 855 (1997) (holding that punitive damages were not appropriate where there was evidence that defendant had general knowledge of the dangers of asbestos, but [*13] where defendant did not have knowledge that the workers alleged to be injured in the case "were at risk at any time it could have warned them."). *Accord Ross*, 8 N.Y.3d at 488-89 (holding that it would not be appropriate to punish an adoption agency for its 1960's era policy of not disclosing adopted children's mental health records in part because mental health professionals of that era "thought that mental illness could be avoided if a child were placed in a loving environment and that disclosure of birth parents' emotional disturbances would negatively affect the child's bonding with the adoptive parents").

Although determination of a defendant's state of mind is generally a question for the jury, this does not relieve the court of its obligation to determine whether there is sufficient evidence for a reasonable jury to find that the requisite state of mind existed. [54] Once "all the evidence is ... considered," the court must decide if "there is enough to warrant the finding that the law requires." [55]

54   *See Roginsky*, 378 F.2d at 850.

55  *Id.*

## IV. DISCUSSION

### A. NIED

The physical injuries suffered by Light may be redressed by way of traditional tort remedies. Any emotional or psychological [*14] harms stemming from the incident can also be redressed through compensatory damages available under Light's negligence cause of action. [56] Noneconomic damages for mental anguish and the emotional consequences of an injury are available and common in negligence actions. An independent NIED claim is cumulative, unnecessary, and therefore dismissed.

56  *See Druschke v. Banana Republic*, 359 F. Supp. 2d 308, 316 (S.D.N.Y. 2005) (dismissing plaintiff's NIED claim on the grounds, *inter alia*, that her injuries could be redressed through assault and battery causes of action) (citing *Campoverde v. Sony Pictures Entm't*, No. 01 Civ. 7775, 2002 U.S. Dist. LEXIS 18347, 2002 WL 31163804 (S.D.N.Y. Sept. 30, 2002)).

### B. Punitive Damages

In *Grogan v. Gamber Corporation d/b/a Milford Plaza*, a New York state trial court held that punitive damages were unavailable to two hotel guests that had been bitten by bed bugs. [57] In that case, the plaintiffs sought punitive damages from both the hotel and the exterminator that serviced the hotel, alleging that the hotel failed to inspect the plaintiffs' room for infestation, despite the fact that adjacent rooms had been treated for bed bugs. The court held that, while there was a question of fact [*15] with regard to ordinary negligence, punitive damages were not available because there were no triable issues of fact as to whether the defendants had acted with such reckless abandon that punitive damages were available. [58] In making this determination, the court relied upon a published recommendation of the New York City Department of Health and Mental Hygiene that "anyone with bedbugs hire a pest control professional." [59] Because the hotel had followed that advice by hiring an exterminator, its conduct could not be considered egregious enough to justify punitive damages.

57  19 Misc. 3d 798, 858 N.Y.S.2d 519 (Sup. Ct. N.Y. Co. 2008).
58  *See id.* at 527.
59  *See id.*

This case is nearly identical to *Grogan*, although there are minor differences. The Metropolitan repeatedly engaged the services of exterminators. There is no evidence that it ever declined a treatment recommended by the exterminators due to cost concerns. Although Light's room had a prior documented infestation - unlike *Grogan* - there is no evidence that the Metropolitan had any reason to suspect that the infestation had returned. More than three months had passed since the room was treated, and there were no guest complaints in the interim. Likewise, [*16] no cleaning staff or other hotel personnel had reported seeing the telltale signs of bed bug infestation in Room 740, despite daily cleaning activities by the staff.

Plaintiffs urge this court to follow the holding in *Mathias v. Accor Economy Lodge, Inc.*, a Seventh Circuit case upholding punitive damages in a bed bug suit for damages. [60] However, that case is easily distinguished. In *Mathias*, upper management had refused to fumigate the hotel, even though the infestation was of "farcical proportions," [61] was well-known by the hotel staff, and had been confirmed by an exterminator who had quoted a reasonable price to fumigate the premises. Additionally, the *Mathias* plaintiffs' room had been classified as "DO NOT RENT UNTIL TREATED," and it had not been treated when the plaintiffs checked in. [62] Further, the Seventh Circuit noted that the hotel's "deliberate exposure of hotel guests to the health risks created by insect infestations exposes the hotel's owner to sanctions under Illinois and Chicago law that in the aggregate are comparable in severity to the punitive damage award in this case." [63] There are no comparable violations of code or state statutes alleged in the present case. [*17] In sum, there is insufficient evidence for a reasonable jury to find that the Metropolitan acted with the wantonness required for punitive damages.

60  347 F.3d 672 (7th Cir. 2003).
61  *Id.* at 675 ("a guest, after complaining of having been bitten repeatedly by insects while asleep in his room in the hotel was moved to another room only to discover insects there; and within 18 minutes of being moved to a third room he discovered insects in that room as well and had to be moved still again").
62  *Id.*
63  *Id.* at 678.

### C. Misleading Advertisement

The Metropolitan brought this motion believing that plaintiffs intended to pursue a false advertising claim under federal law. In their opposition memorandum, plaintiffs clarify that they do not intend to

2011 U.S. Dist. LEXIS 59189, *

maintain such a claim. Rather, plaintiffs now seek to incorporate the false advertising allegation into their negligence claim, arguing that if "Light chose [the Metropolitan], partly because it was touted as a Hilton brand offering the best of service and accommodations ... then it would be proper for the jury [to consider] ... that this was another operative fact that proved the defendants' negligence ...." [64] Because plaintiffs make no separate false advertising [*18] claim, summary judgment is not an available remedy. Instead, the motion for summary judgment as to false advertising may be recast as a motion *in limine* to exclude plaintiffs from offering evidence of the allegedly false advertisement at trial.

> 64   Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment at 17.

The plaintiffs' allegations of false or misleading advertisement are based upon advertisements that Light saw on the Hilton website through which she booked her reservation. The advertisement represented that Hilton hotels provide "unsurpassed commitment to hospitality[]... [and] for 90 years, our brands have provided business and leisure travelers the finest in accommodations, service, amenities and value." [65] No evidence is presented that the Metropolitan had any control over or input into that advertisement. Rather, as per its Franchise Agreement with the Metro-

politan, Hilton, as the Franchisor, was responsible for the maintenance and operation of all hotel brand websites, booking sites, and marketing. [66] Because the Metropolitan did not produce or have any control over the Hilton website, the advertisements on that website cannot be introduced [*19] at trial.

> 65   Compl. ¶ 24(h).
> 66   *See* Franchise Agreement, Ex. H to Gotlib Decl. at 6.

## VI. CONCLUSION

For the foregoing reasons, defendants' motion for partial summary judgment is granted with respect to the NIED claim and the request for punitive damages. Plaintiffs are also barred from introducing the advertisements on Hilton's website as evidence at trial. The Clerk of the Court is directed to close this motion (Docket No. 31).

SO ORDERED:

Dated: New York, New York

June 2, 2011

/s/ Shira A. Scheindlin

Shira A. Scheindlin

U.S.D.J.

LEXSEE

**KRZYSZTOF LUKASZUK and KELLY MALONE AS ADMINISTRATOR OF STEPHEN SHOUPPE ESTATE, Plaintiffs, - against - MOTILLA L. SUDEEN, also known as MOTI SUDEEN, JERRY FREEMAN, et al., Defendants.**

**CV 02-5143 (JG)(MDG)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

**2007 U.S. Dist. LEXIS 95919**

**November 27, 2007, Decided**
**November 27, 2007, Filed**

**SUBSEQUENT HISTORY:** Adopted by, Judgment entered by Lukaszuk v. Sudeen, 2008 U.S. Dist. LEXIS 2317 (E.D.N.Y., Jan. 10, 2008)

**PRIOR HISTORY:** United States v. Freeman, 434 F.3d 369, 2005 U.S. App. LEXIS 29222 (5th Cir. La., 2005)

**COUNSEL:** [*1] For Krzysztof Lukaszuk, Kelly Malone, as administrator of Stephen Shouppe Estate, Plaintiffs: Garth Molander, LEAD ATTORNEY, Molander & Associates, Bohemia, NY.

Motilla L. Sudeen, also known as Moti Sudeen, Defendant, Pro se, Yazoo City, MS.

**JUDGES:** MARILYN DOLAN GO, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** MARILYN DOLAN GO

**OPINION**

*REPORT AND RECOMMENDATION*

GO, United States Magistrate Judge:

Plaintiffs Krzysztof Lukaszuk ("Lukaszuk" or "plaintiff") and Kelly Malone ("Malone"), as the Administrator of the Stephen Shouppe Estate, bring this action against defendants Motilla L. Sudeen ("Sudeen"), Jerry Freeman ("Freeman"), Golden Pond, Ltd. ("Golden Pond") and Sudeen's Enterprises, Inc. ("Sudeen's Enterprises") for damages in connection with violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a)-(d), and related state law claims. The Honor-

able John Gleeson granted plaintiffs' motion for default judgment and referred the issue of damages to the assigned magistrate judge. *See* ct. doc. 10. This case was later reassigned to me.

Plaintiffs have reached a settlement of their claims against defendant Sudeen which they entered on the record at a conference on July 25, 2007. *See* minute [*2] entry dated July 25, 2007; Transcript of Settlement Conference held on July 25, 2007 at 3-10 (ct. doc. 46). Malone subsequently withdrew his request for default judgment against defendants Freeman, Golden Pond and Sudeen's Enterprises. *See* ct. docs. 47, 50. Thus, this report and recommendation applies only to plaintiff Lukaszuk's claims against the remaining defendants.

*PERTINENT FACTS*

The facts pertinent to determination of this matter are set forth in the Amended Complaint (ct. doc. 5) and the Affidavit of Krzysztof Lukaszuk dated September 18, 2003 (attached to plaintiffs' Motion for Default Judgment (ct. doc. 8)). Since defendants Jerry Freeman, Golden Pond and Sudeen's Enterprises did not file any submissions or otherwise respond, the well pled facts and allegations are undisputed.

The claims in this action arise from a Ponzi scheme designed to defraud plaintiffs and others by promising high rates of return for their financing of private investment projects. *See* Am. Compl. at PP 9-11; Lukaszuk Aff. at PP 10, 18. Plaintiff Lukaszuk executed a Joint Venture Agreement with Sudeen's Enterprises on October 17, 1998 (the "Agreement") pursuant to which he invested $ 450,000 based on the [*3] promise of a return on his principal investment of

50% per month. Am. Compl. at PP 11-12, Exh. A; Lukaszuk Aff. at PP 5-6, Exh. 5. Sudeen's Enterprises also executed a promissory note dated October 17, 1998 promising to repay Lukaszuk his $ 450,000 investment (the "Promissory Note"). Am. Compl. at P 12, Exh. A; Lukaszuk Aff., Exh. 5. On or about October 20, 1998, $ 450,000 was wired to Sudeen's Enterprises on behalf of Lukaszuk. Lukaszuk Aff. at P 15, Exh. 5. Despite Lukaszuk's demands for full payment on the Promissory Note, plus interest at a rate of 50% per month, defendants failed to make any payments. Am. Compl. at PP 13-14, 29; Lukaszuk Aff. at PP 6-7.

There were many other investors defrauded in the defendants' scheme. Am. Compl. at PP 9-10, 35, 37; Lukaszuk Aff. at P 37. These investors were also induced to enter into investment agreements based on false representations of high yield interest rates. Am. Compl. at P 10.

Following a jury trial held in the United States District Court for the Eastern District of Louisiana, defendants Freeman and Sudeen were convicted on all counts of a 38 count indictment arising from the Ponzi scheme described above, including one count of conspiracy, [*4] fourteen counts of wire fraud, one count of travel fraud and twenty-two counts of money laundering. *See United States v. Motilall Sudeen, et al.,* 02-CR-00062 (E.D. La.), ct. docs. 418, 419 ("Criminal Judgment"). The Fifth Circuit subsequently affirmed Freeman's conviction on direct appeal. *See United States v. Freeman,* 434 F.3d 369 (5th Cir. 2005).

## DISCUSSION

### I. *Legal Standards Governing Default*

A default constitutes an admission of all well-pleaded factual allegations in the complaint, except for those relating to damages. *See Greyhound Exhibitgroup Inc., v. E.L.U.L. Realty Corp.,* 973 F.2d 155, 158 (2d Cir. 1992); *Au Bon Pain Corp. v. Artect, Inc.,* 653 F.2d 61, 65 (2d Cir. 1981). Only "in very narrow, exceptional circumstances" may a court find an allegation not "well pleaded." *TWA v. Hughes,* 449 F.2d 51 (2d Cir. 1971), *rev'd on other grounds,* 409 U.S. 363, 93 S. Ct. 647, 34 L. Ed. 2d 577 (1973); *Niles v. Palmer,* No. 97 CIV. 7573, 1999 U.S. Dist. LEXIS 17759, 1999 WL 1419042, at *5 (S.D.N.Y. Oct. 22, 1999).

Although a court has discretion to determine whether the facts alleged in a complaint state a valid cause of action, a defaulting party ordinarily cannot contest the merits of the plaintiff's claim absent "indisputable" contradictory evidence. [*5] *Au Bon Pain,* 653 F.2d at 65; *TWA,* 449 F.2d at 63-64; *see also Leider v. Ralfe,* No. 01 Civ. 3137, 2004 U.S. Dist. LEXIS 15345, 2004 WL 1773330, at *7 (S.D.N.Y. July 30, 2004) ("Even after [a] default . . . it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law."). A default also effectively constitutes an admission that damages were proximately caused by the defaulting party's conduct-- that is, the acts pleaded in a complaint violated the laws upon which a claim is based and caused injuries as alleged. *See Greyhound,* 973 F.2d at 159; *TWA,* 449 F.2d at 69-70. The movant need prove "only that the compensation sought relate[s] to the damages that naturally flow from the injuries pleaded." *Greyhound,* 973 F.2d at 159.

The court must ensure that there is a basis for the damages specified in a default judgment. In determining damages not susceptible of simple mathematical calculation, Fed. R. Civ. P. 55(b)(2) gives a court the discretion to determine whether an evidentiary hearing is necessary or whether to rely on detailed affidavits or documentary evidence. *See Action S.A. v. Marc Rich and Co., Inc.,* 951 F.2d 504, 508 (2d Cir. 1991); [*6] *Fustok v. Conticommodity Servs., Inc.,* 873 F.2d 38, 40 (2d Cir. 1989). As long as there is a "sufficient basis from which to evaluate the fairness" of the sum awarded, a court may rely upon detailed affidavits and documentary evidence in determining damages. *Fustok,* 873 F.2d at 40. The moving party is entitled to all reasonable inferences from the evidence it offers. *See Au Bon Pain,* 653 F.2d at 65; *Directv, Inc. v. Hamilton,* 215 F.R.D. 460, 462 (S.D.N.Y. 2003).

### II. *Defendants' Liability under RICO and for Common Law Fraud*

#### A. RICO Claim

The Racketeer Influenced and Corrupt Organizations Act, commonly referred to as RICO, provides:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity..., to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce....

Page 2

(b) It shall be unlawful for any person through a pattern of racketeering activity... to acquire or maintain, directly or indirectly, any interest in [*7] or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962(a)-(d). Although RICO is a criminal statute, 18 U.S.C. § 1964(c) provides those injured by the conduct delineated in the RICO statute the right to bring a civil suit for triple damages and costs, including attorneys' fees.

To sustain a civil RICO claim, a plaintiff must first allege the existence of each of the following seven elements before turning to its second burden:

(1) that the defendant; (2) through the commission of two or more acts; (3) constituting a 'pattern;' (4) of 'racketeering activity;' (5) directly or indirectly invests in, or maintains an interest in, or participates in; (6) an 'enterprise;' (7) the activities [*8] of which affect interstate or foreign commerce.

Town of West Hartford v. Operation Rescue, 915 F.2d 92, 100 (2d Cir. 1990); see DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001). Additionally, plaintiff must allege that he was "injured in his business or property by reason of a violation of section 1962." DeFalco, 244 F.3d at 329; West Hartford, 915 F.2d at 100; 18 U.S.C. § 1964(c).

The term "enterprise" includes a "legal entity" or an association-in-fact that is not a legal entity. 18 U.S.C. § 1961(4). "Racketeering activity" is defined as any act indictable under an array of federal criminal statutes, including the money laundering statute, 18 U.S.C. § 1957, and the wire fraud statute, 18

U.S.C. § 1343. See 18 U.S.C. § 1961(1). To constitute a "pattern of racketeering activity," there must be at least two predicate acts meeting the definition of racketeering activity. 18 U.S.C. § 1961(5).

The "pattern" element may be satisfied by either closed-ended or open-ended continuity. H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 241-42, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989). "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over [*9] a substantial period of time." Id. In determining whether closed-ended continuity exists, courts consider several factors, including: "the length of time over which the alleged predicate acts took place, the number and variety of acts, the number of participants, the number of victims, and the presence of separate schemes." GICC Capital Corp. v. Tech. Fin. Group, Inc., 67 F.3d 463, 467 (2d Cir. 1995) (citations omitted). To meet the "pattern" requirement, defendants' activities must be more than "isolated or sporadic." Id.; see Metromedia Co. v. Fugazy, 983 F.2d 350, 369 (2d Cir. 1992) (finding two year period of racketeering activity sufficient).

Under section 1962(c), plaintiff must also establish that defendants "participated in the operation or management of the enterprise itself." First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 176 (2d Cir. 2004) (quoting Azrielli v. Cohen Law Offices, 21 F.3d 512, 521 (2d Cir. 1994)). The "operation or management" test is satisfied "not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." Reeves v. Ernst & Young, 507 U.S. 170, 179, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993). In the Second [*10] Circuit, "the operation or management test typically has proven to be a relatively low hurdle for plaintiffs to clear, especially at the pleading stage." First Capital, 385 F.3d at 176.

Plaintiff Lukaszuk's submissions amply establish that Freeman is liable under RICO. In count three of the Amended Complaint, plaintiff asserts that defendant Freeman violated section 1962(c) by participating in the affairs of an "enterprise," Sudeen's Enterprises, and committed numerous predicate acts of wire fraud between 1998 and 2000. Indeed, Freeman was convicted of 14 counts of wire fraud and 22 counts of money laundering in connection with his activities on behalf of the Ponzi scheme, involving more than 50 victims. See Freeman, 434 F.3d 369; Criminal Judgment. By virtue of his conviction, Freeman is collaterally estopped from challenging the issues previously litigated that were "actually decided" and were "necessary to support a judgment on the merits." See New York v. Julius Nasso Concrete Corp., 202 F.3d 82, 86

(2d Cir. 2000); *Wells Fargo Century, Inc. v. Hanakis, No. 04 CV 1381, 2005 U.S. Dist. LEXIS 17440, 2005 WL 1523788, at *3 (E.D.N.Y. June 28, 2005)*. In affirming Freeman's conviction, the Fifth Circuit specifically [*11] discussed the evidence against Freeman as to the wire fraud and money laundering counts pertaining to plaintiff Lukaszuk. The Fifth Circuit noted that Freeman typed the Agreement, the money Lukaszuk wired to Freeman and Sudeen was not invested in high yield investments as promised and Freeman and Sudeen made a $ 10,500 personal expenditure from Lukaszuk's funds. *See Freeman, 434 F.3d at 377*. In addition, Freeman not only typed and witnessed many of the other fraudulent agreements, but he also maintained financial records of the funds, transferred funds used in the scheme, was a signatory to the accounts into which the investments were deposited and directly made misrepresentations to investors. *Id. at 376 n.6, 377 n.7*. The evidence discussed by the Fifth Circuit amply demonstrates Freeman's participation in the operation of RICO enterprises that engaged in a pattern of racketeering activity, issues he is estopped from contesting.

However, Sudeen's Enterprises and Golden Pond cannot be held liable as defendants for RICO violations. In order to establish liability under section 1962(c), a plaintiff must allege and prove the existence of two distinct entities, a person and an enterprise. [*12] *See Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163, 121 S. Ct. 2087, 150 L. Ed. 2d 198 (2001)*. Corporate entities cannot be both defendants who conduct the affairs of the enterprises and the enterprises themselves. *See Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 88-89 (2d Cir. 1999)*; *Feirstein v. Nanbar Realty Corp., 963 F. Supp. 254, 257-58 (S.D.N.Y. 1997)*. Here, the amended complaint states that the "enterprises" are defendants Sudeen's Enterprises and Golden Pond. Am. Comp. at P 49.

"The plaintiffs' second 'pleading burden' is to allege that he was 'injured in his business or property by reason of a violation of section 1962.'" *West Hartford, 915 F.2d at 100*. This means that the plaintiffs must be able to show that their injuries were "proximately caused by a pattern of racketeering activity violating [section] 1962 or by individual RICO predicate acts." *Lerner v. Fleet Bank, N.A., 318 F.3d 113, 122-23 (2d Cir. 2003)*; *Hecht v. Commerical Clearing House, Inc., 897 F.2d 21, 23 (2d Cir. 1990)*. The proximate cause element requires the plaintiff to show that he reasonably relied on defendants' misrepresentations. *See Bank of China, N.Y. Branch v. NBM LLC, 359 F.3d 171, 176-77 (2d Cir. 2004)*; *Metromedia, 983 F.2d at 368*. [*13] In addition, "the plaintiff must have suffered a direct injury that was foreseeable." *See Baisch v. Gallina, 346 F.3d 366, 373-74 (2d Cir. 2003)*. Upon a defendant's default, proximate causation is irrefutably established when it is properly alleged in the complaint. *Greyhound, 973 F.2d at 159*.

The reasonable reliance requirement is satisfied here since plaintiff alleges that defendants disguised their scheme with the appearance of regularity, employing the Agreement and the Promissory Note. Lukaszuk further alleges that defendants made deliberate misrepresentations which induced him to invest in the fraudulent scheme. Am. Comp. at PP 44-45. Also, plaintiff was clearly a targeted and actual victim of the defendants' scheme to defraud. *See Baisch, 346 F.3d at 375* ("The defendants specifically targeted Baisch as their victim allegedly by taking his loans under false pretenses and consciously creating a high risk of defaulting on those loans"); *Lerner, 318 F.3d at 124* ("the reasonably foreseeable victims of a RICO violation are the targets, competitors and intended victims of the racketeering enterprise"). These and other allegations regarding the defendants' actions more than suffice to establish [*14] that they proximately caused financial injury to Lukaszuk. *See Metromedia, 983 F.2d at 368*.

**B. State Law Fraud Claim**

To plead a common law fraud claim under New York law, plaintiff must allege "a material false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." [1] *S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp., 84 F.3d 629, 633 (2d Cir. 1996)* (quoting *Katara v. D.E. Jones Commodities, 835 F.2d 966, 970-71 (2d Cir. 1987)*). As discussed above with respect to plaintiff's RICO claim, each of these elements have been established by the allegations against Freeman in the amended complaint. These allegations describe more than a mere breach of contractual obligations, including the fraudulent inducement to enter into those contracts. *See NYU v. Continental Ins. Co., 87 N.Y.2d 308, 316-20, 662 N.E.2d 763, 639 N.Y.S.2d 283, 287-90 (1995)*. While plaintiff is not entitled to a separate additional recovery for his state law claims against Freeman, *see Phelan v. Local 305 of the United Association of Journeymen, 973 F.2d 1050, 1063 (2d Cir. 1992)*, he may recover prejudgment interest on his damages, as discussed below.

    1  Plaintiff has [*15] not addressed which state's law applies to his fraud claim. In cases where jurisdiction is based on both diversity of citizenship and a federal question, the forum state's choice of law rules apply. *See Totalplan Corp. of America v. Colborne, 14 F.3d 824, 832 (2d Cir. 1999)*. Under New York

2007 U.S. Dist. LEXIS 95919, *

law, the "first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws." *Curley v. AMR Corp.,* 153 F.3d 5, 12 (2d Cir. 1998). There is no conflict between the laws of New York, Mississippi and Louisiana regarding fraud. *See Guidry v. U.S. Tobacco Co., Inc.,* 188 F.3d 619, 627 (5th Cir. 1999); *Koury v. Ready,* 911 So.2d 441, 445 (Miss. 2005). Thus, New York, as the forum state, would apply its own law. *See Wall v. CSX Transp., Inc.,* 471 F.3d 410, 422-23 (2d Cir. 2006).

With respect to the entity defendants, there are no allegations or evidence demonstrating that Lukaszuk was defrauded by or had any dealings with Golden Pond. Nor has plaintiff stated a claim for breach of contract against Golden Pond since it is not a party to either of the contracts at issue and plaintiff has not offered any alternate theory on which to premise Golden [*16] Pond's contractual liability. See *Sobek v. Quattrochi,* No. 03 Civ. 10219, 2004 U.S. Dist. LEXIS 24584, 2004 WL 2809989, at *3 (S.D.N.Y. Dec. 8, 2004).

As to Sudeen's Enterprises, since Freeman allegedly acted as an agent on behalf of this corporate entity, plaintiff's allegations are sufficient to establish a claim for fraud against it under New York law. See *American Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 566, 102 S. Ct. 1935, 72 L. Ed. 2d 330 (1982) ("a principal is liable for an agent's fraud though the agent acts solely for himself, if the agent acts with apparent authority"); *In re Crazy Eddie Sec. Litig.,* 802 F. Supp. 804, 818 (E.D.N.Y. 1992).

III. *Calculation of Damages*

A. Damages under RICO and for Fraud

18 U.S.C. § 1964(c) provides a plaintiff "injured in his business or property by the conduct" proscribed by the RICO statute the right to bring a civil suit for damages caused by the RICO violation. *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1100 (2d Cir. 1988); 18 U.S.C. § 1964(c). Like fraud damages, RICO damages should be "sufficient to place the plaintiff in the same financial position he would have occupied absent the illegal conduct." *Bankers Trust,* 859 F.2d at 1106. Thus, the appropriate measure of damages proximately [*17] caused by the defendants' RICO violations and common law fraud is the total amount plaintiffs invested in the fraudulent scheme, but does not include lost profits. *See First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 768-69 (2d Cir.

1994) ("general rule of fraud damages is that the defrauded plaintiff may recover out-of-pocket losses caused by the fraud"); *Fleischhauer v. Feltner,* 879 F.2d 1290, 1300 (6th Cir. 1989) (RICO plaintiffs entitled to the amounts they actually invested); *In re Crazy Eddie Sec. Litig.,* 948 F. Supp. 1154, 1165 (E.D.N.Y. 1996) (out-of-pocket losses are rule for damages caused by common law fraud); *see also Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 421, 668 N.E.2d 1370, 646 N.Y.S.2d 76 (1996). Accordingly, Lukaszuk's damages consist of his principal investment of $ 450,000. [2] *See* Lukaszuk Affidavit at PP 5, 7-8; Am. Compl., Exh. A.

> [2]   Although the Fifth Circuit states in its opinion that "Freeman made lulling payments to Lukaszuk," 434 F.3d at 377, the Court also recognized that defendants "encourag[ed] investors to roll over their investments," id. at 373. I credit Lukaszuk's affidavit which states that despite defendants' "repeated assurances of making payment [*18] to the plaintiff," defendants "failed to make any payments." Lukaszuk Aff. at P 8.

Further, defendants Freeman and Sudeen's Enterprises are jointly and severally liable for the damages caused by their RICO violations and fraud. See *Sterling Nat'l Bank v. A-1 Hotels Int'l, Inc.,* No. 00 CV 7532, 2002 U.S. Dist. LEXIS 4944, 2002 WL 461574, at *3 (S.D.N.Y. Mar. 26, 2002) (recommending joint and several liability against defendants some of which were liable under RICO and others of which were liable for fraud); *Empire Blue Cross and Blue Shield v. Finkelstein,* 887 F. Supp. 473, 480 (E.D.N.Y. 1995); *Interpool Ltd. v. Patterson,* No. 89 Civ. 8501, 1994 U.S. Dist. LEXIS 16897, 1994 WL 665850, at *3 (S.D.N.Y. Nov. 28, 1994).

B. Pre-judgment Interest

Although the RICO statute does not specifically provide for the award of pre-judgment interest, a district court has discretion to make such an award. *See Abou-Khadra v. Mahshie,* 4 F.3d 1071, 1084 (2d Cir. 1993); *Wickham Contracting Co. v. Local Union No. 3,* 955 F.2d 831, 835 (2d Cir. 1992); *Panix Prods., Ltd. v. Lewis,* No. 01 Civ. 2709, 2003 U.S. Dist. LEXIS 11952, 2003 WL 21659370, at *3 (S.D.N.Y. July 15, 2003). However, where, as here, treble damages are adequate to compensate plaintiffs, an award of pre-judgment interest would generally [*19] be inappropriate. *TWA,* 449 F.2d at 80; *Panix Prods.,* 2003 U.S. Dist. LEXIS 11952, 2003 WL 21659370, at *3; *Group III Capital, Inc. v. Parasol Group, Ltd.,* No. 00 Civ. 6860, 2003 U.S. Dist. LEXIS 6865, 2003 WL 1948801, at *3 (S.D.N.Y. Apr. 23, 2003); *Securitron*

*Magnalock Corp. v. Schnabolk,* No. 89 Civ. 6731, 1994 U.S. Dist. LEXIS 14894, 1994 WL 576897, at *1 (S.D.N.Y. Oct. 19, 1994), *aff'd,* 65 F.3d 256 (2d Cir. 1995). Accordingly, I recommend that no pre-judgment interest be awarded against Freeman under RICO.

Nevertheless, since plaintiff has asserted well-pleaded pendent state claims for fraud, he is entitled to pre-judgment interest on those claims under New York law. *See Olcott v. Delaware Flood Co.,* 327 F.3d 1115, 1126 (10th Cir. 2003); *Tosto v. Zelaya,* No. 99 Civ. 11864, 2003 U.S. Dist. LEXIS 8085, at *23-*24 (S.D.N.Y. May 12, 2003). Under New York law, awarding pre-judgment interest on damages awarded for fraud is mandatory. [3] *See Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.,* 801 F.2d 13, 28 (2d Cir. 1986); *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 693-95 (2d Cir. 1983); *Tosto,* 2003 U.S. Dist. LEXIS 8085, at *23-*24.

> [3]  The law concerning pre-judgment interest on damages for fraud differs among New York, Mississippi and Louisiana, the states that are potentially [*20] applicable. *See Odom v. City of Lake Charles,* 790 So.2d 51, 63 (La. Ct. App. 2001) (award of interest in tort suits is mandatory from date complaint is filed); *Warwick v. Matheney,* 603 So.2d 330, 342 (Miss. 1992) (pre-judgment interest award is discretionary). Under New Flood's choice of law rules, fraud claims are governed by the state in which the injury is deemed to have occurred, which is usually where the plaintiff is located. *See Sack v. Low,* 478 F.2d 360, 366 (2d Cir. 1973); *Telecom Int'l America, Ltd. v. AT&T Corp.,* 67 F. Supp. 2d 189, 207 n.16 (S.D.N.Y. 1999). Since Lukaszuk alleges in the amended complaint that he is a resident of Brooklyn and the transfer of funds occurred in New York, I recommend that the Court apply New York law to the issue of pre-judgment interest.

Whether pre-judgment interest is awarded under federal or state law, federal courts have ordinarily looked to state law in determining the appropriate interest rate. *See SEC v. Musella,* 748 F. Supp. 1028, 1032 (S.D.N.Y. 1989), *aff'd,* 898 F.2d 138 (1990). New York CPLR section 5001(b), which governs awards of pre-judgment interest, provides that:

> Interest shall be computed from the earliest ascertainable date [*21] the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date in-curred. Where such damages were incurred at various times, interest shall be computed upon each time from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

Thus, pre-judgment interest on New York state claims should accrue as of the date the cause of action accrued. *See Tosto,* 2003 U.S. Dist. LEXIS 8085, at *23-*24.

In the absence of a written contract which clearly specifies a different rate, pre-judgment interest should be awarded at the statutory rate of 9% authorized by CPLR section 5004. *Marine Management, Inc. v. Seco Mgmt., Inc.,* 176 A.D.2d 252, 574 N.Y.S.2d 207 (2d Dep't 1991), *aff'd,* 80 N.Y.2d 886, 600 N.E.2d 627, 587 N.Y.S.2d 900 (1992). Any pre-judgment interest awarded should be calculated on a simple interest basis. *See Marfia v. T.C. Ziraat Bankasi,* 147 F.3d 83, 90 (2d Cir. 1998); *Novomoskovsk Joint Stock Co. v. Revson,* No. 95 CIV. 5399, 1999 WL 767325, at *3 (S.D.N.Y. Apr. 29, 1999). Thus, I recommend this Court award 9% interest from October 20, 1998, the date of plaintiff's payment to defendants. [4] *See Hartford Fire Ins. Co. v. Jainulabdeen,* No. 06-CV-1271, 2007 U.S. Dist. LEXIS 23731, 2007 WL 1028930, at *6 (E.D.N.Y. March 30, 2007); [*22] *In re Crazy Eddie,* 948 F. Supp. at 1168 (defrauded investors would receive pre-judgment interest calculated from last purchase of stock).

> [4]  Because plaintiff is entitled to pre-judgment interest on his claims of common law fraud, I need not decide whether pre-judgment interest should be awarded on other state law claims. *See In re Crazy Eddie Sec. Litig.,* 135 F.R.D. 39, 41 (E.D.N.Y. 1991).

## C. Set-Offs

In RICO cases, when a plaintiff settles with one defendant, the non-settling defendants are "entitled to a credit of the settlement amount against any judgment obtained by the plaintiff against the non-settling defendant as long as both the settlement and judgment represent common damages." *Singer v. Olympia Brewing Co.,* 878 F.2d 596, 600 (2d Cir. 1989); *see In re Masters Mates & Pilots Pension Plan,* 957 F.2d 1020, 1031 (2d Cir. 1992). The Second Circuit has applied a "one satisfaction rule" rather than a "proportionate responsibility rule" in such cases, affording a non-settling defendant a reduction equal to the amount of a prior settlement. *Singer,* 878 F.2d at 600; *see also Gerber v. MTC Elec. Techs. Co., Ltd.,* 329

F.3d 297, 303 (2d Cir. 2003); [*23] *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* No. 93 CIV. 6878 (LMM), 94 CIV. 2713 (LMM), 2000 U.S. Dist. LEXIS 13466, 2000 WL 1364272, at *2-*3 (S.D.N.Y. Sept. 20, 2000). Application of the one satisfaction rule is particularly appropriate here since Freeman has wilfully defaulted and impeded determination of liability and comparative culpability. *See Qualis Care, L.P. v. Hall,* No. 95 Civ. 4955, 1999 U.S. Dist. LEXIS 13417, 1999 WL 683564, at *8 n.6 (S.D.N.Y. Sept. 1, 1999); *In re Crazy Eddie,* 948 F. Supp. at 1169.

However, Freeman is not entitled to a credit until Sudeen actually pays the amounts due under the settlement agreement. [5] *See Twenty First Century,* 2001 U.S. Dist. LEXIS 7494, 2001 WL 761163, at *6 & n.5 (citing *United States Indus., Inc. v. Touche Ross & Co.,* 854 F.2d 1223, 1236 (10th Cir. 1988)); *see also Corder v. Brown,* 25 F.3d 833, 840 (9th Cir. 1994). If and when the settlement amounts are paid, Freeman may request a credit at that time. *See Twenty First Century,* 2001 U.S. Dist. LEXIS 7494, 2001 WL 761163, at *6 n.5 (citing *FDIC v. United Pacific Ins. Co.,* 20 F.3d 1070, 1083 n.11 (10th Cir. 1994)).

> [5]  In addition to any payments from Sudeen under the settlement, both Sudeen and Freeman were ordered to pay restitution to Lukaszuk as part of the criminal judgments entered against them by the Eastern District of [*24] Louisiana. *See* Criminal Judgment. Both Sudeen and Freeman stipulated to their liability to Lukaszuk in the amounts of $ 151,614.09 and $ 3,094.17, respectively. *See United States v. Motilall Sudeen, et al.,* 02-CR-00062, ct. doc. 384.

On the other hand, the common law fraud claim against defendant Sudeen's Enterprises is subject to N.Y. Gen. Oblig. Law § 15-108(a). *See SCS Comms., Inc. v. Herrick Co., Inc.,* 360 F.3d 329, 346 (2d Cir. 2004); *Bank Brussels,* 2000 U.S. Dist. LEXIS 13466, 2000 WL 1364272, at *1-*2 (applying section 15-108(a) to state law fraud claim and *Singer's* one satisfaction rule to RICO claim). Under section 15-108(a), a non-settling defendant is entitled to a reduction that is the greater of (1) the settling defendant's equitable share of the damages, (2) the stipulated amount of the settlement, or (3) the amount actually paid by the settling defendant. *See Chubb & Son Inc. v. Kelleher,* No. 92 CV 4484, 2006 WL 2728636, at *5 (E.D.N.Y. March 30, 2006); *Whalen v. Kawasaki Motors Corp.,* 92 N.Y.2d 288, 292, 703 N.E.2d 246, 680 N.Y.S.2d 435 (1998). However, "the protection of section 15-108(a) is an affirmative defense and is waived if not pled in the defendant's answer." *Chubb & Son Inc. v. Kelleher,* No. 92 CV 4484, 2006 U.S. Dist. LEXIS 67879, 2006 WL 2711543, at *3 (E.D.N.Y. Sept. 21, 2006); [*25] *see Whalen,* 92 N.Y.2d at 293. Having defaulted, Sudeen's Enterprises has waived the benefit of the statutory protection. Nevertheless, since Sudeen's Enterprises and Freeman are jointly and severally liable for plaintiff's claims arising from the same fraudulent scheme, Sudeen's Enterprises is also entitled to a set-off based on the one-satisfaction rule. *See Kelleher,* 2006 U.S. Dist. LEXIS 67879, 2006 WL 2711543, at *3 (applying one-satisfaction rule but denying protection afforded by section 15-108(a)).

### D. Treble Damages

Plaintiff is also entitled to treble damages against Freeman under RICO. *See* 18 U.S.C. § 1964(c). Even if Freeman is entitled to a credit at some time in the future, where plaintiffs are entitled to trebled damages under federal law, courts have upheld the trebling of damages before crediting settlement payments. *See Singer,* 878 F.2d at 601 (where plaintiff sues multiple defendants for treble damages, settles with one or more of them, and then prevails against the remaining defendants, "it is proper to treble the damage award before crediting settlement payments"); *Auwood v. Harry Brandt Booking Office, Inc.,* 850 F.2d 884, 894 (2d Cir. 1988); *New York v. Hendrickson Brothers, Inc.,* 840 F.2d 1065, 1086 (2d Cir. 1988); [*26] *In re Crazy Eddie,* 948 F. Supp. at 1169.

Thus, I recommend awarding Lukaszuk trebled damages against Freeman in the amount of $ 1,350,000.

### E. Punitive Damages

Punitive damages are available where fraud accompanies a breach of contract "evincing a 'high degree of moral turpitude' and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations" and "if the conduct was aimed at the public generally." *Rocanova v. Equitable Life Assur. Soc'y.,* 83 N.Y.2d 603, 613, 634 N.E.2d 940, 612 N.Y.S.2d 339, 342 (1994). I recommend that the Court not award punitive damages against Freeman, as plaintiff has already received treble damages under the RICO statute. To award punitive damages in addition would result in double recovery and, as discussed below, may be disproportionately large and not pass constitutional muster. *See Smith ex rel. Smith v. Islamic Emirate of Afghanistan,* 262 F. Supp. 2d 217, 240 (S.D.N.Y. 2003); *New York Mercantile Exchange v. Verrone,* No. 96 CV 8988(SAS), 1998 U.S. Dist. LEXIS 18098, 1998 WL 811791, at *2 (S.D.N.Y. Nov. 19, 1998).

However, given my recommendation that judgment should be entered against Sudeen's Enterprises

only for common law fraud, plaintiff may be entitled to punitive [*27] damages against it. Here, plaintiff has demonstrated that Sudeen's Enterprises' tortious conduct "was part of a pattern of similar conduct directed at the public generally," for which Sudeen and Freeman were held criminally liable. *Rocanova, 83 N.Y.2d at 613.* In fact, the pattern of fraudulent conduct described by plaintiff, is in the nature of a "'gross and wanton fraud upon the public'" rather than an "'isolated transaction incident to an otherwise legitimate business.'" *See TVT Records v. The Island Def Jam Music Group, 412 F.3d 82, 95 (2d Cir. 2005)* (quoting *Walker v. Sheldon, 10 N.Y.2d 401, 406, 179 N.E.2d 497, 223 N.Y.S.2d 488 (1961)).* Thus, punitive damages are appropriate. *See Wilson v. Car Land Diagnostics Center, Inc., No. 99 CIV. 9570, 2001 U.S. Dist. LEXIS 19760, 2001 WL 1491280, at *4 (S.D.N.Y. Nov. 26, 2001)* (awarding punitive damages against defendant which defaulted on common law fraud claim).

The amount of punitive damages to be awarded lies within the discretion of the court. *See Qualis Care, 1999 U.S. Dist. LEXIS 13417, 1999 WL 683564, at *8; Nardelli v. Stamberg, 44 N.Y.2d 500, 503, 377 N.E.2d 975, 406 N.Y.S.2d 443, 445 (1978).* The Supreme Court has outlined three guideposts to consider in determining punitive damages: (1) the degree of reprehensibility [*28] of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases. *State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003); BMW of North America, Inc. v. Gore, 517 U.S. 559, 575, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996); see also* N.Y. PJI 2:278.

"The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm, 538 U.S. at 418* (quoting *Gore, 517 U.S. at 575);* N.Y. PJI 2:278 ("In considering the amount of punitive damages to award, you should weigh this factor heavily."). Courts should determine the reprehensibility of a defendant's conduct by considering whether: the harm caused was physical rather than economic, the conduct involved repeated actions or was an isolated incident and the harm was the result of intentional malice, trickery, or deceit. *State Farm, 538 U.S. at 418.* Here, Sudeen's Enterprises was engaged in a systematic fraudulent scheme aimed at many investors. Plaintiff claims that he informed the defendants [*29] that he was suffering from a serious brain condition and that their conduct exacerbated his

condition. *See* Lukaszuk Aff. at P 8. Thus, even if the direct consequence of defendants' actions was primarily economic, the defendants' conduct was particularly reprehensible in targeting vulnerable investors such as Lukaszuk.

As to the second guidepost, punitive damages must be "both reasonable and proportionate" to the amount of harm to the plaintiff and the compensatory damages awarded. *See State Farm, 538 U.S. at 426; Gore, 517 U.S. at 580.* Moreover, the court should avoid duplicating components of the compensatory damages award with a punitive damage award. *See State Farm, 538 U.S. at 426.* The Supreme Court has recognized that a punitive damages award of "more than 4 times the amount of compensatory damages" might be "close to the line" of what is constitutionally permissible. *See Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23-24, 111 S. Ct. 1032, 113 L. Ed. 2d 1 (1991).*

As to the third guideline, the court "should 'accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue.'" *Gore, 517 U.S. at 583* (quoting *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 301, 109 S. Ct. 2909, 106 L. Ed. 2d 219 (1989)).* [*30] As discussed above, the RICO statute provides for treble damages for which Sudeen's Enterprises might have been held liable had the allegations in the amended complaint been drafted differently.

After weighing the factors, this Court finds that Sudeen's Enterprises' fraudulent conduct warrants punitive damages and recommends an award of punitive damages in the amount of $ 1,350,000, three times the compensatory damages recommended and equal to the trebled damages recommended against Freeman.

### F. Attorneys' Fees

Under RICO, plaintiff is entitled to recover against Freeman the "costs of the suit, including a reasonable attorneys' fee." *18 U.S.C. § 1964(c); see Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158, 1167 (2d Cir. 1993).* Where a statute provides for the award of attorneys' fees to the prevailing party, the Second Circuit authorizes award of fees based on the "lodestar" or "presumptively reasonable fee" method -- that is, multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. *See Arbor Hill Concerned Citizens Neighborhood Assoc., 493 F.3d 110, 117-18 (2d Cir. 2007); LeBlanc-Stemberg v. Fletcher, 143 F.3d 748, 763-64 (2d Cir. 1998);* [*31] *Luciano v. Olsten Corp., 109 F.3d 111, 115 (2d Cir. 1997).* A party

seeking attorneys' fees bears the burden of supporting its claim of hours expended by accurate, detailed, and contemporaneous time records. *New York State Ass'n for Retarded Children v. Carey*, 711 F.2d 1136, 1147-48 (2d Cir. 1983). Hours that are "excessive, redundant, or otherwise unnecessary" should be excluded. *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983).

Plaintiff seeks to recover attorneys' fees of $ 33,600 for 96 hours of work completed by counsel Garth Molander at the rate of $ 350 per hour. *See* ct. doc. 48. However, plaintiff's attorneys' fee request covers all time spent by Mr. Molander in this action without regard to the fact that time was exclusively spent on the claims of plaintiff Malone and to pursue the claims against defendant Sudeen, who has settled with the plaintiffs, and does not provide any basis for apportioning attorneys' fees among the plaintiffs or defendants in this case.

The allocation of fee liability amongst defendants is a matter committed to the district court's discretion. *Koster v. Perales*, 903 F.2d 131, 139 (2d Cir. 1990); *see Hensley*, 461 U.S. at 437. The district court may allocate [*32] the fee award between the responsible parties "where the claims against the defendants are separate and distinct or where culpability is significantly unequal." *Koster*, 903 F.2d at 139. On the other hand, the court may hold the responsible parties jointly and severally liable for the fee award "where the action or inaction of several defendants produces a single indivisible injury." *Id.* at 140. In deciding apportionment of liability for legal fees among co-defendants, the court "should 'make every effort to achieve the most fair and sensible solution that is possible.'" *Id.*

Several of the time entries refer only to plaintiff Malone. *See* ct. doc. 48 (time entries for 3/15/02, 12/11/02, 1/27/03, 5/22/03, 6/17/03, 6/18/03, 2/9/07, 6/25/07, 7/28/07 and 10/23/07, for a total of 10 hours). I recommend that this time not be assessed as fees incurred by Lukaszuk. As to the remaining time entries, the plaintiffs' claims are so closely related that much of Mr. Molander's time on the case presumably was spent on tasks that benefitted both plaintiffs. Because there is no precise way of apportioning those time entries between plaintiffs, I recommend that the Court approve a one-half allocation of [*33] that time to plaintiff Lukaszuk, notwithstanding the fact he made a much smaller investment. *See Carpenters Local No. 120 Pension Fund v. Calvero Const., Inc.*, No. 96-CV-1767, 1998 U.S. Dist. LEXIS 3470, 1998 WL 135226, at *3 (N.D.N.Y. March 6, 1998).

In addition, some of the time entries are clearly attributable to preparation of plaintiff's case against

defendant Sudeen rather than against defendant Freeman. *See* ct. doc. 48 (time entries for 9/30/05, 10/4/05, 2/15/06, 2/16/06, 2/27/06, 2/28/06, 3/28/06, 11/21/06, 11/22/06, 12/29/06, 3/20/07 and 7/25/07, for a total of 33 hours). That time should not be charged to Freeman. *See Arclightz & Films Pvt. Ltd. v. Video Palace, Inc.*, 303 F. Supp. 2d 356, 364 (S.D.N.Y. 2003) Otherwise, much of the time Molander spent on this litigation involved issues that pertained to all defendants because the issues were interwoven. Since the fraudulent scheme perpetrated by the joint action of defendants produced a single indivisible injury -- loss of plaintiffs' investment principal, it is not unfair to impose joint and several liability upon Freeman for the fee award. I find the remaining time entries reasonable in light of the work completed although I note that Mr. Molander's [*34] use of block billing entries makes it difficult to evaluate the time spent on individual tasks. *Cf. Molefi v. Oppenheimer Trust*, 2007 U.S. Dist. LEXIS 10554, 2007 WL 538547, at *7 (E.D.N.Y. 2007) (applying 15% reduction for block billing and excessive charges); *Aiello v. Town of Brookhaven*, 2005 U.S. Dist. LEXIS 11462, 2005 WL 1397202, at *3 (E.D.N.Y. 2005) (applying 10% reduction for block billing). Thus, I recommend that this Court award fees based on 53 hours of time spent by counsel, excluding time spent in connection with work exclusively devoted to pursuit of claims on behalf of plaintiff Malone or against defendant Sudeen.

Under the presumptively reasonable fee method, the reasonable hourly rates should be based on the rates "'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Cruz v. Local Union No. 3*, 34 F.3d 1148, 1159 (2d Cir. 1994) (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n. 11, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984)). The court should also consider "the rate a paying client would be willing to pay . . . bear[ing] in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Arbor Hill*, 493 F.3d at 117-18. Determination of the prevailing [*35] market rates may be based on evidence presented or a judge's own knowledge of hourly rates charged in the community. *See Chambless v. Masters, Mates & Pilots Pension Plan*, 885 F.2d 1053, 1059 (2d Cir. 1989). The "community" is generally considered the district where the district court sits. *See Arbor Hill*, 493 F.3d at 118. In addition, the Court may consider factors such as the attorney's skill and experience and the novelty of the issues. *See Wells v. Bowen*, 855 F.2d 37, 43 (2d Cir. 1988). In this regard, courts typically recognize that the size and caliber of a firm will influence the determination of appropriate billing rates.

*Chambless,* 885 F.2d at 1059 ("smaller firms may be subject to their own prevailing market rate"); *Pascuiti v. New York Yankees,* 108 F. Supp. 2d 258, 266-67 (S.D.N.Y. 2000) (small firms are subject to a different scale rate than larger firms); *Rodriguez ex rel. Kelly v. McLoughlin,* 84 F. Supp.2d 417, 421-22 (S.D.N.Y. 1999) (citing cases); *Helbrans v. Coombe,* 890 F. Supp. 227, 233 (S.D.N.Y. 1995) (court consideration affected by the size and experience of the firm); *see also Porzig v. Dresdner, Kleinwort, Benson, North America LLC,* 497 F.3d 133, 143 (2d Cir. 2007) [*36] ("courts should not automatically reduce the reasonable hourly rate based solely on an attorney's status as a solo practitioner").

Garth Molander's hourly rate for this case is $ 350.00. *See* ct. doc. 48 at 4. Most fee awards in recent cases in the Eastern District of New York have ranged from $ 200 to $ 275 for partners. *See Lynch v. Town of Southampton,* 492 F. Supp. 2d 197, 212 (E.D.N.Y. 2007); *King v. STL Consulting, LLC,* 05 CV 2719, 2006 U.S. Dist. LEXIS 72116, 2006 WL 3335115, at *7 (E.D.N.Y. Oct. 3, 2006); *Stavitsky v. Bd. of Elections in the City of New York,* 198 F. Supp. 2d 271, 274 (E.D.N.Y. 2002); *Rotella v. Bd. of Educ. of City of New York,* No. CV 01-0434, 2002 U.S. Dist. LEXIS 507, 2002 WL 59106, at *2-*3 (E.D.N.Y. Jan. 11, 2002); *Hiller v. County of Suffolk,* 199 F.R.D. 101, 109 (E.D.N.Y. 2001). Moreover, Molander's rate is above the range approved by courts in this district for solo practitioners. *See Cioffi v. New York Community Bank,* 465 F. Supp. 2d 202, 219 (E.D.N.Y. 2006) (court held that rate of $ 250.00 per hour for a solo practitioner was reasonable); *Louima v. City of New York,* No. 98 Civ. 5083, 2004 U.S. Dist. LEXIS 28886, 2004 WL 2359943, at *8-*9 (E.D.N.Y. Oct. 5, 2004) (awarding fees at a rate of $ 200 per hour for solo practitioner). In addition, [*37] Mr. Molander has not shown that he possesses specialized experience or knowledge related to the claims asserted in this action. Accordingly, I recommend that this Court award fees based on an hourly rate of $ 250.00 for the 47 compensible hours spent performing legal work on the claims against the defaulting defendants. However, the hours spent performing tasks ordinarily performed by a paralegal are not recoverable at counsel rates. *See E-Lead Elec. Co., Ltd. v. Tecnozone Enterps., LLC,* No. 03Civ.4901, 2004 U.S. Dist. LEXIS 19472, 2004 WL 1752604, at *1 (S.D.N.Y. 2004); *Lawson ex. rel. Torres v. City of New York,* No. 99Civ.10393, 2000 U.S. Dist. LEXIS 15709, 2000 WL 1617014, at *2 (S.D.N.Y. Oct. 27, 2000) (award-

ing $ 50 per hour for court filings and copying); *Pascuiti,* 108 F. Supp. 2d at 267 (awarding $ 50 per hour for faxing, filing, photocopying and drafting affidavits of service); *see also Morin v. Nu-Way Plastering, Inc.,* No. CV 03-405, 2005 U.S. Dist. LEXIS 37867, 2005 WL 3470371, at *2 (E.D.N.Y. Dec. 19, 2005) ("The prevailing rate for paralegals is $ 75."). Thus, I recommend awarding fees at a rate of $ 75 per hour for the 6 hours counsel billed for "filing of complaint and giving copies to service" and "mailed by certified mail all defendants Judge Go's order, [*38] filed proof of service with Court." *See* ct. doc. 48 (time entries dated 9/10/02 and 4/22/05).

In sum, I recommend awarding Lukaszuk attorneys' fees against Freeman in the amount of $ 6,100.00 ($ 250 x 47 hours + $ 75 x 6 hours / 2).

*CONCLUSION*

For the foregoing reasons, I recommend awarding plaintiff Lukaszuk judgment against defendants Freeman and Sudeen's Enterprises jointly and severally in the amount of $ 450,000 in compensatory damages, $ 1,350,000 in trebled and punitive damages, respectively, and pre-judgment interest at the rate of 9% in the amount of $ 371,379.52 through December 21, 2007 and at a daily rate of $ 110.96 until the entry of judgment. Further, I recommend awarding Lukaszuk $ 6,100 in attorneys' fees against defendant Freeman. Finally, I recommend that no judgment be granted against defendant Golden Pond.

A copy of this report and recommendation will be filed electronically and sent to defendants by mail. Any objections to this report and recommendation must be filed electronically with the Clerk of this Court, with a copy to the Honorable John Gleeson, by December 21, 2007. Failure to file timely objections may waive the right to appeal the District Court's Order. [*39] *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir. 1989).

SO ORDERED.

Dated: Brooklyn, New York

November 27, 2007

/s/

MARILYN DOLAN GO

UNITED STATES MAGISTRATE JUDGE

LEXSEE

**ROBERTO MARTINEZ TAPIA, MESA INN CORP., a Texas Corporation,
Successor by merger to Palatine Hills, N.V., Plaintiffs-Appellants, -v-
BANQUE INDOSUEZ, INDOSUEZ INTERNATIONAL FINANCE B.V., Ge-
neva Branch, ANA ONETTI, Defendants-Appellees.**

**99-7170**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**1999 U.S. App. LEXIS 29260**

**November 3, 1999, Decided**

**NOTICE:**      [*1]  RULES OF THE SECOND CIR-
CUIT COURT OF APPEALS MAY LIMIT CITA-
TION TO UNPUBLISHED OPINIONS. PLEASE
REFER TO THE RULES OF THE UNITED
STATES COURT OF APPEALS FOR THIS CIR-
CUIT.

**PRIOR HISTORY:**    Appeal from the United States
District Court for the Southern District of New York
(Martin, J.).

**DISPOSITION:**    AFFIRMED.

**COUNSEL:**  Appearing for Plaintiffs-Appellants:
Howard E. Cotton, Rosenman & Colin LLP, New
York, NY.

Appearing for Defendants-Appellees: Richard W.
Reinthaler, Dewey Ballantine LLP, New York, NY.

**JUDGES:** Present: PIERRE N. LEVAL, JOSE A.
CABRANES, ROSEMARY S. POOLER, Circuit
Judges.

**OPINION**

SUMMARY ORDER

ON CONSIDERATION WHEREOF, IT IS
HEREBY ORDERED, ADJUDGED, AND DE-
CREED that the judgment of the District Court be and
it hereby is AFFIRMED.

Plaintiffs Roberto Martinez Tapia (Martinez) and
Mesa Inn Corp., successor by merger to Palatine
Hills, N.V. ("Palatine"), appeal from a judgment of
the United States District Court for the Southern Dis-
trict of New York (John S. Martin, Jr., Judge) that

dismissed their complaint against Banque Indosuez
("BI"), Indosuez International Finance B.V., Geneva
Branch ("IIF") and Ana Onetti for failure to state a
claim.

The significant allegations of the complaint can
be summarized [*2]  as follows. In 1987, Martinez, a
Mexican business man who speaks only Spanish, met
Onetti, a native of Costa Rica and Spanish speaker
then employed by Chase Manhattan. Onetti frequently
tried to persuade Martinez, who previously had made
only conservative investments, to take risks in order
to realize a higher rate of return. Martinez generally
rejected her advice, explaining that he would accept a
lower rate of return to achieve his goal of safe in-
vestments with maximum liquidity. On the two occa-
sions that Martinez accepted Onetti's advice during
her employment at Chase Manhattan, the investments
turned out poorly.

Between 1992 and the spring of 1993, Onetti
worked for another company and again attempted to
persuade Martinez to make investments through her.
Martinez again declined.

In May or June 1993, Onetti informed Martinez
that she was currently working for BI. Onetti, who
always spoke with and wrote to Martinez in Spanish,
claimed that BI and IIF, BI's wholly owned subsidi-
ary, could offer Martinez an opportunity to realize a
greater return without increasing his risk by leverag-
ing his purchase of Mexican bonds with loans from
BI. Onetti claimed that (1) Martinez would get [*3]
the benefit of any appreciation in the bonds, (2) BI
would bear the risk of depreciation, and (3) BI would
require no collateral other than the bonds. While em-
ployed by BI, Onetti also had a social relationship
with the Martinez family and was invited to many
family gatherings.

On August 19, 1993, Onetti traveled to Mexico with a letter agreement to be signed by Martinez on behalf of Palatine. This agreement, unlike prior correspondence, was in English and contradicted Onetti's prior assurance that BI would bear the risk of a decrease in the price of the bonds. Onetti promised Martinez that she would supply a written Spanish translation of this document and of subsequent more specific bond sales documents faxed to Palatine on August 25, 1993, but she did not and instead gave him an inaccurate oral translation of the letter agreement that left out the portion dealing with risk. Martinez claims that he signed the documents because Onetti pressured him and he justifiably relied on her oral Spanish translation. The letter agreement that Martinez signed does not bear a date, but the bond sales agreements were signed on September 8, 1993. Martinez later purchased more bonds under similar [*4] circumstances and also agreed to "roll over" bonds on their settlement dates. Still later the value of the bonds fell, and BI asked for a partial payment on its loan to Martinez due to the reduced collateral. Because Martinez refused BI's demands, defendants ultimately liquidated most of his bonds, causing Martinez to lose millions of dollars.

Martinez brought suit against BI, IIF, and Onetti in the United States District Court for the Southern District of New York. The lengthy complaint contains claims for RICO violations, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty, and breach of the implied obligation of good faith and fair dealing. Defendants moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Characterizing Martinez as a "sophisticated businessman," the district court granted defendants' motion, finding that "the complaint does not plead a fraud claim, the predicate for the RICO claims, or a breach of any other duty owed by the defendants to the plaintiffs" because Martinez signed written agreements that contradicted the alleged oral misrepresentations. The court also noted that "even [*5] if . . . Martinez were much less sophisticated, he could not establish that he justifiably relied on statements that were directly contradicted by documents he signed."

We agree that Martinez' claims are barred by the documents that he signed, which authorized all of the actions that the defendants took. A party to a written contract generally cannot avoid its terms by claiming inconsistent oral representations. See Pimpinello v. Swift & Co., Inc., 253 N.Y. 159, 162, 170 N.E. 530 (1930). Reliance on the oral representations is not justified because "if the signer could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent." Id. at 162-63. There is a limited exception to this general principle where the signer can establish that (1) he "is illiterate, or blind, or ignorant of the alien language of the writing;" (2) someone misrepresented the contents of the writing to him; and (3) he is not negligent. Id. at 163. However, where the contract involves a substantial sum and no emergency prevents access to a competent translator, an individual who does not seek an [*6] independent translator is negligent even if a representative of the other contracting party gives an inaccurate oral translation that omits the crucial term and fails to supply a written translation on request. See Gaskin v. Stumm Handel GmbH, 390 F. Supp. 361, 365-67 (S.D.N.Y. 1975). Martinez did not allege an emergency and in fact did not sign some of the documents necessary for his first bond transaction with defendants until almost three weeks after his meeting with Onetti. Moreover, his complaint alleges that several million dollars were at stake in these transactions. Thus, Martinez cannot establish that he was not negligent and cannot benefit from the Pimpinello exception.

Because the allegations of the complaint and the annexed documents demonstrate that Martinez cannot prevail on his claims, we need not consider Martinez' argument that the district court erred by finding that he was a sophisticated investor. As the district court noted, Martinez' claims fail even if he is an unsophisticated investor.

We have considered the balance of Martinez' claims and found that they lack merit.

LEXSEE

**DARYL K. WASHINGTON, and SUNDAY PLAYERS, INC., Plaintiffs, - against - KELLWOOD COMPANY, Defendant.**

**05 Civ. 10034 (DAB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2009 U.S. Dist. LEXIS 32565**

**March 24, 2009, Decided**
**March 24, 2009, Filed**

**COUNSEL:** [*1] For Daryl K. Washington, Sunday Players, Inc., Plaintiffs: Aubrey Nick Pittman, LEAD ATTORNEY, The Pittman Law Firm, P. C., Dallas, TX; David Avi Rosenfeld, Joseph Frank Russello, LEAD ATTORNEYS, Coughlin Stoia Geller Rudman & Robbins, LLP (LI), Melville, NY.

For Kellwood Company, Defendant: Anthony Nicholas Elia, III, Silverberg Stonehill & Goldsmith, P.C., New York, NY; Kenneth Roy Schachter, Kenneth R. Schachter, Esq., New York, NY.

**JUDGES:** DEBORAH A. BATTS, United States District Judge.

**OPINION BY:** DEBORAH A. BATTS

**OPINION**

MEMORANDMUM & ORDER

DEBORAH A. BATTS, United States District Judge.

Plaintiffs Daryl K. Washington and Sunday Players, Inc. (collectively "Plaintiffs") bring this action against Defendant Kellwood Company ("Defendant"). Plaintiffs allege that Defendant acted unlawfully by failing to use best, or even reasonable, efforts to make profitable Plaintiffs' licensed marks for compression sports apparel and accessories. [1]

> 1    Compression garments are made with stretchable fabrics and are worn skin-tight." (Dorf Affidavit P 4.)

Specifically, in their Amended Complaint, Plaintiffs bring nine causes of action against Defendant. Count One is a breach of contract claim, with respect to a License Agreement. Count [*2] Two is a breach of contract claim, with respect to an alleged Sales and Marketing Agreement. Count Three claims fraud. Count Four alleges breach of the duties of good faith and fair dealing. Count Five alleges unfair trade practices and unfair competition. Count Six asserts a promissory-estoppel claim. Count Seven avers unjust enrichment. Count Eight seeks exemplary damages. Count Nine seeks attorney's fees.

Now before the Court is Defendant's Motion to Dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). Defendant moves to dismiss Counts Three (fraud), Four (breach of duty of good faith and fair dealing), Five (unfair trade practice and unfair competition), Six (promissory estoppel), Seven (unjust enrichment), Eight (exemplary damages) and Nine (attorneys' fees). Defendant argues these claims should be dismissed because they are either merely duplicative of Plaintiff's breach of contract claims, or because they are insufficiently supported by the allegations made in the Amended Complaint.

For the reasons contained herein Defendant's Motion to Dismiss shall be GRANTED.

I. Background

In 2002, Plaintiff Washington developed several licensed marks for a "Sunday Players" brand [*3] to be used for compression athletic apparel and accessories. (Am. Compl. P 7.) Plaintiffs owned right, title, and interest in these licensed marks. (Id.) Plaintiffs sought out major manufacturing and marketing companies who could exploit the market available for this type of apparel. (Am. Compl. P 8.)

Around June 2002, two of Defendant's authorized agents/representatives, Rick Peterson ("Peterson") and Greg Dorf ("Dorf"), traveled to Dallas, Texas to

meet with Plaintiffs. Peterson, Dorf, and Plaintiffs discussed the prospect of Defendant manufacturing products with Plaintiffs' licensed marks. (Am. Compl. P 9.) Dorf and Peterson represented to Plaintiffs that Defendant believed the Sunday-Players brand would be very successful. (Am. Compl. P 10.) Defendant also told Plaintiffs that Defendant "had significant experience in marketing and selling apparel and that it had substantial and unlimited relationships with 'major retailers' which would enable Plaintiffs' products to achieve hundreds of millions annually in sales." (Am. Compl. P 11.)

In approximately July 2003, to prove its contacts in the retail industry, Defendant introduced Plaintiffs to retail representatives, each of whom expressed [*4] interest in Plaintiffs' products. (Am. Compl. P 12.) On or around September 5, 2003, Defendant told Plaintiffs that a popular cable television station, MTV, wanted to partner with Sunday Players to promote the brand. (Am. Compl. P 14.) Defendant told Plaintiffs that this promotion would lead to hundreds of millions of dollars in product sales. (Id.) Around the same time, Defendant also represented to Plaintiffs that initial orders with major retailers, including Target and Footlocker, would exceed $ 10 million, and that larger sales with these and other retailers would ensue. (Am. Compl. P 15.) On or around November 25, 2003, in reliance on these representations, Plaintiffs entered into a license agreement ("the License Agreement") with Defendant. [2] (Am. Compl. P 16.)

> 2   The License Agreement provides Defendant with the exclusive license in the territory to produce, manufacture, advertise, promote, import, distribute, and sell the licensed products. (License Agreement § 1.1.) The contract sets forth rights and restrictions regarding Defendant's use of this license. For example, under the License Agreement, Defendant is required to pay Plaintiffs a royalty fee based on the sales of the [*5] licensed products. (License Agreement § 6.1.) The License Agreement also obligates Defendant to make marketing expenditures on the licensed products equal to three percent of their net sales. (License Agreement § 9.1; Schedule A to License Agreement, Item 10.) The License Agreement further requires the Defendant to keep all information, sketches, and design concepts it receives from Plaintiffs confidential, during and after the term of the contract. (License Agreement § 10.1.) "Nothing [in the License Agreement] and no acts or assistance given or rendered by Licensor or Licensee shall be construed to constitute Licensor or Licensee as partners, joint venturers, agents or employees of each other." (License Agreement § 11.1") In recognition of the fact that Defendant would be investing a substantial amount of capital in the venture, the License Agreement also offered Defendant every reasonable opportunity to continue the license past the contract's expiration, as long as Defendant used "best efforts" to comply with the License Agreement. (License Agreement § 11.1.)

At some point between January and July 2004, Defendant flew to Dallas to meet with four "Sales Groups." (Am. Compl. PP 20, [*6] 25.) These groups were previously retained by Plaintiffs to help with sales of products bearing their marks. (Am. Compl. P 21.) In this meeting, Defendant asked to have direct control over everything related to sales, including control over the Sales Groups. (Am. Compl. PP 22-23.) After several meetings, Defendant made oral and written representations and agreements under which Defendant assumed control of Plaintiffs' sales and marketing activities. (Am. Compl. P 24.) Around July 28, 2004, Peterson acknowledged via e mail that Plaintiffs and Defendant entered an agreement ("Sales and Marketing Agreement"). (Am. Compl. P 25.) Under the Sales and Marketing Agreement, Defendant appropriated the daily operation of sales, marketing, distribution, and customer service for Sunday Players. (Am. Compl. P 25.) In written and oral agreements, Defendant informed Plaintiffs it would: (a) spend additional marketing funds on Sunday Players products, (b) finance the Sales Groups' efforts to sell Sunday-Players products; (c) supply additional products for endorsement deals; and, (d) allow Sunday Players sales representatives to accompany Defendant on retailer visits. (Am. Compl. P 26.)

Around the first [*7] quarter of 2005, Defendant terminated agreements relating to the Sales Groups. (Am. Compl. P 27.) Around April 2005, Defendant terminated all remaining agreements with Plaintiffs. (Am. Compl. P 28.) Plaintiff believes that Defendant manufactured and marketed its own line of compression athletic apparel to retailers, in spite of its obligations to market Plaintiffs' products to the same retailers. (Am. Compl. P 29.)

## II. DISCUSSION

### A. Legal Standards

For a complaint to survive dismissal under Rule 12(b)(6), the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct.

1955, 1974, 167 L. Ed. 2d 929 (2007). In other words, a plaintiff must satisfy "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir.2007). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 127 S.Ct. at 1964-65 (internal quotation [*8] marks omitted). Further, in deciding a motion to dismiss, the court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." Roth v. Jennings, 489 F.3d 499, 510 (2d Cir.2007) (citation omitted). However, "general, conclusory allegations need not be credited ... when they are belied by more specific allegations of the complaint." Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany, No. 05 Civ. 10669, 2007 U.S. Dist. LEXIS 71906, 2007 WL 2822214, at *7 (S.D.N.Y.2007).

B. Fraud

To state a claim for fraud or fraudulent concealment under New York law, a plaintiff must show: (1) that defendant knowingly made a material misrepresentation or failed to disclose material information that he had a duty to disclose; (2) that defendant intended to defraud the plaintiff thereby; (3) that plaintiff reasonably relied upon the misrepresentation or omission; and (4) that plaintiff suffered damage as a result of such reliance. See Crigger v. Fahnestock and Co., Inc., 443 F.3d 230, 234 (2d Cir. 2006); Century Pacific, Inc. v. Hilton Hotels Corp., 528 F.Supp.2d 206, 232 (S.D.N.Y. 2007).

Defendant [*9] asserts four different grounds for dismissal of Plaintiffs' fraud claim. (Def. Mem. Law at 6.) First, Defendant maintains that Plaintiffs' fraud claim is merely duplicative of Counts One and Two, Plaintiffs' breach of contract claims. (Def. Mem. Law at 6-9.) Second, Defendant argues that dismissal is proper because Plaintiffs' Amended Complaint fails to plead a necessary element of a fraud claim, the misrepresentation of a material fact. (Def. Mem. Law at 9-12.) Third, Defendant argues that Plaintiffs fail to allege fraud with the particularity required under Fed. R. Civ. P. 9(b). (Def. Mem. Law at 15-16.) Finally, Defendant contends that Plaintiffs' fraud claim should be dismissed with respect to the concealment allegations because it was under no duty to disclose. As a result, Defendant contends that any alleged concealment of the fact that it manufactured and marketed compression athletic gear, even while under agree-

ment with Plaintiffs, does not amount to a cause of action for fraud. (Def. Mem. Law at 13-15.)

Plaintiffs respond that their fraud claim is distinct from their breach of contract claims. Plaintiffs argue that they were fraudulently induced to enter into the License Agreement [*10] and, moreover, that subsequent misrepresentations and concealed facts compelled them to enter into additional agreements with Defendants, including the Sales and Marketing Agreement. (Pls. Opp. Mem. at 6-11.) Plaintiffs also maintain that they have pleaded all necessary elements of a fraud claim, including the misrepresentation of multiple material facts, with the particularity required by Fed. R. Civ. P. 9(b). (Pls. Opp. Mem. at 5, 6, 15-17.) Furthermore, Plaintiffs contend that Defendant's concealment of its own compression wear dealing is properly pleaded as a fraud claim. Plaintiffs argue that Defendants had a duty to disclose such information, and that such information would have dissuaded them from entering into the License and Sales and Marketing Agreements. (Pls. Opp. Mem. at 11-15.)

It is well settled that no action for fraud stands when the only fraud charged relates to breach of a contract. Stewart v. Jackson & Nash, 976 F.2d 86, 88 (2d Cir. 1992) (citing 60 N.Y.JUR.2d Fraud & Deceit § 19 (1987)). However, when a plaintiff is induced to enter into a contract by false representations, or by omissions, fraud lies in the inducement; it is thus separate from the breach of contract [*11] claim. Id. at 88-89 (citing 60 N.Y.JUR.2d Fraud & Deceit § 206 (1987)). Plaintiffs allege that they would not have entered into agreements with Defendant if they were aware of information they accuse Defendant of either misrepresenting or omitting. (Am. Compl. P 41.) Hence, the fact that Plaintiffs' Amended Complaint is partly based on breach of contract claims does not necessarily bar a cause of action for fraud. In addition, "if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of material existing fact" upon which an action based on fraudulent inducement may be asserted. Stewart, 976 F.2d at 88-89 (citing Sabo v. Delman, 3 N.Y.2d 155, 156, 143 N.E.2d 906, 164 N.Y.S.2d 714 (1957) (emphasis removed)).

In their Memorandum of Law, Plaintiffs for the first time allege that "Kellwood made misstatements of material fact and promises with present, albeit undisclosed, intent not to perform them." (Def. Mem. Of Law at 8.) However, "[i]n considering a motion to dismiss for failure to state a claim, a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits and documents incorporated [*12] by reference in the

complaint." Field Day, LLC v. County of Suffolk, 463 F.3d 167 (2d Cir. 2006) (citing Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)). Therefore, the Court does not consider Plaintiffs' allegations of Defendant's intention not to perform set out in their Memorandum of Law.

Defendant also moves, however, to dismiss Plaintiffs' fraud claim on the grounds that it does not properly plead the misrepresentation of an existing material fact. (Def. Mem. of Law at 9-10.)

The Second Circuit clearly distinguishes promissory statements regarding future conduct, which cannot substantiate liability beyond a breach of contract claim, from misrepresentations of present fact, which can give rise to a separate claim of fraudulent inducement. Stewart, 976 F.2d at 89 (citing Deerfield Commc'ns. v. Chesebrough-Pond's, 68 N.Y.2d 954, 956, 502 N.E.2d 1003, 510 N.Y.S.2d 88 (1986))(internal citations omitted)). In Stewart, a law firm represented to a prospective employee that it recently secured an environmental law client and that it was in the process of creating an environmental law department. These representations were found to be representations of present fact and actionable under a theory of fraudulent [*13] inducement. Stewart, 976 F.2d at 89.

In their Amended Complaint, Plaintiffs allege that Defendant made seven fraudulent representations or omissions: (1) that initial orders with Target and Foot Locker would exceed $ 10,000,000.00; (2) that there would be much larger sales to these and other retailers following that initial order; (3) that MTV wanted to partner with Sunday Players and Defendant would negotiate a multi-million dollar deal with MTV; (4) that Plaintiffs' representatives would be allowed to accompany Defendant's representatives on visits with retailers; (5) that Defendant would invest a substantial amount of capital in the sale of Plaintiffs' mark; and (6) that Defendant concealed its own dealings in compression athletic wear with the same retailers to whom Defendant was supposed to market Sunday Players. (Am. Compl. P 41.) Finally, Plaintiffs' allege that "after other agreements were entered into between Kellwood and Plaintiffs, Kellwood repeatedly misrepresented and/or concealed existing facts." Id.

Defendant is correct that most of Plaintiffs' allegations involve promissory statements regarding future conduct and occurrences, rather than misrepresentations of present [*14] fact. Nevertheless, representation (6) alleges a present fact misrepresentation that may give rise to a fraudulent inducement claim separate from a claim for breach of contract. However, in order to plead a claim for fraudulent conceal-

ment under New York law a defendant must have had a duty to disclose the omitted information to the plaintiff. Century Pacific, Inc, 528 F.Supp.2d at 232. During a business transaction such a duty "arises in three situations: (1) where a party has made a partial or ambiguous statement, as a party 'cannot give only half of the truth;' (2) where a party has a fiduciary duty to another; or (3) where a party has superior knowledge that is not available to the other party and the party with superior knowledge knows that the other party is acting on the basis of mistaken knowledge." Id. (internal citations omitted) (citing Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)).

Taking Plaintiffs' allegations as true, Defendant was aware that it was providing its own compression products to the same retailers it had promised to have sell Plaintiffs' products. (Am. Compl. PP 29, 41.) Meanwhile, allegedly Plaintiffs were not aware of the fact Defendant [*15] sold its own or other compression products through those retailers. (Id.) However, because Plaintiffs have not alleged that Defendant knew or must have known that it was unaware of this fact, Plaintiffs have not sufficiently pled a duty to disclose. See Brass, 987 F.2d at 151-52 (finding that plaintiff had adequately pleaded a duty to disclose where defendant had superior knowledge of undisclosed information and plaintiff alleged that defendant "surely knew" that if plaintiff were told the information, he would never have agreed to the deal).

Furthermore, Fed. R. Civ. P. 9(b) requires that allegations of fraud "be stated with particularity." Acito v. Imcera Group, Inc., 47 F.3d 47, 51 (2d Cir. 1995). The demands of particularity require that, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Id. (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)). To satisfy the particularity requirements of Rule 9(b), "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." [*16] Acito, 47 F.3d at 52. "The requisite strong inference may be drawn either (a) by alleging facts to show defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Id. (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)).

Plaintiffs conclusory generalizations repeatedly fail to satisfy any of the elements of particularity in pleading their fraud claim.

Accordingly, Defendant's Motion to Dismiss Plaintiffs' fraud claim is hereby GRANTED.

Rule 15(a) of the Federal Rules of Civil Procedure requires that courts freely grant leave to amend "when justice so requires." Fed. R. Civ. P. 15 (a). " [I]t is the usual practice upon granting a motion to dismiss to allow leave to replead." Cohen v. Citibank, 1997 U.S. Dist. LEXIS 2112, 1997 WL 88378 at *2 (S.D.N.Y. 1997). Absent a showing of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or the futility of the amendment, a plaintiff should be granted leave to replead. See Protter v. Nathan's Famous Sys., Inc., 904 F.Supp. 101, 111 (E.D.N.Y. 1995) (citing Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962) ).

Because [*17] the conclusory language Plaintiffs use to describe some of Defendant's alleged misstatements or omissions may conceal what are actually allegations of misrepresentations of present fact, and because Plaintiffs may be able to replead their allegations with sufficient particularity to satisfy Rule 9(b), Plaintiffs claim for fraud is DISMISSED without prejudice. Plaintiffs are given leave to replead their fraud in the inducement claims to the extent they allege a misstatement or omission of present fact or intention not to perform, with the requisite particularity to satisfy Rule 9(b). Any allegations of fraudulent concealment based on a duty to disclose arising from Defendant's superior knowledge should include allegations of Defendant's awareness of Plaintiffs' ignorance as to the omitted facts.

## C. Breach of Duties of Good Faith and Fair Dealing

Defendant moves to dismiss Count Four on the grounds that breach of good faith and fair dealing is subsumed by Plaintiffs' breach of contract claims. (Def. Mem. Law at 17.) Defendant argues that since Plaintiffs assert contractual claims, they cannot now make identical claims in quasi-contract. (Def. Rep. Mem. at 8-9.)

"The elements of a claim [*18] for breach of the duty of good faith and fair dealing are practically identical to the elements of a negligence claim:" (1) defendant must owe plaintiff a duty to act in good faith and conduct fair dealing; (2) defendant must breach that duty; and (3) the breach of duty must proximately cause plaintiff's damages. Boyd v. University of Illinois, 2001 U.S. Dist. LEXIS 2515, 2001 WL 246402, *10 (S.D.N.Y. 2001). Furthermore, although "New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when it is based on the same facts as the breach of contract claim," Goldblatt

v. Englander Communications, LLC, 2007 U.S. Dist. LEXIS 4278, 2007 WL 148699, *5 (S.D.N.Y. 2007); see also, Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 80 (2d Cir. 2002), where a plaintiff establishes a legal duty separate and apart from contractual duties, such a claim is viable despite the existence of an express contract. See Goldblatt, 2007 U.S. Dist. LEXIS 4278, 2007 WL at *5 ("a claim for breach of the implied covenant of good faith can survive a motion to dismiss 'only if it is based on allegations different from those underlying the accompanying breach of contract claim.'" quoting, Siradas v. Chase Lincoln First Bank, N.A., 1999 U.S. Dist. LEXIS 15593, 1999 WL 787658 at *6 (S.D.N.Y. 1999)); [*19] see also Bullmore v. Banc of America Securities LLC, 485 F. Supp. 2d 464, 2007 WL 1225549, *5 (S.D.N.Y. 2007).

Plaintiffs argue that the factual basis for their breach of good faith and fair dealing claim is distinct from that underlying the breach of contract claims. (Pl. Mem. Law at 19.) However, Plaintiffs' Amended Complaint merely states that, "[Defendant's] breach of the terms of each agreement referenced above and its refusal to use its best efforts, or even reasonable efforts, to generate profits for Plaintiffs' products is a breach of the covenant of good faith and fair dealing." (Am. Compl. P 45.)

First, a claim for good faith and fair dealing based on the "breach of the terms of each agreement" is necessarily duplicative of a breach of contract claim. Moreover, Plaintiffs themselves allege that Defendant's obligation to use best or reasonable efforts to generate profits for Plaintiffs is an obligation created by the License Agreement. (See Am. Compl. P 32 (a)) (". . . Defendant materially breached the License Agreement . . . [by] failing to use its best, or even reasonable, efforts to generate profits under the agreement"). Based on Plaintiffs' pleadings, the Court can find no factual predicate [*20] which imposes a legal duty to act in good faith and conduct fair dealing other than those arising from express contractual terms. [3]

As a result, Defendant's Motion to Dismiss Plaintiffs' claim for breach of good faith and fair dealing is GRANTED.

Because Plaintiffs' claim for breach of the duties of good faith and fair dealing relies entirely on the same obligations it alleges were breached in its contract claims, it would be futile to provide Plaintiffs leave to replead. See Camp Summit of Summitville, Inc. v. Visinski, 2007 U.S. Dist. LEXIS 28496, 2007 WL 1152894 (S.D.N.Y. 2007) (dismissing claim for breach of implied covenant of good faith and fair dealing with prejudice where claim "was merely du-

plicative of [plaintiff's] claim for breach of contract"). Accordingly, Plaintiffs' claim for breach of the duties of good faith and fair dealing is DISMISSED with prejudice.

> 3  Plaintiffs Memorandum of Law points the Court to six additional allegations made in their Amended Complaint which, in their view, substantiate a claim for breach of good faith and fair dealing which is distinct from their claim for breach of contract. (Pl. Mem. Law at 19, (citing Am. Compl. PP 25, 26, 36, 41, 45, 50, 51.)) Paragraphs 25, 26, and [*21] 36 each explicitly discuss breach of contractual terms. Paragraph 41 relates to alleged fraudulent representations and omissions that have been dismissed by the Court. Paragraph 46 is merely conclusory and refers ambiguously to Defendant's conduct and omissions. Paragraphs 50 and 51 allege use and misappropriation of confidential information. However, although misappropriation of confidential information may give rise to a breach of the duties of good faith and fair dealing, this cannot be the case where, as here, the misappropriation of confidential information is already barred by an express contractual term. See Konecranes v. Cranetech, Inc., 2005 U.S. Dist. LEXIS 3887, 2005 WL 246916, *3 (W.D.N.Y). Here, the License Agreement forbids both the use and disclosure of confidential information. (License Agreement § 10.1.) None of these allegations offer a factual ground for a breach of the duties of good faith and fair dealing claim that diverge from the factual basis for Plaintiffs breach of contract claims.

D. Unfair Trade Practices and Unfair Competition

Defendant also moves to dismiss Count Five, which alleges both statutory Unfair Trade Practices and common law Unfair Competition based upon Defendant's misappropriation [*22] and exploitation of confidential information. Defendant contends that this claim must be dismissed because it is duplicative of Plaintiffs' breach of contract claims. (Def. Mem. Law at 17.) Defendant also contends that Count Five is defective because Plaintiffs' Amended Complaint fails to allege precisely what confidential information Defendant misappropriated. (Def. Mem. Law at 17-18.)

New York courts recognize an "incalculable variety" of illegal practices which fall within the scope of common law unfair competition. Roy Exp. Co. Est. of Vaduz, Liech., et al. v. Columbia Broad. Sys., Inc.,

672 F.2d 1095, 1105 (2d Cir. 1982) (citing Ronson Art Metal Works, Inc. v. Gibson Lighter Mfg. Co., 3 A.D.2d 227, 159 N.Y.S.2d 606, 609 (1957)). Unfair competition involves the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property." Roy Exp. Co. Est. of Vaduz, Liech., et al., 672 F.3d at 1105. Under New York common law, unfair competition requires allegations of: (1) acts or omissions by defendants that proximately caused a misappropriation; and (2) the property or benefit misappropriated. Volvo North America Co. v. Men's Intn'l Professional Tennis Council, 857 F.2d 55, 75 (2d Cir. 1988) [*23] (citations omitted). Central to a viable claim for unfair competition is some element of bad faith. Saratoga v. Vichy Springs, 625 F.2d 1037, 1044 (2d Cir. 1980).

Plaintiffs' basis for a claim of common law unfair competition is that Defendant misappropriated confidential information for the purpose of marketing and selling its own products. (Pl. Mem. of Law at 21.) However, like their claim for breach of the duty of good faith and fair dealing, Plaintiffs' unfair competition claim is merely duplicative of their breach of contract claims. See Orange County Choppers, Inc. v. Olaes Enterprises, Inc., 497 F.Supp.2d 541, 558 (S.D.N.Y. 2007) ("It is well-settled, however, that no claim [for unfair competition] lies where its underlying allegations are merely a restatement, albeit in slightly different language, of the implied contractual obligations asserted in the cause of action for breach of contract.") (internal citations omitted).

Plaintiffs argue that there is a material difference between disclosure of confidential information and misappropriation of confidential information, and that a confidentiality clause barring disclosure does not preclude a separate claim for unfair competition [*24] based on misappropriation. (Pl. Mem. of Law at 21.) However, as discussed, supra at note 2, the License Agreement in this case includes an express bar on both the use and disclosure of confidential information. (License Agreement § 10.1.) ("Licensee . . . agrees that, both during the term of the Agreement and after the termination thereof, it shall not use or disclose [business and operations of Licensor which it learns or has learned].").

Furthermore, Defendant submits that Plaintiffs' statutory unfair trade practices claim must also be dismissed because, under the New York's statutory scheme, a claim for unfair trade practice requires consumer injury or harm to the public interest. (Def. Rep. Mem. at 9.) Defendant argues that Plaintiffs have failed to allege conduct constituting consumer injury or harm to the public interest. (Id.)

Unlike common law unfair competition, unfair or deceptive trade practice is governed by N.Y. GEN. BUS. LAW § 349. To adequately plead a claim for deceptive acts and practices under N.Y. Gen. Bus. Law. § 349, "the gravamen of the complaint must be consumer injury or harm to the public interest" and such harm must raise "significant ramifications for the public [*25] at large." Gucci America, Inc. v. Duty Free Apparel, Ltd., 277 F.Supp.2d 269, 273 (S.D.N.Y. 2003). General allegations of consumer confusion, or claims in which allegations of injury to the plaintiff's business "far outweigh [] any incidental harm to the public at large" will not survive a motion to dismiss. Id. at 273-74 (internal quotations omitted); see also Northwestern Mut. Life Ins. Co. V. Wender, 940 F.Supp. 62, 65 (S.D.N.Y. 1996) (dismissing § 349 claims where "there are no specific allegations of an impact on consumers at large . . .").

Plaintiffs fail to identify how any particular act alleged in their Amended Complaint was misleading or harmful to the public or consumers at large. Instead, Plaintiffs allegations center on a contractual dispute between private parties, and thus cannot meet the requirements of N.Y. GEN. Bus. LAW § 349.

Accordingly, Defendant's Motion to Dismiss Plaintiffs' claim for unfair competition and unfair trade practices is GRANTED.

Because Plaintiffs' unfair competition claim is based entirely on alleged conduct that is proscribed by the express terms of the contract, and because Plaintiffs' Complaint provides no indication whatsoever of harm to the public [*26] or consumers arising from Defendant's alleged conduct, it would be futile to provide Plaintiffs leave to replead this cause of action. See Orange County Choppers, 497 F.Supp.2d at 562 (dismissing the plaintiff's unfair competition claim with prejudice where it was duplicative of the plaintiff's breach of contract claim). Accordingly, Plaintiffs' claim for unfair trade practices is DISMISSED with prejudice.

E. Promissory Estoppel

Defendant moves to dismiss Count Six as duplicative of Plaintiffs' breach of contract claims. (Def. Mem. Law at 18.) Defendant claims that the merger clause in section 13.4 of the License Agreement prevents Plaintiff from making any claim based on promissory estoppel. (Id.) Defendant argues that any complete and integrated agreement, such as the License Agreement entered into by the parties, precludes any reasonable reliance on promises outside the agreement. (Def. Mem. Law at 19.)

In New York, a cause of action for promissory estoppel requires the plaintiff to prove: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on that promise; and (3) injury to the relying party as a result of reliance. Kaye v. Grossman, 202 F.3d 611, 615 (2d Cir. 2000). [*27] Generally, promissory estoppel applies only "where there is no written contract, or where the parties' written contract is unenforceable for some reason." DDCLAB Ltd. v. E.I Du Pont De Nemours & Co., 2005 U.S. Dist. LEXIS 2721, 2005 WL 425495 at *1 (S.D.N.Y 2005)(citations omitted). "[A]pplying promissory estoppel to create contractual obligations where a comprehensive contract exists would contravene the fundamental rules that extrinsic evidence cannot be used to vary the unambiguous terms of a contract, . . . and that obligations inconsistent with the terms of a contract cannot be implied." 2005 U.S. Dist. LEXIS 2721, [WL] at 18 (citations omitted).

However, the existence of a written contract does not automatically foreclose all promissory estoppel claims. Moreover, the existence of a merger clause in an agreement does not eliminate the possibility of reliance. In considering a case where parties shared a loan agreement but there was an alleged subsequent promise regarding remediation services, this District decided, "While [a merger clause] may preclude Defendants' from claiming they reasonably relied upon promises prior to the Loan Agreement, it does not preclude Defendants from claiming they reasonably relied upon promises made after [*28] the Loan Agreement." National Oil Well Maintenance Co. v. Fortune Oil & Gas, Inc., 2004 U.S. Dist. LEXIS 16765, 2004 WL 1886293, *8 (S.D.N.Y., 2004) (emphasis in original); see also, Urban Holding Corp. v. Haberman, 162 A.D.2d 230, 556 N.Y.S.2d 337, 339 (N.Y.A.D. 1990) (holding that where a merger clause is of a very general nature it does not vitiate a promissory estoppel claim); HealthNow New York, Inc. v. APS Healthcare Bethesda, Inc., 2006 U.S. Dist. LEXIS 13148, 2006 WL 659518, *8 (N.D.N.Y. 2006) (a general integration clause does not bar a promissory estoppel claim where the alleged promises are not contradictory to the clause or terms of the agreement).

In this case, the parties have a written License Agreement. Defendant also alleges that the parties entered into a Sales and Marketing Agreement. Yet, Plaintiffs aver, in the alternative, a claim for promissory estoppel. Because Plaintiffs have not alleged that the License Agreement and Sales and Marketing Agreement are unenforceable contracts, a claim for promissory estoppel cannot lie for promises made before entering into those contracts. If Defendant made promises subsequent to either of these contracts, then there would remain material issues of fact as to whether Defendant's promises were clear [*29] and unambiguous, whether Plaintiffs reasonably relied

upon them, and whether that reliance resulted in unconscionable injury. Yet Plaintiffs provide only vague summaries of these "clear and unambiguous" promises, and more importantly, do not state that they were made after the formation of the Agreements. (Am. Compl. PP 53-56.)

Accordingly, Defendant's motion to dismiss Plaintiffs' promissory estoppel claim is GRANTED. However, because of the vagueness of Plaintiffs' allegations regarding Defendant's promises, they may still be able to adequately plead the existence of particular promises that were made by Defendant after the formation of the Agreements. Hence, the Court grants Plaintiffs leave to replead their claim for promissory estoppel. Plaintiffs' claim for promissory estoppel is hereby DISMISSED without prejudice.

F. Unjust Enrichment

Defendant seeks to dismiss Plaintiffs' Count Seven, a claim for unjust enrichment, as again duplicative of Plaintiffs' breach of contract claims. (Def. Mem. Law at 20.)

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience" [*30] require restitution." Kaye, 202 F.3d at 616. "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." Banco Espirito Santo de Investimento, S.A., 2003 U.S. Dist. LEXIS at *52 (quoting U.S. E. Telecomms. v. U.S. W. Communs. Servs., 38 F.3d 1289, 1296 (2d Cir. 1994)).

Nevertheless, Federal Rule of Civil Procedure 8(e)(2) sets forth lenient provisions for alternative pleadings. In pertinent part, Rule 8(e)(2) states: "A party may set forth two or more statements of a claim . . . alternately or hypothetically, either in one count . . . or in separate counts. . . . A party may also state as many separate claims . . . as the party has regardless of consistency. . . ." See Knudsen v. Quebecor Printing (U.S.A.) Inc., 792 F.Supp. 234, 237 (S.D.N.Y. 1992). This Circuit construes the language of Rule 8(e)(2) to, "permit plaintiffs to sue on a contract and at the same time alternatively repudiate the agreement and seek recovery on a quantum meruit claim. . . ." Knudsen, 792 F.Supp. at 237 (internal quotations omitted), (citing Seiden Associates, Inc. v. ANC Holdings, Inc., 754 F.Supp. 37, 39 (S.D.N.Y. 1991) [*31] (holding that federal and New York state pleading rules allow contradictory claims alleging both breach of a contract or, in the alternative, a claim in quasi contract)).

Here, only the License Agreement is an express contract. At this stage of the litigation, the Sales and Marketing Agreement must be implied from an e mail declaring that Defendant will be "taking over the day to day operations of Sales, Marketing, Distribution and Customer Service" for Plaintiff Sunday players, Inc., and announcing the introduction of "the Kellwood/Sunday Players Team," attached as Exhibit B of Plaintiffs' Amended Complaint.

Under New York law, the existence of an implied contract is a question of fact for the factfinder to determine. See New Windsor Volunteer Ambulance Corps., Inc. v. Meyers, 442 F.3d 101, 112 (2d Cir. 2006) (citations omitted). Some of the promises alleged by Plaintiffs - for example, those regarding the day to day operations of sales, marketing, distribution and customer service - are not covered by the subject matter of the License Agreement. Consequently, as to those promises which are implicated by the subject matter of the alleged Sales and Marketing Agreement, but not the terms [*32] of the License Agreement, Plaintiffs may plead unjust enrichment in the alternative. Nevertheless, Plaintiffs have not adequately done so here. Nowhere do Plaintiffs explain how Defendant was enriched, how the alleged enrichment came at Plaintiffs' expense, or why this alleged enrichment was inequitable. Instead they merely recite in the most general terms that "Defendant Kellwood was enriched, at Plaintiffs' expense, by Defendant's actions and/or omissions as set forth in detail in Paragraphs 1-56 hereof." (Am. Compl P 58.) Because Plaintiffs have not alleged what Defendants unjustly gained, or how that gain was at their own expense, Plaintiffs have not adequately pleaded their claim for unjust enrichment. See e.g., In re Vivendi Universal, S.A., 2004 U.S. Dist. LEXIS 7015, 2004 WL 876050, at *12 (S.D.N.Y. Apr. 22, 2004) ("Ordinarily, conclusory allegations are not sufficient to make out a claim of unjust enrichment"); Ainbinder v. Potter, 282 F.Supp.2d 180, 190 (S.D.N.Y. 2003) (dismissing unjust enrichment claim because "[e]ven reading the pleadings liberally, the plaintiffs have not coherently alleged how the defendants were unjustly enriched at the plaintiffs' expense") (emphasis added) ; Mina Inv. Holdings, Ltd. v. Lefkowitz, 51 F.Supp.2d 486 (S.D.N.Y. 1999) [*33] (noting that the Court had earlier "found that Plaintiffs failed to allege, in anything other than conclusory terms . . . the enrichment sustained by [Defendant], and the manner in which that enrichment was at Plaintiffs' expense") (emphasis added).

Accordingly, Defendant's Motion to Dismiss Plaintiffs' claim for unjust enrichment is GRANTED. However, because Plaintiffs may still be able to specify how Defendants were unjustly enriched by the

2009 U.S. Dist. LEXIS 32565, *

promises that are alleged to be the subject matter of the Sales and Marketing Agreement, as well as how this enrichment came at their own expense, Plaintiffs are granted leave to replead their claim for unjust enrichment. Plaintiffs claim for unjust enrichment is DISMISSED without prejudice.

G. Exemplary Damages

Defendant moves to dismiss Count Eight for failure to state an independent cause of action. (Def. Mem. Law at 21.) Plaintiffs argue that their claim for punitive damages is suitably plead in relation to their fraud and unfair competition claims. (Pls. Opp. Mem. at 22.)

It is well settled that under New York law there is no independent cause of action for punitive damages. IMR Associates, Inc. v. C.E. Cabinets, Ltd., 2007 U.S. Dist. LEXIS 34788, 2007 WL 1395547, *8 (E.D.N.Y. 2007) (citations omitted). Although "New York law does not preclude the award of punitive damages where conduct that gives rise to a contract action is also tortious," Brink's Inc. v. City of New York, 717 F.2d 700, 705 (2d Cir. 1983), the standard for awarding punitive damages is extraordinarily stringent. "Punitive damages are permitted when the defendant's wrongdoing is not simply intentional but evince[s] a high degree of moral turpitude and demonstrate[s] such wanton dishonesty as to imply a criminal indifference to civil obligations." Ross v. Louise Wise Services, Inc., 8 N.Y.3d 478, 868 N.E.2d 189, 836 N.Y.S.2d 509, 2007 WL 1294566 (N.Y. 2007) (citations and internal quotations omitted). See also Prozeralik v. Capital Cities Communications, Inc., 82 N.Y.2d 466, 479, 626 N.E.2d 34, 605 N.Y.S.2d 218 (N.Y. 1993) (punitive damages are available where deliberate conduct "has the character of outrage frequently associated with crime") (citation and internal quotations omitted); Walker v. Sheldon, 10 N.Y.2d 401, 179 N.E.2d 497, 223 N.Y.S.2d 488, 490 (N.Y. 1961) (misconduct meriting punitive damages is characterized by reprehensible and evil motive).

Plaintiffs' claim for punitive damages is improperly pleaded as an independent cause of action. Additionally, Plaintiffs' request for punitive damages cannot [*35] be contained by underlying counts involving tortious activity. Even as alleged by Plaintiffs, the facts in this case do not describe outrageous or criminally indifferent conduct, or conduct motivated by

evil. Accordingly, Defendant's Motion to Dismiss Plaintiffs' claim for punitive damages is GRANTED. Because the Complaint does not evince any hint of alleged conduct that goes beyond run-of-the-mill dishonest and fraudulent behavior, the Court further denies Plaintiffs leave to replead its claim for exemplary damages. Accordingly, Plaintiffs' claim for exemplary damages is DISMISSED with prejudice.

H. Attorneys' Fees

Defendant moves to dismiss Count Nine for failure to state an independent cause of action. (Def. Mem. Law at 21.) Defendant argues that attorneys' fees are not recoverable unless there is specific contractual or statutory authority, neither of which exist here. (Id.) Plaintiffs note that N.Y. GEN. BUS. LAW §§ 349(h) and 350(e) allow courts, at their discretion, to award reasonable attorneys' fees to a prevailing plaintiff. (Pls. Opp. Mem. at 23.) Plaintiffs claim that since they made a claim for unfair trade practices they are entitled to maintain a claim for statutory attorneys' [*36] fees. (Id.)

Plaintiffs base their claim for attorney's fees solely on their cause of action for unfair trade practices. (Pl. Opp. Mem. at 23.) That claim has been dismissed with prejudice. Plaintiffs' claim for attorney's fees is thus likewise DISMISSED with prejudice.

III. Conclusion

For the foregoing reasons, Defendant's motion to dismiss Counts Three, Four, Five, Six, Seven, Eight and Nine is GRANTED. Plaintiffs are given leave to replead Counts Three, Six and Seven.

Plaintiffs shall file and serve a second Amended Complaint within sixty (60) days of the date of this Order. Defendant shall move or answer within twenty (20) days of service. Failure by Plaintiffs to file and serve within 60 days shall result in the granting of Defendant's Motions to Dismiss with prejudice.

SO ORDERED.

Dated: New York, New York

March 24, 2009

/s/ Deborah A. Batts

DEBORAH A. BATTS

United States District Judge

LEXSEE

**RAINN WILSON, Plaintiff, -v- CAR LAND DIAGNOSTICS CENTER, INC. and MERAB KATSOBASHVILI, Defendants.**

**99 Civ. 9570 (GEL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2001 U.S. Dist. LEXIS 19760**

**November 15, 2001, Decided
November 26, 2001, Filed**

**DISPOSITION:**    [*1]  Plaintiff's motion for attorney's fees and costs granted.

**COUNSEL:** For RAINN WILSON, plaintiff: Dan Getman, Getman & Selcov, L.L.P., New Paltz, NY.

**JUDGES:** Gerard E. Lynch, United States District Judge.

**OPINION BY:** Gerard E. Lynch

**OPINION**

*OPINION AND ORDER*

GERARD E. LYNCH, District Judge:

Plaintiff Rainn Wilson brought this action against defendants Merab Katsobashvili and Car Land Diagnostic Center, Inc. ("Car Land") for common law fraud, deceptive business practices in violation of § 349 of New York's General Business Law ("GBL § 349"), and violation of the federal odometer tampering statute, 49 U.S.C. § 32710. Car Land defaulted, and judgment was granted against it on all causes of action. [1] On July 25, 2001, a jury found in favor of the plaintiff on the deceptive business practices claim, and awarded the plaintiff $ 2,000 in damages.

1   In March 2000, Chief Judge Mukasey, to whom the case was then assigned, permitted counsel for the defendants to withdraw from representation for non-payment. The complaint was subsequently amended, and defendants served an answer signed only by Katsobashvili. Chief Judge Mukasey ordered Car Land to secure representation and answer through counsel or face default. *See* Order of

March 24, 2000. When Car Land failed to do so, it was held in default. The Court deferred determination of the amount of default judgment to be entered against Car Land, pending trial.

[*2]  At trial, the plaintiff produced overwhelming evidence of outrageously misleading statements made by the defendant Katsobashvili in selling him a defective used car for $ 3,500. Based on this evidence, the jury found that the defendant had intentionally misled the plaintiff and found the defendant liable under GBL § 349. However, the jury also returned a verdict for the defendant on the common law fraud claim, evidently finding that, on the evidence presented at trial, the plaintiff could not have reasonably relied on the defendant's representations -- the one additional element distinguishing common law fraud from the claim under GBL § 349. The jury also found for the defendant on the charge of odometer tampering, apparently unpersuaded that the defendant was responsible for the rollback of the vehicle's odometer.

Two matters remain for resolution. First, plaintiff has moved for attorney's fees and costs, and defendant has vigorously contested that demand. Second, the Court deferred determination of the amount of the default judgment against Car Land pending trial, in effect treating the trial as an inquest on damages.

*Discussion*

A. *Attorney's Fees and Costs*

Plaintiff [*3]  seeks attorney's fees and costs in the amount of $ 45,394.24. The application is predicated upon GBL § 349, since this was the only claim on which he prevailed against the defendant at trial. Fee awards under GBL § 349 are not granted auto-

2001 U.S. Dist. LEXIS 19760, *

matically, as a matter of right, but are committed to the sound discretion of the trial court. *Riordan v. Nationwide Mutual Fire Ins. Co.*, 977 F.2d 47, 53 (2d Cir. 1992). An initial determination of fee awards under GBL § 349 may be made using the "lodestar" method, which determines an appropriate fee award by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. *See, e.g., Independent Living Aids, Inc. v. Maxi-Aids, Inc.*, 25 F. Supp. 2d 127, 131-32 (E.D.N.Y. 1998). The lodestar may then be adjusted by taking "into account the factors ordinarily considered by New York courts when evaluating requests for attorney's fees, including time and skill required in litigating the case, the complexity of the issues, the customary fee for the work, and the results achieved." *Riordan*, 977 F.2d at 53.

In this case, the nature of the case and the results achieved [*4] justify a substantial reduction in the lodestar amount of $ 43,871.47 claimed by the plaintiff. Although the case undoubtedly involved issues of consumer significance of the sort intended to be covered by the statute, it presented neither complex facts nor novel issues of law, and thus prosecuting plaintiff's claim required no special skill. Indeed, defendant, an immigrant with limited command of English and no legal training, represented himself at trial with considerable effectiveness.

More importantly, the plaintiff was not particularly successful in this litigation. Plaintiff sued on three causes of action and sought $ 30,000 in actual damages, as well as punitive damages. He was only successful on one of these claims, and received less than 10% of the compensatory damages originally sought, and no punitive damages. Thus, while plaintiff must be considered a prevailing party for the purposes of a statutory award of fees, the limited success calls for a reduction in the fees sought. *See Riordan, 977 F.2d at 54* ("In setting this relationship between the amount recovered and the fee award [under GBL § 349], the district court merely exercised its discretion with [*5] respect to one factor considered in arriving at an appropriate fee award: the result obtained."). Rather than the amount sought by the plaintiff, this Court finds that a fee award of $ 10,000 is appropriate given the nature of the case and the results secured by the plaintiff. *See Hensley v. Eckerhart*, 461 U.S. 424, 435, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983) ("The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success.").

The plaintiff argues against this conclusion by citing a line of Second Circuit cases rejecting a re-

quirement of proportionality between fee awards and damages won. *See Quaratino v. Tiffany & Co.*, 166 F.3d 422 (2d Cir. 1999); *DiFilippo v. Morizio*, 759 F.2d 231, 235-6 (2d 1985). But those cases are plainly inapposite here. First, the cited cases involved fee awards under federal civil rights statutes, and do not govern claims under GBL § 349. Such claims are governed by state law, and the Second Circuit has upheld as consistent with New York state law an attorney's fee award under that very statute that was expressly [*6] limited to a fraction of the damages awarded. *Riordan*, 977 F.2d at 53-54.

This distinction is not merely a difference between New York and federal policies, but soundly rooted in the different purposes of the statutes in question. In *Quaratino* and *DiFilippo*, as is often the case in civil rights cases, the extent of the plaintiff's success at trial was not fully captured in the damages award, since the intangible value of the rights vindicated was far greater than the actual physical injuries sustained. For example, in *Quaratino*, the plaintiff received only minor physical injuries from police brutality, and thus the low damage award did not fully reflect the importance of the constitutional violation established at trial. *See* 166 F.3d at 426. Similarly, in *DiFilippo*, the Second Circuit overturned the district court's reduction of the lodestar amount as improper where the plaintiff, despite the low amount of damages, had secured an "unambiguous victory." 759 F.2d at 236. In the present case, in contrast, the rights involved are consumer rights in commercial cases, which are directly measured by the financial damages imposed.

[*7] Even if the rule of *Quaratino* and *DiFilippo* applies here, moreover, the reduction of the plaintiff's lodestar amount does not violate that rule. Unlike the district courts in those cases, or, for that matter, in *Riordan*, this Court is not limiting the award to a fixed percentage of the damages obtained. The reduction in plaintiff's fee award is based not on the modest nature of the damages awarded to plaintiff, but on plaintiff's limited success in this litigation. Here, plaintiff was only minimally successful on his claims. Not only did the jury find for the plaintiff on only one of three claims, but the jury also awarded only modest damages for the claim on which the plaintiff was successful, in comparison to the amount sought. Thus, this is hardly a case where the plaintiff achieved an "unambiguous victory" despite only receiving limited damages. *Cf. DiFilippo*, 759 F.2d at 236. Rather, the plaintiff's limited success was fully reflected by the limited damages he received. A reduced fee award is thus consistent with the general proposition that an award of attorney's fees should reflect the results achieved. [2]

2    Plaintiff cites *Hensley* in support of the proposition that "where the successful and unsuccessful claims are related, no reduction is possible." (P. Mem. at 3.) However, *Hensley* undercuts rather than supports his argument. In that case the Supreme Court held that where a plaintiff achieves "excellent results" a fee award should not be reduced merely because plaintiff failed to prevail on every contention in the lawsuit. It went on to state, however, that if "a plaintiff has achieved only partial or limited success" the lodestar may be reduced "even where the plaintiff's claims were interrelated." 461 U.S. at 435-36. "The results are what matters." *Id.* at 435.

[*8]  While the limited results obtained require a substantial reduction in the lodestar amount, the Court emphatically rejects defendant's claim that the award should be reduced to one-third the recovery achieved, or $ 666.67. New York has specifically provided for attorney's fees in this consumer protection statute, in order to encourage and enable consumers to bring lawsuits to vindicate their rights. As this case exemplifies, the amount in controversy in such suits will often be small, and a strictly proportionate fee award would often be insufficient to attract competent counsel. It is undoubtedly for this reason that the New York courts do not apply such a rule, but apply a multi-factor test that gives weight to a number of factors, including the time required in litigating the case and customary fees of the attorney. Here, while defendant with some justice quibbles over certain of the time charges documented by plaintiff's counsel, a $ 10,000 fee award is quite modest in light of the time required to try even a simple case such as this one, and a reasonable hourly fee for an attorney of the level of experience of plaintiff's counsel.

Moreover, the Court recognizes that defendant [*9] Katsobashvili was a wily and persistent adversary, and that the purposes of GBL § 349 are well served by an attorney's fee award here. Faced with a resistant defendant, with a long and well documented record of consumer complaints and defiance of state administrators charged with protecting the public from fraud, [3] an unrepresented plaintiff with a small claim would likely give up before achieving the recovery to which he was entitled. An award of attorney's fees that is substantially larger than the verdict may be unusual, but in this case it is certainly not excessive.

3    Documentary evidence at trial demonstrated that the New York Department of Motor Vehicles had repeatedly found that the de-

fendant had engaged in fraudulent and deceptive business practices against other customers with respect to his automobile repair business. The evidence also established that his license to operate was revoked on at least three occasions, and amply supported an inference that defendant had engaged in delaying tactics to forestall paying fines and avoid adjudication of these cases to the maximum extent possible.

[*10]  Plaintiff also moves for an award of costs. Although defendant is correct that GBL § 349 does not itself explicitly provide for costs, Fed. R. Civ. P. 54(d) provides for the routine allowance of costs to the prevailing party unless the court otherwise directs. District courts have the discretion to deny an award of costs under Rule 54(d). *Bekiaris v. United States*, 1998 U.S. Dist. LEXIS 16574, 1998 WL 734362, 96 Civ. 302 (S.D.N.Y. Oct. 20, 1998). Among the factors which may be considered in determining whether an award of costs would be inequitable are defendant's indigence or financial hardship and plaintiff's good faith in bringing the action. *Id.*

The defendant does not, nor could he, argue that plaintiff brought this action in bad faith or merely to harass him. Plaintiff suffered inconvenience and financial loss because of defendant's unlawful and fraudulent conduct, and was entitled to pursue his legal remedies. Moreover, although the defendant has stated that he appeared pro se in this action because he could not afford representation, he has failed to make an adequate showing of indigence, through documentary or other evidence establishing financial hardship, that might warrant a [*11] denial of costs to the plaintiff. Accordingly, plaintiff's request for costs in the amount of $ 1,522.77 will be granted.

B. *Default Judgment*

Defendant Car Land has defaulted, and plaintiff accordingly seeks judgment for the full amount demanded against it, plus the full amount of attorney's fees demanded. But that it not the law. While a default establishes liability on the claims asserted against the defaulting party, in the case of unliquidated claims the Court is required to conduct an inquest to determine the amount of damages appropriate. *See* Fed. R. Civ. P. 55(b)(2). Evidence introduced at trial provides a sufficient basis to make such a determination. *Fustok v. Conticommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989).

Here, the jury's verdict of $ 2,000 was based on the apparent conclusion reasonably founded in the evidence, that although sold for $ 3,500, the car had at most an actual value of $ 1,500. The Court adopts that conclusion and finds damages of $ 2,000 appropriate.

2001 U.S. Dist. LEXIS 19760, *

However, because Car Land defaulted on the federal odometer tampering count, which requires an award of treble damages, the award against it should be increased to $ [*12] 6,000. Moreover, Car Land has also defaulted on the common-law fraud claim, which permits an award of punitive damages. Based on Car Land's history of consumer fraud, and the deliberate misconduct in this case, the Court finds punitive damages of $ 4,000 appropriate. Finally, as discussed above, an award of $ 10,000 in attorney's fees and $ 1,522.77 of costs is also required. Accordingly, judgment in the amount of $ 21,522.77 should be entered against defendant Car Land.

*Conclusion*

Plaintiff's motion for attorney's fees and costs is granted in an amount of $ 10,000 for attorney's fees and $ 1,522.77 for costs. The clerk is directed to enter final judgment against defendant Katsobashvili for those amounts, in addition to the $ 2,000 awarded by the jury and embodied in the previous judgment entered on August 16, 2001. The clerk is further directed to enter judgment by default against defendant Car Land Diagnostics, Inc., for a total of $ 21,522.77.

SO ORDERED:

Dated: New York, New York

November 15, 2001

Gerard E. Lynch

United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION,                    :

    Plaintiff,                               :

    v.                                       :        CA 98-237 (GK/AK)

CAPITAL CITY MORTGAGE CORP., ET AL.,         :

    Defendants                               :        **FILED**

—————————————————————              FEB 1 1 2002

CLYDE HARGRAVES, ET AL.,                     :        NANCY MAYER WHITTINGTON, CLERK
                                                      U.S. DISTRICT COURT
    Plaintiffs,                              :

    v.                                       :        CA 98-1021 (GK/AK)

CAPITAL CITY MORTGAGE CORP., ET AL.,         :

    Defendants                               :

## ORDER

This matter having come before the court on the "Motion of Defendants Capital

City Mortgage Corporation and Thomas K. Nash to Sever and to Conduct Sample

*(the Opposition of Plaintiff FTC, and the Reply,)*

Trials," it is this ~~8th~~ day of February, ~~2000~~ 2002;

    ORDERED, that the motion be and hereby is GRANTED, ~~and it is~~ *in part & denied in*

*part, and it is*

    FURTHER ORDERED, that *FTC v. Capital City Mortgage Corp, et al.* CA 98-

237(GK/AK) and *Hargraves . Capital City Mortgage Corp, et al.* CA 98-1021(GK/AK)

be and hereby are severed, and it is *the Motion to Conduct Sample*

    FURTHER ORDERED, that ~~in~~ *FTC v. Capital City Mortgage Corp, et al. CA 98-*

*Trials in CA 98-237 is denied,*

~~237(GK/AK), the court shall try, as an initial matter, the FTC Act cases related to the~~

~~following borrowers: Tommy Broadwater, Keith Crawford, Joseph Dillon, Hui Han,~~

*1/ This issue is largely moot in light of the settlement of the parties.*

(N)                                                                        53

~~Mildred King and Ernest Peterson. Thereafter the court will determine whether issues common to the remaining cases can be disposed of and, if additional trials are deemed necessary, will determine which sample cases shall be tried in the next group.~~

Gladys Kessler
United States District Judge

Copies to:

Philip M. Musolino, Esq.
Musolino & Dessel
1615 L Street, N.W., #440
Washington, DC 20036

Brad Blower, Esq.
Federal Trade Commission
601 Pennsylvania Avenue, NW
Washington, D.C. 20580

Jeffrey D. Robinson, Esq.
Elizabeth Sheldon, Esq.
Baach, Robinson & Lewis
1 Thomas Circle, NW
Washington, D.C. 20005

Mark Foster, Esq.
Zuckerman, Spaeder, Goldstein
 Taylor & Kolker, L.L.P.
1201 Connecticut Avenue, NW
Washington, DC 20036

John P. Relman, Esq.
Relman & Associates
1350 Connecticut Ave., N.W. Suite 304
Washington, D.C. 20036

Lars Waldorf, Esq.
Richard J. Ritter, Esq.
Washington Lawyers' Committee for
 Civil Rights and Urban Affairs
11 Dupont Circle, N.W. Suite 400
Washington, D.C. 20036

2