# 12-2909-cv(L)

## 12-2912-cv(CON), 12-3619-cv(CON), 12-3621-cv(CON)

## United States Court of Appeals

### for the

## Second Circuit



SANDRA C. BARKLEY, aka SANDRA C. BARKLAY,

*Plaintiff – Counter-Defendant – Cross Defendant – Appellee,*

SCAROLA MALONE AND ZUBATOV LLP,

*Appellee,*

– v. –

OLYMPIA MORTGAGE COMPANY,

*Defendant – Counter-Claimant – Cross-Defendant,*

*(For Continuation of Caption See Reverse Side of Cover)*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF – COUNTER-DEFENDANT – CROSS-DEFENDANT – APPELLEE SANDRA C. BARKLEY

SOUTH BROOKLYN LEGAL SERVICES
105 Court Street, Fourth Floor
Brooklyn, New York 11201
Tel.: (718) 237-5500

COWAN, LIEBOWITZ & LATMAN, P.C.
1133 Avenue of the Americas
New York, N.Y. 10036-6799
Tel.: (212) 790-9200

AARP FOUNDATION LITIGATION
601 E. Street, NW
Washington, D.C. 20049
Tel.: (202) 434-2060

*Attorneys for Plaintiff – Counter-Defendant –*
*Cross-Defendant – Appellee Sandra C. Barkley*

---

THOMAS MESSINA, DLJ MORTGAGE CAPITAL LLC,

*Defendants – Cross-Defendants – Cross-Claimants*,

ALLIANCE MORTGAGE CORPORATION, dba Everyhome Mortgage Company,
WILSHIRE CREDIT CORPORATION, FEDERAL NATIONAL MORTGAGE
ASSOCIATION, XYZ CORPORATION (Said name being fictitious, it being the intention of
Plaintiff to designate any corporation having a legal interest in Plaintiff's mortgages), JP
MORGAN CHASE BANK, as Trustee for the Home Equity Trust Series
2003-3 substituted as deft for Wilshire Credit Corporation and XYZ Corporation,
MICHAEL B. CHEATHAM, CREDIT SUISSE FIRST BOSTON LLC, CREDIT SUISSE
FIRST BOSTON MORTGAGE SECURITIES, INC., BENJAMIN TURNER,

*Defendants – Cross-Defendants,*

MICHAEL MASCIALE, CERTILMAN BALIN ADLER & HYMAN, LLP,

*Defendants,*

UNITED PROPERTY GROUP, LLC, UNITED HOMES, LLC,
GALIT NETWORK, LLC, YARON HERSHCO,

*Defendants – Cross-Defendants – Cross-Claimants
– Appellants.*

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF FACTS ................................................................ 1

STANDARDS OF REVIEW ............................................................. 9

SUMMARY OF ARGUMENT ........................................................ 9

ARGUMENT .................................................................................. 14

I.    The District Court Did Not Abuse Its Discretion in Consolidating the Actions for Trial. ...................................................................................... 14

   A.  The District Court Correctly Identified Common Issues of Fact and Law That Weighed in Favor of Consolidation. ........................................... 15

   B.  The District Court Properly Considered All of the Criteria Relevant to the Decision Whether to Consolidate. ...................................................... 16

   C.  The District Court Minimized the Risk of Prejudice or Confusion with Jury Instructions and Separate Verdict Forms. .................................... 17

   D.  The Remaining Arguments Against Consolidation Lack Merit. ................... 18

II.   The Plaintiffs Proved Fraud by Clear and Convincing Evidence. .................... 19

   A.  *Caveat Emptor* Does Not Apply to Bar Plaintiffs' Fraud Claims................. 20

   B.  Purported "Specific Merger Clauses" Do Not Defeat Plaintiffs' Fraud Claims ........................................................................................... 22

   C.  Plaintiffs Proved That Defendants Defrauded Them, and Did Not Merely Breach Their Contracts. ................................................................... 25

   D.  There Was Ample Evidence to Support the Jury's Finding That Hershco Committed Fraud. ........................................................................... 27

     1.   Hershco Waived His Right to Appeal the Jury's Finding on Fraud Because He Failed to Raise It in His Rule 50(a) Motion. ................................ 27

     2.   The Jury's Verdict Holding Hershco Liable for Fraud Was Supported by Clear and Convincing Evidence. .............................................. 28

III.  Plaintiffs' Civil Conspiracy Claim—and the Jury's Verdict—Are Supported by Fact and Law. ............................................................................. 32

i

IV.    The Jury's Determination to Pierce the Corporate Veil Was Amply
Supported by the Evidence. ...................................................................34

   A.  Hershco Waived Any Challenge to the "Control/Domination" Prong of
the Piercing Test. ...............................................................................35

   B.  The Jury's Finding That Hershco Controlled and Dominated His
Companies Was Supported by Ample Evidence.................................35

   C.  The Jury Had Ample Evidence to "Connect the Dots" Between Abuse of
Corporate Formalities and the Fraud or Wrong Perpetuated on Plaintiffs...........39

V.  Hershco Failed to Preserve for Review His Argument That the Jury Erred in
Finding Him Liable for Violating G.B.L. § 349....................................42

VI.    Punitive Damages Were Reasonable and Well Supported by the Evidence
and the Law. .........................................................................................43

   A.  The UH Defendants Waived Their Challenge to the Award of Punitive
Damages for Violation of G.B.L. § 349, and Their Challenge Lacks Merit........44

   B.  The Evidence Establishes Grounds for Punitive Damages Based on the
Plaintiffs' Success on Their Fraud Claims. ........................................47

VII.    The District Court Applied New York General Obligations Law § 15-108
Correctly in Setting off Plaintiffs' Damages Awards.............................48

VIII. The Attorneys' Fees Awarded by the District Court Were Reasonable and
Justified. ...............................................................................................51

CONCLUSION .......................................................................................58

Certification Pursuant to Fed. R. App. P. 32(a)(7)(B) and (C)................59

ii

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                        **Page**

*Am. Soc'y. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982) ..... 31

*Assets Collecting Co. v. Barnes-King Dev. Co.*, 198 F. 82 (2d Cir. 1912)........... 31

*Barkley v. Olympia Mortg. Co.*, 2010 WL 3709278
    (E.D.N.Y. Sept. 13, 2010) ................................................... 2, 15–17, 19, 26

*Barkley v. United Homes*, *LLC*, 848 F. Supp. 2d 248
    (E.D.N.Y. 2012).......................................................................... 7–8, 48–49

*Barkley v. United Homes*, *LLC*, 2012 WL 2357295
    (E.D.N.Y. June 20, 2012) ........................................ 8, 26–27, 33, 42–43, 44

*Barkley v. United Homes*, *LLC*, 2012 WL 3095526
    (E.D.N.Y. July 30, 2012) ............................................................... 8, 53–54

*Cohen v. Koenig*, 25 F.3d 1168 (2d Cir. 1994).................................................... 29

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 110 S. Ct. 2447, 110 L. Ed.
    2d 359 (1990).......................................................................................... 51–52

*Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148 (2d
    Cir. 1994) ..................................................................................................... 28

*Debruyne v. Nat'l Semiconductor Corp. (In re Repetitive Stress Injury Litig.)*,
    11 F.3d 368 (2d Cir. 1993) ....................................................................... 18

*Diaz v. Paragon Motors of Woodside, Inc*., 2007 WL 2903920
    (E.D.N.Y. Oct. 1, 2007).............................................................................. 55

*F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250
    (2d Cir. 1987)............................................................................................. 56

*F.T.C. v. Crescent Pub. Group, Inc.*, 129 F. Supp. 2d 311 (S.D.N.Y. 2001)....... 43

*Hendrix v. Raybestos–Manhattan, Inc.*, 776 F.2d 1492 (11th Cir. 1985) ...... 16, 17

*In re Parmalat Sec. Litig*., 684 F. Supp. 2d 453 (S.D.N.Y. 2010), *aff'd sub
    nom. Food Holdings Ltd. v. Bank of Am. Corp.*, 423 Fed. Appx. 73
    (2d Cir. 2011).............................................................................................. 31

*In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) ........................................ 52

*Johnson v. Celotex Corp.*, 899 F.2d 1281 (2d Cir. 1990) ........................ 15, 16, 17

*MAG Portfolio Consult, GmbH v. Merlin Biomed Group, LLC*, 268 F. 3d 58 (2d Cir. 2001) ............................................................................. 36

*Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537 (2d Cir. 1994) ........... 42

*Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47 (2d Cir. 1992) ......... 46, 56

*Samuels v. Air Transport Local 504*, 992 F.2d 12 (2d Cir. 1993) ...................... 23

*Shade v. Hous. Auth. of New Haven*, 251 F.3d 307 (2d Cir. 2001) ...................... 47

*State Farm Mut. Auto. Ins. Co. v. Accident Victims Home Health Care Servs.*, 467 Fed. Appx. 368 (6th Cir. 2012) ........................................................ 18

*United States v. Paccione*, 949 F.2d 1183, 1200 (2d Cir. 1991) .......................... 31

*Wilson v. Car Land Diagnostics Center, Inc.*, 2001 WL 1491280 (S.D.N.Y. Nov. 26, 2001) ....................................................................... 55

*Zervos v. Verizon N.Y.*, Inc., 252 F.3d 163 (2d Cir. 2001) .................................. 52

## STATE CASES                                                      Page

*Bethka v. Jensen*, 250 A.D.2d 887, 672 N.Y.S.2d 494 (N.Y. App. Div. 3d Dep't 1998) .......................................................................... 20

*Bridger v. Goldsmith*, 143 N.Y. 424 (1894) ....................................................... 25

*Danann Realty Corp. v. Harris*, 5 N.Y.2d 317 (1959) ................................. 23–24

*Ernst Iron Works v. Duralith Corp.,* 270 N.Y. 165 (1936) ................................. 24

*Hart v. Moore*, 155 Misc. 2d 203 (Sup. Ct. Westchester Cty. 1992) ............. 45–46

*Jablonski v. Rapalje*, 14 A.D.3d 484, 788 N.Y.S.2d 158 (N.Y. App. Div. 2d Dep't 2005) .......................................................................... 20

*Latiuk v. Faber Constr. Co.,* 269 A.D.2d 820, 703 N.Y.S.2d 645 (N.Y. App. Div. 4th Dep't 2000) .................................................................... 45

*Marine Midland Bank v. John E. Russo Produce Co.*, 50 N.Y.2d 31, 427 N.Y.S.2d 961, 405 N.E.2d 205 (1980) ........................................................ 29

*Merry Realty Co., v. Martin*, 103 Misc. 9, 169 N.Y.S. 696 (Sup. Ct. Kings Cty. 1918), *aff'd sub nom. Merry Realty Co. v. Shamokin & Hollis Real Estate Co.*, 186 A.D. 538, 174 N.Y.S. 627 (2d Dep't 1919), *rev'd on other grounds*, 230 N.Y. 316, 130 N.E. 306 (1921).....................................22

*Morris v. New York State Dep't of Taxation & Fin.*, 82 N.Y.2d 135 (1993).......34

*People v. Apple Health & Sports Clubs, Ltd.*, 80 N.Y.2d 803, 587 N.Y.S.2d 279, 599 N.E.2d 683 (1992) .......................................................29

*Stoian v. Reed*, 66 A.D.3d 1278, 888 N.Y.S.2d 639 (N.Y. App. Div. 3d Dep't 2009) ........................................................................20

*Walker v. Sheldon*, 10 N.Y.2d 401 (1961)...........................................45

*Wall v. CSX Transp., Inc.*, 471 F.3d 410 (2d Cir. 2006) ....................26

*Wilner v. Allstate Ins. Co.*, 71 A.D.3d 155, 893 N.Y.S.2d 208 (App. Div. 2d Dep't 2010)........................................................45

## FEDERAL STATUTES AND RULES                                          **Page**

42 U.S.C. § 1981 .................................................................1

42 U.S.C. § 1982 .................................................................1

42 U.S.C. § 1985(3) ............................................................1

42 U.S.C. § 3604 .................................................................1

42 U.S.C. § 3605 .................................................................1

Fed. R. Civ. P. 42(a) ........................................................9, 15

Fed. R. Civ. P. 50(a)......................................3, 11, 23, 27–28, 33, 35, 42, 43

Fed. R. Civ. P. 50(b) ......................8, 9, 11, 23, 25, 26, 28, 33, 35, 42, 44

Fed. R. Civ. P. 56 ...............................................................9

Fed. R. Civ. P. 59 ...............................................................8

Fed. R. Evid. 404 ..........................................................18–19

Fed. R. Evid. 405 .............................................................19

v

## STATE AND LOCAL STATUTES AND RULES                     **Page**

N.Y. Gen. Bus. L. § 349 ............................................1, 3, 4, 13, 42–43, 44–47, 53

N.Y. Gen. Obl. L. § 15-108 ...........................................................7, 9, 13, 48–51

N.Y. Exec. L. § 296(5)................................................................................ 1

Title 8 of the New York City Administrative Code ................................................ 1

## OTHER AUTHORITY                                         **Page**

Fed. R. Civ. P. 50(b), Notes of Advisory Committee to 1991 Amendment......... 23

## STATEMENT OF FACTS

The Plaintiffs, seven African-American first-time homebuyers, all purchased their homes from Yaron Hershco ("Hershco") and his companies, United Homes, LLC, United Property Group, LLC, Galit Network, LLC (the "United Homes entities" or "UH Defendants") (collectively, the "Defendants"). In the course of their home purchase transactions, all of the Plaintiffs were shown distressed properties whose defects were concealed by superficial repairs, were steered to lawyers and lenders introduced to them by the Defendants, were subjected to high-pressure tactics to close on the properties quickly, and were discouraged from seeking independent advice or counsel which would have alerted them to the problems with the properties and their loans. The Defendants promised all the Plaintiffs fully renovated homes and then, after the closings, failed or refused to follow through on their promises to the Plaintiffs. Saddled with defective homes and completely unaffordable mortgages, the Plaintiffs brought six separate actions against the Defendants and lenders, lawyers and appraisers that participated in the scheme, asserting claims for violations of anti-discrimination statutes 42 U.S.C. §§ 1981, 1982, and 1985(3) and of the Fair Housing Act, 42 U.S.C. §§ 3604 and 3605; state law claims for fraud and conspiracy to commit fraud; and violations of New York General Business Law § 349, New York State Executive Law § 296(5) and Title 8 of the New York City Administrative Code. All the Plaintiffs sought

actual and punitive damages.  The actions were consolidated for pretrial purposes.

The litigation was zealous and intense, spanning seven years and involving extensive motion practice, court appearances, discovery disputes, and mediation sessions. Plaintiffs conducted or defended forty-three depositions, litigated multiple discovery motions against nearly every defendant in the consolidated actions, engaged in two extensive mediation sessions, and successfully defended against two motions for summary judgment.  In order to develop the legal theories that underlay these cases, Plaintiffs' counsel engaged several experts who issued reports.  When it became clear that, despite numerous attempts at settlement, the case would proceed to trial, Plaintiffs' counsel then spent hundreds of hours preparing the Plaintiffs, the experts, and other witnesses for trial.  Plaintiffs moved to consolidate the six cases for trial, and the district court granted the motion in a Memorandum and Order dated September 13, 2010.  *Barkley v. Olympia Mortgage Co.*, 2010 WL 3709278 (E.D.N.Y. Sept. 13, 2010).

At trial, the jury heard direct testimony from all the Plaintiffs (except for Rodney Gibbons, who passed away a few months before the trial; portions of his videotaped deposition were played for the jury).  The jury also heard from Plaintiffs' experts on, *inter alia*, the unaffordability of the mortgages (James Brown); the substandard conditions in the properties (Sirivishnu Khalsa); the inflated values of the homes (Dominick Pompeo); and on the relationships among

and business practices of Defendants Hershco and his United Homes entities (Alan Blass). Plaintiffs also called Yaron Hershco to the stand to testify about his ownership of the United Homes entities and their corporate structure, and the jury had an opportunity to listen to and weigh his testimony. After the close of Plaintiffs' case, the Defendants made motions for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. (A-4271–93.) The district court did not grant these motions.

On June 1, 2011, after a three-week trial, a nine-person jury found the UH Defendants; their owner and principal, Hershco; and other defendants liable to the Plaintiffs in this matter for deceptive practices in violation of Section 349 of New York's General Business Law, fraud, and civil conspiracy to commit fraud. Specifically, the jury found that Hershco and the UH Defendants knowingly and willfully misled or deceived the Plaintiffs into entering home purchase and financing transactions by misrepresenting the value of each property, the condition of each property, and/or the terms and affordability of the mortgages each plaintiff obtained to purchase his or her property. (A-4979–5010.) The jury also found that Hershco and the UH Defendants, along with Olympia Mortgage Company, committed fraud and conspired to commit fraud against the Plaintiffs. (*Id*.) The jury further found that the Defendants' actions in defrauding and deceiving Plaintiffs through their property-flipping scheme were repugnant and involved a

3

high degree of moral culpability.  Plaintiffs were awarded compensatory and punitive damages on their deceptive practices, conspiracy, and fraud claims.  (*Id.*) The jury also found sufficient facts to pierce the corporate veil and hold Hershco individually liable for the fraud, conspiracy, and G.B.L. § 349 claims, having found that Hershco "exercised complete control over [the United Homes entities]" in connection with each Plaintiff's home purchase transaction, and that Hershco committed fraud or some other wrong against each Plaintiff through his domination over the UH Defendants. In addition, the jury found that Hershco, as a corporate officer of the UH Defendants, participated in or knowingly approved of wrongful conduct.

The jury heard and saw ample evidence at trial to support each of its findings. The scope and nature of the evidence presented by Plaintiffs plainly established the truth of their claims that the Defendants had conspired with appraisers, lenders, and lawyers to dupe the Plaintiffs into purchasing substandard defective properties for far above their real values with abusive loan products, and had then reneged on their promises to fix the properties after the closings.

Specifically, the jury heard and saw evidence that the Defendants misrepresented the condition of and actively concealed serious defects in the properties (A-980-987; A-988-89; A-1154; A-1311; A-1313–15; A-1679–81; A-1683–84; A-1686; A-1690–91; A-3061–65; A-3072–76; A-3081; A-3346–59; A-

4

3766–76); intentionally misrepresented the value of these properties (A-2330–47);

used their employees to show these properties to the Plaintiffs (A-899; A-902);

promised that all repairs would be completed by the Defendants after closing (A-

930–31; A-994–95; A-1120; A-1127; A-1150; A-1301; A-1667–68; A-3049–52;

A-3333–35); and orchestrated with a stable of lenders and lawyers (A-915–16; A-

1134–35; A-1141–44; A-1287; A-1294; A-1463–67; A-1647; A-3041–43; A-3321;

A-3327; A-3746–47; A-3749) to engage in high-pressure tactics (A-1390–91; A-

3335; A-3760) designed to prevent Plaintiffs from obtaining independent advice.

The jury heard and saw testimony demonstrating that the Plaintiffs relied on the

independent judgment of these lenders and lawyers to their great detriment. (A-

945; A-1087–88; A-1295; A-1412–14; A-1649–51; A-3059–60; A-3042–43; A-

3056; A-3322; A-3335; A-3748–49). The jury heard and saw evidence of how,

after the deals were done, Defendants failed or refused to complete repairs in the

properties in any meaningful way.  (A-987–89; A-995–96; A-1071; A-1303; A-

1667; A-1682; A-1688–92; A-3062–63; A-3065; A-3071–73; A-3081; A-3347–54;

A-3358–59; A-3768–71; A-3850.)  The jury heard and saw evidence of the

commonality of the deficiencies in the properties, from malfunctioning heating

systems and code violations, drafty windows, and insufficient insulation (A-980–

982; A-1681; A-3065; A-3072–74; A-3349–51; A-3359; A-3766–69) to holes in

floors which were concealed by carpets (A-1311; A-1684; A-3356–57; A-3766–

5

67; A-3775–76), to pipes leaking sewage and other serious plumbing issues (A-982–83; A-988–89; A-1679–81; A-1683–84; A-1686; A-3061–63; A-3346–52; A-3766–74).

The jury also saw and heard evidence showing that, in addition to misrepresentations about the condition of the properties and Defendants' willingness to do repairs, Defendants also falsely represented that the Plaintiffs' mortgages would be affordable because the Defendants would help them find tenants who would pay rents high enough to help them cover the mortgages. (A-999; A-1139–40; A-1143–44; A-1299; A-1637–38; A-1671–72; A-3319; A-3325–26; A-3741; A-3756.)

The jury also heard and saw evidence of the injuries suffered by the Plaintiffs as a result of Defendants' scheme. The evidence before the jury was sufficient for it to find that the Plaintiffs endured inconvenience, frustration, and emotional trauma as a result of the horrifically poor conditions of their homes, and that they incurred substantial repair expenses to make their homes habitable because Defendants failed to repair the properties as promised. (A-998–1000; A-1311–19; A-1690–93; A-3065–83; A-3202; A-3346–60; A-3766–77; A-3788.) The jury also had ample evidence to find that the Plaintiffs suffered from damages due to the fraudulent over-appraisal of their properties. (A-2330–47.)

Finally, the jury saw and heard evidence from both Yaron Hershco himself

6

as well as Plaintiffs' expert Alan Blass about the way Hershco operated and controlled the United Homes entities.  Specifically, the jury heard evidence that Hershco orchestrated the inner workings of each of the United Homes entities "as a man with 21 pockets in his coat constantly moving cash from one pocket to another as he needed it, whether it was for cash flow purposes or for lending purposes or for some other unknown purposes."  (A-3529; A-3497–3516.)  The evidence further established that Hershco abused the corporate form in order to perpetrate the fraudulent transactions at issue in this action. Hershco testified that he set up new companies such as the UH Defendants for the express purpose of purchasing, rehabilitating, and reselling properties. (A-3290–91; A-3503.)

In addition, Hershco's testimony established that besides being the president and sole owner of his companies, he directly and personally engaged in acquiring properties, overseeing construction, and securing financing for the United Homes entities. (A-3243–44, A-3247–53, A-3299–3300.)  Moreover, Hershco's signature appeared on each of the deeds through which the homes were conveyed to Plaintiffs, and he met face-to-face with Plaintiff Sandra Barkley. (A-3261–65.)

Following the trial, the parties engaged in further motion practice, including, *inter alia*, a motion filed jointly by the UH Appellants and Hershco pursuant to section 15-108 of New York General Obligations Law to reduce the jury's award of damages by the amount paid to Plaintiffs by settling defendants.  This motion

7

was granted in part and denied in part by a Memorandum and Order issued by the district court on January 27, 2012.  *Barkley v. United Homes*, *LLC*, 848 F. Supp. 2d 248 (E.D.N.Y. 2012).  On February 28, 2012, the district court entered judgment for damages and pre- and post-judgment interest in favor of Plaintiffs.  On March 1, 2012, the district court entered an amended judgment for damages, pre- and post-judgment interest and injunctive relief in favor of Plaintiffs.

After entry of judgment, The UH Defendants and Hershco filed separate motions under Rules 50(b) and 59 of the Federal Rules of Civil Procedure, seeking judgment as a matter of law and, alternatively, a new trial.  The district court denied both motions in a Memorandum and Order dated June 20, 2012.  *Barkley v. United Homes*, *LLC*, 2012 WL 2357295 (E.D.N.Y. June 20, 2012).

Also after entry of judgment, Plaintiffs filed a petition for attorneys' fees, and a separate petition was filed by Scarola Malone and Zubatov LLP, former counsel for Plaintiffs.  In a Memorandum and Order dated July 30, 2012, the district court concluded that Plaintiffs were entitled to fees and costs, but that they were not entitled to the amounts petitioned for; the court granted $2,363,467.90 in attorneys' fees, plus costs, to Plaintiffs and to Plaintiffs' former counsel.  *Barkley v. United Homes*, *LLC*, 2012 WL 3095526 (E.D.N.Y. July 30, 2012).   The district court entered a supplemental judgment on August 2, 2012, ordering a judgment in favor of Plaintiffs for attorneys' fees and costs in the amount of $2,480,286.25.

## STANDARDS OF REVIEW

This Court reviews the district court's decision to consolidate the Plaintiffs' actions for trial, pursuant to Fed. R. Civ. P. 42(a), for abuse of discretion.

This Court reviews the district court's determination of a motion for summary judgment, pursuant to Fed. R. Civ. P. 56, *de novo*.

In reviewing the jury's verdict, including the imposition of damages, this Court evaluates all factual evidence in the light most favorable to the non-appealing party, and draws all reasonable inferences in favor of the non-appealing party.

This Court reviews *de novo* the district court's determination of a post-trial motion for judgment pursuant to Fed. R. Civ. P. 50(b).

This Court reviews a decision to pierce the corporate veil *de novo*, but defers to the trier of fact unless the findings are clearly erroneous.

This Court reviews the application for setoff of damages pursuant to New York General Obligations Law §15-108 *de novo*, but defers to the fact-finding below unless clearly erroneous.

This Court reviews awards of attorneys' fees for abuse of discretion.

## SUMMARY OF ARGUMENT

The district court consolidated for trial the six actions at bar, after having found that consolidation would promote judicial economy and prevent inconsistent

adjudications, and having concluded that no specific risk of prejudice or confusion weighed against consolidation. Because the district court exercised appropriate discretion in consolidating the actions, this Court should affirm the district court's determination.

The jury saw and heard evidence of a property-flipping scheme orchestrated by Defendants, in which employees and agents of United Homes, LLC, United Property Group, LLC, Galit Network, LLC (collectively, the "UH Defendants") and Appellant Yaron Hershco ("Hershco"), and others made misrepresentations to Plaintiffs that induced Plaintiffs to purchase overvalued homes owned by Defendants that had serious concealed defects, and to finance the purchases with unsuitable loans issued by participants in the scheme. The jury heard and saw evidence that the Plaintiffs were unsophisticated and vulnerable first-time homebuyers who were steered by the Defendants to lenders and lawyers who participated in the scheme and who, along with Defendants, actively concealed information about the property defects, inflated property values and harmful mortgages from Plaintiffs. The jury heard and saw evidence that the Plaintiffs relied on the misrepresentations, purchased the defective and overpriced homes, and were injured as a result. Contrary to Defendants' contentions here, the jury correctly found, based on clear and convincing evidence, that Defendants committed fraud and that, with the other defendants, conspired to defraud

10

Plaintiffs.  The Court should therefore affirm the jury's finding of fraud.

To the extent that the UH Defendants argue that the district court erred in denying their Rule 50(b) motion on the ground that purported "specific merger clause" in the Plaintiffs' sales contracts barred Plaintiffs from prevailing on their fraud claims, Defendants waived this argument by failing to raise it in their Rule 50(a) motion.  The Court should therefore decline to consider this argument.[1]

To the extent that the UH Defendants argue that the district court erred in denying their Rule 50(b) motion on the ground that evidence about Defendants' failure to make renovations and repairs is evidence not of fraud but rather of breach of contract, such evidence involves conduct and representations collateral to Plaintiffs' sales contracts, and therefore this evidence supported the jury's finding of fraud.[2]

---

[1] The United Homes Defendants' "Summary of Argument" asserts that the district court "erred in allowing the plaintiffs to point to the properties' conditions to establish their fraud claims in light of the specific merger clause contained in each contract of sale."  (UH Br. 16.)  This summary differs from the argument actually advanced by the UH Defendants (UH Br. 24–28).  To the extent that the UH Defendants are asserting that the district court made an erroneous evidentiary ruling during trial, such argument was never before made and is not preserved.

[2] The United Homes Defendants' "Summary of Argument" asserts that the district court "erred in allowing the plaintiffs to point, in pursing [sic] fraud, to any dissatisfaction with the sellers' post-sale efforts to honor their warranties and conduct repairs."  (UH Br. 16.)  This summary differs from the argument actually advanced by the UH Defendants (UH Br. 28–30).  To the extent that the UH Defendants are asserting that the district court made an erroneous evidentiary ruling during trial, such argument was never before made and is not preserved.

Hershco argues that he cannot be held personally liable for fraud because the jury heard no evidence that he personally made any of the misrepresentations upon which the jury's findings of fraud were based.  Because the jury heard evidence of Hershco's personal domination of the business affairs of the corporate defendants that permitted them to impute misrepresentations and omissions to Hershco, this Court should affirm the jury's verdict as to Hershco's personal liability for fraud.

The UH Defendants argue that the district court not only should have granted their post-trial motion for judgment as a matter of law on Plaintiffs' claims for civil conspiracy to defraud, but also should have dismissed this claim at the summary judgment stage.  Their argument—that New York does not recognize this cause of action—has no merit.  This Court should affirm the jury's verdict finding that the defendants conspired to defraud Plaintiffs.

Hershco argues that because the evidence was insufficient for the jury to find him liable for fraud, it is also insufficient for a finding of liability for conspiracy to commit fraud.  Because he makes this argument for the first time on appeal, it is not preserved for review.  Even if the Court were to consider this argument, it could not succeed because of the substantial evidence presented to the jury both as to fraudulent conduct and as to Hershco's involvement.  The Court should affirm the jury's finding.

The jury correctly found that it was proper to pierce the corporate veil and

12

hold Hershco liable for the wrongful conduct of his companies. To the extent that Hershco argues that there was insufficient evidence to satisfy the first element of veil-piercing, domination and control of his companies, that argument is not preserved because it has never been made prior to this appeal. Even if the argument had been preserved, moreover, it lacks merit. To the extent that Hershco argues that there was insufficient evidence to satisfy the second element of veil-piercing, commission of fraud or other wrong against the Plaintiffs, through his domination of his companies, the jury heard ample evidence linking Hershco's domination to the Defendants' fraudulent and wrongful conduct. The Court should therefore affirm the jury's verdict as to veil-piercing.

Hershco argues that the evidence was insufficient for the jury to hold him personally liable for violations of G.B.L. § 349, New York's consumer protection statute. Because Hershco makes this argument for the first time here, the argument was not properly preserved for review and the Court should decline to consider it.

While the UH Defendants assert that the punitive damages that the jury awarded for violations of G.B.L. § 349 were excessive as a matter of law, this argument both misconstrues the law and was in any event waived when the parties agreed to the form of the verdict sheets after a full and fair opportunity to object to them. The Court should affirm the jury's award of punitive damages for the Defendants' deceptive practices.

13

Similarly, while the UH Defendants argue that the jury's awards of punitive damages for fraud were unjustified, the jury heard ample evidence from which they were entitled to conclude that punitive damages were appropriate.

After trial, Hershco and his companies moved for the jury awards to be reduced by the value of all the settlements reached between the Plaintiffs and settling defendants.  The district court granted their motion in part, setting off the damages awards by sums that were arrived at by determining the amount of setoff called for under section 15-108 of New York General Obligations Law.  While the UH Defendants argue that the district court erred in not setting off by the total combined monetary and non-monetary value of the settlements, they do not point to any factual or legal error in the district court's determination.  This Court should affirm the district court's determination of the proper value of setoff.

The UH Defendants argue that the attorneys' fees awarded to Plaintiffs' counsel were excessive.  Because these fees were supported in both fact and law, this Court should affirm them.

## ARGUMENT

## I.    The District Court Did Not Abuse Its Discretion in Consolidating the Actions for Trial.

The UH Defendants advance several arguments in support of their contention that the district erred in consolidating the Plaintiffs' actions for trial.  None of the arguments constitutes any basis for this Court to substitute its

14

judgment for the reasonable discretion exercised by the district court.

## A. The District Court Correctly Identified Common Issues of Fact and Law That Weighed in Favor of Consolidation.

"Rule 42(a) of the Federal Rules of Civil Procedure empowers a trial judge to consolidate actions for trial when there are common questions of law or fact to avoid unnecessary costs or delay." *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284 (2d Cir. 1990) (citing cases). The district court identified several areas of legal and factual commonality among the six cases, including allegations "that the UH Defendants, among others, targeted persons of limited financial means and savvy who had never before purchased homes"; "that United Homes operated a 'one-stop shop' through which it directed plaintiffs to 'cooperating' lenders, appraisers and attorneys who rushed the transactions to completion at breakneck speed so that plaintiffs had little time to seek independent advice"; and "that despite United Homes's repeated representations that their homes would be renovated and repaired, each home was significantly in disrepair, with latent defects in many cases masked by cosmetic repairs."  2010 WL 3709278, at *27 (E.D.N.Y. Sept. 13, 2010) (internal quotation marks omitted). The district court noted that even the Defendants had conceded "that there are certain facts that overlap each of these six actions, and that to a certain degree, some common questions of law and fact are presented." *Id.*

15

### B.    The District Court Properly Considered All of the Criteria Relevant to the Decision Whether to Consolidate.

Where common questions of law or fact are present across cases, a court may exercise its broad discretion to consolidate them after considering "whether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses, and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives." *Hendrix v. Raybestos–Manhattan, Inc.*, 776 F.2d 1492, 1495 (11th Cir. 1985) (*quoted in Johnson*, 899 F.2d at 1285). "When considering consolidation, a court should also note that the risks of prejudice and confusion may be reduced by the use of cautionary instructions to the jury and verdict sheets outlining the claims of each plaintiff." *Id*.

The district court exercised its discretion within the bounds prescribed by the decisions of this Court. Having identified common factual and legal questions, it went on to identify further factors that militated in favor of consolidation, including avoiding unnecessary expense and delay, and preventing inconsistent adjudications. 2010 WL 3709278, at *28. Finally, the district court considered the defendants' arguments that consolidation would be prejudicial, and rejected them. The court found that "[t]he UH Defendants' *concerns regarding prejudice or*

16

*confusion* arising out of 'pattern and practice' evidence do not outweigh the significant benefits of consolidation.  Indeed, courts routinely consolidate cases involving allegedly discriminatory or unlawful practices or policies." *Id*. at *29 (citing cases) (emphasis added).

The UH Defendants argue that the district court "applied the wrong analytical standard to the prejudice question." (UH Br. 18.)  However, because the district court did not find that consolidation posed *any* "specific risk of prejudice or confusion," *Hendrix*, 776 F.2d at 1495, its decision to consolidate was proper.

### C.    The District Court Minimized the Risk of Prejudice or Confusion with Jury Instructions and Separate Verdict Forms.

Although the district court did not find a specific risk of prejudice or confusion, it sought to reduce any such risk "by the use of cautionary instructions to the jury and verdict sheets outlining the claims of each plaintiff." *Johnson*, 899 F.2d at 1285.  The UH Defendants' assertion that the court failed to do so is false, for the district court instructed the jury:

> Although the plaintiffs in this trial are being represented by the same counsel, you are not to treat them as one person.  Each plaintiff and defendant is entitled to your separate consideration, and each plaintiff must prove his or her claims against each of the defendants against whom the plaint[iff] alleges a claim.

(A-4715–16).  The district court went on to instruct the jury that it must consider each defendant's potential liability individually.  (A-4716).

The jury was also given separate verdict forms for each case, further

17

minimizing any risk of prejudice, however remote.  (A-4979–5010.)  The parties
were all given a full and fair opportunity to object to and propose changes to the
verdict forms, as they were with respect to the jury instructions.

### D.    The Remaining Arguments Against Consolidation Lack Merit.

The UH Defendants seek to use this Court's decision in *Debruyne v.
National Semiconductor Corp. (In re Repetitive Stress Injury Litig.)*, 11 F.3d 368
(2d Cir. 1993), to support their argument that consolidation was error because the
district court's concern with prejudice was inadequate.  In *Debruyne*, however, the
Court vacated the district court's consolidation orders because the district court had
failed to make any specific findings regarding common questions of fact and law,
and this Court there found no support for consolidation in the complaints.  11 F.3d
at 373.  *Debruyne* did not address the issue of prejudice.

Similarly misplaced is the UH Defendants' argument that the Federal Rules
of Evidence prohibit consolidation where the cases proposed to be consolidated
share a common defendant.  The Federal Rules of Evidence have no relevance to
consolidation; indeed, Plaintiffs were unable to find any case in which a court
considered the Federal Rules of Evidence in determining whether to consolidate.
(The case cited by the UH Defendants in support of this argument, *State Farm Mut.
Auto. Ins. Co. v. Accident Victims Home Health Care Servs*., 467 Fed. Appx. 368
(6th Cir. 2012), does not deal with consolidation.)  Rule 404, which restricts the

18

use of evidence of a person's character or of past crimes or wrongs, and Rule 405, which governs how character may be proved where evidence of character is admissible, are not relevant to consolidation, because consolidation does not determine what evidence is presented or to what purpose.

The UH Defendants find fault with the district court's reliance on case law ordering or upholding consolidation, attempting to distinguish these decisions as involving more or stronger areas of commonality and therefore more appropriate for consolidation.  The distinction is illusory, for the areas of factual and legal commonality in the instant actions are far more extensive than the "single, common fact" that warranted consolidation in one cited case, or the "a common (and not just similar) experience" in another set of cases (UH Br. 22–23).  UH Defendants make much of the fact that each of the cases involves a different transaction (which is why the cases were properly brought as separate actions), but minimize the existence of "common questions of law and fact" that the UH Defendants and Hershco explicitly "recognize[d]" when they responded to Plaintiffs' motion to consolidate.  2010 WL 3709278, at *27.  By their own admission, these actions share common legal and factual questions that made consolidation proper.  This Court should affirm the consolidation order.

## II.    The Plaintiffs Proved Fraud by Clear and Convincing Evidence.

The UH Defendants and Hershco argue that the jury erred in finding for the

Plaintiffs on their fraud claims because Plaintiffs did not meet their burden of proof. (UH Br. 31–46; Hershco Br. 32–39.) Because Plaintiffs proved fraud against the defendants by clear and convincing evidence, the Court should affirm the jury's verdict.

### A. *Caveat Emptor* Does Not Apply to Bar Plaintiffs' Fraud Claims.

The main thrust of the UH Defendants' argument is that none of the evidence of deceptive conduct adduced at trial could prove fraud, because the doctrine of *caveat emptor* governs in New York. However, defendants may not use *caveat emptor* to shield themselves from liability for their own fraudulent conduct where, as here, they engaged in "active concealment" that "thwarted the plaintiff's efforts to fulfill his responsibilities fixed by the doctrine of caveat emptor." *Bethka v. Jensen*, 250 A.D.2d 887, 887–88, 672 N.Y.S.2d 494 (N.Y. App. Div. 3d Dep't 1998); *accord Stoian v. Reed*, 66 A.D.3d 1278, 1279, 888 N.Y.S.2d 639 (N.Y. App. Div. 3d Dep't 2009); *Jablonski v. Rapalje*, 14 A.D.3d 484, 485, 788 N.Y.S.2d 158 (N.Y. App. Div. 2d Dep't 2005). The jury heard overwhelming evidence that by steering Plaintiffs to attorneys, lenders and appraisers involved in the conspiracy, the UH Defendants actively concealed from Plaintiffs the defects in the subject properties, the false valuation of the properties, and the harmful nature of the transactions. (A-915–16; A-1141–44; A-1287; A-1294; A-1463–67; A-1647; A-3041–43; A-3321; A-3327; A-3746–47; A-3749).

Through their use of the "one-stop shop" model of real estate sales, the UH

Defendants thwarted Plaintiffs, all inexperienced first-time home buyers,[3] from

obtaining the information that would have revealed the deception.

The jury also heard evidence that the defective conditions in the homes were

concealed by defendants:

- rotten, shoddy, and improperly installed flooring concealed beneath
  carpets (A-1311; A-1684; A-3356–57; A-3766–67; A-3775–76);

- construction debris hidden under the carpets in the house or buried in
  the backyard (A-1690; A-3074–76);

- electrical and plumbing problems, including leaky fixtures (A-986–
  87; A-1313–15; A-3061–64; A-3350; A-3353–54; A-3358–59; A-
  3766–67).

The UH Defendants fail to recognize, much less address the effect of, any of

the evidence of active concealment.  This extensive evidence provided a basis for

the jury to find, pursuant to the instructions given them by the court (A-4953) (to

which the UH Defendants had had a full and fair opportunity to object), that the

doctrine of *caveat emptor* did not apply in light of the proof of Defendants' active

---

[3] The UH Defendants insist—even to the point of misstating the facts—that
Plaintiffs were sophisticated, savvy homebuyers.  They assert, "Each plaintiff had
some experience buying real property and understood the available options" (UH
Br. 33), although the record establishes that none of the Plaintiffs had ever bought
real property before the subject transactions.

concealment.

The UH Defendants argue that the Plaintiffs could not have been defrauded by the inflated appraisals that falsely boosted the prices of the homes, because appraisals are merely opinions, not factual statements.  But just as the doctrine of *caveat emptor* does not apply when relevant information is actively concealed from the buyer, so are inflated appraisals potentially fraudulent when the buyers are tricked by the sellers and the buyers are not versed in home values.  *See Merry Realty Co., v. Martin*, 103 Misc. 9, 169 N.Y.S. 696 (Sup. Ct. Kings Cty. 1918), *aff'd sub nom. Merry Realty Co. v. Shamokin & Hollis Real Estate Co.*, 186 A.D. 538, 174 N.Y.S. 627 (2d Dep't 1919), *rev'd on other grounds*, 230 N.Y. 316, 130 N.E. 306 (1921).  From the evidence that the defendants conspired to conceal the defective conditions and the true value of the properties from Plaintiffs, all first-time home buyers, the jury was entitled to find that the inflated appraisals—all of which supported the inflated sales prices of the properties—constituted material misrepresentations forming the foundation for a finding of fraud.

Because all of the UH Defendants' arguments rely on the inapplicable doctrine of *caveat emptor*, they fail to show that the jury erroneously concluded that the Plaintiffs were defrauded.

### B.    Purported "Specific Merger Clauses" Do Not Defeat Plaintiffs' Fraud Claims

The UH Defendants argue that the district court erred in denying their post-

22

trial motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) on

the point that the purported "specific merger clauses" in the Plaintiffs' contracts of

sale should have barred the Plaintiffs' fraud claims.   (UH Br. 24–28.)  The district

court was correct to deny the motion on this point, however, because it is

undisputed that the "specific merger clause" argument was not advanced as part of

United Homes' Rule 50(a) motion made at the close of Plaintiffs' case in chief.

*See* Fed. R. Civ. P. 50(b), Notes of Advisory Committee to 1991 Amendment ("A

post-trial motion for judgment can be granted only on grounds advanced in the pre-

verdict motion."); *Samuels v. Air Transport Local 504*, 992 F.2d 12, 14 (2d Cir.

1993) (judgment as a matter of law pursuant to Rule 50(b) is limited to those issues

"specifically raised in [a] prior motion for a directed verdict.").  Indeed, the record

reflects that there was no testimony whatsoever during the trial about the supposed

"specific merger clauses."

Even if there had been testimony regarding alleged "specific merger

clauses" during the trial, and even if any defendant had made a timely Rule 50(a)

motion for judgment based upon such evidence, Plaintiffs' fraud claims would not

thereby have been defeated.  The New York State Court of Appeals case that the

UH Defendants rely principally upon for their merger clause argument, *Danann*

*Realty Corp. v. Harris*, 5 N.Y.2d 317 (1959), indicates that a specific merger

clause may not operate to bar fraud claims if the claimant did not read or did not

23

understand the provision: "[W]here a person has read and understood the disclaimer of representation clause, he is bound by it." 5 N.Y.2d at 322. The decision the *Danann* court cites as the source for this proposition the case *Ernst Iron Works v. Duralith Corp.,* 270 N.Y. 165 (1936). In that case, the sales agent for the defendant had verbally misrepresented to the plaintiffs facts about prior sales of the product. The *Ernst* court held that the plaintiffs' fraud claim was barred for the express reason that the plaintiffs had concededly read and understood the clause of the contract stating that the defendant made no representations as to previous sales.

In the instant cases, by contrast, there was ample testimony at trial that the Plaintiffs either did not read or did not understand their sales contracts—necessarily including any purported "specific merger clauses." (A-1044, A-1145, A-1596, A-1810, A-3056, A-3328–29, A-3334–35, A-3760–63.) Some plaintiffs testified that the lawyers that had been referred to them by United Homes never discussed the terms of the contract with them at all. (A-1296, A-1877, A-3056, A-3323, A-3717–18.)

There is a good reason why courts refuse to bind parties to specific merger clauses that they did not read or understand. Particularly in cases such as these, where there is substantial evidence that the defendants drafted the clause and ensured through its fraudulent scheme that the plaintiffs not read or understand the

document, to permit the defendants to avoid liability through such unlawful

conduct would be perverse.  The New York State Court of Appeals has long

embraced this position:

> I assume that there is no authority that we are required to follow in
> support of the proposition that a party who has perpetrated a fraud
> upon his neighbor may, nevertheless, contract with him in the very
> instrument by means of which it was perpetrated, for immunity
> against its consequences, close his mouth from complaining of it and
> bind him never to seek redress.

*Bridger v. Goldsmith*, 143 N.Y. 424, 428 (1894).

Even if the UH Defendants had presented any evidence or elicited any

testimony about the alleged "specific merger clauses," which they did not, such

clauses cannot be used to bar Plaintiffs' fraud claims under the proven facts.

### C.    Plaintiffs Proved That Defendants Defrauded Them, and Did Not Merely Breach Their Contracts.

The UH Defendants argue that the evidence did not support Plaintiffs' fraud

claims, contending that the alleged fraud merely boils down to breach of the sales

contracts.  They argue that because "[a]lleged wrongdoing that merely constitutes a

breach of contract cannot constitute fraud," the district court erred both in letting

the fraud claims go to trial and in denying the UH Defendants' Rule 50(b) motion

on this point.  (UH Br. 28.)  But, as the district court pointed out both in denying

summary judgment and in denying the UH Defendants' Rule 50(b) motion, the

material representations that induced the Plaintiffs to execute the sales contracts

went beyond misrepresentations about the defendants' intent to perform on the contracts themselves. *See Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) ("New York law specifically recognizes causes of action for fraud in the inducement [of a contract] when the misrepresentation is collateral to the contract it induced.") (citations omitted). In denying summary judgment, the district court identified "undisputed evidence" that Plaintiffs had been induced to enter to contracts by misrepresenting that the homes would be fully renovated prior to sale, and that Defendants would help them find tenants for rental units. The district court further noted that "there is substantial admissible evidence indicating that the Defendants affirmatively took steps to conceal defects in plaintiffs' homes by, *inter alia*, concealing rotten flooring; leaking roofs, walls and windows; debris; electrical and plumbing problems; and water damage." 2010 WL 3709278, at *22 (E.D.N.Y. Sept. 13, 2010). Further, in denying the UH Defendants' Rule 50(b) motion, the district court cited at length the "ample evidence" that defendants had induced the plaintiffs to enter sales contracts by promising that the homes for sale had been or would be fully renovated, while in fact serious (but difficult to discover) defects remained. 2012 WL 2357295, at *7–8 (E.D.N.Y. June 20, 2012). The court went on to cite to voluminous trial evidence showing that defendants promised to repair many items but either made inadequate efforts at repair or completely failed to perform. *Id*. at *8–9. The court concluded that the jury could

26

have found from such evidence that defendants never intended to make the

renovations and repairs that they promised Plaintiffs, and therefore that Plaintiffs

were fraudulently induced to enter into the contracts. *Id*. at *9.[4]

The trial court correctly considered the evidence and rejected the argument

that Plaintiffs' fraud claims were simply recast breach-of-contract claims. This

Court should affirm these determinations.

### D.    There Was Ample Evidence to Support the Jury's Finding That Hershco Committed Fraud.

Hershco argues that no reasonable juror could have found him liable for

fraud. The jury's verdict finding Hershco so liable should be upheld because he

did not preserve this issue for appeal, and because the verdict was supported by

clear and convincing evidence.

### 1.    Hershco Waived His Right to Appeal the Jury's Finding on Fraud Because He Failed to Raise It in His Rule 50(a) Motion.

Without citation to the record, Hershco asserts that the district court erred in

denying his "motion for judgment as a matter of law on [the fraud] claim prior to

submitting the case to the jury." (Hershco Br. 38.) However, because Hershco

---

[4] At trial, plaintiffs put on substantial evidence of material
misrepresentations and omissions collateral to any contracts between plaintiffs and
the UH Appellants. Specifically, the undisputed evidence demonstrates that
United Homes advertised newly renovated and fully renovated homes" (A-1120;
A-1127; A-1491–92; A-1503–04; A-1654), which was proven to be a gross
misrepresentation.

never made such a Rule 50(a) motion regarding fraud, he did not preserve the issue of fraud for appeal.  A-4270–78.  Hershco sought relief under Rule 50(a) based solely on his contention that plaintiffs had not satisfied the second element of veil-piercing because they had not connected the lack of corporate formalities to the fraud they alleged.  A-4271–79.  Therefore, although he argued in his post-trial Rule 50(b) motion that there was insufficient evidence for a finding of fraud against him, the argument had not been preserved and was not properly asserted there, and the district court declined to address this argument.  "[S]ufficiency of the evidence claims may not be reviewed upon appeal if they were not preserved in the trial court in a directed verdict motion."  *Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1155 (2d Cir. 1994).  The Court should dismiss Hershco's challenge to the jury's finding of fraud against him on this basis alone.

> **2.    The Jury's Verdict Holding Hershco Liable for Fraud Was Supported by Clear and Convincing Evidence.**

Even had Hershco properly preserved his argument, there would be no basis for this Court to overturn the jury's finding that Hershco defrauded the Plaintiffs, because the evidence of his liability was clear and convincing.

As primary support of his contention that the evidence of his liability for fraud was insufficient, Hershco asserts that there was no evidence of his direct involvement in the fraud.  He states repeatedly that there is no evidence that he had ever interacted with any of the Plaintiffs, that fraudulent misrepresentations had

come directly from him, that he had been personally involved in the subject transactions or in the repairs or renovations made to Plaintiffs' homes, that he had personally met with other co-conspirators, that he had participated in the closings of the subject transactions, or that he was involved in creating the advertisements for the company.  (Hershco Br. 22–23, 24–25, 33–34.)  Even if all of these statements were true—and they are not[5]—it is not necessary that a corporate officer directly involve himself in the misrepresentations in order to be held liable for his companies' fraud.

It has long been established that "[o]fficers and directors of a corporation may be held liable for fraud if they participate in it or have actual knowledge of it." *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994) (quoting *People v. Apple Health & Sports Clubs, Ltd.*, 80 N.Y.2d 803, 807, 587 N.Y.S.2d 279, 282, 599 N.E.2d 683, 686 (1992); citing *Marine Midland Bank v. John E. Russo Produce Co.*, 50 N.Y.2d 31, 44, 427 N.Y.S.2d 961, 968–69, 405 N.E.2d 205, 211–12 (1980)).  The jury found that "Hershco, as a corporate officer of United Homes, LLC, United Property Group, LLC, and Galit Network, LLC, participated in or knowingly approved of [their] wrongful conduct."  (A-4983, A-4989, A-4994, A-4999, A-5005, A-5010.)  Hershco acknowledges that this is the law (Hershco Br.

---

[5] Contrary to the repeated assertion that no documents or testimony demonstrated that Hershco "made any statements or had any interaction with any of the Appellees" (Hershco Br. 22, 24, 33), Plaintiff Sandra Barkley testified about her meeting with Mr. Hershco.  (A-3361–3363.)

36–37), but denies that any evidence was presented from which the jury could find that he knew about or participated in the fraud.

Hershco's denials notwithstanding, the trial record amply supports the jury's determination that he was liable as a corporate officer for the wrongful conduct of his companies.  Hershco testified at length that he is the sole owner, member, director, and/or president of every one of his companies.  (A-3242–45; A-3247–53.)  He testified that he participated directly in obtaining financing for, acquiring, overseeing the construction work on, and reselling the properties.  (A-3243–44; A-3299–3300) The jury heard testimony that he set up his many companies (including the companies made defendants in these actions) for the express purpose of buying, rehabilitating, and reselling homes.  (A-3290–92; A-3503.)  Hershco testified that he had personally guaranteed $19 million in loans to his companies.  (A-3261.)  Hershco's testimony demonstrated his hands-on knowledge of and control over every aspect of the business from acquisition to construction to sales and financing.  (A-3298–3300.) There was abundant evidence that Hershco established and orchestrated every aspect of this widespread property-flipping scheme.

The record also shows that Hershco had personal knowledge of the complaints raised by Sandra Barkley about the condition of her home. Ms. Barkley testified that she sent Hershco a letter about five weeks after she purchased the

30

house setting out problems she had with the transaction and the house itself. (A-3360–63.) She testified that during her meeting with Hershco he told her that he remembered that she had some concerns about her house, which indicates that he was intimately involved in the day-to-day decisions of his companies.

There is also no question whether the conduct of the employees of the United Homes entities could be imputed to the companies themselves. Under agency law, the "principal is . . . liable for the agent's misrepresentations that cause pecuniary loss to a third party when the agent acts within the scope of his apparent authority." *Am. Soc'y. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982). On that basis, a court may impose liability on corporations for the acts of their agents acting within the scope of their authority. *See In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453, 471–72 (S.D.N.Y. 2010), *aff'd sub nom. Food Holdings Ltd. v. Bank of Am. Corp.*, 423 Fed. Appx. 73 (2d Cir. 2011); *Assets Collecting Co. v. Barnes-King Dev. Co.*, 198 F. 82, 84 (2d Cir. 1912); *cf. United States v. Paccione*, 949 F.2d 1183, 1200 (2d Cir. 1991) ("Acts of individuals on [the corporation's] behalf may be properly chargeable to it.") (internal quotation marks omitted).

The jury was instructed:

A corporation can act only through its officers and agents and, when they give the appearance of acting with the authority of the corporation, the corporation is responsible for their acts. Under general rules of agency law, principals are liable even when their

31

> agents act fraudulently so long as they are acting with apparent
> authority. Apparent authority is that which the principal permits the
> agent to exercise or which he represents to others that the agent
> possesses.

(A-4961–62.)  The trial record contains extensive evidence of the misrepresentations by employees of the United Homes entities about the conditions of the properties, the intent to fully renovate, their ability to place reliable renters, the affordability of the homes and mortgages and the promises to repair during the warranty period. These misrepresentations were made by employees acting with the authority of the United Homes entities, which the jury determined were not distinct from Hershco himself (*see* Part IV, *infra*).

The jury heard clear and convincing evidence from which it fairly concluded that Hershco knew about and/or participated in the fraudulent conduct of his companies.  This Court should affirm the jury's finding of fraud against Hershco.

## III.    Plaintiffs' Civil Conspiracy Claim—and the Jury's Verdict—Are Supported by Fact and Law.

Both UH Defendants and Hershco appeal the jury's finding of liability on Plaintiffs' claim of conspiracy to commit fraud, on separate grounds.

The UH Defendants contend that the trial court erred in permitting the jury to consider Plaintiffs' civil conspiracy claim and in not overruling the jury's verdict on this claim, arguing that "conspiracy cannot stand as a separate cause of action under New York law even if it constitutes a mere element of a fraud claim."

(UH Br. 30.)  This is erroneous for two reasons:  First, conspiracy *is* a separate cause of action, although it is viable only when predicated on a defendant's tortious conduct—fraud, in the case at bar.  Second, conspiracy is not an "element of a fraud claim."  As the trial court stated in refusing to dismiss the claim pursuant to Rule 50(b), "[t]o establish a claim of civil conspiracy, plaintiffs must demonstrate the underlying tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury."  2012 WL 2357295, at *14.  The court then recited the trial evidence that supported the jury's findings as to each element.  *Id*.  The UH Defendants do not identify the error in the district court's conclusion that the Plaintiffs met their burden as to each element of conspiracy, both at the summary judgment stage and at trial, and this Court should affirm those determinations.

Hershco contends that he cannot be found liable for conspiracy to defraud because of the lack of evidence supporting the fraud verdict against him.  (Hershco Br. 41–42.)  Hershco did not make this argument to the district court pursuant to Rule 50(a) or Rule 50(b), so it is waived.[6]  Even if it were not waived, Hershco's argument cannot succeed.  Assuming *arguendo* that insufficient proof of fraud

---

[6] In his Rule 50(b) motion, Hershco argued for judgment as a matter of law on the civil conspiracy claim on the same erroneous ground that UH Defendants now assert:  the alleged lack of a claim for civil conspiracy under New York law. The Court rejected this argument on the merits.  2012 WL 2357295, at *14.

33

liability is also insufficient proof of liability for conspiracy, the evidence of Hershco's liability for fraud was clear and convincing; *see* Part II.D.2, *supra*. The Court should affirm the jury's verdict as to the civil conspiracy claim.

## IV. The Jury's Determination to Pierce the Corporate Veil Was Amply Supported by the Evidence.

Hershco contends on appeal that no reasonable juror could have found it appropriate to pierce the corporate veil of the United Homes entities to hold him personally responsible for their actions. (Hershco Br. 42.) He argues that his companies were a "corporate combine" or "family of companies operating conjunctively," and claims there was "not a scintilla of evidence" to find that Hershco dominated his corporations or used them for purely personal business. (*Id.* at 44–46.)

A party seeking to pierce the corporate veil in New York must make a two-part showing: (i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil. *Morris v. New York State Dep't of Taxation & Fin.*, 82 N.Y.2d 135 (1993). For the first time on appeal, Hershco contends that plaintiffs offered insufficient evidence to establish either element.

34

### A.    Hershco Waived Any Challenge to the "Control/Domination" Prong of the Piercing Test.

Hershco is precluded from review of the jury's finding on the first element of veil piercing because his counsel conceded the point during Rule 50(a) arguments. "[The] . . . two factors necessary for piercing the corporate veil include complete domination, domination and control, which *assuming for purposes of this argument . . . plaintiffs have met through the testimony of Alan Blass"* (A-4277) (emphasis added).[7]  Hershco's counsel thereafter made no attempt to address the control/domination element of the piercing test, arguing instead that plaintiffs had failed to establish the second element.

Because Hershco expressly conceded the first element of piercing, and presented no facts or law to demonstrate plaintiffs' failure to meet it, he waived it for purposes of his Rule 50(b) motion. Indeed, this issue was *not* raised in his Rule 50(b) motion, but is raised now, for the first time, on appeal.  Because the issue was not preserved for appeal, the Court need not address it on its merits.

### B.    The Jury's Finding That Hershco Controlled and Dominated His Companies Was Supported by Ample Evidence.

Hershco argues that no reasonable juror could have found that he dominated the corporations because there was no evidence that they were mere "dummies" carrying out his personal business rather than their own and that the companies'

---

[7] The verdict form required the jury to state its finding as to each element. (A-4983, A-4989, A-4994, A-4999, A-5005, A-5010.)

35

financial statements were properly prepared. (Hershco Br. 41–46.)  His argument

ignores both New York law and trial evidence that Hershco's business plan and its

execution so globally violated the boundaries of corporate integrity as to render the

line between owner and corporation meaningless.

This Court has established a non-exclusive list of factors tending to show

that a corporation has been dominated:  (1) the usual formalities of the

corporation—that is,  issuance of stock, election of directors, keeping of corporate

records and the like—were absent;  (2) the corporate defendants did not have

sufficient capital to operate; (3) whether funds are put in and taken out of the

corporation for personal rather than corporate purposes; (4) overlap in ownership,

officers, directors, and personnel, (5) whether the owner and/or one or more of the

corporation share common office space, address and telephone numbers; (6)

whether the corporations transact business with one another as free and

independent entities, or as entities with a special relationship to one another, or as

one entity controlling the other; (7) one or more of the corporations pays or

guarantees the debts or other corporations; (8)  property of one corporation being

by another of the corporations as if it were its own; (9)  funds are put in and taken

out of one or more of the corporations for personal rather than corporate purposes;

(10) the corporations are not treated as independent profit centers.  *MAG Portfolio*

*Consult, GmbH v. Merlin Biomed Group, LLC,* 268 F. 3d 58 (2d Cir. 2001).  (*See*

36

A-4959-4961.)

The jury was instructed on these factors but was also correctly charged that, while they could consider them in determining the control/domination element, they need not "find that every one of these circumstances is true in these cases in order to find that the corporate veil is pierced." (A-4961.)  Plaintiffs submitted substantial evidence that a potent combination of these factors was present in the way Hershco ran his companies.

Hershco testified that he was the president and sole owner of his companies, and was involved in acquiring properties, overseeing construction and personally guaranteeing the financing for the companies.  (A-3243:12-20; A-3244:14-20; A-3247:17-25; A-3248:21- A-3250:8; A3251:19-A-3253:5; A-3299:24-A-3300:22.)  During one six-month period, he testified, he personally guaranteed $19 million in loans while selling $30 million in real estate.  (A-3261.)

The evidence showed that Hershco's companies were completely interdependent:  none of them transacted business with each other as independent companies or had discretion to manage their own affairs.  (A-3299; A-3244–45; A-3249; A-3250–51.)  There were no operating agreements between the companies, no lease agreements, no loan agreements, no interest charged, no due dates for loans extended.  (A-3499–3501.)  Indeed, the evidence reveals that there were no set procedures for settling intercompany loans.  (A-3515.)  More than twenty of

37

Hershco's companies—including defendants United Homes, United Property Group and Galit Network—operated out of the same offices, used the same phone numbers, and even shared the same employees, with the expenses of payroll concentrated in select companies without regard for which company used the services of the employee. (A-3505–06.) In one six-month period alone, Galit Properties put down over $970,000 in deposits to purchase real estate yet did not actually take title to any properties. (A-3550–52.) Sales proceeds were deposited back into Galit Properties' account regardless of whom the checks were made out to or which company owned the property. (A-3590–93.) Further, the corporate structure Hershco set up for his companies allowed all of the proceeds of his companies to flow directly through the companies to Hershco as owner. (A-3530–31.)

The evidence established that Hershco's complete control over his companies allowed him to manipulate the balance sheets of all of his companies and concentrate all of the capital in a few entities. (A-3567; A-3584–87; A-3587–89; A-3590.) For example, in 2002, although United Property Group had 15 percent of all the companies' sales, it only paid 7.5 percent of expenses for the shared office space, and no rent. (A-3564–65.) Galit Properties paid 99 percent of the rent for the companies even though it had zero sales revenue. (A-3560–61.)

As further proof of Hershco's manipulation of his companies' assets and

38

liabilities, plaintiffs' forensic accounting expert, Alan Blass testified that the bulk of the Hershco company assets and liabilities were actually intercompany loans. In December 2002, 22 percent of United Property Group's assets were loans to other Hershco-owned entities; the percentage for Galit Network was even higher at 33 percent. (A-3575–78.) By the end of 2003, almost 40 percent of United Property Group's assets were intercompany loans and well over 60 percent of Galit Network's assets were intercompany loans. Yet there were no loan agreements, no interest charged, and no ultimate reckoning among Hershco's companies. (A-3499–3501.)

Considering all of the evidence, the jury was plainly justified in finding that Hershco controlled and dominated his companies, failing to observe even minimal corporate formalities, instead treating them as his alter ego, thereby justifying piercing the corporate veil.

### C.    The Jury Had Ample Evidence to "Connect the Dots" Between Abuse of Corporate Formalities and the Fraud or Wrong Perpetuated on Plaintiffs.

Hershco's claim that Plaintiffs failed to connect his abuse of corporate formalities to the fraudulent actions of his companies is baseless.[8] In fact, the

---

[8]    Hershco's original Rule 50(a) challenge to sufficiency of evidence for the second element was so unintelligibly presented as to justify waiver on that ground as well. Far from articulating the law and facts in support of the second element, Hershco's attorney argued that veil-piercing has nothing to do with Plaintiffs' claims, that there is nothing illegal in property-flipping, and that

record fully supports the conclusion that Hershco manipulated his companies, essentially treating them as his alter ego, for the sole purpose of perpetrating the fraudulent property-flipping scheme that caused Plaintiffs' injuries. Without the flexibility that arose from abusing the corporate form, Hershco could not have carried out the scheme.

Hershco testified that he started his companies by purchasing, fixing up and then selling one property—and as he acquired more assets, he created more companies, including defendants United Homes, Inc., United Property Group, and Galit Properties. (A-3298–3300.) According to his own testimony, Hershco set up companies to purchase, rehabilitate and resell properties: property-flipping was his business model.

Hershco was the architect of the property-flipping scheme. In addition to acquiring properties, obtaining financing, overseeing construction and handling sales, he also approved advertising contracts and other invoices in amounts ranging from fifty dollars to thousands of dollars. (A-3260–61; A-5175; A-3269; A-5705; A-3269–70; A-3280–81.) Moreover, Hershco was a party to the purchases and resales of the properties: he signed the deeds and other documents necessary to complete purchase and sales transactions, including for each of the plaintiffs'

---

Hershco's companies were separate entities that had paid all their taxes. (A-4272–76.)

homes.  (A-3261–65.)  Hershco's efforts to downplay the evidence of his central involvement in the scheme are belied by the record.

Hershco's business model required capital.  He admitted that he set up new companies so he could borrow more money to purchase and resell more properties. (A-3290–92; A-3503.)  Critically, without the extension of credit enabled by the creation of new companies, he could not have purchased and resold the same volume of properties. For his scheme to be successful, he needed to be able to use the assets of any of companies to pay for the debts of another—construction, marketing, salaries, closing costs—so that he could quickly purchase and resell the properties.  (A-3290–92; A-3500–01; A-3529.)  As expert Alan Blass testified, Hershco handled his companies like a man with twenty-one pockets: he undercapitalized his companies and manipulated their assets and liabilities to further his business purposes.  (A-3542.)

The jury heard the testimony of Alan Blass that Hershco undercapitalized his companies; heard evidence from Hershco himself that he created more companies to make it possible for him to expand his business of buying, fixing up, and reselling homes; and heard testimony that plaintiffs' home transactions were part of Defendants' pattern of buying and reselling homes quickly.  (A-3462.)  There was more than sufficient testimony from which the jury could infer that Hershco's conduct with respect to his properties was directly connected to the wrongs that the

41

plaintiffs suffered.

Juries are entitled to draw inferences, even of complex causal connections, from trial evidence. For example, this Court held that a jury could have drawn conclusions about how a series of acts and decisions led to a litigated transaction. *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543–44 (2d Cir. 1994). Given the weight of the evidence, the jury properly found a connection between Hershco's manipulation of his companies and the fraud perpetrated against Plaintiffs and properly pierced the corporate veil so as to hold Hershco personally liable for the acts of his companies.

## V.    Hershco Failed to Preserve for Review His Argument That the Jury Erred in Finding Him Liable for Violating G.B.L. § 349.

Hershco argues that the jury should not have found him liable under section 349 of the General Business Law because there was insufficient proof that he was personally involved in any misrepresentations or omissions actionable under G.B.L. § 349.  (Hershco Br. 39–40.)  Hershco waived this argument by failing to assert it on a motion under Rule 50(a).  He asserted the argument in his Rule 50(b) motion, and the district court entertained it to the extent of denying it on the ground that "there was sufficient evidence to pierce the corporate veil.  Because there was sufficient evidence to find that the UH Defendants engaged in deceptive practices in violation of G.B.L. § 349, the claim is also sustained as to Mr. Hershco, the alter ego of the UH Defendants."  2012 WL 2357295, at *20.  Indeed,

there was sufficient evidence of Hershco's involvement in and/or knowledge of his company's misrepresentations and omissions to justify finding him liable for fraud (*see* Part II.D., *supra*), and the same evidence supports the finding that Hershco is personally liable for his companies' violation of G.B.L.§ 349.  *See*, *e.g*., *F.T.C. v. Crescent Pub. Group, Inc.*, 129 F. Supp. 2d 311, 324 (S.D.N.Y. 2001) ("Plaintiffs are entitled to relief against the individual defendants . . . on a showing that they participated in the corporate defendants' wrongful acts or that they had the authority to control the corporate defendants and knew of the acts or practices."). Although this argument is not preserved for review, if the Court chooses to consider it, it should affirm.

## VI.    Punitive Damages Were Reasonable and Well Supported by the Evidence and the Law.

The UH Defendants challenge the jury's awards of punitive damages relating to findings of liability, arguing that the punitive damages for violation of section 349 of the General Business Law were excessive as a matter of law and that punitive damages for fraud were not supported by the evidence.  The argument as to G.B.L. § 349 was not preserved by way of a Rule 50(a) motion and is therefore waived.  The punitive damages awarded by the jury were warranted by the evidence and did not exceed what the law allows.

43

### A.    The UH Defendants Waived Their Challenge to the Award of Punitive Damages for Violation of G.B.L. § 349, and Their Challenge Lacks Merit.

The UH Defendants argue that the jury's awards of punitive damages in each of the consolidated actions for violation of New York General Business Law § 349 were excessive as a matter of law and should have been stricken.  (UH Br. 47–48.[9])  They argue that these punitive damage awards are excessive as a matter of law because the statute does not allow any punitive damage award if, as in these actions, the compensatory damages equal or exceed $1,000.  This argument was waived and, additionally, lacks merit.

In its decision on the Rule 50(b) motions in this case, the district court set aside the UH Defendants' argument regarding punitive damages on the G.B.L. § 349 claims on the ground that it was waived because not asserted earlier, noting that "despite having a full and fair opportunity to object to the jury instructions and the verdict sheet, and to voice defendants' position that GBL § 349 does not allow the grant of punitive damages where compensatory damages equal or exceed $1,000, defendants did not do so."  2012 WL 2357295, at *17.  This Court should accordingly decline to decide this issue that was not preserved for review.

---

[9] Although the UH Appellants state that each "plaintiff (or plaintiff pair)" was awarded $5,000 in punitive damages for the G.B.L. § 349 violation, this is incorrect; the awards in each case amounted to $1,000 per defendant in this category of damages.  The total amount of punitive damages differed based on the number of defendants.  (A-4979, A-4985, A-4990, A-4995, A-5000–01, A-5006.)

44

Should this Court elect to decide this issue on its merits, it should affirm. The UH Defendants argue that "these punitive damage awards are excessive as a matter of law, because the statute does not allow any punitive damage award if the compensatory damages equal or exceed $1,000"; but this argument is incorrect. Section 349(h) of the General Business Law restricts the court's award of treble damages to a maximum of $1,000, but does not govern the award of punitive damages, which plaintiffs may seek in addition to treble damages. *See Wilner v. Allstate Ins. Co.*, 71 A.D.3d 155, 167, 893 N.Y.S.2d 208 (App. Div. 2d Dep't 2010) (noting that although treble damages awarded under G.B.L. § 349(h) are capped at $1,000, "plaintiffs may seek both treble damages and punitive damages").

The general rule regarding punitive damages pursuant to G.B.L. § 349 is that cases involving a high degree of moral turpitude can support an award of punitive damages. *Latiuk v. Faber Constr. Co.,* 269 A.D.2d 820, 821, 703 N.Y.S.2d 645 (N.Y. App. Div. 4th Dep't 2000) (acknowledging, citing *Walker v. Sheldon*, 10 N.Y.2d 401, 405 (1961), that punitive damages may be available under G.B.L. § 349 for certain types of intentionally misleading acts aimed at the public at large). *Hart v. Moore*, 155 Misc. 2d 203 (Sup. Ct. Westchester Cty. 1992), cited by the UH Defendants in support of their argument regarding the availability of punitive damages (UH Br. 47–48), can and should be distinguished from the

45

situation here because it was a lower court case deciding a matter of first

impression relating to the unsettled question whether a third-party beneficiary can

recover punitive damages against an insurance company for violations of G.B.L.

§ 349.[10]

In its charge to the jury on punitive damages based on G.B.L. § 349—a

charge to which Defendants had a full and fair opportunity to object, but did not—

the district court instructed:

> Punitive Damages: If you find that a plaintiff did sustain injury as a
> result of defendants' violations of New York General Business Law
> section 349, you may also choose to award the plaintiff punitive
> damages. In order to determine if punitive damages are appropriate,
> you must decide if the conduct of the party being held liable evidences
> a high degree of moral culpability, or whether the conduct is so
> flagrant as to transcend mere carelessness, or whether the conduct
> constitutes willful or wanton negligence or recklessness.

(A-4794.)  The jury then answered "yes" in the section of the verdict sheet which

asked if the Defendants conduct was repugnant and involved a high degree of

moral culpability.  (A-4981; A-4986–87; A-4991–92; A-4996–97; A-5000; A-

5007–08.)  The jury also answered "yes" to the question whether Defendants had

knowingly and willfully misled the Plaintiffs.  (A-4979; A-4985–87; A-4990; A-

4995; A-5002; A-5006.)  Based on the foregoing, the jury received proper

---

[10] *See Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47 (2d Cir. 1992)
(certifying the question to the New York State Court of Appeals; the question was
subsequently withdrawn because of a settlement between the parties before the
Court had a chance to decide the issue).

instructions about the standard to use in determining whether an award of punitive damages under G.B.L. § 349 was appropriate.[11]

### B.    The Evidence Establishes Grounds for Punitive Damages Based on the Plaintiffs' Success on Their Fraud Claims.

The UH Defendants argue that the jury was not justified in awarding punitive damages to Plaintiffs for UH Defendants' fraudulent conduct because there was not clear and convincing evidence that the conduct "evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations," as is required to justify such an award. (UH Br. 48–49.)  While Plaintiffs dispute whether the standard of review of a punitive damages for fraud is "clear and convincing evidence," as opposed to the preponderance standard applied by this Court in some cases, the punitive damages awards is due to be affirmed under either standard.  The evidence showed that the UH Defendants orchestrated an elaborate scheme to offer to help unsophisticated first-time homebuyers to "make their dreams come true," only to exploit their trust and lack of experience in order to profit substantially at their expense. The UH Defendants falsely represented that Plaintiffs were purchasing "newly renovated"

---

[11]    At the most, the UH Defendants could have argued—had the argument not been waived—that the query about the defendants' morally repugnant and culpable behavior should have been under both the G.B.L. § 349 section of the verdict sheet and the fraud section of the verdict sheet.  However, the UH Defendants waived their objections to the structure of the verdict sheet when they did not raise them during the charging conference.  *See Shade v. Hous. Auth. of New Haven*, 251 F.3d 307, 312–13 (2d Cir. 2001).

and "fully renovated" homes, assured them that their homes would be affordable, and steered them to lenders, attorneys, and inspectors in order to conceal their misrepresentations.  As a result of the UH Defendants' scheme, Plaintiffs were burdened with unaffordable mortgages and overvalued homes with major defects that made them unsafe and unsound.  (A-980–87; A-1311–19; A-1679–91; A-1984–96; A-2046–2130; A-3061–80; A-3346–54; A-3766–76.)  The jury was entitled to find, based on such evidence, that punitive damages were called for.  This Court should affirm the jury's proper exercise of discretion in awarding punitive damages for the UH Defendants' fraud.

## VII.  The District Court Applied New York General Obligations Law § 15-108 Correctly in Setting off Plaintiffs' Damages Awards.

After trial, the UH Defendants and counsel for lender defendant Olympia Mortgage Company filed separate motions under section 15-108 of New York General Obligation Law for the damages awards to be reduced by the value of the settlements into which the Plaintiffs had entered with settling defendants. Plaintiffs opposed these motions, arguing that the statute does not provide for setoff equal to the value of the settlement.  The district court, after considering the parties' arguments and reviewing documents submitted under seal that reflected the settlements, ordered setoff of the damages awards, but not as to the entire value of those settlements.  848 F. Supp. 2d 248, 267 (E.D.N.Y. 2012).

The district court first concluded that, because G.O.L. § 15-108 and the case

48

law construing it expressly exclude settlements with non-tortfeasors from setoff, the settlements reached with necessary parties sued pursuant to Fed. R. Civ. P. 19 would not be part of the setoff. *Id*. at 264–65. Second, the district court concluded that to the extent that Plaintiffs settled claims for non-economic damages, those settlement amounts should not be included in the setoff amount because the Plaintiffs were not awarded any damages for non-economic harms, so any settlements for non-economic harms does not meet the "same injury" requirement of G.O.L. § 15-108. *Id*. at 266–67. Third, the district court apparently did not include some non-monetary settlements in the setoff, because the monetary value of these settlements was not established. *Id*. at 265 n.4.

The UH Defendants argue that the district court erred in not reducing the damages awards by 100 percent of the value of the settlements that Plaintiffs entered into with the settling defendants. (UH Br. 50–53.) They argue first that it was error for the district court to exclude from setoff the portions of the settlement attributed (based on the amounts of damages Plaintiffs had actually sought for different harms alleged) to non-economic harms. They support their argument with citations to cases that *affirm* the principle supporting the district court's discount of the setoff: only settlements for the "same injury" for which the jury awarded damages—in this case, economic damages for fraud, civil conspiracy and deceptive practices—are to be applied to setoff. (UH Br. 51–52.) Because the

49

settling defendants settled claims for non-economic damages (under race-discrimination statutes) that the Plaintiffs were not awarded in the jury's verdict, it was correct for the district court to exclude these amounts from the settlement.

The UH Defendants also argue that the district court erred in excluding the Rule 19 defendants' settlements from setoff, complaining that "the District Court did not identify any other injuries these settlement payments might have compensated, thus knowingly approving a double recovery that even it acknowledged state law disfavored." (UH Br. 52.)  Neither do the UH Defendants identify what other injuries they speculate may have been addressed by the Rule 19 party settlements, or why this would be relevant given the lack of ambiguity in the law's exclusion of non-tortfeasors from setoff.  The UH Defendants do not point to any authority supporting their position.  The Court should not disturb the district court's order on this point.

The UH Defendants further contend that the value of the non-monetary portions of some settlements (including modifications of Plaintiffs' mortgage loans) should have been included in the setoff.  Even if such amounts are properly included in setoff—and the language of the statute indicates that they are not[12]—the parties were unable to provide the district court with clear information as to the

---

[12] Section 15-108(d)(1) indicates that setoff is available only as to settlements in which "the plaintiff or claimant receives, as  part  of  the  agreement, monetary consideration greater than one dollar."

50

value of those non-monetary settlements.  The UH Defendants disagree, but again point to no authority to support their position.  This Court should therefore affirm the district court's decision regarding setoff of the damage awards.

## VIII. The Attorneys' Fees Awarded by the District Court Were Reasonable and Justified.

The UH Defendants contend that the district court abused its discretion in awarding what it characterizes as "grossly excessive" attorneys' fees of $2,363,467.90.  They argue that awarding this amount was abuse of discretion because, although the jury found for Plaintiffs on their fraud, conspiracy to commit fraud, and deceptive practices claims, the Plaintiffs did not prevail on their federal civil rights claims, so their "limited success" warranted a reduced fee. (UH Br. 53–56.)  They also argue that the district court abused its discretion by not applying the "proportionality analysis" used in New York courts.  (UH Br. 56–58.)  They further argue that the Court should reduce the attorneys' fees awarded to Plaintiffs' former counsel, Scarola Malone & Zubatov LLP ("SMZ"), and/or to remand for further discovery regarding the termination of representation by SMZ, presumably to determine whether the firm earned the fees that they were awarded. The UH Defendants argue that the entire attorneys' fees award should be stricken or, alternatively, should be reduced to $350,000.  (UH Br. 56.)

"A district court has "abuse[d] its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence,"

51

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S. Ct. 2447, 110 L. Ed.

2d 359 (1990), or rendered a decision that "cannot be located within the range of

permissible decisions." *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (quoting

*Zervos v. Verizon N.Y.*, Inc., 252 F.3d 163, 169 (2d Cir. 2001)).  Because the

attorneys' fees award was based on a reasoned, careful analysis both of the facts

and the applicable law, and because the district court clearly explained the reasons

for awarding the amounts it did, there is no basis for this Court to find abuse of

discretion.

Plaintiffs' attorneys, past and present, petitioned for fees in the amount of

$3,750,890.69 ($2,887,911.19 combined for current counsel from AARP

Foundation Litigation, South Brooklyn Legal Services, and Cowan Liebowitz &

Latman, P.C., and $862,979.50 for SMZ).  The requested fees reflected the work

performed by attorneys and paralegals over the course of seven years, but the

contemporaneous time records submitted with the applications also reflected

substantial reductions in the hours actually expended in the litigation:  several

attorneys who were extensively involved in the litigation and trial either deeply

discounted their hours or did not include their time at all, and excluded from the

fee applications was any time specifically dedicated to work on the civil rights

claims on which Plaintiffs did not prevail at trial.  The fees requested were based

on different hourly rates for the different attorneys and paralegals involved; as to

some of the attorneys, Plaintiffs petitioned for an hourly rate that was higher than the prevailing rate in the Eastern District of New York, because of those attorneys' practice in other jurisdictions.

The district court considered the applications and determined that Plaintiffs were entitled to fees because they prevailed on their G.B.L. § 349 claims.  2012 WL 3095526, at *2 (E.D.N.Y. July 30, 2012).  The district court correctly began to determine the presumptively reasonable fee by determining the presumptively reasonable hourly rate for each attorney and paralegal.  *Id*. at *3.  The district court concluded that the Plaintiffs had not made the requisite showing that any attorneys were entitled to rates above the range typically awarded in the Eastern District of New York, but that because of the complexity of the litigation, rates at the high end of the ranges were appropriate.  *Id*. at *7–8.  Accordingly, the court determined reasonable rates for each attorney and paralegal, which were generally substantially lower (20 to 25 percent lower in several instances) than the requested rates.  *Id*. at *8.

Having established reasonable hourly rates, the district court then proceeded to determine the reasonable number of hours expended.  The district court considered the defendants' argument (now raised again on appeal) that the requested number of hours should be reduced because Plaintiffs did not prevail on their civil rights claims.  The district court acknowledged that hours may be

reduced based on limited success at trial, but that courts—including the United States Supreme Court—have held that there are two legally recognized reasons for doing so: "First, the hours may be reduced when an attorney's work in the action is unrelated to the successful claims. Second, when an attorney's work cannot be neatly divided between claims, the hours may be reduced based on the 'degree of success obtained' in the action." *Id*. at *9 (citations omitted). The district court noted that Plaintiffs' attorneys had already eliminated time clearly unrelated to their successful claims. The court further stated that the Plaintiffs had obtained a "substantial degree of success at trial," observing that they had prevailed on most of their claims, for which they had been awarded a significant monetary judgment. The court concluded, "These claims produced substantial relief for the plaintiffs and required a significant amount of work from the attorneys involved," and accordingly declined to reduce Plaintiffs' fees based on degree of success. *Id*. at *10.

The district court did, however, significantly reduce the number of hours from the number requested by Plaintiffs. Finding that the contemporaneous time records submitted by Plaintiffs reflected some duplicative work and overstaffing, the court made an across-the-board reduction in the number of hours by 25 percent. *Id*. at *11.

For all the reductions that the district court made to the Plaintiffs' requested

54

fees, the district court considered the facts reasonably and found that the outcome of the case—a verdict primarily in favor of Plaintiffs, and a sizable monetary award—did not require a further reduction based on "degree of success obtained." There is no basis for finding that the district court abused its discretion in so finding.

The UH Defendants point to no authority holding that federal courts determining attorneys' fees under New York law must apply a proportionality analysis. Indeed, there is authority to the contrary; *see Diaz v. Paragon Motors of Woodside, Inc.*, 2007 WL 2903920, at *8 (E.D.N.Y. Oct. 1, 2007) ("Nor are attorney's fees awarded under N.Y. Gen. Bus. Law § 349 . . . required to be proportional."). The *Diaz* court cites, in support of this assertion, a case that the UH Defendants cite in support of their assertion that the proportionality analysis should be applied to reduce the Plaintiffs' attorneys' fees to approximately one third of the jury's verdict. In that case, *Wilson v. Car Land Diagnostics Center, Inc.*, 2001 WL 1491280 (S.D.N.Y. Nov. 26, 2001), the district court awarded $10,000 in attorney's fees under G.B.L. § 349, plaintiff's only successful claim, although damages were only $2,000. The *Wilson* court stated that a fee award that exceeds the jury's award was "certainly not excessive," and further noted that "the amount in controversy in [G.B.L. § 349] suits will often be small" and the fee must be sufficient to attract competent counsel. *Id*. at *3.

55

The UH Defendants contend that this Court held in *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250 (2d Cir. 1987), that "[a] departure from the [proportionality] rule requires the District Court to articulate a basis for an exception." (UH Br. 57.) But that case did not state that such an articulation is required; the fact that the district court that case had offered no such explanation was just one reason among others why the Court found abuse of discretion. In the cases at bar, the district court provided clear and detailed explanations for its determination of Plaintiffs' fee petitions.

In urging this Court to strike or remand and order reduction of the attorneys' fee award, the UH Defendants rely heavily on Second Circuit cases that do nothing more than affirm the district court's use of discretion to limit attorneys' fees. The district court in the instant cases did the same, and exercised its discretion in a way expressly approved by this Court:

> We perceive no abuse of discretion in this instance. The district court in its opinion took into account the factors ordinarily considered by New York courts when evaluating requests for attorney's fees, including the time and skill required in litigating the case, the complexity of issues, the customary fee for the work, and the results achieved.

*Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 53 (2d Cir. 1992). This Court should likewise find that in these cases, the district court properly exercised its discretion.

There is, furthermore, no basis for this Court to reduce SMZ's fees, or to

56

remand for purposes of discovery relating to the reasons for SMZ's termination of representation.  The district court throughout the litigation had the opportunity to observe the conduct and performance of SMZ's attorneys from the start of the litigation until their termination, and found no basis for reducing their fees based on the termination or inquiring into the reason for the termination.  The UH Defendants cite to no authority for the relief that they seek from this Court, and this Court should decline to grant it.

For all the foregoing reasons, this Court should affirm the district court's proper exercise of discretion in awarding attorneys' fees.

# CONCLUSION

For the reasons stated herein, the Court should affirm the judgments of the

district court in their entirety.

Dated:          March 26, 2013
                Brooklyn, New York

Respectfully submitted,

/s/  Sara Manaugh

_____
SARA MANAUGH
PAVITA KRISHNASWAMY
South Brooklyn Legal Services
Foreclosure Prevention Project
105 Court Street, 3rd Floor
Brooklyn, New York 11201
(718) 237-5500
smanaugh@sbls.org

JEAN CONSTANTINE-DAVIS
AARP Foundation Litigation
601 E Street NW
Washington, D.C. 20049
(202) 434-2058
JCDavis@aarp.org

J. CHRISTOPHER JENSEN
Cowan, Liebowitz & Latman, P.C.
1133 Avenue of the Americas
New York, NY 10036-6799
(212) 790-9204
jcj@cll.com

*Attorneys for Plaintiffs-Appellees*

## Certification Pursuant to
## Fed. R. App. P. 32(a)(7)(B) and (C)

The undersigned hereby certifies that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and (C) because the brief contains 13,857 words of text.

The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief was prepared in a proportionally spaced typeface using Microsoft Word 2010, Times New Roman, Size 14.

Dated: March 26, 2013

  /s/ Sara Manaugh
Sara Manaugh, Esq.

59

# ADDENDUM

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

**H**Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court,
E.D. New York.
Sandra C. BARKLEY, Plaintiff,
v.
OLYMPIA MORTGAGE CO., et al., Defendants.
Mary Lodge, Plaintiff,
v.
**United Homes**, LLC, et al., Defendants.
Dewitt Mathis, Plaintiff,
v.
**United Homes**, LLC, et al., Defendants.
Rodney Gibbons and Sylvia Gibbons, Plaintiffs,
v.
**United Homes**, LLC, et al., Defendants.
Miles McDale and Lisa McDale, Plaintiffs,
v.
**United Homes**, LLC, et al., Defendants.
Charlene Washington, Plaintiff,
v.
**United Homes**, LLC, et al., Defendants.
**Nos. 04-cv-875 (KAM)(RLM), 05-cv-187
(KAM)(RLM), 05-cv-4386 (KAM)(RLM), 05-cv-
5302 (KAM)(RLM), 05-cv-5362 (KAM)(RLM),
05-cv-5679 (KAM)(RLM).**

Sept. 13, 2010.

### MEMORANDUM & ORDER

MATSUMOTO, District Judge.

**\*1** Pending before the court are the motions of defendants United Homes, LLC ("United Homes" or "UH"), United Property Group, LLC, Galit Network, LLC and Yaron Hershco (collectively, the "UH Defendants"), and defendants Wachovia Bank, N.A. ("Wachovia") and Bayview Loan Servicing, LLC ("Bayview") (collectively, the "Wachovia Defendants"), for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Also pending is plaintiffs' motion to consolidate the above-captioned actions for trial pursuant Federal Rule of Civil Procedure 42. For the reasons set forth herein, defendants' summary judgment motions are denied and plaintiffs'

motion to consolidate is granted.

### I. INTRODUCTION

Plaintiffs, eight African-American first-time home-buyers, commenced the six above-captioned actions against the UH Defendants, lenders, appraisers, lawyers and others, claiming that defendants conspired to sell them overvalued, defective homes, financed with predatory loans, and targeted them because they are minorities. Plaintiffs allege that the UH Defendants discriminated against them in violation of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604 and 3605, and 42 U.S.C. §§ 1981, 1982, and 1985(3). Plaintiffs further assert state law claims for fraud and conspiracy to commit fraud, and violations of New York General Business Law § 349, and state and local anti-discrimination laws, namely, New York State Executive Law § 296(5) ("NYHRL") and Title 8 of the New York City Administrative Code ("NYCHRL"). *See Barkley,* 2007 U.S. Dist LEXIS 61940, at \*8-9. The UH Defendants move for summary judgment seeking dismissal of all six actions against them.

The Wachovia Defendants seek summary judgment dismissal of plaintiff Mary Lodge's action (05-cv-187). Although Lodge does not assert any causes of action against the Wachovia Defendants in her Amended Complaint (ECF No. 62, "Lodge Am. Compl."),^FN1 Wachovia allegedly is the trustee for a trust into which one of Lodge's mortgage loans was sold, and Bayview is allegedly the servicer of that mortgage. (Lodge Am. Compl. ¶¶ 17-18.) Among other relief sought, Lodge seeks an order declaring unenforceable "the subject notes and mortgages" and an injunction enjoining enforcement of the same. (*Id., ad damnum* clause ¶ 3.) Lodge additionally seeks an order declaring void any mortgage liens on her property. (*Id., ad damnum* clause ¶ 2.) Thus, the Wachovia Defendants were joined as necessary parties pursuant to Federal Rule of Civil Procedure 19. (*Id.* ¶¶ 17-18.)

> FN1. References to submissions on the public court docket refer to documents filed in the *Barkley* (04-cv-875) and *Lodge* (05-cv-187) actions.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

## II. BACKGROUND[FN2]

> [FN2.](#) The court presumes the parties' familiarity with the facts and procedural history of the related cases. A summary of the allegations in the complaints can be found in the court's August 22, 2007 Memorandum and Order in *Barkley v. Olympia Mortgage Co.,* No. 04-cv-875, 2007 U.S. Dist LEXIS 61940 (E.D.N.Y. Aug. 22, 2007) (the "August 2007 Order").

The following undisputed facts are taken from the [Local Civil Rule 56.1](#) ("Rule 56.1") statements of the parties in connection with the Wachovia Defendants' motion for summary judgment and plaintiffs' Rule 56.1 Statement in opposition to the UH Defendants' motion for summary judgment.[FN3]

> [FN3.](#) The UH Defendants did not submit a [Local Civil Rule 56.1](#) statement of undisputed material facts supported by admissible evidence, as required.

**A. The UH Defendants' Summary Judgment Motion**

**a. Sandra C. Barkley**

**\*2** In or around 2002, plaintiff Sandra Barkley, an African-American woman, became interested in purchasing her first home. (ECF No. 470, Plaintiff's Rule 56.1 Statement in Opposition to the UH Defendants' Motion for Summary Judgment ("Pls. 56.1 Stmt.") ¶¶ 1, 3.) Through an acquaintance, Barkley was referred to Shaun Caesar, a United Homes employee. (*Id.* ¶ 4; *see generally* ECF No. 470, Affidavit of Sandra Barkley ("Barkley Aff.").) According to Ms. Barkley, Caesar assured her that UH "would take care of all aspects of the home-buying process." (Barkley Aff. ¶ 7.) Barkley later learned that her acquaintance was paid $1,000 for referring her to United Homes. (*Id.* ¶ 5.)

In January 2003, Caesar showed Barkley three homes, and she liked one home in particular located at 557 Hancock Street in the Bedford-Stuyvesant section of Brooklyn. (Pls. 56.1 Stmt. ¶¶ 2, 8.) Ms. Barkley asked Caesar about certain necessary repairs

to the Hancock Street house and Caesar assured her that the repairs would be completed before closing. (Barkley Aff. ¶ 8.) According to Ms. Barkley, Caesar would not tell her the price of the house, but instead assured her that she could afford it. (*Id.*) At the time, Barkley earned approximately $2,332 per month as an employee of the New York City Housing Authority. (*Id.* ¶ 4.)

A few days later, Barkley met with attorney Michael Cheatham at UH's offices in Brooklyn. (*Id.* ¶ 9.) Mr. Cheatham advised Ms. Barkley that he would represent her during the home-buying process. (*Id.* ¶ 10.) United Homes asked Ms. Barkley to provide a check for a $4,000 down payment on the house, and she gave a $4,000 check to Mr. Cheatham. (*Id.* ¶ 9.) According to Ms. Barkley, Cheatham asked her to "sign some papers" but told her that she need not worry about reading them. (*Id.* ¶ 10.) When Barkley asked Cheatham about the price of the house, he allegedly did not provide the "exact price" but "assured" her that she could afford the property because she would be able to rent the upstairs unit for $1,600 per month. (*See id.* ¶ 10.) Although not initially disclosed to Ms. Barkley, an appraisal report dated January 6, 2003, prepared by defendant Thomas Messina valued the property at $359,000. (Pls. 56.1 Stmt. ¶ 20.)

Following her meeting with Mr. Cheatham, Ms. Barkley scheduled an appointment with another attorney for January 14, 2003, and she advised Cheatham of her intention to work with another lawyer. (Barkley Aff. ¶ 13.) On January 13, however, a UH employee contacted Barkley and advised that the closing would occur the following day. (*Id.* ¶ 14.) Mr. Barkley "felt like [she] had no choice but to cancel [her] appointment." (*Id.*) Still, on January 14, Barkley advised Cheatham that she did not want him to represent her at the closing and wanted another attorney. (*Id.* ¶ 15.) Shortly thereafter, Barkley received a call from another attorney, Benjamin Turner, who advised that he would represent Barkley at the closing that evening. (*Id.*)

**\*3** Later that day, Ms. Barkley and Caesar walked through the property and Barkley noticed "numerous problems" with the house. (*Id.* ¶ 16.) Ms. Barkley informed Caesar and Turner of the needed repairs. (*Id.*)

The closing occurred during the evening of January

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

14, 2003 at UH's offices. (*See id.* ¶ 17.) Turner represented Barkley and he handed her "many documents and told [her] to sign" them. (*Id* .) Ms. Barkley states that she "felt very rushed" during the closing. (*Id.*) Barkley also provided another check in the amount of $6,000. (*Id.*) Barkley first learned of the purchase price of the house-$359,000-and that she was entering into two mortgages, which required monthly payments in excess of her salary. (*Id.* ¶¶ 17-19.)

Ms. Barkley executed two mortgages on January 14, 2003. The first is a 30-year adjustable-rate mortgage in the amount of $287,200 for the benefit of Olympia Mortgage Company ("Olympia") and the second is a 15-year balloon mortgage with monthly payments based on a 30-year amortization, fixed at 12.5% interest, in the amount of $53,850 for the benefit of Olympia. (Pls. 56.1 Stmt. ¶ 22.)

Ms. Barkley was "so distraught" by the purchase price and monthly mortgage payments that she sent a letter to Turner, Cheatham and Olympia requesting to cancel the mortgages. (Barkley Aff. ¶ 20.) After she sent the letter, Caesar called her to say that she had gotten a good deal. (*Id.* ¶ 21.)

When Barkley moved into the home, she discovered that many of the repairs had not been made. (*Id.* ¶ 22.) Over the next several months, Barkley contacted UH regarding the many problems with her home and provided a detailed list of needed repairs. (*Id.* ¶ 23.) Although UH sent a plumber and contractor to the house, many of the repairs were "never completed or not completed properly." (*Id.*) She was also unable to rent the upstairs apartment for $1,600; instead, Barkley rented out the apartment for $1,200 per month. (*See id.* ¶ 24.)

**b. Rodney and Sylvia Gibbons**

In 2002, plaintiff Rodney Gibbons and his wife, Sylvia, both African Americans, became interested in purchasing their first home. (Pls. 56.1 Stmt. ¶ 34.) That year, the Gibbonses saw a United Homes television commercial and a billboard in Brooklyn advertising "dream homes." (*Id.* ¶¶ 35-36.) They decided to visit UH's offices. (*Id.* ¶ 37.) There, the couple first met a United Homes manager, who was Caucasian. (*Id.*) The manager then introduced them to an African-American man named Barry Braxton. (*Id.*) Mr. Braxton told the Gibbonses that he attended church

and that he takes care of "his own people" so he would take care of them. (*Id.* ¶ 38.)

Braxton showed the couple houses on several occasions, mostly in Brooklyn's Bushwick neighborhood. (*Id.* ¶ 42.) They liked a property at 1148 Halsey Street. (*Id.* ¶ 43.) During a walk-through of the house, Mr. Gibbons observed a number of problems, including water stains on the walls and uneven floors. (*Id.* ¶ 43.) Braxton promised that everything would be fixed. (*Id.*)

**\*4** Although Mrs. Gibbons was concerned that the couple could not afford the house, Braxton assured them that they could afford it by renting the upstairs apartment unit for $1,600 per month. (*Id.* ¶¶ 44, 46.) At the time, the couple's combined net monthly income was approximately $2,500. (*Id.* ¶ 49.) The Gibbonses decided to purchase the property. (*Id.* ¶ 44.)

Shortly after viewing the property, another United Homes employee told the Gibbonses that UH had a lawyer to represent them, and they were introduced to Marios Sfantos. (*Id.* ¶ 46.) Mr. Sfantos met with the couple at UH's offices and told them that United Homes had an inspector who could evaluate the property, but they could hire their own inspector. (*Id.* ¶ 47.) Mr. Sfantos also told the Gibbonses that if they discovered problems with the house after they moved in, United Homes would fix them. (*Id.*)

Soon after this meeting, the Gibbonses met with a United Homes supervisor and David Unger, a representative from Olympia, to discuss a mortgage. (*Id.* ¶ 49.) The couple met with Mr. Unger several times at UH's offices and a UH representative was usually present during the meetings. (*Id.* ¶ 51.) During the meetings, the couple was told to take out two mortgages. (*Id.*) At one of the meetings, the Gibbonses made a $15,000 down payment on the property, by check, payable to "Galit Property." (*Id.* ¶ 52.) The couple was told to bring an additional $3,000 to the closing. (*Id.* ¶ 53.)

At the closing, the Gibbonses again expressed concern that they could not afford the monthly mortgage payments based on their income. (*Id.* ¶ 56.) Mr. Braxton and a UH employee assured them that the mortgage payments would be affordable with rental income. (*Id* .) Mr. Gibbons, however, became sick and suffered a heart attack at the closing, requiring the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

closing to be interrupted. (*Id.* ¶ 57.)

After the failed closing, Braxton called Mrs. Gibbons several times and pressured her to complete the closing by telling her that there were other offers on the property. (*Id.* ¶ 58.) Thereafter, Mrs. Gibbons asked UH to confirm that it could help the couple find a tenant and advised that if so, they would purchase the property. (*Id.* ¶ 59.) A UH employee assured Mrs. Gibbons that United Homes would help the Gibbonses find a tenant and that the property would be affordable with the rental income. (*Id.*) The Gibbonses agreed to close on the property. (*See id.* ¶ 62 .)

On the evening before the closing, the Gibbonses walked through the property with Mr. Braxton. They were unable to view parts of the house due to a lack of lighting. (*Id.* ¶ 60.) During the walk-through, the Gibbonses observed many problems with the house, including extensive water damage. (*Id.* ¶ 61.) Mr. Braxton noted the problems and indicated that UH would fix them. (*Id.*)

On November 13, 2002, the Gibbonses closed on the property. At the closing, a UH employee told Mrs. Gibbons that UH had reduced the sale price from $369,000 to $359,000 and again assured them that they could afford the house with rental income. (*Id.* ¶ 65.) Defendant Thomas Messina, who prepared an appraisal report dated November 7, 2002, estimated the value of the house at $359,000. (*Id.* ¶ 66.) During the closing, the Gibbonses executed two mortgages for the benefit of Olympia, the terms of which are identical to the mortgages executed by plaintiff Barkley. (*See id .* ¶¶ 22, 69.)

**\*5** After moving in, the Gibbonses discovered numerous defects, including extensive water damage and rodent infestation. (*Id.* ¶ 72.) Although UH unsuccessfully attempted to fix a leaking roof, they made no other repairs. (*Id.* ¶ 73.) Further, despite Mr. Braxton's assurances, UH did not assist the Gibbonses in finding a tenant for months. (*Id.* ¶ 74.) After six months, Mr. Braxton recommended a tenant who was willing to pay $1,200 per month. (*Id.*) The delays in finding a tenant caused the Gibbonses financial hardship. (*Id.*)

**c. Dewitt Mathis**

In 2002, plaintiff Dewitt Mathis, an African-American man, became interested in purchasing his first home. (*Id.* ¶ 118.) Mathis went to United Homes after seeing an advertisement which, to Mathis, made the home-buying process accessible notwithstanding any credit problems. (*Id.* ¶ 119.) During his first meeting with United Homes, a UH salesman named Oren showed Mathis two houses located in the Bushwick and East New York sections of Brooklyn. (*Id.* ¶ 120.) Mathis liked a house located at 21 Marconi Place but it appeared to be under construction. (*Id.* ¶ 121-22.) Oren told Mathis that UH was completely renovating the house and that all necessary repairs would be completed in a week. (*Id.* ¶ 122.)

Thereafter, Mathis and his domestic partner, Karen Jenkins, met with a UH employee to discuss financing and the details of the sale. (*See id.* ¶ 124.) The couple was told that Jenkins's mother, Jessie Jenkins would have to co-sign the mortgage because Karen Jenkins was unemployed at the time. (*Id.* ¶ 125.) Thereafter, United Homes introduced attorney Marios Sfantos to Mr. Mathis and they met at United Homes's offices. (*Id.* ¶ 127.) United Homes also arranged for Mathis to meet with a representative of Alliance Mortgage Banking Corporation ("Alliance"), which qualified Mathis and Jessie Jenkins for 6.5% fixed-rate mortgage in the amount of $319,978. (*See id.* ¶¶ 134, 137.)

After moving in, Mathis discovered numerous problems with the house. (*Id.* ¶ 140.) Among other significant problems, electrical wiring was improperly installed; the floors, concealed by carpeting, were unfinished; there was extensive water leaking and water damage; debris was hidden underneath a layer of dirt in the backyard; and the house was infested with rodents and insects. (*Id.*) United Homes attempted some repairs but many of the problems persisted. (*Id.* ¶ 141.)

**d. Miles and Lisa McDale**

In 2002, Miles McDale and his wife, Lisa, both African Americans, became interested in purchasing their first home. (*Id.* ¶ 144.) At the time, their combined monthly income was $3,200. (*Id .*) The couple had seen advertisements in newspapers, subways and buses for United Homes depicting African-American couples. (*Id.* ¶ 146.) The McDales went to United Homes's offices in Brooklyn and met with Robert

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

Cadoch. (*Id.* ¶ 147.) Mr. Cadoch arranged for an African-American man named Gregory Copeland to show the McDales several houses in the East New York, East Flatbush, Bedford-Stuyvesant and Brownsville sections of Brooklyn, some of which were in significant disrepair. (*Id.* ¶ 149; *see* ECF No. 470, Declaration of Meghan Faux ("Faux Decl."), Ex. 26, UH Defendants' Responses to Plaintiffs' First Set of Interrogatories ("UH Defs. Interrogatory Responses") at 4.) According to Ms. McDale, when she asked Copeland about United Homes's customer base, he responded that it "was Puerto Ricans and African-Americans, mostly African-Americans." (Pls. 56.1 Stmt. ¶ 150.) Further, according to the McDales, when asked why he was showing them the specific houses he chose, Copeland "indicated that he believed United Homes was trying to sell the McDales a home in certain neighborhoods." (*Id.*)

**\*6** After several days of viewing houses, one evening, Mr. Copeland took the McDales to 2126 Union Street in Brooklyn. (*Id.* ¶ 152 .) Because there were no lights in the house, the couple was shown the house by flashlight. (*Id.*) The couple concluded that the property was a "crack house" and needed work, but that its "size and layout" fit their needs better than the other properties they had seen. (*Id.*)

The following day, the McDales asked Cadoch about the possibility of buying the house "as is." (*Id.* ¶ 154.) According to Mr. McDale, another United Homes employee, Jerry Reznik, advised that UH could not profit from the house if it was sold "as is." (*See id* .) Mr. Cadoch assured the McDales that UH would "totally rehabilitate the house for them and restore it based on the exact size and layout of the house as they had seen it." (*Id.*) Reznik then told the McDales that the sales price was $385,000 and that the couple "need not worry" about the price because the property would generate rental income. (*Id.* ¶¶ 155-56.)

Thereafter, the McDales were introduced to a loan broker from Alliance named Mr. Israel. (*Id.* ¶ 158.) Mr. McDale advised Israel that he had a child support obligation of over $500 due every two weeks. (*Id.*) Reznik and Israel told the McDales that because of the child support obligation, the couple could only qualify for a "no doc" loan with an adjustable rate mortgage. (*Id.* ¶ 162.) Mr. Reznik also dropped the property's sales price by $20,000, to $365,000. (*Id.* ¶

159.) Donna Kianka, an appraiser retained in connection with the home sale, created an appraisal report dated November 12, 2002, which estimates the value of the property at $365,000. (*Id.* ¶ 160.)

Mr. Reznik or Mr. Israel then told the McDales that they would need an attorney, and that they could get their own attorney or use one provided by United Homes who was already familiar with UH. (*Id.* ¶ 167.) Minutes later, the couple met with Mr. Turner, who, according to the McDales, advised the couple that they could get their own attorney, but that he was familiar with UH and would ensure that the "house and the deal were up to par." (*Id.* ¶ 168.)

Over the next two weeks, the McDales expressed concerns about the repairs needed on the house. (*Id.* ¶ 170.) According to the McDales, Mr. Reznik told them that they could hire their own inspector but that UH "always" commissioned an inspection. (*Id.*) Thereafter, the McDales were introduced to Paul, a construction manager for UH who, according to the McDales, promised to restore the house to its original condition and to install new sheetrock and flooring. (*Id.* ¶ 171.) Paul also assured the McDales that PVC pipes would not be used, because they are toxic if burned. (*See id.*)

During the weeks following their meeting with Paul, the McDales attempted to gain access to the Union Street house but were told by UH that they could not enter because of ongoing construction. (*Id* . ¶ 172.) When the McDales entered the first floor, they were asked to leave. (*Id.*) Before leaving, however, the McDales observed that contractors were installing new windows without insulation. (*Id.*) When the McDales confronted Paul about this, Paul said that insulation was too costly and that if they wanted it, they would have to purchase it. (*Id.*) The McDales could not afford insulation. (*Id.*) The next time they saw the house, window and carpet installation was complete. (*Id.*) The McDales also observed that UH had reconfigured the layout of the house, contrary to their prior representation. (*Id.*)

**\*7** At the closing, the McDales met attorney Raj Maddiwar, who advised that he was Turner's associate. (*Id.* ¶ 177.) The McDales asked why Mrs. McDale's name was not on the title, but Mr. Maddiwar told the couple not to ask because the closing had to occur that day otherwise the interest rates would

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

increase. (*Id.* ¶ 179.) Mr. Maddiwar rushed Mr. McDale through the execution of closing documents without providing enough time to read them. (*Id.* ¶ 182.)

Mr. McDale took title to the Union Street house on November 15, 2002. That same day, he conveyed title to himself and Mrs. McDale. (*Id.* ¶ 183.) The McDales executed a 30-year fixed-rate mortgage on November 15, 2002 in the amount of $346,750 for the benefit of Alliance. (*Id.* ¶ 184.) The monthly mortgage payments were $2,678, approximately 80% of the McDales's net monthly income. (*Id.* ¶ 185.)

Shortly after the closing, a United Homes rental agent came to the house and advised the McDales that they could get $1,700 in monthly rental income for the upstairs unit. (*Id.* ¶ 189.) The McDales were able to rent the upstairs unit for $1,348 per month because United Homes had divided the upstairs so that only three rooms qualified as bedrooms. (*Id.*)

Problems with the house surfaced after the McDales moved in. (*Id.* ¶ 190.) Among other problems, there was flooding and water damage, walls and floors had crumbled, and the couple had enormous gas bills because they could not keep the house properly heated due to the lack of insulation. (*Id.* ¶¶ 190-91, 196.) The McDales contacted United Homes about the problems which, initially, offered to "redo the whole house" but then offered an insufficient amount of money to cover the repairs. (*Id.* ¶ 192 .) The couple ultimately defaulted on their mortgage and subsequently refinanced and borrowed an additional $50,000 to assist in the cost of repairs and cover monthly mortgage payments. (*Id.* ¶ 194.)

**e. Charlene Washington**

In 2002, plaintiff Charlene Washington, an African-American woman, became interested in purchasing her first home. (*Id.* ¶ 200.) In November 2002, she was referred by a friend to Robert Wright, a member of her church who was in the real estate business. (*Id.* ¶ 201.) According to Ms. Washington, Wright told her that he worked for United Homes. (*Id.* ¶ 202.) Ms. Washington had previously seen advertisements for United Homes which typically featured an African-American couple standing in front of a house. (*Id.* ¶ 203.)

Wright showed Ms. Washington two two-family homes in Brooklyn which were under repair. (*Id.* ¶ 205.) The lights were not functioning in the second house she visited, located at 2422 Dean Street in Brooklyn, so she was unable to visually inspect it thoroughly. (*See id.* ¶ 206.) Washington preferred this second house because it was within walking distance of her church. (*Id.*)

After Washington decided that she wanted to purchase the house, she arranged to meet with Wright at United Homes's offices. There, Wright informed her that UH worked with an attorney named Michael Cheatham, who could assist her, or she could choose her own attorney. (*Id.* ¶ 207.) Washington agreed to meet Cheatham, who met with her at UH's offices shortly thereafter. (*Id.*) Mr. Cheatham told Washington that UH needed a deposit and she gave him a check for $2,000 payable to United Homes. (*Id.*) The sales price of the Dean Street property was $315,000. (*Id.*)

**\*8** United Homes also arranged for Washington to meet with a representative of Gateway Mortgage at UH's offices. (*Id.* ¶ 211.) Later, at church, Mr. Wright informed Ms. Washington that Gateway had not approved her for a mortgage and asked her to return to UH's offices to meet with other lenders. (*Id.* ¶ 212.) After she met with other lenders at UH's offices, Mr. Wright instructed Washington again to return to UH's offices and meet with Gateway's representative a second time. (*Id.*)

Before Ms. Washington closed on the house, she returned to the property during daylight hours. (*Id.* ¶ 213.) The house appeared to be in good condition. (*Id.*)

On January 13, 2003, Wright took Washington to UH's offices for the closing. (*Id.* ¶ 214.) Mr. Cheatham was also present and told her to sign the closing documents. (*Id.*) At the closing, Ms. Washington learned for the first time that she would have an adjustable-rate mortgage with Alliance. (*Id.* ¶ 216.) She did not fully understand the meaning of an adjustable-rate mortgage. (*Id.*) That day, Washington executed an adjustable-rate mortgage in the amount of $303,688 for the benefit of Alliance. (*Id.* ¶ 217.) Her initial monthly mortgage payment was $1,755 .76 and consumed over 70% of her net monthly income. (*See id.* ¶ 218.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

Shortly after the closing, Ms. Washington experienced problems with her new house. A problem with the chimney caused her furnace to shut down in the middle of the winter. (*Id.* ¶ 223.) After initially failing to repair the problem, United Homes eventually restored heat to the home. (*Id.*) Ms. Washington also discovered leaky basement walls and rodent infestation. (*See id.* ¶¶ 224, 226, 229.) Sometime in 2003, she discovered water damage in her kitchen and a leaking roof. (*Id.* ¶ 228.) Thereafter, in the fall of 2004, after pulling back the carpet on the second floor of her house, she noticed more than 20 holes in the flooring, some as large as her fist. (*Id.* ¶ 229.)

**f. Mary Lodge**

In 2002, plaintiff Mary Lodge, a retired African-American woman, began looking for a house. (*Id.* ¶¶ 78-79.) She had no experience with the home-buying process. (*Id.* ¶ 80.) After seeing an advertisement for United Homes, Lodge contacted UH and visited its Brooklyn offices. (*Id.* ¶ 81.) According to Lodge, a UH representative told her that all of UH's houses sell for $319,000 to $350,000 and that UH would help her get a mortgage. (*Id.* ¶ 82.)

Another UH representative, an African-American man named Chris Webb, then took Lodge and her daughter to view three houses. (*Id.* ¶ 84.) Lodge liked one located at 249 Halsey Street in Brooklyn (the "Lodge property") and thought it appeared to be in decent shape. (*Id.*) According to Lodge, Mr. Webb told her that she could rent out two of the three apartments in the house for $1,500 each to pay the mortgage. (*Id.* ¶ 85.) At the time, Ms. Lodge received approximately $400 per month in Social Security payments as well as temporary income from housing two foster children. (*See id.* ¶ 79.) Notwithstanding, based upon Mr. Webb's statements, Ms. Lodge believed that with rental income, she could afford the monthly mortgage payments on the house. (*Id.* ¶ 88.)

**\*9** A week or two later, Ms. Lodge visited UH's offices after receiving a phone call requesting that she meet with UH as soon as possible. (*Id.* ¶ 86.) Although she felt pressured, the next day Ms. Lodge met with a United Homes salesperson about purchasing the Halsey Street house. (*Id.* ¶¶ 86-87.) When asked by the salesperson how much she could put down toward the purchase price, Ms. Lodge advised that she could pay between $30,000 to $35,000, and believed that by putting down a large sum, she would lower the amount of her mortgage loan. (*Id.* ¶ 89.) At that time, she was told that the house cost $419,000, significantly more than the previously quoted price range. (*Id.* ¶¶ 82, 90.) Michael Gilbert, an appraiser retained in connection with the home sale, created an appraisal report dated January 16, 2003, which estimated the value of the property at $420,000. (*Id.* ¶ 91.) The following day, Ms. Lodge delivered a $35,000 check to United Homes. (*Id.* ¶ 93.)

Thereafter, she met with attorney Michael Cheatham at UH's offices. (*Id.* ¶ 93.) According to Ms. Lodge, Cheatham told her that he worked for United Homes, but that he would represent her as a "favor." (*Id.* ¶ 94.) He also told her to return the next day with a check for an additional $5,000, which she did. (*Id.*)

The closing took place at UH's offices on January 16, 2003. (*Id.* ¶ 101.) During the closing, Ms. Lodge found out for the first time that she would have two mortgages. (*Id.* ¶ 102.) Ms. Lodge was upset about this fact and told Cheatham that she was ready to terminate the closing. (*Id.* ¶ 103.) In response, Cheatham reassured Lodge that she would be able to rent two apartments for $1,500 each and cover the mortgage payments through rental income alone. (*Id.* ¶ 104.) Lodge relented and completed the closing. (*Id.* ¶ 105.)

Lodge signed a contract to purchase 249 Halsey Street from United Homes for $419,000. (ECF No. 454, Wachovia Defendants' Local Rule 56.1 Statement ("Wachovia Defs. 56.1 Stmt.") ¶ 1; ECF No. 456, Plaintiff Mary Lodge's Rule 56.1 Statement in Opposition to the Wachovia Defendants' Motion for Summary Judgment ("Lodge 56.1 Stmt.") ¶ 1; ECF No. 456, Declaration of Jean Constantine-Davis ("Constantine-Davis Decl."), Ex. L, Contract of Sale, Bates Nos. UHD 7-11.) She executed two mortgages with Olympia. The first is a 30-year 6.625% fixed-rate mortgage in the amount of $335,200 for the benefit of Olympia. The second is a 15-year balloon mortgage with monthly payments based on a 30-year amortization, fixed at 12.5% interest, in the amount of $41,900 for the benefit of Olympia. (Pls. 56.1 Stmt. ¶ 107.) Lodge was required to pay $2,897 each month in mortgages payments and related expenses. (*Id.* ¶ 111.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

After moving in, Lodge discovered that the house was in disrepair. (*See id.* ¶ 112.) Among other problems, much of the flooring was rotten and full of holes, the basement flooded whenever it rained, and the house was not insulated. (*Id.*)

**g. Facts Common to Plaintiffs**

**\*10** According to the plaintiffs, their interactions with United Homes followed a pattern. As previously mentioned, each plaintiff was an African-American, first-time homebuyer and each purchased their home from the UH Defendants within a four-month period from September 2002 to January 2003. (*Id.* ¶¶ 2-3, 22, 34, 64, 79-80, 106, 116-18, 136, 144-45, 183, 199-200, 215.) Each of the plaintiffs took title to their respective properties from United Property Group, LLC via deed signed by defendant Hershco. (*Id.* ¶¶ 18, 64, 106, 136, 183, 215.)

Several plaintiffs state that United Homes promised to provide them with a package of services, including an attorney, home appraisal and inspection and all mortgage arrangements. (*See, e.g ., id.* ¶¶ 6, 39-40, 46, 50, 82, 119, 134, 167-68, 211.) Moreover, some of the plaintiffs were discouraged from arranging for independent property inspections (*id.* ¶¶ 47, 99, 170) or obtaining independent legal advice (*id.* ¶¶ 14-15). Further, several plaintiffs state that they had limited access to their houses and were forced to inspect properties with inadequate lighting, shortly before closing. (*See id.* ¶¶ 60, 152, 206.)

The undisputed evidence also indicates that UH's agents and employees assured plaintiffs that United Homes would fully renovate their homes and repeatedly promised that all repairs would be completed before the closing. (*Id.* ¶¶ 7, 48, 61, 99, 122, 154, 213.) Each plaintiff's home was significantly in disrepair, with defects in many cases masked by cosmetic repairs. (*Id.* ¶¶ 28, 72, 112, 140, 197, 225.) By contrast, the UH Defendants contend, without citing any admissible evidence, that "no representations as to the value or the condition of the properties were ever made ...." (ECF No. 482, UH Defendants' Memorandum of Law ("UH Defs. Mem.") at 3.) <sup>FN4</sup>

> **FN4.** The UH Defendants' Memorandum of Law is not paginated, but the court has paginated its copy of the Memorandum. Page 1 of the court's copy of the Memorandum be-

gins on the page titled "Preliminary Statement."

It is further undisputed that United Homes employees referred plaintiffs to Olympia or Alliance to finance the purchase of properties from United Homes. (Faux Decl. Ex. 27, Excerpts from the Deposition of Yariv Reznik ("Reznik Dep.") at 36-40, 43-45, 48-51.) United Homes typically would negotiate a monthly mortgage payment with the purchaser, and the lender was required to confirm the loan to fit the negotiated payment. (Pls. 56.1 Stmt. ¶ 235.) Further, employees of Olympia and Alliance took mortgage applications from UH's clients at United Homes's offices. (*Id.* ¶ 236, 241.)

Additionally, UH employees referred homebuyers to attorneys. (*Id.* ¶ 242.) Attorneys Cheatham, Sfantos, and Turner all received calls directly from United Homes employees asking them to represent a UH purchaser. (*Id.* ¶ 243.) These attorneys routinely met with clients referred by United Homes at UH's offices. (*Id.* ¶ 244.)

The undisputed evidence further establishes that United Homes spent over $1.5 million on advertising in 2002 and 2003. (*Id.* ¶ 252.) These expenditures included newspaper, subway, and television advertisements. (*Id.*) Through their advertisements, UH promised "fully renov[ated]" and "[n]ewly renov[ated]" homes. (*Id.* ¶ 267; *see* Faux Decl., Ex. 11, at Bates Nos. CL-46, 50.) One newspaper advertisement states "Sit back & enjoy while our contractors are remodeling your dream home according to your needs[,]" while another claims "great for living or investm[en]t." (*Id.,* at Bates Nos. CL-56, 59.) Another advertisement promised that homes would be "Exquisitely Renovated (New Bathrooms, Kitchens, Appliances, Etc)" and "Quality Craftsmanship Throughout the Whole House[.]" (*Id.,* at Bates No. DCD-03.) United Homes's television commercial titled "One's Man's Ceiling" depicted an African-American family sitting in their apartment underneath a white man who is stomping on his floor, causing debris to fall from the ceiling onto the family. (*See* Pls. 56.1 Stmt. ¶ 268.)

**\*11** Further, there is evidence that United Homes's clients predominantly were racial minorities. Specifically, Christopher Webb, a sales agent for United Homes, testified that the approximately "50 to 60

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

percent" of UH's customers were African American, "25 percen[t] Latino" and the "rest was [sic] European or Indian or whatever ...." (Faux Decl., Ex. 28, Excerpts from the Deposition of Christopher Webb ("Webb Dep.") at 244-45.)

## B. Wachovia Defendants' Summary Judgment Motion

As previously mentioned, Ms. Lodge executed two mortgage loans with Olympia to finance the purchase of her home. (Wachovia Defs. 56.1 Stmt. ¶ 5; Constantine-Davis Decl., Exs. QR.) The first loan was secured by a note executed by Lodge in the total principal sum of $335,200 (the "First Note") for the benefit of Olympia. (Constantine-Davis Decl., Ex. Q; Wachovia Defs. 56.1 Stmt. ¶ 6.) The first loan was further secured by a first mortgage lien against the property (the "First Mortgage"). (Wachovia Defs. 56.1 Stmt. ¶ 6.) The second loan was secured by a note executed by Lodge in the total principal sum of $41,900. (Constantine-David Decl., Ex. R .) Because Lodge seeks through her action to bar enforcement of the First Mortgage, facts relevant only thereto are discussed herein.

The Wachovia Defendants assert that in or about June 2003, Olympia offered to sell Lodge's First Mortgage to Bayview Financial Trading Group, LP ("Bayview Financial"), a holding company of defendant Bayview. (ECF No. 455, Declaration of Robert Hodapp ("Hodapp Decl.") ¶ 6.) On or about June 25, 2003, Olympia and Bayview Financial entered into a Supplement to Loan Sale Agreement ("Agreement") memorializing Olympia's sale of 53 loans, including Lodge's First Note and First Mortgage, to Bayview Financial. (*Id.; see* Constantine-Davis Decl., Ex. X, Agreement.) Bayview Financial had previously purchased loans from Olympia in April 2002. (Hodapp Decl., Ex. A, Deposition of Jack Silver ("Silver Dep.") at 16.) According to Jack Silver, Bayview's Vice President, the closing for the purchase of the 53 loans from Olympia, including Lodge's First Note and First Mortgage, took place on July 14, 2003. (*Id.* at 31.)

Bayview states that it paid "valuable consideration" for the First Note and First Mortgage. (ECF No. 454, Declaration of Jack Silver ("Silver Decl.") ¶ 6; Hodapp Decl. ¶ 10; *see also* Silver Dep. at 82.) Bayview paid the "total outstanding principal in addi-

tion to some interest due on the First Mortgage and First Note." (Silver Decl. ¶ 6.) Specifically, Bayview Financial paid $334,007.22 toward the outstanding principal balance on Ms. Lodge's First Mortgage, as well as $2,643.21 in accrued interest on the loan. (Silver Dep. at 82; *see also* Lodge 56.1 Stmt. ¶ 22.)

Both Jack Silver and Robert Hodapp, Bayview's Vice President and Corporate Counsel, state that when Bayview Financial purchased the First Note and First Mortgage from Olympia, it had "no notice of any defense or claim against it on the part of Lodge or any other person." (Hodapp Decl. ¶ 11; Silver Decl. ¶ 7.) Before the July 14, 2003 closing, however, Odyxa Bermudez, an in-house appraiser at Bayview Financial, emailed Mr. Silver to discuss concerns regarding the valuation of certain properties in Brooklyn. (*See* Silver Dep. at 46-50; Constantine-Davis Decl., Ex. H, Email from Bermudez to Silver dated 7/1/10, Bates No. Bayview 14.) Bermudez reported to Silver that she contacted an appraiser named Mr. Gilbert (who had generated an appraisal for Olympia for the Lodge loan). (Silver Dep. at 48-50.) The email provides, in relevant part, that

> **\*12** We have contacted an agent in Brooklyn who alerted us to the flipping and inflating sales prices going on in Brooklyn in the recent months. He happened to have sold one of the properties in our deal.
>
> I got in touch with one of the appraisals [sic] that "supposedly" completed these appraisals and he informed us that not only had he not completed these appraisals but that there [sic] his name has been involved in several forged appraisals now in the hands of the attorney general.
>
> As you can see the appraisals on these Brooklyn properties cannot be given any credit.

(*Id.*)

In response to the email, Bayview Financial "closely review[ed]" property valuations and was "very cautious with respect to how [Bayview Financial] valued properties." (Silver Dep. at 51.) Mr. Hodapp acknowledges that Bayview "was 'aware' of appraisal and other 'issues' generally affecting the real estate market as a whole in Brooklyn" but maintains that "[n]either Bayview nor Wachovia were under notice

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

of any claim or defense." (Hodapp Decl. ¶ 12.)

As part of Bayview Financial's due diligence, it commissioned a broker price opinion ("BPO") to value the Lodge property. A BPO dated July 10, 2003 indicates that the property was valued between $200,000 and $400,000, with a "[r]ecommended" list price of $369,900 and a "[p]robable" sales price of $360,000. (Constantine-Davis Decl., Ex. I, Bates No. Fillmore 10; *see also* Silver Dep. at 55.) An appraisal report dated November 20, 2002 issued by Michael Gilbert to Olympia concerning the property indicates that the "[l]isting price" is $449,000 and that the sales price is $419,000. (Constantine-Davis Decl., Ex. J, Bates No. OMC-L 0382.)

When Bayview Financial acquired Ms. Lodge's First Mortgage in July 2003, it was not concerned about borrowers' debt-to-income ratio on loans they reviewed for purchase. (Lodge 56.1 Stmt. ¶ 25 .) Ms. Lodge's loan application does not indicate whether she had any income or assets. (Constantine-Davis Decl., Ex. U, Residential Loan Application dated 1/6/03, Bates Nos. OMC-L 0226-29.) Mr. Silver testified that, as a result of due diligence performed on Ms. Lodge's mortgages, he was aware that there was a second "piggyback" mortgage to the First Mortgage. (Silver Dep. at 57; *see* Lodge 56.1 Stmt. ¶ 18.)

After sale and assignment of the First Note and First Mortgage by Olympia to Bayview Financial, the First Note and First Mortgage were securitized. (Silver Decl. ¶ 5; Hodapp Decl. ¶¶ 7-8.) Wachovia served as the trustee of the securitization trust and Bayview serviced the trust, which included the First Mortgage. (Silver Decl. ¶ 5.) At some point thereafter, U.S. Bank and Trust ("US Bank") purchased Wachovia's assets and thus succeeded Wachovia's rights as trustee. (*See* Hodapp Decl. ¶ 8.) Defendant Bayview, as servicer of the securitization trust which included the First Mortgage, "has continuously been in possession, custody and control of the original documents, including the First Note and First Mortgage." (*Id.*) According to Mr. Hodapp, "US Bank, as trustee, the successor to Wachovia as Trustee, is the holder of the First Note and First Mortgage.... Wachovia ... never had an ownership interest in the First Note and Mortgage aside from in its capacity as trustee." (Hodapp Decl. ¶ 9.)

**\*13** On January 13, 2005, Lodge filed this action (05-

cv-187) naming, *inter alia,* Olympia and Wachovia. (ECF No. 1, Complaint ¶ 11, 13.) Bayview was added as a defendant in June 2005. (ECF No. 32, Stipulation Substituting Parties.) Thereafter, on December 8, 2005, Ms. Lodge filed the instant Amended Complaint which alleges, *inter alia,* that "[o]n information and belief, Wachovia is the trustee for a trust into which plaintiff's first mortgage was sold and, as such, is a necessary party pursuant to Federal Rule of Civil Procedure 19." (Lodge Am. Compl. ¶ 17.) Lodge further alleges in her Amended Complaint that "Bayview is the servicer of plaintiff's first mortgage, and is thus a necessary party pursuant to Federal Rule of Civil Procedure 19." (*Id.* ¶ 18.) Wachovia and Bayview denied these allegations in their Answer. (ECF No. 237, Answer ¶¶ 17-18.)

### III. DISCUSSION

**A. Summary Judgment Standard**

A court may grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party. *Flanigan v. General Elec. Co.,* 242 F.3d 78, 83 (2d Cir.2001). Nevertheless, the nonmoving party may not "rely merely on allegations or denials" but must instead "set out specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). Further, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir.2008) (citations omitted).

**B. The UH Defendants' Motion for Summary Judgment**

**a. Compliance with Local Civil Rule 56.1**

Rule 83 of the Federal Rules of Civil Procedure ("Rule 83") authorizes the district court to adopt local

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

rules governing practice. Fed.R.Civ.P. 83(a)(1). Rule 83 further provides that "[a] local rule imposing a requirement of form must not be enforced in a way that causes a party to lose any right because of a nonwillful failure to comply." Fed.R.Civ.P. 83(a)(2). Significantly, Rule 83(a)(2) does not "affect the court's power to enforce local rules that involve more than mere matters of form-for example, a local rule requiring parties to identify evidentiary matters relied upon to support or oppose motions for summary judgment." Fed.R.Civ.P. 83 advisory committee's notes (1995).

Pursuant to Rule 83's authority for district courts to adopt local rules, Local Civil Rule 56.1 requires a party moving for summary judgment to submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried[,]" together with citation to the admissible evidence of record supporting each such fact. Local Civil Rule 56.1(a), (d). "Failure to submit such a statement may constitute grounds for denial of the motion" for summary judgment. Local Civil Rule 56.1(a); cf. T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 417 (2d Cir.2009) (while observing that Rule 56.1's requirement of a statement of undisputed facts "is strict[,]" the court held that in cases brought pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400-1482, Rule 56.1 statements are not strictly required because a summary judgment motion in an IDEA case "can serve as an aid to the court within the statutory scheme whose purpose is to ensure that children with disabilities receive the educational benefits to which they are entitled.").

*14 Here, the UH Defendants have failed to file a Rule 56.1 Statement, despite receiving notice of their failure and an opportunity to correct the deficiency in their reply papers. (See Barkley, 04-cv-875, ECF No. 470, Plaintiffs' Memorandum of Law in Opposition to the UH Defendants' Motion for Summary Judgment ("Pl. Opp. to UH") at 4, 15-16) (pointing out the UH Defendants' failure to comply with Rule 56.1.) Cf. Tota v. Bentley, No. 09-4566-cv, 2010 U.S.App. LEXIS 10717, at *2 (2d Cir. May 26, 2010) (finding that trial court did not abuse its discretion by permitting the summary judgment movants to file a Rule 56.1 statement of undisputed facts in their reply papers where the Rule 56.1 statement was based on

affidavits submitted with the movants' moving papers). Nor have the UH Defendants explained their failure to comply with Rule 56.1.

Although Rule 56.1 permits-but does not require-the denial of a non-compliant motion for summary judgment, denial of the UH Defendants' motion for summary judgment in this case is appropriate because they have failed to identify undisputed material facts, supported by admissible evidence, which would permit the court to evaluate and provide the factual bases for their instant motion for summary judgment. Instead, the UH Defendants have recycled many of their arguments in their previously denied Rule 12(b)(6) motion to dismiss and re-characterized it as a summary judgment motion. Nor do the affidavits submitted by defendant Hershco in support of the UH Defendants' motions adequately identify and discuss the pleadings, discovery, disclosure materials or any other relevant admissible evidence, as prescribed by Fed.R.Civ.P. 56(c)(2), concerning plaintiffs' numerous causes of action or otherwise "assist the court in determining which facts are genuinely undisputed." *See Madison Maidens, Inc. v. American Mfrs. Mut. Ins. Co.,* No. 05-cv-4585, 2006 U.S. Dist. LEXIS 39633, at *5 (S.D.N.Y. June 15, 2006). Accordingly, the UH Defendants' motion may be denied for these reasons alone. *See* Rule 56.1(d); *Felton v. King of Salsa, LLC,* No. 09-cv-7918, 2010 U.S. Dist. LEXIS 43443, at *4-*5 (S.D.N.Y. May 4, 2010) (denying summary judgment based on the movant's failure to comply with Rule 56.1) (citations omitted); *Searight v. Doherty Enters., Inc.,* No. 02-cv-604, 2005 U.S. Dist. LEXIS 42681, at *3 (E.D.N.Y. Sept. 29, 2005) (denying summary judgment without prejudice based on movant's failure to comply with Rule 56.1); *see also Tota,* 2010 U.S.App. LEXIS 10717, at *2 (observing that the court of appeals accords "considerable deference" to the "the district court's interpretation and application of its own local rule" (quoting LoSacco v. City of Middletown, 71 F.3d 88, 92 (2d Cir.1995))).

By contrast, as discussed herein, plaintiffs' extensive Rule 56.1 Statement and supporting declarations, excerpted deposition testimony and exhibits raise issues of material fact and preclude summary judgment on plaintiffs' claims. [FN5] Plaintiffs' claims are addressed in turn below.

FN5. The UH Defendants did not object to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

or otherwise take issue with plaintiffs' reli-
ance on unsworn experts' reports which
summarize their findings and opinions about
which they would testify under oath at trial.
Although unsworn expert reports generally
do not satisfy the admissibility requirement
of Rule 56(e), *see Fall v. New York State
United Teachers,* 289 Fed. Appx. 419, 421
n. 3 (2d Cir.2008); *Glowczenski v. Taser
Int'l, Inc.,* No. 04-cv-4052, 2010 U.S. Dist.
LEXIS 47269, at *6 (E.D.N.Y. May 13,
2010); Fed.R.Civ.P. 56(e)(1)-(2); Local Civ-
il Rule 56.1(d), the court need not consider
plaintiffs' unsworn expert reports because of
the UH Defendants' failure to identify and
adequately establish any undisputed material
facts, as required by Rule 56.1, and because
of plaintiffs' extensive showing of material
facts in dispute. *Cf. Capobianco v. City of
New York,* 422 F.3d 47, 55 (2d Cir.2005)
(holding that where the defendants proffered
and relied upon plaintiff's unsworn expert
report in support of their summary judgment
motion, the district court erred by *sua sponte*
excluding the unsworn report without
providing the plaintiff notice and an oppor-
tunity to cure the defect by "obtain[ing] a
sworn affidavit" from the expert, "which
presumably would have merely reiterated"
what was already stated in the report); *Cor-
nell Research Found., Inc. v. Hewlett-
Packard Co.,* No. 01-cv-1974, 2007 U.S.
Dist. LEXIS 89637, at *60 (S.D.N.Y. Jan.
31, 2007) (observing that a defective un-
sworn expert report submitted in opposition
to a summary judgment motion may be
cured by "the submission of an affidavit or a
declaration verifying the report's contents")
(collecting cases).

**b. Claims under 42 U.S.C. §§ 1981 and 1982**

*15 Title 42 U.S.C. § 1981 ("Section 1981") and §
1982 ("Section 1982") "ban discrimination in various
financial transactions, including making and enforc-
ing contracts and purchasing real and personal prop-
erty." *Barkley,* 2007 U.S. Dist LEXIS 61940, at *33-
*34 (citing 42 U.S.C. §§ 1981, 1982). Specifically,
Section 1981 provides, in pertinent part, that all per-
sons "shall have the same right ... to make and en-
force contracts ...." 42 U.S.C. § 1981(a). Section

1982 provides, in relevant part, that "[a]ll citizens of
the United States shall have the same right ... as is
enjoyed by white citizens ... to ... purchase, lease,
sell, hold, and convey real ... property." 42 U.S.C. §
1982. Sections 1981 and 1982 permit actions alleging
discriminatory conduct against wholly private indi-
viduals and organizations. *See Runyon v. McCrary,*
427 U.S. 160, 179 (1976) (Section 1981); *Jones v.
Mayer,* 392 U.S. 409, 438-39 (1968) ( Section 1982).

To prevail under either Sections 1981 or 1982, plain-
tiffs must establish that (1) they are members of a
racial minority; (2) the UH Defendants intended to
discriminate against them on the basis of their race;
and (3) the discrimination concerned one or more of
the activities enumerated in Sections 1981 or Section
1982, such as the making or enforcement of contracts
or the purchase of real property. *See Puglisi v. Un-
derhill Park Taxpayer Assoc.,* 947 F.Supp. 673, 700
(S.D.N.Y.1996), *aff'd,* 125 F.3d 844 (2d Cir.1997);
*Barkley,* 2007 U.S. Dist LEXIS 61940, at *34. Al-
though both parties' submissions inadequately discuss
the elements of plaintiffs' federal claims against the
UH Defendants, the parties fundamentally dispute
whether the UH Defendants intentionally discrimi-
nated against or racially targeted the plaintiffs be-
cause of their African-American race. (*See* Hershco
Aff. ¶ 23; UH Defs. Mem. at Point IV; Pls. Mem. at
28; ECF No. 471, UH Defendants' Reply Memoran-
dum of Law ("UH Defs. Reply Mem.") at 14.) Thus,
in opposing the UH Defendants' motion for summary
judgment, plaintiffs must proffer sufficient admiss-
ible evidence to raise a genuine issue of material fact
concerning the UH Defendants' intent to discriminate
against them. *See Okolie v. Paikoff,* 589 F.Supp.2d
204, 217 (E.D.N.Y.2008); *see also General Bldg.
Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391
(1982) (concluding that Section 1981 "can be violat-
ed only by purposeful discrimination"); *Mian v.
Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d
1085, 1087 (2d Cir.1993); *Weser v. Glen,* 190
F.Supp.2d 384, 406 (E.D.N.Y.2002) (observing that
to prevail under Section 1981 or 1982, the plaintiff
must establish discriminatory intent or motive).

The UH Defendants contend "plaintiffs' evidence of
targeting based on race is legally insufficient ...."
(UH Defs. Reply Mem. at 14; *see also* Hershco Aff. ¶
23.) The court respectfully disagrees.

Plaintiffs have proffered sufficient admissible evi-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

dence from which a jury could find intentional discrimination by the UH Defendants. Plaintiffs' admissible evidence includes United Homes advertising featuring African-American and other minority customers (Pls. 56.1 Stmt. ¶¶ 36, 119, 146, 203), admissions by UH witnesses that UH sold properties mostly to African-American and Latino buyers in neighborhoods comprised predominantly of such racial and ethnic groups, and that UH obtained and showed housing stock in predominantly minority neighborhoods (*See id.* ¶¶ 7, 42, 84, 120, 149).[FN6] Indeed, when the McDales inquired why they were being shown houses in the East New York, East Flatbush, Bedford-Stuyvesant and Brownsville sections of Brooklyn, a representative of UH, Gregory Copeland, admitted "he believed United Homes was trying to sell the McDales a home in certain neighborhoods." (Pls. 56.1 Stmt. ¶ 150.) When the McDales asked about UH's customer base, the United Homes representative responded that "it was Puerto Ricans and African-Americans, mostly African-Americans."[FN7] (*Id.*)

> **FN6.** The court properly may consider census maps compiled by the United States Census Bureau for the year 2000, which reveal that the neighborhoods in which plaintiffs were shown and purchased homes were predominantly African American. *See Victoria Cruises, Inc. v.. Yangtze Cruises, Inc., 630 F.Supp.2d 255, 263 n. 3* (noting that the court may take judicial notice of government statistics, including census statistics); Fed.R.Evid. 202. Public census data is available at http:// factfinder.census.gov [last visited September 13, 2010].

> **FN7.** The statements of UH's representative are admissions. A statement is not hearsay if it is offered against a party and is, among other things, "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." *Fed.R.Evid. 801(d)(2)(D)*; *see also Pappas v. Middle Earth Condo. Ass'n, 963 F.2d 534, 537 (2d Cir.1992)*; *Arista Records LLC v. Lime Group LLC,* No. 06-cv-5936, 2010 U.S. Dist. LEXIS 46638, at \*39 (S.D.N.Y. May 11, 2010). Here, the undisputed evidence indicates (i) the existence of

an agency relationship between United Homes and Mr. Copeland, who showed homes to the McDales on behalf of United Homes; (ii) that Copeland's statements were made during the course of the relationship; and (iii) that his statements relate to a matter within the scope of the agency relationship, namely, the showing of homes to the McDales.

**\*16** Additionally, plaintiffs have presented evidence that United Homes used "race-conscious outreach strategies." *See Barkley,* 2007 U.S. Dist LEXIS 61940, at \*36-37. Specifically, the undisputed evidence establishes that when the Gibbonses first visited United Homes's offices, they met with a Caucasian manager who then paired them with an African-American salesman, Barry Braxton. (Pls. 56.1 Stmt. ¶ 37.) According to the Gibbonses, Mr. Braxton told the Gibbonses that he attended church and that he "takes care of his own people [.]" (*Id.* ¶ 38) (quotation marks omitted). Although it is unclear to whom the phrase "own people" refers, a jury should be permitted to decide whether the statement supports a finding of racial targeting. Further, Christopher Webb, a sales agent for United Homes, testified that approximately "50 to 60 percent" of UH's customers were African American, "25 percen[t] Latino" and the "rest was [sic] European or Indian or whatever ...." (Webb Dep. at 244-45.)

Taken together, this evidence is sufficient to raise a genuine issue of material fact as to whether the UH Defendants targeted plaintiffs because of their race in order to lure them into allegedly fraudulent real estate transactions. As the court previously observed, "evidence of [racial] targeting may establish discriminatory intent in housing discrimination cases." *Barkley,* 2007 U.S. Dist LEXIS 61940, at \*38 (collecting cases). Accordingly, the UH Defendants' motion for summary judgment on plaintiffs' Section 1981 and Section 1982 claims is denied.

### c. Claims under 42 U.S.C. § 1985(3)

The UH Defendants also seek summary judgment on plaintiffs' claims under 42 U.S.C. § 1985(3) ("Section 1985(3)"). Section 1985(3) provides, in relevant part, that

    If two or more persons ... conspire ... for the pur-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

pose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3). Section 1985(3) does not create any "substantive rights" and therefore "rights, privileges, and immunities that § 1985(3) vindicates must be found elsewhere ...." *United Bhd. of Carpenters and Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 833 (1983) (citations omitted); *see Traggis v. St. Barbara's Greek Orthodox Church,* 851 F.2d 584, 587 (2d Cir.1988) (observing that Section 1985(3) "itself provides no substantive rights; instead, it provides a remedy for violation of the rights it designates. Determining which rights the statute designates, however, is not always a simple matter." (citations and internal quotation marks omitted)).

Here, plaintiffs base their Section 1985(3) claim on alleged violations of Sections 1981 and 1982. (*See, e.g.,* 04-cv-875, ECF No. 78, Amended Complaint ("Barkley Am. Compl.").) Although neither party has addressed whether Section 1985(3) provides a remedy for violations of Sections 1981 or 1982, there is authority indicating that the plaintiffs may seek redress under Section 1985(3) for violations of Section 1981 where, as here, the Section 1981 claim is based on the right to make contracts free from racial discrimination. *See Rowe Entm't, Inc. v. William Morris Agency, Inc.,* 2000 U.S. Dist. LEXIS 9256, at *48 (S.D.N.Y. July 6, 2000); *cf. Great Am. Fed. Sav. and Loan v. Novotny,* 442 U.S. 366, 372, (1979) (holding that Section 1985(3) does not confer a separate right of action for injuries redressed by Title VII); *Jenkins v. Arcade Bldg. Maint.,* 44 F.Supp.2d 524, 553 (S.D.N.Y.1999) (holding that Section 1981's "prohibition against racial harassment relating to the conditions of employment ... cannot form the substantive basis for a § 1985(3) conspiracy.")

**\*17** "The four elements of a § 1985(3) claim are: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any

right of a citizen of the United States." *Mian,* 7 F.3d at 1087 (citation omitted); *see Barkley,* 2007 U.S. Dist LEXIS 61940, at *35.

Additionally, "[a] conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct." *Barkley,* 2007 U.S. Dist LEXIS 61940, at *35 (citations and internal quotation marks omitted); *see LeBlanc-Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir.1995); *cf. Cine SK8, Inc. v. Town of Henrietta,* 507 F.3d 778, 792 (2d Cir.2007) (holding that where there was sufficient evidence for a reasonable jury to find that a majority of the town board members, as individuals, were motivated by racial animus in amending the plaintiff's special use permit, the court could not "draw a reasonable inference from this evidence alone that the members ... had even a tacit understanding" to amend the permit because of racial animus). "Furthermore, the conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Mian,* 7 F.3d at 1087 (citation and internal quotation marks omitted).

Neither plaintiffs nor the UH Defendants have addressed Section 1985(3)'s four-element test and, instead, focus their arguments exclusively on whether there is sufficient evidence of discriminatory intent. As previously discussed, there is admissible evidence which, taken together, is sufficient to raise a genuine issue of material fact as to whether the UH Defendants targeted plaintiffs based on their race.

Further, the undisputed evidence sufficiently raises a genuine issue of material fact regarding the existence of a conspiracy and whether certain acts of the defendants were taken in furtherance thereof. Among other things, the evidence demonstrates that each plaintiff was shown distressed and defective properties in predominantly minority sections of Brooklyn; were encouraged to and met with lenders and attorneys arranged for by United Homes at UH's offices, which attorneys purported to represent the purchasers; were subject to high-pressure tactics to close quickly on the deals; and were discouraged from obtaining independent advice about the terms of the transactions and from conducting thorough and independent inspections. The evidence further demonstrates that each plaintiff purchased homes with hid-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

den defects, superficial repairs and unaffordable mortgages. Thus, when viewed in totality, the evidence indicates the existence of a conspiracy carried out by the UH Defendants, lawyers, real estate appraisers, and lenders, who all participated in a scheme to obfuscate the home-buying process for these first-time minority purchasers. Accordingly, the UH Defendants' motion for summary judgment on plaintiffs' Section 1985(3) claims is denied.

**d. Claims under the Fair Housing Act**

*18 The UH Defendants also seek summary judgment dismissal of plaintiffs' claims under Fair Housing Act ("FHA"), 42 U.S.C. § 3604 ("Section 3604") and § 3605 ("Section 3605"). Among other things, Section 3604 prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). Section 3605 prohibits anyone "whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3605(a).

Disparate treatment claims under the FHA are analyzed under the burden-shifting analysis prescribed by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Boykin v. KeyCorp,* 521 F.3d 202, 213 (2d Cir.2008) (citing *Mitchell v. Shane,* 350 F.3d 39, 47 (2d Cir.2003)); *Barkley,* 2007 U.S. Dist LEXIS 61940, at *42 (citations omitted). Under the burden-shifting framework, plaintiffs must establish a *prima facie* case of discrimination, the elements of which the court will discuss below. If plaintiffs establish a *prima facie* case of discrimination, the UH Defendants must proffer a legitimate, nondiscriminatory reason for their conduct. If the UH Defendants make such a showing, the burden shifts back to the plaintiffs to demonstrate that discrimination was the "real reason" for the UH Defendants' action. *Mitchell,* 350 F.3d at 47.

Each plaintiff herein claims that the UH Defendants violated the FHA by "targeting" them "for a predatory home sale and financing transaction" that consti-

tuted "reverse redlining." (*See, e.g.,* Barkley Am. Compl. ¶ 221.) " 'Reverse redlining' is the situation in which a lender unlawfully discriminates by extending credit to a neighborhood or class of people (typically living in the same neighborhood) on terms less favorable than would have been extended to people outside the particular class at issue." *Williams v.2000 Homes Inc.,* No. 09-cv-16, 2009 U.S. Dist. LEXIS 65433, at *11 (E.D.N.Y. July 29, 2009) (citation omitted). Although the Second Circuit has not yet addressed whether reverse redlining violates the FHA, the court in this action previously held that this type of predatory lending connected to the purchase of a home can form the basis of a claim under either § 3604(b) or § 3605(a). *See Barkley,* 2007 U.S. Dist. LEXIS 61940, at *43-*47.

The court observed in its August 2007 Order that the elements necessary to establish a *prima facie* case of discrimination based on reverse redlining are as follows: (1) plaintiffs are members of a protected class, an element which the parties do not dispute is satisfied; (2) plaintiffs applied for and were qualified for loans; (3) the loans were made on grossly unfavorable terms; and (4) the transactions were discriminatory. *Barkley,* 2007 U.S. Dist. LEXIS 61940, at *44-*45 (citations omitted); *see Williams,* 2009 U.S. Dist. LEXIS 65433, at *12. The court previously held that the fourth element may be established "with evidence of intentional targeting" of a protected class. *See Barkley,* 2007 U.S. Dist. LEXIS 61940, at *47. For the reasons previously discussed herein, plaintiffs have raised a genuine issue of material fact as to whether the UH Defendants intentionally targeted them based on their African-American race, thus satisfying the fourth element of the *prima facie* analysis and requiring denial of summary judgment on plaintiffs' FHA claims.[FN8] Further, the same evidence of racial targeting rebuts any legitimate, nondiscriminatory reason for the UH Defendants' actions and provides a basis upon which a jury may find that discrimination was the "real reason" for the UH Defendants' action. *See Mitchell,* 350 F.3d at 47. Accordingly, the UH Defendants' motion for summary judgment on plaintiffs' FHA claims is denied because a reasonable jury could find that the UH Defendants' actions were motivated by discrimination. *Cf. id.* ("summary judgment is appropriate if no reasonable jury could find that the defendant's actions were motivated by discrimination." (citation omitted)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 16

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

FN8. Based upon the UH Defendants' failure to offer any evidence that there are undisputed facts relevant to the second and third elements, or even to discuss these elements in their Memorandum of Law, the court declines to address the same and will not for purposes of this motion find that plaintiffs have failed to satisfy the second and third elements of the *prima facie* analysis.

**e. Claims under State and Local Anti-Discrimination Laws**

**\*19** The UH Defendants seek summary judgment dismissal of plaintiffs' claims under the NYHRL and NYCHRL "for the same reasons" that they contend warrant dismissal of plaintiffs' federal law claims. (UH Defs. Mem. at 7.) Alternatively, without citing any legal authority or providing any reasoning, the UH Defendants seek severance of these claims "so that [sic] can be brought in State Court." (*Id* .)

Because the standards relevant to NYHRL and NYCHRL claims "parallel those applicable under the Fair Housing Act," the court denies the UH Defendants' summary judgment motion dismissing such claims. *See Barkley,* 2007 U.S. Dist. LEXIS 61940, at \* 56-\* 57 (citing *Lynn v. Village of Pomona,* 212 Fed. Appx. 38, 2007 U.S.App. LEXIS 610, at \*3 n. 2 (2d Cir. Jan. 9, 2007)). Moreover, the court declines to sever plaintiffs' NYHRL and NYCHRL claims based on the UH Defendants' failure to explain the basis for the requested relief and because such relief is not warranted. *See Atlantic Specialty Ins. v. AE Outfitters Retail Co.,* No. 07-cv-8508, 2009 U .S. Dist. LEXIS 101802, at \*4 (S.D.N.Y. Oct. 30, 2009) (the "decision whether to grant a severance motion is committed to the sound discretion of the trial court" (citations and internal quotation marks omitted)).

**f. Claims under New York General Business Law § 349**

The UH Defendants contend that plaintiffs' claims under New York General Business Law § 349 ("Section 349") should be dismissed. The UH Defendants maintain that "the statute does not apply here because the Complaints are limited to disputes between the plaintiffs and the defendants arising out of a relationship, which is essentially contractual in nature." (UH Defs. Mem. at 1.) The UH Defendants

further contend that Section 349 "does not apply to a breach of a private contract ... because that conduct is not an act or practice affecting the public interest." (*Id.*)

The court has previously considered this argument and observed that "Section 349 reaches real estate transactions consisting of a 'package of consumer services.' " *Barkley,* 2007 U.S. Dist. LEXIS 61940, at \*58 (citing *Polonetsky v. Better Homes Depot, Inc.,* 760 N.E.2d 1274, 1277 (N.Y.2001)). Based upon plaintiffs' allegations that "defendants orchestrated all-inclusive home sales and steered plaintiffs to participating lawyers, lenders, and mortgage brokers[,]" the court previously held that plaintiffs adequately alleged "consumer-oriented" conduct for purposes of Section 349. *Id.* at \*59.

The elements of a Section 349 claim are "(1) the defendant's challenged acts or practices must have been directed at consumers, (2) the acts or practices must have been misleading in a material way, and (3) the plaintiff must have sustained injury as a result." *Cohen v. JP Morgan & Chase Co.,* 498 F.3d 111, 126 (2d Cir.2007) (citations omitted).

As to the first element, plaintiffs must demonstrate that the UH Defendants' alleged acts or practices have a "broa[d] impact on consumers at large." *See Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 647 N.E.2d 741, 744 (N.Y.1995); *Sheehy v. New Century Mortg. Corp.,* 690 F.Supp.2d 51, 74 (E.D.N.Y.2010). "Thus, when courts have found § 349 applicable in the context of real estate transactions, they have usually done so where defendant published advertisements or otherwise solicited the general public." *Sheehy,* 690 F.Supp. at 74 (collecting cases).

**\*20** Here, the undisputed evidence establishes that the UH Defendants advertised their services on billboards, in subways, in newspapers, on television, through a website and with flyers. (UH Defs. Interrogatory Responses at 6-7.) Accordingly, the first element of a Section 349 claim is satisfied.

As to the second and third elements, plaintiffs have proffered evidence that would enable a reasonable fact finder to conclude that the UH Defendants engaged in practices that are "objectively" misleading in a material way that damaged the plaintiffs. *See*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 17

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

*Oswego,* 647 N.E.2d at 744 (deceptive or misleading representations or omissions are defined objectively as those "likely to mislead a reasonable consumer acting reasonably under the circumstances"). Most significantly, as discussed above, each plaintiff states that despite United Homes's repeated representations that their homes would be renovated and repaired, each home was significantly in disrepair, in many cases with myriad defects masked by cosmetic repairs, which defects caused plaintiffs to incur substantial repair costs. By contrast, it is undisputed that United Homes advertised "fully renov[ated]" and "[n]ewly renov[ated]" homes. (Faux Decl ., Ex. 11, at Bates Nos. CL-46, 50.) One advertisement promised that homes would be "Exquisitely Renovated (New Bathrooms, Kitchens, Appliances, Etc)" and "Quality Craftsmanship Throughout the Whole House[.]" (*Id.,* at Bates No. DCD-03.) Thus, at a minimum, there is a triable issue of fact as to whether United Homes's advertisements were objectively misleading. Thus, summary judgment as to plaintiffs' Section 349 claims is denied.

**g. Fraud Claims**

To state a claim for fraud in New York, a plaintiff must allege "(1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." *Haggerty v. Ciarelli & Dempsey,* No. 09-2135-cv, 2010 U.S.App. LEXIS 6128, at *4 (2d Cir. Mar. 25, 2010) (citations omitted); *see Barkley,* 2007 U.S. Dist. LEXIS 61940, at *59 (citations omitted). The court has previously held that plaintiffs have adequately alleged fraud claims against each of the UH Defendants. *See id.,* at *62-*66.

The UH Defendants seek summary judgment dismissal of plaintiffs' fraud claims on substantially the same grounds that this court previously rejected in the context of the UH Defendants' Rule 12(b) (6) motion to dismiss. The UH Defendants contend that plaintiffs cannot identify any misrepresentations or omissions of material fact which were known to be false and that the doctrine of *caveat emptor* defeats plaintiffs' fraud claims insofar as the "properties were made fully available for inspection ... without restriction ...." (UH Defs. Mem. at 2, 4.) The UH Defendants further contend that plaintiffs' fraud claims

"arise out of contracts" and therefore "no independent fraud claim can be sustained or maintained." (*Id.* at 4.) The court disagrees.

***21** With respect to the first three elements required to state a fraud claim, as explained in Section II(A)(g), *supra,* plaintiffs proffer undisputed admissible evidence of the UH Defendants' material factual misrepresentations and omissions throughout plaintiffs' home-buying processes. (*See also* Pls. Mem. at 7-10.) The evidence indicates, among other things, that the UH Defendants, with the assistance of complicit lawyers, lenders and real estate appraisers, concealed facts and misled the plaintiffs about the condition and true value of the properties that unquestionably would be material to any reasonable purchaser. Consequently, the evidence raises questions of material fact as to whether the UH Defendants intended to defraud plaintiffs.

As to the fourth element, the court rejects the UH Defendants' contention that plaintiffs have failed to establish reasonable reliance upon the UH Defendants' alleged misrepresentations and omissions. The UH Defendants argue that the doctrine of *caveat emptor* required plaintiffs to exercise "ordinary intelligence" to ascertain the "truth or the real quality of the properties." (UH Defs. Mem. at 4.) This argument was rejected in the court's August 2007 Order because the *caveat emptor* doctrine does not apply where, as here, there is evidence that the seller "concealed facts or induced buyers to refrain from making independent inquiries into the terms of a real estate deal." *See Barkley,* 2007 U.S. Dist. LEXIS 61940, at *60 (citations omitted). Further, the *caveat emptor* doctrine is inapplicable to bar fraud claims where, as here, there is a material factual dispute as to whether the UH Defendants "deliberately steered plaintiffs" to other members of the alleged conspiracy "to prevent their discovery of the true value of the properties at issue." *Id.,* at *61. As discussed in Section II(A)(g), *supra,* plaintiffs have proffered admissible evidence that the UH Defendants steered them to other parties complicit in the alleged fraud, and pressured them to sign closing documents, "thereby discouraging them from obtaining independent advice about the terms of the transactions." *See id.,* at *61-*62; *see also M & T Mortg. Corp. v. White,* No. 04-CV-4775, 2010 U.S. Dist. LEXIS 89008, at *48-*49 (E.D.N.Y. Mar. 18, 2010) (concluding that the *caveat emptor* doctrine was inapplicable where a jury could find that the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

plaintiffs' failure to perform or procure independent property inspections resulted from the defendant home seller's referral of plaintiffs to appraisers and attorneys who allegedly deprived the plaintiffs of independent advice), *aff'd*, 2010 U.S. Dist. LEXIS 88944 (August 26, 2010).

As to the fifth element, the UH Defendants do not genuinely dispute that plaintiffs have proffered admissible evidence of damages. By contrast, as previously explained, each plaintiff's home was significantly in disrepair, with latent defects in many cases concealed by cosmetic repairs. (*See* Pls. 56.1 Stmt. ¶¶ 28, 72, 112, 140, 197, 225.)

**\*22** Finally, the court rejects the UH Defendants' contention that plaintiffs' fraud claims do not lie because they arise out of an alleged breach of contract. (*See* UH Defs. Mem. at 4.) Generally, "a fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract." *Wall v. CSX Transp., Inc.,* 471 F.3d 410, 416 (2d Cir.2006) (quotation marks omitted); *see also id.* (observing that a cause of action for fraud cannot exist when a fraud claim arises out of the same facts as a breach of contract claim where the sole additional allegation is that the "defendant entered into a contract while lacking the intent to perform" contractual obligations (citation omitted)). Notwithstanding, "New York law specifically recognizes causes of action for fraud in the inducement [of a contract] when the misrepresentation is collateral to the contract it induced." *Id.* (citations omitted).

Here, as previously discussed, plaintiffs have proffered admissible evidence of alleged material misrepresentations and omissions that are collateral to any contracts between plaintiffs and the UH Defendants. Specifically, the undisputed evidence demonstrates that United Homes advertised "renovated" homes that were "great for living or investm[en]t." (*See* Faux Decl., Ex. 11, at Bates Nos. CL-46, 50, 56, 59.) Further, the UH Defendants' employees or agents assured plaintiffs that United Homes would fully renovate their homes and repeatedly promised that all repairs would be completed before the closing and that United Homes would assist them in securing tenants for rental units. (Pls. 56.1 Stmt. ¶¶ 7, 10, 44, 46, 48, 59, 61, 65, 85, 99, 104, 122, 154, 156, 213.) Additionally, there is substantial admissible evidence indicating that the UH Defendants affirmatively took

steps to conceal defects in plaintiffs' homes by, *inter alia,* concealing rotten flooring; leaking roofs, walls and windows; debris; electrical and plumbing problems; and water damage. (*Id.* ¶¶ 28, 112, 140, 190, 224.) Accordingly, the court concludes that the UH Defendants' representations are sufficiently collateral to their agreements with the plaintiffs as to sustain a claim for fraud in the inducement under New York law. Thus, summary judgment on plaintiffs' fraud claims is denied.

**h. Civil Conspiracy Claims**

The UH Defendants seek summary judgment dismissal of plaintiffs' civil conspiracy claims on the mistaken grounds that "New York does not recognize a cause of action for civil conspiracy." (UH Defs. Mem. at 5) (citing *Hebrew Inst. for the Deaf & Exceptional Children v. Kahana,* 870 N.Y.S.2d 85 (N.Y.App.Div.2008); *Crispino v. Greenpoint Mortg. Corp.,* 769 N.Y.S.2d 553 (N.Y.App.Div.2003).) The cited cases, however, recognize that a claim of civil conspiracy is not an independent cause of action but is predicated upon the tortious conduct of a defendant. *See Kahana,* 870 N.Y.S.2d at 86 ("New York does not recognize civil conspiracy to commit a tort as an independent cause of action; rather, such a claim stands or falls with the underlying tort") (citations omitted); *Crispino,* 769 N.Y.S.2d at 556 ("a mere conspiracy to commit a fraud is never of itself a cause of action" (citation and internal quotation marks omitted)). Here, plaintiffs' civil conspiracy claims are derivative of their underlying claims for fraud, which survive summary judgment.

**\*23** To establish a claim of civil conspiracy, plaintiffs must demonstrate the underlying tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury. *Meisel v. Grunberg,* 651 F.Supp.2d 98, 119 (S.D.N.Y.2009).

The court has discussed each of the above four factors in the context of other causes of action and will briefly summarize the evidence as it applies to plaintiffs' civil conspiracy claims. As to the first element, the undisputed evidence indicates the existence of an agreement between the UH Defendants, lawyers, appraisers and lenders to sell distressed and defective

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

properties to the plaintiffs. As to the second and third elements, the UH Defendants, *inter alia,* arranged for plaintiffs to meet with lawyers and lenders in their offices, performed cosmetic repairs on plaintiffs' homes, pressured plaintiffs to close quickly on the transactions, and discouraged the plaintiffs from obtaining independent advice about the terms of the transactions and from conducting thorough and independent inspections. Finally, plaintiffs were unquestionably damaged as a result of the conspiracy by purchasing homes with hidden defects, superficial repairs and unaffordable mortgages. Thus, summary judgment on plaintiffs' civil conspiracy claims is denied.

**C. Wachovia Defendants' Motion for Summary Judgment**

The Wachovia Defendants move for summary judgment on plaintiff Mary Lodge's claims against the enforceability of the First Mortgage, based upon the affirmative defense that Wachovia is a holder in due course of Lodge's First Note and First Mortgage. The parties agree that the New York Uniform Commercial Code ("NYUCC") establishes the rights of a holder in due course and the defenses that may be asserted by the maker, such as Lodge, of a negotiable instrument such as the First Note. (*See* ECF No. 454, Wachovia Defendants' Memorandum of Law ("Wachovia Defs. Mem.") at 4; [FN9] ECF No. 456, Plaintiff Lodge's Memorandum of Law ("Lodge Mem.") at 8 and nn. 6-7; ECF No. 455, Wachovia Defendants' Reply Memorandum of Law ("Wachovia Defs. Reply Mem.") at 2.) The provision dictates that, except in certain situations, a holder in due course takes an instrument free from "all claims to it on the part of any person ...." NYUCC § 3-305.[FN10]

> [FN9.] The Wachovia Defendants' Memorandum of Law is not paginated, but the court has paginated its copy of the Memorandum. Page 1 of the court's copy of the Memorandum begins on the page titled "Preliminary Statement."

> [FN10.] NYUCC § 3-305, governing the "[r]ights of a Holder in Due Course" provides:

>> To the extent that a holder is a holder in due course he takes the instrument free

from

(1) all claims to it on the part of any person; and

(2) all defenses of any party to the instrument with whom the holder has not dealt except

(a) infancy, to the extent that it is a defense to a simple contract; and

(b) such other incapacity, or duress, or illegality of the transaction, as renders the obligation of the party a nullity; and

(c) such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms; and

(d) discharge in insolvency proceedings; and

(e) any other discharge of which the holder has notice when he takes the instrument.

"Under UCC Article 3, '[a] holder in due course is defined as a(1) holder (2) of a negotiable instrument (3) who took it for value, (4) in good faith, and (5) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of another.' " *Provident Bank v. Cmty. Home Mortg. Corp.,* 498 F.Supp.2d 558, 572 (E.D.N.Y.2007); *see* NYUCC § 3-302; *see also A.I. Trade Fin., Inc. v. Laminaciones de Lesaca, S .A.,* 41 F.3d 830, 836-37 (2d Cir.1994) (citation omitted); *Hartford Accident & Indem. Co. v. American Express Co.,* 74 N.Y.2d 153, 159 (1989). The parties do not dispute the second element, that the subject note is a negotiable instrument. (Lodge Mem. at 8 n. 7.)

**\*24** Instead, Lodge contends that there is a genuine factual dispute as to whether (i) Wachovia is a holder [FN11] of the First Note and First Mortgage; (ii) Wachovia took the subject note and mortgage for value; and (iii) Wachovia and Bayview took the note and mortgage in bad faith, with notice of claims or de-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

fenses. (*See* Lodge Mem. at 7-8.) The Wachovia Defendants contend that Wachovia was a holder in due course when the First Note was assigned to it as trustee and at the time this lawsuit was commenced. (*See* Wachovia Defs. Reply Mem. at 1-2.) The Wachovia Defendants further contend that they took the First Note and First Mortgage in good faith, for value, and that they had no actual notice of any claims or defenses. (*Id.*)

> FN11. Under the NYUCC, a "holder" is defined as "a person who is in possession of ... an instrument ..., issued or indorsed to him or to his order or to bearer or in blank." NYUCC § 1-201(20). The "indorsement must be written by or on behalf of the holder and on the instrument or on a paper so firmly affixed thereto as to become a part thereof." *Id.* § 3-202(2). "Thus, although a party may be a transferee of an instrument, it does not follow that such party must also be a holder within the meaning of UCC Article 3." *Provident Bank,* 498 F.Supp.2d at 573 (quoting *Hauser v. W. Group Nurseries, Inc.,* 767 F.Supp. 475, 486 (S.D.N.Y.1991)).

Even assuming for purposes of their motion only that the Wachovia Defendants both are holders of the First Note and First Mortgage or were holders at the time they were joined as Rule 19 parties,[FN12] and that they took the instruments for value, there is a material factual dispute as to whether the Wachovia Defendants took the instruments in good faith and without notice of claims or defenses.

> FN12. The Wachovia Defendants' submissions are seemingly contradictory and inconsistent regarding the "holder" issue. Although the Wachovia Defendants claim that "Wachovia as Trustee is the holder of the First Note, and in fact, is in possession of the First Note and First Mortgage" (Wachovia Defs. Reply Mem. at 2), Mr. Hodapp states that Bayview "has continuously been in possession, custody and control of the original documents, including the First Note and First Mortgage." (Hodapp Decl. ¶ 8.) Mr. Hodapp further states that "Wachovia as Trustee ... became the owner and holder of the First Note and First Mortgage" (*id.* ¶ 7), and that Wachovia "never had an ownership

interest in the First Note and Mortgage aside from in its capacity as trustee." (*Id.* ¶ 9.)

The NYUCC defines "good faith" as "honesty in fact in the conduct or transaction concerned." NYUCC § 1-201(19). Under the NYUCC, good faith "requires honesty only. It does not require the exercise of due care." *In re Apponline.com, Inc.,* 285 B.R. 805, 819 (E.D.N.Y.2002) (citation omitted); *Provident Bank,* 498 F.Supp.2d at 573.

"Similarly, '[t]o constitute notice of a claim or defense, the purchaser must have notice of the claim or defense or knowledge of such facts that his action in taking an instrument amounts to bad faith.' " *Provident Bank,* 498 F.Supp.2d at 573 (quoting NYUCC § 3-304(7)). In determining whether a party had notice of a claim or defense to a negotiable instrument, courts apply a "subjective test of actual knowledge rather than an objective test which might involve constructive knowledge." *See A.I. Trade,* 41 F.3d at 837 (citing *Carrefour U.S.A. Properties Inc. v. 110 Sand Co.,* 918 F.2d 345, 347 (2d Cir.1990); *Hartford Accident,* 74 N.Y.2d at 162) (internal quotation marks omitted).

"The same facts that call a party's 'good faith' into question may also give that party 'notice' that the instrument has one of the problems listed in section 3-302" (*e.g.* the instrument is subject to a claim or defense). 2 James J. White & Robert S. Summers, Uniform Commercial Code § 17-7 (5th ed.2008). "The holder's initial burden on the issues of notice and good faith ... is 'a slight one' that may be satisfied by his affidavit disclaiming any knowledge of the maker's defense when the notes were negotiated." *A.I. Trade,* 41 F.3d at 836 (citing *First Int'l Bank, Ltd. v. L. Blankstein & Son, Inc.,* 59 N.Y.2d 436, 444 (1983)). "Such an affidavit, 'while necessarily conclusory in form,' may nevertheless be enough to place on the maker the burden of coming forward with evidence sufficient to raise a genuine issue as to the holder's notice of defenses. *Id.* at 837 (quoting *First Int'l Bank,* 59 N.Y.2d at 444).

**\*25** Here, the Wachovia Defendants have proffered a declaration indicating that neither Bayview nor Wachovia had notice of any claim or defense against the First Note or First Mortgage. (*See* Hodapp Decl. ¶¶ 11-12.) They have thus satisfied their "slight" initial burden to establish a lack of knowledge of any claim

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

or defense to the instruments. See _A.I. Trade,_ 41 F.3d at 836.

Consistent with her obligations under Fed.R.Civ.P. 56(e), Lodge must proffer admissible evidence from which a reasonable jury could find notice and bad faith. _See Citibank, N.A. v. Trump Taj Mahal Assocs.,_ No. 95-cv-4327, 1996 U.S. Dist. LEXIS 16480, at *10 (S.D.N.Y. Nov. 6, 1996) ("Plaintiff need not ... show 'actual notice' to defeat a motion for summary judgment; plaintiff need only show there is a genuine issue of fact from which a reasonable jury can infer notice and bad faith." (citations omitted)). Lodge contends that there is sufficient evidence to defeat summary judgment and from which a jury could infer that the Wachovia Defendants acquired the First Note and First Mortgage with knowledge of Lodge's claim that the appraisal on which the property value was based was questionable, or even forged, and/or that Lodge had no realistic possibility to repay the loan. The court agrees.

There is evidence that the Bayview entities were aware of property flipping and inflated or fraudulent appraisals in Brooklyn at the time Lodge purchased her home and obtained financing from Olympia. (See Silver Dep. at 48-49.) As previously mentioned, a July 1, 2003 email from Odyxa Bermudez, an in-house appraiser at Bayview Financial, to Jack Silver, advises of property flipping and sales price inflation "going on in Brooklyn in the recent months" and that one of the properties involved "in our deal" with Olympia was implicated. (Constantine-Davis Decl., Ex. H, Email from Bermudez to Silver dated 7/1/10, Bates No. Bayview 14.) The email also indicates that some appraisals had been forged and that "appraisals on these Brooklyn properties can be given any credit ." (_Id._) The evidence further establishes that Mr. Gilbert, who appraised the Lodge property for Olympia, was contacted by Ms. Bermudez, who confirmed that flipping and inflated appraisals were occurring in Brooklyn regarding Lodge's and other loans that Bayview purchased from Olympia. (Silver Dep. at 48-50.)

Further, the undisputed evidence indicates that before purchasing the First Note and First Mortgage, Bayview performed "independent due diligence" (Hodapp Decl. ¶ 10) and ordered broker price opinions ("BPO") to determine "accurate" property values. (See Wachovia Defs. Reply Mem. at 6; Constan-

tine-Davis Decl., Ex. I, Lodge BPO dated July 10, 2003, Bates No. Fillmore10.) In contrast to the $419,000 sales price of Lodge's home, the BPO recommended that the property be valued at $369,000 and estimated a $360,000 sales price, which suggests that Lodge's property was over appraised.

**\*26** Bayview was also aware that Ms. Lodge had not listed any assets or income on her loan application and that she had undertaken a second "piggyback" loan at the time she purchased her home. (See Silver Dep. at 57; Lodge 56.1 Stmt. ¶ 18; Constantine-Davis Decl., Ex. U, Residential Loan Application dated 1/6/03, Bates Nos. OMC-L 0226-29.) Although the Wachovia Defendants were not concerned about borrowers' debt-to-income ratio on loans they reviewed for purchase, (Lodge 56.1 Stmt. ¶ 25), at a minimum, Lodge's lack of income or assets and substantial debt raise concerns about her ability to repay the loan.

When viewed in totality, the evidence is sufficient to raise material factual questions as to whether the Wachovia Defendants acted in good faith when they acquired the First Note and First Mortgage and whether they actually were aware of defenses to the loan. Accordingly, the Wachovia Defendants' motion for summary judgment is denied.

### D. Plaintiffs' Motion to Consolidate

Plaintiffs move to consolidate the above-captioned actions for trial pursuant to Federal Rule of Civil Procedure Rule 42(a). (_Barkley,_ 04-cv-875, ECF No. 467, Notice of Motion and Memorandum of Law ("Pls. Consolidation Mem.").) The UH Defendants and the Wachovia Defendants oppose consolidation and seek separate trials. (_Barkley,_ 04-cv-875, ECF No. 468, UH Defendants' Memorandum of Law ("UH Defs. Consolidation Mem."); _Lodge,_ 05-cv-187, ECF No. 452, Wachovia Defendants' Memorandum of Law ("Wachovia Defs. Consolidation Mem.").) Olympia also opposes consolidation and "joins in opposing" the motion "for the reasons set forth in the submissions of the other Defendants." (_Barkley,_ 04-cv-875, ECF No. 466, Olympia's Memorandum of Law.)

Pursuant to Fed.R.Civ.P. Rule 42, "[i]f actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

actions; or (3) issue any other orders to avoid unnecessary cost or delay." Fed.R.Civ.P. 42(a). "The trial court has broad discretion to determine whether consolidation is appropriate." *Johnson v. Celotex Corp.,* 899 F.2d 1281, 1284 (2d Cir.1990) (citations omitted); *see Gorbaty v. Wells Fargo Bank, N.A.,* Nos. 10-CV-3291, 10-CV-3354, 2010 U.S. Dist. LEXIS 77289, at *1 (E.D.N.Y. July 27, 2010) (citation omitted). A party moving for consolidation bears the burden of showing the commonality of factual and legal issues in the actions it seeks to consolidate. *DeBruyne v. National Semiconductor Corp.,* 11 F.3d 368, 373 (2d Cir.1993).

"Consolidation is appropriate in order to serve the interests of judicial economy." *Capp v. New York State Dep't of Transp.,* Nos. 10-cv-679, 10-cv-681, 10-cv-682, 2010 U.S. Dist. LEXIS 66068, at *3 (E.D.N.Y. June 22, 2010) (citation omitted); *see Johnson,* 899 F.2d at 1285. "Specifically, consolidation of cases with common questions of law or fact is favored to avoid unnecessary costs or delay, and to expedite trial and eliminate unnecessary repetition and confusion." *Capp,* 2010 U.S. Dist. LEXIS 66068, at *3 (citing *Johnson,* 899 F.2d at 1284; *Devlin v. Trans. Comm'cns Int'l Union,* 175 F.3d 121, 130 (2d Cir.1999)) (internal quotation marks omitted). "Cases may be consolidated even where, as here, certain defendants are named in only one of the complaints." *Id.* (citation omitted). Considerations of convenience and economy, however, "must yield to a paramount concern for a fair and impartial trial." *Johnson,* 899 F.2d at 1285 (citation omitted).

**\*27** In determining whether consolidation is appropriate, the court must consider the following factors:

> Whether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses, and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

*Id.* (citation omitted) (alteration in original). "One of the primary objectives of consolidation is to prevent separate actions from producing conflicting results." *Bank of Montreal v. Eagle Assocs.,* 117 F.R.D. 530,

533 (S.D.N.Y.1987) (citation omitted).

Plaintiffs have satisfied their burden of demonstrating the existence of common factual and legal questions in the six actions sought to be consolidated. The complaints in each action contain virtually identical factual allegations, claiming that the UH Defendants, among others, "targeted persons of limited financial means and savvy who had never before purchased homes." *See Barkley,* 2007 U.S. Dist. LEXIS 61940, at *11. Plaintiffs allege that United Homes operated a "one-stop shop" through which it directed plaintiffs to "cooperating" lenders, appraisers and attorneys "who rushed the transactions to completion at breakneck speed so that plaintiffs had little time to seek independent advice." *See id.* The plaintiffs further allege that "defendants exploited New York City's racially segregated housing market and engaged in 'reverse redlining,' the practice of intentionally extending credit to members of minority communities on unfair terms." *See id.* Plaintiffs contend that they were targeted based on their race through the use of advertisements that featured minority homebuyers and selectively running these ads in minority communities. *See id.* Many of the plaintiffs allegedly received unaffordable mortgages based on inadequate verification of income or assets, and inflated property values that were significantly over-appraised. Each plaintiff further alleges that despite United Homes's repeated representations that their homes would be renovated and repaired, each home was significantly in disrepair, with latent defects in many cases masked by cosmetic repairs. The UH Defendants, who are defendants in all six actions, "recognize that there are certain facts that overlap each of these six actions, and that to a certain degree, some common questions of law and fact are presented." (UH Defs. Consolidation Mem. at 3.)

Further, requiring separate trial in each of the six actions will result in a significant burden on the parties and witnesses and will needlessly consume the parties' and the court's limited resources. Each of the eight plaintiffs, who are represented by the same counsel, have indicated that they will testify in support of their Fair Housing Act claims and that they have designated seven expert witnesses for trial. (Pls. Consolidation Mem. at 5, 8.) If separate trials are held, each of the plaintiffs and the parties' fact and expert witnesses would testify at each of the trials. Further, the UH Defendants and some of the other

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

defendants would have to appear and defend separate trials. Consolidation would thus minimize duplicative testimony by the parties and their witnesses, and thus further the interests of judicial economy.

**\*28** Relying upon three New York State cases, the UH Defendants contend that consolidation is inappropriate because "each case involves a separate parcel of realty and separate defects or repairs ...." (UH Defs. Consolidation Mem. at 5-6) (citing *Stephens v. Allstate Ins. Co.,* 586 N.Y.S.2d 305 (N.Y.App.Div.1992); *H.H. Robertson Co. v. New York Convention Center Dev. Corp.,* 554 N.Y.S.2d 175 (N.Y.App.Div.1990); *Dean Witter Reynolds, Inc. v. Greene,* 452 N.Y.S.2d 404 (N.Y.App.Div.1981).) The UH Defendants' reliance on these cases is misplaced. *Stephens* does not concern real property. There, the appellate court affirmed the denial of a motion to consolidate where it found that the plaintiff chiropractors' claims against an insurance company arose out of "separate incidents and separate claims ...." 586 N.Y.S.2d at 305. Here, as noted above, the factual patterns and claims are common to all actions. Also inapposite is *H.H. Robertson,* where the appellate court affirmed the denial of a motion to consolidate two separate actions brought by different contractors against the same real estate developer arising out of different contracts with the developer. Although the parties' claims involved the same construction site, the court concluded that the two actions, *inter alia,* involved "different parties" and "different factual issues[.]" 554 N.Y.S.2d at 176. In *Dean Witter Reynolds,* the appellate court found that consolidation of actions concerning share prices for a real estate investment trust was not warranted where actions were commenced by different parties to enforce distinct insurance policies. 452 N.Y.S.2d at 405.

By contrast, plaintiffs' reliance on *Hargraves v. Capital City Mortg. Corp.,* 140 F.Supp.2d 7 (D.D.C.2000) is persuasive. The *Hargraves* court denied the motion of a lending company and its president for separate trials where the court found that proof of the plaintiffs' claims of racially discriminatory lending practices "will be interwoven, particularly as to the expert witness testimony regarding patterns of racially discriminatory lending." 140 F.Supp.2d at 28. The court observed that there "are distinct advantages in having the claims tried together, including the minimization of expense and delay, and the convenience of the parties and the Court." *Id.* at 29.

Although the instant actions involve different parcels of real property, as discussed above, the alleged fact patterns and law in each case are substantially the same and will require similar and overlapping fact and expert testimony and evidence. Thus, considerations of judicial efficiency strongly favor consolidation of the six above-captioned actions because they involve essentially the same legal theories, questions of law and fact, many of the same remaining defendants, and will require much of the same evidence.

Based upon the existence of many common factual and legal issues, and the overlapping nature of the evidence expected to be presented at trial, the court further finds that the risk of inconsistent verdicts here is significant, which factor further favors consolidation. Where the individual plaintiffs expect to rely on the same factual and expert evidence to establish their claims, they should not be required to try their claims in separate trials and risk being subject to inconsistent verdicts.

**\*29** The UH Defendants contend that they will be "severely prejudiced" by a joint trial. (UH Defs. Consolidation Mem. at 6.) The contend that if the plaintiffs present their claims in one trial, the "jury will of necessity gather the preconceived notion that some conspiracy must have existed to bring all these people together against the defendants." (*Id.* at 4.) They contend that plaintiffs' "common ancestry, background, and appearance ... will cause any reasonable juror to believe that perhaps something is wrong, because otherwise how did all these people of like background come together." (*Id.*) They further contend that the "respective sales in each of the actions are so dissimilar and the trial may prove so unwieldy, that ... a joint trial will result in jury confusion ...." (*Id.* at 6.)

Similarly, the Wachovia Defendants, as Rule 19 parties, contend that plaintiffs' "attempts to show a 'pattern and practice' will undoubtedly result in an inference by the jury that all of the defendants (including Wachovia and Bayview) were involved in the same pattern and practice." (Wachovia Defs. Consolidation Mem. at 5.) [FN13] The Wachovia Defendants request that the court order separate trials pursuant to Rule 42(b) [FN14] on their defenses because "Bayview is nothing more than a servicer and Wachovia is a holder in due course of its mortgage." (*Id.* at 6.) The Wa-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

chovia Defendants are concerned that evidence of alleged fraud and property flipping "will result in sympathetic jurors more concerned with compensating Lodge than whether or not Bayview or Wachovia had actual knowledge or Lodge's claim." (*Id.* at 7.)

> FN13. The Wachovia Defendants' Memorandum of Law is not paginated, but the court has paginated its copy of the Memorandum. Page 1 of the court's copy of the Memorandum begins on the "Introduction" page.

> FN14. Rule 42(b) provides, in relevant part, that "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims."

The UH Defendants' concerns regarding prejudice or confusion arising out of "pattern and practice" evidence do not outweigh the significant benefits of consolidation. Indeed, courts routinely consolidate cases involving allegedly discriminatory or unlawful practices or policies. *See EEOC v. HBE Corp.,* 135 F.3d 543, 551 (8th Cir.1998) (affirming the district court's Rule 42(a) consolidation of claims of two plaintiffs alleging employment discrimination as (1) the cases had common questions of law and fact; (2) both plaintiffs sought to present similar evidence about a climate of racial hostility; (3) the same evidence was relevant to both plaintiffs in establishing why one was fired and why the other perceived a climate of racial discrimination); *Caronia v. Hustedt Chevrolet,* Nos. 05-cv-3526, 05-cv-4148, 05-cv-4149, 05-cv-4230, 2009 U.S. Dist. LEXIS 120971, at *10-*13 (E.D.N.Y. Dec. 29, 2009) (despite differences in various plaintiffs' causes of action for sexual discrimination and retaliation, the court ordered consolidation for trial due to a "substantial overlap" in the factual and legal issues); *BD v. DeBuono,* 193 F.R.D. 117, 141-43 (S.D.N.Y.2000) (consolidation under Rule 42(a) of actions where plaintiffs' claims that defendants maintained an unconstitutional practice or policy limiting a particular therapy for the treatment of autism); *LeGrand v. New York City Transit Auth.,* No. 95-cv-333, 1999 U.S. Dist. LEXIS 8020, at *23 (E.D.N.Y. May 26, 1999) (consolidation under Rule 42(a) of pregnancy discrimination suits warranted given common legal issue of existence of

same unlawful discriminatory practice or policy of defendant); *cf. Alaniz v. Zamora-Quezada,* 591 F.3d 761, 774 (5th Cir.2009) (affirming denial of a Rule 42(b) motion for separate trials where the plaintiffs each alleged "continuous sex discrimination involving the same *modus operandi*" and were "based on a similar series of transactions that were committed by the same defendant over a relatively short time span"); *Alexander v. Fulton County,* 207 F.3d 1303, 1324-25 (11th Cir.2000) (affirming the district court's refusal to order separate trials under Rule 42(b) where 18 plaintiffs alleged a systematic pattern of racial discrimination by one particular supervisor, even though the plaintiffs complained of different adverse employment decisions and had different work histories), *overruled on other grounds by Manders v. Lee,* 338 F.3d 1304 (11th Cir.2003); *Hargraves,* 140 F.Supp.2d at 28 (denying motion Rule 42(b) motion to sever, discussed above).

**\*30** Similarly, consolidation will not prejudice Bayview or Wachovia's defenses. Plaintiffs correctly point out that, as "holders" of a negotiable instrument, the Wachovia Defendants' liability is limited to the instrument. (*See* Pls. Consolidation Mem. at 6.) *See Primavera Familienstiftung v. Askin,* 173 F.R.D. 115, 130 (S.D.N.Y.1997) ("Consolidation 'does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another.' " (quoting *Johnson v. Manhattan Ry. Co.,* 289 U.S. 479, 496-97 (1933))). Further, the Wachovia Defendants' concerns that the jury will compensate Lodge out of sympathy are merely speculative and insufficient to overcome the benefits of a joint trial.

Finally, any risk of confusion or prejudice at trial can be mitigated with jury instructions and verdict sheets. The Second Circuit has observed that "the risks of prejudice and confusion may be reduced by the use of cautionary instructions to the jury and verdict sheets outlining the claims of each plaintiff." *Johnson,* 899 F.2d at 1285 (citation omitted); *see Consorti v. Armstrong World Indus., Inc.,* 72 F.3d 1003, 1008 (2d Cir.1995) (risk of confusion or prejudice avoided in consolidated action where district court used "intelligent management devices" such as "special verdict forms to help the jury approach deliberations in a well-organized fashion"), *vacated on other grounds sub nom. Consorti v. Owens-Corning Fiberglas Corp.,* 518 U.S. 1031 (1996); *Caronia,* 2009 U.S.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3709278 (E.D.N.Y.)
**(Cite as: 2010 WL 3709278 (E.D.N.Y.))**

Dist. LEXIS 120971, at *13 (finding that the defendants' "concerns regarding prejudice and juror confusion can be adequately addressed through the use of cautionary instructions to the jury and carefully crafted verdict sheets"); *Franco v. Ideal Mortg. Bankers, Ltd.,* No. 07-cv-3956, 2009 U.S. Dist. LEXIS 91570, at *19 (E.D.N.Y. Sept. 28, 2009), *aff'd,* 2009 U.S. Dist. LEXIS 104550 (E.D.N.Y. Nov. 3, 2009). Indeed, the court will order the parties to submit proposed jury instructions and verdict sheets prior to trial.

Accordingly, the court, in its discretion, grants plaintiffs' motion to consolidate the above-captioned six actions for trial. The Wachovia Defendants' request for a separate trial is denied.

### IV. CONCLUSION

For the foregoing reasons, the defendants' motions for summary judgment are denied and plaintiffs' motion to consolidate is granted. The parties shall confer about the length of the trial and dates of their availability for trial after December 10, 2010, and shall jointly advise the court of the same, in writing, by September 16, 2010.

SO ORDERED.

E.D.N.Y.,2010.
Barkley v. Olympia Mortg. Co.
Slip Copy, 2010 WL 3709278 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Page 1

Slip Copy, 2012 WL 2357295 (E.D.N.Y.)
**(Cite as: 2012 WL 2357295 (E.D.N.Y.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Sandra C. **BARKLEY**, Plaintiff,
v.
UNITED HOMES, LLC, United Property Group, LLC,
Yaron Hershco, Galit Network, LLC, **Olympia** Mortgage
Corp., and Benjamin Turner, Defendants.
Mary Lodge, Plaintiff,
v.
United Homes, LLC, United Property Group, LLC, Yaron
Hershco, Galit Network, LLC, **Olympia** Mortgage Corp.,
Bayview Loan Servicing, LLC, Bayview Asset Manage-
ment, LLC, U.S. Bank, N.A., as Trustee for Bayview As-
set–Backed Securities Trust Series 2007–30, and Bayview
Financial Management Corp., Defendants.
Dewitt Mathis, Plaintiff,
v.
United Homes, LLC, United Property Group, LLC, Yaron
Hershco, Galit Network, LLC, and Alliance Mortgage
Banking Corp., Defendants.
Sylvia Gibbons and Sylvia Gibbons, as Administrator of
the Estate of Rodney Gibbons, Plaintiffs,
v.
United Homes, LLC, United Property Group, LLC, Yaron
Hershco, Galit Network, LLC, and **Olympia** Mortgage
Corp., Defendants.
Miles McDale and Lisa McDale, Plaintiffs,
v.
United Homes, LLC, United Property Group, LLC, Yaron
Hershco, Galit Network, LLC, Alliance Mortgage Bank-
ing, Corp., and Benjamin Turner, Defendants.
Charlene Washington, Plaintiff,
v.
United Homes, LLC, United Property Group, LLC, Yaron
Hershco, Galit Network, LLC, and Alliance Mortgage
Banking Corp., Defendants.

Nos. 04–cv–875 (KAM)(RLM), 05–cv–187
(KAM)(RLM), 05–cv–4386 (KAM)(RLM), 05–cv–5302
(KAM)(RLM), 05–cv–5362 (KAM)(RLM), 05–cv–5679
(KAM)(RLM).
June 20, 2012.

J. Christopher Jensen, Cowan, Liebowitz & Latman, P.C.,
New York, NY, Jean Constantine-Davis, Aarp Foundation
Litigation, Washington, DC, Jennifer Light, Meghan Faux,
Pavita Krishnaswamy, Rachel Geballe, Sara Linda Ma-
naugh, South Brooklyn Legal Service, Brooklyn, NY, for
Plaintiff.

Eric Joseph Grannis, Law Offices Of Eric J. Grannis,
Donald H. Greener, Greener & Schioppo, Allan Noel
Taffet, New York, NY, Richard S. Naidich, Robert P.
Johnson, Naidich Wurman Birnbaum & Maday, LLP,
Great Neck, NY, Peter S. Thomas, Peter S. Thomas, Pc,
Peter S. Gordon, Gordon & Gordon, Pc, Forest Hills, NY,
for Defendants.

**MEMORANDUM AND ORDER**
MATSUMOTO, District Judge.
**\*1** Plaintiffs Sandra Barkley, Mary Lodge, Dewitt
Mathis, Lisa McDale, Miles McDale, Charlene Washing-
ton, and Sylvia Gibbons in her individual capacity and as
the Administrator of the Estate of Rodney Gibbons (col-
lectively "plaintiffs") each commenced six separate ac-
tions against United Homes, LLC; United Property Group,
LLC; Galit Network, LLC (collectively, the "UH De-
fendants"); Yaron Hershco, the owner and principal of the
UH Defendants; Olympia Mortgage Corp. ("Olympia")[FN1]
(collectively "defendants"); and others, alleging that de-
fendants engaged in a fraudulent property-flipping scheme
wherein the UH Defendants acquired distressed, damaged,
and defective properties in predominantly minority
neighborhoods, made substandard and superficial repairs,
and used racially targeted marketing strategies to sell the
properties as "newly renovated" at substantially inflated
prices, primarily to members of racial and ethnic minori-
ties with little or no experience with homeownership and
minimal financial acumen. Plaintiffs further alleged that
the UH Defendants conspired with appraisers, attorneys,
and mortgage lenders in order to perpetrate the fraudulent
scheme.

FN1. Olympia is named as a defendant in the ac-
tions brought by plaintiffs Sandra Barkley, Mary
Lodge, and Sylvia Gibbons, and the Estate of
Rodney Gibbons.

On May 9, 2011, jury selection and trial commenced
in these actions. (ECF [FN2] Minute Entry dated 5/9/2011.)
Prior to submitting the cases to the jury, the court denied

Slip Copy, 2012 WL 2357295 (E.D.N.Y.)
**(Cite as: 2012 WL 2357295 (E.D.N.Y.))**

defendants' motions for judgment as a matter of law, made pursuant to Federal Rule of Civil Procedure 50(a) ("Rule 50(a)") with regard to plaintiffs' claims and the extent to which the corporate veil could be pierced to impose individual liability on Mr. Hershco. (Trial Transcript ("Tr.") XIII at 268–91.) Following a three-week trial, on June 1, 2011, the jury found the UH Defendants, Mr. Hershco, and Olympia liable for engaging in deceptive business practices in violation of Section 349 of New York General Business Law ("GBL § 349"), fraud, and conspiracy to commit fraud, and awarded compensatory and punitive damages. (ECF Minute Entry dated 6/1/2011; ECF No. 566, Jury Verdict ("Verdict").) The jury found the UH Defendants, Mr. Hershco, and Olympia not liable on plaintiffs' discrimination claims. (Verdict.)

> FN2. Unless otherwise indicated, all Electronic Case Filing system ("ECF") citations are to docket number 04–cv–875.

Presently before the court are (1) renewed motions for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) ("Rule 50(b)"), and (2) in the alternative, motions for a new trial pursuant to Federal Rule of Civil Procedure 59 ("Rule 59") by the UH Defendants and Mr. Hershco (the "moving defendants").FN3 (ECF No. 618, Memorandum of Law in Support of Hershco's Motion for Judgment as a Matter of Law, or in the Alternative, a New Trial ("Hershco Mem."); ECF No. 620, Memorandum of Law in Support of the UH Defendants' and Yaron Hershco's Motion for Judgment as a Matter of Law, or in the Alternative, a New Trial ("Defs.' Mem."); ECF No. 649, Defendants' Memorandum of Law in Reply ("Defs.' Reply)".) Plaintiffs oppose the moving defendants' motions. (ECF No. 643, Plaintiffs' Memorandum of Law in Opposition ("Pls.' Opp'n").)

> FN3. The court notes that, inexplicably and without leave of the court to file two motions, Mr. Hershco joined the arguments submitted by the UH Defendants in their motion in addition to submitting his own motion pursuant to Rules 50 and 59. Although this double-filing has required the court to expend extra effort to compare the motions—significant parts of which are duplicative—the court has addressed all of Mr. Hershco's arguments, wherever they may be found.

*2 For the reasons set forth below, the court denies the moving defendants' Rule 50(b) and 59 motions.

*BACKGROUND*

**I. The Verdict**

**A. The Jury's Findings**

After a three-week jury trial, the jury found by a preponderance of the evidence that defendants engaged in unfair and deceptive practices in violation of GBL § 349 by inducing plaintiffs to enter into their respective home purchase and financing transactions by misrepresenting the appraised value of the properties, the condition of the properties, and/or the terms and affordability of their respective mortgages. (Verdict.) In addition, the jury found by clear and convincing evidence that defendants defrauded plaintiffs in connection with plaintiffs' home purchase and financing transactions. (Id.) The jury also found that defendants conspired with one or more other defendants to engage in the fraudulent activity. (Id.)

Moreover, the jury found sufficient facts to pierce the corporate veil and hold Mr. Hershco individually liable for the fraud, conspiracy, and GBL § 349 claims, having found that Mr. Hershco "exercised complete control over [the UH Defendants]" in connection with each plaintiff's home purchase transaction, and that Mr. Hershco committed fraud or some other wrong against each plaintiff through his domination over the UH Defendants. (Id.) In addition, the jury found that Mr. Hershco, as a corporate officer of the UH Defendants, participated in or knowingly approved of wrongful conduct. (Id.)

**B. Awards of Compensatory and Punitive Damages**
The jury awarded compensatory and punitive damages to plaintiffs as summarized below:

**Damages Awarded to Sandra Barkley**FN4

> FN4. Unless indicated otherwise, Messrs. Hershco and Turner, Olympia, and the UH Defendants are jointly and severally liable for the damages listed.

| | |
|---|---|
| Compensatory Damages for Unfair and Deceptive Practices | $1,000 |
| Punitive Damages for Unfair and Deceptive Practices | $1,000 from Yaron Hershco |

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2357295 (E.D.N.Y.)
**(Cite as: 2012 WL 2357295 (E.D.N.Y.))**

| | |
|---|---|
| | $1,000 from each UH Defendant |
| | $1,000 from Olympia |
| | $1,000 from Ben Turner |
| Compensatory Damages for Fraud | $45,000 |
| Punitive Damages for Fraud | $25,000 from Yaron Hershco |
| | $5,000 from each UH Defendant |
| | $10,000 from Olympia |
| | $10,000 from Ben Turner |
| Compensatory Damages for Conspiracy to Defraud | $45,000 |

**Damages Awarded to Rodney and Sylvia Gibbons**[FN5]

FN5. Unless indicated otherwise, Mr. Hershco, Olympia, and the UH Defendants are jointly and severally liable for the damages listed.

| | |
|---|---|
| Compensatory Damages for Unfair and Deceptive Practices | $1,000 |
| Punitive Damages for Unfair and Deceptive Practices | $1,000 from Yaron Hershco |
| | $1,000 from each UH Defendant |
| | $1,000 from Olympia |
| Compensatory Damages for Fraud | $57,500 |
| Punitive Damages for Fraud | $35,000 from Yaron Hershco |
| | $5,000 from each UH Defendant |
| | $10,000 from Olympia |
| Compensatory Damages for Conspiracy to Defraud | $57,500 |

**Damages Awarded to Mary Lodge**[FN6]

Olympia, and the UH Defendants are jointly and severally liable for the damages listed.

FN6. Unless indicated otherwise, Mr. Hershco,

| | |
|---|---|
| Compensatory Damages for Unfair and Deceptive Practices | $1,000 |
| Punitive Damages for Unfair and Deceptive Practices | $1,000 from Yaron Hershco |
| | $1,000 from each UH Defendant |
| | $1,000 from Olympia |
| Compensatory Damages for Fraud | $50,000 |
| Punitive Damages for Fraud | $35,000 from Yaron Hershco |
| | $5,000 from each UH Defendant |

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2357295 (E.D.N.Y.)
**(Cite as: 2012 WL 2357295 (E.D.N.Y.))**

| | |
|---|---|
| | Defendant |
| | $10,000 from Olympia |
| Compensatory Damages for Conspiracy to Defraud | $50,000 |

**Damages Awarded to Dewitt Mathis**[FN7]

Alliance, and the UH Defendants are jointly and severally liable for the damages listed.

FN7. Unless indicated otherwise, Mr. Hershco,

| | |
|---|---|
| Compensatory Damages for Unfair and Deceptive Practices | $1,000 |
| Punitive Damages for Unfair and Deceptive Practices | $1,000 from Yaron Hershco |
| | $1,000 from each UH |
| | Defendant |
| | $1,000 from Alliance |
| Compensatory Damages for Fraud | $65,000 |
| Punitive Damages for Fraud | $35,000 from Yaron Hershco |
| | $5,000 from each UH |
| | Defendant |
| | $10,000 from Alliance |
| Compensatory Damages for Conspiracy to Defraud | $65,000 |

**Damages Awarded to Miles and Lisa McDale**[FN8]

Hershco and Turner, Alliance, and the UH Defendants are jointly and severally liable for the damages listed.

FN8. Unless indicated otherwise, Messrs.

| | |
|---|---|
| Compensatory Damages for Unfair and Deceptive Practices | $1,000 |
| Punitive Damages for Unfair and Deceptive Practices | $1,000 from Yaron Hershco |
| | $1,000 from each UH |
| | Defendant |
| | $1,000 from Alliance |
| | $1,000 from Ben Turner |
| Compensatory Damages for Fraud | $75,000 |
| Punitive Damages for Fraud | $25,000 from Yaron Hershco |
| | $5,000 from each UH |
| | Defendant |
| | $10,000 from Alliance |
| | $10,000 from Ben Turner |
| Compensatory Damages for Conspiracy to Defraud | $75,000 |

**Damages Awarded to Charlene Washington**[FN9]

FN9. Unless indicated otherwise, Mr. Hershco, Alliance, and the UH Defendants are jointly and severally liable for the damages listed.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2357295 (E.D.N.Y.)
**(Cite as: 2012 WL 2357295 (E.D.N.Y.))**

| Compensatory Damages for Unfair and Deceptive Practices | $1,000 |
|---|---|
| Punitive Damages for Unfair and Deceptive Practices | $1,000 from Yaron Hershco |
| | $1,000 from each UH |
| | Defendant |
| | $1,000 from Alliance |
| Compensatory Damages for Fraud | $25,000 |
| Punitive Damages for Fraud | $35,000 from Yaron Hershco |
| | $5,000 from each UH |
| | Defendant |
| | $10,000 from Alliance |
| Compensatory Damages for Conspiracy to Defraud | $25,000 |

***DISCUSSION***

**II. Defendants' Rule 50(b) Motions to Set Aside the Verdict**

**A. Legal Standard**

  **\*3** Rule 50(a) of the Federal Rules of Civil Procedure permits a party to move for judgment as a matter of law before a case is submitted to the jury. Fed.R.Civ.P. 50(a). A motion made pursuant to Rule 50(a) "must specify the judgment sought and the law and facts that entitle the movant to the judgment." *Id.* If the court denies a party's Rule 50(a) motion, the movant may file a renewed motion for judgment as a matter of law no later than 28 days after entry of judgment.[FN10] Fed.R.Civ.P. 50(b). "In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." *Id.*

>     FN10. The parties do not dispute that defendants' Rule 50(b) and 59 motions are timely.

  "In considering a motion for judgment as a matter of law, the district court 'must draw all reasonable inferences in favor of the nonmoving party.' " *Zellner v. Summerlin,* 494 F.3d 344, 370 (2d Cir.2007) (quoting *Reeves v. Sanderson Plumbing,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). The court must not, however, make credibility determinations or weigh the evidence because " '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.' " *Id.* (quoting *Reeves,* 530 U.S. at 150). Consequently, " 'alt-

hough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.' " *Id.; see also Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970 (2d Cir.1987) (a court "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury") (internal quotation marks omitted).

  The movant thus bears a heavy burden, because "a court may grant a motion for judgment as a matter of law 'only if it can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been *compelled* to accept the view of the moving party .' " *Zellner,* 494 F.3d at 370–71 (quoting *Piesco v. Koch,* 12 F.3d 332, 343 (2d Cir.1993)). In other words, the court may grant a Rule 50(b) motion for judgment as a matter of law only if the record contains " 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or ... such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [it].' " *Concerned Area Residents for Env't v. Southview Farm,* 34 F.3d 114, 117 (2d Cir.1994) (quoting *Song v. Ives Lab., Inc.,* 957 F.2d 1041, 1046 (2d Cir.1992)). The court reviews the moving defendants' Rule 50(b) motions in light of these considerations.

**B. Procedural Waiver**

  As an initial matter, plaintiffs argue that the moving defendants' Rule 50(b) motions for judgment as a matter of law are procedurally flawed to the extent that the movants'

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2357295 (E.D.N.Y.)
**(Cite as: 2012 WL 2357295 (E.D.N.Y.))**

Rule 50(a) motions failed to reference the specific grounds upon which the Rule 50(b) motions rest. (Pls.' Opp'n at 3–5.) According to plaintiffs, defendants waived two specific arguments now present before the court: (1) the "specific merger clause" in the plaintiffs' contracts of sale renders plaintiffs' fraud claims inactionable, and (2) plaintiffs failed to present sufficient evidence to support the jury's award of compensatory damages. (*Id.* at 4–5.)

**\*4** Defendants do not deny their failure to raise either issue; instead, defendants urge the court not to "apply a procedural 'gotcha' " by declining to consider defendants' unpreserved arguments. (Defs.' Reply at 6.) In addition, defendants argue that despite their "procedural oversight," the court should nonetheless consider their arguments to avoid a manifest injustice. (*Id.* at 7.)

**1. Legal Standard**

A party moving for judgment as a matter of law pursuant to Rule 50(a) "must specify the grounds upon which the motion relies." *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53–54 (2d Cir.1993), *overruled on other grounds by Kasten v. Saint–Gobain Performance Plastics Corp.,* —— U.S. ——, 131 S.Ct. 1325, 179 L.Ed.2d 379 (2011). A renewed motion for judgment as a matter of law pursuant to Rule 50(b) must follow an earlier motion on the same subject because " '[t]he very purpose of Rule 50(b)'s requiring a prior motion for a directed verdict is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him [or her] from taking the case to the jury.' " *Broadnax v. City of New Haven,* 415 F.3d 265, 268 (2d Cir.2005) (quoting *Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers,* 34 F.3d 1148, 1155 (2d Cir.1994)). Accordingly, the court may reach a forfeited issue only if ignoring the issue would "result in manifest injustice" or if the issue involved is "purely legal error." *AIG Global Secs. Lending Corp. v. Banc of Am. Secs., LLC,* 386 F. App' x 5, 6 (2d Cir.2010).

**2. Application**

At the close of plaintiff's case-in-chief, pursuant to Rule 50(a), defendants moved to dismiss Mr. Hershco as an individual defendant on grounds that plaintiffs had presented insufficient evidence to pierce the corporate veil because they had failed to establish that Mr. Hershco, the owner and principal of the UH Defendants, abused the corporate form in furtherance of fraud. (Tr. XIII at 269–77.) In addition, defendants argued that there was "no proof of fraud," particularly because plaintiffs entered into their home purchases in "arm's length deal[s] with [their] eyes wide open, with legal counsel at [the] table." (*Id.* at

279–83.) Defendants also asserted that plaintiffs failed to present sufficient evidence of civil conspiracy because there was no evidence of fraud, conspiracy, or the steering of lawyers or lenders. (*Id.* at 281.) Moreover, defendants contended that there was no evidence to support plaintiffs' claims that the prices of plaintiffs' homes were inflated; that defendants knowingly saddled plaintiffs with unaffordable mortgages; or that plaintiffs were unsophisticated buyers with no financial acumen. (*Id.* at 281–83 .) Defendants further argued that plaintiffs had failed to meet the burden of proof with respect to plaintiffs' racial discrimination claims. (*Id.* at 277–86.)

Defendants did not, however, articulate in their Rule 50(a) motions (1) that plaintiffs' fraud claims were inactionable due to the "specific merger clause" in plaintiffs' contracts of sale; or (2) that plaintiffs failed to prove sufficient evidence of compensatory damages. Consequently, because neither of the unpreserved issues involves purely legal questions and the court finds no risk of manifest injustice, the court will not reach the issues here.

**C. Fraud**

**\*5** In support of their motion for judgment as a matter of law with respect to plaintiffs' fraud claims, defendants advance numerous arguments, all of which lack merit.

**1. Doctrine of *Caveat Emptor* Does Not Apply**

Defendants first argue that plaintiffs' fraud claim is barred by the doctrine of *caveat emptor* because the transactions at issue were "all at arm's length between parties of ordinary intelligence and experience." (Defs.' Mem. at 8–10.) Defendants assert that because plaintiffs were sophisticated and "experienced buyers [who] understood the options available to them in the real estate property market," plaintiffs' reliance on defendants' representations regarding the value or quality of their home purchases was unjustified, and therefore an improper basis for plaintiffs' fraud claims. (*Id.* at 8.)

Under the doctrine of *caveat emptor,* New York "imposes a duty on buyers of real estate to independently ascertain or verify the value of the property at issue." *M & T Mortg. Corp. v. White,* 736 F.Supp.2d 538, 558 (E.D.N.Y.2010) (citing *London v. Courduff,* 141 A.D.2d 803, 529 N.Y.S.2d 874 (N.Y.App. Div.2d Dep't 1988)). Thus, it is "settled law in New York that the seller of real property is under no duty to speak *when the parties deal at arm [']s length* "[FN11] and "[t]he mere silence of the seller, without some act or conduct which deceived the purchaser, does not amount to a concealment that is actionable as a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2357295 (E.D.N.Y.)
**(Cite as: 2012 WL 2357295 (E.D.N.Y.))**

fraud." *Id.* (citing *London,* 529 N.Y.S.2d at 874).

> FN11. An arm's-length transaction is one that occurs when "a willing buyer [is] under no compulsion to buy and a willing seller [is] under no compulsion to sell." *Arthur Props., S.A. v. ABA Gallery, Inc.,* No. 11–cv–4409, 2011 WL 5910192, at *3 (S.D.N.Y. Nov.28, 2011).

Courts have found exceptions to the rule of *caveat emptor,* however, where sellers concealed facts or induced buyers to refrain from making independent inquiries into the terms of a real estate deal. *See, e.g., Wilson v. Toussie,* 260 F.Supp.2d 530, 540 (E.D.N.Y.2003) (noting that there are exceptions to the rule if "the misstatement of value was made in conjunction with a larger scheme or conspiracy to defraud"); *Bethka v. Jensen,* 250 A.D.2d 887, 672 N.Y.S.2d 494, 494–95 (N.Y.App.Div.1998) (noting that the rule does not apply where "some conduct ... on the part of the seller rises to the level of 'active concealment' ").

Furthermore, some courts have declined to apply the rule of *caveat emptor* to bar fraud claims in cases with allegations that defendants deliberately steered plaintiffs to other members of the conspiracy in order to prevent their discovery of the true value of the properties at issue. *See, e.g., Banks v. Consumer Home Mortg., Inc.,* No. 01–CV–8508, 2003 WL 21251584, at *9 (E.D.N.Y. Mar.28, 2003) ("[I]t is clear that plaintiffs' allegations of steering ... involve deliberate efforts to discourage plaintiffs from looking beyond the members of the alleged conspiracy for assistance."). In addition, where plaintiffs are "vulnerable, unsophisticated, first-time home buyers hoodwinked by a sophisticated, layered, business operation involving multiple individuals and entities," the parties are *not* at arm's length and therefore not subject to the doctrine of *caveat emptor. M & T Mortg.,* 736 F.Supp.2d at 559.

**\*6** The court finds that the doctrine of *caveat emptor* does not apply to the instant action in light of the evidence at trial that (1) plaintiffs were unsophisticated and vulnerable potential home buyers; (2) defendants steered plaintiffs to a sophisticated, layered business operation comprised of attorneys, lenders, and inspectors who were part of defendants' overall conspiracy to prevent plaintiffs from discovering the true value, condition, and affordability of the homes plaintiffs ultimately purchased from defendants; and (3) defendants' active concealment of serious defects in the homes defendants sold to plaintiffs rose to a level of actionable fraud.

First, the court finds no merit in defendants' contention that plaintiffs' home purchase transactions were conducted at arm's length and that plaintiffs were sophisticated and experienced homebuyers (*see* Defs.' Mem. at 8–10). The moving defendants cite to evidence that the McDales had on one prior occasion entered into a contract to buy a home in Pennsylvania (*see* Tr. II at 41–43); that Mr. Mathis had previously consulted a real estate agency called City Developers to view homes and to obtain financing for another home that he did not ultimately purchase (*see* Tr. IX at 212–16); and that Ms. Lodge was added to the deed of a property and had some experience with taking out a mortgage and selling that property (*see* Tr. III at 24–27).

The court finds that the foregoing is far from compelling evidence that plaintiffs were "sophisticated" and "experienced" home buyers, however. The cited evidence merely supports a finding that, at best, some plaintiffs had some degree of prior *exposure* to the home purchasing process before conducting the transactions at issue in this action.[FN12] The McDales' prior experience with entry into a contract for sale with respect to a *single* home did not render them "sophisticated" home buyers. Mr. Mathis repeatedly stated that his knowledge of the financing and home purchasing process was limited to what City Developers had told him, and that he "just kept going with what they [City Developers] were telling [him]." (*See* Tr. IX at 230.) Moreover, the simple addition of Ms. Lodge's name to a property deed did not give her experience in purchasing a home.

> FN12. Notably, defendants' statement that "plaintiffs' own expert, Dominick Pompeo, could not conclude the transactions for any plaintiff were anything other than arms['s] length" (*see* Defs.' Mem. at 8 (citing Tr. VII at 129)) is misleading, as Mr. Pompeo did not testify at all regarding the arm'slength or non-arm's-length nature of the plaintiffs' transactions. (*See* Tr. VII at 129.)

Second, the evidence at trial showed that defendants steered plaintiffs to attorneys, lenders, and inspectors who were involved in the overall conspiracy, thereby discouraging plaintiffs from obtaining independent advice about the terms of the transactions and the true value, condition, and affordability of the homes. (Tr. I at 81–82; Tr. II at 179–82; Tr. III at 34, 41; Tr. IV at 112; Tr. IX at 163–65; Tr. X at 156, 162; Tr. XII at 35–36; 38.) As Ms. Lodge testified, "[e]verything came in a package deal," meaning

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Slip Copy, 2012 WL 2357295 (E.D.N.Y.)
(Cite as: 2012 WL 2357295 (E.D.N.Y.))

that "you got attorneys set up for you," "[y]ou got your mortgage people set up for you," and there was an "[i]nspector set up for you," and "everything was like a push, push deal." (Tr. III at 137–38.) Moreover, plaintiffs testified that they trusted their respective attorneys to protect their interests during the course of the home purchase transaction. (Tr. II at 125–26; Tr. III at 42; Tr. IV at 115–16; Tr. IX at 181–82; Tr. X at 157; Tr. XII at 37–38.) The evidence thus supports a finding that plaintiffs were "vulnerable [and] unsophisticated" first—or at best, second-time home buyers who were "hoodwinked by a sophisticated, layered, business operation involving multiple individuals and entities," and that the transactions were *not* conducted at arm's length. *M & T Mortg.,* 736 F.Supp.2d at 559.

**\*7** Finally, as detailed in Section II.C.3 *infra,* the evidence at trial established that defendants actively concealed serious defects in the homes they sold to each plaintiff, and such concealment was actionable as fraud. In light of the foregoing, the court finds that the doctrine of *caveat emptor* does not apply to bar plaintiffs' fraud claim.

**2. Plaintiffs' Fraud Claim Asserts More Than a Breach–of–Contract Claim**

The moving defendants also argue that they are entitled to judgment as a matter of law with respect to plaintiffs' fraud claim because "the only alleged wrongdoing merely constitutes a breach of contract." (Defs.' Mem. at 13 (citing *Van Neil v. Berger,* 219 A.D.2d 811, 632 N.Y.S.2d 48, 48 (N.Y.App.Div.1995)); Defs.' Reply at 5.) The moving defendants specifically contend that plaintiffs failed to present any evidence that the UH Defendants did not intend to honor their one-year warranty to make necessary repairs at plaintiffs' homes, and that "[t]o the contrary, there was ample evidence adduced at trial demonstrating that United Homes returned to plaintiffs' homes and performed promised repairs after closing." (*See* Defs.' Mem. at 13–14.)

The moving defendants' argument rests on the premise that "[a] cause of action for fraud is not stated where the only fraud alleged relates to a breach of contract." *Van Neil,* 632 N.Y.S.2d at 48; *see also Wall v. CSX Transp., Inc.,* 471 F.3d 410, 416 (2d Cir.2006) (generally, "a fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract") (internal quotation marks omitted). Notwithstanding, "New York law specifically recognizes causes of action for fraud in the inducement [of a contract] when the misrepresentation is collateral to the contract it induced." *Id.*

The moving defendants' myopic view that plaintiffs' fraud claim rests entirely on the theory that defendants breached the contracts of home sale by failing to perform necessary repairs per the one-year warranty is misplaced. On the contrary, the trial record contains ample evidence to support other grounds for plaintiffs' fraud claim. The evidence at trial established that the UH Defendants' employees or agents repeatedly assured plaintiffs that United Homes would fully renovate plaintiffs' homes, and repeatedly promised that requested repairs would be completed before the closing. (Tr. I at 96–97; Tr. II at 32–33, 158, 165, 188; Tr. III at 48; Tr. IV at 132–33; Tr. IX at 171–74; Tr. X at 168–70.) In fact, however, the homes were not newly renovated; rather, each home harbored serious defects that were undiscoverable or difficult to discover until after plaintiffs moved in. Such defects included:

• malfunctioning heating systems and code violations, drafty windows, and insufficient insulation (*see* Tr. II at 18–20; Tr. IV at 146; Tr. IX at 187, 194–96; Tr. X at 184–86, 194; Tr. XII at 55–58);

• rotten, shoddy, and improperly installed flooring concealed beneath carpets (*see* Tr. III at 58; Tr. IV at 149); Tr. X at 191–92; Tr. XII at 55–56, 64–65); leaking roofs, ceilings, and walls (*see* Tr. IV at 145, 156; Tr. IX at 203; Tr. XII at 55–56);

**\*8** • construction debris hidden under the carpets in the house or buried in the backyard (*see* Tr. IV at 155; Tr. IX at 196–98);

• electrical and plumbing problems, including leaky fixtures (*see* Tr. II at 24–25; Tr. III at 60–62; Tr. IX at 183–86, 189, 193; Tr. X at 185, 188–89, 193–94; Tr. XII at 55–56);

• flooding, which resulted in water damage or the back up of raw sewage into the home, and broken and open pipes, clogged drains, and sewage lines (*see* Tr. II at 20–21, 26–27; Tr. IV at 144–46, 148–49, 151; Tr. IX at 183–85; Tr. X at 181–87; Tr. XII at 55–63); and

• improperly installed, cracked tiles in the kitchen (Tr. X at 189–91).

All of these conditions later came to light when plaintiffs called upon the UH Defendants to perform addi-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2357295 (E.D.N.Y.)
**(Cite as: 2012 WL 2357295 (E.D.N.Y.))**

tional repairs. Thus, plaintiffs' fraud claims were based in part on defendants' misrepresentations of the homes as "newly renovated," not merely breach of contract.

Moreover, plaintiffs' fraud claims also arose out of the UH Defendants' misrepresentations of their intent to renovate or perform necessary repairs at plaintiffs' homes. The court acknowledges that, as defendants point out (*see* Defs.' Mem. at 13), "[a] present expression of the intent to perform a future act is actionable as fraud only if actually made with a preconceived and undisclosed intention of not performing it," *Tanzman v. La Pietra,* 8 A.D.3d 706, 778 N.Y.S.2d 199, 201 (N.Y.App.Div.2004) (internal quotation omitted), and thus, "a claim based upon statements of future intention ... requires proof of a present intent to deceive." *Marcraft Recreation Corp. v. Francis Devlin Co.,* 506 F.Supp. 1081, 1087 (S.D.N.Y.1981). The court notes, however, that "fraudulent intent 'is rarely susceptible to direct proof and must ordinarily be established by circumstantial evidence and the legitimate inference arising therefrom.' " *Century Pac., Inc. v. Hilton Hotels Corp.,* 528 F.Supp.2d 206, 222 (S.D.N.Y.2007) (quoting *Enzo Biochem, Inc. v. Johnson & Johnson,* No. 87–CV–6125, 1992 WL 309613, at *11 (S.D.N.Y. Oct.15, 1992)).

The record contains ample evidence that although the UH Defendants promised to perform repairs, they did not intend to properly and fully renovate plaintiffs' homes before closing or perform the necessary repairs. Although defendants cite to various portions of the trial record that indicate that the UH Defendants performed *some* of the promised repairs for each plaintiff (*see* Defs.' Mem. at 14), the record reflects that many of those repairs were inadequate and failed to permanently address the underlying problems.

At the McDales' home, the UH Defendants used "very thin wood .... [that] felt like it was going to give at any moment" to repair the floor; unclogged a drainage pipe that soon re-clogged, resulting in the backup of sewage into the home; and installed a non-functional wireless doorbell system instead of the requested doorbell. (Tr. II at 21–22, 25–27.) The Gibbonses' leaky roof continued to leak even after the UH Defendants "repaired" it. (Tr. IV at 156–57.) Due to the UH Defendants' shoddy repairs in Mr. Mathis's home, water drips from the skylight window and water continues to seep into the basement during every heavy rain; the circuit breaker is still frequently triggered; and a radiator continues to leak. (Tr. IX at 184–85, 193–95; 203).

**\*9** Despite the UH Defendants' lackluster attempts to

fix various conditions in Ms. Barkley's home, the front door still leaks and creates a puddle inside the home every time it rains; the floor of the basement is half-cement, half-dirt, and cracked; approximately five gallons of water collects in the basement every time it rains; and the light switches shock or pop every time they are flipped on or off. (Tr. X at 182–89.) Ms. Washington's ceiling continues to "bubble" with leakage, and the basement walls leak every time it rains. (Tr. XII at 57–60.)

In addition to the aforementioned failed "attempts" to perform repairs, the record is replete with evidence of numerous other repairs that the UH Defendants promised to undertake and completely failed to perform. As Ms. Washington testified, "They [UH Defendants] patched problems. They didn't fix anything." (Tr. XII at 139.) The list of items that the UH Defendants failed to even attempt to repair include: unsealed or clogged drainage and sewage pipes; walls that needed painting or sanding; termite-damaged floor joints and rotted sections of a basement window hatch; leaning basement stairs; basement drains to prevent rain seepage; uneven floors or floors with holes concealed beneath carpet; a bathroom sink that overflowed because it was detached or leaning; faulty radiators; and leaking fixtures that caused leaks between floors. (Tr. II at 26–27, 109; Tr. III at 50; Tr. IV at 132, 147, 153–56; Tr. IX at 187; Tr. X at 183–85, 193–94.) In light of the foregoing, the court finds that the record contained ample evidence from which the jury could find that the defendants did not intend to fulfill the promises regarding repairs and renovations that they made to induce plaintiffs to purchase their homes. Thus, the court finds that plaintiffs' fraud claim does not merely assert a breach-of-contract claim.

### 3. Plaintiffs Presented Sufficient and Clear and Convincing Evidence of Fraud

The moving defendants also contend that plaintiffs failed to establish at trial, by clear and convincing evidence, each element of the fraud claim. (Defs.' Mem. at 14–27; Defs.' Reply at 2–4.) In particular, the moving defendants assert that there was insufficient evidence to establish that (1) plaintiffs paid more than what their houses were worth; (2) plaintiffs received unaffordable mortgages; and (3) plaintiffs were deceived as to the state of renovations and repairs. (Defs.' Mem. at 15.) The court finds no merit in these arguments and finds that plaintiffs presented more than sufficient evidence at trial for the jury to find, by clear and convincing evidence, every element of plaintiffs' fraud claim.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2357295 (E.D.N.Y.)
**(Cite as: 2012 WL 2357295 (E.D.N.Y.))**

**a. Elements of Fraud Claim**

"The elements of fraud under New York law are: '[1] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [2] made for the purpose of inducing the other party to rely upon it, [3] justifiable reliance of the other party on the misrepresentation or material omission, and [4] injury.' " *Premium Mortg. Corp. v. Equifax, Inc.,* 583 F.3d 103, 108 (2d Cir.2009) (quoting *Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996)).

**\*10** Each element of a fraud claim must be established by clear and convincing evidence at trial. *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.,* 500 F.3d 171, 181 (2d Cir.2007). Clear and convincing evidence is " '[e]vidence indicating that the thing to be proved is highly probable or reasonably certain.' " *Ragbir v. Holder,* 389 F. App' x 80, 84–85 (2d Cir.2010) (quoting *Black's Law Dictionary* 636 (9th ed.2009)). "This [clear and convincing] evidentiary standard demands a high order of proof ... and forbids the awarding of relief whenever the evidence is loose, equivocal or contradictory." *Abrahami v. UPC Constr. Co.,* 224 A.D.2d 231, 638 N.Y.S.2d 11, 13 (1996) (citations omitted) (internal quotations omitted). Consequently, fraud may not be " 'assumed on doubtful evidence or circumstances of mere suspicion.' " *Fire & Cas. Ins. Co. of Conn. v. 2207 7th Ave. Rest. Corp.,* No. 03–CV–4739, 2004 WL 1933781, at \*3 (S.D.N.Y. Aug. 30, 2004) (quoting *Brayer v. John Hancock Mut. Life Ins. Co.,* 179 F.2d 925, 928 (2d Cir.1950)).

"Clear and convincing evidence may, however, be circumstantial." *Century Pac.,* 528 F.Supp.2d at 219; *see also Deem v. Lockheed Corp.,* No. 87–CV–7017, 1991 WL 196171, at \*6 (S.D.N.Y. Sept. 25, 1991) ("[F]raud is rarely susceptible of direct proof and must ordinarily be established by circumstantial evidence and the legitimate inferences arising therefrom." (internal quotation marks omitted)).

**b. Evidence at Trial**

**i. Material Misrepresentations and Omissions**

The court finds that the evidence at trial was more than adequate to sustain each plaintiffs' fraud claim against defendants. First, as discussed *supra* in Section II.C.2, the

evidence established that defendants knowingly misrepresented the homes plaintiffs purchased as "newly renovated." Essentially, defendants "concealed from the plaintiffs the poor, dilapidated condition of [the] houses, and the extent of the repairs and renovations that were needed so that the houses would approximate the values ascribed to them in the appraisal," which constitutes the type of material misrepresentation upon which plaintiffs may ground a fraud claim. *M & T Mortg.,* 736 F.Supp. at 564. Moreover, by steering plaintiffs to certain lenders, attorneys, and inspectors (*see* Tr. I at 81–82; Tr. II at 179–82; Tr. III at 34, 41; Tr. IV at 112; Tr. IX at 163–65; Tr. X at 156, 162; Tr. XII at 35–36, 38), and pressuring plaintiffs to close quickly, defendants further prevented plaintiffs from discovering the true condition of their home purchases.

The concealment of true property conditions and steering prevented plaintiffs from discovering or seeking to determine the true value of the properties. The degree to which defendants' appraisals misrepresented the actual value of each home was established through the testimony of plaintiffs' real-estate appraisal expert Dominick Pompeo, who independently appraised the fair market value of each plaintiff's home as of the date of each home purchase. Mr. Pompeo determined that the actual value of each home was significantly lower than the values reflected in the appraised value represented by defendants to plaintiffs prior to each plaintiffs' purchase and lower than the price that each plaintiff paid for their home. (Tr. VII at 43–60.) The discrepancies are set forth in the table below[FN13]:

> **FN13.** Although the moving defendants contend that Mr. Pompeo's appraisal values were "fatally flawed because he did not explain why his appraised values differed from the appraisals performed at the time of sale," the court finds that Mr. Pompeo explained the bases for his appraisals—inspection of the property, review of zoning and tax information, and comparison against sales of comparable properties (*see* Tr. VII at 60–61)—and that the issue defendants raise goes to the weight of the evidence, an issue inappropriate for determination in a Rule 50 motion. *See Katara,* 835 F.2d at 970 (court "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury").

| Plaintiff | Pompeo Appraisal | Appraisal Amount at Time | Purchase Price |
| --- | --- | --- | --- |

Slip Copy, 2012 WL 2357295 (E.D.N.Y.)
**(Cite as: 2012 WL 2357295 (E.D.N.Y.))**

| | | of Purchase | |
|---|---|---|---|
| Mathis | $202,000 | $325,000 | $325,000 |
| Lodge | $235,000 | $419,000 | $420,000 |
| Barkley | $235,000 | $359,000 | $359,000 |
| Gibbons | $245,000 | $359,000 | $359,000 |
| McDale | $220,000 | $365,000 | $370,000 |
| Washington | $180,000 | $315,000 | $337,000 |

**\*11** Second, the evidence at trial established that when plaintiffs expressed hesitation about purchasing the homes because of the high monthly mortgage payments, defendants misrepresented the zoning of plaintiffs' properties and defendants' ability and intention to procure tenants who could pay sufficient rent to enable plaintiffs to afford the mortgages. The UH Defendants' employees and agents promised plaintiffs that United Homes would find tenants who could pay at least $1,600 to $1,700 in rent, and that the tenants would be ready to move in and begin paying rent as soon as each plaintiff moved into his or her home. (Tr. II at 37, 177–78, 181–82; Tr. III at 46; Tr. IV at 102–03, 136–37; Tr. X at 154, 160–61; Tr. XII at 30, 45.) In fact, however, the UH Defendants did not succeed in acquiring tenants for plaintiffs until several (up to eight) months after plaintiffs moved in, and the rental payments plaintiffs received were substantially lower than the promised amounts ($944 to $1,450), which caused financial difficulties for the plaintiffs. (Tr. II at 37; Tr. III at 54–56; Tr. IV at 136–39; Tr. X at 177; Tr. XII at 53.) In some instances, the plaintiff's home was not zoned for the number of tenants promised. (Tr. II at 192; Tr. III at 33.)

Third, as discussed *supra* in Section III.C.2, the evidence at trial showed that defendants assured plaintiffs, both verbally and in the contracts of sale, that United Homes would perform any necessary repairs in the homes within one year of purchase. The jury could infer that defendants' promises amounted to misrepresentation based on defendants' failure to perform some repairs at all, and defendants' shoddy and ineffective repairs on others. Consequently, the court finds that there was sufficient, clear and convincing evidence that defendants knowingly made material misrepresentations or omissions of fact which were false and known by defendants to be false, or which defendants did not genuinely believe to be accurate.

**ii. Intent to Induce Plaintiffs' Reliance**

As noted earlier, "fraudulent intent 'is rarely susceptible to direct proof and must ordinarily be established by circumstantial evidence and the legitimate inference aris-

ing therefrom.' " *Century Pac., 528 F.Supp.2d at 222* (quoting *Enzo Biochem, 1992 WL 309613, at \*11*). The court finds that the trial evidence was sufficient for the jury to infer that defendants made the material misrepresentations described *supra* for the purpose of inducing plaintiffs to purchase and finance their homes.

Agents and employees of the UH Defendants, and the attorneys to whom defendants steered plaintiffs, repeatedly assured plaintiffs that United Homes would fully renovate their homes and repeatedly promised that requested repairs would be completed before the closing. (Tr. I at 96–97; Tr. II at 32–33, 158, 165, 188; Tr. III at 48; Tr. IV at 102, 132–33; Tr. IX at 171–74; Tr. X at 168–70.) In addition, when plaintiffs expressed concerns about the affordability of their mortgages, defendants represented that plaintiffs could find tenants who would pay sufficient rent to allow plaintiffs to pay their mortgages. (Tr. II at 177–82; Tr. III at 46; Tr. IV at 102–03; Tr. IX at 169, 244; Tr. X at 153–54, 160–61; Tr. XII at 30, 45.) Drawing all reasonable inferences in favor of plaintiffs, the court finds that the evidence was sufficient for the jury to conclude that defendants made the material misrepresentations described in Section III.C.3.b.i to induce plaintiffs to purchase and finance the homes.

**iii. Justifiable Reliance**

**\*12** " 'Under New York law, a plaintiff must establish that his reliance was justifiable, both in the sense that the party claiming to have been defrauded was justified in believing the representation and that he was justified in acting upon it.' " *Century Pac., 528 F.Supp.2d at 228* (quoting *Compania SudAmericana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co., 785 F.Supp. 411, 419 (S.D.N.Y.1992)*). Where a defendant intentionally steers a plaintiff to a lawyer, and convinces the plaintiff to trust defendants and that lawyer, and "consciously [leads] [plaintiff] down a false path of trust so as to profit from [plaintiff's] ignorance, that is sufficient to establish reasonable reliance." *Phillips v. Better Homes Depot, Inc., No. 02–cv–1168, 2003 WL 25867736, at \*16 (E.D.N.Y.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2357295 (E.D.N.Y.)
**(Cite as: 2012 WL 2357295 (E.D.N.Y.))**

Nov.12, 2003); *see also Banks,* 2003 WL 21251584, at *9 (finding reasonable reliance where defendants "deliberately steered" homebuyer plaintiffs to mortgage lender and attorney "in order to thwart an independent evaluation of the property").

Here, the trial record shows that defendants steered plaintiffs to attorneys and lenders, and that plaintiffs, who were inexperienced homebuyers,[FN14] trusted those professionals to protect plaintiffs' interests. (Tr. I at 81–82, 105, 110–11; Tr. II at 179–82; Tr. III at 34, 41–42, 159; Tr. IV at 112; Tr. IX at 163–65; Tr. X at 156–58, 162; Tr. XII at 35–39.) The attorneys shepherded plaintiffs through the closing process, instructing them to sign the contracts and downplaying the need to read the documents. Raj Maddiwar, the lawyer assigned to represent the McDales at their closing told them that "as [the McDales'] lawyer he would read the document because I [Mr. McDale] wouldn't understand the lawyer's speak as he called it" and that "I [Mr. McDale] should sign the document if he [the lawyer] says it's okay." (Tr. I at 111.) When Mr. McDale received documents to sign, he initially reviewed the documents before signing, but Mr. Maddiwar became "highly upset" and told Mr. McDale that there was no need for Mr. McDale to review the documents because "it was just going to slow the process up." (*Id.*)

FN14. *See* discussion *supra* in Section III.C.1.

Similarly, Ms. Lodge testified that she trusted Michael Cheatham, the attorney to whom United Homes steered her, to protect her interests, but that he let her down. (Tr. III at 159.) For example, Ms. Lodge expected Mr. Cheatham to explain the terms of the mortgage and the contract with her before closing, but instead, "[e]verything was a rush, rush to sign a paper" and that "[w]ith him [Mr. Cheatham] it was just, you know, like you sign here, you sign here." (*Id.*) She protested and said, "[W]ait, let me read. I can't read everything. Let me read some of what's going on," but he did not take the time to do so or to explain the documents to her. (*Id.* at 159–61.)

Mr. Cheatham also represented Ms. Washington, and simply told her at closing that "I'm going to tell you what these documents are and you can sign them." (Tr. VI at 49.) Mr. Cheatham did not review the documents with Ms. Washington. (*Id.*) Instead, he would ask her, "Are you going to live in the house?" and when she answered in the affirmative, he replied, "Sign here." (*Id.*)

**\*13** The UH Defendants steered the Gibbonses to at-

torney Marios Sfantos. (Tr. IV at 114–15.) The jury heard that Mr. Sfantos failed to review the relevant contract documents with the Gibbonses prior to closing, and the UH Defendants told the Gibbonses that they did not need to read the documents before signing because Mr. Sfantos had already reviewed them. (*Id.* at 120.) In addition, Mr. Sfantos himself told the Gibbonses that "everything's going to be all right" and "[y]ou don't have to worry about anything" because Mr. Sfantos had already read the papers and "everything look[ed] good." (*Id.* at 115–16.) Mr. Sfantos also represented Mr. Mathis, and at the closing, Mr. Sfantos just told Mr. Mathis to sign the contracts as Mr. Sfantos handed them over. (Tr. IX at 164–65, 178.)

At the closing for Ms. Barkley's home purchase, Ms. Barkley attempted to read the stack of documents before signing them. (Tr. X at 170.) Ben Turner, the attorney to whom the UH Defendants steered Ms. Barkley, advised her that he had already reviewed the papers and that everything was okay, and urged Ms. Barkley to just initial and sign the papers quickly, which she did because her closing began in the evening. (*Id.*)

In addition, counsel for the Gibbonses, Ms. Lodge, and Ms. Barkley also reassured those plaintiffs that their mortgages would be affordable because United Homes would provide paying tenants whose rental payments would significantly alleviate the plaintiffs' financial burden. (Tr. III at 52–53; Tr. IV at 115; Tr. X at 156.)

As the jury found, the trial evidence thus establishes that defendants induced plaintiffs' reliance by holding United Homes out as a "one-stop shop," by steering plaintiffs to attorneys, lenders, and inspectors, and by creating a "false path of trust" in which plaintiffs believed that the UH Defendants and their attorneys had plaintiffs' best interests in mind. The court finds that this deliberate steering lulled plaintiffs into a false sense of security that inhibited plaintiffs from seeking independent evaluations of the properties or the affordability of the mortgages, and that plaintiffs' reliance on defendants' misrepresentations was reasonable.

### iv. Damages

Finally, the court finds that plaintiffs presented substantial evidence of the injuries they sustained due to defendants' misrepresentations. As discussed *supra* in Section III.C.2, plaintiffs endured inconvenience, frustration, and physical damage to their homes due to the unexpectedly poor condition of their homes. In addition, plaintiffs incurred substantial repair expenses to make their homes

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2357295 (E.D.N.Y.)
**(Cite as: 2012 WL 2357295 (E.D.N.Y.))**

habitable because defendants failed to repair the properties as promised. (Tr. II at 36–38; Tr. III at 58–66; Tr. IV at 155–58; Tr. IX at 187–205; Tr. X at 37, 181–95; Tr. XII at 55–66, 77.) Moreover, most plaintiffs experienced significant financial hardships due to (1) defendants' failure to timely secure tenants; (2) defendants' misrepresentation regarding the ready availability of tenants with the ability to make sufficient rental payments; and (3) defendants' misrepresentations about the legal occupancy status of various homes.[FN15] (Tr. II at 36–38, 192; Tr. III at 33, 66; Tr. IV at 161; Tr. X at 177–78, 197.) Plaintiffs also suffered from damages due to the overappraisal of their properties. (Tr. II at 36–38; Tr. III at 66; Tr. IV at 155–58; Tr. IX at 205; Tr. X at 177–79; Tr. XII at 134–35.)

> FN15. Defendants represented to the McDales that their house was a legal five-bedroom house, which was not true. (Tr. II at 192.) After the McDales moved in, they learned that the home was not a legal five-bedroom, which decreased the potential rental income for their upstairs apartment. (*Id.*) Similarly, the UH Defendants told Ms. Lodge that she would be able to rent out two units to tenants to provide sufficient income to support her mortgage payments, but the home is a legal two-family home, not a legal three-family home. (Tr. III at 33.)

**\*14** Accordingly, the court finds that plaintiffs presented sufficient evidence to support the jury's finding, by a clear and convincing standard, as to each element of plaintiffs' fraud claim, and denies defendants' motion for judgment as a matter of law with respect to the fraud claim.

**D. Civil Conspiracy**
The moving defendants seek judgment as a matter of law with respect to plaintiffs' civil conspiracy claims on the mistaken grounds that " '[t]here is no substantive tort of conspiracy' under New York law." (Defs.' Mem. at 29; Hershco Mem. at 10–12 (quoting *Alexander & Alexander of NY, Inc. v. Fritzen,* 68 N.Y.2d 968, 969, 510 N.Y.S.2d 546, 503 N.E.2d 102 (1986).) As each case to which defendants cite acknowledges, however, a claim of civil conspiracy is not an *independent* cause of action, but is viable when predicated upon the tortious conduct of a defendant. *See, e.g., Alexander,* 68 N.Y.2d at 969, 510 N.Y.S.2d 546, 503 N.E.2d 102 ("Allegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort." (citation omitted)); *Keller v. Levy,* 265 A.D. 723, 724, 40 N.Y.S.2d 580 (N.Y.App.Div.1943) ("[O]rdinarily, a charge of con-

spiracy, in and of itself, does not give ground for civil relief, unless followed by allegations of overt acts, and resulting injury."). Here, plaintiffs' civil conspiracy claims are related to their underlying claims for fraud, which survive defendants' motion for judgment as a matter of law for the reasons set forth *supra.*

Furthermore, plaintiffs' civil conspiracy claims survive defendants' motion for judgment as a matter of law because there is sufficient evidence in the record to establish each element of civil conspiracy. To establish a claim of civil conspiracy, plaintiffs must demonstrate the underlying tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury. *Meisel v. Grunberg,* 651 F.Supp.2d 98, 119 (S.D.N.Y.2009).

The court has discussed each of the above four factors in the context of plaintiffs' fraud causes of action and will briefly summarize the evidence as it applies to plaintiffs' civil conspiracy claims. As to the first element, the evidence at trial indicated the existence of an agreement between the UH Defendants, lawyers, appraisers, inspectors, and lenders to sell distressed and defective properties to the plaintiffs. As to the second and third elements, the UH Defendants, *inter alia,* arranged for plaintiffs to meet with lawyers and lenders in defendants' offices, performed cosmetic repairs on plaintiffs' homes, pressured plaintiffs to close quickly on the transactions, and discouraged the plaintiffs from obtaining independent advice about the terms of the transactions and from conducting thorough and independent inspections. Finally, by purchasing homes with hidden defects, superficial repairs and unaffordable mortgages, plaintiffs unquestionably suffered damages as a result of the conspiracy. Thus, defendants' motion for judgment as a matter of law with respect to plaintiffs' civil conspiracy claims is denied.

**E. Punitive Damages for Fraud and Civil Conspiracy Claims**
**\*15** The moving defendants further argue that the jury's award of punitive damages for plaintiffs' fraud and civil conspiracy claims should be set aside because (1) the record evidence does not demonstrate any basis for the jury's findings that defendants committed fraud or conspiracy to commit fraud; and (2) the punitive damages awards are so "grossly excessive" that they violate defendants' due process rights. (Defs.' Mem. at 32–34; Hershco Mem. at 12–15.)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

Slip Copy, 2012 WL 2357295 (E.D.N.Y.)
**(Cite as: 2012 WL 2357295 (E.D.N.Y.))**

As an initial matter, as discussed at length *supra,* the court finds that the trial record contains sufficient evidence to support the fraud and civil conspiracy causes of action. Accordingly, defendants' motion to set aside the jury's punitive damages awards on this basis is denied.

The court notes that the parties disagree as to whether the standard of proof for punitive damages awards is clear and convincing or preponderance of the evidence. (*Compare* Defs.' Mem. at 33 *with* Pls.' Mem. at 30.) The conflict is understandable, given the lack of clarity and conflicting authority surrounding the required burden of proof. *See Greenbaum v. Svenska Handelsbanken, N.Y.,* 979 F.Supp. 973, 975–82 (S.D.N.Y.1997) (citing cases and discussing at length the contradictions regarding the evidentiary standard required for awards of punitive damages); *compare id.* at 982 (concluding that New York law requires proof of punitive damages by a preponderance of the evidence) *with Randi A.J. v. Long Island Surgi–Center,* 46 A.D.3d 74, 86, 842 N.Y.S.2d 558 (2007) (holding that clear and convincing evidence is required to impose punitive damages). The court finds that under either standard, there was sufficient evidence to satisfy the stringent legal standards that govern punitive damages awards.

In order to award punitive damages, a jury must find that "defendant[s'] conduct evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations." *Walker v. Sheldon,* 10 N.Y.2d 401, 405, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961). The evidence at trial summarized earlier in this Memorandum and Order established that defendants engaged in an elaborate, organized scheme to prey on and deceive naïve, inexperienced home buyers in order to significantly profit at their expense. Defendants promised plaintiffs a "newly renovated home" and gave them assurances regarding affordability and the quality of the homes, and steered them to lenders, attorneys, and inspectors in order to protect their overall scheme. As a result of defendants' scheme, plaintiffs were saddled with mortgages they could not afford and defective homes whose values were vastly overappraised in light of the extensive repairs that were needed to make them habitable. The court finds that such conduct demonstrates defendants' "high degree of moral turpitude" and "wanton dishonesty as to imply a criminal indifference to civil obligations." *Id.*

Moreover, the court rejects defendants' contention that

the punitive damages awards violate their due process rights because the damages amounts are constitutionally excessive. (Defs.' Mem. at 33–34.) As the parties note, the Supreme Court has identified three guideposts to determine whether an award is "grossly excessive": (1) the degree of reprehensibility of defendants' conduct; (2) the disparity between the harm or potential harm suffered by plaintiffs and the punitive damages award; and (3) the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases. *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 574–75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

**\*16** "In assessing the reprehensibility of a defendant's conduct, the Supreme Court has instructed that courts should 'consider[ ] whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.' " *Thomas v. iStar Fin., Inc.,* 652 F.3d 141, 148 (2d Cir.2011) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)).

The evidence at trial established that the harms caused by defendants' conduct were primarily economic, although the court recognizes that plaintiffs also experienced significant physical hardship, risks to their health and safety, frustration, stress, and anxiety due to defendants' misrepresentations. In addition, the shoddy construction of the homes resulted in conditions—including inadequate heat, mold and mildew, and raw sewage leaking into the home-that posed significant health hazards, reflecting defendants' reckless disregard for the health and safety of others. Moreover, the fact that this trial involved six different actions and households demonstrates that defendants' actions were not isolated and could not be said to have arisen by "mere accident." Accordingly, the court finds that the first guidepost weighs in favor of a finding that the punitive damages awards were not excessive.

The second consideration, "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award," calls for the court's comparison of the punitive damages and compensatory damages awarded by the jury, which is set forth below:

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2357295 (E.D.N.Y.)
**(Cite as: 2012 WL 2357295 (E.D.N.Y.))**

| Plaintiff | Total Punitive Damages for Fraud | Total Compensatory Damages for Fraud and Conspiracy to Defraud | Ratio |
|---|---|---|---|
| Sandra Barkley | $60,000 | $90,000 | .67:1 |
| Rodney and Sylvia Gibbons | $60,000 | $115,000 | .52:1 |
| Mary Lodge | $60,000 | $100,000 | .60:1 |
| Dewitt Mathis | $60,000 | $130,000 | .46:1 |
| Miles and Lisa McDale | $60,000 | $150,000 | .40:1 |
| Charlene Washington | $60,000 | $50,000 | 1.2:1 |

The Supreme Court concluded in *State Farm* that "a [punitive damages] award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." 538 U.S. at 425. "There are, however, 'no rigid benchmarks' for this analysis, and '[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.' " *Thomas*, 652 F.3d at 149 (quoting *State Farm*, 538 U.S. at 425). Here, with the exception of Ms. Washington's award, the jury's award of punitive damages for fraud was significantly less than the total compensatory damages the jury awarded to each plaintiff for fraud and conspiracy to defraud. The court finds all of the punitive damages awards to be clearly within the bounds of constitutional propriety and the realm of reason. Consequently, the court finds that the second factor also weighs in favor of a finding that the punitive damages award was not excessive.

**\*17** The court does not factor in the third guidepost, "the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases," because neither party cites civil penalties authorized or imposed in comparable cases, nor has the court's independent research identified comparable examples. Accordingly, having reviewed and balanced all relevant factors, the court finds that the punitive damages awards to the plaintiffs are not constitutionally excessive.

## F. General Business Law Section 349

### 1. Sufficiency of the Evidence

The court finds no merit in the moving defendants' contention that plaintiffs produced insufficient evidence of their GBL § 349 claim for deceptive practices. In order to find a party liable under GBL § 349: "(1) the defendant's challenged acts or practices must have been directed at consumers, (2) the acts or practices must have been mis-

leading in a material way, and (3) the plaintiff must have sustained injury as a result." *Cohen v. JP Morgan & Chase Co.*, 498 F.3d 111, 126 (2d Cir.2007). As plaintiffs note and defendants do not dispute, the jury was not required to consider the first element because the court deemed it satisfied as a matter of law. (*See* Pls.' Mem. at 10; Defs.' Reply at 13; ECF No. 564, Jury Instructions, at 31.)

As to the second and third elements, as discussed in detail *supra* in Sections III.C.2 and III.C.3, plaintiffs have presented ample evidence from which the jury could find that defendants' acts or practices were deceptive or misleading in a material way and that each plaintiff was injured because of those acts. Accordingly, the court denies defendants' motion for judgment as a matter of law with respect to the GBL § 349 claim.

### 2. Punitive Damages

The moving defendants argue that the punitive damages awarded under GBL § 349 are "excessive as a matter of law and must be stricken" because "[n]o punitive damage award is allowed under [GBL § 349(h)] if the compensatory damages equal or exceed $1,000." (Defs.' Mem. at 31–32; Hershco Mem. at 16.) Plaintiffs assert that this argument is waived because the moving defendants failed to raise it earlier and object to the jury instructions on punitive damages under GBL § 349. (Pls.' Mem. at 22–23.) Plaintiffs also contend that even if defendants were permitted to raise this challenge at this juncture, the cases defendants cite are distinguishable. (*Id.*)

The court finds that defendants waived their argument regarding punitive damages under GBL § 349. Despite having a full and fair opportunity to object to the jury instructions and the verdict sheet, and to voice defendants' position that GBL § 349 does not allow the grant of punitive damages where compensatory damages equal or exceed $1,000, defendants did not do so. Accordingly, the objection is waived and the court will not set aside the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2357295 (E.D.N.Y.)
(Cite as: 2012 WL 2357295 (E.D.N.Y.))

jury's punitive damage award.[FN16] *See Veerman v. Deep Blue Group L.L.C .*, No. 08 Civ. 5042, 2010 WL 4449067, at *5–6 (S.D.N.Y. Nov. 3, 2010) (denying defendants' Rule 50(b) motion to vacate jury's award of punitive damages because defendants had failed to raise relevant objections to jury instructions and verdict sheet); *see also Queenie, Ltd. v. Nygard Int'l,* 204 F.Supp.2d 601, 606 (S.D.N.Y.2002) (same).

>   FN16. Even if the court decided defendants' motion on its merits, however, the court would uphold the jury's punitive damages award because GBL § 349(h) restricts the court's award of treble damages, but does not govern the award of punitive damages, which plaintiffs may seek in addition to treble damages. *See Wilner v. Allstate Ins. Co.,* 71 A.D.3d 155, 167, 893 N.Y.S.2d 208 (N.Y.App.Div.2010) (noting that although treble damages awarded under GBL § 349(h) are capped at $1,000, plaintiffs may seek both treble damages and punitive damages").

**G. Piercing the Corporate Veil**
*18 Mr. Hershco argues that there is insufficient evidence to pierce the corporate veil and impose individual liability on him, particularly because a court should permit veil-piercing only under "extraordinary circumstances," *Murray v. Miner,* 74 F.3d 402, 404 (2d Cir.1996), and plaintiffs did not present sufficient evidence for the jury to find that Mr. Hershco's domination over the UH Defendants was the "instrument of fraud or otherwise resulted in wrongful or inequitable consequences." (Hershco Mem. at 3 (quoting *TNS Holdings, Inc. v. MKE Sec. Corp.,* 92 N.Y.2d 335, 339, 680 N.Y.S.2d 891, 703 N.E.2d 749 (1998)); Defs.' Reply at 8–10.) Mr. Hershco contends that "the overwhelming evidence demonstrated [his] complete lack of involvement in [plaintiff's] various transactions," as evidenced by the facts that, for example, no plaintiff except Ms. Barkley ever met Mr. Hershco; he was not present at the closings of plaintiffs' homes; and the majority of plaintiffs were unaware that Mr. Hershco owned the UH Defendants. (Hershco Mem. at 3–5.) In addition, although Mr. Hershco acknowledges that the evidence at trial established his failure to observe corporate formalities with his businesses, he argues that plaintiffs failed to establish the required nexus between Mr. Hershco's abuse of the corporate form and fraudulent conduct. (*Id.* at 5–8, 680 N.Y.S.2d 891, 703 N.E.2d 749.)

Plaintiffs counter that the evidence at trial established Mr. Hershco's involvement in designing and orchestrating the fraudulent scheme and demonstrated that Mr. Hershco abused the corporate form for the sole purpose of carrying out that scheme. (Pls.' Mem. at 10 .)

**1. Legal Standard**
"A corporation is an entity that is created by law and endowed with a separate and distinct existence from that of its owners." *Am. Protein Corp. v. AB Volvo,* 844 F.2d 56, 60 (2d Cir.1988). "Because a principal purpose for organizing a corporation is to permit its owners to limit their liability, there is a presumption of separateness between a corporation and its owners, which is entitled to substantial weight." *Id.* (internal citation omitted).

In determining whether to pierce the corporate veil to hold an owner liable for the acts of its corporation, the Second Circuit has found that under New York law, "[c]ontrol is the key." *Id.* Specifically, "[t]he parent must exercise complete domination 'in respect to the transaction attacked' so that the subsidiary had 'at the time' no separate will of its own, and such domination must have been used to 'commit fraud or wrong' against plaintiff, which proximately caused plaintiff's injury." *Id.* (quoting *Lowendahl v. Baltimore & Ohio R.R.,* 247 A.D. 144, 287 N.Y.S. 62, 76 (N.Y.App.Div.1936), *aff'd,* 272 N.Y. 360, 6 N.E.2d 56 (1936)). Factors indicating an owner's control over a corporation include "lack of normal corporate formality in the subsidiary's existence, under-capitalization, and personal use of the subsidiary's funds by the parent or owner." *Am. Protein,* 844 F.2d at 60.

**2. Application**
*19 The court finds that the evidence at trial was more than sufficient to establish that Mr. Hershco exercised complete domination over the UH Defendants with respect to plaintiffs' home purchases such that the UH Defendants had "no separate will[s] of [their] own," and Mr. Hershco used such domination to defraud plaintiffs. Expert witness Alan Blass testified that Mr. Hershco orchestrated the inner workings of each of the UH Defendants "as a man with 21 pockets in his coat constantly moving cash from one pocket to another as he needed it, whether it was for cash flow purposes or for lending purposes or for some other unknown purposes." (Tr. XI at 108; *see also id.* at 76–95 (deposition testimony of Boaz Smorlarchik, United Homes representative, regarding entities' practices).) Mr. Blass testified that, as a result, "all of the corporate lines were totally blurred" among the UH Defendants, such that it could not be determined "where [a particular company] was operating," "who was working for" that company, which company was borrowing money from others, or

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2357295 (E.D.N.Y.)
**(Cite as: 2012 WL 2357295 (E.D.N.Y.))**

"where each of the loans stood." (*Id.* at 121.) In addition, the companies were interdependent; for example, the companies shared employees, lent money among themselves without charging interest or imposing due dates for repayment, and often received revenue for sales made or paid for expenses incurred, by other companies. (Tr. XI at 78–80, 84–85, 169–72.)

The evidence further established that Mr. Hershco abused the corporate form in order to perpetrate the fraudulent transactions at issue in this action. Mr. Hershco testified that he set up new companies such as the UH Defendants for the express purpose of purchasing, rehabilitating, and reselling properties. (Tr. X at 125–27; Tr. XI at 82.) In addition, Mr. Hershco's testimony established that besides being the president and sole owner of his companies, he was also involved in acquiring properties, overseeing construction, and securing financing for the transactions. (Tr. X at 78–79, 82–88, 134–35.) Moreover, even though Mr. Hershco did not personally meet any plaintiffs except Ms. Barkley, his signature appeared on each of the deeds through which the homes were conveyed to plaintiffs. (*Id.* at 96–100.)

Mr. Hershco's abuse of the corporate form and failure to observe corporate formalities enabled him to "put the monies where [they were] needed to pay the companies" and their outside lenders, thus enabling him to perpetuate the property-flipping scheme that included sales of homes to plaintiffs. (Tr. XI at 169–70.) The evidence thus amply demonstrated that Mr. Hershco solely and completely dominated and controlled the UH Defendants without regard for the corporate form to the extent that he became the alter ego of the corporation in perpetuating the fraud. Thus, there was sufficient evidence to pierce the corporate veil and hold Mr. Hershco individually liable for the fraud committed by the UH Defendants.

**\*20** Although Mr. Hershco further argues that there was insufficient evidence to hold him liable for deceptive practices in violation of GBL § 349 (*see* Hershco Mem. at 9–10), this argument has no merit in light of the court's finding that there was sufficient evidence to pierce the corporate veil. Because there was sufficient evidence to find that the UH Defendants engaged in deceptive practices in violation of GBL § 349, the claim is also sustained as to Mr. Hershco, the alter ego of the UH Defendants.

## III. Defendants' Rule 59 Motions for a New Trial

### A. Legal Standard

"A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.,* 290 F.3d 98, 106 (2d Cir.2002) (internal quotation marks omitted). The standard applied in reviewing a party's motion for a new trial "depends on on whether that party objected contemporaneously to the purported errors." *Marcic v. Reinauer Transp. Cos.,* 397 F.3d 120, 124 (2d Cir.2005). Where objections have been preserved through contemporaneous objection, a new trial is warranted if "the district court committed errors that were a 'clear abuse of discretion' that were 'clearly prejudicial to the outcome of the trial.' " *Id.* (quoting *Pescatore v. Pan Am. World Airways, Inc.,* 97 F.3d 1, 17 (2d Cir.1996)); *see also Vogelfang v. Riverhead Cnty. Jail,* No. 04–CV–1727, 2012 WL 1450560, at \*6 (E.D.N.Y. Apr. 19, 2012) (same).

Where claimed errors were not preserved contemporaneously at trial, "a new trial will be granted only for error that was 'so serious and flagrant that it goes to the very integrity of the trial' " because "failure to object deprives the trial court of the opportunity to correct the error during trial." *Marcic,* 397 F.3d at 124 (quoting *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 51 (2d Cir.1998)); *see also Lore v. City of Syracuse,* 670 F.3d 127, 160 (2d Cir.2012) (internal citations omitted) (party's failure to object at trial to substance of verdict form "waives its right to a new trial on that ground and has no right to object to such matters on appeal ... unless the error is fundamental").

### B. Application

The moving defendants move for a new trial pursuant to Rule 59 on grounds that the interests of justice require a new trial in light of "numerous significant errors that occurred during the trial" that substantially prejudiced defendants. (Defs.' Mem. at 42; Hershco Mem. at 16.) In particular, defendants contend that (1) the jury charges failed to specify that the punitive damages award for fraud must be supported by clear and convincing evidence; (2) the jury charges regarding the fraud claim were vague and failed to advise the jury that *all* elements of fraud must be satisfied; and (3) the jury charge regarding misrepresentation for the fraud claim was not modified to include instructions regarding expressions of opinion; and (4) the verdict sheet erroneously omitted the element of reliance to support the fraud claim. (Defs.' Mem. at 42–43; Hershco Mem. at 15–18.)

Page 18

Slip Copy, 2012 WL 2357295 (E.D.N.Y.)
**(Cite as: 2012 WL 2357295 (E.D.N.Y.))**

**\*21** Federal Rule of Civil Procedure 51 ("Rule 51") requires parties to make objections to jury instructions before the court issues the jury charge. Fed.R.Civ.P. 51(c)(2)(A). Where a litigant fails to comply with the objection requirements of Rule 51, the court may review the jury instructions only for " 'fundamental error,' which is more stringent than the 'plain error' standard applicable in criminal appeals." Cash v. Cnty. of Erie, 654 F.3d 324, 341 n. 8 (2d Cir.2011).

The moving defendants raise the aforementioned jury instruction and verdict sheet issues for the first time in their Rule 59 motions. All parties had multiple opportunities to submit proposed jury instructions and proposed verdict sheets prior to trial and prior to charging the jury. Yet defendants all failed to request changes to the jury instructions and verdict sheet that would address the concerns noted above. Moreover, the court held a charging conference during which all parties had yet another opportunity to request changes to the proposed jury charges and verdict sheet. (See Tr. XIV.) In fact, the court provided the parties with three different versions of the jury charges in an attempt to incorporate the parties' requests. (See ECF Nos. 562, 563, Draft Jury Instructions; ECF No. 564, Jury Instructions.) Although defendants requested a number of other changes to the charges, they failed to request the modifications that they raise here.

The moving defendants also had ample opportunity to submit proposed verdict sheets and object to plaintiffs' proposed verdict sheets, but again failed to do so until now. On April 4, 2011, prior to the commencement of this three-week trial, plaintiffs submitted their proposed verdict sheets. (ECF No. 536, Plaintiffs' Proposed Verdict Sheet.) No defendant submitted proposed verdict sheets, although they had been ordered to do so. (See ECF No. 495, Pretrial Scheduling Order ¶ 6(v).) After the final pretrial conference, the court directed the parties to meet and confer in an attempt to resolve any disputes regarding pretrial submissions-including jury instructions—and to agree on proposed verdict sheets. (See Minute Order dated 4/11/2011.) On April 15, 2011, plaintiffs filed a joint status report, noting that after conferring with counsel for the UH Defendants and Hershco, the verdict sheets had been modified, but that the UH Defendants and Hershco continued to object to the instructions regarding piercing the corporate veil. (ECF No. 544, Status Report dated 4/15/2011, at 3.) Moreover, at trial, the parties again discussed changes to the proposed verdict sheets and submitted revised versions for the jury. (See Tr. XIV.) At no point did the moving defendants object to language in the verdict sheet con-

cerning the mention of the reliance element of the fraud claim. Consequently, the court reviews the moving defendants' objections for fundamental errors that are "so serious and flagrant that [they go] to the very integrity of the trial." Greenway, 143 F.3d at 51.

**\*22** The court finds no fundamental error requiring a new trial, or any error "so serious and flagrant" as to threaten the integrity of the trial or deprive the jury of legal guidance, or have any effect on the outcome of the verdict. Moreover, in any event, defendants' arguments are spurious. First, with respect to the jury instruction regarding the "clear and convincing" standard of proof that defendants claim is necessary to sustain a punitive damages, the court again notes that there is conflicting authority and a lack of clarity surrounding the required burden of proof in the Second Circuit. See Greenbaum, 979 F.Supp. at 975 (citing cases and discussing at length the contradictions regarding the evidentiary standard required for awards of punitive damages); compare id. at 982 (concluding that New York law requires proof of punitive damages by a preponderance of the evidence) with Randi A.J., 46 A.D.3d at 86, 842 N.Y.S.2d 558 (holding that clear and convincing evidence is required to impose punitive damages). Moreover, as discussed above, under either standard, there was sufficient evidence to sustain the jury's award of punitive damages. See Altria Group, Inc. v. United States, 658 F.3d 276, 286 (2d Cir.2011) (quoting Boyce v. Soundview Tech. Grp., Inc., 464 F.3d 376, 390 (2d Cir.2006)) ("Viewing the instructions 'as a whole,' a new trial will not be granted unless a jury instruction 'misleads the jury as to the correct legal standard or does not adequately inform the jury on the law' and the error is not harmless.").

Second, the court finds no error in the jury instructions with respect to fraud. The court first instructed the jury that "[i]n order to recover for fraud, the plaintiffs must prove, by clear and convincing evidence, the following elements," then listed the elements of the fraud claim. (Tr. XVI at 14.) " 'A new trial is required if, considering the instruction as a whole, the cited errors were not harmless but in fact prejudiced the objecting party.' " D'Cunha v. Genovese/Eckerd Corp., 415 F. App'x 275, 278 (2d Cir.2011) (quoting Girden v. Sandals Int'l, 262 F.3d 195, 203 (2d Cir.2001)). Considering the court's instruction as a whole, the court finds no error in the jury instructions, particularly because the court's instruction made clear that a finding of fraud was conditional on finding of each element by clear and convincing evidence:

In order for plaintiffs to prevail on their claims of fraud,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 2357295 (E.D.N.Y.)
**(Cite as: 2012 WL 2357295 (E.D.N.Y.))**

the defendants *must* have made a misrepresentation or a material omission of fact .... *If* you find that the defendants made material representations of fact or failed to disclose material facts despite having a duty to do so, *you must then determine* if the representations were false.... *If* you find that the defendant did make the representations that each plaintiff is claiming they did, *you must then determine* if the defendant knew that the representations were false, or recklessly made the representations without regard to whether they were true or false .... *If* you decide that the defendants did in fact make false representations to the plaintiffs, *you must then decide* if any misrepresentations made by the defendants were made for the purpose of inducing the plaintiffs to purchase and finance the subject properties.... *If* you find that the representations were made in order to induce the plaintiffs to rely on them, *you must next decide* if the plaintiffs were justified in relying on the defendants' representations.

**\*23** (Tr. XVI at 15–17 (emphasis added).) The language of the jury instructions made clear that a verdict for plaintiffs on the fraud claim required the jury to find all elements of the claim.

Third, the court finds no error in its jury charges regarding misrepresentation. The jury charge as a whole made clear that the fraud claim must have rested on a *fact,* not an opinion, and that plaintiffs' theory was that "all of the defendants' misrepresentations to them were offered as fact, not opinion." (*Id.* at 8.) Moreover, the requirement that the fraud claim be based on a misrepresentation or omission of a material *fact* was mentioned at least eight times during the instructions on the elements of fraud. (*Id.* at 15–17.) Similarly, when read as a whole together with the jury instructions, the verdict sheet makes clear that reliance is a required element of fraud. *See Velez v. City of New York,* No. 04–CV–1775, 2012 WL 1237646, at *5 (E.D.N.Y. Apr. 12, 2012) (considering jury instructions and verdict sheet as a whole in Rule 59 motion). Accordingly, the court finds no error in the jury instructions or the verdict sheet, much less fundamental error.

### CONCLUSION
For the foregoing reasons, the court denies the moving defendants' motions pursuant to Rule 50(b) and 59.

**SO ORDERED.**

E.D.N.Y.,2012.
Barkley v. United Homes, LLC

Slip Copy, 2012 WL 2357295 (E.D.N.Y.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Page 1

Slip Copy, 2012 WL 3095526 (E.D.N.Y.)
**(Cite as: 2012 WL 3095526 (E.D.N.Y.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Sandra C. **BARKLEY**, Plaintiff,
v.
UNITED HOMES, LLC, United Property Group, LLC,
Yaron Hershco, Galit Network, LLC, **Olympia** Mortgage
Corp., and Benjamin Turner, Defendants.
Mary Lodge, Plaintiff,
v.
United Homes, LLC, United Property Group, LLC, Yaron
Hershco, Galit Network, LLC, **Olympia** Mortgage Corp.,
Bayview Loan Servicing, LLC, Bayview Asset Manage-
ment, LLC, U.S. Bank, N.A., as Trustee for Bayview As-
set–Backed Securities Trust Series 2007–30, and Bayview
Financial Management Corp., Defendants.
Dewitt Mathis, Plaintiff,
v.
United Homes, LLC, United Property Group, LLC, Yaron
Hershco, Galit Network, LLC, and Alliance Mortgage
Banking Corp., Defendants.
Sylvia Gibbons and Sylvia Gibbons, as Administrator of
the Estate of Rodney Gibbons, Plaintiffs,
v.
United Homes, LLC, United Property Group, LLC, Yaron
Hershco, Galit Network, LLC, and **Olympia** Mortgage
Corp., Defendants.
Miles McDale and Lisa McDale, Plaintiffs,
v.
United Homes, LC, United Property Group, LLC, Yaron
Hershco, Galit Network, LLC, Alliance Mortgage Bank-
ing, Corp., and Benjamin Turner, Defendants.
Charlene Washington, Plaintiff,
v.
United Homes, LLC, United Property Group, LLC, Yaron
Hershco, Galit Network, LLC, and Alliance Mortgage
Banking Corp., Defendants.

Nos. 04–cv–875 (KAM)(RLM), 05–cv–187
(KAM)(RLM), 05–cv–4386 (KAM)(RLM), 05–cv–5302
(KAM)(RLM), 05–cv–5362 (KAM)(RLM), 05–cv–5679
(KAM)(RLM).
July 30, 2012.

J. Christopher Jensen, Cowan, Liebowitz & Latman, P.C.,
New York, NY, Jean Constantine–Davis, AARP Founda-
tion Litigation, Washington, DC, Jennifer Light, Meghan
Faux, Pavita Krishnaswamy, Rachel Geballe, Sara Linda
Manaugh, South Brooklyn Legal Service, Brooklyn, NY,
for Plaintiffs.

Eric Joseph Grannis, Law Offices Of Eric J. Grannis,
Donald C. Barkley; Mary Lodge; Dewitt Mathis; Miles
Taffet, Duval & Stachenfeld LLP, New York, NY, Richard
S. Naidich, Robert P. Johnson, Naidich Wurman Birnbaum
& Maday, LLP, Great Neck, NY, Peter S. Thomas, Peter S.
Thomas, PC, Forest Hills, NY, for Defendants.

### *MEMORANDUM AND ORDER*
MATSUMOTO, District Judge.
**\*1** Pending before this court is a motion by plaintiffs
Sandra C. Barkley; Mary Lodge; Dewitt Mathis; Miles
and Lisa McDale; Charlene Washington; and Sylvia Gibbons
in her individual capacity and as Administrator of
the Estate of Rodney Gibbons (collectively "plaintiffs") to
recover $3,750,890.69 in attorneys' fees and $116,902.09
in costs from defendants United Homes, LLC; United
Property Group, LLC; Galit Network, LLC; Yaron
Hershco (the "UH Defendants"); Olympia Mortgage
Corp.; Bayview Loan Servicing, LLC; Bayview Asset
Management, LLC; U.S. Bank, N.A., as trustee for
Bayview Asset–Backed Securities Trust Series 2007–30;
Bayview Financial Management Corp.; and Benjamin
Turner (collectively "defendants"). The requested fees and
costs arise from the legal work performed on behalf of
plaintiffs in the consolidated actions, which commenced
more than seven years ago.

For the reasons set forth below, the court grants
plaintiffs' applications for fees and costs, but reduces the
requested amounts.

### *BACKGROUND*
Plaintiffs commenced these actions in 2004 and 2005
under the Fair Housing Act, 42 U.S.C. §§ 3604–05, U.S.C.
§§ 1981, 1982, and 1983(3), and state and local antidis-
crimination laws, including New York State Executive
Law § 296(5) ("NYHRL") and Title 8 of the New York
City Administrative Code ("NYCHRL"). Plaintiffs also
brought state law claims for fraud and conspiracy to
commit fraud, and for violations of New York General
Business Law § 349 ("GBL § 349"). Plaintiffs alleged that

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3095526 (E.D.N.Y.)
**(Cite as: 2012 WL 3095526 (E.D.N.Y.))**

they were victims of a property-flipping scheme whereby defendants deceived plaintiffs into purchasing defective homes financed with predatory loans. (*See generally* ECF No. 1,[FN1] Complaint[FN2] ("Compl.").) In essence, plaintiffs alleged that the UH Defendants acquired distressed, damaged, and defective residential properties in predominantly minority neighborhoods, made substandard and superficial repairs, and used racially targeted marketing strategies to sell the properties as "newly renovated" at substantially inflated prices, primarily to members of racial and ethnic minorities with little or no experience with homeownership and minimal financial acumen. Plaintiffs further alleged that the UH defendants conspired with appraisers, attorneys, and mortgage lenders in order to perpetrate the fraudulent scheme.

> FN1. Unless otherwise indicated, all Electronic Case Filing system ("ECF") citations are to docket number 04–cv–875.

> FN2. Plaintiffs amended the complaint multiple times during the pendency of the actions, primarily to name proper defendants.

The protracted litigation in these consolidated cases required the expenditure of significant time, money, and resources by all parties. (*See generally* ECF No. 635–1, Plaintiffs' Memorandum of Law in Support of Attorneys' Fees and Costs ("AARP/SBLS Mem.") at 2–3.) Plaintiffs have amended their complaints during the pending actions, primarily to name the proper defendants. (*See generally* Compl.) There were multiple rounds of discovery and discovery disputes, extensive and numerous settlement conferences and mediation sessions, and multiple unsuccessful motions to dismiss and for summary judgment. (*Id.*) Furthermore, the parties expended significant time preparing for and participating at trial when attempts at settlement failed. (*Id.*)

**\*2** On June 11, 2011, following a three-week trial, the jury found defendants liable for engaging in deceptive business practices in violation GBL § 349, fraud, and conspiracy to commit fraud, and awarded compensatory and punitive damages. (ECF Minute Entry dated 6/1/2011; ECF No. 566, Jury Verdict ("Verdict").) The jury found defendants not liable on plaintiffs' federal discrimination claims. (Verdict.)

Two groups of attorneys represented plaintiffs during the course of this litigation. The first group was composed of attorneys from AARP Foundation Litigation ("AARP"),

South Brooklyn Legal Services ("SBLS"), and the law firm Cowan, Leibowitz & Latman, P.C. ("CLL"). With the exception of CLL, which appeared more recently in January 2011, when the trial date was established, this group (collectively "AARP/SBLS Attorneys") has represented plaintiffs throughout the duration of the instant actions. The second group was composed of attorneys from the law firm Scarola, Malone & Zubatov, LLP ("SMZ Attorneys"). The SMZ Attorneys began representing plaintiffs in 2007, but withdrew as counsel of record on March 17, 2009. (*See* Order dated March 17, 2009.) Both groups of attorneys move for an award of attorneys' fees on behalf of plaintiffs, and the court considers their motions in tandem.

The AARP/SBLS Attorneys moved for an award of attorneys' fees on April 16, 2012. (AARP/SBLS Mem. at 3 (requesting fees for Jean Constantine–Davis, Rachel Geballe, J. Christopher Jensen, Pavita Krishnaswamy, Jennifer Light, Sarah Manaugh, and Nina Simon).) Based on their requested hourly rates, the AARP/SBLS Attorneys seek $2,887,911.19 in fees, plus $85,449.38 in costs, for a total of $2,973,360.57, which includes $2,887,911.19 in fees and $85,449.38 in costs. (*Id.* at 2.)

The SMZ Attorneys separately moved for attorneys' fees on April 16, 2012. (*See generally* Memorandum of Law in Support of Scarola, Malone & Zubatov LLP's Motion for Attorneys' Fees and Costs ("SMZ Mem.").) Based on their requested hourly rates, the SMZ Attorneys seek $894,431.20, which includes 862,979.50 in fees and $31,451.70 in costs. (*Id.* at 5.)

### DISCUSSION

As an initial matter, the court notes that plaintiffs are entitled to recover reasonable attorneys' fees because they prevailed on their deceptive practices claim pursuant to GBL § 349. *See* N.Y. Gen. Bus. L. § 349(h).

A determination of the appropriate award for attorneys' fees rests soundly within the discretion of the district court. *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany,* 522 F.3d 182, 190 (2d Cir.2008) (concluding that "the district court, in exercising its considerable discretion [should] bear in mind all of the case-specific variables ... relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate"). "A district court should consider the rate a reasonable, paying client would pay, and use that rate to calculate the presumptively reasonable fee." *Id.* at 193. "The party seeking reimbursement bears the burden of proving the reasonableness and necessity of hours spent and rates

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3095526 (E.D.N.Y.)
**(Cite as: 2012 WL 3095526 (E.D.N.Y.))**

charged." *Morin v. Nu–Way Plastering Inc.,* No. 03–CV–405, 2005 WL 3470371, at *2 (E.D.N.Y. Dec. 19, 2005) (citing *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136 (2d Cir.1983)).

**I. Reasonable Hourly Fee**

**\*3** After determining that a party is entitled to fees, the court, in considering a motion for attorneys' fees and costs, must first determine the presumptively reasonable fee for the legal services performed. *See Arbor Hill,* 522 F.3d at 183–84. The presumptively reasonable fee "boils down to what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively." *Simmons v. N.Y.C. Transit Auth.,* 575 F.3d 170, 174 (2d Cir.2009) (citing *id.* at 190) (internal quotations omitted).

The Second Circuit held in *Simmons* that "a district court must first apply a presumption in favor of application of the forum rule," under which "district courts are directed to calculate attorneys' fees based on the rates prevalent in the forum in which the litigation was brought." *Id.* at 175. "[T]o overcome that presumption, a litigant must persuasively establish that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result." *Id.* In addition, in considering the presumptively reasonable fee, the court must consider factors such as the labor and skill required, the difficulty of the legal issues presented, the attorney's customary hourly rate, and the attorney's experience and expertise. *Id.*

**II. Reasonable Hourly Rates**

**A. Requested Rates for AARP/SBLS Attorneys**

The AARP/SBLS Attorneys request hourly rates for two sets of attorneys: two attorneys seek hourly rates that prevail in Washington, D.C. Five attorneys seek hourly rates that prevail in New York, although one of the attorneys, J. Christopher Jensen, seeks compensation based on the hourly rates awarded in the Southern District of New York, where his office is located. (AARP/SBLS Mem. at 7.)

**1. Washington, D.C. Attorneys**

Jean Constantine–Davis and Nina F. Simon, two of AARP's Washington, D.C.-based attorneys, have represented plaintiffs as counsel of record in this action since the actions were commenced. (*See* Declaration of Jean Constantine–Davis ("Constantine–Davis Decl.") ¶ 6; Declara-

tion of Nina F. Simon ("Simon Decl.") ¶ 1; ECF No. 635, Exhibit A to Plaintiffs' Memorandum of Law in Support of Attorneys' Fees and Costs ("AARP/SBLS Ex. A").)

**a. Jean Constantine–Davis**

Ms. Constantine–Davis is a senior attorney at AARP, where she has worked since 1998. (*See* Constantine–Davis Decl. ¶ 6; AARP/SBLS Ex. A.) She has more than twenty-five years of experience as an attorney and specializes in mortgage lending litigation. (*Id.* ¶¶ 5–6.)

**b. Nina F. Simon**

Ms. Simon was a senior attorney at AARP from 1997 until March 2009. (*See* Simon Decl. ¶ 5; AARP/SBLS Ex. A.) She is currently the Director of Litigation at the Center for Responsible Lending. (*Id.* ¶ 6.) She has more than thirty years of experience as an attorney, including more than fifteen years of experience in mortgage and lending law at AARP. (*Id.* ¶ 4.)

**\*4** Plaintiffs request an hourly rate of $500 for both Ms. Constantine–Davis and Ms. Simon. (AARP/SBLS Mem. at 7.) In support of this rate, plaintiffs argue that Washington, D.C.based attorneys with similar experience "are regularly [awarded] fees ranging from $600–740 per hour[.]" (*Id.* at 11.)

**2. New York Attorneys**

**a. J. Christopher Jensen**

J. Christopher Jensen is the Chairman and partner at CLL. He has considerable experience in New York City housing law and civil litigation and significant experience litigating cases in the United States District Courts for the Southern District of New York and the Eastern District of New York. (*See* Declaration of J. Christopher Jensen ("Jensen Decl.") ¶¶ 1, 5; AARP/SBLS Ex. A.) After graduating law school in 1973, he worked as staff counsel for Suburban Action Institute. (AARP/SBLS Mem. at 12.) He later served in the United States Attorney's Office in the Eastern District of New York, eventually becoming Chief of the Civil Division. (*Id.* at 12.) Based on this experience, plaintiffs request an hourly rate of $600–625 for Mr. Jensen. (*Id.* at 7.)

**b. Pavita Krishnaswamy**

Pavita Krishnaswamy is the Deputy Director of Litigation at SBLS. (*See* Declaration of Pavita Krishnaswamy ("Krishnaswamy Decl.") ¶ 1, AARP/SBLS Ex. A.) She has

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3095526 (E.D.N.Y.)
**(Cite as: 2012 WL 3095526 (E.D.N.Y.))**

worked at SBLS for more than ten years in that capacity and as part of the Comprehensive Rights Unit. Ms. Krishnaswamy has experience litigating family law, housing law, and public benefits cases in New York City. (AARP/SBLS Mem. at 17–18.) Plaintiffs request an hourly rate of $375 for Ms. Krishnaswamy, but they do not seek fees for Ms. Krishnaswamy's legal services at trial. (*Id.* at 3, 7.)

### c. Jennifer Light

Jennifer Light is a staff attorney at SBLS, where she has worked since 2000. (*See* Declaration of Jennifer Light ("Light Decl.") ¶ 1; AARP/SBLS Ex. A.) Since 2009, Ms. Light has worked on the Foreclosure Prevention Project at SBLS. (*Id.* ¶ 7.) Plaintiffs request an hourly rate of $400 for Ms. Light. (AARP/SBLS Mem. at 7.)

### d. Sara Manaugh

Sara Manaugh is a staff attorney at SBLS. (*See* Declaration of Sara Manaugh ("Manaugh Decl.") ¶ 1; AARP/SBLS Ex. A.) Ms. Manaugh graduated from law school in 2003 and has experience litigating federal civil commercial actions. (*Id.* at 16.) Plaintiffs request an hourly rate of $375 for Ms. Manaugh. (AARP/ SBLS Mem. at 7.)

### e. Rachel Geballe

Rachel Geballe has worked as a staff attorney at SBLS since 2007 and has worked on the Foreclosure Prevention

project since 2009. (*See* Declaration of Rachel Geballe ("Geballe Decl.") ¶ 1; SBLS/AARP Ex. A.) (*Id.* ¶ 7.) Plaintiffs request an hourly rate of $300 for Ms. Geballe. (AARP/SBLS Mem. at 7.)

### B. Requested Rates for SMZ Attorneys

The SMZ Attorneys request fees for the following nine attorneys and four paralegals.[FN3] (Exhibit A to SMZ Mem. ("SMZ Ex. A").)

> FN3. The court follows decisions in the Eastern District of New York and includes fees for work performed by paralegals in the request for attorneys' fees. *See, e.g., Carco Grp., Inc. v. Maconachy,* No. CV 05–6038(ARL), 2011 WL 6012426 (E.D.N.Y. Dec.1, 2011); *Prot. One Alarm Monitoring, Inc. v. Exec. Prot. One Sec. Serv., LLC,* 553 F.Supp.2d 201 (E.D.N.Y.2008).

### 1. Richard J.J. Scarola

**\*5** Richard J.J. Scarola is the founding and managing partner of Scarola, Malone & Zubatov LLP ("SMZ"), a New York-based law firm that specializes in complex commercial litigation. (Declaration of Richard J.J. Scarola ("Scarola Decl.") ¶ 6; SMZ Ex. A.) Mr. Scarola has twenty years of experience as an attorney. ( *Id.* ¶ 7.) Plaintiffs request the following hourly rates for Mr. Scarola's work during the instant actions:

| Period | Requested Hourly Rate |
| --- | --- |
| October 2004—January 2007 | $525 |
| January 2007—January 2008 | $550 |
| January 2008—March 2009 | $575 |

### 2. Alex Zubatov

Alex Zubatov is a partner at SMZ. (Scarola Decl. ¶ 20.) He has more than ten years of experience as an attorney and specializes in commercial litigation. (*Id.*) Plaintiffs request an hourly rate of $425 for Mr. Zubatov. (*Id.* ¶ 23.)

### 3. Amy Bennett

Amy Bennett was an associate at SMZ during this litigation. (*Id.* ¶ 15.) While at SMZ, she specialized in commercial litigation. (*Id.* ¶ 16.) Ms. Bennett graduated from law school in 1996. (*Id.*) She has since worked in private practice and at the General Counsel's office of the City University of New York. (*Id.*) Plaintiffs request an hourly rate of $275 for Ms. Bennett. (*Id.* ¶ 23.)

### 4. Brian A. Turetsky

Brian A. Turetsky is an associate at SMZ. (*Id.* ¶ 15.) Mr. Turetsky graduated law school in 2002. (*Id.* ¶ 18.) In addition to working in private practice, he also serves on the Housing & Urban Development Committee of the Association of the Bar of the City of New York. (*Id.*) Plaintiffs request an hourly rate of $360 for Mr. Turetsky. (*Id.* ¶ 23.)

### 5. C. Michael Carlson

C. Michael Carlson was an associate at SMZ when he worked on the instant actions. (*Id.* ¶ 19.) Mr. Carlson graduated from law school in 2002 and specializes in commercial litigation at SMZ. (*Id.*) Plaintiffs request an hourly rate of $250 for Mr. Carlson. (*Id.* ¶ 23.)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3095526 (E.D.N.Y.)
**(Cite as: 2012 WL 3095526 (E.D.N.Y.))**

**6. Frank S. Rossi, II**

Frank S. Rossi, II, was an associate at SMZ during this action. (*Id.* ¶ 15.) Mr. Rossi graduated from law school in 2001 and specializes in commercial litigation at SMZ. (*Id.* ¶ 17) Plaintiffs request an hourly rate of $275 for Mr. Rossi. (*Id.* ¶ 23.)

**7. Jon S. Drumwright**

John S. Drumwright was a senior associate at SMZ during this action. (*Id.* ¶ 14.) Mr. Drumwright graduated from law school in 1999 and specialized in commercial litigation at SMZ. (*Id.*) Plaintiffs request the following hourly rates for M. Drumwright's work during the instant actions (*see id.* ¶ 23.):

| Period | Requested Hourly Rate |
| --- | --- |
| March 2006—February 2008 | $290 |
| February 2008—August 2008 | $325 |

**8. Mark Peters**

Mark Peters was an associate at SMZ when he worked on the instant actions. (*Id.* ¶ 10.) Mr. Peters has been practicing law since 1990. (*Id.*) He has testified before the State Assembly Banking Committee regarding reform of sub-prime lending practices, and has authored several articles regarding consumer protection and related subject matter. (*Id.* ¶ 12.) Mr. Peters specialized in commercial litigation at SMZ. (*Id.* ¶ 13.) Plaintiffs request the following hourly rates for Mr. Peters's work during the instant actions:

| Period | Requested Hourly Rate |
| --- | --- |
| October 2004—February 2006 | $350 |
| February 2006—March 2007 | $450 |

**9. Rachel G. Balaban**

**\*6** Rachel G. Balaban is a partner at SMZ. (*Id.* ¶ 21.) Ms. Balaban graduated from law school in 1999 and specializes in commercial litigation at SMZ. (*Id.*) Plaintiffs request an hourly rate of $465 for Ms. Balaban. (*Id.* ¶ 23.)

**10. Paralegal Staff**

Additionally, SMZ requested hourly rates for four paralegals: Andrea L. Ravich, Katerina Apostolides, Michael Vahala, and Pearl Zelma. (*Id.* ¶ 23.) SMZ included no information regarding the paralegals' professional experience. (*Id.*) Plaintiffs request the following hourly rates for Ms. Ravich, Ms. Apostolides, Mr. Vahala, and Ms. Zelma:

| Paralegal | Requested Hourly Rate |
| --- | --- |
| Andrea L. Ravich | $80.00 |
| Katerina Apostolides | $80.00 |
| Michael Vahala | $125.00 |
| Pearl Zelma | $80.00 |

**C. Presumption of the Forum Rule**

Plaintiffs request out-of-district rates for certain attorneys. Specifically, plaintiffs request Washington, D.C.-based rates for Ms. Simon and Ms. Constantine–Davis, and rates that prevail in the Southern District of New York for Mr. Jensen. In opposition, defendants argue that plaintiffs have not met their burden in overcoming the presumption in favor of the forum rate with respect to Ms. Simon, Ms. Constantine–Davis, and Mr. Jensen. (Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Attorneys' Fees ("Def.Opp.") at 4.)

In order to overcome the presumption in favor of application of the forum rule, plaintiffs must demonstrate that a reasonable client would have selected counsel from outside of the Eastern District of New York because doing so would "likely ... produce a substantially better net result." *See* Simmons, 575 F.3d at 175. To carry this burden,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3095526 (E.D.N.Y.)
**(Cite as: 2012 WL 3095526 (E.D.N.Y.))**

plaintiffs must make a "particularized showing" that "se-lection of out-of-district counsel was predicated on expe-rience-based, objective factors," and that using in-district counsel likely would have "produce[d] a substantially inferior result." *Id.* at 176. Plaintiffs could make such a showing by demonstrating either (1) that experienced in-district attorneys were "unwilling or unable to take the case," or (2) that this action required special expertise that could only be found outside of the Eastern District of New York. *See id.* (citation omitted).

Plaintiffs have failed to demonstrate that experienced attorneys within the Eastern District of New York were "unwilling or unable" to act as counsel in this case. *See id.* A court in the Second Circuit has held that plaintiffs must have searched unsuccessfully for counsel within the East-ern District before finding representation elsewhere. *See Harvey v. Home Savers Consulting Corp.,* No. 07–CV–2645, 2011 WL 4377839, at *4 (E.D.N.Y. Aug. 12, 2011) (finding that plaintiff overcame the forum rule presumption after unsuccessfully contacting more than 100 in-district firms before hiring Manhattan firm).

Here, plaintiffs have made an insufficient showing as to the availability or quality of counsel from within this district, or to plaintiffs' efforts in obtaining in-district rep-resentation. The record contains no indication of the number of attorneys plaintiffs contacted or the search process for attorneys within the Eastern District of New York before hiring Ms. Constantine–Davis, Ms. Simon, and Mr. Jensen. (*See* AARP/SBLS Ex. A; Plaintiffs' Reply Memorandum of Law in Support of Attorneys' Fees and Costs("AARP/SBLS Reply") at 4.) Although plaintiffs argue that the conclusions in *Harvey* are "instructive" as to the lack of experienced attorneys in the Eastern District who are willing to undertake complex fraud litigation, (*see* AARP/SBLS Reply at 5 (citing *Harvey,* 2011 WL 4377839 at *4)), plaintiffs have not provided sufficient information attesting to their own search for counsel. A mere citation to a recent case from the Eastern District of New York and a statement that counsel in the Eastern District of New York could not be located, without more, does not satisfy the *Simmons* requirement of a "particu-larized showing" that in-district counsel were unable or unwilling to help plaintiffs. 575 F.3d at 175. Consequently, the court finds that plaintiffs have failed to show that plaintiffs were unable to engage representation from within the Eastern District of New York because experienced in-district attorneys were "unwilling or unable to take the case." *Id.* at 176.

**\*7** Plaintiffs have also failed to show that using in-district counsel would produce a "substantially inferior result." *Simmons,* 575 F.3d at 176. Although the court acknowledges that Ms. Constantine–Davis and Ms. Simon specialize in mortgage law and that Mr. Jensen is an ex-perienced federal trial attorney, plaintiffs have not made a particularized showing that they could not locate able counsel within the Eastern District of New York who were willing to represent plaintiffs. *See Blue Moon Media Grp., Inc. v. Field,* No. CV 08–1000, 2011 WL 4056068, at *11 (E.D.N.Y. Apr. 11, 2011) (applying forum rule where defendant provided "no specific information which would establish that local counsel with the requisite experience were unwilling or unable to take the case, or, alternatively, that no in-district counsel possessed such expertise"); *Whitney,* 2009 WL 4929274, at *6 (finding that plaintiff did not meet "stringent standard" set by *Simmons* to overcome presumption of forum rule).

Plaintiffs argue that "AARP possessed an expertise ... that was not readily available ... within the district" and that, absent this expertise, "plaintiffs would likely have suffered an inferior result." (*See* AARP/SBLS Reply at 4.) Plaintiffs, however, present no evidence to support this assertion and therefore fail to satisfy their heightened burden under *Simmons.*[FN4] (*See id.* at 4–5.) Without spe-cific evidence that plaintiffs did in fact contact attorneys within this district, plaintiffs fail to overcome the pre-sumption in favor of the forum rule.

FN4. Defendants also claim there are several re-cent cases in which counsel within the Eastern District of New York obtained results similar to those involved in the instant action. The court has reviewed the cases that defendants cite, however, and finds that the cited cases are not analogous to the instant action. The instant action involved a three-week trial with a favorable jury verdict, whereas defendants' cited cases involved court rulings on motions for summary judgment and motions to dismiss. (*See* Def. Opp. at 11–12 (citing *Human Res. Research & Mgmt. Grp. v. Cnty. of Suffolk,* 687 F.Supp.2d 237 (E.D.N.Y.2010) (denying defendants' summary judgment motion when plaintiffs were repre-sented by four groups of attorneys from within the Eastern District of New York in a Fair Housing Act lawsuit); *Reyes v. Fairfield Props.,* 661 F.Supp.2d 249 (E.D.N.Y.2009) (denying de-fendants' motion to dismiss when attorneys from within the Eastern District of New York repre-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3095526 (E.D.N.Y.)
**(Cite as: 2012 WL 3095526 (E.D.N.Y.))**

sented plaintiffs) *Council v. Better Homes Depot, Inc.,* 04–cv–5620, WL 2376381 (E.D.N.Y. Aug. 6, 2006) (denying defendants' motion to dismiss when attorneys from within the Eastern District of New York represented plaintiffs in a lawsuit filed under GBL § 349).)

Because plaintiffs have failed to overcome the presumption in favor of the forum rule, the court will next consider whether the requested rates are comparable to those typically awarded in the Eastern District of New York. In this district, courts have recently awarded fees in the range of $300–450 per hour for partners, $200–300 for senior associates, and $100–200 for junior associates. *See, e.g., Carco Grp., Inc. v. Machonachy,* No. CV 05–6038, 2011 WL 6012426, at *3 (E.D.N.Y. Dec. 1, 2011); *Santillan v. Henao,* 822 F.Supp.2d 284, 300 (E.D.N.Y. Sept.30, 2011); *Gutman v. Klein,* No. 03 Civ. 1570, 2009 WL 3296072, at *2 (E.D.N.Y.2009). *See also Libaire v. Kaplan,* No. CV–06–1500, 2011 WL 7114006, at *4 (E.D.N.Y. Jun. 17, 2011) (awarding an hourly rate of $300 to senior associate with 26 years of experience and $200 to junior associate with three years of experience); *Toussie v. Cnty. of Suffolk,* No. CV 01–6716, 2011 WL 2173870, at *2 (E.D.N.Y. May 31, 2011) (awarding an hourly rate of $450 to partner with 34 years of experience).

Given the extensive experience of plaintiffs' attorneys and the complexity of the litigation, the court finds that application of hourly rates at the high end of these ranges is appropriate. *See Carco Grp.,* 2011 WL 6012426, at *3, 5 (awarding an hourly rate of $425 to a partner with more than twenty years of experience); *BBY Solutions, Inc. v. Schwartz,* No. CV 11–0947, 2011 WL 6986937, at *7 (E.D.N.Y. Nov.17, 2011) (awarding an hourly rate of $400 to a partner with more than twenty years of experience); *Field Day, LLC v. Cnty. of Suffolk,* Civil Action No. 04–2202, 2010 WL 5490990, at *3 (E.D.N.Y. Dec.30, 2010) (awarding an hourly rate "at the high end of the [reasonable hourly fee] range" to a partner with "substantial experience"); *cf. Santillan* 822 F.Supp.2d at 300 (awarding partner $375 per hour for otherwise "relatively straightforward" default case with "no novel or complex issues").

**\*8** In calculating the presumptively reasonable fee, the court will therefore apply the following hourly rates:

| Attorney | Hourly Rate |
| --- | --- |
| Jean Constantine–Davis | $450 |
| Nina F. Simon | $400 |
| J. Christopher Jensen | $450 |
| Pavita Krishnaswamy | $325 |
| Jennifer Light | $300 |
| Sara Manaugh | $300 |
| Rachel Geballe | $200 |
| Richard J.J. Scarola | $400 |
| Amy Bennett | $200 |
| Brian Turetsky | $300 |
| C. Michael Carlson | $200 |
| Frank S. Rossi, II | $200 |
| Jon S. Drumwright | $300 |
| Mark Peters | $325 |
| Rachel G. Balaban | $400 |
| Alex Zubatov | $400 |

**D. Paralegal Staff Rates**

Where, as here, a party provides no information regarding its paralegals' professional experience, a court in the Eastern District of New York may reduce hourly rates for paralegal staff. *See Protection One,* 553 F.Supp.2d at 209 (reducing paralegals' requested rates by over 30 percent when applicant made no showing of the paralegals' professional experience). In *Protection One,* the court

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3095526 (E.D.N.Y.)
**(Cite as: 2012 WL 3095526 (E.D.N.Y.))**

applied an hourly rate of $80 for paralegals in the absence of any information in the record that detailed the paralegals' professional experience. *See id.* at 209. The court

adopts this rate, which alters the hourly rate of only one member of the paralegal staff. Accordingly, the court applies the following hourly rates:

| Paralegal | Hourly Rate |
|---|---|
| Andrea L. Ravich | $80.00 |
| Katerina Apostolides | $80.00 |
| Michael Vahala | $80.00 |
| Pearl Zelma | $80.00 |

**II. Reasonable Number of Hours**

To support their fee application, plaintiffs have submitted contemporaneous billing records in accordance with *New York State Ass'n for Retarded Children, Inc. v.*

*Carey,* 711 F.2d 1136, 1148 (2d Cir.1983). (*See* AARP/SBLS Ex. A.) The records reflect the following hours spent by each attorney and paralegal and do not include time excluded by plaintiff's counsel:

| Attorney | Recorded Hours |
|---|---|
| Jean Constantine–Davis | 2813.30 |
| Nina F. Simon | 1083.35 |
| J. Christopher Jensen | 284.30 |
| Pavita Krishnaswamy | 35.00 |
| Jennifer Light | 528.00 |
| Sara Manaugh | 1170.00 |
| Rachel Geballe | 393.00 |
| Richard J.J. Scarola | 479.80 |
| Amy Bennett | 79.70 |
| Brian Turetsky | 16.60 |
| C. Michael Carlson | 7.40 |
| Frank S. Rossi, II | 10.20 |
| Jon S. Drumwright | 1026.80 |
| Mark Peters | 534.60 |
| Rachel G. Balaban | 45.80 |
| Alex Zubatov | 18.20 |

| Paralegal | Recorded Hours |
|---|---|
| Andrea L. Ravich | 2.10 |
| Katerina Apostolides | 3.00 |
| Michael Vahala | 2.20 |
| Pearl Zelma | 4.00 |

The defendants argue, however, that (1) plaintiffs' limited success at trial renders the fee request unreasonable; and (2) plaintiffs' time records are vague, ambiguous, and internally inconsistent. (*See* Def. Opp. at 14–28.) Consequently, defendants urge the court to reduce the total

number of hours.

**A. Plaintiff's Degree of Success**

**\*9** Defendants urge the court to reduce the number of recorded hours because plaintiffs' discrimination

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3095526 (E.D.N.Y.)
**(Cite as: 2012 WL 3095526 (E.D.N.Y.))**

claim—which defendants characterize as the "centerpiece of this case"—was unsuccessful and the resulting damage awards were far lower than plaintiffs sought. (Def. Opp. at 2.) Defendants argue that the court should give plaintiffs' limited success at trial primary consideration and award a lower amount in attorneys' fees. (*Id.* at 16 (citing *Kassim v. City of Schenectady*, 415 F.3d 246, 254 (2d Cir.2005) (internal quotations omitted).) In response, plaintiffs argue that the $1.1 million judgment and the successful jury verdict represent a "highly successful outcome" that is not overshadowed by lack of success in the discrimination claims. (AARP/SBLS Reply at 1–2.) Additionally, plaintiffs argue that given the length and complexity of this case, plaintiffs expended a reasonable number of hours working towards its conclusion. (*Id.* at 7–8.)

Courts in the Second Circuit recognize two reasons that an attorney's recorded hours may be reduced based on limited success at trial. *See Khan v. HIP Centralized Lab. Servs., Inc.*, No. CV–03–2411, 2009 WL 2259643, at *2 (E.D.N.Y. July 29, 2009) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). First, the hours may be reduced when an attorney's work in the action is unrelated to the successful claims. *Id.* Second, when an attorney's work cannot be neatly divided between claims, the hours may be reduced based on the "degree of success obtained" in the action. *Id.* (citing *Hensley* at 436) (internal quotations omitted).

In this case, plaintiffs' claims are interrelated, making it difficult to neatly divide the unsuccessful claims from the successful claims. Defendants correctly note that the discrimination claims were central to the plaintiffs' actions, as evidenced by the substantial discovery work, research, and briefing devoted to those claims. (*See, e.g.,* ECF No. 158–2, Plaintiffs' Consolidated Memorandum of Law in Opposition to Defendants' Motion to Dismiss, at 11–28; ECF No. 470, Plaintiffs' Consolidated Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, at 26–29; Trial Tr., Vol. I at 12, 28–31; Vol. III at 230–260; Vol. IV at 3–34.) Nevertheless, in most instances, work performed on plaintiffs' discrimination claims cannot be separated from work performed on the claims on which plaintiffs prevailed because all of the claims "involve[d] a common core of facts or [were] based on related legal theories." *Khan* at *2 (citing *Hensley*, 461 U.S. at 435) (internal quotations omitted). Moreover, plaintiffs have already voluntarily excluded a large number of hours that had been expended solely on the discrimination claims. (*See* AARP/SBLS Reply at 8.) Consequently, to the extent that any remaining hours in the timesheets

were devoted to plaintiffs' discrimination claims, the court finds that those hours were simultaneously devoted to, and interrelated with, plaintiffs' successful claims.

**\*10** Furthermore, even though plaintiffs did not prevail on their asserted discrimination claims, they achieved a substantial degree of success at trial. In determining a party's degree of success at trial, courts look to the "significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.* at *3 (citing *Hensley*, 461 U.S. at 435). Here, the plaintiffs prevailed on most of their claims and ultimately won a $1.1 million judgment against defendants. (*See* Pl. Mem. at 3.) These claims produced substantial relief for the plaintiffs and required a significant amount of work from the attorneys involved.

The court therefore finds no reason to reduce plaintiffs' fee award based on their asserted lack of success at trial.

**B. Excessive and Duplicative Billing**

Defendants also argue that plaintiffs' attorneys' recorded hours are excessive, duplicative, and ambiguous. (*See* Def. Opp. at 25–26.) Consequently, defendants urge the court to apply an across-the-board reduction in the hours requested. (*Id.*) In response, plaintiffs argue that the hours should not be reduced further due to the length and complexity of the cases. (AARP/SBLS Reply at 7–8.)

Courts in the Eastern District of New York have found that an across-the-board reduction is appropriate when a litigant's time records are unreasonable. *Manzo v. Sovereign Motors Cars.*, Ltd, No. 08–CV–122, 2010 WL 1930237, at *8 (E.D.N.Y. May 11, 2010) (reducing requested fees by twenty-five percent because of overstaffing and duplicative entries); *see also New York State Ass'n for Retarded Children*, 711 F.2d at 1146 (noting that courts "endorse[ ] percentage cuts as a practical means of trimming fat from a fee application"); *Lochren v. Cnty. of Suffolk*, 344 Fed. App'x. 706, 709 (2d Cir.2009) (finding no abuse of discretion where district court applied a twenty-five percent reduction in fees because of "needless duplication of work"). Such a reduction is particularly appropriate when an applicant's records include vague entries (see *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 172 (2d Cir.1998); when the records indicate block billing (*see Plitz v. Inc. Vill. of Freeport*, No. CV 07–4078, 2011 WL 588255138, at *7 (E.D.N.Y. Nov. 17, 2011); and when the records indicate duplicative work (*see Carco Grp.*, 2011 WL 6012426, at *3 (E.D.N.Y. Dec.1, 2011).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3095526 (E.D.N.Y.)
**(Cite as: 2012 WL 3095526 (E.D.N.Y.))**

Plaintiffs' attorneys have submitted contemporaneous time records. (*See* AARP/SBLS Ex. A; SMZ Ex. A.) The court finds that this satisfies the requirement, established in *New York State Ass'n for Retarded Children,* that attorneys provide a record of time expended when applying for fees. 711 F.2d at 1147. Moreover, plaintiffs' counsel have voluntarily written off hours they expended. (*See* AARP/SBLS Mem. at 3.) Nonetheless, upon close review of plaintiffs' records, the court finds that many of the requested hours are excessive, vague, and, at some points, duplicative. There are many instances in which attorneys devoted significant amounts of time to vague tasks such as "organizing files" and "research." (*See* Constantine–Davis Decl. at 8, 16; AARP/SBLS Ex. A.) Such vague language precludes the court from determining whether the time spent on each task was reasonable.

**\*11** Moreover, multiple attorneys frequently billed for the same assignment, leading to an excessively large number of hours for nearly every attorney. This redundant work was likely the product of the growing number of attorneys working on plaintiffs' cases, and the result was that minor tasks were overstaffed, leading to duplicative work and an unreasonably large fee request.

Accounting for overstaffing, duplicative work, and excessive time spent on minor tasks, the court will exercise its discretion and reduce the number of overall hours by twenty-five percent. See *New York State Ass'n for Retarded Children,* 711 F.2d at 1146 (noting that courts "endorse[ ] percentage cuts as a practical means of trimming fat from a fee application"); *Lochren,* 344 F. App'x at 709 (finding no abuse of discretion where district court applied a twenty-five percent reduction in fees because of "needless duplication of work"); *Concrete Flotation Sys., Inc. v. Tadco Constr. Corp.,* 2010 WL 2539771, at \*8 (E.D.N.Y. Mar.15, 2010) (applying a twenty-five percent reduction in hours for overstaffing and duplicative work). The court applies this reduction to the hours submitted by all attorneys and paralegal staff.

The following shows the adjusted and reduced reasonable hours expended by plaintiffs' attorneys, the adjusted and reduced reasonable hourly rates, and the total amount that the court awards in attorneys' fees:

### Attorneys

| Attorney | Reasonable Hourly Rate | Reasonable Number of Hours | Fees Awarded |
| --- | --- | --- | --- |
| Jean Constantine–Davis | $450 | 2,109.98 | $949,491.00 |
| Nina F. Simon | $400 | 812.51 | $325,004.00 |
| J. Christopher Jensen | $450 | 213.23 | $95,953.50 |
| Pavita Krishnaswamy | $325 | 26.25 | $8,531.25 |
| Jennifer Light | $300 | 396.00 | $118,800.00 |
| Sara Manaugh | $300 | 877.50 | $263,250.00 |
| Rachel Geballe | $200 | 294.75 | $58,950.00 |
| Richard J.J. Scarola | $400 | 359.85 | $143,940.00 |
| Amy Bennett | $200 | 59.78 | $11,956.00 |
| Brian Turetsky | $300 | 12.45 | $3,735.00 |
| C. Michael Carlson | $200 | 5.55 | $1,110.00 |
| Frank S. Rossi, II | $200 | 7.65 | $1,530.00 |
| Jon S. Drumwright | $300 | 770.10 | $231,030.00 |
| Mark Peters | $325 | 400.95 | $130,308.75 |
| Rachel G. Balaban | $400 | 34.35 | $13,740.00 |
| Alex Zubatov | $400 | 13.65 | $5,460 |
| **TOTAL** | | | **$2,362,789.50** |

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3095526 (E.D.N.Y.)
**(Cite as: 2012 WL 3095526 (E.D.N.Y.))**

| Paralegal | Reasonable Hourly Rate | Reasonable Number of Hours | Fees Awarded |
|---|---|---|---|
| Andrea L. Ravich | $80.00 | 1.58 | $126.40 |
| Katerina Apostolides | $80.00 | 2.25 | $180.00 |
| Michael Vahala | $80.00 | 1.65 | $132.00 |
| Pearl Zelma | $80.00 | 3.00 | $240.00 |
| **TOTAL** | | | **$678.40** |

**Total Fees Awarded:**
**$2,363,467.90**

### III. Costs

Included in plaintiffs' application for attorneys' fees is a request for $116,901.08 in costs incurred during the action. Courts in the Second Circuit typically award costs for "reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *LeBlanc–Sternberg v. Fletcher,* 143 F.3d 748, 763 (2d Cir.1998) (citation omitted); *see also Miltland Raleigh–Durham v. Meyers,* 840 F.Supp. 235, 239 (S.D.N.Y.) (finding that attorneys' reasonable expenses could be included in fee awards as long as those expenses were "incidental and necessary to the representation of ... clients") (internal quotation marks omitted). Nonrecoverable costs, however, are those that are "routine office overhead" that "must normally be absorbed within the attorney's hourly rate." *Kuzma v. I.R.S.,* 821 F.2d 930, 934 (2d Cir.1987).

**\*12** In the Eastern District of New York, courts have found that most administrative costs are recoverable. *See, e.g., Simmons v. New York City Transit Auth.,* No. CV 02–1575, 2008 WL 630060, at *7 (E.D.N.Y. Mar.5, 2008) (finding that applicant could recover costs related to filing fees, process servers, postage, travel and photocopying), *vacated and remanded on other grounds,* 575 F.3d at 170; *Cho v. Koam Med. Servs.,* 524 F.Supp.2d 202, 212 (E.D.N.Y.2007) (finding that applicant could recover costs related to shipping, reproduction, telephone, facsimile, postage, deposition services, deposition transcripts, and legal databases); *Molefi v. Oppenheimer Trust,* No. 03 CV 5631, 2007 WL 538547, at *8 (E.D.N.Y. Feb.15, 2007) (finding that applicant could recover costs related to mailings, photocopies, and court fees).

Here, almost all of plaintiffs' listed costs were related to legal research, mail delivery, travel, and administrative expenses for hearings, depositions, and court filings. (*See* SMZ Ex. A; AARP/SBLS Ex. A). These expenses are the types of costs that are routinely included in awards for attorneys' fees in the Eastern District of New York. *See Cho,* 524 F.Supp.2d at 212. A small fraction of the requested costs, however, came from overtime meals. (*See* SMZ Ex. A.) The court does not grant plaintiffs' request for costs from meals, since these costs comprise "routine office overhead" and are generally not recoverable. *See Kuzma,* 821 F.2d at 934.

After reviewing plaintiffs' requests, the court has determined that the expenditures for document reproduction, shipping, deposition/hearing transcripts, and legal research are reasonable. (*See* SMZ Ex. A; AARP/SBLS Ex. A). Therefore, the court awards $116,818.35 for these items.

### CONCLUSION

For the reasons stated above, the court awards plaintiffs $1,819,979.75 in attorneys' fees and $85,449.38 in costs for work performed by the AARP/SBLS Attorneys. The court also awards plaintiffs $543,488.15 in attorneys' and paralegals' fees and $31,368.97 in costs for work performed by the SMZ Attorneys.

Accordingly, the Clerk of the Court is directed to enter judgment in favor of plaintiffs in the amount of $2,480,286.25 for attorneys' fees and costs.

**SO ORDERED.**

E.D.N.Y.,2012.
Barkley v. United Homes, LLC
Slip Copy, 2012 WL 3095526 (E.D.N.Y.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

Page 1

Not Reported in F.Supp.2d, 2007 WL 2903920 (E.D.N.Y.)
**(Cite as: 2007 WL 2903920 (E.D.N.Y.))**

H
Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Eddie M. DIAZ, Plaintiff,
v.
PARAGON MOTORS OF WOODSIDE, INC. and
Americredit Financial Services, Inc., Defendants.

No. CV-03-6466(CPS)(RML).
Oct. 1, 2007.

Mitchell Taras, Dennis Roger Hirsch, Francis Dana Bigelow, Sadis & Goldberg LLC, New York, NY, for Plaintiff.

Craig M. Bonnist, Bonnist & Cutro LLP, Rye, NY, for Defendants.

MEMORANDUM OPINION AND ORDER
SIFTON, Senior Judge.

**\*1** Eddie Diaz brings this action against Paragon Motors of Woodside, Inc. ("Paragon") and Americredit Financial Services, Inc. ("Americredit") to recover attorneys' fees and disbursements in the amount of $86,569.52, pursuant to Rule 54(d) of the Federal Rules of Civil Procedure.[FN1]

> **FN1.** Rule 54(d) allows a prevailing party costs, other than attorneys' fees "unless the court otherwise directs." Fed.R.Civ.P. 54(d)(1). A court may also award attorneys' fees and related non-taxable expenses on application by a party. Fed.R.Civ.P. 54(d)(2)(A).

This motion for fees stems from an action Diaz commenced against Paragon Motors alleging that defendant Paragon Motors violated (1) the Truth in Lending Act (TILA), 15 U.S.C. § 1601 et seq.,[FN2] (2) the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691,[FN3] (3) New York's Vehicle & Traffic Law § 417-a[FN4] (4) New York's "Used Car Lemon Law," New York General Business Law § 198-b,[FN5] (5) the Magnuson-Moss Warranty Act (MMWA), 15 U.S.C. § 2310,[FN6] by breaching (a) express warranties (b) implied warranties and (c) revocation of acceptance, and (6) New York General Business

Law § 349 by its deceptive sales practices.[FN7] In addition, plaintiff alleged that (7) co-defendant Americredit should be held liable for damages on claims which plaintiff asserts against co-defendant Paragon, pursuant to 16 C.F.R. § 433.2 (the "Holder Rule"), as a provider of consumer credit.

> **FN2.** Pursuant to 15 U.S.C. § 1640, an individual bringing a TILA claim may recover: 1) actual damages; 2) twice the amount of any finance charge in connection with the transaction, not less than $100 nor greater than $1,000; 3) costs of the action, together with a reasonable attorney's fee as determined by the court.

> **FN3.** An individual bringing suit under ECOA may be entitled to actual damages, punitive damages up to $10,000, equitable and declaratory relief, as well as costs and attorney's fees. 15 U.S.C. § 1691e.

> FN4. "A consumer injured by a violation of this section may bring an action to recover damages. Judgment may be entered for three times the actual damages suffered by a consumer or one hundred dollars, whichever is greater. A court may also award reasonable attorneys' fees to a prevailing plaintiff buyer." NY V & T § 417-a (4).

> **FN5.** If a dealer fails to honor the warranty as provided in N.Y. GBL § 198-b, "the dealer shall accept return of the used motor vehicle from the consumer and refund to the consumer the full purchase price ." N.Y. General Business Law § 198-b (c)(1).

> **FN6.** Consumers may recover "a sum equal to the aggregate amount of cost and expenses (including attorneys' fees) ... unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate." 15 U.S.C. § 2310(d).

> **FN7.** "In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2007 WL 2903920 (E.D.N.Y.)
**(Cite as: 2007 WL 2903920 (E.D.N.Y.))**

own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff." McKinney's General Business Law § 349(h).

On March 29, 2006, I issued a Memorandum Opinion and Order with respect to plaintiff's motion for partial summary judgement on liability with respect to the TILA, ECOA and N.Y. Veh. & Traf. Law § 417-a claims and defendants' cross motions for summary judgment on all claims. The March decision granted plaintiff summary judgment on liability with respect to its claims under TILA and N.Y. Veh. & Traf. Law § 417-a, and on N.Y. Gen. Bus. Law § 349 to the extent that such claim was premised on violations of TILA and N.Y. Veh. & Traf. Law § 417-a.[FN8] I granted defendants' summary judgment on all other claims with the exception of the MMWA breach of implied warranty claim and the MMWA revocation of acceptance claim. In June, the parties filed a joint stipulation voluntarily discontinuing the MMWA claim.

> FN8. Because TILA provides for more limited assignee liability than the Holder Rule, 16 C.F.R. § 433.2, I granted Americredit's motion for summary judgment on plaintiff's TILA claim. *Diaz v. Paragon Motors of Woodside, Inc.,* 424 F.Supp.2d 519, 544 (E.D.N.Y.2006).

I held a bench trial on October 11, 2006 to determine whether the plaintiff was entitled to damages as a result of defendants' violations of TILA and N.Y. Veh. & Traf. Law § 417-a and N.Y. Gen. Law § 349. In my January 29, 2007 Memorandum Opinion and Order following the trial, I awarded plaintiff $1000 in damages against Paragon Motors for violations of TILA, and $7,890 in damages against both Paragon Motors and Americredit for violations of N.Y. Veh. & Traf. Law § 417-a. I also concluded that defendants violated New York General Business Law § 349, but I did not award Diaz any damages for prevailing on this claim because the damages were duplicative of the damages recovered under TILA and N.Y. Veh. & Traf. Law § 417-a. Plaintiff thereafter applied for attorney's fees and disbursements.

For the reasons set forth below, I conclude that plaintiff is entitled to attorneys fees and disbursements in the total amount of $67,353.52.

What follows sets forth the findings of fact and conclusions of law on which these determinations are based as required by Rule 58 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 58(a)(1).

## BACKGROUND

**\*2** Familiarity with this Court's earlier decisions, findings and conclusions is assumed.[FN9]

> FN9. *Diaz,* 424 F.Supp.2d 519, and *Diaz v. Paragon Motors of Woodside, Inc.,* No. CV-03-6466, 2007 WL 295602 (E.D.N.Y. Jan.29, 2007).

## DISCUSSION
*Amount of Fees and Disbursements Requested*

Plaintiff requests an award of $72,665.50 in fees and $13,914.02 in disbursements pursuant to Rule 54(d) of the Federal Rules of Civil Procedure for attorneys fees and disbursements. Defendants argue that the amount of fees requested is unwarranted because of plaintiff's limited success. In addition, defendants object to the billing of clerical work at attorney and paralegal rates, the billing of the expert witness fee above the $40.00 daily witness fee provided by 28 U.S.C.A. § 1821 and § 1920, the inclusion of Federal Express fees and the inclusion of pre-litigation fees. Defendants also object to calculating attorney fees using hourly rates for attorneys practicing in the Southern District of New York (as requested by plaintiff's counsel) rather than using Eastern District rates.

## TILA

Under 15 U.S.C. § 1640, a prevailing plaintiff can recover reasonable costs and attorney fees [FN10] as determined by the court. I awarded Diaz $1000 in damages against defendant Paragon Motors [FN11] for prevailing on this cause of action, as stated in my March 29, 2006 Memorandum Opinion and Order.

> FN10. 15 U.S.C. § 1640(a)(3) provides that "in the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 1635 of this title, the costs of the action, together with a reasonable attorney's fee as determined by the court."

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2007 WL 2903920 (E.D.N.Y.)
**(Cite as: 2007 WL 2903920 (E.D.N.Y.))**

*FN11.* In my March 29, 2006 Memorandum Opinion and Order pages 54-56, I granted defendant Americredit summary judgment with respect to TILA.

*N.Y. Veh. & Traf. Law § 417-a*

New York Vehicle and Traffic Law § 417-a also allows the court to award a prevailing plaintiff reasonable attorney fees [FN12]. In my January 29, 2007 Memorandum Opinion and Order, I found that Diaz suffered a loss of $2,630 (the price Diaz paid, $16,590, minus the retail value at the time Diaz purchased the vehicle which was $13,960 [FN13]). (Trial Transcript, 27-28.) Accordingly, I awarded Diaz $7,890, which is three times the damage figure of $2,630, in damages against both Paragon and Americredit.

*FN12.* N.Y. Veh. & Traf. Law § 417-a(4).

*FN13.* Plaintiff's expert testified that the Blue Book Value of the vehicle at the time of purchase was $17,450. That figure is then devalued by 20% due to the vehicle's rental history for a retail value of $13,960.

*New York General Business Law § 349*

In my January 29, 2007 Memorandum Opinion and Order, I found that Diaz was injured as a result of defendants' deceptive acts at the time the TILA and N.Y. Veh. & Traf. Law § 417-a violations occurred. Plaintiff showed that defendants' acts met all three elements needed for violating N.Y. Gen. Bus. Law § 349. Thus, defendants were liable for violations of N.Y. Gen. Bus. Law § 349. However, I denied awarding additional damages under N.Y. Gen. Bus. Law § 349 because I already awarded Diaz actual damages for these same injuries under TILA and N.Y. Veh. & Traf. Law § 417-a. Compensatory damages can only be awarded one time for an injury. *Gentile v. County of Suffolk,* 926 F.2d 142, 153 (2d Cir.1991); *Wickham Contracting Co. v. Board of Education,* 715 F.2d 21, 28 (2d Cir.1983).

*Fees*

The Second Circuit uses the "presumptively reasonable fee," known as the "lodestar figure" (or "lodestar") in other circuits, to determine reasonable attorneys fees for federal claims. *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* 493 F.3d 110 (2d. Cir. July 12, 2007); *Cruz v. Local Union No. 3 of the International Brotherhood of Electrical Workers,* 34 F.3d 1148, 1159 (2d Cir.1994); *Heng Chan v. Sung Yue Tung*

*Corp.,* No. 03-CV-6048, 2007 WL 1373118 (E.D.N.Y. May 8, 2007). Accordingly, the presumptively reasonable fee award is the appropriate method to determine fees for the TILA claim. In addition, the presumptively reasonable fee award, or lodestar, is used to make a fee determination in cases concerning claims of N.Y. Gen. Bus. Law § 349 and N.Y. Veh. & Traf. Law § 417-a. *See, e.g., Independent Living Aids, Inc. v. Maxi-Aids, Inc.,* 25 F.Supp.2d 127, 131-32 (E.D.N.Y.1998) (awarding attorney fees on a N.Y. Gen. Bus. Law § 349 claim based on the lodestar calculation); *General Motors Corp. v. Villa Martin Chevrolet, Inc.,* 240 F.Supp.2d 182 (E.D.N.Y.2002) (using the lodestar calculation to award attorney fees in a case involving N.Y. Veh. & Traf. Law § 496 because "New York courts typically apply a 'lodestar' analysis when setting fees pursuant to a fee-shifting statute") (internal citations omitted).

**\*3** The presumptively reasonable fee "is arrived at by multiplying the number of hours reasonably expended on the litigations ... by an hourly rate." *Kirsch v. Fleet Street, Ltd.,* 148 F.3d 149, 172 (2d Cir.1998). In the Second Circuit "any attorney ... who applies for court-ordered compensation ... must document the application with contemporaneous time records." These records should specify, for each attorney, the date, the hours expended and the nature of the work. *New York State Ass'n for Retarded Children, Inc., v. Carey,* 711 F.2d 1136, 1148 (2d Cir.1983). However, "[i]t is not required that counsel describe in great detail how billable time was spent; it is sufficient to identify the general subject matter of time expenditures." *Aiello v. Town of Brookhaven,* No. 94-CV-2622, 2005 WL 1397202, \*9 (E.D.N.Y.2005) (citing *Perdue v. City Univ. of New York,* 13 F.Supp.2d 326, 345 (E.D.N.Y.1998)).

Plaintiff seeks an award of attorney fees and costs in the amount of $86,569.52 pursuant to Fed.R.Civ.P. 54(d) for prevailing on his claims against the defendants under the Truth in Lending Act, New York Vehicle and Traffic Law § 417-a and New York General Business Law § 349. Plaintiff has submitted contemporaneous time records in support of this fee motion. In addition, plaintiff has submitted attorney and paralegal affirmations as to the truthfulness of the time submissions and an affidavit from the office manager and bookkeeper of plaintiff's lawyer's firm to substantiate the payments for costs and expenses. Plaintiff has also submitted an affidavit from Allen J. Charne, the executive director of the New York City Bar Association's Legal Referral Service stating that his organization was unable to find qualified attorneys in the boroughs of Queens, Brooklyn or the Bronx willing to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2903920 (E.D.N.Y.)
(Cite as: 2007 WL 2903920 (E.D.N.Y.))

handle consumer protection cases relating to automobile sales issues FN14.

> FN14. Plaintiff notes that Mr. Charne's affidavit, dated June 21, 2005, was provided in support of Sadis & Goldberg's fee application in *Valverde et. al. v. Star Auto Sales of Bayside, Inc.,* Eastern District of New York docket number 04-CV-3625, an auto financing case in the Eastern District that also involved TILA and GBL § 349 claims.

Plaintiff's memorandum in support of this fee motion discusses the appropriate hourly rates for attorneys in both the Eastern and Southern Districts of New York. It also discusses the qualifications and experience of each staff member from Sadis & Goldberg who worked on this case in order to support their requested hourly rates.

*Applicable Community and Prevailing Market Rates*

Plaintiff believes his attorneys should be compensated at the rates of attorneys practicing in the Southern District of New York, which are higher hourly rates than those found in the Eastern District. Defendants, in their initial Memorandum of Law in Opposition to Plaintiff's Motion for Attorneys' Fees did not oppose plaintiff's request for attorney compensation at Southern District rates. However, after the Second Circuit's decision in *Arbor Hill* FN15 was issued, defendants submitted a supplemental brief arguing that plaintiff's attorneys should be compensated at the prevailing rates in the Eastern District of New York.

> FN15. On April 30, 2007, I issued an order directing the parties to submit supplemental papers on the impact, if any, of the decision in *Arbor Hill* on the motion for fees in this case.

The reasonable rate used to determine the amount of attorneys' fees to award in the Second Circuit is calculated according to the prevailing rates in the district in which the court sits. *Polk v. N.Y. State Dep't of Corr. Servs.,* 722 F.2d 23, 25 (2d Cir.1983). The Second Circuit recently elaborated on this point in *Arbor Hill,* saying, "the district court should generally use the prevailing hourly rate in the district where it sits to calculate the 'lodestar' ... [however] the district court may adjust this base hourly rate to account for a plaintiff's reasonable decision to retain out-of-district counsel," and may also adjust the base hourly rate for other case-specific factors FN16. *Arbor Hill,* 493 F.3d at 112. The district court, who is responsible for setting the base hourly rate, should also look at, "what a reasonable, paying client

would be willing to pay," to have the case litigated efficiently when "deciding whether to use an out-of-district hourly rate in its fee calculation." *See, generally,* 493 F.3d 110. The *Arbor Hill* decision noted that a client who can recover attorney fees through a fee shifting statute does not have much incentive to negotiate rates with his attorney before litigation. *Id.* Therefore, "the district court must act later to ensure that the attorney does not recoup fees that the market would not otherwise bear." *Id.*

> FN16. These factors include, "the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively ..., the timing demands of the case, whether the attorney had an interest ... in achieving the ends of the litigation or initiated the representation himself, whether the attorney was initially acting *pro bono,* and other returns ... the attorney expected from the representation." *Arbor Hill,* 493 F.3d 110, 2007 WL 2004106 at *1.

*4 A reasonable, paying client would presumptively hire a firm located near the courthouse in which the litigation is to take place and one which has a high rate of success with similar cases. Indeed, plaintiff had, in this case, researched consumer protection law firms in the New York City area on the Internet. He chose Sadis and Goldberg, which is located in the Southern District of New York, based primarily on the firm's rate of success posted on the firm's web site regarding consumer awards in previous cases. (Diaz Affirmation in Further Support.) Defendants have pointed to no firm located in this district with an equal or better rate of success FN17. Hiring an attorney located near the courthouse in which the litigation is to take place minimizes expenses incurred as a result of an attorney's travel time. The principal courthouses for the Southern and Eastern Districts of New York are minutes away from each other, on either side of the East River. Travel time between the Southern and Eastern Districts is minimal. Here, it is safe to say that a reasonable paying client would, like Diaz, hire the firm even though it is located in the Southern District of New York, based on its experience, success rate and proximity to the courthouse in which the litigation would take place. Accordingly, I will apply the usual billing rates of attorneys located in the Southern District.

> FN17. Allen J. Charne, the executive director of the New York City Bar Association's Legal Referral Service ("LRS") stated that his organization refers all complaints related to automobile sales

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2903920 (E.D.N.Y.)
**(Cite as: 2007 WL 2903920 (E.D.N.Y.))**

issues to Sadis and Goldberg. The LRS was unable to find any other qualified attorneys in the boroughs of Queens, Brooklyn or the Bronx to handle consumer protection cases related to automobile sales. (Charne Aff., June 21, 2005.)

*Attorney and Staff Hourly Rates*

In order to set the hourly rates, courts compare the attorneys' usual billing rates with the prevailing market rates in the applicable district. *Miele v. New York State Teamsters Conference Pensions & Retirement Fund,* 831 F.2d 407 (2d Cir.1987). The hourly rates charged by each attorney and paralegal in this case comport with the rate charged generally in the Southern District, by lawyers with comparable experience.

In the Southern District, awarded rates range from $250 per hour for mid-level associates to over $400 per hour for senior partners. *See e.g., M.S. v. New York City Board of Education,* 2002 WL 31556385 (S.D.N.Y.2002) (8th year associates billed from $310-$375 per hour); *Anderson v. City of New York,* 132 F.Supp.2d 239 (S.D.N.Y.2001) ($250 per hour for a mid-level associate). In addition, paralegal time is reasonably compensated at an hourly rate over $120 in the Southern District. *See e.g., Yurman Designs Inc. v. PAJ, Inc.,* 125 F.Supp.2d 54 (S.D.N.Y.2000) (awarding a paralegal rate of $162.35 per hour); and *Berlinsky v. Alcatel Alsthom Compagnie Generale D'Electricite,* 970 F.Supp. 348 (finding a paralegal hour fee of $150 reasonable).

Five attorneys and two paralegals at Sadis and Goldberg worked on this case. Attorney Douglas R. Hirsch is a partner and head of the litigation department. He has been practicing law since 1990. His hourly rate for litigation ranges from $375 to $450, and billed in this case at a rate of $375 per hour. Attorney Dennis R. Hirsch is a ninth year associate at Sadis & Goldberg. His hourly rate is $305. Attorney Francis Bigelow is a sixth year associate and billed in this case at $245 per hour. Attorney David Kasell graduated from law school in 1995 and worked for a law firm for one year before working as a financial consultant. He joined Sadis & Goldberg in 2006. His hourly rate is $305. Attorney Mitchell Taras is a tenth year associate with five years of experience in automobile and automobile financing litigation. His hourly rate is $375. Paralegals Pat Green and Michael Crespo both have over seven years of experience and are billed at an hourly rate of $120.

**\*5** Since these billing rates are in line with the prevailing market rates, fees will be awarded at the following hourly rates:

| Name | Requested / Awarded Rate |
| --- | --- |
| Douglas R. Hirsch | $375 |
| Dennis Hirsch | $305 |
| Mitchell B. Taras | $305 |
| David Kasell | $305 |
| Francis Bigelow | $245 |
| Michael Crespo | $120 |
| Pat Heaney | $120 |

*Compensation for Time Spent on Unsuccessful Causes of Action*

Plaintiff contends that he should recover fees and costs for all the claims in this action, even on claims he lost and on claims which were voluntarily dismissed. Defendants argue that plaintiff is not entitled to attorney fees for time spent on unsuccessful claims and also request a reduction in the lodestar amount because plaintiff achieved only a limited success.

"Although there is a 'strong presumption' that the lodestar figure represents the 'reasonable' fee, other considerations may lead to an upward or downward departure from the lodestar." *Grant v. Martinez,* 973 F.2d 96, 101 (2d Cir.1992) (internal quotation marks and citation omitted). "A prevailing party who is entitled to a fee award for his successful prosecution of successful claim is not entitled to a fee award for unsuccessful claims that were 'based on different facts and different legal theories.' " *Kirsch,* 148 F.3d at 173 (citing *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). In addition, the lodestar award may be adjusted on the basis of the results obtained, the "party advocating such a departure, however, bears the burden of establishing that an adjustment is necessary to the calculation of a reasonable fee." *Hensley,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2903920 (E.D.N.Y.)
**(Cite as: 2007 WL 2903920 (E.D.N.Y.))**

The Supreme Court, in *Hensley,* constructed a framework to help determine whether a plaintiff's partial or limited success requires a reduction in the lodestar amount. 461 U.S. at 434-37. A district court looks to see if the plaintiff failed on any claims wholly unrelated to the claims on which he succeeded. Hours spent on the wholly unrelated, unsuccessful claims should not be included in the lodestar amount. *Id.* at 434-35. Next, the district court looks at whether there were any unsuccessful claims that were interrelated to the successful claims. If such claims exist, the court has to decide whether the plaintiff's limited success warrants a reduction in the lodestar award. *Id.* at 436. If the plaintiff has obtained excellent results, there should be no reduction in the fee award. *Id.* at 435.

Plaintiff argues that he should recover fees and costs for all the claims in this action. In support of this position, plaintiff cites *Grant* as instructing courts to compensate counsel for "time spent on unsuccessful claims or motions, so long as the unsuccessful claims or motions are not 'wholly unrelated' to the prevailing claims." (Pl's Mem. of Law in Supp. of Pl's Mot. for an Award of Reasonable Att'y Fees, pg. 12 (citing *Grant,* 973 F.2d 96).) Plaintiff asserts that all his claims are related because they all stemmed from his purchase and finance of the subject vehicle.

**\*6** In order to determine whether claims are related, courts have looked at whether claims are based on a "common core of facts," "related legal theories," or "require essentially the same proof." *Kerin v. U.S. Postal Service,* 218 F.3d 185, 194 (2d Cir.2000). Here, the claims may be divided into three categories: financing, disclosure and warranty. Plaintiff prevailed on the TILA and N.Y. Veh. & Traf. Law § 417-a claims. In addition, he prevailed on the N.Y. Gen. Bus. Law § 349 claim to the extent that such claim was premised on violations of TILA and N.Y. Veh. & Traf. Law § 417-a. All these claims fall under the categories of financing and disclosure. Plaintiff was unsuccessful or voluntarily discontinued all of the warranty related claims.

*Equal Credit Opportunity Act Claims*
Plaintiff's Equal Credit Opportunity Act ("ECOA") claims share a common core of facts with the successful TILA claims and therefore, plaintiff can recover for the time his counsel spent developing those claims. The ECOA claim was based on the premise that Paragon failed to give plaintiff notice that Paragon obtained credit in a different amount and at different terms than Diaz requested for the purchase of the automobile. Mem. Op. and Order, 23, Mar. 29, 2006. The TILA claim was similarly based upon changes in the credit and finance agreement. Mem. Op. and Order, 18, Mar. 29, 2006. Therefore, I decline to remove time spent on the ECOA claims from the lodestar calculation.

*New York's Used Car Lemon Law and Magnuson-Moss Warranty Act Claims*
Plaintiff did not succeed on any of the warranty related claims, specifically claims based on New York's "Used Car Lemon Law," New York General Business Law § 198-b, and the Magnuson-Moss Warranty Act. Defendants contend that because these claims are not related to the successful claims, any time spent on these claims should be removed from the lodestar calculation. I agree. Where a plaintiff has only achieved partial or limited success, even where the claims were "interrelated, nonfrivolous, and raised in good faith," the number of hours spent on the litigation may be excessive. *Hensley,* 461 U.S. at 440. "Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit," rather a plaintiff is permitted to recover fees from the defendant in specific instances. *Id.* As a result, time spent on the New York General Business Law § 198-b and the Magnuson-Moss Warranty Act claims and their withdrawal will not be included in the lodestar calculation [FN18]

FN18. The following are the dates, employees, descriptions and amount of time that was spent on these unrelated claims:

| Date | Employee | Description | Hours |
|------|----------|-------------|-------|
| 2/03/05 | PH | T/c w/client-he needs copy of invoice for car repair from accident from the auto body shop, informed him I need to have the name and address of the shop if it does not appear on their invoice. He will fax it to me as soon as possible. | .1 |

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2903920 (E.D.N.Y.)
**(Cite as: 2007 WL 2903920 (E.D.N.Y.))**

| | | | |
|---|---|---|---|
| 2/15/05 | PH | Rec'd clt's invoice for car repair from accident, sent same w/letter to Bonnist (supplemental discovery) via reg. mail. | .3 |
| 5/25/05 | DH | Continued with drafting reply papers on SJ motion, completed arguments on ECOA claim, V & T 417-a claim, conf'd with DRH re wether to oppose warranty claims, likelihood or success at trial on these claims, etc. | 1.5 |
| | | *The number of deducted hours here is reduced from 3.1 to 1.5 because some of the tasks performed are appropriate for compensation, while others are not. Kirsch,* 148 F.3d at 173 (where hours are unnecessary, the court has discretion to deduct a reasonable portion of the hours claimed). | |
| 4/18/06 | DH | Conference with FB re whether we should dismiss all claims we did not succeed on and proceed towards inquest, discussed the need to obtain client's consent. | .3 |
| 6/06/06 | FB | Attention to letter from adversary C Bonnist; drafted stipulation withdrawing claims for revocation and breach of implied warranty. | .4 |
| 6/06/06 | PH | Faxed stipulation (of withdrawal) to Bonnist, rec'd confirmation. | .2 |

*Reduction based on Partial or Limited Success*

Defendants correctly state that the degree of success is an important consideration when awarding attorney fees. *See e.g., Parrish v. Sollecito,* 280 F.Supp.2d 145 (S.D.N.Y.2003); *Grant,* 973 F.2d at 101. Diaz filed eight claims against each defendant. He prevailed on three causes of action against Paragon Motors and on two [FN19] causes of action against Americredit [FN20]. The relief Diaz initially sought was greater than the relief he obtained after the trial. The warranty claims Diaz filed would have granted him revocation of acceptance and a refund of the full purchase price of the automobile had he prevailed on

those claims. N.Y. Gen. Bus. Law § 198-b; 15 U.S.C. § 2310. Diaz did not prevail on any of his warranty claims, those claims were either dismissed on summary judgment or voluntarily withdrawn by Diaz. (Mem. Op. and Order, 23, Mar. 29, 2006; Stipulation to Voluntarily Dismiss under Rule 41(a)(ii), June 7, 2006.) However, since I have already taken into account the fact that Diaz dismissed his claims brought under the warranty related causes of action above, by declining to award plaintiff's attorneys any compensation for the time spent on warranty related claims, I see no need to reduce the fee award further on this basis.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2903920 (E.D.N.Y.)
**(Cite as: 2007 WL 2903920 (E.D.N.Y.))**

FN19. *See* footnote 8, *supra.*

FN20. Defendants make no distinction between their respective positions with respect to this motion. Accordingly, any claim by defendant Americredit that its liability for fees and disbursements should be less that the co-defendants' because of plaintiff's failure to prevail against defendant Americredit is not taken into account in the Court's award of fees and disbursements.

**\*7** There remains the question whether plaintiff achieved only partial success on the claims in which he prevailed. It is true that plaintiff made no recovery on his claim under N.Y. Gen. Bus. Law § 349. However, that is only because an award of damages on that claim would have duplicated his recovery under TILA and N.Y. Veh. & Traf. Law § 417-a, which can hardly be called limited success. On the claims in which he prevailed, he recovered all that he was entitled to. Accordingly, I will not further reduce plaintiff's award for only partial success on the claim on which he prevailed.

*Proportionality*

The attorney's fee award is substantially greater than the damages award. The Second Circuit has rejected a rule requiring strict proportionality between the fee award and the damages award at least in the context of civil rights statutes. *Cowan v. Prudential Ins. Co. of America,* 935 F.2d 522 (2d Cir.1991). The court in *Cowan* stated that "a presumptively correct lodestar figure should not be reduced simply because a plaintiff recovered a low damage award". *Id.* at 526.FN21

FN21. The Second Circuit has recently reaffirmed its decision in *Cowan* that proportionality of the fee award to the damages award cannot serve as the sole factor for awarding fees in civil rights cases. *See Kassim v. City of Schenectady,* 415 F.3d 246, 252 (2d Cir.2005) ("If the district court reduced the fee in the belief that the claimed hours were simply disproportionate in a case involving a $2500 injury, without regard to the reasonableness of the attorney's expenditure of time in responding to the particular circumstances, this was error."); *see also Quaratino v. Tiffany & Co.,* 166 F.3d 422, 425-26 (2d Cir.1999). "Congress enacted fee-shifting in civil rights litigation precisely because the expected monetary recovery in many cases was too small to attract effective legal

representation." *Id.* at 426 (citing *Rivera,* 477 U.S. at 575 (plurality opinion) ("Congress did not intend for fees in civil rights cases ... to depend on obtaining substantial monetary relief.")).

The same rationale applies to awards of attorney's fees under the fee shifting provisions of TILA. Since recoveries under TILA are typically small, limited to the statutory damages provided in 15 U.S .C. § 1640(a) due to the difficulty in proving actual damages, a proportionate fee award would often be insufficient to attract competent counsel.

TILA's attorney's fees provision, 15 U.S.C. § 1640(a)(3), seeks to vindicate Congress' intent by "creat[ing] a system of 'private attorney generals' to aid in effective enforcement of the substantive statute." *Nigh v. Koons Buick Pontiac GMC, Inc.,* 384 F.Supp.2d 915, 919 (E.D.Va.2005) (quoting *de Jesus v. Banco Popular de Puerto Rico,* 918 F.2d 232, 233 (1st Cir.1990)), aff'd in part and vacated in part, 458 F.3d 183 (4th Cir.2007); *see also New Century Mortgage Corp. v. Payton,* 2004 WL 524693, at *1 (N.D.Ill. March 11, 2004) ("In enacting the Truth in Lending Act, Congress contemplated that the statute would be enforced by private litigants acting as private attorneys general") (internal quotation marks and citations omitted). *See Purtle v. Eldridge Auto Sales, Inc.,* 91 F.3d 797, 802 (6th Cir.1996) (Under TILA "[t]he attorney's fees are not limited by the amount of [plaintiff's] recovery"), *cert. denied,* 520 U.S. 1252, 117 S.Ct. 2411, 138 L.Ed.2d 177 (1997). After the Supreme Court's remand in *Nigh,* the district court awarded fees for the initial trial proceedings in the amount of $29,129.10, having reduced the requested amount by forty percent because of plaintiff's lack of success on his other claims. In awarding this amount, the Court cited *Purtle* for the proposition that "recovery of attorney's fees under the TILA are not limited by the amount of the recovery." *Nigh,* 384 F.Supp.2d at 924. This award was appealed to the Fourth Circuit. 478 F.3d 183 (4th Cir.2007). Upon review, the Fourth Circuit, due to its uncertainty of whether the district court meant to award $26,129.10 or $29,129.10, vacated the award and remanded the case to the district court simply to have the district court recalculate the trial fee award. *Id.* at 190. However, the Fourth Circuit noted that "We would have no trouble approving either the $26,129.10 or the $29,129.10 award-both seem reasonable under the circumstances, and we upheld $26,129.10 once already ..." *Id.* at 188.

**\*8** Nor are attorney's fees awarded under N.Y. Gen. Bus. Law § 349 and N.Y. Veh. & Traf. Law § 417-a re-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2903920 (E.D.N.Y.)
**(Cite as: 2007 WL 2903920 (E.D.N.Y.))**

quired to be proportional.[FN22] *See Wilson v. Car Land Diagnostics*, 2001 WL 1491280, at *2 (S.D.N.Y. Nov.26, 2001) (awarding $10,000 in attorney's fees under § 349, plaintiff's only successful claim, although damages were only $2,000, noting "[a]n award of attorney's fees that is substantially larger than the verdict may be unusual, but in this case it is certainly not excessive"). As Judge Lynch further noted in *Wilson*, "the amount in controversy in [consumer protection] suits will often be small" and the fee must be sufficient to attract competent counsel. *Id.* at *3.

> **FN22.** Defendants cite to *Loza v. F & D Garet Motors, Inc.*, No. 26542/02, 2007 N.Y. Misc. LEXIS 328 (N.Y.Sup.Ct. Jan. 16, 2007), for the proposition that the award of plaintiff's attorney's fees should be significantly reduced from the request. *Loza* is a case that Sadis & Goldberg, plaintiff's counsel, argued before Queens Supreme Court. Sadis & Goldberg's client in *Loza* brought claims for violation of the Magnuson Moss Warranty Act and N.Y. Gen. Bus. Law § 349. Despite counsel's success, the Queens Supreme Court reduced counsel's fee and disbursement request from $50,861.89 to $7,500.00 for fees and $201.89 for disbursements. The court offered no explanation for this reduction, other than mentioning that the fees sought were significantly higher than the damages awarded to plaintiff. The decision appears to conflict with those in other New York cases considering results achieved as only one factor among others to be considered in a fee award. *See, Riordin v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 54 (2d Cir.1992); *Podhorecki v. Lauer's Furniture Stores, Inc.*, 201 A.D.2d 947, 607 N.Y.S.2d 818 (4th Dep't 1994) ("There is no bright [ ] line rule that a fee award [pursuant to New York General Business Law § 396] ... must be proportional to the amount at issue ... it is not sufficient to state that the fee must be reduced because the court cannot, 'in good conscience,' award what plaintiffs request") (internal citations omitted).

Applying this law to the facts of this case, I conclude that a further reduction in the attorney's fees because of the relation of the award to the fees sought is not appropriate. Applying the *Arbor Hill* factors, 495 F.3d at 112, the case required familiarity with an area of law with which few trial attorneys are acquainted, and in which plaintiff's attorneys have developed some expertise. The somewhat

complicated negotiations leading to the purchase of the vehicle presented a measure of factual complexity. The case required the resources of an expert to establish the reduction of value in the car because of its prior use as a rental vehicle. Since the client's recovery was not large, the lawyer's success cannot be expected to attract other clients. In sum, an award below the approximately $65,000 approved by this decision would substantially reduce an already low measure of interest by members of the bar in handling cases such as this.

*Pre-Litigation Fees*

Plaintiff filed his complaint with this Court on December 29, 2003. Plaintiff's motion for an award of fees requests compensation for work done on this matter prior to filing the complaint, dating back to June 26, 2003. Defendants oppose any award of fees for work prior to the date the complaint was filed. In *Peterson v. Continental Casualty Co.*, parsing another fee-shifting statute, 29 U.S.C. § 1132(g)(1), the Court of Appeals discussed whether Congress intended the term 'action' to limit recovery for work performed by an attorney after the filing of a complaint. 282 F.3d 112, 119 (2d Cir.2002). It determined that absent statutory language to the contrary, "the term 'action' [is] restricted to formal judicial proceedings ... and connotes a formal adversarial proceeding under the jurisdiction of a court of law." *Id.* Accordingly, pre-filing work was not recoverable.

The statutes at issue here likewise appear to refer to the recovery of fees for work performed in an "action." N.Y. Veh. & Traf. Law § 417-a; 15 U.S.C. § 1640(e) ("[a]ny action under this section may be brought in any United States District Court, or any other court of competent jurisdiction ..."); N.Y. Gen. Bus. Law § 349 ("any person who has been injured by reason of any violation of this section may bring an action ... the court may award reasonable attorneys fees ..."). The "statutory scheme" of each statute "provides support for a construction of the fee-shifting provision limited to actions under the jurisdiction of a court of law." *Peterson*, 282 F.3d at 120. Accordingly, I decline to award any fees which were incurred prior to December 29, 2003, the date this action was commenced.[FN23]

> **FN23.** This results in a deduction of 2.3 hours of paralegal work and 16.6 hours of attorney work from the following people:

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2903920 (E.D.N.Y.)
**(Cite as: 2007 WL 2903920 (E.D.N.Y.))**

| Employee | Hours Deducted |
|---|---|
| Douglas R. Hirsch (attorney) | 4.7 |
| Dennis Hirsch (attorney) | .5 |
| Mitchell B. Taras (attorney) | 11.4 |
| Michael Crespo (paralegal) | 2.3 |

*Paralegal and Clerical Duties*

**\*9** The defendants next object to any award of attorney or paralegal fees for the time spent preforming clerical work such as making photocopies, faxing documents and mailing documents. Such work may not be billed at attorney or paralegal rates. *Missouri v. Jenkins,* 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989). Plaintiff argues that the court in *Bristol Investment Fund, Inc. v. Carnegie International Corp.,* appears to award fees compensating attorneys and paralegals for the performance of clerical tasks at their customary rates. 302 F.Supp.2d 177 (S.D.N.Y. Dec.2, 2003). What the court *Bristol* said was that, "... the invoices include various disbursements that were associated with the tasks Bristol's attorneys undertook in this action, including messenger, fax, express mail, copying and filing fees, among other things. These fees [sic] appear to be both typical and reasonable." *Id* at 179(emphasis added). While the use of the terms "fees" to refer to what was initially described as "disbursements" is confusing, in context it is clear that time spent on the tasks of photocopying, faxing, mailing, and filing are all clerical in nature and cannot be billed at either attorney or paralegal rates whether performed by an attorney, paralegal or clerk.

Below is a list of the dates [FN24], employees, descriptions and hours expended on clerical tasks appropriately excluded from the award of fees or disbursements.

FN24. Since I have excluded all tasks prior to the filing of the complaint from the calculation, this table only includes dates and tasks dated on or after December 29, 2003.

| Date | Paralegal | Description | Hours |
|---|---|---|---|
| 12/31/03 | MC | Copied complaint, prepared cover letter, federal express package for service on Secretary of State. | .9 |
| 1/05/04 | MC | Prepared checks, cover letter and FedEx to serve complaints on Secretary of State. | .4 |
| 1/14/04 | MC | Copied and sent original affidavit of service with copy to court for filing with SASE and cover letter. | .3 |
| 5/18/04 | MC | Letter to opp. counsel with settlement demand copied and sent out, document requests for dealer also copied and sent out. | .5 |
| 10/04/04 | MC | Copy of Cherin order sent to Bonnist. | .2 |
| 10/19/04 | MC | Faxed letter to Judge to Craig Bonnist, original sent FedEx to Judge. | .4 |
| 10/29/04 | MC | Copied and organized deposition exhibits, sent plaintiff's | .9 |

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2903920 (E.D.N.Y.)
**(Cite as: 2007 WL 2903920 (E.D.N.Y.))**

| | | | |
|---|---|---|---|
| | | exhibits to opp. counsel. | |
| 11/17/04 | MC | Copied file document, prepared FedEx for expert. | .6 |
| 11/19/04 | MC | EBT to client and opp. counsel. | .7 |
| 11/29/04 | MC | Fax of deposition transcript to David Stivers. | .2 |
| 12/21/04 | PH | Copies of EBT transcripts. | .3 |
| 4/12/05 | MC | Copied, collated motion for summary judgment and memorandum of law (velo binding for memo), prepared exhibits, original for court, copy for file. All above sent out and filed accordingly. | 4.8 |
| 4/13/05 | MC | Copied, collated motion for summary judgment and memorandum of law (velo binding for memo), prepared exhibits, original for court, copy for file, prepared envelope, monarch label for copy sent to opp. counsel, prepared filing slip for court copy, also prepared blue backs, affirmation of mailing. All above sent out and filed accordingly. | 1.6 |
| 4/21/05 | MC | Prepared Redweld and filed away summary judgment materials. | .3 |
| 6/01/06 | MC | FedEx prepared for judge and for opp. counsel. | .5 |
| 6/06/06 | PH | Faxed stipulation to Bonnist, rec'd. | .2 |
| 7/31/06 | PH | Tracked FedEx pkg. sent to opp re: trial exhibits for opp. review. Online FedEx confirmed rec'd, print out of confirmation rec'd. Entered into Redweld. | .2 |
| 8/09/06 | MC | Joint exhibits separated, collated, copied, with exhibit tabs. Federal [express]. | 1.8 |
| 8/17/06 | MC | Federal express envelopes prepared for Judge Sifton and opposing counsel for memorandum of law. Memo copied, collated, sent to same for next day delivery. | .4 |

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2903920 (E.D.N.Y.)
(Cite as: 2007 WL 2903920 (E.D.N.Y.))

| Date | Attorney | Description | Hours |
|------|----------|-------------|-------|
| 9/18/06 | PH | MC confirmed that SavOn confirmed fax receipt of sub-poena sent Thurs. | .2 |
| 10/12/06 | PH | Delivered FedEx pkgs for FB to FedEx office. | .3 |
| 10/25/06 | MC | Faxed letters to Judge from file. | .2 |
| **Total** | | | **15.9**[25] |

FN25. This results in a deduction of 15.9 hours of paralegal work from the following people:

| Employee | Hours Deducted |
|----------|----------------|
| Pat Heaney | 1.1 |
| Michael Crespo | 14.8 |

**\*10** (Pl.'s Ex. of Time Entries in Affirmation of Mot. for Att'y Fees, Feb. 9, 2007).

The following two entries describe both non-compensable clerical tasks (such as "fedex'd reply brief") and paralegal tasks (such as "attempting to ECF with court", which are not clerical tasks, at least at this stage of IT sophistication). These entries will be included in the award at the paralegal's hourly rate. Each of these tasks did not take up much of the paralegal's time, and, were best performed by a single individual. *Marisol A. ex rel. Forbes v. Guliani,* 111 F.Supp.2d 381, 395 (S.D.N.Y. Aug.30, 2000).

| Date | Attorney | Description | Hours |
|------|----------|-------------|-------|
| 10/17/06 | PH | PDF'd post-trial reply brief and reply brief letter. Attempting to ECF with court. ECF'd and fedex'd reply brief to Judge. | .4 |
| 6/02/05 | PH | PDF plaintiff's reply memo of law in support of motion for summary judgment and in opposition to defendant's cross-motion.

Electronically filed, served copy on opposition and judge (courtesy copy) via FedEx. | 1.0 |

The following tasks, were performed by an attorney but could have been performed by a paralegal, and there-fore, will be billed at a paralegal's hourly rate.

| Date | Attorney | Description | Hours |
|------|----------|-------------|-------|
| 4/14/05 | DH | Attention to voicemail from opp counsel who is apparently missing a page of the state-ment of facts, confirmed what was missing via telephone and emailed pdf version of docu- | .2 |

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2903920 (E.D.N.Y.)
**(Cite as: 2007 WL 2903920 (E.D.N.Y.))**

| Date | Attorney | Description | Hours |
|---|---|---|---|
| | | ment over. | |
| 4/15/05 | DH | Telephone conference with Judge's law clerk confirming receipt of courtesy copies of the motion papers and clarifying the issues relating to ECFing the exhibit package. | .2 |
| 4/21/06 | FB | Checked court's website for SJ order entered by clerk, not on site yet. | .2 |
| 12/12/06 | FB | Checked court's website for decision, no decision. | .1 |
| 12/20/06 | FB | Checked court's website for decision, not issued yet. | .1 |
| **Total** | | | **.8**[26] |

FN26. This results in a deduction of .8 hours of attorney work from the following people, and instead billed at the hourly paralegal rate:

| Employee | Hours Deducted |
|---|---|
| Dennis Hirsch | .4 |
| Francis Bigelow | .4 |

(Pl.'s Ex. of Time Entries in Affirmation of Mot. for Att'y Fees, Feb. 9, 2007).

The following two entries again describe both compensable and non-compensable tasks that an attorney performed. These entries will be included in the award at the attorney's hourly rate. "It would be unreasonable to expect attorneys to delegate every ministerial duty they perform because, '[t]he time spent delegating the task could well exceed the time spent by the attorney' performing the task." *Marisol A. at* 395 (S.D.N.Y. Aug. 30, 2000) (internal citation omitted).

| Date | Attorney | Description | Hours |
|---|---|---|---|
| 10/25/05 | FB | Attention to ECF re request for adjournment; gave letter requesting same to PG to file via ECF; call to Judge Levy's chambers re request; attention to order from court to call adversary C. Bonnist re same; faxed copy of court's order to Bonnist. | .3 |
| 8/17/06 | FB | Finalized reply trial brief; reviewed FedEx packages for mailing same; call from adversary M. Shilinski re stip as to facts for trial. | .3 |

**\*11** (Pl.'s Ex. of Time Entries in Affirmation of Mot. for Att'y Fees, Feb. 9, 2007).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2903920 (E.D.N.Y.)
**(Cite as: 2007 WL 2903920 (E.D.N.Y.))**

*Total Fees Awarded*

In sum, applying the aforementioned Eastern District of New York rates and deducting hours for which plaintiff is not entitled to compensation, I award the plaintiff's attorneys $ 64,236.50 in attorney fees.

| Employee | Rate | Hours | Total ($) |
|---|---|---|---|
| Douglas R. Hirsch | $375 | 8.6 | 3,225.00 |
| Dennis Hirsch | $305 | 123.9 | 37,789.50 |
| Mitchell B. Taras | $305 | 2.7 | 823.50 |
| David Kasell | $305 | 13.1 | 3,995.50 |
| Francis Bigelow | $245 | 66.2 | 16,219.00 |
| Michael Crespo | $120 | 1.4 | 168.00 |
| Pat Heaney | $120 | 16 | 1,920.00 |
| Attorney Performed Paralegal Work | $120 | 0.8 | 96.00 |
| **Total** | | | **$64,236.50** |

*Disbursements*

*Expert Witness Fees*

Defendants argues that the $10,837.00 expert witness fee of David Stivers is not recoverable above a $40.00 daily witness fee provided by 28 U.S.C.A. § 1821 and § 1920. Defendants states that the statutes in this case do no explicitly provide for recovery of expert witness fees, as allowed by other statutes. *See e.g.,* 42 U.S.C.A. § 2000e-5.

Plaintiff argues that expert witness fees are recoverable because to hold otherwise would deny a consumer the necessary protection. *Murphy v. Arlington Central Dist. Board of Ed.,* 402 F.3d 332 (2d Cir.2005) (allowing an award of expert witness fees under IDEA statute). However, the decision in the cited case was overturned by the Supreme Court, *Murphy v. Arlington Central School Dist. Board of Ed.,* --- U.S. ----, 126 S.Ct. 2455, 165 L.Ed.2d 526 (2006). The Supreme Court held that the list of recoverable costs was the list enumerated by 28 U.S.C. § 1920. *Id.* The statutes in question in this case also make no explicit allowance for recovery of expert witness fees. Accordingly the witness fees of the expert in this case, the expert fees are taxable at $40.00 per day attendance fee as set forth in 28 U.S.C.A. § 1821.

*Federal Express Fees*

Defendants' final request is a fee reduction in the amount of $473.81 for Federal Express fees. Defendants argue that such fees are not taxable as costs of litigation because they, too, are not listed in 28 U.S.C. § 1920.

However, costs are ordinarily recoverable if they are "incidental and necessary to the litigation ." *Tips Exports, Inc., v. Music Mahal, Inc., 2007 WL 952036 (E.D.N.Y. Mar.27, 2007).* These costs include postage. *Id.* Accordingly, the Federal Express fees in the amount of $473.81 are appropriately included in the award.

*Total Disbursements Awarded*

Plaintiff requests an award of $13,914.02 in disbursements. Taking into account only $40.00 for the expert witness, the Federal Express fees and other requested costs, plaintiff is awarded $3,117.02.

**CONCLUSION**

For the reasons set forth above, the plaintiff is entitled to attorneys fees and disbursements in the total amount of $67,353.52, jointly and severally against both defendants. The Clerk is directed to transmit a copy of the within to all parties and to Magistrate Judge Levy.

**\*12** SO ORDERED.

E.D.N.Y.,2007.
Diaz v. Paragon Motors of Woodside, Inc.
Not Reported in F.Supp.2d, 2007 WL 2903920 (E.D.N.Y.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.